No. 25-5157

———————————————————————————

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————————————

NATIONAL TREASURY EMPLOYEES UNION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

———————————————————————————

On appeal from the United States District Court
for the District of Columbia

———————————————————————————

## APPELLEE'S RESPONSE TO APPELLANTS' MOTION FOR A STAY PENDING APPEAL

———————————————————————————

JULIE M. WILSON
General Counsel

PARAS N. SHAH
Deputy General Counsel

ALLISON C. GILES
Assistant Counsel

JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W.,
Suite 1000
Washington, D.C.  20001
(202) 572-5500

# <u>TABLE OF CONTENTS</u>

INTRODUCTION.........................................................................................1

BACKGROUND ........................................................................................3

   I.   Congress's Broad Grant of Collective-Bargaining Rights to
       Federal Workers.....................................................................3

   II.  The President's Sweeping Executive Order Cancelling Statutory
       Collective-Bargaining Rights Through the Narrow National-
       Security Exemption...............................................................5

   III. The Administration's Admitted Motivations Behind the
       Executive Order ...................................................................7

ARGUMENT .............................................................................................9

   I.   This Court Should Require the Government to Adhere to Circuit
       Rule 8 and Deny Its Motion. ...............................................9

   II.  The Equitable Factors Strongly Warrant Denying the
       Government's Motion. ........................................................10

     A.   A Stay Pending Appeal Would Irreparably Harm NTEU.......11

     B.   Maintaining Collective Bargaining Would Not Irreparably
        Harm the Government. .......................................................13

     C.   A Stay Pending Appeal Would Harm the Public....................15

   III. The District Court Correctly Concluded that NTEU Will Likely
       Succeed on the Merits. .......................................................15

     A.   Judicial Review and the Presumption of Regularity...............15

     B.   The Validity of NTEU's Ultra Vires Claims...........................18

     C.   Subject-Matter Jurisdiction ....................................................24

CONCLUSION ........................................................................................28

**INTRODUCTION**

Appellee National Treasury Employees Union (NTEU) respectfully submits this opposition to the government's motion for a stay pending appeal. That motion aims to stay the district court's preliminary injunction of Executive Order No. 14,251, *Exclusions from Labor-Management Relations Program* (the Executive Order), Section 2, as it applies to twelve NTEU-represented federal agencies that the Order exempts from the Federal Service Labor-Management Relations Statute of 1978 (the Statute) in whole or in part.[1]

1.    The government's request to this Court, if granted, would inflict the irreparable harm that the district court's preliminary

---

[1] Eleven agencies are exempted *entirely*: the Internal Revenue Service (IRS), IRS Office of Chief Counsel, Federal Communications Commission (FCC), Department of Energy (DOE), Bureau of Fiscal Service (BFS), Environmental Protection Agency (EPA), Treasury's Departmental Offices, Office of the Comptroller of the Currency (OCC), Alcohol and Tobacco Tax and Trade Bureau (TTB), Bureau of Land Management (BLM), and the Department of Justice (DOJ). Addendum (A) A03 ¶6. NTEU represents five *components* of Health and Human Services (HHS) that the Executive Order exempts, while other NTEU-represented parts of HHS remain within the Statute's coverage. *Id.*

The government mistakenly discusses the Departments of Defense and State in its motion, but those agencies are not involved in this litigation. *See* Defendants' Motion for Stay (Mtn.) at 20-21.

injunction seeks to prevent: the end of NTEU. The Executive Order strips collective-bargaining rights from about two-thirds of the nearly 160,000 federal workers whom NTEU represents. It has cut off over half of NTEU's revenue stream, threatening the union's very existence. And it has eviscerated NTEU's ability to collectively bargain for its workers with the agency defendants here, at a time when federal employees are facing unprecedented attacks.

**2.** On the merits, the district court correctly concluded that the Executive Order's sweeping use of a narrow national-security exemption to undo the bulk of the Statute's coverage contravenes the Statute where the exemptions were driven by extra-statutory motivations. Those motivations, the White House Fact Sheet on the Executive Order makes clear, included exacting political retribution against "hostile" federal-sector unions that challenge the President's agenda and making federal workers easier to fire.

The government asks this Court to conclude—in quick-fire motions briefing—that Congress intended the President to have the ability to destroy the Statute without judicial review. But Congress intended to create a statutory collective-bargaining system that could

not be altered in a material way by the President and that strengthened federal-sector unions. The government argues, nonetheless, that Congress provided for unchecked Executive discretion to dismantle that system, including as a way to punish union dissent.

## BACKGROUND

### I. Congress's Broad Grant of Collective-Bargaining Rights to Federal Workers

"In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the Executive Order regime." *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 107 (1983).

As a centerpiece of its federal civil-service reform and as Title VII of the Act, Congress thus enacted the Statute, 5 U.S.C. § 7101 *et seq*. Congress intended the Statute to replace the existing Executive-Order regime governing federal labor relations with a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement

of Rep. Clay).[2]

The Statute rests on Congress's explicit finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest." 5 U.S.C. § 7101(a). And through the Statute, Congress assigned federal-sector labor organizations the job of "act[ing] for" and "negotiat[ing] collective-bargaining agreements covering" not only their members, but all employees in the bargaining units that they were elected to represent. *Id.* § 7114(a).

Congress excluded some agencies or offices within agencies from the Statute, such as the Federal Bureau of Investigation. *Id.* § 7103(a)(3). The Statute gives the President narrow grounds to exclude additional agencies if he determines that an agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work," *and* the Statute cannot be applied "in a manner consistent with national security requirements and considerations." *Id.*

---

[2] This Court has relied on the statements of "major players in the legislation, such as Representative Clay." *OPM v. FLRA*, 864 F.2d 165, 169 (D.C. Cir. 1988).

§ 7103(b)(1).

Presidents have used this narrow authority to exempt discrete offices within agencies that clearly perform primarily national-security or intelligence work. *See, e.g.*, Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 19, 1979) (exempting Treasury's Office of Intelligence Support); Exec. Order No. 12,559, 51 Fed. Reg. 18,761 (May 20, 1986) (exempting Drug Enforcement Administration's Office of Intelligence).

## II. The President's Sweeping Executive Order Cancelling Statutory Collective-Bargaining Rights Through the Narrow National-Security Exemption

Before the Executive Order at issue, no president had ever attempted to use Section 7103(b)(1)'s narrow national-security exemption to exclude an entire Cabinet-level agency from the Statute— let alone multiple Cabinet-level agencies. This Executive Order, though, strips collecting-bargaining rights from "roughly 67 percent of the entire federal workforce and for 75 percent of workers who are already in a union."[3]

---

[3] Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico (Mar. 28, 2025, 11:04 AM), www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010.

The Office of Personnel Management (OPM) explained that excluded agencies "are no longer subject to the collective bargaining requirements of chapter 71" and that the unions representing bargaining-unit employees at those agencies have "los[t] their status" as the exclusive representative for those employees.[4] Thus, the OPM Guidance discusses the "terminat[ion of] CBAs" at these agencies. *Id.* at 5.

NTEU represents nearly a dozen federal agencies that the Executive Order excludes from the Statute's coverage. *See* A03 ¶6. The Executive Order and OPM Guidance led to, as relevant here, twelve collective-bargaining agreements that NTEU bargained with those departments and agencies not being honored. A16-17 ¶¶58-59; A19-A24 ¶¶2-24. The Executive Order has caused NTEU to lose approximately two-thirds of the bargaining-unit employees that it represents. A04 ¶9. NTEU has represented several of the bargaining units that the

---

[4] *See* Charles Ezell, *Guidance on Executive Order* Exclusions from Federal Labor-Management Programs, OPM, Mar. 27, 2025, at 3, www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf (OPM Guidance).

Executive Order excludes from the Statute's coverage for decades and some since the Statute's inception. *See* A14 ¶¶46-57.

## III. The Administration's Admitted Motivations Behind the Executive Order

The Administration issued a Fact Sheet and OPM Guidance on the Executive Order on the same night that the Order issued.[5] Each discusses the Executive Order's impetus: facilitating mass firings of federal employees and exacting political vengeance.

**A.** The OPM Guidance acknowledges the larger context: the President's direction to agencies "to prepare large-scale reductions in force (RIFs)." OPM Guidance at 5. Now, with the Executive Order's issuance, OPM advises that agencies can "conduct RIFs . . . without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.* According to OPM, "[a]gency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation." *Id.*

---

[5] *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (Fact Sheet).

**B.**     The White House Fact Sheet reveals an additional motivation for the Executive Order: political retribution against "hostile Federal unions." The Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." *Id.*

NTEU is one of the "Federal unions" that has fought back against President's Trump's agenda. NTEU has filed lawsuits in federal district court against several Administration initiatives that it believes are unlawful. *See, e.g., NTEU v. Vought*, No. 25-cv-381 (D.D.C.); *NTEU v. Trump*, 25-cv-420 (D.D.C.).

The Executive Order targets about a dozen different collective-bargaining relationships that NTEU has with federal agencies and departments. A17 ¶59. That includes the largest and oldest bargaining unit that NTEU represents: the IRS. A05 ¶19; A09 ¶37; A14 ¶46. The morning after the Executive Order issued, the Administration preemptively sued an NTEU chapter seeking a declaratory judgment that the Department of Treasury may rely on the Executive Order to terminate the IRS's collective-bargaining agreement with NTEU. *See* Complaint, *Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49 (E.D. Ky. Mar. 28, 2025).

# ARGUMENT

A stay pending appeal is an "extraordinary" remedy. *CREW v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018). A stay applicant must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## I. This Court Should Require the Government to Adhere to Circuit Rule 8 and Deny Its Motion.

The government requested a stay pending appeal from the district court, but it did not wait for a decision from that court before filing its motion with this Court only *three hours later*. That fails to comply with Rule 8.

"A motion for stay must describe" the "outcome" of that district court request. *See D.C. Circuit Handbook of Practice and Internal Procedures* 33 (2024). That did not happen here. Neither did the government "attempt to notify the opposing side by telephone in

advance" or describe in its motion "the efforts made to so notify the opposing side" (of which there was none). Cir. R. 8(a)(2).[6]

The government's flouting of Rule 8 is a growing trend. Just recently, the government failed to file a motion for stay pending appeal with the district court before requesting a stay from this Court. *See* Mot. to Strike, *NTEU v. Vought*, No. 25-5091 (D.C. Cir. Mar. 31, 2025). It also, as it did here, moved for a stay pending appeal with the district court and this Court on the same day, without awaiting a ruling from the district court. *See* Mot.to Strike, *Widakuswara v. Lake*, Nos. 25-5144, 25-5145 (D.C. Cir. Apr. 25, 2025).

If Rule 8 means anything, the Court should deny the government's motion based on its multiple violations of the rule.

## II. The Equitable Factors Strongly Warrant Denying the Government's Motion.

"[T]he central purpose of preliminary relief—whether at the trial level or the appellate level—is to prevent irreparable injury, not to short-circuit the normal course of litigation. The equities thus loom

---

[6] The government likewise ignored the requirement that it confer with opposing counsel before requesting a stay in the district court. *See* D.D.C. R. 7(m).

large in this early posture." *J.G.G. v. Trump*, No. 25-5067, 2025 U.S. App. LEXIS 7131, at *36 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring).

## A. A Stay Pending Appeal Would Irreparably Harm NTEU.

The Executive Order has taken away over half of NTEU's revenue stream and about two-thirds of the workers that it represents. If this Court stays the emergency relief that the district court ordered based on the record before it, NTEU might not survive.

***First***, Defendants fail to acknowledge that a plaintiff can show irreparable harm where the loss threatens the plaintiff's very existence. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). NTEU has already lost over $3 million because the agency defendants here have stopped processing dues payments to NTEU through payroll deductions, as the Statute and their collective-bargaining agreements require. *See* A92-93 ¶4. If this continues, NTEU will lose *over half* of its annual revenue. A05 ¶17; *see also Wilmer Cutler Pickering Hale & Dorr LLP v. EOP*, No. 25-cv-917, 2025 U.S. Dist. LEXIS 61536, at *4–6 (D.D.C. Mar. 28, 2025) (finding loss of one-third of plaintiff's revenue was irreparable injury).

11

Financial losses of this magnitude threaten NTEU's very existence. A93 ¶5. The largest federal-sector union, AFGE, has announced it is laying off half its staff nationwide because of the effect of this Administration's actions on its finances. *Id*. ¶6. NTEU might be next if the district court's emergency relief is stayed. *Id.*

Defendants suggest NTEU can make up for dues that are lost by asking members to make voluntary contributions. Mtn. at 28. But Defendants have taken away the very apparatus—the payroll deduction system in 5 U.S.C. § 7115—on which NTEU relies for virtually all its dues payments. *See* A05 ¶15. And Defendants do not explain *why* NTEU members would pay dues if NTEU is no longer their exclusive representative and able to collectively bargain on their behalf.

***Second***, Defendants claim that any weakening of NTEU's bargaining power, which is an additional irreparable injury, is speculative. Mtn. at 27. But NTEU presented undisputed evidence to the district court showing that agencies targeted in the Executive Order stopped bargaining with NTEU on changes to conditions of employment; and stopped participating in the collectively bargained grievance-arbitration process. A22-24 ¶¶15-24. And NTEU members

are now cancelling their membership explicitly because of the Order.

A94 ("President Trump demolished the union several weeks ago . . . .

Please see the attached form, SF-1188 to end my participation in

NTEU.").

Courts have recognized that government action that

"fundamentally diminishe[s]" union bargaining power is an Article III

injury (*NTEU v. Chertoff*, 452 F.3d 839, 853 (D.C. Cir. 2006)) and that

an employer's refusal to bargain with a union is likely to cause

irreparable harm (*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180,

1191 (9th Cir. 2011)). Absent the district court's emergency relief, there

is a "very real danger" that NTEU's membership will continue to

"erode" and that any final remedy "would be ineffective." *See Asseo v.

