**[ORAL ARGUMENT NOT SCHEDULED]**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION,<br><br>    Plaintiff-Appellee,<br><br>    v.<br><br>DONALD J. TRUMP, et al.,<br><br>    Defendants-Appellants. | No. 25-5157 |

**UNDERLYING DECISION FROM WHICH APPEAL ARISES**

Attached are the April 25, 2025, order and the April 28, 2025,

opinion of the district court granting plaintiff a preliminary injunction.

JOSHUA M. SALZMAN

 s/ *Joshua M. Koppel*
JOSHUA M. KOPPEL
 (202) 514-4820
Attorneys
Civil Division, Appellate Staff
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 7212
Washington, D.C. 20530

May 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | Civil Action No. 25-0935 (PLF) |
| DONALD J. TRUMP, et al., | ) ) ) |  |
| Defendants. | ) ) ) |  |

## ORDER

Upon consideration of Plaintiff's Motion for a Preliminary Injunction [Dkt. No. 9], it is hereby

ORDERED that Plaintiff's Motion for a Preliminary Injunction [Dkt. No. 9] is GRANTED; it is

FURTHER ORDER that Section 2 of the Executive Order, Exclusions from Federal Labor-Management Relations Programs (Mar. 27, 2025), is unlawful as applied to the Defendants who are heads of agencies with employees represented by the Plaintiff; it is

FURTHER ORDER that the Office of Personnel Management's Guidance on Executive Order Exclusions from Federal Labor-Management Programs (Mar. 27, 2025) ("OPM Guidance"), on the Executive Order is unlawful as applied to the Defendants who are heads of agencies with employees represented by the Plaintiff; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing Section 2 of Executive Order; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing the OPM Guidance; and it is

FURTHER ORDERED that the parties shall meet and confer and file a joint status report on or before May 2, 2025, proposing a schedule for how this case should proceed.

An opinion explaining the Court's reasoning will be issued within the next few days.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/25/25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
                                        )
NATIONAL TREASURY EMPLOYEES             )
UNION,                                  )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )        Civil Action No. 25-0935 (PLF)
                                        )
DONALD J. TRUMP et al.,                 )
                                        )
            Defendants.                 )
_____)


<u>OPINION</u>

In 1978, Congress passed the Federal Service Labor-Management Relations
Statute.  This landmark piece of legislation codified the rights of federal employees to
collectively bargain and "participate through labor organizations of their own choosing in
decisions which affect them."  5 U.S.C. § 7101(a)(1).  In passing the statute, Congress spoke
unequivocally:  "labor organizations and collective bargaining in the civil service are in the
public interest."  5 U.S.C. § 7101(a).  Congress's determination that these rights should apply
broadly – and that those rights "contribute[] to the effective conduct of public business," 5
U.S.C. § 7101(a)(1)(B) – was undisturbed for decades, governing the state of the federal
workforce despite changes in the composition of Congress and presidential administrations.

This all changed on March 27, 2025.  On that day, President Trump issued an
Executive Order invoking 5 U.S.C. § 7103(b)(1), which permits the President to "issue an order
excluding any agency or subdivision thereof from coverage" of the Federal Service Labor-
Management Relations Statute if the President determines that "the agency or subdivision has as

a primary function intelligence, counterintelligence, investigative, or national security work," and that the statute's provisions "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." The effect of the Executive Order was substantial: it removed collective bargaining rights from approximately two-thirds of the federal workforce. In response to this sweeping Executive Order, the National Treasury Employees Union ("NTEU") filed the instant action challenging the Executive Order, arguing that the President exceeded his power when issuing the order.

NTEU filed a motion for a preliminary injunction on April 4, 2025. See Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 9]. The Court held oral argument on the motion on April 23, 2025. Upon careful consideration of the parties' written submissions, their oral arguments, and the relevant authorities, the Court granted NTEU's motion for a preliminary injunction. See Order of April 25, 2025 [Dkt. No. 32].[1]

## I.   BACKGROUND

### A.  Statutory Background

The Federal Service Labor-Management Relations Statute set forth in Title VII of the Civil Service Reform Act, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978) (codified at 5 U.S.C. §§ 7101-35) ("FSLMRS"), provides certain protections of the "right of employees to organize, bargain collectively, and participate through labor organizations of their

---

[1]     The papers reviewed by the Court in connection with this matter include: Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1]; Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 9]; Memorandum of Points and Authority in Support of Plaintiff NTEU's Motion for a Preliminary Injunction ("Pl.'s Mem.") [Dkt. No. 9-1]; Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Opp.") [Dkt. No. 26]; and Plaintiff NTEU's Reply in Support of its Motion for a Preliminary Injunction ("Pl.'s Reply) [Dkt. No. 29].

own choosing in decisions which affect them . . . ."  5 U.S.C. § 7101(a)(1).  In passing the

statute, Congress found that based on "experience in both private and public employment," the

protections were necessary to "safeguard[] the public interest," "contribute[] to the effective

conduct of public business," and "facilitate[] and encourage[] the amicable settlements of

disputes between employees and their employers involving conditions of employment."  Id.  In

sum, Congress found that "labor organizations and collective bargaining in the civil service are

in the public interest."  Id.

      Among other things, the FSLMRS requires federal agencies to collectively

bargain "with respect to the conditions of employment affecting such employees."  5 U.S.C.

§ 7103(a)(12).  The statute provides a role for "labor organizations" in this collective bargaining

process, stating:

> A labor organization which has been accorded exclusive recognition
> is the exclusive representative of the employees in the unit it
> represents and is entitled to act for, and negotiate collective
> bargaining agreements covering, all employees in the unit.  An
> exclusive representative is responsible for representing the interests
> of all employees in the unit it represents without discrimination and
> without regard to labor organization membership.

5 U.S.C. § 7114(a)(1).

      While Congress extended these protections to "many" federal employees, it did

not "include the entire federal workforce within this regime."  Am. Fed'n of Gov't Emps., AFL-

CIO v. Reagan, 870 F.2d 723, 724 (D.C. Cir. 1989).  "The Act itself exempted several federal

agencies from coverage," id., including the Federal Bureau of Investigation, the Central

Intelligence Agency, and the National Security Agency.  See 5 U.S.C. § 7103(a)(3).  In addition

to these explicit exclusions, "Congress also addressed the matter of national security" in

Section 7103(b).  Soc. Sec. Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps.

(Petitioner/Labor Org.), 59 F.L.R.A. 137, 143 (Sept. 12, 2003).  Specifically, Congress granted

the President the authority to either exclude or suspend certain "agenc[ies] or subdivision[s]

thereof" from the statute's coverage.  See 5 U.S.C. § 7103(b).  Section 7103(b) provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –
>
>> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>>
>> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.
>
> (2) The President may issue an order suspending any provision of this chapter with respect to any agency, installation, or activity located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security.

5 U.S.C. § 7103(b).  The exclusion provided in Section 7103(b)(1) has been invoked numerous

times since the passage of the FSLMRS.[2]  As NTEU points out, however, Section 7103(b)(1) has

never been invoked to exclude an entire cabinet-level department from the FSLMRS.  See Pl.'s

Mem. at 4.

---

[2]     See Exec. Order No. 12171, 44 Fed. Reg. 66565 (1979); Exec. Order No. 12338, 47 Fed. Reg. 1369 (1982); Exec. Order No. 12410, 48 Fed. Reg. 13143 (1983); Exec. Order No. 12559, 51 Fed. Reg. 18761 (1986); Exec. Order No. 12632, 53 Fed. Reg. 9852 (1988); Exec. Order No. 12666, 54 Fed. Reg. 1921 (1989); Exec. Order No. 12671, 54 Fed. Reg. 11157 (1989); Exec. Order No. 12681, 54 Fed. Reg. 28997 (1989); Exec. Order No. 12693, 54 Fed. Reg. 40629 (1989); Exec. Order No. 13039, 62 Fed. Reg. 12529 (1997); Exec. Order No. 13252, 67 Fed. Reg. 1601 (2002); Exec. Order No. 13381, § 5(b), 70 Fed. Reg. 37955 (2005); Exec. Order No. 13467, § 3(d), 73 Fed. Reg. 38107 (2008); Exec. Order No. 13480, §§ 2-6, 73 Fed. Reg. 73991, 73992 (2008); Exec. Order No. 13741, § 3, 81 Fed. Reg. 68291 (2016); Exec. Order No. 13760, §2, 82 Fed. Reg. 5325 (2017); Exec. Order No. 13869, §3(b), 84 Fed. Reg. 18130 (2019); see also 5 U.S.C. § 7103, U.S. Government Publishing Office, available at https://www.govinfo.gov/content/pkg/USCODE-2019-title5/html/USCODE-2019-title5-partIII-subpartF-chap71-subchapI-sec7103.htm [https://perma.cc/4JFC-SQXY].

