# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5157**

**September Term, 2024**

**1:25-cv-00935-PLF**

**Filed On:** May 16, 2025

National Treasury Employees Union,

        Appellee

    v.

Donald J. Trump, President of the United
States, et al.,

        Appellants

**BEFORE:**    Henderson, Walker, and Childs*, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for stay pending appeal and an immediate administrative stay, the opposition thereto, and the reply, it is

**ORDERED** that the motion for stay be granted. The Government has met the requirements for a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). A stay applicant must show that (1) it "is likely to succeed on the merits," (2) it "will be irreparably injured absent a stay," (3) a stay will not "substantially injure" other interested parties, and (4) a stay is in the "public interest." *Id.*

1. The Government is likely to prevail in its appeal of the district court's preliminary injunction. To obtain a preliminary injunction, a plaintiff must demonstrate that it will suffer irreparable harm while the case is pending. *See Winter v. NRDC*, 555 U.S. 7, 20, 32 (2008). The National Treasury Employees Union failed to establish

* A statement by Circuit Judge Childs, dissenting from this order, is attached.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5157**                                    **September Term, 2024**

irreparable harm.  That is a sufficient basis for vacating a preliminary injunction.[1]  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief").

The Union says it will suffer two irreparable harms.  Neither qualifies.

*First*, the Union asserts that without a preliminary injunction it will lose bargaining power and suffer reputational harm that will deter present and future membership.  But those harms are speculative because they would materialize only *after* an agency terminates a collective-bargaining agreement, and the Government directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes.  Ex. 1-B, *National Treasury Employees Union v. Trump*, No. 25-cv-0935, 2025 WL 1218044 (D.D.C. Apr. 11, 2025), ECF No. 26-1; *see also Winter*, 555 U.S. at 22 (irreparable harm must be "likely," not merely "possib[le]").[2] So the Union was not entitled to equitable relief on this basis.[3]

*Second*, the Union says it will suffer an irreparable financial injury from the loss of automatically withheld union dues.  But such "financial injuries are rarely irreparable because they are presumptively remediable through monetary damages." *Clevinger v. Advocacy Holdings, Inc.*, __ F.4th __, No. 23-7116, 2025 WL 1197927, at *2 (D.C. Cir. 2025).  Here, the Union can seek to recover missing dues in subsequent Federal Labor

_____

[1] Because the district court's preliminary injunction is likely to be vacated for lack of irreparable harm, we need not address the Government's arguments regarding the Union's likelihood of success on the merits.

[2] On this point, Judge Childs' thoughtful dissent implies agreement.  A version of her question to the Government can be addressed to the Union: "How" is it possible that the absence of "the district court injunction will cause irreparable injury when the Government itself voluntarily imposed that same constraint?"  Dissenting Statement at 5.  On appeal, when the Government will prevail if it shows the Union does not need a preliminary injunction to avoid irreparable injury, the Union will struggle to "show its own injury from the district court" declining to enjoin "an already-paused Executive Order." *Id.* at 6.

[3] To be clear, if a specific agency or subagency deviates from that self-imposed rule, individual units may seek injunctive relief appropriately tailored to any non-speculative, irreparable harm.  But absent ongoing irreparable harm, the Union is not entitled to equitable relief.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5157**                                      **September Term, 2024**

Relations Authority (FLRA) proceedings if the Union ultimately prevails in this litigation.  *See, e.g.*, *U.S. Department of Defense, Ohio National Guard*, 71 F.L.R.A. 829, 830 (2020) (ordering reimbursement of dues that an agency unlawfully failed to withhold); *see also* 5 U.S.C. § 7118(a)(7) (authorizing the FLRA to issue an order that gives a collective-bargaining agreement "retroactive effect" and to take "such other action as will carry out the purpose" of the Civil Service Reform Act).

Moreover, it is speculative that the Union will suffer a significant financial injury in the interim.  To start, the Union will continue collecting dues from some 54,000 employees who are not covered by the Executive Order.  *See National Treasury Employees Union v. Trump*, No. 25-cv-0935, 2025 WL 1218044, at *17 (D.D.C. Apr. 28, 2025) ("the Executive Order covers 65.9% of all NTEU-represented employees, or approximately 104,278 employees").  In addition, nothing prevents Union members covered by the Executive Order from voluntarily paying the dues they owe; that is, after all, how most other voluntary membership organizations collect dues.  *Cf. Alachua County Education Association v. Rubottom*, No. 23-cv-111, 2023 WL 7132968, at *3 (N.D. Fla. Sept. 22, 2023) (noting that after one public employer "ceased deducting membership dues from payroll," "about half of dues-paying members . . . transitioned to paying dues via another method," and after another public employer did so, "60% of members . . . signed up to pay dues through [an] alternative payment method").

