**[ORAL ARGUMENT NOT YET SCHEDULED]**

No. 25-5157

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

NATIONAL TREASURY EMPLOYEES UNION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

_____

On appeal from the United States District Court
for the District of Columbia

_____

**APPELLEE'S PETITION FOR REHEARING EN BANC**

_____

JULIE M. WILSON
General Counsel

PARAS N. SHAH
Deputy General Counsel

ALLISON C. GILES
Assistant Counsel

JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W.,
Suite 1000
Washington, D.C.  20001
(202) 572-5500

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... ii

RULE 40 STATEMENT ............................................................................ 1

BACKGROUND ....................................................................................... 5

I. Congress's Broad Grant of Collective-Bargaining Rights to Federal Workers ............................................................................. 5

II. The President's Sweeping Executive Order Cancelling Statutory Collective-Bargaining Rights ......................................................... 7

III. The Administration's Admitted Motivations Behind the Executive Order ........................................................................... 8

IV. Procedural History .......................................................................... 9

ARGUMENT .......................................................................................... 11

The Majority's Ruling Is Wrong and Will Cause Irreparable Harm to Federal-Sector Collective Bargaining. ....................................... 11

A. The Majority's Entire Analysis Is Based on a Factual Misunderstanding. .................................................................... 11

B. NTEU Demonstrated Irreparable Harm and Is Thus Likely to Prevail on Appeal .................................................................... 15

C. Maintaining Collective Bargaining Would Not Irreparably Harm the Government. .............................................................. 18

D. A Stay Pending Appeal Would Harm Other Parties and the Public. ........................................................................................ 20

CONCLUSION ....................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445
(1st Cir. 1990) ...................................................................... 16

*Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89
(1983) ............................................................................... 1, 5

*Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017) ..... 20

*DHS, ICE*, 70 F.L.R.A. 628 (2018) ......................................... 19

*In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012) ...................... 14

*J.G.G. v. Trump*, No. 25-5067, 2025 U.S. App. LEXIS 7131 (D.C. Cir.
Mar. 26, 2025) ...................................................................... 5

*NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) ........................... 16, 19

*OPM v. FLRA*, 864 F.2d 165 (D.C. Cir. 1988) ................................. 6

*Perkins Coie LLP v. U.S. Dep't of Justice*, No. 25-716, 2025 U.S. Dist.
LEXIS 84475 (D.D.C. May 2, 2025) ........................................ 17–18

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011) ......... 16

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
No. 25-cv-917, 2025 U.S. Dist. LEXIS 61536
(D.D.C. Mar. 28, 2025) ........................................................ 17

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ...................... 17

**Statutes**

5 U.S.C. § 7101 *et seq* ......................................................... 6

5 U.S.C. § 7101(a) .......................................................... 1, 6, 21

5 U.S.C. § 7103(a)(3) ............................................................ 6

5 U.S.C. § 7103(b)(1) ........................................................................ 7

5 U.S.C. § 7106 ............................................................................... 19

5 U.S.C. § 7114(a) ............................................................................. 6

5 U.S.C. § 7115 ................................................................... 3, 16, 17

## Other Authorities

124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) ..................................... 6

## RULE 40 STATEMENT

The Court should grant rehearing en banc because this case presents a question of exceptional importance: whether the Congress that codified federal-sector collective bargaining intended to allow the President to dismantle its statutory system through a narrow national-security exemption—and to allow it where the President states that he is using the exemption to punish unions who do not support him and to make federal employees easier to fire. If the government's position prevails, there is no national-security exemption that the President could make—no matter how outlandish or pretextual—that would be subject to judicial review or exceed his statutory authority.

**1.** Congress passed the Federal Service Labor-Management Relations Statute of 1978 (the Statute) to codify federal labor relations and to safeguard it from the whims of any President; to promote collective bargaining; and to strengthen federal labor unions. *See* 5 U.S.C. § 7101(a); *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 107 (1983).

This Court's 2-1 decision to stay the district court's emergency relief pending appeal might very well end federal-sector collective

bargaining. In practical terms, the ruling—which was based strictly on an equities analysis (A2 n.1)—effects what the district court aimed to prevent: it will kill federal-sector unions.

Executive Order No. 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the Executive Order), strips collective-bargaining rights from federal workers in over thirty agencies or subdivisions, such as the Environmental Protection Agency and the Internal Revenue Service (IRS). A7. In all, it takes about two-thirds of federal workers out of the Statute's coverage. *Id.* For NTEU, that means "65.9% of all NTEU-represented employees, or approximately 104,278 employees." A46.

The panel's stay will allow agencies to continue to ignore federal-sector unions like NTEU—to refuse to bargain with them or to engage with them—all while federal workers are under unprecedented attack. That includes the impending large-scale reductions-in-force. This Court's stay means that the one-dozen NTEU-represented agencies that that Executive Order targets will continue not to discuss those reductions-in-force with NTEU or honor the reduction-in-force procedures in their collective-bargaining agreements. A35, A47–48.

NTEU will not get these chances to advocate for and to protect its workers back: "there is a substantial possibility that only a small fraction of its once large union w[ill] remain upon prevailing in this litigation." A48. The same will be true for other federal-sector unions.

This Court's stay will also allow federal agencies exempted through the Executive Order to refuse to process dues payments to federal-sector unions via the payroll deduction process that Congress created in 5 U.S.C. § 7115(a). Those dues payments restarted less than two weeks ago because of the district court's preliminary injunction and after NTEU had lost over $3 million in dues revenue. Doc. #2114615 at 126–27, ¶ 4.[1] The stay will restart those losses, which for NTEU will take away over half of its revenue. A50–51.

As the district court understood, those losses threaten NTEU's very existence. A50. Indeed, the largest federal-sector union, the American Federation of Government Employees, has announced it is laying off half its staff nationwide because of the effect of this Administration's actions on its finances. Doc. #2114615 at 127, ¶ 6.

_____

[1] Citations to court documents use the page numbers generated in the ECF header.

With the two largest federal-sector unions (among others) on the precipice, so too is Congress's statutory regime.

And the final blow for federal-sector unions might be just around the corner. The Executive Order, Section 7, directs agency heads to recommend additional national-security exemptions from the Statute. If the government gets the unchecked executive power that it is asking for here, additional exemptions are sure to come.

2. The majority's ruling is based on a plain factual misunderstanding: that agencies were not implementing the Executive Order before the district court enjoined its implementation. That is untrue. The district court's factual findings and the record, relevant portions of which NTEU submitted to this Court with its opposition, are directly to the contrary. *See* Doc. #2114615 at 33–130.

But the majority ignored that record and the district court's factual findings. It then gave the government a pass on its own burden, allowing it to "glide[] over its obligation to show irreparable injury." A9 (Childs, J., dissenting). The majority found it sufficient for the government, "[i]n one brief paragraph," to simply invoke the words "national security." *Id.* The majority did not stop there. It went on to

raise arguments that the government did not even suggest to the Court: that the preliminary injunction is too broad and that it "doubt[s] that $0 was the 'appropriate bond' in this case." A3, A5 n.4.

"[T]he central purpose of [a stay pending appeal] is to prevent irreparable injury, not to short-circuit the normal course of litigation." *J.G.G. v. Trump*, No. 25-5067, 2025 U.S. App. LEXIS 7131, at *36 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring). Yet the majority rushed past the district court's factual findings to upend the status quo in a way that will harm federal-sector unions irreparably. Putting the Executive Order, Section 2, back into effect will accomplish the Order's aims of dismantling Congress's collective-bargaining regime and punishing union dissent. This merits the full Court's intervention.

## BACKGROUND

### I. Congress's Broad Grant of Collective-Bargaining Rights to Federal Workers

"In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the Executive Order regime." *Bureau of Alcohol, Tobacco & Firearms*, 464 U.S. at 107.

As Title VII of the Act, Congress enacted the Statute, 5 U.S.C. § 7101 *et seq.* Congress intended the Statute to replace the existing Executive-Order regime governing collective bargaining with a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).[2]

The Statute rests on Congress's finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest." 5 U.S.C. § 7101(a). The Statute assigns federal-sector unions the job of "act[ing] for" and "negotiat[ing] collective-bargaining agreements covering" all employees in the bargaining units that they are elected to represent. *Id.* § 7114(a).

Congress excluded some agencies from the Statute, like the Federal Bureau of Investigation. *Id.* § 7103(a)(3). The Statute gives the President narrow grounds to exclude additional agencies if he

---

[2] This Court has relied on statements from "major players in the legislation, such as Representative Clay." *OPM v. FLRA*, 864 F.2d 165, 169 (D.C. Cir. 1988).

determines that an agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work," and the Statute cannot be applied "in a manner consistent with national security requirements and considerations." *Id*. § 7103(b)(1).

## II. The President's Sweeping Executive Order Cancelling Statutory Collective-Bargaining Rights

Before the Executive Order at issue, no President had used Section 7103(b)(1)'s narrow national-security exemption to exclude an entire Cabinet-level agency from the Statute—let alone multiple Cabinet-level agencies. A7. This Executive Order, though, strips collective-bargaining rights from about two-thirds of federal workers, including 65.9% of the workers that NTEU represents. A14, A46.

The Office of Personnel Management (OPM) issued guidance explaining that excluded agencies "are no longer subject to the collective-bargaining requirements of [chapter 71]" and that the unions representing bargaining-unit employees at those agencies have "los[t] their status" as the exclusive representative for those employees. A19.

NTEU represents nearly a dozen federal agencies that the Executive Order excludes from the Statute's coverage. *See* Doc. #2114615 at 37, ¶ 6. NTEU has represented several of the

bargaining units that the Executive Order excludes from the Statute's coverage for decades and some since the Statute's inception in 1978. *See* Doc. #2114615 at 48–50, ¶¶ 46–57.

## III. The Administration's Admitted Motivations Behind the Executive Order

The Administration issued a Fact Sheet and OPM Guidance on the same night as the Executive Order. Each discusses the Executive Order's impetus: facilitating mass firings of federal employees and exacting political vengeance.

**A.** The OPM Guidance acknowledges the larger context: the President's direction to agencies "to prepare large-scale reductions in force." A35. Now, with the Executive Order's issuance, OPM advises that "agencies can proceed to '[d]isregard contractual [reduction-in-force] articles' and 'prepare large-scale reductions in force' as the 'President has directed.'" *Id.* According to OPM, "Agency [collective-bargaining agreements] often create procedural impediments' to removing [underperforming] employees." *Id.*

**B.** The White House Fact Sheet reveals an additional motivation for the Executive Order: political retribution against "hostile

Federal unions." A18. The Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." A19. NTEU is one of the "Federal unions" that has fought back against President Trump's agenda. NTEU has initiated litigation against several Administration initiatives that it believes are unlawful. A33.

The Executive Order targets a dozen different collective-bargaining relationships that NTEU has with federal agencies and departments. A17–18. That includes NTEU's largest bargaining unit: the IRS. Doc. #2114615 at 39, 43, and 48, ¶¶ 19, 37, and 46.

## IV. Procedural History

On March 31, NTEU filed a lawsuit alleging that the Executive Order's exemptions of its bargaining units from the Statute, individually and collectively, were ultra vires because they exceeded the President's authority under the Statute; and that the exemptions reflected First Amendment retaliation for NTEU's litigation against the Administration. A20. NTEU then moved for a preliminary injunction against the Executive Order, Section 2, and OPM's implementing guidance against the defendants. *Id.*

In a decision issued on April 28, the district court held that the White House's own words and actions defeated the presumption of regularity and allowed for judicial review of NTEU's ultra vires claims. A29–36. The district court found "clear evidence" that the President's sweeping use of that narrow exemption was "retaliatory" and aimed to "punish unions for the 'war' they have 'declared [] on President Trump's agenda'"; served to facilitate "unrelated policy objectives" like "mak[ing] federal employees easier to fire"; and "bear no relation to the [statutory] criteria" for the national-security exemption. A33–36, A38. The evidence likewise showed that the President's exemptions were based on "disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a 'manner consistent with national security requirements and considerations.'" A32 (quoting 5 U.S.C. § 7103(b)(1)(B)).

The district court concluded that NTEU would likely succeed in proving its ultra vires claims (A36–45 (abstaining from evaluating First Amendment claim)); that it had shown irreparable harm given the damage to its bargaining power and the financial losses that threatened

its very existence (A45–52); and that the equities favored preliminary relief (A52–53). The district court thus preliminarily enjoined Section 2 of the Executive Order as it applies to eleven NTEU-represented agencies that the Order exempts from the Statute entirely and another NTEU-represented agency that the Order exempts in part. A17–18.

On April 30, the government appealed the district court's ruling. It then asked this Court for an immediate administrative stay of the ruling and a motion for stay pending appeal. Doc. #2113741. This Court did not grant an administrative stay, but on May 16 granted a stay pending appeal in a divided decision that was based solely on the equitable factors. A2 n.1.

## ARGUMENT

### The Majority's Ruling Is Wrong and Will Cause Irreparable Harm to Federal-Sector Collective Bargaining.

#### A. The Majority's Entire Analysis Is Based on a Factual Misunderstanding.

At the heart of the majority's equities analysis is an incorrect fact: that agencies were complying with their collective-bargaining agreements before the district court's injunction. A2–4 (stating that "the Government directed agencies to *refrain* from terminating collective-bargaining agreements . . . until after the litigation concludes"). This

belief is based exclusively on a Frequently Asked Questions document that OPM issued on April 8—after NTEU filed suit and moved for preliminary relief—which contains the following suggestion: that "'[a]gencies should not terminate any collective bargaining agreements . . . until the conclusion of litigation or further guidance from OPM directing such termination.'" A10, A48 (quoting FAQ document).

Based on the mistaken premise that agencies complied with this suggestion, the majority concluded that neither NTEU nor anyone else is harmed from a stay of the preliminary injunction. A2, A4. Indeed, in the majority's view, the preliminary injunction was not needed at all, given agencies' alleged compliance with their collective-bargaining agreements. A2. Thus, the majority concludes, the government will likely prevail on appeal. A1-2.

