**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5157**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL TREASURY EMPLOYEES UNION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**RESPONSE TO PLAINTIFF'S
PETITION FOR REHEARING EN BANC**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ....................................................................... 1

STATEMENT ............................................................................ 2

    A.    Statutory And Regulatory Background ................................. 2

    B.    Factual Background ............................................................ 4

    C.    Prior Proceedings .............................................................. 6

ARGUMENT ............................................................................ 9

I.    THIS CASE DOES NOT WARRANT REHEARING ..................................... 10

II.    THE PANEL CORRECTLY DETERMINED THAT THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS ........................................... 11

    A.    NTEU Has Not Demonstrated Irreparable Harm ................ 11

    B.    The Government Is Also Likely To Prevail For Other Reasons ........................................................................... 15

III.    THE EQUITABLE FACTORS FAVOR A STAY ......................................... 20

CONCLUSION ......................................................................... 22

CERTIFICATE OF COMPLIANCE

# GLOSSARY

| | |
|---|---|
| FLRA | Federal Labor Relations Authority |
| FSLMRS | Federal Service Labor-Management Relations Statute |
| NTEU | National Treasury Employees Union |
| OPM | Office of Personnel Management |

## INTRODUCTION

Congress granted the President authority to exclude certain agencies and agency subdivisions from coverage under the Federal Service Labor-Management Relations Statute (FSLMRS) if applying the provisions of that statute to those agencies or subdivisions would be inconsistent with the requirements of national security. Like many Presidents before him, President Trump invoked that authority in a duly issued executive order. A district court preliminarily enjoined implementation of the order, however. A motions panel of this Court stayed the injunction pending appeal, explaining that the government is likely to prevail on appeal because plaintiff National Treasury Employees Union (NTEU) had not demonstrated irreparable harm and the government and public interest would be harmed absent a stay.

NTEU has not shown circumstances that would warrant the extraordinary step of rehearing en banc of the government's stay motion. Although NTEU asserts that the merits issue in this case is of exceptional importance, that issue was not addressed by the Court in granting the stay: The Court addressed only the balance of equities. The Court should allow this appeal to proceed in the ordinary course

before a merits panel that could address the merits of NTEU's claim in the first instance, if necessary to the resolution of the appeal.

The petition for rehearing en banc should be denied.

## STATEMENT

### A.    Statutory And Regulatory Background

Congress enacted the FSLMRS to govern labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135. The statute grants federal employees the right to organize and bargain collectively over conditions of employment. *Id.* §§ 7102(2), 7114.

The FSLMRS also establishes a dedicated mechanism for resolving labor disputes. The Federal Labor Relations Authority (FLRA) is charged with resolving complaints that an agency has engaged in unfair labor practices, such as by refusing to negotiate in good faith or otherwise failing to comply with the provisions of the FSLMRS. 5 U.S.C. §§ 7116, 7118. The FLRA also reviews exceptions to arbitration awards that arise out of any grievance that may include, *inter alia*, a claim of a violation or misinterpretation of any law affecting conditions of employment. *Id.* §§ 7103(a)(9), 7121, 7122. With

certain exceptions, "any final order of the [FLRA]" is subject to judicial review in a court of appeals.  *Id.* § 7123(a).

The FSLMRS exempts several federal agencies from its coverage, including the Federal Bureau of Investigation and Central Intelligence Agency.  5 U.S.C. § 7103(a)(3).  Additionally, the statute provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—
>
> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

*Id.* § 7103(b)(1).

Shortly after enactment of the FSLMRS, President Carter issued an executive order excluding more than 45 agencies or subdivisions from coverage, precluding their employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979).  Those agencies included, *inter alia*, subdivisions of the Library of Congress, Department of Treasury and Internal Revenue Service, Department of Defense, and Department of Energy.  *Id.* § 1-2, 44 Fed. Reg. at 66,565-66,566.  Nearly every President since has issued similar executive

orders altering that list in response to changing circumstances and the evolving responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 12,666, 54 Fed. Reg. 1921 (Jan. 17, 1989).