Centro Medico Del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990).

## B. Maintaining Collective Bargaining Would Not Irreparably Harm the Government.

The district court's order does not irreparably harm the

government. It only maintains the longstanding status quo. For

example, there has been collective bargaining at the IRS for half a

century with no President ever suggesting (until a month ago) that it is

inconsistent with national security considerations.

The sole basis for the government's claim of harm is a generalized assertion that "to impede the government's ability to supervise the employees engaged in" national-security work "'would appreciably injure [the Nation's] interests.'" Mtn. at 27. The government does not explain why collective bargaining at the affected agencies, today, suddenly impedes the government's ability to supervise its employees or, more the point, affects national-security interests.

The government's unsupported argument should fail. The district court found "clear evidence" that the Executive Order's national-security exemptions were not motivated by national-security concerns, but instead by policy disagreements and a desire to retaliate against certain federal-sector unions. *See* Dkt. 34 (Op.) at 17-24. The government should not get emergency relief by simply using the words "national security," particularly in light of the district court's detailed factual findings. These findings must be accepted unless clearly erroneous. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

## C.     A Stay Pending Appeal Would Harm the Public.

As Congress stated on the face of the Statute, "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). Staying the district court's emergency relief would nullify the collective-bargaining rights of over one-hundred thousand NTEU-represented federal workers. *See* A04 ¶9. If Congress's words have meaning, that cannot be in the public interest.

## III.   The District Court Correctly Concluded that NTEU Will Likely Succeed on the Merits.

The government's path to success on the merits requires this Court to disregard the "clear evidence" (Op. at 18) reflected in the government's own statements and actions showing that political vengeance and policy objectives unrelated to national security prompted the Executive Order. And it requires this Court to conclude that there is no national-security exemption that the President could make—no matter how outlandish or pretextual—that would exceed his authority under the Statute.

## A.     Judicial Review and the Presumption of Regularity

Typical arguments against judicial review—a concern with probing presidential motivations or second-guessing national-security

decisions (*see* Mtn. at 19)—are inapplicable where the White House explicitly states the President's improper motivations for his national-security decisions. Consistent with this Court's precedent, the district court held that, in this unique circumstance, the White House's own words and actions defeated the presumption of regularity and allowed for judicial review of NTEU's ultra vires claims. Op. 17-24.

Here, the district court found "clear evidence that 'the President was indifferent to the purposes and requirements of the [Statute], or acted deliberately in contravention of them.'" Op. 18 (quoting *AFGE v. Reagan*, 870 F.2d 723, 728 (D.C. Cir. 1989)). Specifically, the district court made the following findings, among others. These factual findings must be accepted unless clearly erroneous. *See In re Navy Chaplaincy*, 697 F.3d at 1178.

- "The scope of the Executive Order – covering two-thirds of the federal workforce – and the Fact Sheet's characterization of unions and collective bargaining rights . . . as 'dangerous' stand in stark contrast to" Congress's findings in Section 7101(a)(1) of the Statute. Op. 19.

- The White House Fact Sheet's justifications for the Executive Order are "better understood as a disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a 'manner consistent with national security

requirements and considerations.'" Op. 20 (quoting 5 U.S.C. § 7103(b)(1)(B)).

- White House Fact Sheet's statements regarding "hostile Federal unions" "bear no relation to the criteria established by Congress in Section 7103(b)(1)." They instead "reflect President Trump's frustration with the unions' representational activity and exercise of their First Amendment rights . . . and the impact those activities have had on his policy directives." Op. 21.

- "[T]hese statements in the Fact Sheet appear to be in direct response to the number of lawsuits and grievances NTEU has filed against the Trump Administration in the last several months." *Id.*

- "[C]ertain inclusions and exclusions from the Executive Order reflect a preference for unions that have a 'constructive relationship' with the President. For example, the President's decision to allow 'police officers, security guards, [and] firefighters' to retain their collective bargaining rights, but to remove such rights from employees of the Federal Bureau of Prisons – whose employees are represented by a union that has been critical of the President and his Administration – suggests that the President's relationship with particular unions was a factor in determining which agencies and subdivisions were included in the Executive Order." *Id.* at 22.

- "The language used in the Fact Sheet coupled with the focus on 'constructive partnership[s] as opposed to 'mass obstruction' undercuts the presumption that the President considered and abided by the statutory language in Section 7103(b)(1)." *Id.* "Furthermore, it suggests a retaliatory motive to punish unions for the 'war' they have 'declared [] on President Trump's agenda." *Id.*

- There "is strong evidence that the President's invocation of Section 7103(b)(1) was to remove the barriers created by the

[Statute] to his unrelated policy objectives," i.e., "mak[ing] federal employees easier to fire." *Id*. at 23-24.

## B. The Validity of NTEU's Ultra Vires Claims

A common formulation of the ultra vires standard requires violation of a "clear and mandatory" statutory directive. *See Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). This standard encompasses more than the government lets on. *See* Mtn. at 12-13.

In *Chamber of Commerce v. Reich*, for example, this Court found an executive order ultra vires because it conflicted with the National Labor Relations Act, though not with a "statutory right or mandate . . . found in the statute in so many words." 74 F.3d 1322, 1330 (D.C. Cir. 1996). Rather, the executive order conflicted with an implied statutory right established in Supreme Court precedent. *Id.* at 1330, 1332. *Accord Univ. of D.C. Faculty Ass'n v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 619-22 (D.C. Cir. 1998) (finding an agency acted ultra vires not because it violated an explicit statutory mandate, but because it presumed it had power that was not expressly delegated).

More recently, this Court rejected an overly narrow interpretation of the "clear and mandatory" standard in *National Association of Postal Supervisors*, 26 F.4th at 971. The Court held that language in the Postal Act beginning with "[i]t shall be the policy of the Postal Service," despite affording broad discretion to the agency, "place[d] clear limits" on that discretion and formed the basis for an ultra vires claim. *Id.* at 970-71.

Similarly, Congress's findings in Section 7101(a) of the Statute that "labor organizations and collective bargaining in the civil service are in the public interest," and the criteria in Section 7103(b) on which the President must base his statutory exclusions, place the kinds of "clear limits" on the President's statutory authority that form the basis of ultra vires review. *Id.* at 971. And indeed, as the district court's fact findings show, the President exceeded these limits. The sheer scope of the exemptions (three-quarters of unionized workers); the President's heavy reliance on extra-statutory criteria (a desire for political retribution and an easier path to firing employees); and the lack of any credible arguments regarding the statutory criteria show that NTEU will likely prevail on its ultra vires claims.

None of the agencies relevant here (*see supra* n.1) plausibly satisfies Section 7103(b)(1)'s narrow criteria. Under Section 7103(b)(1), a President may exclude an agency or agency component from the Statute only if the agency has "as a primary function intelligence, counterintelligence, investigative, or national security work" and if the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

1.　The Supreme Court's definition of "national security" in *Cole v. Young*, 351 U.S. 536, 544 (1956), should govern here. In that case, the Court evaluated a statute that allowed agencies to summarily suspend and terminate employees "whenever [they] shall determine such termination necessary or advisable in the interest of the national security of the United States." *Id.* at 541.

The Court held that the statutory context—federal worker protections—called for a "narrow meaning" of "national security" that included "only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare." *Id.* at 544.

Adopting the government's "indefinite and virtually unlimited meaning" for national security, the Court cautioned, would result in the underlying statute—which was "an exception to the general personnel laws"—being "utilized effectively to supersede those laws." *Id.* at 547.

That is the situation here too. If this Court accepts Defendants' view of "national security work," then *every federal agency* is at risk for being exempted from the Statute. That would "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." *OPM*, 864 F.2d at 168.

**2.** Defendants' statutory analysis is flawed in other respects.

***First***, Defendants interpret "a primary function . . . [of] national security work" in Section 7103(b)(1) in a way that reads "primary" entirely out of the text. *See* Mtn. at 20-22.

While there is no governing statutory interpretation of "*a primary* function," the Ninth Circuit has construed "*a primary* location" in a way that is instructive here. "Despite the use of 'a,' the word 'primary' connotes a single leading location"—or, here, function. *See City of Ketchikan v. Cape Fox Corp.*, 85 F.3d 1381, 1384 (9th Cir. 1996) (citing

dictionary definitions of "primary" as "[f]irst; principal; chief; leading," and "first in importance; chief; principal; main").

Indeed, "[t]o read the statute otherwise would change the meaning of 'primary' to merely 'significant.'" *Id.* The government's expansive view of "a primary function" to include "several" functions for each relevant agency should thus fail. *See* Mtn. at 20-21.

***Second***, Defendants failed to argue to the district court that any of the Department of Treasury's components that the Executive Order excludes from the Statute (except for IRS) satisfies Section 7103(b)(1)'s criteria and have now waived those arguments.

The government argued to the district court that the President excluded "all of Treasury" and therefore only Treasury "as a whole" should be subject to Section 7103(b)(1)'s analysis, including its primary function criterion. Dkt. 26 at 29. Here, the government acknowledges that the President excluded "subdivisions" of Treasury (Mtn. at 5) but references the broad mission of the Department as a whole to justify those subdivisions' exclusion. Mtn. at 22. This analysis is incorrect. The plain text of Section 7103(b)(1) requires that the statutory criteria be applied to each "subdivision," where the President has exempted a

"subdivision." The government nonetheless has failed, both here and in the district court, to address the following Treasury subdivisions at issue: the IRS Office of Chief Counsel, BFS, OCC, TTB, and Treasury's departmental offices.

**Third**, the government fails to provide any real analysis of Section 7103(b)(1)'s second criterion: that the Statute cannot be applied to the agency "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). Defendants' response to the fact that the agencies that the Executive Order targets have fallen within the Statute's coverage, in many cases, for decades (see A14-16 ¶¶46-57) is twofold. The government complains about the "inefficiencies" of collective bargaining in the federal sector. Mtn. at 18. And then the government warns against "second-guess[ing]" the President's unexplained determinations that the agencies at issue cannot collectively bargain consistent with national security considerations. *Id.* at 19.

Ultimately, the government's "disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly," is an insufficient analysis of Section 7103(b)(1)'s second

criterion. Op. 20. *See In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("[T]he President may not decline to follow a statutory mandate . . . simply because of policy objections.") (Kavanaugh, J.). And Congress provides the rejoinder with its finding that unions "contribute[] to the effective conduct of public business." 5 U.S.C. § 7101(a)(1)(B).

## C. Subject-Matter Jurisdiction

The government argues that the district court lacked subject-matter jurisdiction over NTEU's claims because they must be brought through the Statute's administrative channels. Mtn. at 10-12. That argument—which reflects inconsistent positions in this Court and in the Eastern District of Kentucky—fails for several reasons. The most obvious is that the Executive Order has taken away the administrative channels that the government argues must be used.

***First***, this Court should reject the government's argument that a federal district court has jurisdiction to declare the Executive Order *lawful*, as it asks the Eastern District of Kentucky to do, but that a federal district court lacks jurisdiction to determine that the Executive

Order is *unlawful*, as it argues to this Court.[7] Those positions are irreconcilable.

The government has tried to explain its inconsistent positions by arguing to the Eastern District of Kentucky that the Department of Treasury "is not subject to Chapter 71 after the President's Executive Order" and therefore has no channel through which to proceed for its claim.[8] But the same is true here: because the agency defendants here are "not subject to Chapter 71 after the President's Executive Order," they are outside the Statute's administrative processes. So those agencies cannot institute an Authority proceeding against NTEU, and NTEU cannot initiate an Authority proceeding against them.

Left with no credible way to distinguish its position in Kentucky, the government argues that NTEU's theory that the Executive Order is unlawful has jurisdictional implications. Mtn. at 12 ("Plaintiff's own theory dictates that the FLRA was the exclusive venue for this suit."). A district court's jurisdiction does not depend on what side of an issue the

---

[7] Complaint, *Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Mar. 28, 2025).

[8] Motion for Summary Judgment at 20, *Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Apr. 18, 2025).

plaintiff takes. NTEU understands that the Executive Order indeed cut off access to the Statute for nearly a dozen of its agencies; a legal claim that the Executive Order is unlawful does not restore the administrative channels that the Executive Order has cut off.

*Second*, the district court correctly found that, consistent with this Court's precedent, NTEU's claims should not be channeled because the Executive Order takes that channel away. "The administrative review scheme . . . is not available . . . for the simple reason that those agencies and subdivisions have been excluded from the [Statute's] coverage by the very Executive Order at issue here." Op. 10.

The Federal Labor Relations Authority (Authority) has determined that it lacks jurisdiction in just these circumstances. *See AFGE Local 987*, 66 F.L.R.A. 589, 598 (2012) (dismissing claim against Air Force Office of Special Investigations for lack of jurisdiction because it was exempted from the Statute); *AFGE, Local 3966*, 57 F.L.R.A. 750 (2002) ("since [an] Executive Order exempts United States Attorneys' Offices from coverage of the Statute, the Authority lacks jurisdiction to decide the cases").

This Court's precedent, in turn, shows that federal district-court jurisdiction exists for claims over which the Authority lacks jurisdiction. In *AFGE, Local 446 v. Nicholson*, this Court unanimously held that the district court had jurisdiction because the challenged action was "expressly outside the FLRA's purview" and the union was "presumptively entitled to judicial review of its claim." 475 F.3d 341, 3448 (D.C. Cir. 2007). The same is true here, where the Executive Order takes the agency defendants here "outside the FLRA's purview" (*id.*), as the government concedes in its Kentucky litigation.[9]

The government suggests that NTEU could still file an unfair labor practice charge with the Authority and make its way to a federal appellate court. Mtn. at 12. But a charge against an excluded agency would be dismissed for lack of jurisdiction, a dismissal that is not subject to judicial review. *Turgeon v. FLRA,* 677 F.2d 937, 938-39 (D.C. Cir. 1982).