### B.  Factual Background

### 1.  The Executive Order

On March 27, 2025, President Trump issued an executive order titled "Exclusions from Federal Labor-Management Relations Programs."  Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order").  Section 2 of the Executive Order amends a previous executive order – Executive Order 12171 of November 19, 1979 – which had excluded various agencies and subdivisions from the FSLMRS pursuant to Section 7103(b).  See Exec. Order No. 12171, 44 Fed. Reg. 66565, 66565 (Nov. 19, 1979).  The March 27, 2025 Executive Order states that "[t]he agencies and agency subdivisions set forth in section 2 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work," and that it has been "determined that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations."  Executive Order § 1(a).

As is relevant to NTEU, the Executive Order excludes from the FSLMRS the following agencies and subdivisions "where NTEU represents employees as the exclusive bargaining unit representative":

> Department of Treasury, Internal Revenue Service, IRS Office of Chief Counsel, Bureau of Fiscal Service, Departmental Offices, Alcohol and Tobacco Trade and Tax Bureau, Office of Comptroller of the Currency;
>
> Department of Energy;
>
> Department of Justice, Civil Rights Division and Environment and Natural Resources Division;
>
> Environmental Protection Agency;
>
> Federal Communications Commission;

5

> Department of Health and Human Services, the Office of the Secretary, the Food and Drug Administration, the Administration for Strategic Preparedness and Response, the Centers for Disease Control and Prevention, and the Office of Refugee Resettlement within the Administration of Children and Families; and

> Department of the Interior, Bureau of Land Management.

Declaration of Daniel Kaspar ("Kaspar Decl.") [Dkt. No. 9-2] ¶ 6; see Executive Order § 2.

According to NTEU, the "Executive Order singly eliminates collective bargaining for some two-thirds of the federal workforce." Pl.'s Mem. at 5.

A "Fact Sheet" was issued by the White House the same day that the Executive Order was issued. See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ [https://perma.cc/Y7HR-4W3H] ("Fact Sheet"). The Fact Sheet is divided into three parts. First, it lists eight "national security missions" – "National Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Cybersecurity," "Economic Defense," and "Public Safety" – and provides descriptions of each of these missions. See Fact Sheet. Second, in a section titled "Ensuring that Agencies Operate Effectively," the Fact Sheet explains that the Civil Service Reform Act "enables hostile Federal unions to obstruct agency management," and that this "is dangerous in agencies with national security responsibilities." See id. Finally, in a section titled "Safeguarding American Interests," the Fact Sheet explains:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.

- Certain Federal unions have declared war on President Trump's agenda.

  - The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.

  - For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration –an average of over one a day.

- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

Fact Sheet at 3.

On the same day, the Office of Personnel Management ("OPM") issued a memorandum titled "Guidance on Executive Order Exclusives from Federal Labor-Management Programs." See Charles Ezell, Guidance on Executive Order Exclusions from Federal Labor-Management Programs, OPM, Mar. 27, 2025, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf [https://perma.cc/QH4A-MQ9F] ("OPM Guidance"). The OPM Guidance states that pursuant to the Executive Order and Section 7103(b), "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the FSLMRS and "are no longer required to collectively bargain with federal unions." OPM Guidance at 3. The document also states that "Federal unions" "lose their status as the 'exclusively recognized' labor organizations for employees of the agencies and agency subdivisions covered by Exclusions" in the Executive

Order.  Id. (alterations omitted) (referencing 5 U.S.C. § 7111(a)); see 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . by a majority of the employees in an appropriate unit who cast valid ballots in the election.").

## 2.  The Instant Litigation

On March 31, 2025, NTEU filed this lawsuit.  See Compl.  NTEU brings three counts:  (1) Section 2 of the Executive Order "is unlawful and ultra vires because it conflicts with 5 U.S.C. § 7103(b)(1)"; (2) Section 2 of the Executive Order "is unlawful and ultra vires because it conflicts with 5 U.S.C. Chapter 71"; and (3) Section 2 of the Executive Order "is unlawful because it reflects retaliation in violation of NTEU's First Amendment rights."  See id. ¶¶ 78-95.  NTEU seeks, inter alia, an injunction enjoining all the defendants – excluding the President – from "implementing" Section 2 of the Executive Order and OPM Guidance related to the Executive Order.

## II.  JURISDICTION

The government's first argument is that that the Court lacks jurisdiction over this case.  See Opp. at 12-16.  In support, the government contends that Congress created a "special statutory review scheme" in the FSLMRS, and that such a scheme precludes this Court's review under Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994).

The Supreme Court has recognized that "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action."  Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023) (citing Thunder Basin Coal Co. v. Reich, 510 U.S. at 207).  While Congress may create such a "statutory review scheme"

explicitly, it may also do so implicitly by "specifying a different method to resolve claims about agency action," such as by providing for "review in a court of appeals following the agency's own review process."  Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., Civil Action No. 24-3354 (RDM), 2025 WL 637416, at *4 (D.D.C. Feb. 27, 2025).  To determine whether district court review is precluded, courts apply a two-step approach.  At the first step, the court determines whether Congress has "preclude[d] district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review."  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019).  Congress can be found to have done so "when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure."  Id. (citation and quotation marks omitted).

At the second step, courts consider whether the plaintiff's claim falls within this "alternative statutory scheme for administrative and judicial review."  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 754.  To answer this question, courts consider three factors:  (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise."  Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Thunder Basin Coal Co. v. Reich, 510 U.S. at 212-13); see Nat'l Ass'n for the Advancement of Colored People v. United States Postal Serv., 496 F. Supp. 3d 1, 14 (D.D.C. 2020) (subsequent history omitted).  "When the answer to all three questions is yes, '[the Court] presume[s] that Congress does not intend to limit jurisdiction.'"  Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 489 (2010)).  In the event the factors "point in different

directions," "[t]he ultimate question is how best to understand what Congress has done – whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., 2025 WL 637416, at *5 ("[I]f the factors point in different directions . . . . courts must return to the lodestar of whether Congress intended the type of claim at issue to be swept into the statutory enforcement scheme.") (internal citation and quotation marks omitted).

        The Court concludes that its jurisdiction is not precluded in this case.  The government's argument is essentially that NTEU must pursue its claims using the administrative review scheme created by Congress in the FSLMRS – the Federal Labor Relations Authority ("FLRA") – rather than by bringing claims in a federal district court.  See Opp. at 12-13.  The administrative review scheme, however, is not available to challenge the Executive Order's exclusions of the agencies and subdivisions subject to the Executive Order for the simple reason that those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order at issue here.  See Pl.'s Reply at 17 (arguing that the "Executive Order has taken away the administrative channels that Defendants argue must be used).  The relevant precedents from the FLRA make this point clear.  See United States Dep't of the Air Force Air Force Materiel Command Warner Robins Air Logistics Ctr. Robins Air Force Base, Georgia (Respondent) & Am. Fed'n of Gov't Emps. Loc. 987 (Charging Party/union), 66 F.L.R.A. 589, 598 (Apr. 20, 2012) ("[T]he Authority has determined that an exemption from coverage constitutes a jurisdictional bar to its consideration of unfair labor practice complaints raised under the Statute"); Department of the Navy, Naval Telecommunications Ctr., Ward Circle and NAVTELCOM Unit Local No. 1, American Federation of Government Employees, 6 F.L.R.A. 498, 500 (1981) ("Where the President has specifically excluded an agency from coverage under

the Statute by issuing an executive order, the Authority is clearly without jurisdiction to process a representation petition.").

  Indeed, the exact case the government contends NTEU should bring to the FLRA was attempted in 2002 in the context of a different executive order invoking the Section 7103(b)(1) exclusion, and the FLRA dismissed the case for lack of jurisdiction.  See United States Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party), 57 F.L.R.A. 750 (Apr. 25, 2002).  In a brief opinion, the FLRA summarized the case and explained why it lacked jurisdiction, stating:

> In each of these cases, the Respondent is the United States Attorney's Office for the Southern District of Texas.  On January 7, 2002, the President issued Executive Order 13252, "Exclusions From the Federal Labor-Management Program," exempting, as relevant here, United States Attorneys' Offices from coverage of the Federal Service Labor-Management Relations Statute (the Statute).

> Subsequently, the Authority requested and received submissions from the parties as to why these cases should not be dismissed for lack of jurisdiction in light of the Executive Order. In their submissions, the General Counsel and the Respondent agree that, since the Executive Order exempts United States Attorneys' Offices from coverage of the Statute, the Authority lacks jurisdiction to decide the cases and should dismiss the complaints.