2. The district court's preliminary injunction inflicts irreparable harm on the President by impeding his national-security prerogatives, which were explicitly recognized by Congress.  *See* 5 U.S.C. § 7103(b).

The Union contends that if the Government suffers any harm, it would be self-inflicted, and therefore not attributable to the preliminary injunction.  That argument fails for two reasons.

*First*, the preliminary injunction is broader than the Government's self-imposed restrictions.  It prohibits agency heads from obeying Section 2 of the Executive Order and the associated Office of Personnel Management (OPM) guidance.  That guidance instructs agency heads to "consult with their General Counsels as to how to implement the President's directive" and to "consider" specified changes and "any others that agencies deem necessary, consistent with the President's national security determination."  Ex. 1-A at 3, *National Treasury Employees Union v. Trump*, No. 25-cv-0935, 2025 WL 1218044 (D.D.C. Apr. 11, 2025), ECF No. 26-1.  In effect, the preliminary injunction enjoins the *entire* implementation process, including preparatory work.  The Government's self-imposed restrictions, by contrast, recommend only that agency heads refrain from terminating CBAs and decertifying bargaining units.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5157**                                        **September Term, 2024**

*Second*, the Government suffers irreparable harm even to the extent the preliminary injunction overlaps with the Government's self-imposed restrictions.  The injunction eliminates the President's control over the decision to pause implementation of the Executive Order and, by consequence, his flexibility to respond to future developments, at least without returning to the district court.  In other words, the preliminary injunction ties the government's hands.  That transfer of control, from the Executive to the Judiciary, is more problematic where, as here, we are operating in the national security context, an area "in which the President generally enjoys 'unique responsibility.'"  *Hedges v. Obama*, 724 F.3d 170, 200 (2d Cir. 2013) (quoting *American Insurance Association v. Garamendi*, 539 U.S. 396, 415 (2003)); *see also Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 795 (D.C. Cir. 1971) (declining to enter a stay against the government because the court was "in no position . . . to enter a stay order that would interject the Court into national security matters that lie outside its province").

3. Other parties, including the Union, will not be harmed by a stay, largely for the same reasons that the Union will not be harmed without a preliminary injunction.  The Union claims that a stay will "nullify the collective-bargaining rights of over one-hundred thousand NTEU-represented federal workers."  Opp. 15.  But that ignores the Government's self-imposed restrictions, so it misses the mark.

4. Finally, preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest.  To hold otherwise would give to the courts what the Constitution gave to Congress and the President.  *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017) ("National-security policy is the prerogative of the Congress and President."); *Winter*, 555 U.S. at 33 (vacating a preliminary injunction, in part because there was "no basis for jeopardizing national security").

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5157**                                          **September Term, 2024**

* * *

For these reasons, the Government has met its burden for a stay pending appeal.[4]

**Per Curiam**

                                        **FOR THE COURT:**
                                        Clifton B. Cislak, Clerk

                              BY:    /s/
                                        Selena R. Gancasz
                                        Deputy Clerk

_____

[4] Separately, we clarify that injunction bonds are generally required.  Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction . . . *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added)).  Here, the district court denied the Government's request for an injunction bond because "each of the preliminary injunction factors weigh[ed] heavily in [the Union's] favor" and requiring a bond would conflict with the Union's "right to seek judicial review." *National Treasury Employees Union*, 2025 WL 1218044, at *21.  But that logic would apply any time a district court grants a preliminary injunction — an exception that swallows the rule.  Accordingly, we doubt that $0 was the "appropriate bond" in this case.  *National Kidney Patients Association v. Sullivan*, 958 F.2d 1127, 1129 (D.C. Cir. 1992); *see also Edgar v. Mite Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring) (an injunction bond "is the moving party's warranty that the law will uphold the issuance of the injunction"); *Monzillo v. Biller*, 735 F.2d 1456, 1461 (D.C. Cir. 1984) ("Rule 65(c) of the Federal Rules of Civil Procedure requires the filing of a security bond by a party who benefits from a temporary restraining order or preliminary injunction"); *Habitat Education Center v. United States Forest Service*, 607 F.3d 453, 459 (7th Cir. 2010) (because the "costs of government are borne ultimately by taxpayers," Rule 65(c) applies no less when a "government agency" is subject to a preliminary injunction).