The panel majority's foundational understanding of the state of affairs before the preliminary injunction issued is incorrect. The government briefly argued to the district court that an April 8 issuance from OPM—the document on which the majority relies—showed that collective-bargaining agreements remained in force. Dist. Ct. Doc. # 26 at 15. But the government did not raise that argument again after

NTEU dispatched it in its reply. Dist. Ct. Doc. # 29 at 25–26 ("Despite the magic words of the FAQs, agencies have, in fact, utterly rejected their collective bargaining obligations with NTEU. Before and after April 8, agencies have refused to meet with NTEU, to bargain with NTEU, or to honor contractual obligations"), *id.* # 29-1 (attaching exhibits showing defendants' non-compliance with agreements).

Indeed, at oral argument on NTEU's motion for a preliminary injunction, the government refused to defend the argument made in its opposition after NTEU raised it. As NTEU stated:

> [T]his didn't come up in the government's initial presentation, but . . . there shouldn't be any factual question here that agencies are disregarding our CBAs. In the government's brief it argued that agencies are not terminating CBAs, and it offered an FAQ document from the Office of Personnel Management advising agencies that they . . . "shouldn't terminate CBAs."
>
> Your Honor read from the March 27th OPM guidance that's still in force . . . [It] details actions that agencies should take . . . "after terminating CBAs." And those actions include disregarding reduction in force articles [in] CBAs. We know, and it's established in the record, that's already happening here with NTEU's agencies.
>
> It also says, "After termination, stop processing dues payment[s] via payroll deduction." We already know, and it's in the record, that's already happening. So if it happens to be the case that some of the agency defendants here haven't used the magic word "termination," those contracts have been

terminated and agencies are acting consistent with the
March 27th guidance and they are not honoring our CBAs.

Dist. Ct. Doc. # 33 at 46–47. The government chose not to respond and

defend its earlier position. *Id.* at 48–53, 55.

Consistent with the undisputed record evidence, the district court

found that:

> [C]ertain agencies have already failed to honor provisions of
> the respective collective bargaining agreements by failing to
> withhold dues payment from employees' paychecks,
> "disavow[ing] any obligation to bargain," and beginning to
> implement reductions in force.[]

> In other words, notwithstanding the lack of the formal
> cancellation of the collective bargaining agreements, the
> agencies and subdivisions have been instructed that the
> protections in the [Statute] are no longer operative . . . [and]
> have already begun disregarding provisions of the collective
> bargaining agreements in line with the OPM Guidance.

A47, 49 (internal citations omitted). Those factual findings must be

accepted unless clearly erroneous. *In re Navy Chaplaincy*, 697 F.3d

1171, 1178 (D.C. Cir. 2012). And, here, these findings are undisputed.

The majority nonetheless accepted the government's conclusory

attempt to resurrect its debunked argument. Doc. #2113741 at 32. And

it completely ignored both the district court's findings to the contrary

and the supporting evidence that NTEU appended to its submission to

the panel. Doc. #2114615 at 33–130. That error renders its entire analysis plainly wrong.

## B. NTEU Demonstrated Irreparable Harm and Is Thus Likely to Prevail on Appeal

The majority's sole basis for its determination that NTEU is unlikely to succeed on the merits is its conclusion that NTEU failed to show irreparable harm. A2–3. That conclusion, as explained above, is based entirely on the mistaken premise that agencies were honoring their collective-bargaining agreements before the district court's order. An accurate factual understanding leaves no doubt that NTEU showed irreparable harm.

**1.** The Executive Order drastically diminishes NTEU's bargaining power, which is an additional irreparable injury. The Executive Order took away about two-thirds of the workers that NTEU represents, and it led to agencies disregarding a dozen of its collective-bargaining agreements. A46, A49. Agencies covered by the Executive Order stopped bargaining with NTEU on changes to conditions of employment—including the impending reductions-in-force—and stopped participating in the grievance-arbitration process. Doc. #2114615 at 56–58, ¶¶ 15–24. NTEU members in these agencies

cancelled their membership explicitly because of the Order. *Id.* at 128 ("President Trump demolished the union several weeks ago . . . Please see the attached form, SF-1188 to end my participation in NTEU.").

Courts have held that government action that "fundamentally diminishe[s]" union bargaining power is an Article III injury (*NTEU v. Chertoff*, 452 F.3d 839, 853 (D.C. Cir. 2006)) and that an employer's refusal to bargain with a union is likely to cause irreparable harm (*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011)). Absent the district court's emergency relief, there is a "very real danger" that NTEU's membership will continue to "erode" and that any final remedy "would be ineffective." *See Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990).

**2.** NTEU lost over $2 million before the district court's preliminary injunction because the agency defendants stopped processing dues payments to NTEU through payroll deductions, as 5 U.S.C. § 7115 and their collective-bargaining agreements require. A50–51. And by the time defendants complied with the preliminary injunction, losses exceeded $3 million. Doc. #2114615 at 126–27, ¶ 4.

Staying the preliminary injunction will cause NTEU to lose over half of its annual revenue. *See* A50–51.

Financial losses of this magnitude threaten NTEU's very existence (A50) and thus constitute irreparable harm. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-cv-917, 2025 U.S. Dist. LEXIS 61536, at *4–5 (D.D.C. Mar. 28, 2025) (finding irreparable harm where an Executive Order threatened almost one-third of the plaintiff's revenue, which would be a "devastating blow to plaintiff—threatening plaintiff's very existence").

The majority suggested NTEU can make up for dues that are lost through agencies stopping payroll deductions by asking members to make voluntary contributions. A3. But the Executive Order takes away the apparatus that Congress created in 5 U.S.C. § 7115 and on which NTEU relies for virtually all its dues payments. A50–51. And the Executive Order also takes away the basic reason that NTEU members pay dues at all: to support their exclusive representative, which is entitled to collectively bargain on their behalf and with which their employers must engage. A51; *cf. Perkins Coie LLP v. U.S. Dep't of*

*Justice*, No. 25-716, 2025 U.S. Dist. LEXIS 84475, at *38 n.20 (D.D.C. May 2, 2025) (noting that executive order took away the reason clients hired firm: i.e., it "hamper[ed] the effectiveness of [firm's] representation of clients").

### C. Maintaining Collective Bargaining Would Not Irreparably Harm the Government.

**1.** Preserving Congress's collective-bargaining regime while the government's appeal is pending will not cause it irreparable harm. The basis for the government's claim of harm is "a generalized statement that interference with 'the government's investigation, intelligence, and national security functions—or . . . the government's ability to supervise the employees engaged in such work—would appreciably injure the Nation's interests.'" A9 (Childs, J., dissenting).

But, as Judge Childs explains, "the district court's injunction maintains the state of affairs that has existed for nearly half a century: NTEU has bargained on behalf of federal workers since the 1970s. The Government does not explain why irreparable injury will result from continuing this decades-long practice for a short period of time while we adjudicate the merits of this appeal." *Id.* (internal citations omitted) That should end the analysis.

And while "the Government claims that a stay would protect the President's ability 'to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining'" (*id.*), that is merely a policy objection to collective bargaining, which the Executive Branch may take up with Congress. It is not a showing of irreparable harm.

This Court, moreover, has underscored that "the scope of bargaining under [the Statute] is extraordinarily narrow." *Chertoff*, 452 F.3d at 860. "[T]he restricted scope of bargaining under [the Statute] gives federal agencies great 'flexibility' in collective bargaining." *Id.* at 861. And the Statute grants agencies wide latitude to act promptly in exigent situations and often allows bargaining to occur *after* an agency implements a change to working conditions.[3]

    **2.**    Critically important here is that the district court found "clear evidence" that the Executive Order's national-security exemptions were *not* motivated by national-security concerns. *See* A29–

---

[3] *See* 5 U.S.C. § 7106 (granting agencies the right "to take whatever actions may be necessary to carry out the agency mission during emergencies"); *DHS, ICE*, 70 F.L.R.A. 628, 630 (2018) (agency may bargain after implementing changes to condition of employment if made pursuant to a law or government-wide regulation).

36. Instead, the evidence—the Administration's own words—showed that the exemptions were motivated by a desire "to punish unions for the 'war' they have 'declared [] on President Trump's agenda;" and "to remove the barriers created by the [Statute] to his unrelated policy objectives," *i.e.*, "mak[ing] federal employees easier to fire." A34–36.

These factual findings, which must be accepted unless clearly erroneous, likewise defeat the government's claim of irreparable harm absent a stay.

\*　　\*　　\*

"When confronting a statutory question touching on . . . national security . . . a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 827 (9th Cir. 2017). The government should not get emergency relief by simply using the words "national security." *Cf.* A4.

### D. A Stay Pending Appeal Would Harm Other Parties and the Public.

The majority based its conclusion that a stay pending appeal will not hurt other parties on the same mistaken fact that permeates the

rest of its analysis: the majority's belief that the government is honoring collective-bargaining agreements. *See* A4 (relying on "the Government's self-imposed restrictions."). But those agreements are being disregarded. So, the majority's stay of the district court's emergency relief will hurt the "over one-hundred thousand NTEU-represented federal workers" who will lose their collective-bargaining rights. *See id.*

And while the government and the public's interests generally merge, they should not here. Congress concluded that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). If Congress's words have meaning, a stay that allows the President to eviscerate federal-sector collective bargaining through "retaliatory" national-security exemptions is not in the public interest. A34.

## CONCLUSION

The Court should grant this petition.

Respectfully submitted,

*/s/ Julie M. Wilson*
JULIE M. WILSON
General Counsel

*/s/ Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel

*/s/ Allison C. Giles*
ALLISON C. GILES
Assistant Counsel

*/s/ Jessica Horne*
JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

May 23, 2025                    Counsel for Appellee NTEU

# CERTIFICATE OF COMPLIANCE

I hereby certify this response complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the typeface and type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3) because it contains 3,895 words, excluding those words that Federal Rule of Appellate Procedure 32(f) exempts.

*/s/  Jessica Horne*
JESSICA HORNE
Assistant Counsel

**[ORAL ARGUMENT NOT YET SCHEDULED]**

No. 25-5157

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

NATIONAL TREASURY EMPLOYEES UNION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

_____

On appeal from the United States District Court
for the District of Columbia

_____

**ADDENDUM TO
APPELLEE'S PETITION FOR REHEARING EN BANC**

_____

JULIE M. WILSON
General Counsel

PARAS N. SHAH
Deputy General Counsel

ALLISON C. GILES
Assistant Counsel

JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W.,
Suite 1000
Washington, D.C.  20001
(202) 572-5500

# INDEX

Pursuant to Circuit Rule 40(c) and to aid the Court in reviewing Appellee's petition, the following documents are included in this Addendum:

Copy of the Panel Opinion...........................................................................A1

    Majority Opinion.............................................................................A1

    Dissent.............................................................................................A6

District Court's Opinion (Apr. 28, 2025).................................................A13

District Court's Order (Apr. 25, 2025) ....................................................A59

Certificate of Parties and Amici..............................................................A61

Corporate Disclosure Statement..............................................................A62

Certificate of Service................................................................................A63

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5157**                                    **September Term, 2024**

**1:25-cv-00935-PLF**

**Filed On:**  May 16, 2025

National Treasury Employees Union,

       Appellee

  v.

Donald J. Trump, President of the United
States, et al.,

       Appellants

    **BEFORE:**    Henderson, Walker, and Childs*, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for stay pending appeal and an immediate administrative stay, the opposition thereto, and the reply, it is

**ORDERED** that the motion for stay be granted.  The Government has met the requirements for a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). A stay applicant must show that (1) it "is likely to succeed on the merits," (2) it "will be irreparably injured absent a stay," (3) a stay will not "substantially injure" other interested parties, and (4) a stay is in the "public interest."  *Id.*

1. The Government is likely to prevail in its appeal of the district court's preliminary injunction.  To obtain a preliminary injunction, a plaintiff must demonstrate that it will suffer irreparable harm while the case is pending.  *See Winter v. NRDC*, 555 U.S. 7, 20, 32 (2008).  The National Treasury Employees Union failed to establish

___

* A statement by Circuit Judge Childs, dissenting from this order, is attached.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5157**                                    **September Term, 2024**

irreparable harm.  That is a sufficient basis for vacating a preliminary injunction.[1]  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief").

The Union says it will suffer two irreparable harms.  Neither qualifies.

*First*, the Union asserts that without a preliminary injunction it will lose bargaining power and suffer reputational harm that will deter present and future membership.  But those harms are speculative because they would materialize only *after* an agency terminates a collective-bargaining agreement, and the Government directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes.  Ex. 1-B, *National Treasury Employees Union v. Trump*, No. 25-cv-0935, 2025 WL 1218044 (D.D.C. Apr. 11, 2025), ECF No. 26-1; *see also Winter*, 555 U.S. at 22 (irreparable harm must be "likely," not merely "possib[le]").[2] So the Union was not entitled to equitable relief on this basis.[3]

*Second*, the Union says it will suffer an irreparable financial injury from the loss of automatically withheld union dues.  But such "financial injuries are rarely irreparable because they are presumptively remediable through monetary damages."  *Clevinger v. Advocacy Holdings, Inc.*, ___ F.4th ___, No. 23-7116, 2025 WL 1197927, at *2 (D.C. Cir. 2025).  Here, the Union can seek to recover missing dues in subsequent Federal Labor

_____

[1] Because the district court's preliminary injunction is likely to be vacated for lack of irreparable harm, we need not address the Government's arguments regarding the Union's likelihood of success on the merits.

[2] On this point, Judge Childs' thoughtful dissent implies agreement.  A version of her question to the Government can be addressed to the Union: "How" is it possible that the absence of "the district court injunction will cause irreparable injury when the Government itself voluntarily imposed that same constraint?"  Dissenting Statement at 5.  On appeal, when the Government will prevail if it shows the Union does not need a preliminary injunction to avoid irreparable injury, the Union will struggle to "show its own injury from the district court" declining to enjoin "an already-paused Executive Order."  *Id.* at 6.