## B.    Factual Background

In March 2025, President Trump issued another such executive order, determining that certain agencies and subdivisions have "as a primary function intelligence, counterintelligence, investigative, or national security work" and that the FSLMRS "cannot be applied to th[ose] agencies and agency subdivisions in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, §§ 1-2, 90 Fed. Reg. 14,553, 14,553-14,555 (Apr. 3, 2025). The designated agencies include, *inter alia*, the Department of State, Department of Defense, Federal Communications Commission, Environmental Protection Agency, and subdivisions of the Departments of the Treasury, Energy, Justice, and Health and Human Services. *Id.*

The same day, the Office of Personnel Management (OPM) issued guidance to federal agencies regarding the executive order. Ezell,

*Guidance on Executive Order* (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F (OPM Guidance).  OPM explained that "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the FSLMRS and "are no longer required to collectively bargain with Federal unions."  OPM Guidance 3.  OPM advised agencies to "consult with their General Counsels as to how to implement" the executive order.  *Id.*

The OPM guidance also identified several ways in which exclusion from the FSLMRS could improve agency functions.  OPM explained that collective-bargaining agreements "often create procedural impediments to separating poor performers beyond those required by statute or regulation," and that covered agencies and subdivisions would now have a freer hand to "separate employees for unacceptable performance in appropriate cases."  OPM Guidance 3-4.  The guidance also emphasized that covered agencies would be able to "eliminate waste, bloat, and insularity" by conducting reductions in force where appropriate, ordering employees to return to in-person work, and ensuring that agency resources are not diverted for union business.  OPM Guidance 5-6.

Many of the designated agencies and subdivisions have one or more collective-bargaining agreements with employee unions. Several of those agencies filed suits requesting declaratory judgments that they are legally entitled to rescind such agreements in light of Executive Order 14,251. *See* Complaint, *U.S. Dep't of Def. v. AFGE*, No. 6:25-cv-00119 (W.D. Tex. Mar. 27, 2025); Complaint, *U.S. Dep't of Treasury v. NTEU Chapter 73*, No. 2:25-cv-00049 (E.D. Ky. Mar. 28, 2025). On April 8, the Chief Human Capital Officers Council, an interagency forum led by the Director of OPM, shared with the designated agencies a guidance that advises agencies not to "terminate any [collective-bargaining agreements]" or file FLRA petitions to "decertify bargaining units" "until the conclusion of litigation." Dkt. 26-1, at 13.

### C.   Prior Proceedings

**1.** Plaintiff NTEU filed this action against the President, the Acting Director of OPM, and the heads of several agencies designated in Executive Order 14,251. NTEU alleges that the executive order

conflicts with the FSLMRS by designating agencies that do not meet the requirements of 5 U.S.C. § 7103(b)(1).  Dkt. 1, at 27-28.[1]

Plaintiff moved for a preliminary injunction, which the court granted.  Dkt. 32; Dkt. 34 (Op.).  The court first determined that it has jurisdiction over NTEU's claims and that the union does not need to bring its claims through the FLRA review scheme established by the FSLMRS.  Op. 8-13.  On the merits, the court acknowledged that the executive order is entitled to a presumption of regularity, but it opined that NTEU had rebutted that presumption by identifying an ostensible conflict with the statute.  Op. 17-24.  The court then held that the President's determination was *ultra vires* because the government had not shown that the designated agencies perform intelligence, investigative, or national-security work as a "primary" function and because the President had, in the court's view, applied an overly broad interpretation of "national security" when invoking § 7103(b)(1).  Op. 28-33.

_____

[1] NTEU also asserted a First Amendment claim that the district court did not reach.

The court also held that NTEU faced irreparable harm from loss of bargaining power and union dues. Op. 34-40. And it determined that an injunction would serve the public interest by preserving the status quo and furthering the purposes of the FSLMRS. Op. 41-42.

**2.** The government appealed and moved for an emergency stay pending appeal. This Court granted that motion. Order, May 16, 2025 (Stay Order).

The Court determined that the government is likely to prevail on appeal because NTEU failed to establish irreparable harm. Stay Order 1-2. The Court explained that the union's assertion that it would "lose bargaining power and suffer reputational harm that will deter present and future membership" was "speculative" because such harms "would materialize only *after* an agency terminates a collective-bargaining agreement, and the Government directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes." Stay Order 2. NTEU also would not suffer irreparable financial injury from the loss of automatically withheld union dues, the Court explained, because the union can seek to recover missing dues in subsequent FLRA

proceedings if it ultimately prevails in this litigation.  Stay Order 2-3.

The union will also "continue collecting dues from some 54,000

employees who are not covered by the Executive Order" and can collect

dues directly even from those union members who are covered by the

order.  Stay Order 3.