**Third,** the government cites *AFGE v. Trump*, where unions' claims were channeled. 929 F.3d 748, 754 (D.C. Cir. 2019). But in that

_____

[9] Motion for Summary Judgment at 20, *Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Apr. 18, 2025).

27

case the unions had "several 'administrative options'" available to them for challenging the executive orders at issue there. *See id.* at 757. Here, as the district court concluded, there are no administrative options left. *See* Op. 12. The Executive Order categorically has removed any union claims relating to the agencies at issue here from the administrative scheme.

**Fourth,** this Circuit's precedent instructs that where a party would suffer "independent harm caused by the delay" associated with channeling, "full relief" cannot not be obtained through the administrative scheme and district court jurisdiction is thus merited. *Jarkesy v. SEC*, 803 F.3d 9, 27–28 (D.C. Cir. 2015). That would apply here, given the urgent threat to NTEU's existence.

## CONCLUSION

This Court should deny the government's motion.

Respectfully submitted,

 /s/  Julie M. Wilson
JULIE M. WILSON
General Counsel

 /s/  Paras N. Shah
PARAS N. SHAH
Deputy General Counsel

 /s/  Allison C. Giles
ALLISON C. GILES
Assistant Counsel

 /s/  Jessica Horne
JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

May 6, 2025            Attorneys for Appellee NTEU

# CERTIFICATE OF COMPLIANCE

I hereby certify this response complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century, a proportionally spaced font, and that it complies with the typeface and type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5159 words, excluding those words that Federal Rule of Appellate Procedure 32(f) exempts.

/s/ Allison C. Giles

_____
ALLISON C. GILES
Assistant Counsel

# ADDENDUM

## Table of Contents

1.  Exhibit 1, Declaration of Daniel J. Kaspar dated April 2, 2025…………………………………………………………...……A1

2.  Exhibit 2, Supplemental Declaration of Daniel J. Kaspar dated April 16, 2025…………………………………………………A18

3.  Exhibit 3, Second Supplemental Declaration of Daniel J. Kaspar dated May 4, 2025……………………………………….....A91

# EXHIBIT 1

<u>DECLARATION OF DANIEL KASPAR</u>

I, Daniel Kaspar, hereby declare as follows:

1.      I currently serve as Director of Field Operations at the National Treasury Employees Union (NTEU). I have worked for NTEU since 2011.

2.      As Director of Field Operations, I am responsible for overseeing NTEU's field offices across the nation. Representatives in each field office serve as chapters' and members' first line of contact with NTEU on a day-to-day basis. By virtue of my job duties, I am familiar with the agencies where NTEU-represented employees work as well as the duties those employees perform. I am also familiar with the collective bargaining agreements that we have negotiated with our agencies.

<u>The Executive Order and OPM Guidance</u>

3.      I have reviewed President Trump's Executive Order entitled "Exclusions from Federal Labor Management Relations Programs" (March 27, 2025) (the Executive Order).

4.      I have also reviewed the guidance issued by the Office of Personnel Management (OPM) entitled "Guidance on Executive Order *Exclusions from Federal Labor Management Relations Programs*" (OPM Guidance) (March 27, 2025).

5.      The Executive Order, section 2, excludes multiple agencies from the 1978 Federal Service Labor-Management Relations Statute (the Statute).

6.    The Executive Order includes the following agencies where NTEU represents employees as the exclusive bargaining unit representative:

- Department of Treasury, Internal Revenue Service (IRS), IRS Office of Chief Counsel, Bureau of Fiscal Service (BFS), Departmental Offices, Alcohol and Tobacco Trade and Tax Bureau (TTB), Office of Comptroller of the Currency (OCC);

- Department of Energy (DOE);

- Department of Justice (DOJ), Civil Rights Division and Environment and Natural Resources Division;

- Environmental Protection Agency (EPA);

- Federal Communications Commission (FCC);

- Department of Health and Human Services (HHS), the Office of the Secretary, the Food and Drug Administration, the Administration for Strategic Preparedness and Response, the Centers for Disease Control and Prevention, and the Office of Refugee Resettlement within the Administration of Children and Families; and

- Department of the Interior, Bureau of Land Management (BLM).

## The Executive Order Will Reduce the Number of Employees Represented by NTEU

7.    The Executive Order immediately and adversely affects NTEU in multiple ways.

8.    The Executive Order substantially reduces the number of employees represented by NTEU.

9.    At the end of December 2024, NTEU represented 158,144 employees. Taken together, the number of employees who are represented by NTEU and who are in agencies covered by the Executive Order is 104,278. This means that the Executive Order will cut the number of NTEU-represented employees by 65.9%

10.    NTEU's clout and influence is related to the number of employees that it represents. For example, NTEU regularly tells arbitrators, courts, members of Congress, and the public that it represents more than 150,000 employees in 37 federal agencies and departments across the government.

11.    In my view, NTEU's clout and influence will be diminished if it represents substantially fewer employees at substantially fewer agencies.

12.    I anticipate that we will have less influence at the bargaining table with agencies not covered by the Executive Order because those agencies will be aware that NTEU represents many fewer employees than it did previously.

13.    I anticipate that it will be more difficult for NTEU to persuade employees to join NTEU and become dues-paying members because those employees will be aware that NTEU represents many fewer employees than it did previously.

14.    I anticipate that NTEU will have less influence in advocating employees' interest before Congress because NTEU will represent many fewer employees (and Congressional constituents) that it did previously.

<u>The Executive Order Will Substantially Reduce Dues Paid to NTEU</u>

15.    Of the more than 150,000 employees represented by NTEU, approximately 91,000 have voluntarily joined NTEU and pay dues. The vast majority of those—94%—have taken advantage of the option to have their employer agencies deduct dues from their paychecks automatically and remit the dues to NTEU.

16.    In the NTEU-represented agencies and agency components that the Executive Order excludes from the Statute, NTEU has approximately 58,692 dues-paying members.

17.    OPM Guidance states that such automatic dues withholding at the agencies covered by the Executive Order will stop. When that happens, NTEU's dues revenue will be reduced by about $25 million. This is more than half of NTEU's total revenue stream. The dues revenue that is cut off is forever lost. There is no mechanism for NTEU to recover lost dues revenue from former members for a period during which they had no union representation.

18.    This loss of dues from automatic withholding from such a large percentage of our membership threatens NTEU's very existence.

19.    Several NTEU-represented agencies have begun acting to stop dues withholding in response to the Executive Order, including NTEU's largest bargaining unit, the IRS.

20.    Some NTEU-represented agencies, including BLM and EPA, use the Interior Business Center (IBC) to process their payroll. NTEU learned that on

March 28, 2025, IBC, as a result of the Executive Order, "was directed to remove all union deductions from the Pay Period 25-07" which runs from March 23 to April 5, 2025.

21.    Other NTEU-represented agencies—IRS, BFS, FCC, OCC, TTB, and Treasury's departmental offices—use the United States Department of Agriculture National Finance Center (USDA NFC) to process their payroll. Yesterday, NTEU was scheduled to receive its dues payments for the NTEU members at those agencies for the last pay period. Those dues payments did not arrive. NTEU contacted USDA NFC, which cited the Executive Order as the reason those funds did not arrive.

### The Executive Order Will Diminish the Value of NTEU's Services

22.    OPM has stated that in implementing the Executive Order, agencies should cease participating in grievance procedures and should cease collective bargaining with federal unions who represent employees at affected agencies. OPM Guidance at 3, 5.

23.    NTEU will be of less value to employees in the agencies covered by Executive Order if it can no longer participate in grievance procedures against those agencies.

24.    NTEU will be of less value to employees in the agencies covered by Executive Order if it can no longer participate in any collective bargaining that would benefit them.

25.    Separate from bargaining term agreements, NTEU staff frequently bargain with agencies over changes in employment conditions. To initiate bargaining over such changes, NTEU is required to notify the agency within a certain timeframe (often 30 days or less) after NTEU first receives notice of the change.

26.    If agencies covered by the Executive Order refuse to collectively bargain with NTEU, NTEU will lose that bargaining opportunity not just in the short term but forever.

27.    In one example of bargaining over changes in employment conditions, NTEU initiated bargaining promptly when the COVID-19 outbreak caused its first disruptions. If relevant agencies had simply refused to engage in bargaining, NTEU would have missed its chance to advocate for its members on issues like telework and the availability of personal protective equipment.

28.    NTEU-represented agencies that the Executive Order excludes from the Statute have begun to stop complying with existing collective bargaining agreements. The Bureau of Land Management, for example, has informed NTEU that it will be postponing scheduled collective bargaining agreement negotiations scheduled for April 2, 2025, because of the Executive Order.

29.    NTEU has also been informed that proceedings before the Federal Labor Relations Authority (for example in ongoing proceedings with BLM) are on hold because of the Executive Order.

30.    Similarly, the OCC has canceled a grievance meeting with NTEU based on the Executive Order.

### The Administration's Deferred Resignation Program

31.    On January 28, 2025, the Administration, via a "Fork in the Road" email, offered employees a "deferred resignation program." NTEU-represented employees in each of the agencies or agency components at issue received that offer, and some NTEU-represented employees in each of the agencies or agency components at issue here accepted that offer and had their applications processed.

32.    The administration's deferred resignation program was not available to employees in "positions related to . . . national security." *See* OPM, *Guidance Regarding Deferred Resignation Program* (Jan. 28, 2025) at 3, www.opm.gov/media/3oaf3vs0/opm-guidance-memo-re-deferred-resignation-program-01-28-25-final.pdf.

### Motivation for the Executive Order

33.    It is my belief, based on the language of the Executive Order, the OPM Guidance, and the White House's Fact Sheet on the Executive Order that the President's motivations for the mass exclusion of agencies from the Statute's coverage are animus against federal sector unions and a desire to make federal employees easier to fire.

34.    NTEU has actively opposed President's Trump's agenda which has targeted the federal workforce by filing multiple lawsuits and grievances against wrongful administration actions. NTEU will continue to take action if the Administration continues to act unlawfully to harm federal sector unions and the

employees they represent. I am fearful that additional NTEU action, whether in the courts or in other areas, will lead to further retribution against it, including having more of its agencies and agency components excluded from the Statute.

35.    My understanding based on the language of the Executive Order, news reports, information from other unions and NTEU's own data, is that the Executive Order will have the effect of excluding approximately two-thirds of the federal workforce overall, and three-quarters of those employees who have union representation.

## NTEU History

36.    NTEU has represented employees in federal agencies for many decades.

37.    NTEU was founded in 1938 to represent a group of Internal Revenue collectors.

38.    NTEU has represented additional employees at additional agencies over the intervening years, and its role expanded when collective bargaining was extended to the federal sector by Executive Order 10988 by President Kennedy in January 17, 1962, and by law when Congress enacted the Statute in 1978. *See* Pub.L. No. 95-454.

## Agency Missions and Duties of Employee

34.    The IRS does not primarily perform national security, investigative, or intelligence work. The IRS is the revenue service for the federal government, responsible for collecting federal taxes and administering the Internal Revenue

Code. NTEU-represented employees at IRS do not primarily perform security, investigative, or intelligence work. They provide tax assistance to taxpayers, conduct taxpayer audits, and collect overdue tax revenue.

35.    The IRS Office of Chief Counsel does not primarily perform national security, investigative, or intelligence work. NTEU-represented employees at the Office of Chief Counsel do not primarily perform security, investigative, or intelligence work. They provide legal guidance and interpretive advice to the IRS, to Treasury, and to taxpayers; and coordinate the IRS's position in litigation.

36.    The HHS components that the Executive Order excludes from the Statute and that NTEU represents— the Office of the Secretary, the Food and Drug Administration, the Administration for Strategic Preparedness and Response, the Centers for Disease Control and Prevention, and the Office of Refugee Resettlement, Administration for Children and Families—do not primarily perform national security, investigative, or intelligence work. Those components administer social service programs, civil rights and healthcare programs, and programs that assure food and drug safety and efficacy. NTEU-represented employees at those components of HHS do not primarily perform national security, investigative, or intelligence work. They provide guidance and assistance on HHS's priorities; oversee state administration of HHS's programs; and inspect food and drugs.

37.    BFS does not primarily perform national security, investigative, or intelligence work. BFS functions primarily to manage the government's accounting and federal centralized payment systems, and to reduce public debt. NTEU-

represented employees at BFS do not primarily perform national security, investigative, or intelligence work. They ensure that Americans receive their federal government payments on time.

38.    BLM does not primarily perform national security, investigative, or intelligence work. BLM's primary function is to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations. NTEU-represented employees at BLM do not primarily perform national security, investigative, or intelligence work. They manage public lands for various purposes, including energy development, livestock grazing, recreation, and resource conservation; and maintain natural, cultural, and historic resources.

39.    EPA does not primarily perform national security, investigative, or intelligence work. EPA ensures compliance with and the fair administration of environmental laws, and acts to conserve natural resources. NTEU-represented employees at EPA conduct studies and research on environmental issues; develop and enforce environmental regulations; and provide technical assistance.

40.    FCC does not primarily perform national security, investigative, or intelligence work. FCC regulates interstate and international communications by radio, television, wire, satellite, and cable across the nation. NTEU-represented employees at FCC do not primarily perform security, investigative, or intelligence work.

41.    Treasury's departmental offices do not primarily perform national security, investigative, or intelligence work. These offices guide Treasury's policies.

NTEU-represented employees at Treasury's departmental offices do not primarily perform security, investigative, or intelligence work. They are non-professional employees who provide logistical and mission support, such as assuring adequate supplies, equipment, and mail services; distributing mail; and performing building repairs.

42.     OCC does not primarily perform national security, investigative, or intelligence work. OCC ensures that national banks and federal savings associations operate in a safe and sound manner and provide fair access to financial services. NTEU-represented employees at OCC do not primarily perform national security, investigative, or intelligence work. They examine banks to ensure they are complying with banking rules and regulations that protect consumers.