> We agree that, in light of Executive Order 13252, the Authority lacks jurisdiction to decide these cases.  Accordingly, we dismiss the complaints.

United States Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party), 57 F.L.R.A. at 750 (footnotes omitted).

  In view of this precedent, the Court can think of no reason why the FLRA would decide to exercise jurisdiction over NTEU's case.  In fact, NTEU has already brought a case before the FLRA, which has since "issued an order asking why NTEU's case before it . . . should not be dismissed for lack of jurisdiction," citing United States Att'ys Off. S. Dist. of Texas

Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party), 57

F.L.R.A. at 750.  See Pl.'s Reply at 18; Exhibit 17 to Supplemental Declaration of Daniel Kaspar

("Kaspar Supp. Decl.") [Dkt. No. 29-1 at ECF 65-69] (FLRA's order to show cause "why the

[FLRA] should not dismiss [NTEU's case] for lack of jurisdiction").

   At oral argument, the government agreed that the FLRA likely would determine

that it lacks jurisdiction over NTEU's case challenging the Executive Order.  See Transcript

("Tr.") [Dkt. No. 33] at 21:16-22:5.  The government asserts, however, that this Court's

jurisdiction is nevertheless precluded because the "special administrative review scheme" can

still be followed.  See id. at 21:25-23:23.  Specifically, the government contends that NTEU

must bring its claim to the FLRA – which the FLRA will dismiss for lack of jurisdiction – and

then appeal the FLRA's dismissal to a United States court of appeals, where NTEU can raise its

arguments related to the validity of the Executive Order.  See id.; see also 5 U.S.C. § 7123(a)

(outlining appeal process to a United States court of appeals); Am. Fed'n of Gov't Emps. v.

Sec'y of Air Force, 716 F.3d 633, 636 (D.C. Cir. 2013); Am. Fed'n of Gov't Emps., AFL-CIO v.

Trump, 929 F.3d 748 (D.C. Cir. 2019).  The government's argument misses the point:  the

administrative process of the FSLMRS cannot and does not govern here because the Executive

Order at issue removed the agencies and subdivisions in question from coverage of the

FSLMRS.  In other words, this case is distinguishable from the cases relied on by the

government where the unions had "several administrative options for challenging the executive

orders . . . ."  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 757 (internal

quotation marks omitted); see also Am. Fed'n of Gov't Emps. v. Sec'y of Air Force, 716 F.3d

at 637 ("Because the FSLMRS's remedial regime is exclusive, providing [plaintiff] with multiple

options to challenge the [policy], [plaintiff] cannot circumvent this regime by instead bringing a

suit in district court.").  In the instant case, by virtue of the Executive Order, the claims – and indeed NTEU itself – now are "expressly outside the FLRA's purview."  See Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson, 475 F.3d 341, 348 (D.C. Cir. 2007).  Because there is no "special statutory review scheme" that is actually available to NTEU for reviewing its claim, this Court is not deprived of jurisdiction.

## III. PRELIMINARY INJUNCTION

### A.  Legal Standard

A movant seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016)); see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief" (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008))).  Of these, the most important factor is whether a movant has established a likelihood of success on the merits.  See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024).

Before the Supreme Court's decision in Winter, courts in this Circuit weighed these four factors on a "sliding scale," under which the movant need not "make as strong a showing" on one factor if they "make[ ] an unusually strong showing" on another.  Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)); accord Damus v. Nielsen, 313 F.

Supp. 3d 317, 326 (D.D.C. 2018). This Circuit has suggested, however, that "a likelihood of

success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s]

for a preliminary injunction." Sherley v. Sebelius, 644 F.3d at 392-93 (quoting Davis v. Pension

Benefit Guar. Corp., 571 F.3d at 1296 (Kavanaugh, J., concurring)); see Archdiocese of

Washington v. Wash. Metro. Area Transit Auth., 897 F.3d at 334 (declining to resolve whether

the "sliding scale" approach is still valid after Winter); Nat'l Treasury Emps. Union v. Vought,

Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025). Regardless,

"a failure to show a likelihood of success on the merits alone is sufficient to defeat a

preliminary-injunction motion." Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205

F. Supp. 3d 4, 26 (D.D.C. 2016) (citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573

F.3d 815, 832 (D.C. Cir. 2009)); see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 117-18

(D.D.C. 2018).

    For each of its claims, NTEU bears the burden of persuasion. Chaplaincy of Full

Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). NTEU also "bears the burden

of producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief."

Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

### B. Likelihood of Success on the Merits

    The core of the parties' dispute centers on whether the President exceeded the

authority afforded to him in the FSLMRS when he excluded the agencies and subdivisions under

Section 7103(b)(1). NTEU contends that the President's Executive Order was ultra vires,

arguing that each of the agencies and subdivisions listed in the Executive Order – agencies which

employ nearly two-thirds of the federal workforce, see Pl.'s Mem. at 24 – do not meet the criteria

listed in Section 7103(b)(1). See id. at 10-24. The government makes two general arguments in

14

response.  First, the government argues that the Court lacks the authority to review the

President's "national security-related determinations under" Section 7103(b) or, at a minimum,

that it owes significant deference to the President's conclusion that the particular agencies and

subdivisions subject to the Executive Order are excludable from the FSLMRS.  See Opp.

at 17-20.  Second, in the event the Court does review the President's determination, the

government contends that the identified agencies and subdivisions meet the criteria listed in

Section 7103(b)(1).  See id. at 17-28.

      The D.C. Circuit's decision in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan is

instructive on how the Court must consider the legal issue before it.  See Am. Fed'n of Gov't

Emps., AFL-CIO v. Reagan, 870 F.2d 723 (D.C. Cir. 1989).  In that case, unions representing

federal employees challenged President Reagan's executive order excluding certain subdivisions

of the United States Marshals Service from coverage under the FSLMRS pursuant to

Section 7103(b).  See id. at 725; see also Exec. Order No. 12559, 51 Fed. Reg. 18761 (1986).[3]

The district court concluded that President Reagan's executive order was invalid because it failed

to provide the basis by which the President determined that the criteria in Section 7103(b)(1) had

been satisfied.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 727-28.  The

district court had reasoned that the bases for the President's authority to issue the executive order

must be provided in some way, and that "the absence of determinations or findings in the

[executive order], the lack of any language incorporating and republishing prior findings and

determinations, and the absence of a separate source of executive power sufficient to sustain the

---

[3]    More specifically, Executive Order 12559 excluded "The Office of Special
Operations, the Threat Analysis Group, the Enforcement Operations Division, the Witness
Security Division and the Court Security Division in the Office of the Director and the
Enforcement Division in Offices of the United States Marshals in the United States Marshals
Services."

action" meant the executive order was "not a valid exercise of power under § 7103(b)." <u>Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan</u>, 665 F. Supp. 31, 34 (D.D.C. 1987).

      The D.C. Circuit disagreed and reversed the district court.  <u>See</u> <u>Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan</u>, 870 F.2d at 728.  The court of appeals began by noting that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist," and that the district court imposed an extra-statutory obligation of requiring "the President to insert written findings into an exempting order . . . ." <u>Id</u>. at 727.  As to the argument that "courts are the instrumentalities for ensuring that the authority is properly exercised[] and that the courts must see some proof that these prerequisites were satisfied," the D.C. Circuit stated that the "presumption of regularity [was] decisive" on this issue, explaining:

> We deem the familiar presumption of regularity decisive here.  It "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."
>
> [. . . .]
>
> Over the many years since <u>Martin v. Mott</u>[, 25 U.S. (12 Wheat.) 19, 6 L. Ed. 537 (1827)], the presumption of regularity has been applied in a variety of contexts, it is clearly applicable to the case at bar.  The executive order under review cited accurately the statutory source of authority therefor, and purported to amend an earlier order that indubitably was a proper exercise of that authority.  The Act does not itself require or even suggest that any finding be reproduced in the order.  No more than the District Court have appellants suggested any actual irregularity in the President's factfinding process or activity.  In these circumstances, we encounter no difficulty in presuming executive regularity.  We cannot allow a breach of the presumption of regularity by an unwarranted assumption that the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them.

Id. at 727-28 (footnote omitted).  The court of appeals therefore concluded that "the presumption of regularity [was] pivotal" to the issue of whether the executive order was a valid exercise of authority.  Id. at 728.

In the instant case, as in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, the President has not provided the justification for excluding each of the agencies and subdivisions from the FSLMRS pursuant to Section 7103(b)(1) in the Executive Order itself.  In light of the D.C. Circuit's analysis in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, the Court therefore must address the following issues:  (1) whether the "presumption of regularity" applies to the President's exercise of authority; and (2) whether the President's exercise of authority was ultra vires.  The Court addresses each issue separately.