CHILDS, *Circuit Judge*, dissenting: The Government moves for a stay pending appeal. In that posture, the burden is on the Government to justify a disruption to the ordinary course of litigation. We take such "extraordinary" action only if the Government makes the "critical" showing that it will suffer irreparable injury before the appeal concludes. *Citizens for Resp. & Ethics in Washington v. FEC*, 904 F.3d 1014, 1017, 1019 (D.C. Cir. 2018) (per curiam). But the Government provides only a passing, generalized assertion of harm in its attempt to justify a stay. Even more telling, the Government purports to have already self-inflicted the same injury it claims a stay is necessary to prevent: it directed agencies not to implement the Executive Order until litigation concludes. Because the Government has not satisfied a threshold requirement for a stay, I respectfully dissent.

## I.

### A.

The Federal Service-Labor Management Relations Statute (FSLMRS) grants collective-bargaining rights to certain federal employees. *See* 5 U.S.C. §§ 7101–7135. The FSLMRS reflects Congress's determination that "labor organizations and collective bargaining in the civil service are in the public interest." *Id.* § 7101(a); *see Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 107 (1983) ("Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest").

The President may exclude an agency or subdivision from the scope of the FSLMRS if "(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the FSLMRS] cannot be applied to that agency in a manner consistent with national security requirements and

2

considerations." 5 U.S.C. § 7103 (b)(1). Presidents have previously excluded subdivisions of agencies or departments, such as the Office of Naval Intelligence in the Department of Defense and the National Background Investigations Bureau in the Office of Personnel Management. *See* Exec. Order No. 12,171, § 1-205(a), 44 Fed. Reg. 66,565, 66,565 (Nov. 19, 1979); Exec. Order No. 13,741, § 3(b), 81 Fed. Reg. 68,289, 68,291 (Oct. 4, 2016). No prior designation has excluded an entire Cabinet-level agency or department.

**B.**

In March 2025, President Trump issued an Executive Order excluding from the FSLMRS over thirty agencies or sub-divisions, including entire Cabinet-level agencies and departments like the Environmental Protection Agency; the Department of Justice; the Department of Veterans Affairs; the Department of the Treasury, except the Bureau of Engraving and Printing; and the Department of Energy, except the Federal Energy Regulatory Commission. *See* Exec. Order No. 14,251, §§ 1–3, 90 Fed. Reg. 14,553, 14,553–55 (Mar. 27, 2025). Also excluded are the Food and Drug Administration, the Centers for Disease Control and Prevention, the National Institute of Allergy and Infectious Diseases of the National Institutes of Health, the Bureau of Land Management, the National Science Foundation, and the Federal Communications Commission, among others. *Id.* Altogether, the Executive Order covers about "two-thirds of the federal workforce." A09 ¶ 35. The Executive Order states that the excluded agencies and subdivisions "have as a primary function intelligence, counterintelligence, investigative, or national security work," and that the FSLMRS "cannot be applied to those subdivisions in a manner consistent with national security requirements and considerations." 90 Fed. Reg. at 14,553.

3

Three documents were released alongside the Executive Order.  The White House published a "Fact Sheet," which states that the FSLMRS "enables hostile Federal unions to obstruct agency management" and that certain unions "have declared war on President Trump's agenda."[1]  The Office of Personnel Management (OPM) issued guidance stating that excluded agencies "are no longer subject to the collective-bargaining requirements" of the FSLMRS and "are no longer required to collectively bargain with Federal unions."  Dkt. 26-1 at 6.  An interagency forum led by the OPM Director distributed a Frequently Asked Questions (FAQ) document to the excluded agencies, advising that agencies should not terminate any collective-bargaining agreements or file any petitions to decertify bargaining units until litigation concludes.  Dkt. 26-1 at 13.

A federal employee labor organization, the National Treasury Employees Union (NTEU), filed suit, and the district court issued a preliminary injunction.  The Government appealed and sought a stay pending appeal.

## II.

As the party seeking a stay pending appeal, the Government must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured absent a stay" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay.  *Nken v.*

---

[1] The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H.

4

*Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).    "Although the plaintiff[] must show irreparable injury to secure an injunction, it is now the defendant[s] who—seeking relief from an injunction so obtained—must show irreparable injury absent a stay of the injunction." *J.G.G. v. Trump*, 2025 WL 914682, at *11 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring).

Accordingly, the Government's "showing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024).    "[T]he injury must be both certain and great; it must be actual and not theoretical. Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotations omitted).