[3] To be clear, if a specific agency or subagency deviates from that self-imposed rule, individual units may seek injunctive relief appropriately tailored to any non-speculative, irreparable harm.  But absent ongoing irreparable harm, the Union is not entitled to equitable relief.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5157**                                                    **September Term, 2024**

Relations Authority (FLRA) proceedings if the Union ultimately prevails in this litigation. *See, e.g.*, *U.S. Department of Defense, Ohio National Guard*, 71 F.L.R.A. 829, 830 (2020) (ordering reimbursement of dues that an agency unlawfully failed to withhold); *see also* 5 U.S.C. § 7118(a)(7) (authorizing the FLRA to issue an order that gives a collective-bargaining agreement "retroactive effect" and to take "such other action as will carry out the purpose" of the Civil Service Reform Act).

Moreover, it is speculative that the Union will suffer a significant financial injury in the interim. To start, the Union will continue collecting dues from some 54,000 employees who are not covered by the Executive Order. *See National Treasury Employees Union v. Trump*, No. 25-cv-0935, 2025 WL 1218044, at *17 (D.D.C. Apr. 28, 2025) ("the Executive Order covers 65.9% of all NTEU-represented employees, or approximately 104,278 employees"). In addition, nothing prevents Union members covered by the Executive Order from voluntarily paying the dues they owe; that is, after all, how most other voluntary membership organizations collect dues. *Cf. Alachua County Education Association v. Rubottom*, No. 23-cv-111, 2023 WL 7132968, at *3 (N.D. Fla. Sept. 22, 2023) (noting that after one public employer "ceased deducting membership dues from payroll," "about half of dues-paying members . . . transitioned to paying dues via another method," and after another public employer did so, "60% of members . . . signed up to pay dues through [an] alternative payment method").

2. The district court's preliminary injunction inflicts irreparable harm on the President by impeding his national-security prerogatives, which were explicitly recognized by Congress. *See* 5 U.S.C. § 7103(b).

The Union contends that if the Government suffers any harm, it would be self-inflicted, and therefore not attributable to the preliminary injunction. That argument fails for two reasons.

*First*, the preliminary injunction is broader than the Government's self-imposed restrictions. It prohibits agency heads from obeying Section 2 of the Executive Order and the associated Office of Personnel Management (OPM) guidance. That guidance instructs agency heads to "consult with their General Counsels as to how to implement the President's directive" and to "consider" specified changes and "any others that agencies deem necessary, consistent with the President's national security determination." Ex. 1-A at 3, *National Treasury Employees Union v. Trump*, No. 25-cv-0935, 2025 WL 1218044 (D.D.C. Apr. 11, 2025), ECF No. 26-1. In effect, the preliminary injunction enjoins the *entire* implementation process, including preparatory work. The Government's self-imposed restrictions, by contrast, recommend only that agency heads refrain from terminating CBAs and decertifying bargaining units.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

## No. 25-5157                                          September Term, 2024

*Second*, the Government suffers irreparable harm even to the extent the preliminary injunction overlaps with the Government's self-imposed restrictions.  The injunction eliminates the President's control over the decision to pause implementation of the Executive Order and, by consequence, his flexibility to respond to future developments, at least without returning to the district court.  In other words, the preliminary injunction ties the government's hands.  That transfer of control, from the Executive to the Judiciary, is more problematic where, as here, we are operating in the national security context, an area "in which the President generally enjoys 'unique responsibility.'"  *Hedges v. Obama*, 724 F.3d 170, 200 (2d Cir. 2013) (quoting *American Insurance Association v. Garamendi*, 539 U.S. 396, 415 (2003)); *see also Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 795 (D.C. Cir. 1971) (declining to enter a stay against the government because the court was "in no position . . . to enter a stay order that would interject the Court into national security matters that lie outside its province").

3. Other parties, including the Union, will not be harmed by a stay, largely for the same reasons that the Union will not be harmed without a preliminary injunction.  The Union claims that a stay will "nullify the collective-bargaining rights of over one-hundred thousand NTEU-represented federal workers."  Opp. 15.  But that ignores the Government's self-imposed restrictions, so it misses the mark.

4. Finally, preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest.  To hold otherwise would give to the courts what the Constitution gave to Congress and the President.  *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017) ("National-security policy is the prerogative of the Congress and President."); *Winter*, 555 U.S. at 33 (vacating a preliminary injunction, in part because there was "no basis for jeopardizing national security").

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5157**                                    **September Term, 2024**

*    *    *

For these reasons, the Government has met its burden for a stay pending appeal.[4]

**<u>Per Curiam</u>**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:     /s/
Selena R. Gancasz
Deputy Clerk

_____

[4] Separately, we clarify that injunction bonds are generally required.  Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction . . . *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added)).  Here, the district court denied the Government's request for an injunction bond because "each of the preliminary injunction factors weigh[ed] heavily in [the Union's] favor" and requiring a bond would conflict with the Union's "right to seek judicial review." *National Treasury Employees Union*, 2025 WL 1218044, at *21.  But that logic would apply any time a district court grants a preliminary injunction — an exception that swallows the rule.  Accordingly, we doubt that $0 was the "appropriate bond" in this case.  *National Kidney Patients Association v. Sullivan*, 958 F.2d 1127, 1129 (D.C. Cir. 1992); *see also Edgar v. Mite Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring) (an injunction bond "is the moving party's warranty that the law will uphold the issuance of the injunction"); *Monzillo v. Biller*, 735 F.2d 1456, 1461 (D.C. Cir. 1984) ("Rule 65(c) of the Federal Rules of Civil Procedure requires the filing of a security bond by a party who benefits from a temporary restraining order or preliminary injunction"); *Habitat Education Center v. United States Forest Service*, 607 F.3d 453, 459 (7th Cir. 2010) (because the "costs of government are borne ultimately by taxpayers," Rule 65(c) applies no less when a "government agency" is subject to a preliminary injunction).

CHILDS, *Circuit Judge*, dissenting: The Government moves for a stay pending appeal. In that posture, the burden is on the Government to justify a disruption to the ordinary course of litigation. We take such "extraordinary" action only if the Government makes the "critical" showing that it will suffer irreparable injury before the appeal concludes. *Citizens for Resp. & Ethics in Washington v. FEC*, 904 F.3d 1014, 1017, 1019 (D.C. Cir. 2018) (per curiam). But the Government provides only a passing, generalized assertion of harm in its attempt to justify a stay. Even more telling, the Government purports to have already self-inflicted the same injury it claims a stay is necessary to prevent: it directed agencies not to implement the Executive Order until litigation concludes. Because the Government has not satisfied a threshold requirement for a stay, I respectfully dissent.

## I.

### A.

The Federal Service-Labor Management Relations Statute (FSLMRS) grants collective-bargaining rights to certain federal employees. *See* 5 U.S.C. §§ 7101–7135. The FSLMRS reflects Congress's determination that "labor organizations and collective bargaining in the civil service are in the public interest." *Id.* § 7101(a); *see Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 107 (1983) ("Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest").

The President may exclude an agency or subdivision from the scope of the FSLMRS if "(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the FSLMRS] cannot be applied to that agency in a manner consistent with national security requirements and

A6

2

considerations." 5 U.S.C. § 7103 (b)(1). Presidents have previously excluded subdivisions of agencies or departments, such as the Office of Naval Intelligence in the Department of Defense and the National Background Investigations Bureau in the Office of Personnel Management. *See* Exec. Order No. 12,171, § 1-205(a), 44 Fed. Reg. 66,565, 66,565 (Nov. 19, 1979); Exec. Order No. 13,741, § 3(b), 81 Fed. Reg. 68,289, 68,291 (Oct. 4, 2016). No prior designation has excluded an entire Cabinet-level agency or department.

**B.**

In March 2025, President Trump issued an Executive Order excluding from the FSLMRS over thirty agencies or subdivisions, including entire Cabinet-level agencies and departments like the Environmental Protection Agency; the Department of Justice; the Department of Veterans Affairs; the Department of the Treasury, except the Bureau of Engraving and Printing; and the Department of Energy, except the Federal Energy Regulatory Commission. *See* Exec. Order No. 14,251, §§ 1–3, 90 Fed. Reg. 14,553, 14,553–55 (Mar. 27, 2025). Also excluded are the Food and Drug Administration, the Centers for Disease Control and Prevention, the National Institute of Allergy and Infectious Diseases of the National Institutes of Health, the Bureau of Land Management, the National Science Foundation, and the Federal Communications Commission, among others. *Id.* Altogether, the Executive Order covers about "two-thirds of the federal workforce." A09 ¶ 35. The Executive Order states that the excluded agencies and subdivisions "have as a primary function intelligence, counterintelligence, investigative, or national security work," and that the FSLMRS "cannot be applied to those subdivisions in a manner consistent with national security requirements and considerations." 90 Fed. Reg. at 14,553.

3

Three documents were released alongside the Executive Order. The White House published a "Fact Sheet," which states that the FSLMRS "enables hostile Federal unions to obstruct agency management" and that certain unions "have declared war on President Trump's agenda."[1] The Office of Personnel Management (OPM) issued guidance stating that excluded agencies "are no longer subject to the collective-bargaining requirements" of the FSLMRS and "are no longer required to collectively bargain with Federal unions." Dkt. 26-1 at 6. An interagency forum led by the OPM Director distributed a Frequently Asked Questions (FAQ) document to the excluded agencies, advising that agencies should not terminate any collective-bargaining agreements or file any petitions to decertify bargaining units until litigation concludes. Dkt. 26-1 at 13.

A federal employee labor organization, the National Treasury Employees Union (NTEU), filed suit, and the district court issued a preliminary injunction. The Government appealed and sought a stay pending appeal.

## II.

As the party seeking a stay pending appeal, the Government must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured absent a stay" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay. *Nken v.*

---

[1] The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H.

4

*Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "Although the plaintiff[] must show irreparable injury to secure an injunction, it is now the defendant[s] who—seeking relief from an injunction so obtained—must show irreparable injury absent a stay of the injunction." *J.G.G. v. Trump*, 2025 WL 914682, at *11 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring).

Accordingly, the Government's "showing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024). "[T]he injury must be both certain and great; it must be actual and not theoretical. Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotations omitted).

Despite this weighty burden, the Government glides over its obligation to show irreparable injury. In one brief paragraph, the Government claims that a stay would protect the President's ability "to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining." Stay Mot. 26–27. But the district court's injunction maintains the state of affairs that has existed for nearly half a century: NTEU has bargained on behalf of federal workers since the 1970s. A14–16 ¶¶ 47–57. The Government does not explain why irreparable injury will result from continuing this decades-long practice for a short period of time while we adjudicate the merits of this appeal. Instead, it relies only on a generalized statement that interference with "the government's investigation, intelligence, and national-security functions—or . . . the government's ability to supervise the employees engaged in such work—would appreciably injure the Nation's interests." Stay Mot. 26–27 (cleaned up).

5

Such vague assertions of harm dependent on the merits of the dispute are insufficient to show irreparable injury.

The one specific representation the Government offers regarding the consequences of the Executive Order undercuts its own argument.[2]  Relying on OPM's FAQ document, the Government asserts, and the majority accepts, that the excluded agencies have been directed not to act on the Executive Order during the pendency of this litigation.  The FAQ document states that excluded agencies "should not terminate any [collective-bargaining agreements] until the conclusion of litigation or further guidance from OPM directing such termination" and "should not file any [petitions to decertify bargaining units] until litigation regarding Exclusions has been resolved."  Dkt. 26-1 at 13.  But this very representation casts doubt on the Government's own asserted injury.  How can the Government argue that the district court injunction will cause irreparable injury when the Government itself voluntarily imposed that same constraint?  At this stage, it is the Government's obligation to provide an answer, and it offers none.

And while the Government claims injury from its inability to implement the Executive Order, at the same time it claims the Executive Order will remain without effect even in the absence of the district court injunction.  The Government asserts that NTEU does not suffer irreparable harm to justify

---

[2] I make no conclusions about the Government's likelihood of success on the merits of its appeal because, even accepting the Government's representations, it is unable to make the requisite showing of irreparable injury to justify a stay.  *See Wisconsin Gas Co.*, 758 F.2d at 674 ("We believe that analysis of the second factor disposes of these motions and, therefore, address only whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm.").

6

the district court's injunction and will not be harmed by a temporary stay on appeal because, per the FAQ document, "agencies have been advised not to terminate collective bargaining agreements at this time and not to decertify bargaining units until 'litigation is final.'"  Stay Mot. 27 (quoting Dkt. 26-1 at 13).  But the Government does not explain how it can show its own injury from the district court enjoining an already-paused Executive Order.  To grant a stay, we would need to find with one hand that the Executive Order still has real-world operation for purposes of the Government's irreparable harm, but with the other hand that the Executive Order has none at all for purposes of NTEU's.  The Government fails to even address this inconsistency.

The majority offers two possibilities to resolve the contradiction the Government has teed up: (1) that the preliminary injunction is broader than the Government's self-imposed restrictions, and (2) that the preliminary injunction eliminates the Government's ability to adjust its self-imposed restrictions in the future.  I am not persuaded either is enough.

*First*, the majority teases out a gap between the scope of the district court's injunction and the Government's own, resting its finding of irreparable harm on the Government's inability to operate within that gap.  The Government has not put forth this argument.  Nor has the Government represented that it actually intends to take any action within that gap during the course of this appeal.  Or how an inability to take such action causes an irreparable, cognizable injury.  At this stage, before granting emergency relief, I would require the Government provide us with more.

*Second*, the possibility of some future harm stemming from the Government's inability to rescind its own directive is insufficient.  The district court order may well tie the

7

Government's hands at some point in the future, but we do not issue preemptive relief. Courts have long held that "[i]njunctions . . . will not issue to prevent injuries neither extant nor presently threatened, but only merely feared." *Comm. in Solidarity with People of El Sal. v. Sessions*, 929 F.2d 742, 745–46 (D.C. Cir. 1991) (quotations omitted); *see KalshiEX LLC*, 119 F.4th at 65 ("Perhaps the Commission will amass more evidence substantiating its fears . . . but, on the evidence provided to this court, those fears—as yet—fail to rise beyond the speculative level." (quotations omitted)). The Government cannot carry its burden for a stay pending appeal based only on the possibility that someday there could be a risk of irreparable harm.