The Court further held that the preliminary injunction "inflicts

irreparable harm on the President by impeding his national-security

prerogatives, which were explicitly recognized by Congress," and by

"transfer[ring] … control[] from the Executive to the Judiciary."  Stay

Order 3-4.  Preserving the President's autonomy in a matter requiring

the exercise of his national-security expertise is also "within the public

interest."  Stay Order 4.

## ARGUMENT

NTEU has failed to identify any circumstances that could justify

the extraordinary step of rehearing en banc of the government's stay

motion.  Rehearing is further unwarranted because the motions panel

correctly granted the stay.

# I. THIS CASE DOES NOT WARRANT REHEARING

Petitions for rehearing en banc are "not favored," "rarely granted," and "ordinarily will be allowed only if" the panel decision conflicts with a prior decision of this Court, the Supreme Court, or another court of appeals or involves a question of exceptional importance. *D.C. Circuit Handbook of Practice and Internal Procedures* 58 (2024). En banc review of a motion for a stay pending appeal is even more rare.

NTEU does not contend that the Court's stay order conflicts with any other appellate or Supreme Court decision. NTEU asserts (Pet. 1) that the case presents a question of exceptional importance concerning the scope of the President's statutory authority, but the Court did not address that question in granting the stay. The stay order addresses only the balance of equities: whether NTEU demonstrated irreparable harm entitling it to a preliminary injunction, and whether the government demonstrated harm warranting a stay. To the extent they need to be addressed in this appeal at all, the merits of NTEU's statutory claim were left to the merits panel. And even if the en banc Court were to rehear the stay motion, it would be highly irregular in that posture to definitively address the merits question that NTEU

10

submits is of exceptional importance.  The ordinary criteria for rehearing en banc are thus not presented here.

Nor are there any other exceptional circumstances that could warrant rehearing.  NTEU contends that the motions panel misunderstood the factual record, but NTEU can present any such argument to the merits panel.  And NTEU has not plausibly contended that, absent rehearing of the stay motion, the Court would somehow be presented from fully considering the merits presented in this appeal in the ordinary course.

## II.    THE PANEL CORRECTLY DETERMINED THAT THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

### A.    NTEU Has Not Demonstrated Irreparable Harm

The Court's stay order correctly explained that NTEU "failed to establish irreparable harm," and "[t]hat is a sufficient basis for vacating [the] preliminary injunction."  Stay Order 1-2.

**1.**  The Court first properly rejected NTEU's assertion that it will lose bargaining power and suffer reputational harm, explaining that such harms are speculative, at least before an agency terminates a collective-bargaining agreement.  Stay Order 2.  Indeed, it is speculative to think that employees—whose membership is purely

voluntary regardless of the executive order—will leave the union even before their bargaining unit has been decertified and while this litigation is ongoing, and just as speculative to think that the loss of some number of members would materially weaken NTEU's bargaining position. Other courts have similarly held that a union's concern "that its members will lose confidence in the union" absent immediate relief "is too speculative to justify a preliminary injunction." *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005). A union "is free to explain the difficulties of litigation to its members if they ask why more is not being done sooner," and "if some members' confidence is shaken, the chance that vindication of the union at trial would not restore that confidence is too speculative to justify a preliminary injunction." *Id.*; *see also, e.g.*, *Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 440 (4th Cir. 2018) (rejecting the "theory that interim relief is necessary to prevent the Union from losing employee support").[2]

---

[2] Plaintiff relies (Pet. 16) on *NTEU v. Chertoff*, 452 F.3d 839, 853 (D.C. Cir. 2006), but that case held only that a union had Article III standing to challenge a regulation that diminished its bargaining position; the Court did not address whether the union would suffer irreparable harm warranting a preliminary injunction.

Furthermore, if NTEU ultimately prevails in this litigation and its status as an exclusive bargaining representative is reaffirmed, NTEU has identified no reason that employees who may have left the union would not rejoin. NTEU thus cannot demonstrate that any ostensible harm would be lasting or irreparable.

Nor would NTEU suffer irreparable harm from any agency's refusal to negotiate over changes to employment conditions during the pendency of litigation. If NTEU prevails and the executive order is invalidated, the FLRA could direct agencies not to implement the executive order and impose a retroactive remedy—including with regard to reductions in force. *See Department of the Navy*, 36 F.L.R.A. 509, 511 (1990) ("Where an agency violates the [FSLMRS] by changing a negotiable condition of employment without fulfilling its obligation to bargain on that change, the Statute requires the imposition of a status quo ante remedy, in the absence of special circumstances.").