43.     TTB does not primarily perform security, investigative, or intelligence work. TTB collects taxes on alcohol, tobacco, firearms, and ammunition; ensures the integrity of alcohol products; ensures that only qualified businesses enter the alcohol and tobacco industries; and prevents unfair and unlawful market activity for alcohol and tobacco products. NTEU-represented employees at TTB do not primarily perform security, investigative, or intelligence work. They are responsible for reviewing applications for permits for beer, wine, and spirits producers and manufacturers; and investigating those entities for product integrity, tax collection, and compliance.

44.     DOE does not primarily perform security, investigative, or intelligence work. DOE is responsible for ensuring that the United States has access to reliable,

affordable, and cleaner sources of energy. Its work includes advancing energy technologies, managing the nation's energy resources, and addressing environmental impacts from past energy-related activities. NTEU-represented employees at DOE do not primarily perform security, investigative, or intelligence work. They evaluate the effectiveness and efficiency of DOE programs and provide information and advice to DOE management on the agency's programs and operations.

45.    The DOJ components that the Executive Order excludes from the Statute and that NTEU represents—the Environmental and Natural Resources Division and the Civil Rights Division—do not primarily perform security, investigative, or intelligence work. The Environment and Natural Resources Division is responsible for bringing cases against those who violate the nation's environmental laws as well as defending the federal government in litigation arising under a broad range of environmental statutes. Those in the Civil Rights Division work to uphold the civil and constitutional rights of all persons in the United States and enforce federal statutes prohibiting discrimination. NTEU-represented employees in these two DOJ divisions do not primarily perform security, investigative, or intelligence work. They are attorneys who enforce the laws that their division is charged with upholding.

### NTEU's Collective Bargaining Has Not Adversely Affected National Security

46.    For the nearly half-century that the Statute has been in place, the IRS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

47.    NTEU has represented bargaining unit workers at the IRS Office of Chief Counsel since March 1987. During that period, the IRS Office of Chief Counsel has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

48.    NTEU has represented bargaining unit workers at HHS since November 1978. During that period, HHS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

49.    NTEU has represented bargaining unit workers at the FCC since July 1978. During that period, the FCC has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

50.    NTEU has represented bargaining unit workers at DOE since January 1979. During that period, DOE has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

51.    NTEU has represented bargaining unit workers at BFS since April 1985. During that period, BFS has fallen within the Statute's coverage and had a

collective bargaining agreement with NTEU without any adverse effect on national security interests.

52.     NTEU has represented bargaining unit workers at the EPA since April 1998. During that period, the EPA has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

53.     NTEU has represented bargaining unit workers at Treasury's departmental offices since May 2002. During that period, Treasury's departmental offices have fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

54.     NTEU has represented bargaining unit workers at OCC since November 2002. During that period, OCC has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

55.     NTEU has represented bargaining unit workers at TTB since October 2003. During that period, TTB has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

56.     NTEU has represented bargaining unit workers at BLM since February 2021. During that period, BLM has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect

14

A15

on national security interests. BLM has three different collective bargaining agreements with NTEU, each covering a different portion of the agency.

57.    NTEU has represented bargaining unit workers at DOJ since January 2025.  During that period, DOJ has fallen within the Statute's coverage without any adverse effect on national security interests.

### NTEU and Agency Collective Bargaining Agreements

58.    NTEU has collective bargaining agreements with many of the agencies covered by the Executive Order.

a.    The IRS and NTEU agreed that their agreement would last until September 2027.

b.    IRS Office of Chief Counsel and NTEU agreed that the agreement would last until January 2029.

c.    HHS and NTEU agreed that the agreement would last until July 2028 and then further extended its duration to July 2029.

d.    DOE and NTEU agreed that the agreement would last until January 2026.

e.    EPA and NTEU agreed that the agreement would last until December 2028.

f.    FCC and NTEU agreed that the agreement would last until March 2030.

g.    OCC and NTEU agreed that the agreement would last until February 2028.

h.      Treasury and NTEU agreed that the agreement would last until June 2025.

i.       TTB and NTEU agreed that the agreement would last until January 2027.

j.      For one part of BLM, NTEU and BLM agreed that an interim collective bargaining agreement would last until a comprehensive collective bargaining agreement became effective. For a second part of BLM, the parties agreed that the collective bargaining agreement would last until January 2028. For a third part of BLM, the parties agreed that the collective bargaining agreement would last until February 2030.

k.      BFS and NTEU agreed that the agreement would last until August 2025.

59.     The Executive Order will lead to the termination of twelve of these collective bargaining agreements (a small portion of HHS is not covered by the Executive Order and so a small portion of that agreement will still exist).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 2, 2025

Daniel Kaspar

# EXHIBIT 2

## SUPPLEMENTAL DECLARATION OF DANIEL KASPAR

I, Daniel Kaspar, hereby declare as follows:

1.     As previously explained in my April 2, 2025 declaration, I am the Director of Field Operations for NTEU. In that capacity, I am familiar with the agencies where NTEU-represented employees work, as well as the duties those employees perform. I am also familiar with the collective bargaining agreements that we have negotiated with our agencies and whether agencies are complying with those agreements, as well as statutory collective bargaining obligations.

### Agencies' Failure to Honor Dues Withholding Requirements

2.     Federal law requires that "[i]f an agency has received from an employee in an appropriate unit a written assignment which authorizes the agency to deduct from the pay of the employee amounts for the payment of regular and periodic dues of the exclusive representative of the unit, the agency shall honor the assignment and make an appropriate allotment pursuant to the assignment." 5 U.S.C. § 7115(a).

3.     In addition, every collective bargaining agreement that NTEU has with the agencies named as defendants in this action has a provision requiring the agencies to process payroll deductions for dues if the employee so requests.

4.     Payroll for federal employees is processed by different agencies. Many are processed by the National Finance Center (NFC) within the U.S. Department of Agriculture. NTEU-represented agencies that use NFC include the Federal Communications Commission and the Department of Treasury (including the IRS,

IRS Office of Chief Counsel, Bureau of Fiscal Service, Office of the Comptroller of the Currency, Alcohol and Tobacco Tax and Trade Bureau (TTB), and Departmental Offices).

5.    Other agencies have payroll processed by the Interior Business Center (IBC) within the U.S. Department of Interior. NTEU-represented agencies that use IBC include the Bureau of Land Management (BLM) and the Environmental Protection Agency.

6.    Other agencies have payroll processed by the Defense Finance Accounting Service (DFAS) within the U.S. Department of Defense. NTEU-represented agencies that use DFAS include the Department of Energy and the Department of Health and Human Services.

7.    Payroll periods in the federal government are generally every two weeks, although they are numbered differently if employees are paid through different agencies. For example, the two-week pay period of March 9, 2025 through March 22, 2025 is pay period 5 for NFC paid employees, and is pay period 7 for IBC paid employees.

8.    Federal employees are typically paid on or around the second Thursday after the end of a pay period. For example, for the pay period running from March 9, 2025—March 22, 2025, employees would typically receive their pay (after any withholdings are taken out) on or about April 2 or 3, 2025. If the employee elected to have dues withheld and remitted to NTEU, NTEU would typically receive those dues on or about April 1, 2025.

9.    Agencies are stopping payroll deductions for dues payments from NTEU members to NTEU.

10.    For example, IBC stated in a March 28, 2025 email that "[a]s a result of Executive Order 'Exclusions from Federal Labor-Management Relations Programs' published March 27, 2025, the Interior Business Center (IBC) was directed to remove all union deductions from the Pay Period 25-07 calculate file." (Exhibit 1).

11.    Updating an earlier notice, NFC stated in an April 9, 2025 email that it was providing additional information "regarding halting union dues deductions" and was taking action "to ensure the termination of future union deductions[.]" (Exhibit 2).

12.    Consistent with these statements from payroll processing entities, some agencies have notified NTEU that they have stopped dues withholding. For example, TTB told NTEU on April 11, 2025 that "[p]ursuant to the executive order signed on March 27, 2025, *Exclusions from Federal Labor-Management Relations Programs*, the National Finance Center (NFC) will be halting union dues deductions for covered Treasury Bureaus . . . effective pay period 6 (March 23, 2025 through April 5, 2025) and beyond." (Exhibit 3).

13.    At the end of pay period March 9, 2025—March 22, 2025, NTEU lost more than a million dollars in dues that it otherwise would have received, if agencies had not halted automatic dues withholding.

14.    At the end of pay period March 23, 2025—April 6, 2025, NTEU again lost more than a million dollars in dues that it otherwise would have received, if agencies had not halted automatic dues withholding.

**Agencies' Failure to Honor Other Collective Bargaining Obligations**

15.    In addition to agencies' refusal to comply with statutory and contractual dues withholding requirements, agencies are refusing to comply with other collective bargaining agreement provisions as well.

16.    For example, the IRS sent out a notice to employees on April 4, 2025, stating that "[t]he IRS has begun implementing a Reduction in Force (RIF) that will result in staffing cuts across multiple offices and job categories." (Exhibit 4). The IRS is beginning this process without following the RIF provisions in the IRS-NTEU collective bargaining agreement, such as required advance notice to NTEU's President.

17.    Indeed, IRS notices to employees affected by the RIF explicitly disavow any obligation to bargain or otherwise follow relevant collective bargaining agreement provisions. The notices state:

> Collective bargaining agreements required additional steps before proceeding with a RIF, including extended negotiation periods and waiting periods. However, President Trump signed an executive order entitled "Exclusions from Federal Labor-Management Relations Programs." Application of the national security exemption from collective-bargaining requirements under this executive order and resulting guidance from the Office of Personnel Management eliminates non-statutory delays in executing a RIF.

(Exhibit 5).

18.     Agencies are refusing to sit at the bargaining table with NTEU. For example, BLM stated in an April 2, 2025, email that "[d]ue to the issuance of Executive Order and OPM Guidance: Exclusions From Federal Labor-Management Relations Programs. . .[w]e will be postponing the CBA negotiations scheduled for April 3rd." (Exhibit 6).  And on April 11, 2025, BLM told NTEU that it would be postponing a scheduled Labor Management Relations Committee meeting scheduled for April 14 because of the Executive Order. (Exhibit 7).

19.     BLM also stated in an April 8, 2025 email that it would not bargain with NTEU over the agency's offering of a deferred resignation program because "[c]onsistent with Executive Order 14251, 'Exclusions from Federal Labor-Management Relations Programs,' which was issued on March 27, 2025, the BLM is excluded from Chapter 71 of Title 5. . . ." (Exhibit 8).

20.     Agencies are refusing to participate in grievance proceedings. For example, an IRS representative told NTEU staff on April 2, 2025, in connection with a pending national grievance and unfair labor practice charge, that "[d]ue to the Executive Order on Thursday, we are currently in a holding pattern in terms of grievances."  (Exhibit 9).

21.     TTB told NTEU on April 14 that as a result of the Executive Order, "TTB has suspended (until further notice) all proceedings under the CBA including but not limited to: grievances under the Negotiated Grievance Process (NGP), Partnership Council, midterm bargaining, and Requests for Information, etc." (Exhibit 10).

22.    On April 10, 2025, a representative from the IRS Office of Chief Counsel refused to move forward with arrangements for a long-scheduled arbitration because they were "awaiting further guidance on the Executive Order relating to the CBA." (Exhibit 11).

23.    Under law (5 U.S.C. § 7131(a)) and under all of NTEU's collective bargaining agreements, NTEU stewards are allowed to request "official time" to conduct representational duties during the workday. But BLM told NTEU on April 1, 2025, that it was disapproving use of "LRG and LRD" for certain dates. (Exhibit 12). These codes mean authorized official time.

24.    Management at the Food and Drug Administration (FDA) told NTEU on March 31, 2025 that "[u]ntil further notice, the FDA is ending labor relation meetings with the exclusive representatives of (NTEU/AFGE) in adherence to the above referenced presidential Executive Order." (Exhibit 13). And the FDA told NTEU April 8, 2025, that NTEU stewards would not be allowed to participate in formal meetings with employees, stating that "to comply with EO 14251, *Exclusions from Federal Labor-Management Relations Programs* . . . management participating in this meeting will not be engaging with NTEU. . . ." (Exhibit 14). On April 9, the FDA rescinded its previous approval of NTEU's presence at a meeting between management and an employee, again citing the Executive Order. (Exhibit 15).

25.    Arbitrators are beginning to stop action on lawfully filed grievances because of the Executive Order, which harms NTEU's ability to carry out its mission of fighting for employee and union rights through grievances. For example,

Arbitrator Stephen E. Alpern informed NTEU on April 3, 2025 that he was staying

further proceedings in a grievance about the validity of the BLM and NTEU

collective bargaining agreement because "the Agency raises the contention that

[pursuant to] an Executive Order 14251 (90 FR 14553, March 27, 2025), the

President excluded the Agency from the provisions of Chapter 7 of title 5, United

States Code." (Exhibit 16).

26.    The Executive Order is affecting how the Federal Labor Relations

Authority (FLRA) is handling labor relations matters. For example, NTEU has

multiple petitions pending before the FLRA regarding whether various contract

provisions are negotiable or not. For agencies covered by the Executive Order, the

FLRA has issued a series of show cause orders stating:

> On March 27, 2025, President Donald J. Trump amended Executive Order
> 12,171 (1979), pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), to
> exclude certain agencies and agency subdivisions from the coverage of the
> Federal Service Labor Management Relations Statute (the Statute).
> Accordingly, the Authority directs the Union to show cause why the
> Authority should not dismiss this matter for lack of jurisdiction.

(Exhibit 17).