### 1.   Presumption of Regularity

The "presumption of regularity has been recognized since the early days of the Republic," Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d 723, 727 (D.C. Cir. 1989), and has been applied in a variety of contexts where a governmental official's action has been challenged.  See Aram A. Gavoor & Steven A. Platt, In Search of the Presumption of Regularity, 74 FLA. L. REV. 729, 749 (2022) (outlining different categories of examples where the presumption of regularity has been applied).  The "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926); see Latif v. Obama, 677 F.3d 1175, 1178-181 (D.C. Cir. 2011) (same); Paracha v. Trump, Civil Action No. 04-2022 (PLF), 2019 WL 5296839, at *2 (D.D.C. Oct. 18, 2019).  The presumption of regularity, however, is just that, a presumption. The presumption can be rebutted with "clear evidence" that the official did not discharge his or

her official duties properly, see Owlfeather-Gorbey v. Avery, 119 F.4th 78, 86 (D.C. Cir. 2024),

a standard which is "higher than preponderance of the evidence but lower than beyond a

reasonable doubt." Paracha v. Trump, 2019 WL 5296839, at *2 (citing Addington v. Texas, 441

U.S. 418, 423-35 (1979)).

The Court concludes that NTEU has rebutted the presumption of regularity by

presenting clear evidence that "the President was indifferent to the purposes and requirements of

the [FSLMRS], or acted deliberately in contravention of them." Am. Fed'n of Gov't Emps.,

AFL-CIO v. Reagan, 870 F.2d at 728. The Court reaches this conclusion for three reasons:

(1) the Executive Order and the Administration's surrounding statements are at odds with

Congress's findings in the FSLMRS; (2) the White House Fact Sheet reflects retaliatory motive;

and (3) the Administration's guidance related to the Executive Order – specifically, the OPM

Guidance – suggests that the invocation of Section 7103(b)(1) was in furtherance of unrelated

policy goals rather than based on the statutory criteria.

   a.   The Executive Order is at Odds with the Statute's Purpose and Congress's Findings

The first reason that NTEU prevails in rebutting the presumption of regularity is

because the scope of the Executive Order itself and the statements in the accompanying Fact

Sheet demonstrate that the President was either "indifferent to" or "acted deliberately in

contravention" of the purposes of the FSLMRS. See Am. Fed'n of Gov't Emps., AFL-CIO v.

Reagan, 870 F.2d at 728. As discussed above, see supra Section I.A, Congress made explicit

findings when passing the FSLMRS that "the right of employees to organize, bargain

collectively, and participate through labor organizations of their own choosing in decisions

which affect them" "safeguards the public interest," "contributes to the effective conduct of

public business," and "facilitates and encourages the amicable settlements of disputes between

employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1).

Congress concluded that "labor organizations and collective bargaining in the civil service are in

the public interest." 5 U.S.C. § 7101(a).

The scope of the Executive Order – covering two-thirds of the federal

workforce – and the Fact Sheet's characterization of unions and collective bargaining rights

established by the Civil Service Reform Act as "dangerous" stand in stark contrast to these

Congressional findings. See Fact Sheet. For example, the Fact Sheet acknowledges that

normally "[a]gencies cannot modify policies in collective bargaining agreements until they

expire" and that "[a]gencies cannot make most contractually permissible changes until after

finishing 'midterm' union bargaining." Fact Sheet at 3. But it finds that the statute "enables

hostile Federal unions to obstruct agency management," which is "dangerous in agencies with

national security responsibilities." Id. at 2-3. Indeed, the OPM Guidance highlights several

examples of the obstacles that collective bargaining agreements have presented to the Trump

Administration in accomplishing its broader policies related to reforming the federal workforce.

See, e.g., OPM Guidance at 5 (citing Guidance on Collective Bargaining in Connection with

Reductions in Force, OPM (Mar. 12, 2025), available at https://www.opm.gov/policy-data-

oversight/latest-and-other-highlighted-memos/guidance-on-collective-bargaining-in-connection-

with-reductions-in-force.pdf [https://perma.cc/ENN2-37YQ])). The description of these

obstacles resulting from collective bargaining as "dangerous," and the characterization of the

Civil Service Reform Act as "enabl[ing] hostile Federal unions to obstruct agency management,"

Fact Sheet at 2-3, are directly contrary to Congress's conclusion that such labor policy and labor

organizations are "in the public interest." 5 U.S.C. § 7101(a).

To be sure, as the Section 7103(b)(1) exclusion provision highlights, Congress anticipated that collective bargaining rights may not, in certain cases, be applied in a "a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). But the statements in the Fact Sheet must be considered in the context of the breadth of the Executive Order: the order strips collective bargaining rights from two-thirds of the federal workforce. See Pl.'s Mem. at 4. In other words, justifying the sweeping Executive Order by pointing to the "obstruct[ion] to agency management" caused by "hostile Federal unions" is better understood as a disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a "manner consistent with national security requirements and considerations." See 5 U.S.C. § 7103(b)(1)(B). Indeed, many of the cabinet-level departments that the President has excluded were not included by Congress in the list of agencies exempted from the FSLMRS's coverage. See 5 U.S.C. § 7103(a)(3) (excluding the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, the Federal Service Impasses Panel, and the United States Secret Service and the United States Secret Service Uniformed Division). In sum, there is clearly an inconsistency. Congress determined that collective bargaining rights for the majority of the federal workforce was "in the public interest," yet the Executive Order strips these rights from a majority of the federal workforce. This certainly provides evidence that the "President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them" in his invocation of the Section 7103(b) exclusion. Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.

b. <u>Contemporaneous Statements in the White House Fact Sheet Reflect Retaliatory Motive</u>

The second reason that NTEU prevails in rebutting the presumption of regularity by clear evidence is because the White House Fact Sheet reflects retaliatory motive towards certain unions.  For example, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda," by, <u>inter alia</u>, filing grievances against President Trump and by stating that they would "'fight[] back' against Trump."  Fact Sheet at 3.  The Fact Sheet further states that the Civil Service Reform Act of 1978 – of which the FSLMRS is a part – "enables hostile Federal unions to obstruct agency management," and that the President "refuses to let union obstruction interfere with his efforts to protect Americans and our national interests."  Fact Sheet at 3.  These statements bear no relation to the criteria established by Congress in Section 7103(b)(1).  Rather, the statements reflect President Trump's frustration with the unions' representational activity and exercise of their First Amendment rights – such as through "filing grievances to block Trump policies" – and the impact those activities have had on his policy directives and "agenda."  <u>See</u> Fact Sheet at 3.  Indeed, as NTEU points out, these statements in the Fact Sheet appear to be in direct response to the number of lawsuits and grievances NTEU has filed against the Trump Administration in the last several months.  <u>See</u> Compl. ¶ 63.

Other statements in the Fact Sheet reflect that this frustration with the unions' "war" on President Trump may have been a significant factor in his issuing the Executive Order. For example, the Fact Sheet suggests that it is not "the provisions" of the FSLMRS themselves that "cannot be applied . . . in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B), but rather the unions' <u>use of</u> these provisions, which President Trump views as "mass obstruction that jeopardizes his ability to manage agencies with

21

vital national security missions."  Fact Sheet at 3.  Indeed, the Fact Sheet's statement that President Trump "supports constructive partnerships with unions who work with him" but "will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions" comes very close to conceding this point.  See id.  Furthermore, as NTEU argues, certain inclusions and exclusions from the Executive Order reflect a preference for unions that have a "constructive relationship" with the President.  For example, the President's decision to allow "police officers, security guards, [and] firefighters" to retain collective bargaining rights, but to remove such rights from employees of the Federal Bureau of Prisons – whose employees are represented by a union that has been critical of the President and his Administration – suggests that the President's relationship with particular unions was a factor in determining which agencies and subdivisions were included in the Executive Order.  Pl.'s Reply at 7; see Executive Order § 2(b).