Despite this weighty burden, the Government glides over its obligation to show irreparable injury.    In one brief paragraph, the Government claims that a stay would protect the President's ability "to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining."    Stay Mot. 26–27.    But the district court's injunction maintains the state of affairs that has existed for nearly half a century: NTEU has bargained on behalf of federal workers since the 1970s.    A14–16 ¶¶ 47–57.    The Government does not explain why irreparable injury will result from continuing this decades-long practice for a short period of time while we adjudicate the merits of this appeal.    Instead, it relies only on a generalized statement that interference with "the government's investigation, intelligence, and national-security functions—or . . . the government's ability to supervise the employees engaged in such work—would appreciably injure the Nation's interests."    Stay Mot. 26–27 (cleaned up).

5

Such vague assertions of harm dependent on the merits of the dispute are insufficient to show irreparable injury.

The one specific representation the Government offers regarding the consequences of the Executive Order undercuts its own argument.[2]  Relying on OPM's FAQ document, the Government asserts, and the majority accepts, that the excluded agencies have been directed not to act on the Executive Order during the pendency of this litigation.  The FAQ document states that excluded agencies "should not terminate any [collective-bargaining agreements] until the conclusion of litigation or further guidance from OPM directing such termination" and "should not file any [petitions to decertify bargaining units] until litigation regarding Exclusions has been resolved." Dkt. 26-1 at 13.  But this very representation casts doubt on the Government's own asserted injury.  How can the Government argue that the district court injunction will cause irreparable injury when the Government itself voluntarily imposed that same constraint?  At this stage, it is the Government's obligation to provide an answer, and it offers none.

And while the Government claims injury from its inability to implement the Executive Order, at the same time it claims the Executive Order will remain without effect even in the absence of the district court injunction.  The Government asserts that NTEU does not suffer irreparable harm to justify

_____

[2] I make no conclusions about the Government's likelihood of success on the merits of its appeal because, even accepting the Government's representations, it is unable to make the requisite showing of irreparable injury to justify a stay. *See Wisconsin Gas Co.*, 758 F.2d at 674 ("We believe that analysis of the second factor disposes of these motions and, therefore, address only whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm.").

6

the district court's injunction and will not be harmed by a temporary stay on appeal because, per the FAQ document, "agencies have been advised not to terminate collective bargaining agreements at this time and not to decertify bargaining units until 'litigation is final.'"  Stay Mot. 27 (quoting Dkt. 26-1 at 13).  But the Government does not explain how it can show its own injury from the district court enjoining an already-paused Executive Order.  To grant a stay, we would need to find with one hand that the Executive Order still has real-world operation for purposes of the Government's irreparable harm, but with the other hand that the Executive Order has none at all for purposes of NTEU's.  The Government fails to even address this inconsistency.

The majority offers two possibilities to resolve the contradiction the Government has teed up: (1) that the preliminary injunction is broader than the Government's self-imposed restrictions, and (2) that the preliminary injunction eliminates the Government's ability to adjust its self-imposed restrictions in the future.  I am not persuaded either is enough.

*First*, the majority teases out a gap between the scope of the district court's injunction and the Government's own, resting its finding of irreparable harm on the Government's inability to operate within that gap.  The Government has not put forth this argument.  Nor has the Government represented that it actually intends to take any action within that gap during the course of this appeal.  Or how an inability to take such action causes an irreparable, cognizable injury.  At this stage, before granting emergency relief, I would require the Government provide us with more.

*Second*, the possibility of some future harm stemming from the Government's inability to rescind its own directive is insufficient.   The district court order may well tie the

7

Government's hands at some point in the future, but we do not issue preemptive relief. Courts have long held that "[i]njunctions . . . will not issue to prevent injuries neither extant nor presently threatened, but only merely feared." *Comm. in Solidarity with People of El Sal. v. Sessions*, 929 F.2d 742, 745–46 (D.C. Cir. 1991) (quotations omitted); *see KalshiEX LLC*, 119 F.4th at 65 ("Perhaps the Commission will amass more evidence substantiating its fears . . . but, on the evidence provided to this court, those fears—as yet—fail to rise beyond the speculative level." (quotations omitted)). The Government cannot carry its burden for a stay pending appeal based only on the possibility that someday there could be a risk of irreparable harm.

**III.**

The Government does not identify imminent harm warranting emergency relief. An extraordinary use of our equitable powers requires more than the vague assertions of harm provided here. In the absence of irreparable injury, the Government's merits arguments are better suited to the panel designated to hear them.