**III.**

The Government does not identify imminent harm warranting emergency relief. An extraordinary use of our equitable powers requires more than the vague assertions of harm provided here. In the absence of irreparable injury, the Government's merits arguments are better suited to the panel designated to hear them.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
                                    )
NATIONAL TREASURY EMPLOYEES         )
UNION,                              )
                                    )
            Plaintiff,              )
                                    )
      v.                            )          Civil Action No. 25-0935 (PLF)
                                    )
DONALD J. TRUMP et al.,             )
                                    )
            Defendants.             )
_____)

OPINION

In 1978, Congress passed the Federal Service Labor-Management Relations

Statute. This landmark piece of legislation codified the rights of federal employees to

collectively bargain and "participate through labor organizations of their own choosing in

decisions which affect them." 5 U.S.C. § 7101(a)(1). In passing the statute, Congress spoke

unequivocally: "labor organizations and collective bargaining in the civil service are in the

public interest." 5 U.S.C. § 7101(a). Congress's determination that these rights should apply

broadly – and that those rights "contribute[] to the effective conduct of public business," 5

U.S.C. § 7101(a)(1)(B) – was undisturbed for decades, governing the state of the federal

workforce despite changes in the composition of Congress and presidential administrations.

This all changed on March 27, 2025. On that day, President Trump issued an

Executive Order invoking 5 U.S.C. § 7103(b)(1), which permits the President to "issue an order

excluding any agency or subdivision thereof from coverage" of the Federal Service Labor-

Management Relations Statute if the President determines that "the agency or subdivision has as

a primary function intelligence, counterintelligence, investigative, or national security work,"

and that the statute's provisions "cannot be applied to that agency or subdivision in a manner

consistent with national security requirements and considerations."  The effect of the Executive

Order was substantial:  it removed collective bargaining rights from approximately two-thirds of

the federal workforce.  In response to this sweeping Executive Order, the National Treasury

Employees Union ("NTEU") filed the instant action challenging the Executive Order, arguing

that the President exceeded his power when issuing the order.

      NTEU filed a motion for a preliminary injunction on April 4, 2025.  See

Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 9].  The Court held oral

argument on the motion on April 23, 2025.  Upon careful consideration of the parties' written

submissions, their oral arguments, and the relevant authorities, the Court granted NTEU's

motion for a preliminary injunction.  See Order of April 25, 2025 [Dkt. No. 32].[1]

## I.    BACKGROUND

### A.  Statutory Background

      The Federal Service Labor-Management Relations Statute set forth in Title VII of

the Civil Service Reform Act, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978)

(codified at 5 U.S.C. §§ 7101-35) ("FSLMRS"), provides certain protections of the "right of

employees to organize, bargain collectively, and participate through labor organizations of their

---

[1]     The papers reviewed by the Court in connection with this matter include: Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1]; Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 9]; Memorandum of Points and Authority in Support of Plaintiff NTEU's Motion for a Preliminary Injunction ("Pl.'s Mem.") [Dkt. No. 9-1]; Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Opp.") [Dkt. No. 26]; and Plaintiff NTEU's Reply in Support of its Motion for a Preliminary Injunction ("Pl.'s Reply) [Dkt. No. 29].

own choosing in decisions which affect them . . . ." 5 U.S.C. § 7101(a)(1). In passing the statute, Congress found that based on "experience in both private and public employment," the protections were necessary to "safeguard[] the public interest," "contribute[] to the effective conduct of public business," and "facilitate[] and encourage[] the amicable settlements of disputes between employees and their employers involving conditions of employment." Id. In sum, Congress found that "labor organizations and collective bargaining in the civil service are in the public interest." Id.

Among other things, the FSLMRS requires federal agencies to collectively bargain "with respect to the conditions of employment affecting such employees." 5 U.S.C. § 7103(a)(12). The statute provides a role for "labor organizations" in this collective bargaining process, stating:

> A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit. An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.

5 U.S.C. § 7114(a)(1).

While Congress extended these protections to "many" federal employees, it did not "include the entire federal workforce within this regime." Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d 723, 724 (D.C. Cir. 1989). "The Act itself exempted several federal agencies from coverage," id., including the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency. See 5 U.S.C. § 7103(a)(3). In addition to these explicit exclusions, "Congress also addressed the matter of national security" in Section 7103(b). Soc. Sec. Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps.

(Petitioner/Labor Org.), 59 F.L.R.A. 137, 143 (Sept. 12, 2003). Specifically, Congress granted

the President the authority to either exclude or suspend certain "agenc[ies] or subdivision[s]

thereof" from the statute's coverage. See 5 U.S.C. § 7103(b). Section 7103(b) provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –
>
>> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>>
>> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.
>
> (2) The President may issue an order suspending any provision of this chapter with respect to any agency, installation, or activity located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security.

5 U.S.C. § 7103(b). The exclusion provided in Section 7103(b)(1) has been invoked numerous

times since the passage of the FSLMRS.[2] As NTEU points out, however, Section 7103(b)(1) has

never been invoked to exclude an entire cabinet-level department from the FSLMRS. See Pl.'s

Mem. at 4.

---

[2]     See Exec. Order No. 12171, 44 Fed. Reg. 66565 (1979); Exec. Order No. 12338, 47 Fed. Reg. 1369 (1982); Exec. Order No. 12410, 48 Fed. Reg. 13143 (1983); Exec. Order No. 12559, 51 Fed. Reg. 18761 (1986); Exec. Order No. 12632, 53 Fed. Reg. 9852 (1988); Exec. Order No. 12666, 54 Fed. Reg. 1921 (1989); Exec. Order No. 12671, 54 Fed. Reg. 11157 (1989); Exec. Order No. 12681, 54 Fed. Reg. 28997 (1989); Exec. Order No. 12693, 54 Fed. Reg. 40629 (1989); Exec. Order No. 13039, 62 Fed. Reg. 12529 (1997); Exec. Order No. 13252, 67 Fed. Reg. 1601 (2002); Exec. Order No. 13381, § 5(b), 70 Fed. Reg. 37955 (2005); Exec. Order No. 13467, § 3(d), 73 Fed. Reg. 38107 (2008); Exec. Order No. 13480, §§ 2-6, 73 Fed. Reg. 73991, 73992 (2008); Exec. Order No. 13741, § 3, 81 Fed. Reg. 68291 (2016); Exec. Order No. 13760, §2, 82 Fed. Reg. 5325 (2017); Exec. Order No. 13869, §3(b), 84 Fed. Reg. 18130 (2019); see also 5 U.S.C. § 7103, U.S. Government Publishing Office, available at https://www.govinfo.gov/content/pkg/USCODE-2019-title5/html/USCODE-2019-title5-partIII-subpartF-chap71-subchapI-sec7103.htm [https://perma.cc/4JFC-SQXY].

*B. Factual Background*

1. The Executive Order

On March 27, 2025, President Trump issued an executive order titled "Exclusions from Federal Labor-Management Relations Programs." Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order"). Section 2 of the Executive Order amends a previous executive order – Executive Order 12171 of November 19, 1979 – which had excluded various agencies and subdivisions from the FSLMRS pursuant to Section 7103(b). See Exec. Order No. 12171, 44 Fed. Reg. 66565, 66565 (Nov. 19, 1979). The March 27, 2025 Executive Order states that "[t]he agencies and agency subdivisions set forth in section 2 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work," and that it has been "determined that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." Executive Order § 1(a).

As is relevant to NTEU, the Executive Order excludes from the FSLMRS the following agencies and subdivisions "where NTEU represents employees as the exclusive bargaining unit representative":

> Department of Treasury, Internal Revenue Service, IRS Office of Chief Counsel, Bureau of Fiscal Service, Departmental Offices, Alcohol and Tobacco Trade and Tax Bureau, Office of Comptroller of the Currency;
>
> Department of Energy;
>
> Department of Justice, Civil Rights Division and Environment and Natural Resources Division;
>
> Environmental Protection Agency;
>
> Federal Communications Commission;

> Department of Health and Human Services, the Office of the Secretary, the Food and Drug Administration, the Administration for Strategic Preparedness and Response, the Centers for Disease Control and Prevention, and the Office of Refugee Resettlement within the Administration of Children and Families; and

> Department of the Interior, Bureau of Land Management.

Declaration of Daniel Kaspar ("Kaspar Decl.") [Dkt. No. 9-2] ¶ 6; see Executive Order § 2. According to NTEU, the "Executive Order singly eliminates collective bargaining for some two-thirds of the federal workforce." Pl.'s Mem. at 5.

A "Fact Sheet" was issued by the White House the same day that the Executive Order was issued. See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ [https://perma.cc/Y7HR-4W3H] ("Fact Sheet"). The Fact Sheet is divided into three parts. First, it lists eight "national security missions" – "National Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Cybersecurity," "Economic Defense," and "Public Safety" – and provides descriptions of each of these missions. See Fact Sheet. Second, in a section titled "Ensuring that Agencies Operate Effectively," the Fact Sheet explains that the Civil Service Reform Act "enables hostile Federal unions to obstruct agency management," and that this "is dangerous in agencies with national security responsibilities." See id. Finally, in a section titled "Safeguarding American Interests," the Fact Sheet explains:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.

- Certain Federal unions have declared war on President Trump's agenda.

  - The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.

  - For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration –an average of over one a day.

- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

Fact Sheet at 3.

On the same day, the Office of Personnel Management ("OPM") issued a memorandum titled "Guidance on Executive Order Exclusives from Federal Labor-Management Programs." See Charles Ezell, Guidance on Executive Order Exclusions from Federal Labor-Management Programs, OPM, Mar. 27, 2025, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf [https://perma.cc/QH4A-MQ9F] ("OPM Guidance"). The OPM Guidance states that pursuant to the Executive Order and Section 7103(b), "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the FSLMRS and "are no longer required to collectively bargain with federal unions." OPM Guidance at 3. The document also states that "Federal unions" "lose their status as the 'exclusively recognized' labor organizations for employees of the agencies and agency subdivisions covered by Exclusions" in the Executive

Order.  Id. (alterations omitted) (referencing 5 U.S.C. § 7111(a)); see 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . by a majority of the employees in an appropriate unit who cast valid ballots in the election.").

### 2.  The Instant Litigation

On March 31, 2025, NTEU filed this lawsuit.  See Compl.  NTEU brings three counts:  (1) Section 2 of the Executive Order "is unlawful and ultra vires because it conflicts with 5 U.S.C. § 7103(b)(1)"; (2) Section 2 of the Executive Order "is unlawful and ultra vires because it conflicts with 5 U.S.C. Chapter 71"; and (3) Section 2 of the Executive Order "is unlawful because it reflects retaliation in violation of NTEU's First Amendment rights."  See id. ¶¶ 78-95.  NTEU seeks, inter alia, an injunction enjoining all the defendants – excluding the President – from "implementing" Section 2 of the Executive Order and OPM Guidance related to the Executive Order.

### II.  JURISDICTION

The government's first argument is that that the Court lacks jurisdiction over this case.  See Opp. at 12-16.  In support, the government contends that Congress created a "special statutory review scheme" in the FSLMRS, and that such a scheme precludes this Court's review under Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994).

The Supreme Court has recognized that "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action."  Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023) (citing Thunder Basin Coal Co. v. Reich, 510 U.S. at 207).  While Congress may create such a "statutory review scheme"

explicitly, it may also do so implicitly by "specifying a different method to resolve claims about agency action," such as by providing for "review in a court of appeals following the agency's own review process."  Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., Civil Action No. 24-3354 (RDM), 2025 WL 637416, at *4 (D.D.C. Feb. 27, 2025).  To determine whether district court review is precluded, courts apply a two-step approach.  At the first step, the court determines whether Congress has "preclude[d] district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review."  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019).  Congress can be found to have done so "when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure."  Id. (citation and quotation marks omitted).

At the second step, courts consider whether the plaintiff's claim falls within this "alternative statutory scheme for administrative and judicial review."  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 754.  To answer this question, courts consider three factors:  (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise."  Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Thunder Basin Coal Co. v. Reich, 510 U.S. at 212-13); see Nat'l Ass'n for the Advancement of Colored People v. United States Postal Serv., 496 F. Supp. 3d 1, 14 (D.D.C. 2020) (subsequent history omitted).  "When the answer to all three questions is yes, '[the Court] presume[s] that Congress does not intend to limit jurisdiction.'"  Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 489 (2010)).  In the event the factors "point in different

directions," "[t]he ultimate question is how best to understand what Congress has done – whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., 2025 WL 637416, at *5 ("[I]f the factors point in different directions . . . . courts must return to the lodestar of whether Congress intended the type of claim at issue to be swept into the statutory enforcement scheme.") (internal citation and quotation marks omitted).

The Court concludes that its jurisdiction is not precluded in this case. The government's argument is essentially that NTEU must pursue its claims using the administrative review scheme created by Congress in the FSLMRS – the Federal Labor Relations Authority ("FLRA") – rather than by bringing claims in a federal district court. See Opp. at 12-13. The administrative review scheme, however, is not available to challenge the Executive Order's exclusions of the agencies and subdivisions subject to the Executive Order for the simple reason that those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order at issue here. See Pl.'s Reply at 17 (arguing that the "Executive Order has taken away the administrative channels that Defendants argue must be used). The relevant precedents from the FLRA make this point clear. See United States Dep't of the Air Force Air Force Materiel Command Warner Robins Air Logistics Ctr. Robins Air Force Base, Georgia (Respondent) & Am. Fed'n of Gov't Emps. Loc. 987 (Charging Party/union), 66 F.L.R.A. 589, 598 (Apr. 20, 2012) ("[T]he Authority has determined that an exemption from coverage constitutes a jurisdictional bar to its consideration of unfair labor practice complaints raised under the Statute"); Department of the Navy, Naval Telecommunications Ctr., Ward Circle and NAVTELCOM Unit Local No. 1, American Federation of Government Employees, 6 F.L.R.A. 498, 500 (1981) ("Where the President has specifically excluded an agency from coverage under

the Statute by issuing an executive order, the Authority is clearly without jurisdiction to process

a representation petition.").