Contrary to NTEU's assertion (Pet. 11-15), the Court's stay order is not premised on a factual misunderstanding. The Court recognized that agencies were no longer complying with certain terms of the collective-bargaining agreements. *See* Stay Order 2 (recognizing that

agencies are no longer withholding union dues from employees'
paychecks). But as just discussed, the FLRA can issue relief that
remedies any harm stemming from such noncompliance. NTEU's
remedy is through the grievance procedures set out in the collective-
bargaining agreements and the FLRA, not by seeking a preliminary
injunction in district court. *See AFGE v. Trump*, 929 F.3d 748, 757-758
(D.C. Cir. 2019) (union had administrative options to challenge
executive orders before the FLRA, and the FLRA could grant effective
relief by directing agencies not to implement various provisions of
executive orders).

    **2.** The Court also correctly rejected NTEU's assertion that it will
suffer irreparable monetary harm because the union can recover
missing dues in subsequent FLRA proceedings. Stay Order 2-3. It is
speculative to think that NTEU will suffer a significant financial injury
in the interim given that it "will continue collecting dues from some
54,000 employees who are not covered by the Executive Order." Stay
Order 3. And although agencies are no longer withholding dues from
the paychecks of employees who are covered, NTEU can collect dues
directly from such members. *Id.* "[T]hat is, after all, how most other

voluntary membership organizations collect dues." *Id.* NTEU fails to explain why an alternative method of dues collection would be inadequate. Plaintiff thus failed to put forward evidence to show that a temporary loss of revenue threatens its existence, and the "[b]are allegations" of NTEU's officers on that score fail to substantiate the claim that "harm will *in fact* occur." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

## B. The Government Is Also Likely To Prevail For Other Reasons

Although the Court did not reach the issue in the stay order, the government is also likely to prevail on the merits of this appeal for additional reasons.

**1.** As the government explained in its stay motion, the district court lacks jurisdiction over this action. This Court has recognized that the FSLMRS "'provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims.'" *AFGE*, 929 F.3d at 755. Plaintiff's claim of interference with collective-bargaining rights is precisely the type of claim subject to that administrative review scheme. Plaintiff must therefore channel its dispute before the FLRA in the form

of an unfair-labor-practice charge or grievance. *See* 5 U.S.C. §§ 7116(a), 7118, 7121. Alternatively, plaintiff could challenge the validity of the executive order by opposing the dismissal of a pending case involving a now-excluded agency; an FLRA decision finding the executive order valid and thus dismissing for lack of jurisdiction would be subject to judicial review in the court of appeals, *see id.* § 7123(a).

The district court predicted that had NTEU sought relief from the FLRA, the FLRA would have dismissed for lack of jurisdiction in light of the executive order. *See* Op. 10-12. But the district court cited no FLRA decision holding that it cannot consider a union's challenge to the validity of a presidential exclusion determination; in the cited cases, the FLRA dismissed claims for lack of jurisdiction because the exclusion determination was uncontested. Moreover, even if the FLRA were to conclude that it lacked jurisdiction over NTEU's claim, a circuit court could review that jurisdictional ruling, effectively bringing up the merits. *See AFGE*, 929 F.3d at 758-759 ("[W]e may review the unions' broad statutory and constitutional claims on appeal from an FLRA proceeding even if the FLRA cannot.").

**2.** Even if the district court has jurisdiction, the government is likely to prevail on the merits of plaintiff's non-statutory, or *ultra vires*, claim underlying the preliminary injunction. That claim requires NTEU to show that Executive Order 14,251 "violated a specific prohibition in the statute that is clear and mandatory, was obviously beyond the terms of the statute, or was far outside the scope of the task that Congress gave" the President. *North Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations and quotation marks omitted). NTEU cannot possibly show that the President's exercise of his statutorily delegated discretion contravened any "'specific and unambiguous statutory directive.'" *Federal Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022).

The FSLMRS vests in the President discretion to make exclusions based on his national-security determinations. *See* 5 U.S.C. § 7103(b). The relevant provision "fairly exudes deference" to the President "and appears … to foreclose the application of any meaningful judicial standard of review." *Webster v. Doe*, 486 U.S. 592, 600 (1988); *see AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989) ("Section 7103(b)(1) makes clear that the President may exclude an agency from the

[FSLMRS]'s coverage whenever he 'determines' that the conditions statutorily specified exist.").