27.    The FLRA has also paused an unfair labor proceeding brought by

NTEU on behalf of BLM because of the Executive Order. (Exhibit 18).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2025

Daniel Kaspar

# EXHIBIT 1

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Monday, March 31, 2025 10:00 AM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Peyton Diotalevi <peyton.diotalevi@nteu.org>; ███████████████████████
**Subject:** Fw: URGENT: Union Deduction Impacts from a Recent Executive Order

███████

---

**From:** IBC User Group <IBC-User-Group@updates.ibc.doi.gov>
**Sent:** Friday, March 28, 2025 3:35 PM
**To:** Shea, Kathleen M <kshea@blm.gov>
**Subject:** URGENT: Union Deduction Impacts from a Recent Executive Order

**Interior Business Center**

## MEMORANDUM

**DATE:** Friday, March 28, 2025

**TO:** All User Group Representatives

**FROM:** Keith O'Neill, Associate Director HRD

**SUBJECT:** URGENT: Union Deduction Impacts from a Recent Executive Order

### PLEASE SHARE THIS MESSAGE WITH YOUR APPROPRIATE AUDIENCES.

Valued Customers,

As a result of Executive Order "Exclusions from Federal Labor-Management Relations Programs" published March 27, 2025, the Interior Business Center (IBC) was directed to remove all union deductions from the Pay Period 25-07 calculate file.

**Who does this affect?**
This applies to employees only within Pay Processing Groups 1 and 4.

**What is the impact to employees?**

- Employees will see union deductions on their Leave and Earnings statement Pay Period 25-07.
- Employees will get dues amount returned in a future pay period.

**Does this require any agency action?**
At this time, no further actions are required.

**Union Reports - It is important to note:**

- The union reports will display deductions.
- However, it's crucial to understand that the corresponding funds have **not yet been deposited**.

For employee questions or concerns, please contact the Customer Support Center at CSC_IT_Services_Helpdesk@ios.doi.gov or 1-866-367-1272.

Regards,

Keith O'Neill
Associate Director
Human Resources Directorate
Interior Business Center
U.S. Department of the Interior
www.doi.gov/IBC

## Resources:

- IBC Customer Central

For User Group distribution list changes, email Lorraine Manzanares. All requests should come from a Primary Agency User Group Representative.

Stay Connected with the Interior Business Center



This email was sent by: U.S. Department of the Interior – Interior Business Center – 1849 C Street, NW - MS 1748 - Washington, DC - 20240



EXHIBIT 2

**From:** Langdon Ryan C <Ryan.C.Langdon@irs.gov>
**Sent:** Thursday, April 10, 2025 1:51 PM
**Subject:** FW: Update: Executive Order Stopping Union Dues Payroll Deductions

Hello,

We received your 1188 request, please refer to the below email and attached form.

Thanks,

# Ryan Langdon
**HUMAN RESOURCES ASSISTANT**
**IRS, Human Capital Office**
**HR Shared Services: Payroll Operations Center 1 Section 2**
**Human Resources Shared Services (HRSS)**
Phone: (267) 466-2536
Email  : Ryan.C.Langdon@IRS.Gov
TOD: 6:00 AM – 2:30 PM, M-F (EST)
Payroll Documents – Fax: (855) 207-0459



FYI

**From:** *HRSS NFChelpdesk
**Sent:** Thursday, April 10, 2025 7:15 AM
**Subject:** [EXT] Update: Executive Order Stopping Union Dues Payroll Deductions

Please review CAPPS notification below and share with your staff if applicable.


National Finance Center
CAPPS Notification


# Update: Executive Order Stopping Union Dues Payroll Deductions

April 9, 2025

Reference Number: NFC-1744117663

Dear Customer,

This is an update to the notice issued on April 4, 2025, titled "Follow-Up Executive Order Regarding Union Dues," to provide additional information regarding halting union dues deductions for specific Agencies and occupational series (0081, 0082, 0083, and 0085).

The National Finance Center (NFC) will take following actions in Pay Period (PP) 06 processing:

- Implement system changes in the Personnel Edit Subsystem Edit Messages (PINE) application to ensure the termination of future union deductions and elections within the designated Agencies and occupational series.
- Union deductions will be prevented for the affected employees using deactivation code "90" to stop deductions.
- Reimbursements for ineligible union deductions that occurred during PP05 will occur for affected employees. Employees will see this reimbursement in the remarks field on their Earnings and Leave Statement (E&L)

Attached in this notice, you will find a listing of the of the Department/Agencies affected by the Executive Order. In addition, your Client Management Representative will be providing a separate spreadsheet containing the impacted employees in the specified occupational series, Department/Agency.

**NOTE:** No action is required on the part of the Agency.

Authorized Agency representatives with questions concerning this notification should contact the NFC Contact Center at 1-855-632-4468 or submit a request in the ServiceNow Customer Service Portal using the following links:

A32

- For Federated Users – https://nfcbsm.servicenowservices.com
- For Non-Federated Users
  - Customer Service Management Portal View (Designated CMB POC)
    https://nfcbsm.servicenowservices.com/csm
  - Current Service Portal View (all other users)
    https://nfcbsm.servicenowservices.com/sp_ess

Attachments:

Agency List - Cancelled Union Dues

- Agency List - Cancelled Union Dues.pdf

# EXHIBIT 3

 Outlook

**Fw: Executive Order Stopping Union Dues Payroll Deductions**

**From** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Date** Mon 4/14/2025 2:38 PM
**To** Allie Giles <Allie.Giles@NTEU.ORG>

Get Outlook for iOS

---

**From:** William Igoe <william.igoe@NTEU.ORG>
**Sent:** Monday, April 14, 2025 2:36 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>
**Subject:** Executive Order Stopping Union Dues Payroll Deductions

---

**From:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Sent:** Friday, April 11, 2025 11:16 AM
**Cc:** All TTB SUPERVISORS <ALLTTBSUPERVISORS@ttb.gov>; Aderibigbe, Oyinlola <Oyinlola.Aderibigbe@ttb.gov>;
Martinez, Kameron T. <Kameron.Martinez@ttb.gov>; Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Subject:** Executive Order Stopping Union Dues Payroll Deductions

Good day,

**This message applies only to those TTB employees coded as bargaining unit.  Supervisors are copied for context.**

Pursuant to the executive order signed on March 27, 2025, _Exclusions From Federal Labor-Management Relations Programs_, the National Finance Center (NFC) will be halting union dues deductions for covered Treasury Bureaus, to include TTB, as outlined in the executive order effective pay period 6 (March 23, 2025 through April 5, 2025) and beyond.  Any union dues elections that were being deducted from an employee's pay will automatically be cancelled by the National Finance Center.

Please direct any questions to your supervisor or HR Business Partner.

Regards,
Andrea Johnson
Human Resources Specialist
Alcohol and Tobacco Tax and Trade Bureau (TTB)
Office:  (202) 453-2166
https://www.ttb.gov/



This message was secured by **Zix**®.

EXHIBIT 4

**From:** Doreen Greenwald <doreen.greenwald@NTEU.ORG>
**Sent:** Friday, April 4, 2025 4:17 PM
**To:** ▊▊▊▊▊▊▊
**Subject:** FW: Reduction in Force (RIF) process is beginning

▊

**From:** *IRS Human Capital Officer <irs.human.capital.officer@irs.gov>
**Sent:** Friday, April 4, 2025 4:01 PM
**To:** &&Employees All <employees.all@irs.gov>
**Subject:** Reduction in Force (RIF) process is beginning

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

The IRS has begun implementing a Reduction in Force (RIF) that will result in staffing cuts across multiple offices and job categories. This action is being taken to increase the efficiency and effectiveness of the IRS in accordance with agency priorities and the Workforce Optimization Initiative outlined in a recent Executive Order.

Today, the IRS initiated a RIF for the Office of Civil Rights and Compliance (formerly the Office of Equity, Diversity and Inclusion). This calendar year to date, approximately 5% of this office left through the Deferred Resignation Program and attrition. An additional 75% of the office will be reduced through a RIF. The remaining employees in the OCRC will move under the Office of Chief Counsel to continue to carry out its statutory responsibilities. None of the reductions were made today based on individual performance. The reductions were made in accordance with statute.

**What to expect**

- The RIF will be implemented in phases. **This message is only notification that the IRS has begun the RIF process and does not serve as your official notification.** Each office will receive direct communication when their phase begins.

- **Individual RIF notices** will be issued to impacted employees at least 30-60 days prior to the effective date of any personnel action, as required by the Office of Personnel Management (OPM) guidelines.
- **Personnel reassignments including relocations** will stop effective April 4, 2025. With limited exceptions, all actions with an effective date after April 4, 2025, will be canceled. If you are currently on a detail or temporary promotion, it will not be canceled. Detailed information on exceptions is included in the FAQs.
- We have received approval to offer **VERA (Voluntary Early Retirement Authority) and VSIP (Voluntary Separation Incentive Payment).** More information, including the specific dates and FAQs, will be shared with you next week.

**Action you need to take:**

- **Upload a current resume to HRConnect by April 14, 2025** using these instructions (.docx). HCO will use your resume to determine qualifications during a RIF. If you choose not to upload a resume and are impacted by RIF, the Human Capital Office will use your current position description to determine qualifications. No resumes will be accepted outside of the HRConnect upload feature. If you cannot access HRConnect, you can work with your supervisor.
- **Training:** View the new Reduction in Force (RIF) Briefing - Understanding the Process, Your Rights, and Benefits Course 85139 in ITM.

**What resources are available:**

- Workforce Updates page, including RIF Q&A, with new information added as available.
- Employee Assistance Program (EAP), with confidential counseling and support services available.
- Resume resources:
  - USAJOBS Help Center - What should I include in my resume?
  - iManage - Resume Writing
- Additional guidance on the RIF process is available through OPM:
  - Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative (.pdf)
  - Workforce Reshaping Operations Handbook (.pdf)

We remain committed to sharing information as soon as it becomes available and ensuring all employees have access to resources and support.

Thank you for your continued professionalism and commitment to supporting our mission.

EXHIBIT 5



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

April 4, 2025

MEMORANDUM FOR ███████████████

FROM            Melanie Krause    *Melanie Krause*
                Acting Commissioner, Internal Revenue Service

Subject:        Reduction in Force Notice – Change to Lower Grade

This memorandum constitutes your official Reduction in Force (RIF) Change to Lower Grade (CLG) notice.

The Internal Revenue Service has determined it is necessary to abolish some positions in the Office of Civil Rights and Compliance, formerly known as the Office of Equity, Diversity, and Inclusion, to further workforce shaping efforts in accordance with the "Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative" guidance. Collective bargaining agreements required additional steps before proceeding with a RIF, including extended negotiation periods and waiting periods. However, President Trump signed an executive order entitled "Exclusions from Federal Labor-Management Relations Programs." Application of the national security exemption from collective-bargaining requirements under this executive order and resulting guidance from the Office of Personnel Management eliminates non-statutory delays in executing a RIF.

To conduct the RIF, retention registers were prepared which list employees in retention standing order by civil service tenure group and subgroup, veterans' preference, performance ratings, and length of Federal service. The following information was used to determine your retention standing as of the RIF effective date: 6/3/2025.

Position of Record:  Management & Program Anal, GS-0343-13
Competitive Area:    Office of Civil Rights and Compliance, formerly known as the Office of
                     Equity, Diversity, and Inclusion
Competitive Level:   GS-0343-13-2480
Tenure Group:        1
Sub-Group:           AD
Type of Service:     COMPETITIVE
Service Computation Date (RIF):  8/13/2010
Performance Rating: RATING 1 DATE: 03/31/2023 | RATING 1 SCORE: EXCEEDS FULLY SUCCESSFUL OR EXCEEDED
RATING 2 DATE: 02/28/2022 | RATING 2 SCORE: EXCEEDS FULLY SUCCESSFUL OR EXCEEDED
RATING 3 DATE: 02/28/2021 | RATING 3 SCORE: EXCEEDS FULLY SUCCESSFUL OR EXCEEDED
RATING 4 DATE: NO DATE  | RATING 4 SCORE: NO RATING

Attachment

Adjusted Service Computation Date (RIF): 8/13/1994

In accordance with RIF procedures specified in Title 5, Code of Federal Regulations, Part 351, you were released from your competitive level but are being offered a CLG to the following position:

Position:      GS-0260-12
Position Description Number:  S927840027
Location:      OFC OF CIVIL RIGHTS AND COMPL
               EQUAL EMPLOYMENT OPPORTUNITY
               EEO - TERRITORY 2

This offer of continuing employment is the best offer available.

If you accept this offer:
- You must sign and email the attached Offer Reply Form to hco.ta.workforce.shaping@irs.gov within five (5) workdays of receipt of this notice.
- Your CLG will be effective the pay period immediately following the RIF effective date of: 6/3/2025.

If you decline or fail to respond to this offer within five (5) workdays, it will be considered a declination of the position offered to you in this notice. Consequently, you will be separated by RIF procedures on 6/3/2025.

If you are separated by the RIF because you declined a reasonable offer (defined as not more than two grade or pay levels below your current position), you will not be eligible for severance pay, or discontinued service retirement (even if you previously met the criteria for these entitlements).

- If you are RIF separated:
  - You will be eligible for the IRS Career Transition Assistance Plan (CTAP), registration on the Treasury Department's Reemployment Priority List (RPL), and special selection priority under the Interagency Career Transition Assistance Plan (ICTAP)
  - You may be eligible for benefits available to you under the Workforce Investment Act (WIA) of 1998

This RIF action does not reflect in any way upon your performance or conduct. The Internal Revenue Service sincerely appreciates the contributions you have made during your employment and regrets that you have been personally affected by this reduction in force.

**Appeal and Grievance Rights**

Merit Systems Protection Board
If you are separated by RIF procedures and you believe your rights have been violated, you may appeal the RIF action to the Merit Systems Protection Board, MSPB's e-Appeal Online website. Your appeal must be submitted and must be filed any time during the 30-calendar day period beginning the day after the effective date of the RIF.  Your appeal must contain the

information outlined in the attached extract of the MSPB regulations. You may access a complete copy of the MSPB regulations at www.mspb.gov. If you fail to file your appeal within the applicable time limit, the MSPB may dismiss it as untimely filed, unless you can show good cause for the delay. If you file your appeal untimely, the judge will provide you with an opportunity to show why your appeal should not be dismissed as untimely.