The language used in the Fact Sheet coupled with the focus on "constructive partnership[s]" as opposed to "mass obstruction" undercuts the presumption that the President considered and abided by the statutory language in Section 7103(b)(1).  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.  Furthermore, it suggests a retaliatory motive to punish unions for the "war" they have "declared [ ] on President Trump's agenda."  Fact Sheet at 3.  Such clear evidence of retaliatory motive is "of great significance in addressing the presumption" of regularity.  See Hartman v. Moore, 547 U.S. 250, 263-64 (2006) (concluding that "prosecutor's disclosure of retaliatory thinking on his part" was significant in determining whether the presumption of regularity should be applied); see also Wendt Corp. v. NLRB, 26 F.4th 1002, 1011 (D.C. Cir. 2022) ("A company's open hostility toward Union activity,

including a manager's anti-union speech, is clearly sufficient to establish anti-union animus on the part of that company.") (cleaned up).

   c.  <u>Evidence Reflects that the Executive Order was Motivated by Unrelated Policy Goals</u>

The final reason that NTEU prevails in rebutting the presumption of regularity is because substantial evidence in the record reflects that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria. <u>See</u> Pl.'s Reply at 4-6 (arguing that the Executive Order was motivated by "a desire to make federal employees easier to fire"). The OPM Guidance strongly supports this point, couching the Executive Order in the broader "policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently." OPM Guidance at 5. The OPM Guidance goes on to outline the Administration's many policies and directives related to the federal workforce writ large. For example, the OPM Guidance notes that the "President issued multiple directives to facilitate the separation of underperforming employees," but that "Agency [collective bargaining agreements] often create procedural impediments" to removing these employees. <u>Id</u>. at 3. The OPM Guidance directs the agencies and subdivisions covered by the Executive Order to "seek to bring their policies into alignment with the specific Administration priorities," including limiting performance improvement periods and discontinuing grievance participation. <u>See id</u>. at 3-4. In a section entitled "Effective and Efficient Government," the OPM Guidance explains that "after terminating [the agencies'] [collective bargaining agreements]" pursuant to the Executive Order, agencies can proceed to "[d]isregard contractual [reduction-in-force] articles" and "prepare large-scale reductions in force" as the "President has directed." <u>Id</u>. at 5 (capitalization omitted).

In sum, the OPM Guidance says little about national security, notwithstanding the national security valence of Section 7103(b)(1). On examination, the OPM Guidance and the Executive Order appear to be more about accomplishing the Administration's goal of substantially changing the nature of the federal workforce. The OPM Guidance lists numerous examples of earlier policy directives by the President and OPM, identifies the difficulties collective bargaining agreements posed to accomplishing those directives, and states that those obstacles are now gone as a result of the Executive Order. The framing of the Executive Order in this way is evidence that the President was at best "indifferent to the purposes and requirements of the" FSLMRS. Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728. Indeed, it is strong evidence that the President's invocation of Section 7103(b)(1) was to remove the barriers created by the FSLMRS to his unrelated policy objectives. See In re Aiken Cnty., 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections.").

\*     \*     \*

For the reasons discussed above, the Court concludes that NTEU has successfully rebutted the presumption of regularity. The Court therefore need not presume that the President has "properly discharged [his] official duties" in the absence of justification for the Executive Order. See United States v. Chemical Foundation, Inc., 272 U.S. at 14-15.

2.    The President's Executive Order is Ultra Vires

Having determined that the presumption of regularity does not apply, the issue now becomes whether NTEU likely will be successful in showing that the Executive Order was ultra vires.

"The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself[,]'" or from a combination of the two.  Medellin v. Texas, 552 U.S. 491, 523 (2008) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952)).  While a party has different bases by which to challenge Presidential actions that may exceed the scope of the President's power, one such claim is that the President's action was ultra vires.  See Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority.") (quoting Dart v. United States, 848 F.2d 217, 224 (D.C. Cir. 1988)).  An ultra vires claim is a "non-statutory form of review [that] derives from courts' equitable authority to 'reestablish the limits on' executive authority '[w]hen an executive acts ultra vires.'"  Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab., Civil Action No. 25-339 (JDB), 2025 WL 1129227, at *22 (D.D.C. Apr. 16, 2025) (quoting Dart v. United States, 848 F.2d at 224); see Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015) (Scalia, J.) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").  This claim, however, "is a doctrine of last resort, 'intended to be of extremely limited scope.'"  Schroer v. Billington, 525 F. Supp. 2d 58, 65 (D.D.C. 2007) (quoting Griffith v. Fed. Labor Relations Auth., 842 F.2d 487, 493 (D.C. Cir. 1988)).

In the instant case, the evidence rebutting the presumption of regularity is a significant reason to believe NTEU will prevail on its claim.  The scope of the Executive Order when compared with the intent of Congress in passing the FSLMRS, coupled with the surrounding statements in the Fact Sheet and OPM Guidance – which strongly suggest that

President Trump's invocation of Section 7103(b)(1) was mere pretext for retaliation and for accomplishing unrelated policy objectives – are persuasive reasons to believe NTEU likely will be successful on the merits of its claim.

Ultimately, the success of NTEU's claim hinges on whether the agencies and subdivisions subject to the Executive Order meet the statutory criteria set forth in the FSLMRS. See Opp. at 20. The government provides a meager defense explaining how the agencies and subdivisions covered by the Executive Order – which include approximately two-thirds of the federal workforce, see Kaspar Decl. ¶ 35 – meet the Section 7103(b)(1) criteria. The government's defense consists primarily of statements about the general role of the agencies and subdivisions, and then listing several examples of offices within the agencies and subdivisions that may perform work related to national security. Given the breadth of the Executive Order, however, this approach is wholly inadequate to assess whether each of the agencies and subdivisions actually falls within the statutory national security exception.

To remind, Section 7103(b) provides that:

The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –

(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1).  The government's interpretation of Section 7103(b)(1) hinges on whether each agency and subdivision cited has a "primary function" of "national security work."[4]

With regard to Section 7103(b)(1)(A), the government asserts that "[t]he statute's first three categories of primary functions" – that is, "intelligence, counterintelligence, [and] investigative" work – "require no further explanation."  Opp. at 20.  As for the term "national security work," the government argues that it "has long and consistently been interpreted in the federal labor relations context to refer to work 'directly related to protection and preservation of the military, economic, and productive strength of the United States.'"  Id. (quoting Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 F.L.R.A. 644, 655-56 (1980)).

As for Section 7103(b)(1)(B), the government essentially argues that any agency or subdivision that "has a significant, critical national security mission" necessarily will satisfy the criteria in Section 7103(b)(1)(B).  Opp. at 26.  The government contends that because it has shown that "each Defendant agency or subdivision has a significant, critical national security mission," Section 7103(b)(1)(B) is satisfied.  Id.

---

[4]     The government suggests at several points in its opposition that a few of the agencies and subdivisions satisfy the Section 7103(b)(1) criteria by nature of performing "intelligence, counterintelligence, [or] investigative" work.  See, e.g., Opp. at 23 (arguing Food and Drug Administration has an "investigative function"); id. at 24 (arguing that the Department of Justice "performs investigative, intelligence, and national security work").  The terms "intelligence, counterintelligence, [and] investigative" work likely should be interpreted as having a national security valence in light of Section 7103(b)(1) as a whole.  See Soc. Sec. Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps. (Petitioner1labor Org.), 59 F.L.R.A. at 143 ("Congress also addressed the matter of national security in § 7103(b) of the Statute.").  This issue, however, need not be addressed here because the government undoubtedly relies on "each Defendant agenc[ies'] or subdivision[s'] . . . significant, critical national security mission" in arguing that the Section 7103(b)(1)(2) criteria has been satisfied.  See Opp. at 26; see also id. at 2 ("[T]he Court lacks authority to review the President's national security determination, as Congress expressly recognized").  The government's success therefore depends on the validity of its interpretation of work implicating "national security."

The President's determination appears to apply an overly broad interpretation of both the term "primary function" and the term "national security work." The Court therefore concludes that NTEU is likely to succeed on its claim.

a.   "Primary Function"

While the government never explicitly states how it interprets "primary function," its arguments related to each of the agencies and subdivisions reflect either an overly broad interpretation of the term or a disregard of the term entirely. The government's arguments related to each of the agencies and subdivisions illustrate this point by either pointing to generalized mission statements of the agencies referencing national security, or by pointing to individual functions that segments of the agencies or subdivisions perform that have a national security valence, and then concluding that the entire agencies' or subdivisions' "primary function" is national security.

For example, the government argues that the Department of the Treasury is primarily engaged in "national security work" because it "exists to promote economic and productive strength of the United States – a core national security mission." Opp. at 20. As to the Internal Revenue Service within the Department of the Treasury, the government argues that it primarily performs "national security work" because it "collect[s] almost all Federal revenues," of which "America's military, economic, and productive capacity directly depend . . . ." Opp. at 21. In terms of the Department of Energy ("DOE"), the government argues that the department's "primary role is setting national energy policy, with obvious national security objectives and implications." Id. The government points to certain examples of this, such as the DOE's role in the "security of the U.S. nuclear weapons stockpile" and in the creation of "affordable and reliable domestic supply of energy," which "'is a fundamental

28

requirement for the national and economic security of any nation.'" Id. (quoting Exec. Order No. 14156, 90 Fed. Reg. 8,433 (Jan. 20, 2025)).[5]  With respect to the Food and Drug Administration, the government maintains that it ensures "a secure food supply," which is "critical to national security."  Id. at 23.  As for the Bureau of Land Management, the government argues that its "overseeing of energy production" on public land and its "funding [of] the Federal Government's operations through mineral development" makes it critical to national security.  Id. at 22.