Indeed, the exact case the government contends NTEU should bring to the FLRA

was attempted in 2002 in the context of a different executive order invoking the

Section 7103(b)(1) exclusion, and the FLRA dismissed the case for lack of jurisdiction.  See

United States Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't

Emps. Loc. 3966 (Charging Party), 57 F.L.R.A. 750 (Apr. 25, 2002).  In a brief opinion, the

FLRA summarized the case and explained why it lacked jurisdiction, stating:

> In each of these cases, the Respondent is the United States
> Attorney's Office for the Southern District of Texas.  On January 7,
> 2002, the President issued Executive Order 13252, "Exclusions
> From the Federal Labor-Management Program," exempting, as
> relevant here, United States Attorneys' Offices from coverage of the
> Federal Service Labor-Management Relations Statute (the Statute).
>
> Subsequently, the Authority requested and received submissions
> from the parties as to why these cases should not be dismissed for
> lack of jurisdiction in light of the Executive Order. In their
> submissions, the General Counsel and the Respondent agree that,
> since the Executive Order exempts United States Attorneys' Offices
> from coverage of the Statute, the Authority lacks jurisdiction to
> decide the cases and should dismiss the complaints.
>
> We agree that, in light of Executive Order 13252, the Authority
> lacks jurisdiction to decide these cases.  Accordingly, we dismiss
> the complaints.

United States Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't

Emps. Loc. 3966 (Charging Party), 57 F.L.R.A. at 750 (footnotes omitted).

In view of this precedent, the Court can think of no reason why the FLRA would

decide to exercise jurisdiction over NTEU's case.  In fact, NTEU has already brought a case

before the FLRA, which has since "issued an order asking why NTEU's case before it . . . should

not be dismissed for lack of jurisdiction," citing United States Att'ys Off. S. Dist. of Texas

Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party), 57

F.L.R.A. at 750. <u>See</u> Pl.'s Reply at 18; Exhibit 17 to Supplemental Declaration of Daniel Kaspar

("Kaspar Supp. Decl.") [Dkt. No. 29-1 at ECF 65-69] (FLRA's order to show cause "why the

[FLRA] should not dismiss [NTEU's case] for lack of jurisdiction").

        At oral argument, the government agreed that the FLRA likely would determine

that it lacks jurisdiction over NTEU's case challenging the Executive Order. <u>See</u> Transcript

("Tr.") [Dkt. No. 33] at 21:16-22:5. The government asserts, however, that this Court's

jurisdiction is nevertheless precluded because the "special administrative review scheme" can

still be followed. <u>See id</u>. at 21:25-23:23. Specifically, the government contends that NTEU

must bring its claim to the FLRA – which the FLRA will dismiss for lack of jurisdiction – and

then appeal the FLRA's dismissal to a United States court of appeals, where NTEU can raise its

arguments related to the validity of the Executive Order. <u>See id</u>.; <u>see also</u> 5 U.S.C. § 7123(a)

(outlining appeal process to a United States court of appeals); <u>Am. Fed'n of Gov't Emps. v.

Sec'y of Air Force</u>, 716 F.3d 633, 636 (D.C. Cir. 2013); <u>Am. Fed'n of Gov't Emps., AFL-CIO v.

Trump</u>, 929 F.3d 748 (D.C. Cir. 2019). The government's argument misses the point: the

administrative process of the FSLMRS cannot and does not govern here because the Executive

Order at issue removed the agencies and subdivisions in question from coverage of the

FSLMRS. In other words, this case is distinguishable from the cases relied on by the

government where the unions had "several administrative options for challenging the executive

orders . . . ." <u>See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump</u>, 929 F.3d at 757 (internal

quotation marks omitted); <u>see also Am. Fed'n of Gov't Emps. v. Sec'y of Air Force</u>, 716 F.3d

at 637 ("Because the FSLMRS's remedial regime is exclusive, providing [plaintiff] with multiple

options to challenge the [policy], [plaintiff] cannot circumvent this regime by instead bringing a

suit in district court.").  In the instant case, by virtue of the Executive Order, the claims – and

indeed NTEU itself – now are "expressly outside the FLRA's purview."  See Am. Fed'n of

Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson, 475 F.3d 341, 348 (D.C. Cir. 2007).  Because

there is no "special statutory review scheme" that is actually available to NTEU for reviewing its

claim, this Court is not deprived of jurisdiction.

### III. PRELIMINARY INJUNCTION

#### A.  Legal Standard

A movant seeking preliminary injunctive relief must make a "clear showing that

four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm

in the absence of preliminary relief, a balance of the equities in its favor, and accord with the

public interest."  Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d 314,

321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby, 838 F.3d 1, 6 (D.C.

Cir. 2016)); see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a

preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to

such relief" (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008))).  Of these,

the most important factor is whether a movant has established a likelihood of success on the

merits.  See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); Bailey v. Fed. Bureau of

Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024)

Before the Supreme Court's decision in Winter, courts in this Circuit weighed

these four factors on a "sliding scale," under which the movant need not "make as strong a

showing" on one factor if they "make[ ] an unusually strong showing" on another.  Davis v.

Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting Davenport v.

Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)); accord Damus v. Nielsen, 313 F.

Supp. 3d 317, 326 (D.D.C. 2018).  This Circuit has suggested, however, that "a likelihood of success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction."  Sherley v. Sebelius, 644 F.3d at 392-93 (quoting Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1296 (Kavanaugh, J., concurring)); see Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d at 334 (declining to resolve whether the "sliding scale" approach is still valid after Winter); Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025).  Regardless, "a failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion."  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009)); see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 117-18 (D.D.C. 2018).

    For each of its claims, NTEU bears the burden of persuasion.  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  NTEU also "bears the burden of producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief."  Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

### B.  Likelihood of Success on the Merits

    The core of the parties' dispute centers on whether the President exceeded the authority afforded to him in the FSLMRS when he excluded the agencies and subdivisions under Section 7103(b)(1).  NTEU contends that the President's Executive Order was ultra vires, arguing that each of the agencies and subdivisions listed in the Executive Order – agencies which employ nearly two-thirds of the federal workforce, see Pl.'s Mem. at 24 – do not meet the criteria listed in Section 7103(b)(1).  See id. at 10-24.  The government makes two general arguments in

response.  First, the government argues that the Court lacks the authority to review the

President's "national security-related determinations under" Section 7103(b) or, at a minimum,

that it owes significant deference to the President's conclusion that the particular agencies and

subdivisions subject to the Executive Order are excludable from the FSLMRS.  See Opp.

at 17-20.  Second, in the event the Court does review the President's determination, the

government contends that the identified agencies and subdivisions meet the criteria listed in

Section 7103(b)(1).  See id. at 17-28.

The D.C. Circuit's decision in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan is

instructive on how the Court must consider the legal issue before it.  See Am. Fed'n of Gov't

Emps., AFL-CIO v. Reagan, 870 F.2d 723 (D.C. Cir. 1989).  In that case, unions representing

federal employees challenged President Reagan's executive order excluding certain subdivisions

of the United States Marshals Service from coverage under the FSLMRS pursuant to

Section 7103(b).  See id. at 725; see also Exec. Order No. 12559, 51 Fed. Reg. 18761 (1986).[3]

The district court concluded that President Reagan's executive order was invalid because it failed

to provide the basis by which the President determined that the criteria in Section 7103(b)(1) had

been satisfied.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 727-28.  The

district court had reasoned that the bases for the President's authority to issue the executive order

must be provided in some way, and that "the absence of determinations or findings in the

[executive order], the lack of any language incorporating and republishing prior findings and

determinations, and the absence of a separate source of executive power sufficient to sustain the

---

[3]    More specifically, Executive Order 12559 excluded "The Office of Special
Operations, the Threat Analysis Group, the Enforcement Operations Division, the Witness
Security Division and the Court Security Division in the Office of the Director and the
Enforcement Division in Offices of the United States Marshals in the United States Marshals
Services."

action" meant the executive order was "not a valid exercise of power under § 7103(b)."  Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 665 F. Supp. 31, 34 (D.D.C. 1987).

The D.C. Circuit disagreed and reversed the district court.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.  The court of appeals began by noting that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist," and that the district court imposed an extra-statutory obligation of requiring "the President to insert written findings into an exempting order . . . ."  Id. at 727.  As to the argument that "courts are the instrumentalities for ensuring that the authority is properly exercised[] and that the courts must see some proof that these prerequisites were satisfied," the D.C. Circuit stated that the "presumption of regularity [was] decisive" on this issue, explaining:

> We deem the familiar presumption of regularity decisive here.  It "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."
>
> [. . . .]
>
> Over the many years since Martin v. Mott[, 25 U.S. (12 Wheat.) 19, 6 L. Ed. 537 (1827)], the presumption of regularity has been applied in a variety of contexts, it is clearly applicable to the case at bar.  The executive order under review cited accurately the statutory source of authority therefor, and purported to amend an earlier order that indubitably was a proper exercise of that authority.  The Act does not itself require or even suggest that any finding be reproduced in the order.  No more than the District Court have appellants suggested any actual irregularity in the President's factfinding process or activity.  In these circumstances, we encounter no difficulty in presuming executive regularity.  We cannot allow a breach of the presumption of regularity by an unwarranted assumption that the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them.

Id. at 727-28 (footnote omitted).  The court of appeals therefore concluded that "the presumption of regularity [was] pivotal" to the issue of whether the executive order was a valid exercise of authority.  Id. at 728.

In the instant case, as in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, the President has not provided the justification for excluding each of the agencies and subdivisions from the FSLMRS pursuant to Section 7103(b)(1) in the Executive Order itself.  In light of the D.C. Circuit's analysis in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, the Court therefore must address the following issues:  (1) whether the "presumption of regularity" applies to the President's exercise of authority; and (2) whether the President's exercise of authority was ultra vires.  The Court addresses each issue separately.

### 1.   Presumption of Regularity

The "presumption of regularity has been recognized since the early days of the Republic," Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d 723, 727 (D.C. Cir. 1989), and has been applied in a variety of contexts where a governmental official's action has been challenged.  See Aram A. Gavoor & Steven A. Platt, In Search of the Presumption of Regularity, 74 FLA. L. REV. 729, 749 (2022) (outlining different categories of examples where the presumption of regularity has been applied).  The "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926); see Latif v. Obama, 677 F.3d 1175, 1178-181 (D.C. Cir. 2011) (same); Paracha v. Trump, Civil Action No. 04-2022 (PLF), 2019 WL 5296839, at *2 (D.D.C. Oct. 18, 2019).  The presumption of regularity, however, is just that, a presumption. The presumption can be rebutted with "clear evidence" that the official did not discharge his or

her official duties properly, see Owlfeather-Gorbey v. Avery, 119 F.4th 78, 86 (D.C. Cir. 2024), a standard which is "higher than preponderance of the evidence but lower than beyond a reasonable doubt." Paracha v. Trump, 2019 WL 5296839, at *2 (citing Addington v. Texas, 441 U.S. 418, 423-35 (1979)).

The Court concludes that NTEU has rebutted the presumption of regularity by presenting clear evidence that "the President was indifferent to the purposes and requirements of the [FSLMRS], or acted deliberately in contravention of them." Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728. The Court reaches this conclusion for three reasons: (1) the Executive Order and the Administration's surrounding statements are at odds with Congress's findings in the FSLMRS; (2) the White House Fact Sheet reflects retaliatory motive; and (3) the Administration's guidance related to the Executive Order – specifically, the OPM Guidance – suggests that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria.

a. The Executive Order is at Odds with the Statute's Purpose and Congress's Findings

The first reason that NTEU prevails in rebutting the presumption of regularity is because the scope of the Executive Order itself and the statements in the accompanying Fact Sheet demonstrate that the President was either "indifferent to" or "acted deliberately in contravention" of the purposes of the FSLMRS. See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728. As discussed above, see supra Section I.A, Congress made explicit findings when passing the FSLMRS that "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them" "safeguards the public interest," "contributes to the effective conduct of public business," and "facilitates and encourages the amicable settlements of disputes between

employees and their employers involving conditions of employment."  5 U.S.C. § 7101(a)(1).

Congress concluded that "labor organizations and collective bargaining in the civil service are in

the public interest."  5 U.S.C. § 7101(a).

        The scope of the Executive Order – covering two-thirds of the federal

workforce – and the Fact Sheet's characterization of unions and collective bargaining rights

established by the Civil Service Reform Act as "dangerous" stand in stark contrast to these

Congressional findings.  See Fact Sheet.  For example, the Fact Sheet acknowledges that

normally "[a]gencies cannot modify policies in collective bargaining agreements until they

expire" and that "[a]gencies cannot make most contractually permissible changes until after

finishing 'midterm' union bargaining."  Fact Sheet at 3.  But it finds that the statute "enables

hostile Federal unions to obstruct agency management," which is "dangerous in agencies with

national security responsibilities."  Id. at 2-3.  Indeed, the OPM Guidance highlights several

examples of the obstacles that collective bargaining agreements have presented to the Trump

Administration in accomplishing its broader policies related to reforming the federal workforce.

See, e.g., OPM Guidance at 5 (citing Guidance on Collective Bargaining in Connection with

Reductions in Force, OPM (Mar. 12, 2025), available at https://www.opm.gov/policy-data-

oversight/latest-and-other-highlighted-memos/guidance-on-collective-bargaining-in-connection-

with-reductions-in-force.pdf [https://perma.cc/ENN2-37YQ])).  The description of these

obstacles resulting from collective bargaining as "dangerous," and the characterization of the

Civil Service Reform Act as "enabl[ing] hostile Federal unions to obstruct agency management,"

Fact Sheet at 2-3, are directly contrary to Congress's conclusion that such labor policy and labor

organizations are "in the public interest."  5 U.S.C. § 7101(a).