Accordingly, in *AFGE v. Reagan*, this Court rejected an argument that "courts are the instrumentalities for ensuring that the [§ 7103(b)(1)] authority is properly exercised." 870 F.2d at 726. A bare determination by the President is sufficient to invoke that authority, and there is no requirement that the President issue written findings supporting his national-security determination. *Id.* at 726-728. In light of the presumption of regularity, the Court refused to entertain "an unwarranted assumption that the President was indifferent to the purposes and requirements of the [FSLMRS], or acted deliberately in contravention of them." *Id.* at 728.

This Court thus properly recognized the extent of the discretion statutorily vested in the President and, correspondingly, the limited role for judicial review. After all, "[s]hort of permitting cross-examination of the [President] concerning his views of the Nation's security" and whether granting employees in the relevant agencies coverage under the provisions of the FSLMRS is "inimical to those interests"—a procedure that would plainly be improper—there is "no

basis on which a reviewing court could properly assess" a President's

exclusion decision. *Webster*, 486 U.S. at 600.

If any role for judicial review remains, it must be limited to

circumstances involving a "strong showing of bad faith or improper

behavior." *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978).  No

such showing was made here.  The district court believed that the scope

of the executive order is inconsistent with Congress's finding that "labor

organizations and collective bargaining in the civil service are in the

public interest."  Op. 18-19 (quoting 5 U.S.C. § 7101(a)).  But the

FSLMRS's "[e]xceptions and exemptions are no less part of Congress's

work than its rules and standards." *BP P.L.C. v. Mayor & City Council

of Balt.*, 593 U.S. 230, 239 (2021).  By permitting the President to

exclude agencies from the FSLMRS's coverage where collective

bargaining is inconsistent with national-security requirements,

Congress recognized that this is an "area[] fraught with competing

social demands where … trade-offs are required." *Id.*  The court erred

in construing the executive order as a *violation* of the statute rather

than as *respecting* the competing priorities that it balances.

The district court further erred by second-guessing the President's decision about how agencies must be operated so that employees can best perform their national-security work—a decision that Congress entrusted to the President. Congress may have thought inefficiencies are tolerable in certain circumstances as the price for allowing federal employees to organize, but Congress made clear that labor interests cannot be allowed to undermine national security. The President reasonably concluded that in the designated agencies, such as the Department of Defense, removing procedural impediments to separating poor performers or optimizing the efficiency of an agency through restructuring—even when that involves layoffs—is a national-security imperative. *Contra* Op. 23. The district court should not have overridden the President's judgment in this area. *Cf. Trump v. Hawaii*, 585 U.S. 667, 704 (2018) ("'[W]hen it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'").

## III. THE EQUITABLE FACTORS FAVOR A STAY

As the Court held in granting stay, allowing the injunction to take effect would "inflict[] irreparable harm on the President by

impeding his national-security prerogatives, which were explicitly recognized by Congress." Stay Order 3. The injunction "eliminates the President's control over the decision" whether to implement the executive order or wait until the conclusion of litigation and, "by consequence, his flexibility to respond to future developments." Stay Order 4. The preliminary injunction thus "ties the government's hands" and effects a "transfer of control, from the Executive to the Judiciary … in the national security context." *Id.* Such interference harms not only the government, but the public interest generally.

NTEU argues that the injunction would maintain decades-long practice, but Congress gave the President discretion to exclude agencies from the FSLMRS without any fetters on his ability to respond to evolving national-security demands. Nor did Congress tie a President's hands in evaluating changes in how collective-bargaining requirements affect the functioning of agencies engaged in intelligence, investigative, and national-security functions, even when that evaluation differs from his predecessors'. Courts should not interfere with the discretion granted to the President by second-guessing his national-security determination on the basis that it constitutes a change from previous

practice. This Court should decline to disturb the panel's decision to stay an injunction that would effectively require this President to abide by the national-security determinations of the prior administration.

## CONCLUSION

The Court should deny the petition for rehearing en banc.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MELISSA N. PATTERSON

*/s/ Joshua M. Koppel*
JOSHUA M. KOPPEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4820*
*joshua.m.koppel@usdoj.gov*

June 2025

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 40(d)(2) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Rule 40(d)(3)-(4) because it contains 3,899 words, according to Microsoft Word.

*/s/ Joshua M. Koppel*
Joshua M. Koppel