Equal Employment Opportunity Commission (EEOC)
If you seek to allege that this RIF action was taken against you based in whole or in part on discrimination because of race, color, religion, sex, age, national origin, or physical or mental disability, you may either (1) join your claim of discrimination with your appeal filed with the Merit Systems Protection Board; or (2) pursue an action under Part 1614 of the EEOC regulations. You may also access the U.S. Equal Employment Opportunity Commission (EEOC) website at www.eeoc.gov for additional and further detailed information on the Federal sector EEO process. You may also file with MSPB as noted above and raise discrimination as an affirmative defense. However, you may not proceed through both forums; you must elect one or the other. Whichever action is filed first will be considered an election to proceed in that forum. An election to proceed before the MSPB is determined as of the date the appeal is filled; and an election to proceed under Part 1614 is determined as of the date a complaint of discrimination is filed.

Office of Special Counsel
You may also seek corrective action before the U.S. Office of Special Counsel (OSC). Visit the OSC e-filing system web site at www.osc.gov, to access the online application. However, if you do so, you will be limited to whether the agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures. If you choose to file an action with OSC, you will be foregoing your right to otherwise challenge the basis for this personnel action.

If you have questions after reviewing this letter and the attached material, or you are considering resigning, please submit a ticket via IRworks or contact the Employee Resource Center (ERC) at 1-866-743-5748 or via the online chat box at https://connect.irs.gov/system/web/custom/vascripts/erc_launch_va.html, and tell them you received a RIF notice.

The following attachments can be found on https://www.irs.gov/newsroom/irs-employee-emergency-news
- RIF Notice Package - Quick Reference Guide
- RIF Information Sheet
- Benefits/Entitlements
- OPM RIF Regulations (5 CFR, Part 351)
- MSPB Abbreviated Regulations and Appeal Form

Attachment -Offer Reply Form

Attachment

## OFFER REPLY FORM

**PLEASE COMPLETE AND EMAIL THIS FORM WITHIN 5 WORKDAYS TO:**
hco.ta.workforce.shaping@irs.gov

**THIS FORM MUST BE RECEIVED NO LATER THAN CLOSE OF BUSINESS ON THE 5TH WORKDAY FROM THE DATE OF RECEIPT OF THE RIF NOTICE.  (The notice receipt date is not included in the 5 workdays.)**

**<u>FAILURE TO RETURN THIS FORM WITHIN 5 WORKDAYS WILL BE CONSIDERED A DECLINATION.</u>**
--------------------------------------------------------------------------------

Name:  ___██████████████

Present Organization and Post of Duty:

> Management & Program Anal, GS-0343-13
> INTERNAL REVENUE SERVICE OFC OF CIVIL RIGHTS AND COMPL DIVERSITY & INCLUSION DIVISION DIV,STRTGY&PROACT RES SVCS SEC

Position Offered in RIF Notice:

> GS-0260-12
> Position Description Number:  S927840027
> OFC OF CIVIL RIGHTS AND COMPL
> EQUAL EMPLOYMENT OPPORTUNITY
> EEO - TERRITORY 2

Please check one:

_____    I **ACCEPT** the position offered above.


_____    I **DECLINE** the position offered above.  I understand that, because of this declination, I will be separated from the Federal Service by RIF procedures on 6/3/2025, and that if this was a reasonable offer (defined as not more than two grade or pay levels below your current position), I will not be eligible for severance pay or discontinued service retirement (even if I previously met the criteria for these entitlements).

Employee Signature*:  ██████████████_____ Date: _____
██████████████
*Electronic or hand signatures are acceptable

# EXHIBIT 6

Arathi Premkumar <arathi.premkumar@NTEU.ORG>
Wednesday, April 2, 2025 6:51 PM
Dan Kaspar <dan.kaspar@NTEU.ORG>
FW: CBA Negotiations: Postponement of April 3rd CBA Bargaining

---

Johnston, Lisa J <ljjohnston@blm.gov>
Wednesday, April 2, 2025 2:18 PM
Leib, Lauren A <lleib@blm.gov>; Ken Moffett <ken.moffett@NTEU.ORG>; Arathi Premkumar <arathi.premkumar@NTEU.ORG>
Hutcherson, Sheila K <shutcherson@blm.gov>; McNeer, Laura K <lmcneer@blm.gov>; Mishkin, Maximillian R <mmishkin@blm.gov>
CBA Negotiations: Postponement of April 3rd CBA Bargaining

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Good afternoon all,

Due to the issuance of Executive Order and OPM Guidance: Exclusions From Federal Labor-Management Relations Programs:

https://www.whitehouse.gov/presidential-actions/2025/03/exclusions-from-federal-labor-management-relations-programs/

https://www.chcoc.gov/content/guidance-executive-order-exclusions-federal-labor-management-programs

We will be postponing the CBA negotiations scheduled for April 3rd

**Lisa J Johnston**

**ER/LR Specialist**
**New Mexico BLM**
**(505) 709-7888**

EXHIBIT 7

**From:** Arathi Premkumar <arathi.premkumar@NTEU.ORG>
**Sent:** Friday, April 11, 2025 1:42 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Subject:** FW: April 14th LMRC meeting postponed

---

**From:** Johnston, Lisa J <ljjohnston@blm.gov>
**Sent:** Friday, April 11, 2025 9:32 AM
**To:** Arathi Premkumar <arathi.premkumar@NTEU.ORG>; Leib, Lauren A <lleib@blm.gov>
**Cc:** Hutcherson, Sheila K <shutcherson@blm.gov>; McNeer, Laura K <lmcneer@blm.gov>
**Subject:** April 14th LMRC meeting postponed

> **Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Good morning all,

Due to the issuance of Executive Order and OPM Guidance: Exclusions From Federal Labor-Management Relations Programs:

https://www.whitehouse.gov/presidential-actions/2025/03/exclusions-from-federal-labor-management-relations-programs/

https://www.chcoc.gov/content/guidance-executive-order-exclusions-federal-labor-management-programs

We will be postponing the April 14th LMRC meeting.

**Lisa J Johnston**

**ER/LR Specialist**
**New Mexico BLM**
**(505) 709-7888**

# EXHIBIT 8

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Tuesday, April 8, 2025 10:44 AM
**To:** █████████████████████████████████████

█████████████████████████████████████

**Cc:** Peyton Diotalevi <peyton.diotalevi@nteu.org>; Dan Kaspar <dan.kaspar@NTEU.ORG>
**Subject:** Fw: Department's Deferred Resignation/Retirement Program - Open Period April 4, 2025 - April 9, 2025

████████████

---

**From:** McNeer, Laura K <lmcneer@blm.gov>
**Sent:** Tuesday, April 8, 2025 10:42 AM
**To:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Cc:** BLM_Labor_Relations_Support <BLM_Labor_Relations_Support@blm.gov>
**Subject:** RE: Department's Deferred Resignation/Retirement Program - Open Period April 4, 2025 - April 9, 2025

> **Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Good morning,

Consistent with Executive Order 14251, "Exclusions from Federal Labor-Management Relations Programs," which was issued on March 27, 2025,  the BLM is excluded from Chapter 71 of Title 5 and will not bargain.

Thank You,



Laura McNeer
Lead Human Resources Specialist (Labor/Employee Relations)
Bureau of Land Management (Headquarters)
Cell: 385-315-6498
Email: lmcneer@blm.gov

# EXHIBIT 9

**From:** Ken Moffett <ken.moffett@NTEU.ORG>
**Sent:** Wednesday, April 2, 2025 11:15 AM
**To:** Doreen Greenwald <doreen.greenwald@NTEU.ORG>; Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Ken Moffett <ken.moffett@NTEU.ORG>
**Subject:** FW: [EXT] Re: National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)

███████████████████████████████████████████████

**From:** Jack Jarrett <jack.jarrett@NTEU.ORG>
**Sent:** Wednesday, April 2, 2025 11:08 AM
**To:** Ken Moffett <ken.moffett@NTEU.ORG>; Ryan Soon <ryan.soon@NTEU.ORG>; Rani Rolston <rani.rolston@NTEU.ORG>
**Subject:** Fw: [EXT] Re: National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)

████████████████████████████████████

**From:** Johnson Heather L
**Sent:** Wednesday, April 2, 2025 11:04 AM
**To:** Jack Jarrett
**Cc:** Stratton Christopher R; McCrimmon Sharrean J
**Subject:** RE: [EXT] Re: National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Good Morning,

Due to the Executive Order on Thursday, we are currently in a holding pattern in terms of grievances. So, we cannot address the "Project A" grievance until we get direction from the Secretary.

However, for this particular matter, I did speak to the Business unit. Due to the upheaval that the service is currently facing, they have abandoned this initiative for now. I hope this gives you some clarity while we wait.


Thanks!


**From:** Jack Jarrett <jack.jarrett@NTEU.ORG>
**Sent:** Monday, March 31, 2025 8:26 AM
**To:** Johnson Heather L <Heather.L.Johnson2@irs.gov>
**Cc:** Stratton Christopher R <Christopher.R.Stratton@irs.gov>; McCrimmon Sharrean J <Sharrean.J.McCrimmon@irs.gov>
**Subject:** [EXT] Re: National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)


No problem.  Just let me know when works.


**From:** Johnson Heather L <Heather.L.Johnson2@irs.gov>
**Sent:** Monday, March 31, 2025 8:02 AM
**To:** Jack Jarrett <jack.jarrett@NTEU.ORG>
**Cc:** Stratton Christopher R <Christopher.R.Stratton@irs.gov>; McCrimmon Sharrean J <Sharrean.J.McCrimmon@irs.gov>
**Subject:** National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)


**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Hi Jack,

I'm not sure if you received acknowledgement from LRSN of receipt of the above referenced grievance. I will work on this and reach out to you regarding a grievance meeting.

I apologize for the delayed response.

Thanks!

Heather L. Johnson, M. Div. J.D.

Labor Relations Specialist

Labor Relations Strategy & Negotiations (LRSN)

Labor/Employee Relations & Negotiations (LERN)

1st Friday Short (8:00am    4:30pm); 2nd Friday off

2888 Woodcock Blvd.

Atlanta, Georgia 30341

(470) 719-6749

# EXHIBIT 10

**Sent:** Monday, April 14, 2025 2:41 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Subject:** FW: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.



**From:** Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Sent:** Monday, April 14, 2025 8:56 AM
**To:** William Igoe <william.igoe@NTEU.ORG>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>; Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Subject:** RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Will
TTB does not intend to respond to the grievance request and the information request in the foreseeable future.

As a result of EO 14251, TTB has suspended (until further notice) all proceedings under the CBA including but not limited to: grievances under the Negotiated Grievance Process (NGP), Partnership Council, midterm bargaining, and Requests for Information, etc.

Please note that employees may transition NGP grievances to TTB's Administrative Grievance Process.

R
Geoff


Geoffrey Trivers, DBA, SPHR, SHRM-SCP
Human Resources Officer
Alcohol and Tobacco Tax and Trade Bureau (TTB)
202 306-5971 (mobile)

---

**From:** William Igoe <william.igoe@NTEU.ORG>
**Sent:** Friday, April 11, 2025 3:48 PM
**To:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>; Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>
**Subject:** [EXTERNAL]RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

<span style="color:red">**CAUTION:**</span>This email has originated from an external entity. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

Goeffrey and Andrea,

Please let me know if you intend to respond to the grievance request and the information request.

Thank you,

Will Igoe

---

**From:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Sent:** Wednesday, March 19, 2025 11:10 AM
**To:** William Igoe <william.igoe@NTEU.ORG>; Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>
**Subject:** RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Thank you and no worries.

Regards,
Andrea Johnson
Human Resources Specialist
Alcohol and Tobacco Tax and Trade Bureau (TTB)
Office:  (202) 453 2166
https://www.ttb.gov/



---

**From:** William Igoe <william.igoe@NTEU.ORG>
**Sent:** Wednesday, March 19, 2025 12:05 PM
**To:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>; Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>
**Subject:** [EXTERNAL]RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**CAUTION:** This email has originated from an external entity. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

Attached is the grievance. I apologize for my mistake.

---

**From:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Sent:** Wednesday, March 19, 2025 10:44 AM
**To:** William Igoe <william.igoe@NTEU.ORG>; Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>
**Subject:** RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Hi William:

You provided us with the same document in both attachments.  Can you please send us the grievance?

Regards,
Andrea Johnson
Human Resources Specialist
Alcohol and Tobacco Tax and Trade Bureau (TTB)
Office:  (202) 453-2166
https://www.ttb.gov/



---

**From:** William Igoe <william.igoe@NTEU.ORG>
**Sent:** Wednesday, March 19, 2025 11:11 AM
**To:** Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>; Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>

**Subject:** [EXTERNAL]Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**CAUTION:** This email has originated from an external entity. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

Ms. Johnson, and Mr. Trivers,

NTEU hereby formally submits the attached grievance(s) on behalf of all affected employees, and NTEU. If you are not the appropriate point of contact to address this matter, kindly forward the grievance to the designated TTB official and ensure a copy is cc'd to this email address.

Also, NTEU would like this filing to be processed as one grievance for efficiency. If you disagree, the filing can instead be treated as two separate grievances, with the ULP (Unfair Labor Practice) issues processed independently. Let me know if you agree.