NTEU responds that these examples demonstrate that the government "reads 'primary' entirely out of the text, as they reference any function that an agency at issue performs . . . ."  Pl.'s Reply at 10-11.  The Court agrees.  The government's approach is essentially pointing to a specific function that a particular agency or subdivision performs, and then arguing that the instance of "national security work" means the entire agency's or its subdivision's "primary function" is "national security work."  But even if an agency performs some work that implicates national security, that does not mean that the entire agency has "a primary function" of "national security work."  5 U.S.C. § 7103(b)(1)(A).  In sum, because the government's arguments make clear that the President applied an overly broad interpretation of the term "primary function" or wrote the term out of the statute entirely, the Court concludes that NTEU likely will succeed on its claim.

---

[5]    The government notes that the DOE was created by the "same Congress that enacted the FSLMRS," failing to explain why that Congress did not include the DOE in its list of agencies excluded from the protections in the FSLMRS.  See 5 U.S.C. § 7103(a)(3).

b.  "National Security" and "National Security Work"

The government's interpretation of "national security" and "national security work" is also overly broad.  See 5 U.S.C. § 7103(b)(1)(A)-(B).  The government interprets "national security work" as work "directly related to protection and preservation of the military, economic, and productive strength of the United States."  See Opp. at 20 (citation omitted).  As illustrated above, the government contends that this definition encompasses everything from the collection of taxes to the management of the United States's food supply and distribution.

The government's single citation for its expansive interpretation of "national security work" is to the FLRA's decision in Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 F.L.R.A. 644, 655-56 (1980).  See Opp. at 20.  But that case is significantly less supportive of the government's position than it may think.  Indeed, in that case, the FLRA cautioned against applying an overly broad interpretation of "national security," stating in relevant part:

> A complex legal framework surrounds 'national security' in the context of Government employment.  See, e.g., 5 U.S.C. § 7532; Executive Order 10450; FPM Chapter 732-3, subchapter 1. Exclusion from an appropriate unit deprives employees of the opportunity under the Statute to determine whether or not they wish to be represented by a labor organization and of the opportunity to engage in collective bargaining with respect to conditions of employment through labor organizations.  Labor organizations and collective bargaining in the civil service have been determined by the Congress to be 'in the public interest.'  5 U.S.C. § 7101(a). Therefore, the term 'national security' must be interpreted to include only those sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the United States, including the security of the Government in domestic and foreign affairs, against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense.  See Cole v. Young, 76 S. Ct. 861, 351 U.S. 536 (1956); FPM Chapter 732-3, subchapter 1, paragraph 1.1; 32 C.F.R. § 156.5.

Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4

F.L.R.A. at 655-56.  The FLRA's reasoning in the Oak Ridge case makes clear that the Supreme

Court's decision in Cole v. Young, 351 U.S. 536 (1956), provided guidance on the interpretation

of "national security" in Section 7103(b)(1).  On this point, NTEU agrees, arguing that Cole v.

Young's definition of "national security" "should govern here."  Pl.'s Reply at 9.

In Cole v. Young, the Supreme Court addressed "the meaning of the term

'national security' as used in" a statute enacted in 1950, which gave "the heads of certain

departments and agencies of the Government summary suspension and unreviewable dismissal

powers over their civilian employees, when deemed necessary 'in the interest of the national

security of the United States.'"  See Cole v. Young, 351 U.S. at 538.  The Supreme Court

concluded that while the term "national security" was not defined in the law, it was "clear from

the statute as a whole that that term was intended to comprehend only those activities of the

Government that are directly concerned with the protection of the Nation from internal

subversion or foreign aggression, and not those which contribute to the strength of the Nation

only through their impact on the general welfare."  Id. at 544.  The Supreme Court found that the

law reflected "Congress' concern for the procedural rights of employees and its desire to limit

the unreviewable dismissal power to the minimum scope necessary to the purpose of protecting

activities affected with the 'national security.'"  Id. at 547.  This intent "hardly seem[ed]

consistent" with the "indefinite and virtually unlimited meaning" of "national security" asserted

by the government.  Id.  The government's interpretation had to be rejected.  After all, the

Supreme Court reasoned, the statute's requirement that the President determine that an

"employee's misconduct would affect the 'national security'" would not be necessary "if

'national security' were used in the Act in a sense so broad as to be involved in all activities of

the Government, for then the relationship to the 'national security' would follow from the very fact of employment." Id. at 542-43. The Court concluded with a cautionary statement about the ability for national security determinations to supersede law:

> [I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws. For why could it not be said that national security in that sense requires not merely loyal and trustworthy employees but also those that are industrious and efficient? The relationship of the job to the national security being the same, its demonstrated inadequate performance because of inefficiency or incompetence would seem to present a surer threat to national security, in the sense of the general welfare, than a mere doubt as to the employee's loyalty.

Cole v. Young, 351 U.S. at 547-48.

Appling the reasoning of Cole v. Young to this case, this Court must conclude that the President's interpretation of "national security" exceeds the scope of the meaning intended by Congress. In passing the FSLMRS, Congress clearly expressed a desire to extend collective bargaining rights broadly because it determined that those rights were "in the public interest." 5 U.S.C. § 7101(a) ("[L]abor organizations and collective bargaining in the civil service are in the public interest"). Congress provided a narrow exception that allowed the President to exclude agencies and subdivisions from these protections if the provisions of the law "cannot be applied . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7101(b)(1)(B). And as in Cole v. Young, it is "clear from the statute" that the term "national security" "comprehend[s] only those activities . . . that are directly concerned with the protection of the Nation from internal subversion or foreign aggression . . . ." Cole v. Young, 351 U.S. at 544. But President Trump instead has applied a startlingly broad application of "national security," which – directly contrary to the Supreme

Court's definition in <u>Cole v. Young</u> – encompasses "those activities of Government . . . which contribute to the strength of the Nation only through their impact on the general welfare." <u>Cole v. Young</u>, 351 U.S. at 544. This interpretation of "national security" therefore is inconsistent with the statute and "risks allowing the exception to swallow the rule, thereby undermining the purpose of the statute itself." <u>Nat'l Fed'n of Fed. Emps. v. McDonald</u>, 128 F. Supp. 3d 159, 172 (D.D.C. 2015). "[I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the [FSLMRS], though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." <u>Cole v. Young</u>, 351 U.S. at 548.

In sum, NTEU is likely to prevail in showing that the President has applied an overly broad interpretation of "national security" when invoking Section 7103(b)(1), thereby making the President's Executive Order <u>ultra</u> <u>vires</u>.

\*       \*       \*

In light of its analysis above, the Court concludes that NTEU is likely to succeed on its claim that the Executive Order is <u>ultra</u> <u>vires</u>. This conclusion is reached in light of the evidence rebutting the "presumption of regularity" and the interpretation of Section 7103(b)(1).[6]

### C. Irreparable Harm

The next factor to consider is whether NTEU will suffer irreparable injury without the requested preliminary injunction. <u>See</u> <u>Archdiocese of Washington v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d at 321. The D.C. Circuit "has set a high standard for irreparable injury."

---

[6]       Because the Court concludes that NTEU is likely to succeed on its <u>ultra</u> <u>vires</u> claims, <u>see</u> Compl. ¶¶ 78-89 (Counts One and Two), the Court does not reach the issue of whether NTEU has satisfied the requirements for a preliminary injunction on its First Amendment retaliation claim.

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  "Not only must the injury 'be both certain and great,' and 'actual and not theoretical,' but 'the injury must be beyond remediation.'"  Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com., 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297).  Importantly, "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of establishing] irreparable harm."  League of Women Voters v. Newby, 838 F.3d at 9.

NTEU advances two primary bases by which it argues it will face irreparable harm absent a preliminary injunction.  First, it argues that the Executive Order significantly reduces its bargaining power by "cut[ting] the number of NTEU-represented employees by over 65%."  Pl.'s Mem. 32; see Declaration of Mark L. Gray ("Gray Decl.") [Dkt. No. 9-3] ¶ 6; Kaspar Decl. ¶ 9.  Second, it argues that it faces "severe financial harm" caused by the loss of dues revenue.  See Pl.'s Mem. at 30-32.  More specifically, NTEU states that it will lose approximately $25 million in dues revenue over the course of the next year, or approximately half of its annual revenue.  See id. at 31; Kaspar Decl. ¶ 17; Gray Decl. ¶ 12.