To be sure, as the Section 7103(b)(1) exclusion provision highlights, Congress anticipated that collective bargaining rights may not, in certain cases, be applied in a "a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). But the statements in the Fact Sheet must be considered in the context of the breadth of the Executive Order: the order strips collective bargaining rights from two-thirds of the federal workforce. See Pl.'s Mem. at 4. In other words, justifying the sweeping Executive Order by pointing to the "obstruct[ion] to agency management" caused by "hostile Federal unions" is better understood as a disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a "manner consistent with national security requirements and considerations." See 5 U.S.C. § 7103(b)(1)(B). Indeed, many of the cabinet-level departments that the President has excluded were not included by Congress in the list of agencies exempted from the FSLMRS's coverage. See 5 U.S.C. § 7103(a)(3) (excluding the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, the Federal Service Impasses Panel, and the United States Secret Service and the United States Secret Service Uniformed Division). In sum, there is clearly an inconsistency. Congress determined that collective bargaining rights for the majority of the federal workforce was "in the public interest," yet the Executive Order strips these rights from a majority of the federal workforce. This certainly provides evidence that the "President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them" in his invocation of the Section 7103(b) exclusion. Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.

b.  <u>Contemporaneous Statements in the White House Fact Sheet Reflect Retaliatory Motive</u>

The second reason that NTEU prevails in rebutting the presumption of regularity by clear evidence is because the White House Fact Sheet reflects retaliatory motive towards certain unions.  For example, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda," by, <u>inter alia</u>, filing grievances against President Trump and by stating that they would "'fight[] back' against Trump."  Fact Sheet at 3.  The Fact Sheet further states that the Civil Service Reform Act of 1978 – of which the FSLMRS is a part – "enables hostile Federal unions to obstruct agency management," and that the President "refuses to let union obstruction interfere with his efforts to protect Americans and our national interests."  Fact Sheet at 3.  These statements bear no relation to the criteria established by Congress in Section 7103(b)(1).  Rather, the statements reflect President Trump's frustration with the unions' representational activity and exercise of their First Amendment rights – such as through "filing grievances to block Trump policies" – and the impact those activities have had on his policy directives and "agenda."  <u>See</u> Fact Sheet at 3.  Indeed, as NTEU points out, these statements in the Fact Sheet appear to be in direct response to the number of lawsuits and grievances NTEU has filed against the Trump Administration in the last several months.  <u>See</u> Compl. ¶ 63.

Other statements in the Fact Sheet reflect that this frustration with the unions' "war" on President Trump may have been a significant factor in his issuing the Executive Order. For example, the Fact Sheet suggests that it is not "the provisions" of the FSLMRS themselves that "cannot be applied . . . in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B), but rather the unions' <u>use of</u> these provisions, which President Trump views as "mass obstruction that jeopardizes his ability to manage agencies with

vital national security missions." Fact Sheet at 3. Indeed, the Fact Sheet's statement that President Trump "supports constructive partnerships with unions who work with him" but "will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions" comes very close to conceding this point. See id. Furthermore, as NTEU argues, certain inclusions and exclusions from the Executive Order reflect a preference for unions that have a "constructive relationship" with the President. For example, the President's decision to allow "police officers, security guards, [and] firefighters" to retain collective bargaining rights, but to remove such rights from employees of the Federal Bureau of Prisons – whose employees are represented by a union that has been critical of the President and his Administration – suggests that the President's relationship with particular unions was a factor in determining which agencies and subdivisions were included in the Executive Order. Pl.'s Reply at 7; see Executive Order § 2(b).

The language used in the Fact Sheet coupled with the focus on "constructive partnership[s]" as opposed to "mass obstruction" undercuts the presumption that the President considered and abided by the statutory language in Section 7103(b)(1). See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728. Furthermore, it suggests a retaliatory motive to punish unions for the "war" they have "declared [ ] on President Trump's agenda." Fact Sheet at 3. Such clear evidence of retaliatory motive is "of great significance in addressing the presumption" of regularity. See Hartman v. Moore, 547 U.S. 250, 263-64 (2006) (concluding that "prosecutor's disclosure of retaliatory thinking on his part" was significant in determining whether the presumption of regularity should be applied); see also Wendt Corp. v. NLRB, 26 F.4th 1002, 1011 (D.C. Cir. 2022) ("A company's open hostility toward Union activity,

including a manager's anti-union speech, is clearly sufficient to establish anti-union animus on the part of that company.") (cleaned up).

    c.  Evidence Reflects that the Executive Order was Motivated by Unrelated Policy Goals

        The final reason that NTEU prevails in rebutting the presumption of regularity is because substantial evidence in the record reflects that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria. See Pl.'s Reply at 4-6 (arguing that the Executive Order was motivated by "a desire to make federal employees easier to fire"). The OPM Guidance strongly supports this point, couching the Executive Order in the broader "policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently." OPM Guidance at 5. The OPM Guidance goes on to outline the Administration's many policies and directives related to the federal workforce writ large. For example, the OPM Guidance notes that the "President issued multiple directives to facilitate the separation of underperforming employees," but that "Agency [collective bargaining agreements] often create procedural impediments" to removing these employees. Id. at 3. The OPM Guidance directs the agencies and subdivisions covered by the Executive Order to "seek to bring their policies into alignment with the specific Administration priorities," including limiting performance improvement periods and discontinuing grievance participation. See id. at 3-4. In a section entitled "Effective and Efficient Government," the OPM Guidance explains that "after terminating [the agencies'] [collective bargaining agreements]" pursuant to the Executive Order, agencies can proceed to "[d]isregard contractual [reduction-in-force] articles" and "prepare large-scale reductions in force" as the "President has directed." Id. at 5 (capitalization omitted).

In sum, the OPM Guidance says little about national security, notwithstanding the national security valence of Section 7103(b)(1).  On examination, the OPM Guidance and the Executive Order appear to be more about accomplishing the Administration's goal of substantially changing the nature of the federal workforce.  The OPM Guidance lists numerous examples of earlier policy directives by the President and OPM, identifies the difficulties collective bargaining agreements posed to accomplishing those directives, and states that those obstacles are now gone as a result of the Executive Order.  The framing of the Executive Order in this way is evidence that the President was at best "indifferent to the purposes and requirements of the" FSLMRS.  Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.  Indeed, it is strong evidence that the President's invocation of Section 7103(b)(1) was to remove the barriers created by the FSLMRS to his unrelated policy objectives.  See In re Aiken Cnty., 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections.").

*　　*　　*

For the reasons discussed above, the Court concludes that NTEU has successfully rebutted the presumption of regularity.  The Court therefore need not presume that the President has "properly discharged [his] official duties" in the absence of justification for the Executive Order.  See United States v. Chemical Foundation, Inc., 272 U.S. at 14-15.

### 2.  The President's Executive Order is Ultra Vires

Having determined that the presumption of regularity does not apply, the issue now becomes whether NTEU likely will be successful in showing that the Executive Order was ultra vires.

"The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself[,]'" or from a combination of the two. Medellin v. Texas, 552 U.S. 491, 523 (2008) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952)). While a party has different bases by which to challenge Presidential actions that may exceed the scope of the President's power, one such claim is that the President's action was ultra vires. See Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority.") (quoting Dart v. United States, 848 F.2d 217, 224 (D.C. Cir. 1988)). An ultra vires claim is a "non-statutory form of review [that] derives from courts' equitable authority to 'reestablish the limits on' executive authority '[w]hen an executive acts ultra vires.'" Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab., Civil Action No. 25-339 (JDB), 2025 WL 1129227, at *22 (D.D.C. Apr. 16, 2025) (quoting Dart v. United States, 848 F.2d at 224); see Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015) (Scalia, J.) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."). This claim, however, "is a doctrine of last resort, 'intended to be of extremely limited scope.'" Schroer v. Billington, 525 F. Supp. 2d 58, 65 (D.D.C. 2007) (quoting Griffith v. Fed. Labor Relations Auth., 842 F.2d 487, 493 (D.C. Cir. 1988)).

In the instant case, the evidence rebutting the presumption of regularity is a significant reason to believe NTEU will prevail on its claim. The scope of the Executive Order when compared with the intent of Congress in passing the FSLMRS, coupled with the surrounding statements in the Fact Sheet and OPM Guidance – which strongly suggest that

President Trump's invocation of Section 7103(b)(1) was mere pretext for retaliation and for accomplishing unrelated policy objectives – are persuasive reasons to believe NTEU likely will be successful on the merits of its claim.

Ultimately, the success of NTEU's claim hinges on whether the agencies and subdivisions subject to the Executive Order meet the statutory criteria set forth in the FSLMRS. See Opp. at 20.  The government provides a meager defense explaining how the agencies and subdivisions covered by the Executive Order – which include approximately two-thirds of the federal workforce, see Kaspar Decl. ¶ 35 – meet the Section 7103(b)(1) criteria.  The government's defense consists primarily of statements about the general role of the agencies and subdivisions, and then listing several examples of offices within the agencies and subdivisions that may perform work related to national security.  Given the breadth of the Executive Order, however, this approach is wholly inadequate to assess whether each of the agencies and subdivisions actually falls within the statutory national security exception.

To remind, Section 7103(b) provides that:

The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –

(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1).  The government's interpretation of Section 7103(b)(1) hinges on whether

each agency and subdivision cited has a "primary function" of "national security work."[4]

      With regard to Section 7103(b)(1)(A), the government asserts that "[t]he statute's

first three categories of primary functions" – that is, "intelligence, counterintelligence, [and]

investigative" work – "require no further explanation.  Opp. at 20.  As for the term "national

security work," the government argues that it "has long and consistently been interpreted in the

federal labor relations context to refer to work 'directly related to protection and preservation of

the military, economic, and productive strength of the United States.'"  Id. (quoting Dep't of

Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 F.L.R.A. 644,

655-56 (1980)).

      As for Section 7103(b)(1)(B), the government essentially argues that any agency

or subdivision that "has a significant, critical national security mission" necessarily will satisfy

the criteria in Section 7103(b)(1)(B).  Opp. at 26.  The government contends that because it has

shown that "each Defendant agency or subdivision has a significant, critical national security

mission," Section 7103(b)(1)(B) is satisfied.  Id.

---

[4]    The government suggests at several points in its opposition that a few of the
agencies and subdivisions satisfy the Section 7103(b)(1) criteria by nature of performing
"intelligence, counterintelligence, [or] investigative" work.  See, e.g., Opp. at 23 (arguing Food
and Drug Administration has an "investigative function"); id. at 24 (arguing that the Department
of Justice "performs investigative, intelligence, and national security work").  The terms
"intelligence, counterintelligence, [and] investigative" work likely should be interpreted as
having a national security valence in light of Section 7103(b)(1) as a whole.  See Soc. Sec.
Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps. (Petitioner1labor Org.), 59
F.L.R.A. at 143 ("Congress also addressed the matter of national security in § 7103(b) of the
Statute.").  This issue, however, need not be addressed here because the government undoubtably
relies on "each Defendant agenc[ies'] or subdivision[s'] . . . significant, critical national security
mission" in arguing that the Section 7103(b)(1)(2) criteria has been satisfied.  See Opp. at 26; see
also id. at 2 ("[T]he Court lacks authority to review the President's national security
determination, as Congress expressly recognized").  The government's success therefore depends
on the validity of its interpretation of work implicating "national security."

The President's determination appears to apply an overly broad interpretation of both the term "primary function" and the term "national security work." The Court therefore concludes that NTEU is likely to succeed on its claim.

a.   "Primary Function"

While the government never explicitly states how it interprets "primary function," its arguments related to each of the agencies and subdivisions reflect either an overly broad interpretation of the term or a disregard of the term entirely. The government's arguments related to each of the agencies and subdivisions illustrate this point by either pointing to generalized mission statements of the agencies referencing national security, or by pointing to individual functions that segments of the agencies or subdivisions perform that have a national security valence, and then concluding that the entire agencies' or subdivisions' "primary function" is national security.

For example, the government argues that the Department of the Treasury is primarily engaged in "national security work" because it "exists to promote economic and productive strength of the United States – a core national security mission." Opp. at 20. As to the Internal Revenue Service within the Department of the Treasury, the government argues that it primarily performs "national security work" because it "collect[s] almost all Federal revenues," of which "America's military, economic, and productive capacity directly depend . . . ." Opp. at 21. In terms of the Department of Energy ("DOE"), the government argues that the department's "primary role is setting national energy policy, with obvious national security objectives and implications." Id. The government points to certain examples of this, such as the DOE's role in the "security of the U.S. nuclear weapons stockpile" and in the creation of "affordable and reliable domestic supply of energy," which "'is a fundamental

requirement for the national and economic security of any nation.'" Id. (quoting Exec. Order No. 14156, 90 Fed. Reg. 8,433 (Jan. 20, 2025)).[5] With respect to the Food and Drug Administration, the government maintains that it ensures "a secure food supply," which is "critical to national security." Id. at 23. As for the Bureau of Land Management, the government argues that its "overseeing of energy production" on public land and its "funding [of] the Federal Government's operations through mineral development" makes it critical to national security. Id. at 22.

NTEU responds that these examples demonstrate that the government "reads 'primary' entirely out of the text, as they reference any function that an agency at issue performs . . . ." Pl.'s Reply at 10-11. The Court agrees. The government's approach is essentially pointing to a specific function that a particular agency or subdivision performs, and then arguing that the instance of "national security work" means the entire agency's or its subdivision's "primary function" is "national security work." But even if an agency performs some work that implicates national security, that does not mean that the entire agency has "a primary function" of "national security work." 5 U.S.C. § 7103(b)(1)(A). In sum, because the government's arguments make clear that the President applied an overly broad interpretation of the term "primary function" or wrote the term out of the statute entirely, the Court concludes that NTEU likely will succeed on its claim.