Sincerely,


William Igoe
Assistant Counsel
National Treasury Employees Union
33 North LaSalle Street, Suite 1700
Chicago, IL 60602
(312) 451-1075 (Telephone)
(312) 977-0693 (Facsimile)
https://www.nteu.org/join





EXHIBIT 11

**From:** Gretchen Paulig <gretchen.paulig@NTEU.ORG>
**Sent:** Thursday, April 10, 2025 4:59 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>; Julie Lenggenhager <julie.lenggenhager@NTEU.ORG>
**Subject:** FW: [EXT] RE: Rescheduled Arbitration - V. Robinson

**From:** Elizabeth Reyes <elizabeth.reyes@NTEU.ORG>
**Sent:** Thursday, April 10, 2025 3:52 PM
**To:** Gretchen Paulig <gretchen.paulig@NTEU.ORG>
**Subject:** FW: [EXT] RE: Rescheduled Arbitration - V. Robinson

**From:** Bugaj Jennifer E <Jennifer.E.Bugaj@IRSCOUNSEL.TREAS.GOV>
**Sent:** Thursday, April 10, 2025 3:28 PM
**To:** Elizabeth Reyes <elizabeth.reyes@NTEU.ORG>
**Subject:** RE: [EXT] RE: Rescheduled Arbitration - V. Robinson

> **Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Hi Elizabeth,

We are currently awaiting further guidance on the Executive Order relating to the CBA. For this reason, I cannot make arrangements regarding this hearing at this time, nor commit to travel plans or location for this hearing until Department of the Treasury provides final guidance on the collective bargaining

agreement.  I will get back to you once there is an update on that; hopefully there will be a resolution soon.

Thank you,

**Jennifer E. Bugaj**
Senior Counsel (GLS)
Office of Chief Counsel (IRS) — Chicago
Ph: 312.292.2281

EXHIBIT 12

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Tuesday, April 1, 2025 7:12 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Peyton Diotalevi <peyton.diotalevi@nteu.org>
**Subject:** Re: Change in Decision: LRD and LRG not approved

████████████████████████

LRT = Term Negotiations, including preparation
LRM = Mid-Term Negotiations, including preparation

LRG = General Labor-Management Relations (all contract, administration and representational activities except negotiations, grievances, appeals and complaints)
LRD = Dispute Resolution, Grievances, Appeals, and Complaints, including preparing and presenting

  b.  the requested date

  c.  the requested start time

  d.  the requested end date

  e.  the requested end time

  f.  the total number of official time hours requested

  g.  remarks, including a general description of the activity for which official time will be used.

Sent from my iPhone

On Apr 1, 2025, at 6:53 PM, Dan Kaspar <dan.kaspar@nteu.org> wrote:

███████████████████████████████████

Daniel J. Kaspar (he/him)
Director of Field Operations & Organizing
National Treasury Employees Union
800 K Street, NW - Suite 1000
Washington, D.C. 20001
(202) 572-5500, ext. 6346

---

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Tuesday, April 1, 2025 5:16 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>; Peyton Diotalevi <peyton.diotalevi@nteu.org>
**Subject:** Fwd: Change in Decision: LRD and LRG not approved

██

████████████████

Begin forwarded message:

> **From:** "Davidson, Zoe M" <zdavidson@blm.gov>
> **Date:** April 1, 2025 at 4:47:24 PM EDT
> **To:** Kate Sylvester <kate.sylvester@nteu.org>, "Paulete, Francisca
> (Panchita )" <fpaulete@blm.gov>
> **Subject: FW: Change in Decision: LRD and LRG not approved**
>
> **Caution:** This message originated from outside of the organization.
> Do Not Click links or Open attachments unless you recognize the
> sender and know the content is safe.
>
> FYI
>
> ---
>
> **From:** McIntosh, Stacie J <s05mcint@blm.gov>
> **Sent:** Tuesday, April 1, 2025 4:40 PM
> **To:** Davidson, Zoe M <zdavidson@blm.gov>
> **Subject:** Change in Decision: LRD and LRG not approved
>
> Hi Zoe,
>
> On March 27, 2025 EO "Exclusions from Federal Labor-Management
> Relations Program " was issued by President Trump . As a result of this order , I
> am unable to approve LRG (1598957) for March 27-31 and April 1-4, 2025 and
> LRD (1598960) for April 4, 2025, as requested. This email constitutes my
> change in decision to disapproved for the use of LRG and LRD on the dates
> indicated.
>
> Stacie

Deputy Assistant Director

Resources and Planning Directorate

Bureau of Land Management

(907) 378-3815 c

EXHIBIT 13

**From:** Doug Sanders <doug.sanders@NTEU.ORG>
**Sent:** Wednesday, April 9, 2025 1:30 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Kathryn Huth <kathryn.huth@NTEU.ORG>
**Subject:** FW: NTEU 254: Request for briefing on proposed offices moves for Article 6, Section 5(B) Notice at CDER-St. Louis (week of 3/31/2025)


**Douglas L. Sanders**
**Assistant Counsel and National Field Representative**
National Treasury Employees Union, Denver Field Office
1355 S. Colorado Blvd., Ste. C-210
Denver, CO 80222
303/295-6301 x6413


This email message and any attachments is intended only for the named recipient(s). It may contain information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law and may not be forwarded, disclosed or otherwise utilized without the express permission of the sender. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, do not review the contents, please notify the sender and then delete the message.

**From:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 11:19 AM
**To:** Doug Sanders <doug.sanders@NTEU.ORG>

**Subject:** FW: NTEU 254: Request for briefing on proposed offices moves for Article 6, Section 5(B) Notice at CDER-St. Louis (week of 3/31/2025)

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

**Stephanie Rogers**
*Chapter President NTEU 254*

**U.S. Food and Drug Administration**
T: 303-236-9638
Stephanie.Rogers@fda.hhs.gov



**From:** Cabrera, Naomi <Naomi.Cabrera@fda.hhs.gov>
**Sent:** Monday, March 31, 2025 9:34 AM
**To:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Cc:** Rodriguez, Jason <Jason.Rodriguez@fda.hhs.gov>; Rivas, Elaine M <Elaine.Rivas@fda.hhs.gov>; Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>; Stubbs, Latrecia <Latrecia.Stubbs@fda.hhs.gov>
**Subject:** RE: NTEU 254: Request for briefing on proposed offices moves for Article 6, Section 5(B) Notice at CDER-St. Louis (week of 3/31/2025)

Good morning,

Please see correction (highlighted) to the guidance below:
On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).
Until further notice, the FDA is postponing any scheduled labor relation meetings currently.

Very Respectfully,

**Naomi Cabrera,**
Labor Relations Specialist
Division of Employee and Labor Relations (DELR)
Office of Human Capital Management (OHCM)
Office of Operations (OO)
Office of the Commissioner (OC)
U.S. Food and Drug Administration (FDA)
email: naomi.cabrera@fda.hhs.gov

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed, and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this e-mail or the information herein by anyone other than the intended recipient is prohibited. If you have received this e-mail in error, please notify the sender by reply e-mail, phone, or fax, and destroy the original message and all copies.

**From:** Cabrera, Naomi
**Sent:** Monday, March 31, 2025 9:02 AM
**To:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Cc:** Rodriguez, Jason <Jason.Rodriguez@fda.hhs.gov>; Rivas, Elaine M <Elaine.Rivas@fda.hhs.gov>; Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>; Stubbs, Latrecia <Latrecia.Stubbs@fda.hhs.gov>
**Subject:** RE: NTEU 254: Request for briefing on proposed offices moves for Article 6, Section 5(B) Notice at CDER-St. Louis (week of 3/31/2025)

Good morning,
On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).
Until further notice, the FDA is ending labor relation meetings with the exclusive representatives of (NTEU/AFGE) in adherence to the above referenced presidential Executive Order.

Very Respectfully,

**Naomi Cabrera,**
Labor Relations Specialist
Division of Employee and Labor Relations (DELR)
Office of Human Capital Management (OHCM)
Office of Operations (OO)
Office of the Commissioner (OC)
U.S. Food and Drug Administration (FDA)
email: naomi.cabrera@fda.hhs.gov

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed, and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this e-mail or the information herein by anyone other than the intended recipient is prohibited. If you have received this e-mail in error, please notify the sender by reply e-mail, phone, or fax, and destroy the original message and all copies.

EXHIBIT 14

**From:** Doug Sanders <doug.sanders@NTEU.ORG>
**Sent:** Thursday, April 10, 2025 4:45 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Kathryn Huth <kathryn.huth@NTEU.ORG>
**Subject:** FW: NTEU 254: BUE denied union representation during meeting with supervisor.

**Douglas L. Sanders**
**Assistant Counsel and National Field Representative**
National Treasury Employees Union, Denver Field Office
1355 S. Colorado Blvd., Ste. C-210
Denver, CO 80222
303/295-6301 x6413

This email message and any attachments is intended only for the named recipient(s). It may contain information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law and may not be forwarded, disclosed or otherwise utilized without the express permission of the sender. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, do not review the contents, please notify the sender and then delete the message.

**From:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>
**Sent:** Thursday, April 10, 2025 9:22 AM
**To:** Doug Sanders <doug.sanders@NTEU.ORG>
**Subject:** FW: NTEU 254: BUE denied union representation during meeting with supervisor.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.



**Stephanie Rogers**
*Chapter President NTEU 254*

**U.S. Food and Drug Administration**
T: 303-236-9638
Stephanie.Rogers@fda.hhs.gov



**From:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Sent:** Thursday, April 10, 2025 9:21 AM
**To:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>; Stubbs, Latrecia <Latrecia.Stubbs@fda.hhs.gov>
**Subject:** NTEU 254: BUE denied union representation during meeting with supervisor.

Good morning Stephanie and Latrecia,

The BUE requested Union representation during a 1 to 1 meeting with the supervisor, and the supervisor agreed. Later, the supervisor rescinded because of guidance on revocation of EO 14119 and *"cease the use of pre-decisional involvement of labor unions and employees in agency matters"*.  Though CBA Article 5, section 4 retains the right of the supervisor to meet an employee without Union representation, I am concerned that this guidance may lead to the denial of union representation during Article 7 meetings.

Respectfully,
Anjanette Smith
NTEU Chapter 254 Representative
Food and Drug Administration
St. Louis, MO
Phone: 314-539-3858
Anjanette.Smith@fda.hhs.gov

**From:** ██████████████████ @fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 4:01 PM
**To:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Subject:** FW: meetings and NTEU

Hi Anjanette,

███████████████████████████████████████████████████

Thank you,



---

**From:** Hines, Michelle J <Michelle.Hines@fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 3:42 PM
**To:** ████████████████████ @fda.hhs.gov>
**Subject:** RE: meetings and NTEU

Good afternoon ███,

After further consideration, I am rescinding my approval of your request to have NTEU present during out meeting tomorrow and any future 1:1s/team meetings. It is not my current practice to have anyone from the union present during our 1:1s or my team meetings.

Thank you in advance,

Michelle J. Hines, Branch Chief
OBMI/DBMI3/BMIB3

# EXHIBIT 15

**From:** Doug Sanders <doug.sanders@NTEU.ORG>
**Sent:** Thursday, April 10, 2025 4:45 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Kathryn Huth <kathryn.huth@NTEU.ORG>
**Subject:** FW: NTEU 254: BUE denied union representation during meeting with supervisor.

**Douglas L. Sanders**
**Assistant Counsel and National Field Representative**
National Treasury Employees Union, Denver Field Office
1355 S. Colorado Blvd., Ste. C-210
Denver, CO 80222
303/295-6301 x6413

This email message and any attachments is intended only for the named recipient(s). It may contain information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law and may not be forwarded, disclosed or otherwise utilized without the express permission of the sender. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, do not review the contents, please notify the sender and then delete the message.

**From:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>
**Sent:** Thursday, April 10, 2025 9:22 AM
**To:** Doug Sanders <doug.sanders@NTEU.ORG>
**Subject:** FW: NTEU 254: BUE denied union representation during meeting with supervisor.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.



**Stephanie Rogers**
*Chapter President NTEU 254*

**U.S. Food and Drug Administration**
T: 303-236-9638
Stephanie.Rogers@fda.hhs.gov



**From:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Sent:** Thursday, April 10, 2025 9:21 AM
**To:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>; Stubbs, Latrecia <Latrecia.Stubbs@fda.hhs.gov>
**Subject:** NTEU 254: BUE denied union representation during meeting with supervisor.

Good morning Stephanie and Latrecia,

The BUE requested Union representation during a 1 to 1 meeting with the supervisor, and the supervisor agreed. Later, the supervisor rescinded because of guidance on revocation of EO 14119 and *"cease the use of pre-decisional involvement of labor unions and employees in agency matters"*.  Though CBA Article 5, section 4 retains the right of the supervisor to meet an employee without Union representation, I am concerned that this guidance may lead to the denial of union representation during Article 7 meetings.

Respectfully,
Anjanette Smith
NTEU Chapter 254 Representative
Food and Drug Administration
St. Louis, MO
Phone: 314-539-3858
Anjanette.Smith@fda.hhs.gov

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓@fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 4:01 PM
**To:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Subject:** FW: meetings and NTEU

Hi Anjanette,

██████████████████████████████████████

Thank you,



---

**From:** Hines, Michelle J <Michelle.Hines@fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 3:42 PM
**To:** ████████████████████ @fda.hhs.gov>
**Subject:** RE: meetings and NTEU

Good afternoon ████,

After further consideration, I am rescinding my approval of your request to have NTEU present during out meeting tomorrow and any future 1:1s/team meetings. It is not my current practice to have anyone from the union present during our 1:1s or my team meetings.

Thank you in advance,

Michelle J. Hines, Branch Chief
OBMI/DBMI3/BMIB3

EXHIBIT 16

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Thursday, April 3, 2025 5:05 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Peyton Diotalevi <peyton.diotalevi@nteu.org>
**Subject:** Fw: [EXTERNAL] Re: BLM and NTEU: CBA Repudiation Grievance



**From:** hoya68@gmail.com <hoya68@gmail.com>
**Sent:** Thursday, April 3, 2025 3:20 PM
**To:** 'Nolet, Joshua M' <joshua.nolet@sol.doi.gov>; Kate Sylvester <kate.sylvester@NTEU.ORG>;
arbitrator@alpern.us <arbitrator@alpern.us>
**Cc:** 'BLM_Labor_Relations_Support' <BLM_Labor_Relations_Support@blm.gov>
**Subject:** RE: [EXTERNAL] Re: BLM and NTEU: CBA Repudiation Grievance

**Caution:** This message originated from outside of the organization. Do Not Click links or
Open attachments unless you recognize the sender and know the content is safe.