The Court concludes that each of the injuries are sufficient to show that NTEU will face irreparable harm absent a preliminary injunction.

### 1.  Loss of Bargaining Power

NTEU contends that its loss of bargaining power is both significant and irreparable.  See Pl.'s Mem. at 32-33.  According to NTEU, the Executive Order covers 65.9% of all NTEU-represented employees, or approximately 104,278 employees.  Kaspar Decl. ¶ 9. NTEU argues that it will become "a less effective, less influential organization in ways that cannot be undone" as a result of the Executive Order, Pl.'s Mem. at 33, which removes both

agencies' obligation to collectively bargain and NTEU's status as the exclusive bargaining representative of the agencies' employees.  <u>See</u> OPM Guidance at 3.  More specifically, NTEU asserts that as a result of this reduction in representation, it will be less effective at (1) advocating for employees at agencies not covered by the Executive Order; (2) persuading employees to join the union; and (3) advocating for employees' interests before Congress.  <u>See</u> Kaspar Decl. ¶¶ 11-14.  NTEU argues that these injuries have already begun to occur.  <u>See</u> Pl.'s Reply at 20-23.  For example, NTEU states that certain agencies have already failed to honor provisions of the respective collective bargaining agreements by failing to withhold dues payment from employees' paychecks, Kaspar Supp. Decl. ¶¶ 12-14, "disavow[ing] any obligation to bargain," <u>id</u>. ¶¶ 17-18, and beginning to implement reductions in force.  <u>See</u> <u>id</u>. ¶ 16.

Courts have long recognized that "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions."  <u>Franks Bros. Co. v. NLRB</u>, 321 U.S. 702, 704 (1944).  "The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable."  <u>N.L.R.B. v. Electro-Voice, Inc.</u>, 83 F.3d 1559, 1573 (7th Cir. 1996).  Furthermore, "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished."  <u>Id</u>.; <u>see</u> <u>Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB</u>, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.").  Therefore, any relief a court may provide "must come quickly."  <u>In re Am. Fed'n of Gov't Emps., AFL-CIO</u>, 790 F.2d 116, 117-18 (D.C. Cir. 1986) (citation and quotation marks omitted).

These concerns are heightened in the instant case given the Trump Administration's directive "to prepare large-scale reductions in force." OPM Guidance at 5. Should NTEU not obtain a preliminary injunction, there is a substantial possibility that only a small fraction of its once large union would remain upon prevailing in this litigation. And, as NTEU argues, see Kaspar Decl. ¶¶ 11-14, the loss of representation and status as an exclusively recognized labor organization creates "obstacles [that] make it more difficult for the [plaintiff] to accomplish [its] primary mission." See League of Women Voters v. Newby, 838 F.3d at 9. This in itself constitutes irreparable harm. See id.; Garcia v. Sacramento Coca-Cola Bottling Co., 733 F. Supp. 2d 1201, 1216 (E.D. Cal. 2010) ("[C]ourts have historically held that withdrawal of union recognition is often irreparable.") (collecting cases); Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, Civil Action No. 25-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025).

The government's arguments to the contrary are unavailing. First, the government argues that NTEU's concern over losing bargaining power and members is "speculative" because "no defendant agency has yet taken action to terminate a [collective bargaining agreement] or to remove individuals covered by Executive Order 14,251 from bargaining units." Opp. at 10. In support, the government points to an April 8, 2025 memorandum from the Chief Human Capital Officers Council that states that "[a]gencies should not terminate any collective bargaining agreements . . . until the conclusion of litigation or further guidance from OPM directing such termination." Opp. at 6.

The guidance in the memorandum can provide little solace to plaintiff, and no real support for the government's argument that NTEU's injury is "speculative." The April 8 memorandum itself indicates that collective bargaining agreements may be terminated based on

36

"guidance from OPM directing such termination." See Opp. at 6 (quoting Declaration of Allen R. Brooks [Dkt. No. 26-1] ¶ 6). And OPM has already made clear that agencies and subdivisions "are no longer subject to the collective-bargaining requirements" of the FSLMRS. OPM Guidance at 3 (emphasis added). In other words, notwithstanding the lack of the formal cancellation of the collective bargaining agreements, the agencies and subdivisions have been instructed that the protections in the FSLMRS are no longer operative. Moreover, NTEU has stated that agencies and subdivisions have already begun disregarding provisions of the collective bargaining agreements in line with the OPM Guidance. See Kaspar Supp. Decl. ¶¶ 12-25. The government's argument that NTEU's injury is "speculative" therefore must be rejected for the simple reason that it has already begun to materialize. See Pl.'s Reply at 21 (stating that "[b]efore and after" the April 8 memorandum, "agencies have refused to meet with NTEU, to bargain with NTEU, or to honor contractual obligations . . . .").[7]

Second, the government argues that there is "no reason why losing current NTEU members while this litigation is pending could not be remedied by a favorable judicial ruling in this case restoring its scope of representation." Opp. at 10-11. This argument fails for two reasons. First, the argument ignores the injuries that NTEU will suffer in the interim given that "[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining." Int'l Union of Elec., Radio & Machine Workers, AFL-CIO v. NLRB, 426 F.2d at 1249. Put differently, the period of time when union representation is suspended will have lasting and irreparable effects on employees' interest and

---

[7]    The government also asserts that "[e]ven if agencies did remove NTEU members from bargaining units, those employees could remain members of NTEU . . . ." Opp. at 10. This argument is left unexplained, and it does not address the fact that NTEU would be significantly obstructed in representing its members if the agencies terminate their collective bargaining agreements and refuse to bargain with their employees.

participation in the union.  Second, the President's directive "to prepare large-scale reductions in force" outlined in the OPM Guidance – which the IRS has already appeared to begin to follow through on, see Kaspar Supp. Decl. ¶ 16 – creates the serious concern that NTEU's bargaining power garnered through the size of its membership base will either be forever diminished or will take a great deal of time to restore.  See N.L.R.B. v. Electro-Voice, Inc., 83 F.3d at 1573 ("As time passes, the benefits of unionization are lost and the spark to organize is extinguished.").

In light of the injuries to NTEU's bargaining power that are likely to occur – and indeed have already begun to occur – and the "obstacles" that the loss of bargaining power creates for it to "accomplish [its] primary mission" of representing its members, the Court concludes that NTEU will face irreparable harm absent a preliminary injunction.  See League of Women Voters v. Newby, 838 F.3d at 9; see Garcia v. Sacramento Coca-Cola Bottling Co., 733 F. Supp. 2d at 1216 ("[C]ourts have historically held that withdrawal of union recognition is often irreparable.") (collecting cases).

## 2.  Union Dues

"While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the'" movant's operations.  Climate United Fund v. Citibank, N.A., Civil Action No. 25-0698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  NTEU's declarations clearly reflect that the financial harm from the loss of dues revenue "threatens NTEU's very existence."  Kaspar Decl. ¶ 18; see Gray Decl. ¶ 13 ("The immediate, drastic decrease in income from lost payroll deductions will jeopardize NTEU's very existence.").  NTEU's Director of Field Operations, Daniel Kaspar, asserts that absent preliminary relief, NTEU will lose approximately $25 million

dollars in revenue over the next year, which is "more than half of NTEU's total revenue stream." Kaspar Decl. ¶ 17; see Gray Decl. ¶ 12.  He further states that this injury is imminent, as certain agencies subject to the Executive Order have already begun to stop automatic deductions from union members' paychecks.  Kaspar Decl. ¶¶ 20-21.  Indeed, as of the filing of its reply memorandum on April 16, 2025, NTEU has already lost $2 million in dues revenue.  Kaspar Supp. Decl. ¶¶ 13-14.

   The government does not meaningfully dispute that the severity of the financial loss threatens the very existence of NTEU's operations, though it briefly mentions the general rule that "economic loss does not, in and of itself, constitute irreparable harm."  Opp. at 9 (quoting Nat'l Min. Ass'n v. Jackson, 768 F. Supp. 2d 34, 50 (D.D.C. 2011).  Instead, the government first argues that the financial injury is speculative because "[u]nion members remain free to pay their dues directly to the union" notwithstanding an agency's decision to discontinue automatic deductions from the members' paychecks.  Opp. at 9.  This argument is brief and unexplained.  As NTEU correctly notes, it has already started losing significant dues revenue, and the Executive Order takes "away the basic reason that NTEU members pay dues:  to support their exclusive bargaining representative . . . ."  Pl.'s Reply at 21; see Kaspar Decl. ¶¶ 22-24 (stating that "NTEU will be of less value to employees . . . if it can no longer participate in" any grievance procedure or collective bargaining).  Moreover, as NTEU points out, it is not clear how NTEU would collect dues since some of the defendants have "taken away the very apparatus" created by Congress for collecting the dues payments.  Pl.'s Reply at 21; see 5 U.S.C. § 7115.