---

[5]   The government notes that the DOE was created by the "same Congress that enacted the FSLMRS," failing to explain why that Congress did not include the DOE in its list of agencies excluded from the protections in the FSLMRS. See 5 U.S.C. § 7103(a)(3).

b. <u>"National Security" and "National Security Work"</u>

The government's interpretation of "national security" and "national security work" is also overly broad. <u>See</u> 5 U.S.C. § 7103(b)(1)(A)-(B). The government interprets "national security work" as work "directly related to protection and preservation of the military, economic, and productive strength of the United States." <u>See</u> Opp. at 20 (citation omitted). As illustrated above, the government contends that this definition encompasses everything from the collection of taxes to the management of the United States's food supply and distribution.

The government's single citation for its expansive interpretation of "national security work" is to the FLRA's decision in <u>Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181</u>, 4 F.L.R.A. 644, 655-56 (1980). <u>See</u> Opp. at 20. But that case is significantly less supportive of the government's position than it may think. Indeed, in that case, the FLRA cautioned against applying an overly broad interpretation of "national security," stating in relevant part:

> A complex legal framework surrounds 'national security' in the context of Government employment. <u>See</u>, <u>e.g.</u>, 5 U.S.C. § 7532; Executive Order 10450; FPM Chapter 732-3, subchapter 1. Exclusion from an appropriate unit deprives employees of the opportunity under the Statute to determine whether or not they wish to be represented by a labor organization and of the opportunity to engage in collective bargaining with respect to conditions of employment through labor organizations. Labor organizations and collective bargaining in the civil service have been determined by the Congress to be 'in the public interest.' 5 U.S.C. § 7101(a). Therefore, the term 'national security' must be interpreted to include only those sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the United States, including the security of the Government in domestic and foreign affairs, against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense. <u>See</u> <u>Cole v. Young</u>, 76 S. Ct. 861, 351 U.S. 536 (1956); FPM Chapter 732-3, subchapter 1, paragraph 1.1; 32 C.F.R. § 156.5.

<u>Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181</u>, 4

F.L.R.A. at 655-56.  The FLRA's reasoning in the <u>Oak Ridge</u> case makes clear that the Supreme

Court's decision in <u>Cole v. Young</u>, 351 U.S. 536 (1956), provided guidance on the interpretation

of "national security" in Section 7103(b)(1).  On this point, NTEU agrees, arguing that <u>Cole v.</u>

<u>Young</u>'s definition of "national security" "should govern here."  Pl.'s Reply at 9.

   In <u>Cole v. Young</u>, the Supreme Court addressed "the meaning of the term

'national security' as used in" a statute enacted in 1950, which gave "the heads of certain

departments and agencies of the Government summary suspension and unreviewable dismissal

powers over their civilian employees, when deemed necessary 'in the interest of the national

security of the United States.'"  <u>See Cole v. Young</u>, 351 U.S. at 538.  The Supreme Court

concluded that while the term "national security" was not defined in the law, it was "clear from

the statute as a whole that that term was intended to comprehend only those activities of the

Government that are directly concerned with the protection of the Nation from internal

subversion or foreign aggression, and not those which contribute to the strength of the Nation

only through their impact on the general welfare."  <u>Id</u>. at 544.  The Supreme Court found that the

law reflected "Congress' concern for the procedural rights of employees and its desire to limit

the unreviewable dismissal power to the minimum scope necessary to the purpose of protecting

activities affected with the 'national security.'"  <u>Id</u>. at 547.  This intent "hardly seem[ed]

consistent" with the "indefinite and virtually unlimited meaning" of "national security" asserted

by the government.  <u>Id</u>.  The government's interpretation had to be rejected.  After all, the

Supreme Court reasoned, the statute's requirement that the President determine that an

"employee's misconduct would affect the 'national security'" would not be necessary "if

'national security' were used in the Act in a sense so broad as to be involved in all activities of

the Government, for then the relationship to the 'national security' would follow from the very

fact of employment." Id. at 542-43.  The Court concluded with a cautionary statement about the

ability for national security determinations to supersede law:

> [I]f Congress intended the term to have such a broad meaning that
> all positions in the Government could be said to be affected with the
> 'national security,' the result would be that the 1950 Act, though in
> form but an exception to the general personnel laws, could be
> utilized effectively to supersede those laws.  For why could it not be
> said that national security in that sense requires not merely loyal and
> trustworthy employees but also those that are industrious and
> efficient?  The relationship of the job to the national security being
> the same, its demonstrated inadequate performance because of
> inefficiency or incompetence would seem to present a surer threat
> to national security, in the sense of the general welfare, than a mere
> doubt as to the employee's loyalty.

Cole v. Young, 351 U.S. at 547-48.

Appling the reasoning of Cole v. Young to this case, this Court must conclude

that the President's interpretation of "national security" exceeds the scope of the meaning

intended by Congress.  In passing the FSLMRS, Congress clearly expressed a desire to extend

collective bargaining rights broadly because it determined that those rights were "in the public

interest."  5 U.S.C. § 7101(a) ("[L]abor organizations and collective bargaining in the civil

service are in the public interest").  Congress provided a narrow exception that allowed the

President to exclude agencies and subdivisions from these protections if the provisions of the law

"cannot be applied . . . in a manner consistent with national security requirements and

considerations."  5 U.S.C. § 7101(b)(1)(B).  And as in Cole v. Young, it is "clear from the

statute" that the term "national security" "comprehend[s] only those activities . . . that are

directly concerned with the protection of the Nation from internal subversion or foreign

aggression . . . ."  Cole v. Young, 351 U.S. at 544.  But President Trump instead has applied a

startlingly broad application of "national security," which – directly contrary to the Supreme

Court's definition in <u>Cole v. Young</u> – encompasses "those activities of Government . . . which contribute to the strength of the Nation only through their impact on the general welfare." <u>Cole v. Young</u>, 351 U.S. at 544. This interpretation of "national security" therefore is inconsistent with the statute and "risks allowing the exception to swallow the rule, thereby undermining the purpose of the statute itself." <u>Nat'l Fed'n of Fed. Emps. v. McDonald</u>, 128 F. Supp. 3d 159, 172 (D.D.C. 2015). "[I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the [FSLMRS], though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." <u>Cole v. Young</u>, 351 U.S. at 548.

In sum, NTEU is likely to prevail in showing that the President has applied an overly broad interpretation of "national security" when invoking Section 7103(b)(1), thereby making the President's Executive Order <u>ultra</u> <u>vires</u>.

\*     \*     \*

In light of its analysis above, the Court concludes that NTEU is likely to succeed on its claim that the Executive Order is <u>ultra</u> <u>vires</u>. This conclusion is reached in light of the evidence rebutting the "presumption of regularity" and the interpretation of Section 7103(b)(1).[6]

### C.  Irreparable Harm

The next factor to consider is whether NTEU will suffer irreparable injury without the requested preliminary injunction. <u>See</u> <u>Archdiocese of Washington v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d at 321. The D.C. Circuit "has set a high standard for irreparable injury."

---

[6]     Because the Court concludes that NTEU is likely to succeed on its <u>ultra</u> <u>vires</u> claims, <u>see</u> Compl. ¶¶ 78-89 (Counts One and Two), the Court does not reach the issue of whether NTEU has satisfied the requirements for a preliminary injunction on its First Amendment retaliation claim.

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  "Not only must the injury 'be both certain and great,' and 'actual and not theoretical,' but 'the injury must be beyond remediation.'"  Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com., 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297).  Importantly, "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of establishing] irreparable harm."  League of Women Voters v. Newby, 838 F.3d at 9.

NTEU advances two primary bases by which it argues it will face irreparable harm absent a preliminary injunction.  First, it argues that the Executive Order significantly reduces its bargaining power by "cut[ting] the number of NTEU-represented employees by over 65%."  Pl.'s Mem. 32; see Declaration of Mark L. Gray ("Gray Decl.") [Dkt. No. 9-3] ¶ 6; Kaspar Decl. ¶ 9.  Second, it argues that it faces "severe financial harm" caused by the loss of dues revenue.  See Pl.'s Mem. at 30-32.  More specifically, NTEU states that it will lose approximately $25 million in dues revenue over the course of the next year, or approximately half of its annual revenue.  See id. at 31; Kaspar Decl. ¶ 17; Gray Decl. ¶ 12.

The Court concludes that each of the injuries are sufficient to show that NTEU will face irreparable harm absent a preliminary injunction.

### 1.   Loss of Bargaining Power

NTEU contends that its loss of bargaining power is both significant and irreparable.  See Pl.'s Mem. at 32-33.  According to NTEU, the Executive Order covers 65.9% of all NTEU-represented employees, or approximately 104,278 employees.  Kaspar Decl. ¶ 9. NTEU argues that it will become "a less effective, less influential organization in ways that cannot be undone" as a result of the Executive Order, Pl.'s Mem. at 33, which removes both

agencies' obligation to collectively bargain and NTEU's status as the exclusive bargaining

representative of the agencies' employees.  See OPM Guidance at 3.  More specifically, NTEU

asserts that as a result of this reduction in representation, it will be less effective at (1) advocating

for employees at agencies not covered by the Executive Order; (2) persuading employees to join

the union; and (3) advocating for employees' interests before Congress.  See Kaspar Decl.

¶¶ 11-14.  NTEU argues that these injuries have already begun to occur.  See Pl.'s Reply

at 20-23.  For example, NTEU states that certain agencies have already failed to honor

provisions of the respective collective bargaining agreements by failing to withhold dues

payment from employees' paychecks, Kaspar Supp. Decl. ¶¶ 12-14, "disavow[ing] any

obligation to bargain," id. ¶¶ 17-18, and beginning to implement reductions in force.  See id.

¶ 16.

        Courts have long recognized that "the unlawful refusal of an employer to bargain

collectively with its employees' chosen representatives disrupts the employees' morale, deters

their organizational activities, and discourages their membership in unions."  Franks Bros. Co. v.

NLRB, 321 U.S. 702, 704 (1944).  "The deprivation to employees from the delay in bargaining

and the diminution of union support is immeasurable."  N.L.R.B. v. Electro-Voice, Inc., 83

F.3d 1559, 1573 (7th Cir. 1996).  Furthermore, "[a]s time passes, the benefits of unionization are

lost and the spark to organize is extinguished."  Id.; see Int'l Union of Elec., Radio & Mach.

Workers, AFL-CIO v. NLRB, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a

union can wane quickly as working conditions remain apparently unaffected by the union or

collective bargaining.").  Therefore, any relief a court may provide "must come quickly."  In re

Am. Fed'n of Gov't Emps., AFL-CIO, 790 F.2d 116, 117-18 (D.C. Cir. 1986) (citation and

quotation marks omitted).

These concerns are heightened in the instant case given the Trump Administration's directive "to prepare large-scale reductions in force." OPM Guidance at 5. Should NTEU not obtain a preliminary injunction, there is a substantial possibility that only a small fraction of its once large union would remain upon prevailing in this litigation. And, as NTEU argues, see Kaspar Decl. ¶¶ 11-14, the loss of representation and status as an exclusively recognized labor organization creates "obstacles [that] make it more difficult for the [plaintiff] to accomplish [its] primary mission." See League of Women Voters v. Newby, 838 F.3d at 9. This in itself constitutes irreparable harm. See id.; Garcia v. Sacramento Coca-Cola Bottling Co., 733 F. Supp. 2d 1201, 1216 (E.D. Cal. 2010) ("[C]ourts have historically held that withdrawal of union recognition is often irreparable.") (collecting cases); Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, Civil Action No. 25-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025).

The government's arguments to the contrary are unavailing. First, the government argues that NTEU's concern over losing bargaining power and members is "speculative" because "no defendant agency has yet taken action to terminate a [collective bargaining agreement] or to remove individuals covered by Executive Order 14,251 from bargaining units." Opp. at 10. In support, the government points to an April 8, 2025 memorandum from the Chief Human Capital Officers Council that states that "[a]gencies should not terminate any collective bargaining agreements . . . until the conclusion of litigation or further guidance from OPM directing such termination." Opp. at 6.

The guidance in the memorandum can provide little solace to plaintiff, and no real support for the government's argument that NTEU's injury is "speculative." The April 8 memorandum itself indicates that collective bargaining agreements may be terminated based on

"guidance from OPM directing such termination."  See Opp. at 6 (quoting Declaration of Allen R. Brooks [Dkt. No. 26-1] ¶ 6).  And OPM has already made clear that agencies and subdivisions "are no longer subject to the collective-bargaining requirements" of the FSLMRS.  OPM Guidance at 3 (emphasis added).  In other words, notwithstanding the lack of the formal cancellation of the collective bargaining agreements, the agencies and subdivisions have been instructed that the protections in the FSLMRS are no longer operative.  Moreover, NTEU has stated that agencies and subdivisions have already begun disregarding provisions of the collective bargaining agreements in line with the OPM Guidance.  See Kaspar Supp. Decl. ¶¶ 12-25.  The government's argument that NTEU's injury is "speculative" therefore must be rejected for the simple reason that it has already begun to materialize.  See Pl.'s Reply at 21 (stating that "[b]efore and after" the April 8 memorandum, "agencies have refused to meet with NTEU, to bargain with NTEU, or to honor contractual obligations . . . .").[7]

        Second, the government argues that there is "no reason why losing current NTEU members while this litigation is pending could not be remedied by a favorable judicial ruling in this case restoring its scope of representation."  Opp. at 10-11.  This argument fails for two reasons.  First, the argument ignores the injuries that NTEU will suffer in the interim given that "[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining."  Int'l Union of Elec., Radio & Machine Workers, AFL-CIO v. NLRB, 426 F.2d at 1249.  Put differently, the period of time when union representation is suspended will have lasting and irreparable effects on employees' interest and

---

[7]        The government also asserts that "[e]ven if agencies did remove NTEU members from bargaining units, those employees could remain members of NTEU . . . ."  Opp. at 10.  This argument is left unexplained, and it does not address the fact that NTEU would be significantly obstructed in representing its members if the agencies terminate their collective bargaining agreements and refuse to bargain with their employees.

participation in the union.  Second, the President's directive "to prepare large-scale reductions in force" outlined in the OPM Guidance – which the IRS has already appeared to begin to follow through on, see Kaspar Supp. Decl. ¶ 16 – creates the serious concern that NTEU's bargaining power garnered through the size of its membership base will either be forever diminished or will take a great deal of time to restore.  See N.L.R.B. v. Electro-Voice, Inc., 83 F.3d at 1573 ("As time passes, the benefits of unionization are lost and the spark to organize is extinguished.").