Counsel:

I begin with the premise that I have some authority over this dispute. The authority
derives from my appointment by the Federal Mediation and Conciliation ("FMCS").

Absent a withdrawal of that appointment by the FMCS, I am obligated to proceed. In the first instance, I must resolve whether I have jurisdiction over the dispute, recognizing that my determination is subject to review by the Federal Labor Relations Authority ("FLRA") and that its determination is not subject to judicial review unless this matter involves an unfair labor practice or if it involves a constitutional issue. See, *AFGE, HUD LOCALS COUNCIL 222, v. FLRA, et al.* (DC Cir No  22-5308 April 23, 2024).

Several issues are raised by the Agency challenging my jurisdiction. The Agency claims that the collective bargaining agreement was rejected by the designee of the Agency head with respect to several of its provisions. Presumably because of that rejection, the collective bargaining agreement never went into effect. In turn, the Union might argue that the rejection was of no effect because the agreement was previously reviewed and approved by the Acting Deputy Secretary of the Department of the Interior. These are issues which I have jurisdiction to resolve, as they are necessary to resolving whether the parties have a valid collective bargaining agreement.

However, the Agency raises the contention that an Executive Order 14251 (90 FR 14553, March 27, 2025), the President excluded the Agency from the provisions of Chapter 7 of title 5, United States Code. This exclusion would mean that the Agency has no authority to enter into a collective bargaining agreement. I would thus have no jurisdiction to resolve disputes between the parties. Whether the exclusion is constitutionally valid is beyond my competence and presumably the FLRA. Instead, this is a matter for resolution by the federal courts. I will stay further proceedings for sixty days. If the Union challenges the Executive Order insofar as it applies to the Agency, the stay shall remain in effect pending final judicial resolution. If the Union does not file a judicial action within that time frame, I will dismiss this action.

I request that the parties inform me of future developments.


Stephen E. Alpern
Arbitrator

www.alpern.us

EXHIBIT 17

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

———

**NATIONAL TREASURY EMPLOYEES UNION**
(Union)

**and**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**WASHINGTON, D.C.**
(Agency)

**0-NG-3731**

———

**ORDER TO SHOW CAUSE**

**April 4, 2025**

———

On March 27, 2025, President Donald J. Trump amended Executive Order 12,171 (1979), pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), to exclude certain agencies and agency subdivisions from the coverage of the Federal Service Labor-Management Relations Statute (the Statute).[1]  Accordingly, the Authority directs the Union to show cause why the Authority should not dismiss this matter for lack of jurisdiction.[2]  As described further below, the Agency may reply to the Union's response to this order.

The Union must file its response to this order with the Authority by **April 18, 2025**.  The Union's response must also include a statement of service that complies with the Authority's Regulations showing that the Union served its response on all counsel of record or other designated representatives.[3]

The Union should direct its response to Erica Balkum, Chief, Office of Case Intake and Publication, Federal Labor Relations Authority, 1400 K Street NW, Suite 300, Washington, D.C. 20424-0001.  The proper methods for filing documents with the Authority are set forth at § 2429.24(e) of the Authority's Regulations.[4]  As outlined in the

---

[1] Exclusions from Federal Labor-Management Relations Programs, Exec. Order No. 14251 (Mar. 27, 2025), 90 Fed. Reg. 14553 (Apr. 3, 2025).
[2] *See generally U.S. Att'y's Off., S. Dist. of Tex., Hous., Tex.*, 57 FLRA 750 (2002) (where President amended Executive Order 12,171 to exclude additional entity from Statute's coverage, Authority ordered affected parties to brief whether Authority lacked jurisdiction over their cases).
[3] 5 C.F.R. § 2429.27(a), (c).
[4] *Id.* § 2429.24(e).

Authority's Regulations, the Union's response to the Authority must be filed by personal delivery, commercial delivery, first-class mail, or certified mail.[5]

The Union's failure to comply with this order by **April 18, 2025**, may result in dismissal of the Union's filing in this case.

If the Agency chooses to file a reply to the Union's response, then the reply must be filed with the Authority within *fourteen days* after service of the Union's response. The Agency's reply must also be filed in accordance with the Authority's Regulations, including the requirement to file a statement of service showing that the Agency served its reply on all counsel of record or other designated representatives.[6]

Requests for extensions of time must be in writing and received by the Authority not later than five days before the established time limit for filing.[7] The request must state the position of the other party and must be served on the other party.[8]

Because the Authority's jurisdiction over this matter is in question, *the deadlines for any remaining filings in this case — except for responses or replies to this order — are temporarily suspended*. Except for responses or replies to this order, you are not required to submit any further filings in this case until the Authority notifies you otherwise.

Procedural questions regarding this case should be directed to the Office of Case Intake and Publication at (771) 444-5805.

For the Authority:

Erica Balkum, Chief
Office of Case Intake and Publication

---

[5] *Id.*; *see also id.* § 2429.24(a) ("To file documents by personal delivery, *you must schedule an appointment at least one business day in advance* by calling [(771) 444-5805]." (emphasis added)).
[6] *Id.* §§ 2429.24(e); 2429.27(a), (c).
[7] *Id.* § 2429.23(a).
[8] *Id.*

2

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

──────

**NATIONAL TREASURY EMPLOYEES UNION**
**(Union)**

**and**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**WASHINGTON, D.C.**
**(Agency)**

**0-NG-3731**

──────

**STATEMENT OF SERVICE**

──────

I hereby certify that copies of the Order of the Federal Labor Relations Authority in the subject proceeding have this day been served by the following methods:

EMAIL

Allison Giles
Assistant Counsel
NTEU
800 K Street, N.W., Suite 1000
Washington, DC 20001
Allie.Giles@nteu.org

Christina Ballance
Agency Head Review Officer
Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201
Christina.Ballance@hhs.gov

Garrett Anderson
Attorney Advisor
1961 Stout St.
Denver, CO 80205
garrett.anderson@hhs.gov

Robert F. Kennedy, Jr.
Secretary, HHS
200 Independence Ave., SW
Washington, DC 20201
Christina.Ballance@hhs.gov


Dated:_____          _____ for
        WASHINGTON, D.C.           Belinda Stevenson
                                   Legal Assistant

2

EXHIBIT 18



UNITED STATES OF AMERICA
**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON REGIONAL OFFICE**
1400 K Street, NW, Third Floor
Washington, DC 20424-0001
(771) 444-5780   FAX: (202) 482-6724

April 3, 2025

**VIA EMAIL**

Kate Sylvester
Assistant Counsel
National Treasury Employees Union
800 K St NW, Suite 1000
Washington, DC 20001
Kate.sylvester@nteu.org

Joshua Nolet
Attorney-Advisor, Office of the Solicitor
United States Department of the Interior
1849 C Street, NW
Washington DC 2024
Joshua.Nolet@sol.doi.gov

Re: Bureau of Land Management and
National Treasury Employees Union;
Case No: WA-CA-24-0563

Dear Parties:

This Office docketed the above-captioned unfair labor practice (ULP) charge on September 26, 2024. The Agent assigned to investigate this charge is Sarah Kurfis, who can be reached at 771-444-5787 or skurfis@flra.gov

On March 27, 2025, President Trump issued an Executive Order titled *Exclusions from Federal Labor-Management Relations Programs*, which amended Executive Order 12171, dated November 19, 1979 (as amended), and excluded a number of Federal agencies from collective bargaining pursuant to Section 7103(b)(1) of the Federal Service Labor-Management Relations Statute.

Because the Executive Order impacts the processing of this ULP charge, processing of this charge will be deferred so as to afford the Office of the General Counsel time to reevaluate the case in view of the Executive Order and in view of cases pending before the Authority.

Sincerely,

Jessica S. Bartlett
Regional Director

# EXHIBIT 3

## DECLARATION OF DANIEL KASPAR

I, Daniel Kaspar, hereby declare as follows:

1.   As previously explained in declarations submitted to the district court dated April 2, 2025 and April 16, 2025, I am the Director of Field Operations for NTEU. In that capacity, I am familiar with the agencies where NTEU-represented employees work, as well as the duties those employees perform. I am also familiar with the collective bargaining agreements that we have negotiated with our agencies and whether agencies are complying with those agreements, as well as statutory collective bargaining obligations.

2.   The harm to NTEU from the Executive Order entitled "Exclusions from Federal Labor-Management Relations Programs," 90 Fed. Reg. 14553 (March 27, 2025), is continuing.

3.   I believe the Executive Order will cause existing NTEU members to leave NTEU and cause new employees in NTEU bargaining units not to join. The loss of existing members because of the Executive Order has already begun. For example, an NTEU member within the Food and Drug Administration (FDA) of the U.S. Department of Health and Human Services (HHS) told HHS on April 28, 2025 that she wished "to end [her] participation in NTEU" because of the Executive Order, which excludes FDA from the federal sector labor statute. (Attached).

4.   NTEU is still losing over a million dollars every pay period from dues that would normally have been remitted to the union, but which have stopped

because of the Executive Order. As of the pay period ending on April 19 2025, NTEU has lost three million dollars.

5.      This substantial and continuing loss of revenue threatens NTEU's existence. If this Court stays the emergency relief that the district court ordered, NTEU might not survive in its current form.

6.      The largest federal sector labor union, the American Federation of Government Employees, has laid off half of its workforce because "President Donald Trump's executive actions have rapidly weakened the organization's finances." Ryan J. Foley, Associated Press, "Largest federal employee union, a leading Trump opponent, to lay off more than half of staff" (updated April 24, 2025), https://apnews.com/article/afge-federal-union-trump-cuts-layoffs-downsizing-53c0a1491cc5af65278fbd16b8cfb6b5. Without the preliminary relief that the district court ordered, NTEU, the second largest federal sector union, could be next.

Executed on May 4, 2025

Daniel Kaspar

 Outlook

---

**Fw: HHS/NTEU, Please cancel my NTEU dues and provide a refund for the last 2 pay periods.**
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ U. S. FDA, HOU-RP)

---

**From** Dan Kaspar <dan.kaspar@NTEU.ORG>

**Date** Mon 4/28/2025 11:35 PM

**To** Paras Shah <paras.shah@nteu.org>; Allie Giles <Allie.Giles@NTEU.ORG>; Lindsay Dunn <lindsay.dunn@NTEU.ORG>

**Cc** Julie Wilson <julie.wilson@NTEU.ORG>

📎 1 attachment (84 KB)

SF1188 - Cancel NTEU dues (jct) 04-28-2025.pdf;

▮▮▮▮▮▮▮▮▮▮▮▮▮

Get Outlook for iOS

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮fda.hhs.gov>

**Sent:** Monday, April 28, 2025 12:09:43 PM

**To:** Ballance, Christina (OS) <Christina.Ballance@hhs.gov>; NTEU BUES <NTEUBUE@hhs.gov>

**Cc:** Julie Lenggenhager <julie.lenggenhager@NTEU.ORG>; Peyton Diotalevi <peyton.diotalevi@nteu.org>

**Subject:** RE: HHS/NTEU, Please cancel my NTEU dues and provide a refund for the last 2 pay periods.▮▮▮▮▮▮▮▮ U. S. FDA, HOU-RP)

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Hello,

It appears that union dues are still being taken out of my check.

As I recall, President Trump demolished the union several weeks ago (Friday, 03/28/2025).

Please return my $29.25x 2 Pay Periods ($58.50) and take no more deductions.

Please see the attached form, SF-1188 to end my participation in NTEU.

**Kind Regards,**



**1445 North Loop West (Suite 500),**
**Houston, TX 77008**

@fda.hhs.gov

**From:** Ballance, Christina (OS/ASA/IO) <Christina.Ballance@hhs.gov>
**Sent:** Monday, January 6, 2025 11:48 AM
**To:** NTEU BUES <NTEUBUE@hhs.gov>
**Cc:** Julie A. Lenggenhager <julie.lenggenhager@NTEU.ORG>; Peyton Diotalevi <peyton.diotalevi@nteu.org>; NLERO CORE MEMBERS <NLEROCORE_MEMBERS@hhs.gov>; Wilson, Jennifer (OS) <Jennifer.Wilson@hhs.gov>
**Subject:** HHS/NTEU Joint Article 25 Hours of Duty Training Sessions

The HHS/NTEU Joint Article 25 Alternative Work Schedule (AWS)/Hours of Duty Training videos have been published.

As you may recall, in August, HHS and NTEU were pleased to collaborate and offer a one-hour training session on Article 25, the AWS/Hours of Work. This mutually beneficial training was jointly presented by HHS and NTEU staff and covered the available schedule options, eligibility requirements, submitting and processing schedule requests, as well as reasons an employee's alternative work schedule could be suspended or terminated. This training is designed for all bargaining unit employees and those non-bargaining unit employees who supervise or otherwise need to know the contractual requirements.

The HHS/NTEU Joint Article 25 Training videos are available on the Department's internal YouTube channel; the transcripts for the training are linked to each training session.

We have linked one FDA session and one HHS session here:

> HHS session #3: https://youtu.be/p6cydzOiILs

> FDA session #2: https://youtu.be/-6R5dlxYOR0

However, all four videos are available at: Labor-Management Relations | HHS Intranet

Thank you again for your participation and interest in our trainings!

Christina
Christina V. Ballance (she/her)
Executive Director, National Labor/Employee Relations Office
U.S. Department of Health and Human Services
Phone: 202-729-8773
Cell: 202-436-6485

Scheduler: Jennifer.Wilson@hhs.gov