   The government next argues that NTEU can recover the lost dues revenue at a later date through the FSLMRS's administrative review procedures, since the FLRA "routinely

orders agencies to reinstate the dues allotments of individuals in the unit whose allotments were unlawfully terminated . . . ." Opp. at 10. This argument is unpersuasive for at least two reasons. First, while NTEU may be able to recover dues that it has immediately lost as a result of the Executive Order, this cannot account for the reduction in dues moving forward. Such a reduction inevitably will result from a decrease in membership, either as a product of the agencies following through on the President's directive to implement reductions in force, or through "discourage[ment]" in union membership that results from "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives . . . ." Franks Bros. Co. v. NLRB, 321 U.S. at 704. Second, even if some dues are eventually recovered later, the government ignores the fact that the significant loss NTEU will suffer over the next year – approximately half of its revenue – "will jeopardize NTEU's very existence." Gray Decl. ¶ 13. In the meantime, the loss of revenue creates a serious obstacle for NTEU to "accomplish [its] primary mission" of representing its members. League of Women Voters v. Newby, 838 F.3d at 9; see Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President, Civil Action No. 25-0917 (RJL), 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) ("While economic loss does not always warrant a TRO, this is not a typical situation because plaintiff faces more than economic harm – it faces crippling losses and its very survival is at stake.").

\* \* \*

In sum, NTEU's loss of bargaining power and the significant financial harm to the union that is both ongoing and can be expected to continue represent irreparable harm warranting preliminary relief.

### D. Equities and Public Interest

The remaining preliminary injunction factors – the balance of the equities and assessment of the public interest – weigh in NTEU's favor. These factors "merge when, as here, the Government is the opposing party.'" Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).

NTEU makes two arguments that a preliminary injunction is in the public interest. First, NTEU argues that a preliminary injunction will maintain the status quo that has existed for decades, in which a large portion of the federal workforce possessed collective bargaining rights. See Pl.'s Mem. at 35. Second, NTEU asserts that a preliminary injunction is in the public interest because "[t]he public has an interest in ensuring that the laws enacted by their representatives are not imperiled by executive fiat." Pl.'s Reply at 23 (citation omitted).

The Court agrees with both propositions. Congress unequivocally identified collective bargaining rights and federal unions as being "in the public interest." See 5 U.S.C. § 7101(a). Pursuant to this finding, Congress determined that large portions of the federal workforce should have the right to collectively bargain and be represented by federal unions. This was the state of the federal workforce for decades. The Executive Order dramatically changes this, excluding two-thirds of the federal workforce from the FSLMRS. The scope of the Executive Order, contemporaneous evidence surrounding the Executive Order, and the government's defense of the Executive Order in this case raise serious concerns about whether the President has exceeded his power. See Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[E]nforcement of an unconstitutional law is always contrary to the public interest"); TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) ("[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'")

(quoting <u>R.I.L-R v. Johnson</u>, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); <u>see also</u> <u>League of Women Voters v. Newby</u>, 838 F.3d at 12 (holding that while "[t]here is generally no public interest in the perpetuation of unlawful agency action," "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation'") (quoting <u>Washington v. Reno</u>, 35 F.3d 1093, 1103 (6th Cir. 1994)); <u>Grace v. Whitaker</u>, Civil Action No. 18-1853 (EGS), 2019 WL 329572, at *5 (D.D.C. Jan. 25, 2019) ("[T]here is a public interest . . . in ensuring that statutes enacted by their representatives are not imperiled by executive fiat.") (citation omitted) (cleaned up).

The government's argument that the public interest will be harmed if the Court issues a preliminary injunction is unavailing. The thrust of the government's argument is that it is in the public interest to ensure that the President can effectively operate "agencies relevant to national security without the constraints of collective bargaining," and that a preliminary injunction would "displace and frustrate the President's decision about how to best address issues of national security." Opp. at 34. These arguments, however, presuppose that the President's decisions are in fact "national security" determinations, rather than a recasting of decisions related to "the general welfare" as "national security" determinations. <u>See</u> <u>Cole v. Young</u>, 351 U.S. at 544. For the reasons discussed at length above, the President's assertion of "national security" interests is overly broad in this case.

The Court therefore concludes that the balance of the equities and assessment of the public interest weigh in favor of granting a preliminary injunction. Indeed, each of the preliminary injunction factors weighs in favor of granting NTEU's motion.

## IV. SECURITY AND SCOPE OF PRELIMINARY INJUNCTION

The final two matters the Court must address were raised for the first time by the government at oral argument.  First, the government requests that the Court impose a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.  See Tr. at 52:8-11.  Second, the government argues that in the event that the Court grants NTEU's motion, it should exempt agencies or subdivisions from the preliminary injunction order that meet the criteria in Section 7103(b)(1).  See id. at 51:6-13.

Turning first to the request for a bond, the Federal Rules of Civil Procedure provide that the Court may grant a motion for a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  Nevertheless, "[c]ourts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all."  Simms v. District of Columbia, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (citation omitted) (second alteration in original) (quoting DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999)); see Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *13 n.5 (D.D.C. June 28, 2024).  "A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'"  Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, Civil Action No. 25-0239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (quoting Nat. Res. Def. Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases)).

At oral argument, the government requested that NTEU be required to post a bond because the government will suffer financial harm from a preliminary injunction as a result of

needing to pay certain expenses for employees to engage in union activity.  See Tr. at 52:18-53:4.  The court exercises its discretion to decline this request.  See Aviel v. Gor, Civil Action No. 25-0778 (LLA), 2025 WL 1009035, at *12 (D.D.C. Apr. 4, 2025).  As the Court's analysis of this motion illustrates, NTEU has made a substantial showing that the Executive Order is of unprecedented scope, deprives federal employees and the federal unions of rights that Congress found to be in the public interest, and poses an existential risk to NTEU.  Requiring the posting of a bond would conflict with both the Court's findings that each of the preliminary injunction factors weigh heavily in NTEU's favor and the principles of the right to seek judicial review of unlawful government action.  See Aviel v. Gor, 2025 WL 1009035, at *12 n.7 ("Setting a bond would conflict with every holding in this opinion and contravene the interests of justice."); see also League of United Latin Am. Citizens v. Exec. Off. of the President, Civil Action No. 25-0946 (CKK), 2025 WL 1187730, at *62 (D.D.C. Apr. 24, 2025) (collecting recent cases denying government's request to "post any bond as a condition of obtaining an injunction against agencies or officers of the federal government").

Turning next to the scope of the preliminary injunction, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017).  In the instant case, the government's request that the Court exempt from its preliminary injunction agencies and subdivisions that meet the requirements of Section 7103(b)(1) must be rejected.  NTEU has challenged Section 2 of the Executive Order in its entirety and the government has defended the Executive Order in its entirety.  The Court has concluded that the preliminary injunction factors all weigh heavily in favor of granting preliminary relief.  Specifically, the Court has found that NTEU is likely to succeed in showing

that the President applied an overly broad interpretation of "national security," seemingly disregarded the statutory term "primary function," and – as the evidence rebutting the presumption of regularity suggests – "was indifferent to the purposes and requirements of the [FSLMRS], or acted deliberately in contravention of them."  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.  These conclusions all speak to the fact that Section 2 of the Executive Order is entirely ultra vires.  Furthermore, those conclusions, coupled with a preliminary injunction's purpose of "preserv[ing] the status quo while the district court assesses the merits of a case," Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381 (ABJ), 2025 WL 1144646, at *4 (D.D.C. Apr. 18, 2025), warrant enjoining Section 2 of the Executive Order in its entirety.

Moreover, the government's arguments do not warrant specific agency or subdivision exemptions in the preliminary injunction order.  The government has not shown that any particular agency or subdivision meets the Section 7103(b)(1) criteria.  The meager seven pages explaining how two-thirds of the federal workforce meets the Section 7103(b)(1) criteria, coupled with the limited factual record now before the Court, does not afford the Court the opportunity to determine the exemptions at this time.  The government has not provided sufficient argument or factual support warranting specific exemptions from the preliminary injunction order.

## V.  CONCLUSION

For the foregoing reasons, NTEU's Motion for a Preliminary Injunction [Dkt. No. 9] is hereby GRANTED.

An Order consistent with this Opinion was issued on April 25, 2025.  See Order of April 25, 2025 [Dkt. No. 32].

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/28/25