In light of the injuries to NTEU's bargaining power that are likely to occur – and indeed have already begun to occur – and the "obstacles" that the loss of bargaining power creates for it to "accomplish [its] primary mission" of representing its members, the Court concludes that NTEU will face irreparable harm absent a preliminary injunction.  See League of Women Voters v. Newby, 838 F.3d at 9; see Garcia v. Sacramento Coca-Cola Bottling Co., 733 F. Supp. 2d at 1216 ("[C]ourts have historically held that withdrawal of union recognition is often irreparable.") (collecting cases).

## 2.  Union Dues

"While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the'" movant's operations.  Climate United Fund v. Citibank, N.A., Civil Action No. 25-0698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  NTEU's declarations clearly reflect that the financial harm from the loss of dues revenue "threatens NTEU's very existence."  Kaspar Decl. ¶ 18; see Gray Decl. ¶ 13 ("The immediate, drastic decrease in income from lost payroll deductions will jeopardize NTEU's very existence.").  NTEU's Director of Field Operations, Daniel Kaspar, asserts that absent preliminary relief, NTEU will lose approximately $25 million

dollars in revenue over the next year, which is "more than half of NTEU's total revenue stream." Kaspar Decl. ¶ 17; see Gray Decl. ¶ 12. He further states that this injury is imminent, as certain agencies subject to the Executive Order have already begun to stop automatic deductions from union members' paychecks. Kaspar Decl. ¶¶ 20-21. Indeed, as of the filing of its reply memorandum on April 16, 2025, NTEU has already lost $2 million in dues revenue. Kaspar Supp. Decl. ¶¶ 13-14.

The government does not meaningfully dispute that the severity of the financial loss threatens the very existence of NTEU's operations, though it briefly mentions the general rule that "economic loss does not, in and of itself, constitute irreparable harm." Opp. at 9 (quoting Nat'l Min. Ass'n v. Jackson, 768 F. Supp. 2d 34, 50 (D.D.C. 2011). Instead, the government first argues that the financial injury is speculative because "[u]nion members remain free to pay their dues directly to the union" notwithstanding an agency's decision to discontinue automatic deductions from the members' paychecks. Opp. at 9. This argument is brief and unexplained. As NTEU correctly notes, it has already started losing significant dues revenue, and the Executive Order takes "away the basic reason that NTEU members pay dues: to support their exclusive bargaining representative . . . ." Pl.'s Reply at 21; see Kaspar Decl. ¶¶ 22-24 (stating that "NTEU will be of less value to employees . . . if it can no longer participate in" any grievance procedure or collective bargaining). Moreover, as NTEU points out, it is not clear how NTEU would collect dues since some of the defendants have "taken away the very apparatus" created by Congress for collecting the dues payments. Pl.'s Reply at 21; see 5 U.S.C. § 7115.

The government next argues that NTEU can recover the lost dues revenue at a later date through the FSLMRS's administrative review procedures, since the FLRA "routinely

orders agencies to reinstate the dues allotments of individuals in the unit whose allotments were unlawfully terminated . . . ." Opp. at 10. This argument is unpersuasive for at least two reasons. First, while NTEU may be able to recover dues that it has immediately lost as a result of the Executive Order, this cannot account for the reduction in dues moving forward. Such a reduction inevitably will result from a decrease in membership, either as a product of the agencies following through on the President's directive to implement reductions in force, or through "discourage[ment]" in union membership that results from "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives . . . ." Franks Bros. Co. v. NLRB, 321 U.S. at 704. Second, even if some dues are eventually recovered later, the government ignores the fact that the significant loss NTEU will suffer over the next year – approximately half of its revenue – "will jeopardize NTEU's very existence." Gray Decl. ¶ 13. In the meantime, the loss of revenue creates a serious obstacle for NTEU to "accomplish [its] primary mission" of representing its members. League of Women Voters v. Newby, 838 F.3d at 9; see Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President, Civil Action No. 25-0917 (RJL), 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) ("While economic loss does not always warrant a TRO, this is not a typical situation because plaintiff faces more than economic harm – it faces crippling losses and its very survival is at stake.").

*     *     *

In sum, NTEU's loss of bargaining power and the significant financial harm to the union that is both ongoing and can be expected to continue represent irreparable harm warranting preliminary relief.

### D.  Equities and Public Interest

The remaining preliminary injunction factors – the balance of the equities and assessment of the public interest – weigh in NTEU's favor.  These factors "merge when, as here, the Government is the opposing party.'"  Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).

NTEU makes two arguments that a preliminary injunction is in the public interest. First, NTEU argues that a preliminary injunction will maintain the status quo that has existed for decades, in which a large portion of the federal workforce possessed collective bargaining rights. See Pl.'s Mem. at 35.  Second, NTEU asserts that a preliminary injunction is in the public interest because "[t]he public has an interest in ensuring that the laws enacted by their representatives are not imperiled by executive fiat."  Pl.'s Reply at 23 (citation omitted).

The Court agrees with both propositions.  Congress unequivocally identified collective bargaining rights and federal unions as being "in the public interest."  See 5 U.S.C. § 7101(a).  Pursuant to this finding, Congress determined that large portions of the federal workforce should have the right to collectively bargain and be represented by federal unions. This was the state of the federal workforce for decades.  The Executive Order dramatically changes this, excluding two-thirds of the federal workforce from the FSLMRS.  The scope of the Executive Order, contemporaneous evidence surrounding the Executive Order, and the government's defense of the Executive Order in this case raise serious concerns about whether the President has exceeded his power.  See Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[E]nforcement of an unconstitutional law is always contrary to the public interest"); TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) ("[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'")

(quoting R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); see also League of Women Voters v. Newby, 838 F.3d at 12 (holding that while "[t]here is generally no public interest in the perpetuation of unlawful agency action," "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation'") (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)); Grace v. Whitaker, Civil Action No. 18-1853 (EGS), 2019 WL 329572, at *5 (D.D.C. Jan. 25, 2019) ("[T]here is a public interest . . . in ensuring that statutes enacted by their representatives are not imperiled by executive fiat.") (citation omitted) (cleaned up).

The government's argument that the public interest will be harmed if the Court issues a preliminary injunction is unavailing. The thrust of the government's argument is that it is in the public interest to ensure that the President can effectively operate "agencies relevant to national security without the constraints of collective bargaining," and that a preliminary injunction would "displace and frustrate the President's decision about how to best address issues of national security." Opp. at 34. These arguments, however, presuppose that the President's decisions are in fact "national security" determinations, rather than a recasting of decisions related to "the general welfare" as "national security" determinations. See Cole v. Young, 351 U.S. at 544. For the reasons discussed at length above, the President's assertion of "national security" interests is overly broad in this case.

The Court therefore concludes that the balance of the equities and assessment of the public interest weigh in favor of granting a preliminary injunction. Indeed, each of the preliminary injunction factors weighs in favor of granting NTEU's motion.

## IV. SECURITY AND SCOPE OF PRELIMINARY INJUNCTION

The final two matters the Court must address were raised for the first time by the government at oral argument. First, the government requests that the Court impose a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. See Tr. at 52:8-11. Second, the government argues that in the event that the Court grants NTEU's motion, it should exempt agencies or subdivisions from the preliminary injunction order that meet the criteria in Section 7103(b)(1). See id. at 51:6-13.

Turning first to the request for a bond, the Federal Rules of Civil Procedure provide that the Court may grant a motion for a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). Nevertheless, "[c]ourts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." Simms v. District of Columbia, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (citation omitted) (second alteration in original) (quoting DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999)); see Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *13 n.5 (D.D.C. June 28, 2024). "A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, Civil Action No. 25-0239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (quoting Nat. Res. Def. Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases)).

At oral argument, the government requested that NTEU be required to post a bond because the government will suffer financial harm from a preliminary injunction as a result of

needing to pay certain expenses for employees to engage in union activity.  See Tr.

at 52:18-53:4.  The court exercises its discretion to decline this request.  See Aviel v. Gor, Civil

Action No. 25-0778 (LLA), 2025 WL 1009035, at *12 (D.D.C. Apr. 4, 2025).  As the Court's

analysis of this motion illustrates, NTEU has made a substantial showing that the Executive

Order is of unprecedented scope, deprives federal employees and the federal unions of rights that

Congress found to be in the public interest, and poses an existential risk to NTEU.  Requiring the

posting of a bond would conflict with both the Court's findings that each of the preliminary

injunction factors weigh heavily in NTEU's favor and the principles of the right to seek judicial

review of unlawful government action.  See Aviel v. Gor, 2025 WL 1009035, at *12 n.7

("Setting a bond would conflict with every holding in this opinion and contravene the interests of

justice."); see also League of United Latin Am. Citizens v. Exec. Off. of the President, Civil

Action No. 25-0946 (CKK), 2025 WL 1187730, at *62 (D.D.C. Apr. 24, 2025) (collecting recent

cases denying government's request to "post any bond as a condition of obtaining an injunction

against agencies or officers of the federal government").

       Turning next to the scope of the preliminary injunction, "[c]rafting a preliminary

injunction is an exercise of discretion and judgment, often dependent as much on the equities of

a given case as the substance of the legal issues it presents."  Trump v. Int'l Refugee Assistance

Project, 582 U.S. 571, 579 (2017).  In the instant case, the government's request that the Court

exempt from its preliminary injunction agencies and subdivisions that meet the requirements of

Section 7103(b)(1) must be rejected.  NTEU has challenged Section 2 of the Executive Order in

its entirety and the government has defended the Executive Order in its entirety.  The Court has

concluded that the preliminary injunction factors all weigh heavily in favor of granting

preliminary relief.  Specifically, the Court has found that NTEU is likely to succeed in showing

that the President applied an overly broad interpretation of "national security," seemingly disregarded the statutory term "primary function," and – as the evidence rebutting the presumption of regularity suggests – "was indifferent to the purposes and requirements of the [FSLMRS], or acted deliberately in contravention of them."  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.  These conclusions all speak to the fact that Section 2 of the Executive Order is entirely ultra vires.  Furthermore, those conclusions, coupled with a preliminary injunction's purpose of "preserv[ing] the status quo while the district court assesses the merits of a case," Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381 (ABJ), 2025 WL 1144646, at *4 (D.D.C. Apr. 18, 2025), warrant enjoining Section 2 of the Executive Order in its entirety.

Moreover, the government's arguments do not warrant specific agency or subdivision exemptions in the preliminary injunction order.  The government has not shown that any particular agency or subdivision meets the Section 7103(b)(1) criteria.  The meager seven pages explaining how two-thirds of the federal workforce meets the Section 7103(b)(1) criteria, coupled with the limited factual record now before the Court, does not afford the Court the opportunity to determine the exemptions at this time.  The government has not provided sufficient argument or factual support warranting specific exemptions from the preliminary injunction order.

## V.  CONCLUSION

For the foregoing reasons, NTEU's Motion for a Preliminary Injunction [Dkt.
No. 9] is hereby GRANTED.

An Order consistent with this Opinion was issued on April 25, 2025.  See Order
of April 25, 2025 [Dkt. No. 32].

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/28/25

46

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 25-0935 (PLF) |
| DONALD J. TRUMP, et al., | ) ) | |
| Defendants. | ) ) ) | |

## ORDER

Upon consideration of Plaintiff's Motion for a Preliminary Injunction [Dkt. No. 9], it is hereby

ORDERED that Plaintiff's Motion for a Preliminary Injunction [Dkt. No. 9] is GRANTED; it is

FURTHER ORDER that Section 2 of the Executive Order, Exclusions from Federal Labor-Management Relations Programs (Mar. 27, 2025), is unlawful as applied to the Defendants who are heads of agencies with employees represented by the Plaintiff; it is

FURTHER ORDER that the Office of Personnel Management's Guidance on Executive Order Exclusions from Federal Labor-Management Programs (Mar. 27, 2025) ("OPM Guidance"), on the Executive Order is unlawful as applied to the Defendants who are heads of agencies with employees represented by the Plaintiff; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing Section 2 of Executive Order; it is

A59

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing the OPM Guidance; and it is

FURTHER ORDERED that the parties shall meet and confer and file a joint status report on or before May 2, 2025, proposing a schedule for how this case should proceed.

An opinion explaining the Court's reasoning will be issued within the next few days.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4|25|25

## CERTIFICATE OF PARTIES AND AMICI

Pursuant to D.C. Circuit Rule 28(a)(1)(A), the undersigned counsel certifies as follows:

Plaintiff-Appellee is National Treasury Employees Union. Defendants-Appellants are Donald J. Trump; Charles Ezell; Pamela J. Bondi; Robert F. Kennedy, Jr.; Lee M. Zeldin; Christopher A. Wright; Brendan T. Carr; Scott Bessent; Melanie Krause; Margie Rollinson; Timothy E. Gribben; Mary G. Ryan; Rodney E. Hood; and John Raby (all in their official capacities). There are no other parties, intervenors, or amici.

Respectfully submitted,

 */s/ Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
allie.giles@nteu.org

May 23, 2025          Counsel for Plaintiff-Appellee

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, the undersigned counsel hereby certifies as follows:

1. The National Treasury Employees Union (NTEU) is an unincorporated, non-profit professional organization serving as the exclusive bargaining representative of approximately 160,000 employees of the federal government pursuant to 5 U.S.C. §§ 7101-7135.

2. NTEU has no parent companies.

3. No publicly held company has any ownership interest in NTEU.

Respectfully submitted,

*/s/ Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
allie.giles@nteu.org

May 23, 2025                    Counsel for Plaintiff-Appellee

## CERTIFICATE OF SERVICE

I certify that, on May 23, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the appellate CM/ECF system. I further certify that the foregoing document is being served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Allison C. Giles*
ALLISON C. GILES
Assistant Counsel