

## NTEU
### National Treasury Employees Union

July 2, 2025

**VIA CM/ECF**

Clifton Cislak
Clerk of Court
U.S. Court of Appeals for the District of Columbia Circuit
333 Constitution Ave. N.W.
Washington, D.C. 20001

**Re:  *National Treasury Employees Union v. Trump*, No. 25-5157 (petition for rehearing en banc pending)**

Dear Mr. Cislak:

Pursuant to Rule 28(j), Appellee National Treasury Employees Union (NTEU) writes to inform the Court that the government has taken a position and provided supporting evidence in another federal court that that is highly relevant to NTEU's pending petition for rehearing en banc. The government's submission confirms that the divided motions panel decision at issue was based on a factual misunderstanding.

The linchpin of the panel majority's analysis was that federal agencies were not even implementing the Executive Order at issue when the district court enjoined its implementation. *See* slip op. at 2 (stating that "the Government directed agencies to *refrain* from terminating collective-bargaining agreements . . . until after the litigation concludes"), 2 n.3 ("To be clear, if a specific agency or subagency deviates from that self-imposed rule, individual units may seek injunctive relief appropriately tailored to any nonspeculative, irreparable harm."), 4 (relying on "the Government's self-imposed restrictions"). That led the panel majority to stay the district court's emergency relief based strictly on an equities analysis. *Id.* at 2 n.1.

In a Northern District of California litigation involving the same Executive Order, the government now submits that many of the federal agency defendants in NTEU's litigation (*e.g.*, the Departments of

Treasury, Health and Human Services, and Justice) *are* implementing the Executive Order. *See* Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal at 5-6, *AFGE, et al., v. Trump, et al.*, No. 3:25-cv-03070 (N.D. Cal. July 1, 2025). Indeed, the government argues that these agencies would be injured if they had to unwind their extensive compliance efforts. *Id.* at 6. The government provides supporting declarations from each agency defendant.

There is now a direct conflict between the factual underpinning of the panel majority's ruling and the positions and supporting evidence of each party (and the district court's factual findings). Given the exceptionally high stakes of this litigation for federal sector labor unions, rehearing en banc is warranted.

Sincerely,

/s/ Paras N. Shah

Paras N. Shah
Deputy General Counsel

cc: All counsel of record (via CM/ECF)

BRETT A. SHUMATE
    Assistant Attorney General
YAAKOV M. ROTH
    Principal Deputy Assistant Attorney General
EMILY M. HALL
TYLER J. BECKER
    Counsel to the Assistant Attorney General, Civil Division
ERIC HAMILTON
    Deputy Assistant Attorney General
ALEXANDER K. HAAS
    Director
JACQUELINE COLEMAN SNEAD
    Assistant Branch Director
LISA ZEIDNER MARCUS
    Senior Counsel
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
SYED AHMAD
    Trial Attorneys
    U.S. Department of Justice, Civil Division
    Federal Programs Branch
    1100 L St., NW, Twelfth Floor
    Washington, DC 20530
    Tel: (202) 353-5652
    Fax: (202) 616-8470
    Email: Lydia.Jines@usdoj.gov

Counsel for Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Case No. 3:25-cv-03070-JD<br><br>**Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal**<br><br>Judge: Hon. James Donato |

By Order re Preliminary Injunction dated June 24, 2025, ECF No. 60, this Court enjoined Defendants from implementing or enforcing Section 2 of Executive Order 14,251 against Plaintiffs or

1  their members notwithstanding the President's determination pursuant to 5 U.S.C. § 7103(b)(1) that

2  agencies and agency subdivisions that employ those members have as a primary function intelligence,

3  counterintelligence, investigative, or national security work, and that Chapter 71 of title 5, United States

4  Code, cannot be applied to those government components consistent with national security requirements

5  and considerations.  Exec. Order No. 14,251 § 1, 90 Fed. Reg. 14553, 14554 (Apr. 3, 2025); 5 U.S.C.

6  § 7103(b)(1).

7        Defendants have appealed that decision, ECF No. 61, and now move for an emergency stay

8  pending appeal pursuant to Federal Rule of Civil Procedure 62.  This motion should be granted because

9  Defendants can show a likelihood of success on the merits, irreparable injury in the absence of a stay, and

10  that a stay is in the public interest and will not injure Plaintiffs.  *Nken v. Holder*, 556 U.S. 418, 426 (2009).[1]

11                                        **ARGUMENT**

12  **I.    The Government is Likely to Succeed on Appeal**

13        This Court lacks jurisdiction over Plaintiffs' claims because Congress has expressly channeled

14  their claims to the Federal Labor Relations Authority (FLRA) under the Federal Service Labor-

15  Management Relations Statute (FSLMRS), enacted as Title VII of the Civil Service Reform Act.  As the

16  Ninth Circuit has recognized:

17        At no point does the Act entitle a party to petition a district court for relief.  Given the
        broad purpose of the Act to meet the special requirements of government, the leadership
18        role of the Authority, and the limited role of the judiciary in this statutory scheme, it is
        manifestly the expressed desire of Congress to create an exclusive statutory scheme.
19

20  *Columbia Power Trades Council v. U.S. Dep't of Energy*, 671 F.2d 325, 327 (9th Cir. 1982) (footnotes

21  omitted); *see also AFGE, Nat'l Council of HUD Locs. Council 222, AFL-CIO v. FLRA*, 99 F.4th 585, 593

22  (D.C. Cir. 2024) (identifying an "unbroken line of circuit precedent dealing with § 7123(a)" that has

23  consistently held that district courts lack jurisdiction over FSLMRS disputes).  And the Supreme Court

24  previously held that whether a claim is precluded under the Civil Service Reform Act does not "turn on

25  its constitutional nature . . . but rather on the type of the employee and the challenged employment action."

26

27  ─────────────────
   [1] In the Ninth Circuit, when a high degree of irreparable harm to the movant is shown, the movant is
28  required to show only "serious legal questions going to the merits" to obtain a stay.  *Manrique v. Kolc*,
   65 F.4th 1037, 1041 (9th Cir. 2023) (internal quotations omitted).

1    *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012).  Thus, Plaintiffs cannot escape the FSLMRS's exclusive

2    review scheme by framing their arguments in First Amendment terms.  Plaintiffs can still receive

3    meaningful judicial review of their claims by bringing them before the FLRA in the first instance, followed

4    by an appeal in the appropriate circuit court.

5         Contrary to this binding Supreme Court and Ninth Circuit precedent, this Court found that it had

6    jurisdiction because in its view Plaintiffs' members "are no longer covered by the statute, and they cannot

7    bring claims over which Congress granted the FLRA authority."  ECF No. 60 at 15.  Congress created a

8    special administrative review scheme that this Court must respect.  Accordingly, Plaintiffs must bring

9    their claims before the FLRA.  The Court expressed concern that "[t]he FLRA itself is of the view that it

10   does not have authority to hear claims brought in connection with agencies excluded from Chapter 71

11   coverage."  *Id.*  But the FLRA has not been presented with the claims here.  Even if the FLRA were to

12   conclude that it lacked jurisdiction, however, a court of appeals could review the merits of Plaintiffs'

13   statutory and constitutional challenge.  *See AFGE v. Trump*, 929 F.3d 748, 758-59 (D.C. Cir. 2019) ("[W]e

14   may review the unions' broad statutory and constitutional claims on appeal from an FLRA proceeding

15   even if the FLRA cannot.");  5 U.S.C. § 7123(a).

16        Even assuming jurisdiction, Defendants are likely to succeed on the merits of their appeal.  This

17   Court concluded that "plaintiffs have demonstrated a serious question under the First Amendment that

18   warrants preserving the status quo pending further litigation," ECF No. 60 at 22, but in reaching that

19   conclusion, the Court improperly disregarded the national-security determinations that appear on the face

20   of the President's Executive Order.  *See Trump v. Hawaii*, 585 U.S. 667, 704 (2018); *AFGE v. Reagan*,

21   870 F.2d 723, 727 (D.C. Cir. 1989).  The Court also neglected to consider whether the President would

22   have issued the Executive Order regardless of the alleged retaliatory motive, as Supreme Court and Ninth

23   Circuit precedent require.  *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022); *Mt. Healthy*

24   *City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Boquist v. Courtney*, 32 F.4th 764, 775

25   (9th Cir. 2022).

26        Plaintiffs' and this Court's focus on the White House Press Office Fact Sheet's reference to union

27   efforts to impede the President's agenda, ECF No. 60 at 19-20, ignored the broader message of that

28   document as well as Section 7103(b)(1)(B)'s clear purpose to allow the President to consider such

3

1  impediments.  As the Fact Sheet explains at length, the President signed Executive Order 14,251 in service

2  of two of his top policy priorities: protecting Americans from threats to our national security and

3  improving the efficiency and efficacy of the federal workforce.  The Fact Sheet goes on to enumerate the

4  myriad ways the Executive Order will help protect the national security, including through the "National

5  Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness,

6  Prevention, and Response," "Cybersecurity," "Economic Defense," and "Public Safety."  *See* Fact Sheet:

7  President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective

8  Bargaining Requirements at 1–2 (Mar. 27, 2025), https://perma.cc/W93G-Z889.  Section 7103(b)(1)(B)

9  is itself a recognition by Congress that union activity can impede agency operations and that, when such

10  activity impacts national security considerations, the President can act to restrict it by exempting agencies

11  or subdivisions that have investigative, intelligence, or national security work as a primary function from

12  the Act's coverage.

13      For these reasons, the Government is likely to prevail on the merits of its appeal.

14  **II.  The Remaining Factors Favor a Stay.**

15      The remaining factors (whether Defendants will be irreparably harmed absent a stay; whether

16  issuance of the stay will substantially injure the other parties interested in the proceeding; and where the

17  public interest lies) all favor a stay.

18      **A.  Defendants and the Public Will Be Harmed Absent a Stay.**

19      The injunction impinges on Defendants' ability to redirect their employees to mission-oriented

20  work that advances national security.  Further, the injunction undermines Executive Branch constitutional

21  governance, U.S. Const. art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United

22  States"), and irreparably undermines the President's authority to "prescribe regulations for the conduct of

23  employees in the executive branch." 5 U.S.C. § 7301.  That encroachment on the President's prerogatives

24  is especially intolerable in the national-security context, where the President must be able to act swiftly

25  and decisively.  *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)

26  ("executive decisions" in the national-security realm require "delicate, complex" assessments and rapid

27  responses from agencies and employees).  In actions involving the same Executive Order challenged here,

28  the D.C. Circuit twice has recognized such intolerability in a district court's preliminary injunction of this

Order: "[t]he district court's preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress." *AFSA v. Trump*, No. 25-1020, slip op. at 5 (D.C. Cir. June 20, 2025) (per curiam) (staying preliminary injunction of Section 3 of the Executive Order); *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025) (staying preliminary injunction of Section 2 of the Executive Order).[2] *Cf. Newsom v. Trump*, No. 25-3727, __ F.4th __, 2025 WL 1712930, at *14 (9th Cir. 2025) (granting Defendants' emergency motion to stay the TRO pending appeal because "irreparable harm and the public interest weigh in favor of Defendants"). So too should this Court.

That result is further compelled here because this Court's injunction is a mandatory injunction, that changes the status quo, not maintains it. "'Mandatory preliminary relief . . . is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.'" *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979); *see also Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*, 571 F.3d 873, 879 (9th Cir. 2009) ("In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'") (quoting *Anderson*, 612 F.2d at 1115). Defendant agencies already have taken steps, short of termination of their collective bargaining agreements (CBAs) with Plaintiffs, to implement the President's Executive Order. *See* Exhibit 1 (table describing those steps taken by agencies); Declaration of Carmen Garcia-Whiteside ¶ 4 (Office of Personnel Management); Declaration of Lew Olowski ¶ 4 (Department of State); Declaration of Sheila D. Wright ¶ 4 (Agency for International Development); Declaration of Michael A. Cogar ¶ 4 (Department of Defense); Declaration of John Brown ¶ 5 (Department of Treasury); Declaration of Mark Engelbaum ¶ 4 (Department of Veterans Affairs); Declaration of Matthew E. Hirt ¶ 4 (Department of Justice); Declaration of Christina V. Ballance ¶ 5 (Department of Health and Human Services); Declaration of Kika Scott ¶ 4 (U.S. Customs and Immigration Services); Declaration of Kathryn Jones ¶ 4 (Coast Guard); Declaration of Meir Braunstein ¶ 5 (Immigration and Customs Enforcement); Declaration of Stephanie M. Holmes ¶ 10 (Department of the Interior); Declaration of Reesha Trznadel ¶ 4 (Department of Energy);

---

[2] The court is still considering Plaintiff's request for en banc review.

1    Declaration of Bryan Knowles ¶ 4 (Department of Agriculture); Declaration of Michael Molina ¶ 4

2    (Environmental Protection Agency); Declaration of Micah Cheatham ¶ 6 (National Science Foundation);

3    Declaration of Katie A. Higginbothom ¶ 4 (United States International Trade Commission); Declaration

4    of Arron Helm ¶ 4 (General Services Administration); Declaration of Michael Russo ¶ 4 (Social Security

5    Administration); Declaration of Kimberly Amaya ¶ 4 (Department of Labor); Declaration of Lori A.

6    Michalski ¶ 5 (Department of Housing and Urban Development); Declaration of DeShawn Shepard ¶ 5

7    (Department of Transportation); Declaration of Jacqueline Clay ¶ 4 (Department of Education).

8         This Court's order thus requires Defendant agencies to return their workplaces to their pre-

9    Executive Order status, which itself is injurious and costly to Defendant agencies.  *See, e.g.,* Hirt Decl.

10   ¶ 6(b) (describing "irreparable harm" because of preliminary injunction's impact on DOJ's "planned

11   reorganizations within the litigating divisions, as well as the immediate need to move employees and work

12   from one division to another in order to support the overall national security mission of the DOJ");

13   Olowski Decl. ¶ 6 (describing preliminary injunction's risk of "wast[ing] significant taxpayer resources

14   and, especially, time."); Amaya Decl. ¶ 6(c) (explaining that the "return to one of the two AFGE

15   bargaining units for the approximately 320 OCIO affected employees will require about a month of

16   significant, mostly administrative manpower effort across numerous divisions").  As demonstrated in the

17   record, Defendant agencies will be injured if they cannot comply with the President's Executive Order.

18   *See* Braunstein Decl. ¶ 6(b) (describing how the preliminary injunction, which requires ICE to comply

19   with certain CBAs, will restrict ICE's ability to respond to changed circumstances).  *See also* Defs.' Opp'n

20   to Pls.' Ex Parte Mot. for Prelim. Inj. & Order to Show Cause 15-22, ECF No. 44.

21        When the government is a party, the Court's analysis of the public interest and the equities merge.

22   *Nken*, 556 U.S. at 435.  For similar reasons, the last two factors favor a stay pending appeal.  While this

23   Court recognized that "labor organizations and collective bargaining in the civil service are in the public

24   interest[,]" ECF No. 60 at 26 (quoting 5 U.S.C. § 7101(a)), this Court's preliminary injunction constitutes

25   an extraordinary intrusion into the President's statutory authority to determine whether agencies with a

26   primary intelligence, investigative, or national security function should be excluded from coverage under

27   Chapter 71.  National security is a greater public interest than the right of labor organizations.

28

Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal   3:25-cv-03070-JD

**B.**     **Plaintiffs Will Not Be Harmed by a Stay.**

The Court's conclusion that "Plaintiffs have shown that they are likely to suffer irreparable harm in the absence of an injunction[,]" ECF No. 60 at 25, due to lost union dues is belied where, as here, the Plaintiffs could seek to recover missing dues in subsequent FLRA proceedings if they ultimately prevail in this litigation.  *U.S. Dep't of Def., Ohio Nat'l Guard*, 71 F.L.R.A. 829, 830 (2020).  And in the interim, Plaintiffs can continue to directly solicit and collect dues from their members, which "is, after all, how most other voluntary membership organizations collect dues."  *NTEU*, 2025 WL 1441563, at *2. Plaintiffs' asserted harm regarding loss of bargaining rights is similarly speculative because such loss "would materialize only *after* an agency terminates a collective-bargaining agreement, and the Government directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes."  *Id.* at *1 (emphasis in original; citations omitted).  None of Defendant agencies (except one agency immediately after the issuance of the Executive Order and before issuance of OPM's guidance) has terminated their CBAs with Plaintiffs.  *See* Exhibit 1. And, in any event, any harm to Plaintiffs is substantially outweighed by the harm to the government and to the public.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).

## CONCLUSION

For the foregoing reasons, this Court should enter a stay pending appeal.  In the absence of relief from this Court, Defendants intend to seek a stay pending appeal from the Ninth Circuit shortly.


DATED:  July 1, 2025                         Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General

                                             YAAKOV M. ROTH
                                             Principal Deputy Assistant Attorney General

                                             EMILY M. HALL
                                             TYLER J. BECKER
                                             Counsel to the Assistant Attorney General
                                             Civil Division

                                             ERIC HAMILTON
                                             Deputy Assistant Attorney General
                                             Civil Division, Federal Programs Branch

1

2

ALEXANDER K. HAAS
Director
Civil Division, Federal Programs Branch

3

4

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

5

6

7

8

9

10

11

12

 */s/ Lydia J. Jines*
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
SYED AHMAD
Trial Attorneys
LISA ZEIDNER MARCUS
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St., NW, Twelfth Floor
Washington, DC 20530
Tel: (202) 353-5652
Fax: (202) 616-8470
Email: Lydia.Jines@usdoj.gov

13

*Counsel for Defendants*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Actions taken to implement EO 14251 as of June 24, 2025 (before Preliminary Injunction)

| | Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|---|
| OPM | Yes, for the following organizations in OPM: OCIO, HCDMM, and OESPIM[1] | No.[2] | Yes, for the following organizations: OCIO, HCDMM, and OESPIM | Not applicable. Employees who used official time in the affected organizations have separated from OPM. | Not applicable. No matters related to these organizations have been elevated to the FLRA. | Not applicable. There are no pending grievances or arbitrations involving employees from the affected organizations. | No. CBA provisions on agency space and equipment remain in place as applicable to OPM organizations not affected by EO 14, 251 |
| State | Yes | Yes | Yes | Yes | Held in abeyance | Yes | Yes |
| USAID | No | No | Yes | No | No | No (currently in arbitration) | No. but AFGE has no office space due to termination of the office lease. |
| DoD | No | No | Yes | Yes, but varies by component | The FLRA has held proceedings in abeyance | Have been in abeyance/requested an abeyance | Some had, but most had not |
| Treasury (U.S. Mint) | No | No | No | No | No | No | No |
| VA | No | No, except one agreement terminated not pursuant to the EO | Yes | No | No, but is requesting matters be held in abeyance | No, but is requesting matters be held in abeyance | No |

---

[1] Office of the Chief Information ("OCIO"), Human Capital Data Management and Modernization ("HCDMM"), and Office of the Executive Secretariat and Privacy and Information Management ("OESPIM"). Ex. 2 ¶ 4.

[2] OPM informed unions representing OCIO, HCDMM, and OESPIM employees on April 3, 2025 that the CBA no longer applied to them, but the CBA has not been cancelled. Ex. 2 ¶ 4.

Actions taken to implement EO 14251 as of June 24, 2025 (before Preliminary Injunction)

| | Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|---|
| DOJ | No | No | Yes | Not eliminated in full, but has denied official time | No, requested abeyance | No | No, although, the national counsel representing the Bureau of Prison bargaining unit is no longer allowed space in the DC office |
| HHS | Yes | No | Yes | Eliminated approved official time but made no reassignments. | N/A – no current proceedings | Yes | No |
| USCIS | No | No | Yes[3] | No | No | Held in abeyance[4] | Yes |
| USCG | No | No | Yes, but varies | Yes, Firefighters and AFGE Council leadership supporting eligible employees remain eligible to use official time | No | Held in abeyance. | No |
| ICE | No | No | No (however NFC paused them for 2 pay periods) | No | No | No[5] | No |

---

[3] On or about May 7, 2025, USCIS received notice that NFC would be reinstituting dues deduction.  USCIS is awaiting confirmation that this action has been implemented.  Ex. 10 ¶ 4.

[4] USCIS has participated in a single arbitration that was pending prior to the issuance of EO 14251.  Ex. 10 ¶ 4.

[5] *See* Ex. 12 ¶ 5 (explaining more comprehensively ICE's approach to grievances and arbitrations).

Exhibit 1 to Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal    3:25-cv-3070-JD

Actions taken to implement EO 14251 as of June 24, 2025 (before Preliminary Injunction)

| | Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|---|
| DOI | No | No | Yes | No | DOI has not refused to participate in FLRA matters for the Plaintiff unions. FLRA has granted abeyances for matters impacted by the EO 14,251 | DOI has participated in the grievance process by denying grievances excluded under the EO and proceeded with grievances allowed under the EO. DOI has also received abeyances of arbitrations. | No |
| Energy | No, but we have not been engaging with the unions | No | No, but we are not processing any new dues deduction enrollments | No | No pending matters | No, but has held them in abeyance while litigation is pending | No |
| USDA | No (except for a brief period) | No (except for a brief period) | Yes, except for a brief period | Eliminated official time but made no reassignments. | No, held in abeyance. | No, held in abeyance. | No. |
| EPA | No | No | Yes | No | No | No | No |
| NSF | No | No | Yes | Yes as to official time, no as to reassignments | No | Yes | Yes, reclaimed space |
| USITC | No | No | Yes | No | N/a—no cases pending before the FLRA | Yes | No |
| GSA | No | No, GSA previously terminated its CBA on April 1 but rescinded such termination on April 25 | Yes | Yes | No, they are held in abeyance | All pending national grievances held in abeyance; no arbitrations | Yes |

Exhibit 1 to Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal    3:25-cv-3070-JD

Actions taken to implement EO 14251 as of June 24, 2025 (before Preliminary Injunction)

| | Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|---|
| SSA | No | No | Yes | Eliminated approved official time and made one reassignment. | No | No, held in abeyance. | No |
| DOL | No | No | Yes, only for the excluded employees | No | No | No | No |
| HUD | No | No | Yes, for OCIO employee only | No | No | No | No |
| DOT | No[6] | No | Yes | No | No | No | No |
| ED | No | No | No | No | No | No | No |

---

[6] On Monday March 31, 2025, the Office of the Secretary of Transportation ("OST") provided a preliminary notice to AFGE, that it would no longer recognize the Union as the exclusive representative for its OCIO employees and that the CBA provision that identifies the OCIO as part of the bargaining unit was void. However, no further action has been taken to remove OST OCIO employees from the bargaining unit, and no employee's bargaining unit status was changed in the system. Ex. 23 ¶ 5.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,

        Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

        Defendants.

Case No. 3:25-cv-03070-JD

**Declaration of Carmen Garcia-Whiteside as part
of Defendants' Emergency Motion to Stay the
Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, Carmen Garcia-Whiteside, declare as follows:

1.     I am currently employed by the United States Office of Personnel Management ("OPM"), as the Chief Human Capital Officer, and have been employed in this role since December 2022. I report to the OPM Director. I have been employed at OPM since 2009. In my current role, I oversee, among other things, OPM's Office of the Chief Human Capital Officer ("OCHCO"). In addition to leading the operational human resources function for the agency, I also lead the development and implementation of the agency's corporate human resources strategy, policy, and solutions to workforce management challenges.

2.     I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration as part of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal. I make this declaration based on my personal knowledge and information provided to me in the course of performing my duties, including information provided by employees within OCHCO, OPM's Human Resources ("HR") department. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.     I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Section 2 of the Executive Order excludes the following agencies or subdivisions of OPM from coverage under Chapter 71 of Title 5, United States Code: Office

of the Chief Information Officer.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.    The following information regarding OPM is correct and accurately reflects actions OPM took to implement Executive Order 14,251 prior to the June 24, 2025, issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| Yes, for the following organizations in OPM: OCIO, HCDMM, and OESPIM[1] | No.[2] | Yes, for the following organizations: OCIO, HCDMM, and OESPIM | Not applicable. Employees who used official time in the affected organizations have separated from OPM. | Not applicable. No matters related to these organizations have been elevated to the FLRA. | Not applicable. There are no pending grievances or arbitrations involving employees from the affected organizations. | No. CBA provisions on agency space and equipment remain in place as applicable to OPM organizations not affected by EO 14, 251 |

5.    OPM will suffer the following harms if forced to continue to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)    The confusion and uncertainty caused by this change will harm both OPM and the employees previously represented by the union.  OPM had already stopped the collection of dues and removed the union as exclusive representatives of these employees.  OPM will experience an administrative burden in returning to the status quo, including from the re-initiation of the collection of dues.

b)    It is also unclear if OPM will need to retrospectively engage in bargaining or notification

---

[1] Office of the Chief of Information ("OCIO"), Human Capital Data Management and Modernization ("HCDMM"), and Office of the Executive Secretariat and Privacy and Information Management ("OESPIM").

[2] OPM informed unions representing OCIO, HCDMM, and OESPIM employees on April 3, 2025 that the CBA no longer applied to them, but the CBA has not been cancelled.

Garcia-Whiteside Decl. ISO Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD

1    that would have happened since March 27, 2025.  For example, OPM has conducted Reductions-

2    in-Force ("RIF") in OPM organizations previously represented by the union.  Some of the

3    employees impacted by the RIF may have been re-employed through CTAP postings, the

4    validity of which may be called into question.

5        I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1,

6    2025.

CARMEN GARCIA-WHITESIDE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,

           Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:25-cv-03070-JD

**Declaration of Lew Olowski in Support of
Defendants' Emergency Motion to Stay
Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, Lew Olowski, declare as follows:

1.      I am the Chief Human Capital Officer in the Department of State ("State"), and I have served in this role since April 4, 2025.  In my current role, I am responsible for all aspects of human resources management and development, including but not limited to labor relations.

2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.      I am familiar with Executive Order 14,251, Exclusions from Federal Labor-Management Relations Programs (the "Executive Order").  Section 2 of the Executive Order excludes State from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.      The following information regarding State is correct and accurately reflects actions State took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| Yes | Yes | Yes | Yes | Held in abeyance | Yes | Yes |

5.      State will suffer the following harms if forced to continue to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)      The preliminary injunction prevents State from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b)      The United States will be irreparably harmed as a consequence of this court's preliminary injunction against implementation of Section 2 of Executive Order 14,251. Consistent with the President's determination, Secretary Rubio announced that "Securing America's borders and protecting its citizens from external threats is the first priority foreign affairs function of the United States.  This effort requires the United States to marshal all available resources and authorities."  Public Notice 12682 ¶ 2 , 90 Fed. Reg. 12200, 12200 (Mar. 14, 2025).  To that end, the Secretary is optimizing the Department of State's organizational profile and directing thousands of employees toward specific priorities that achieve this goal. This Court's injunction risks slowing down the Secretary's resource allocation decisions, including but not limited to the drafting and publication of rules and regulations needed to implement it, which *ipso facto* compromises the Department of State's effectiveness in protecting American citizens.  To illustrate: if as a consequence of meddling by labor unions like the Plaintiffs the Secretary is delayed or prevented from directing employees away from offices that promote global-warming treaties, or offices whose job it was to censor Americans, and towards offices that facilitate the United States' provision of services to American citizens at overseas posts in the Middle East—whether through tasks ranging from passport processing to

chartering evacuation flights to facilitating communications between the United States and overseas—then American citizens will suffer irreparable harms to their physical safety. This is especially so in any area wherein Americans depend directly upon the support of the Department of State to facilitate their return to the American homeland during a crisis or to ensure their lawful passport status when overseas at the mercy of hostile or corrupt foreign governments. Just eleven days ago, for example, Department of State employees facilitated emergency evacuation flights from Israel to bring Americans home who might otherwise have been killed by an Iranian missile or a Palestinian terrorist during the active warfare ongoing in that region.

c)     Rigmarole with labor unions like the Plaintiffs wastes significant taxpayer resources and, especially, time. Merely to negotiate ground rules for subsequently negotiating collective bargaining agreements, the Department spent 2, 4, or 5 weeks of effort with each of four different labor unions. Then, to negotiate substantive bargaining agreements, the Department spent 5, 6, 12, and 20 weeks negotiating with each labor union, respectively. And when these negotiations resulted in an impasse proceeding, the Department spent 10 more weeks on that. Negotiation over collective bargaining agreements and the resulting impasse cost taxpayers about $340,576 in government employee compensation and arbitral fees. It has taken less time than that—and cost compensation well spent—to negotiate certain high-stakes international agreements, such as Safe Third Country Agreements that allow the United States to deport dangerous murderous illegal aliens from the homeland to the territory of foreign governments that may be willing to receive them. And national security and foreign affairs must be responsive to threats that materialize instantly and will cause deaths if not addressed by an immediately responsive workforce. At the Bureau of Global Talent Management, which I direct, our personnel do not only spend their time negotiating with labor unions but are also called upon to facilitate operations like the above-referenced emergency evacuation flight and are routinely consulted to facilitate the removal from overseas posts or the adjudication of overseas assignment privileges for people who present dangers to themselves or to the stability and security of our missions abroad—whether due to the risk of being compromised by hostile governments' spy networks or to the risk of physical harm caused by their conduct or

1    involvement in high-risk projects.

2        d)      Similarly, the Secretary may direct, consistent with the President's determination,

3    that financial resources are better spent on other purposes than on the presently sized and

4    composed federal workforce.  Monies spent by the Department of State on labor-management

5    relations with Plaintiffs in the form of official time, space, and equipment can instead be

6    allocated toward programs that contribute to the United States' national security.  For example,

7    these expenditures may include programs that strengthen military ties to overseas partners, which

8    reduce the risk of warfare erupting beyond our partners' ability to contain it in their respective

9    theatres.  Or if not expended on such programs, these monies could also be returned to the public

10   fisc to contribute towards whatever the United States and its taxpayers may prioritize rather than

11   expended on union time, space, and equipment. As the Secretary has said, "every dollar we

12   spend, every program we fund, and every policy we pursue must be justified with the answer to

13   three simple questions: Does it make America safer?  Does it make America stronger?  Does it

14   make America more prosperous?"

15       e)      Specifically, in FY2024, labor unions inflicted real property costs of $230,664.74

16   against the Department. None of this was reimbursed back to taxpayers. The Department

17   permitted labor and employees for whom "taxpayer-funded union time" was authorized to use

18   10,400 hours of work. None of this was reimbursed back to taxpayers, either. But taxpayers did

19   lose about $943,704 in compensation for such government employees' "union time" instead of

20   these employees providing actual public services to Americans. All of this value was lost to the

21   taxpayer but none of these costs made America safer, stronger, or richer.

22       f)      In addition to the many quantifiable harms caused by an injunction against

23   Executive Order 14,251, there are also significant national security concerns where an agency

24   tasked with protecting national security has employees who are wearing two "hats" while on

25   official government time:  one for the protection of the American people and the other for a labor

26   union. For example, employees seeking policy guidance on topics ranging from financial records

27   to the conduct of romantic and sexual relations in high security-risk scenarios sometimes appeal

28   to their colleagues acting as union representatives, not strictly in their capacity as public servants.

(To the labor unions' credit, I am aware of at least one instance wherein the union advised an employee against dual-hatting while serving on a committee that was responsible for allocating scarce material resources to individual employees located overseas.) The injunction perpetuates this state of affairs to the detriment of our national security.

g)    The Department of State's limited resources fulfill a broad purpose—"the duty to protect the people of the United States from any threats originating from foreign actors or from foreign soil" and "all policy related to the protection and travel of U.S. citizens overseas, visa operations and visa issuance, implementation of the Arms Export Control Act, . . . among other authorities." *Id.* at ¶ 4.  The Court's injunction instead requires that this purpose yield to Plaintiff organizations who are concerned narrowly only about the interests of their members.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1, 2025.

/s/
Lew Olowski

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO,
*et al.*,

               Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

               Defendants.

Case No. 3:25-CV-03070-JD

**Declaration of Sheila D. Wright in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, Sheila D. Wright, declare as follows:

1.    I am the Deputy Chief Human Capital Officer in the United States Agency for International Development ("USAID"), and I have served in this role since June 20, 2023. In my current role, I am responsible for leading the federal labor management relations team and functions.

2.    I am familiar with the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal. I make the following statements based upon my personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.    I am familiar with Executive Order 14251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Section 2 of the Executive Order excludes USAID from coverage under Chapter 71 of Title 5, United States Code. Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14554 (Apr. 3, 2025).

4.    The following information regarding USAID is correct and accurately reflects actions USAID took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re:

Wright Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD

Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes | No | No | No (currently in arbitration) | No, but AFGE has no office space due to termination of the office lease. |

I declare under penalty of perjury that the foregoing is true and correct. Executed on 07/01/2025.

/s/ *Sheila D. Wright*

Sheila D. Wright

Wright Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | Case No. 3:25-cv-03070-JD |
| Plaintiffs, | **Declaration of Michael A. Cogar in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Judge: Hon. James Donato |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Michael A. Cogar, declare as follows:

1. I am the Deputy Assistant Secretary of Defense for Civilian Personnel Policy in the Department of Defense ("DoD" or the "Department"), and I have served in this role since May 19, 2025. In my current role, I am responsible for civilian personnel matters, including the DoD Labor-Management Relations Program. In this capacity, I am responsible for the development and issuance of civilian personnel policies, programs, procedures and guidance, the DoD Labor Management Relations Program, and the effective, efficient and strategic management of DoD's civilian workforce. In addition, my office provides the Office of the Secretary of Defense, Defense Agencies and Field Activities, and Military Departments with policy advice and guidance through the Defense Civilian Personnel Advisory Service and administers the non-appropriated fund personnel system, as well as the foreign national employment program within the Department.

2. I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration in support of Defendants' emergency motion to stay the preliminary injunction pending appeal. I make the following statements based upon my personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3. I am familiar with Executive Order 14251, Exclusions from Federal Labor-Management

1  Relations Programs (the "Executive Order"). Section 2 of the Executive Order excludes DoD from

2  coverage under Chapter 71 of Title 5, United States Code, "except for any subdivisions excluded

3  pursuant to Section 4" of the Executive Order. Exec. Order 14251 § 2, 90 Fed. Reg. 14553, 14553 (Apr.

4  3, 2025).

5        4.      The following information regarding DoD is correct and accurately reflects actions the

6  Department took to implement Executive Order 14251 prior to the June 24, 2025, issuance of the "Order

7  re: Preliminary Injunction":

| Has requested to decertify unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes | Yes, but varies by component | The FLRA has held proceedings in abeyance | Have been in abeyance/requested an abeyance | Some had, but most had not |

15       5.      The Department will suffer the following harms if forced to continue to comply with the

16  preliminary injunction and return its labor management operations to the status quo that existed prior to

17  the March 27, 2025, issuance of the Executive Order:

18             a)      The preliminary injunction prevents the Department from complying with the

19  President's directions in the Executive Order, in which the President made national-security

20  determinations entrusted to him by Congress.

21             b)      Implementation of the Executive Order enhanced national security by allowing

22  military medical facilities to better utilize their resources in support of warfighters. Specifically,

23  these facilities have been able to move employees into crucial open positions without having to

24  wait two pay periods as required by the Master Labor Agreement Article on Details. This

25  increased flexibility has allowed the facilities to move LPNs and RNs from one floor or unit to

26  another on short notice, thus enhancing continuous care for Service Members, including some in

27  a deployable-status, and their dependents.

28             c)      Moreover, the Executive Order has enabled military medical facilities to react

more nimbly to workplace challenges, such as schedule changes, details, and reassignments. Consequently, facilities could provide uninterrupted care for Service Members in support of DoD's overall national security mission. If forced to comply with the preliminary injunction, military medical facilities will revert to the pre-injunction status quo, which could result in interruptions to and longer wait times for medical care for Service Members, including those in deployable-status, and their dependents, which would result in harms to warfighter readiness and national security.

d)    As indicated above, DoD had taken a wide variety of other actions to implement the Executive Order prior to the issuance of the preliminary injunction. If forced to continue to comply with the preliminary injunction, the Department will have undone those actions by: reestablishing the withholding of union dues; restarting the processing of grievances; reengaging on arbitrations that had been held in abeyance; reengaging on matters pending before the Federal Labor Relations Authority; reestablishing the provision of official time to unions under the Statute and in accordance with the provisions of applicable Collective Bargaining Agreements (CBAs); reengaging in collective bargaining under the Statute and in accordance with the provisions of applicable CBAs; and otherwise reverting back to full compliance with the terms of applicable CBAs, including, but not limited to: overtime distribution requirements, provision of union office space, and adherence to disciplinary and performance management procedural requirements.

e)    These efforts require significant resources to accomplish, including manhours on the part of Human Resources and legal staff, payroll providers and supervisory personnel, as well as costs such as arbitration-related expenses. These are resources that otherwise could be devoted to the implementation of administration priorities related to establishing a high-performance Federal workforce, strengthening probationary periods in the Federal service, and restoring accountability to policy-influencing positions in the Federal workforce, efforts which serve to strengthen the Department's ability to meet its critical national security mission. Complying with the preliminary injunction diverts resources from these critical activities immediately.

1

2       I declare under penalty of perjury that the foregoing is true and correct to the best of my

3   knowledge. Executed on June 30, 2025.

4       COGAR.MICHAEL.   Digitally signed by
        ANTHONY.1157111   COGAR.MICHAEL.ANTHONY.11
        716              57111716
                          Date: 2025.06.30 20:08:19 -04'00'

5       _____

        Michael A. Cogar

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | Case No. 3:25-cv-03070-JD |
| Plaintiffs, | **Declaration of John Brown in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Judge: Hon. James Donato |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, John Brown declare as follows:

1.      I am Chief of the Labor Relations and Negotiations Branch for Human Resources ("HR") for the United States Mint, headquartered in Washington, D.C.  I have served in this position since January 2025, and at the Department of the Treasury since 2018.  As Chief of the Labor Relations and Negotiations Branch for HR, I oversee labor relations for the United States Mint.

2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on the evening of June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' emergency motion to stay the preliminary injunction pending appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.      I am familiar with Executive Order 14251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").  Section 2 of the Executive Order excludes Treasury, except for the Bureau of Engraving and Printing, from coverage under Chapter 71 of Title 5, United States Code. Exec. Order 14251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.      The components of the Mint that are represented by Plaintiff union AFGE are: All professional and nonprofessional employees of the Department of the Treasury, U.S. Mint, including police officers; (except those assigned to the Philadelphia Mint), management officials, supervisors,

Brown Decl. ISO Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                    1

confidential employees, employees engaged in federal personnel work in other than a purely clerical capacity, and temporary employees (defined as those appointed for up to 700 hours with no reasonable expectation of reappointment).

5.    The following information regarding the United States Mint is correct and accurately reflects actions United States Mint took to implement Executive Order 14251 prior to the June 24, 2025, issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | No | No | No | No | No |

6.    Treasury will suffer the following harms if forced to continue to comply with the preliminary injunction and return its labor-management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)    The preliminary injunction prevents Treasury from complying with the President's directions in the Executive Order.

b)    The Mint suffers quantifiable, numerical harm through the CBA.  For example, the Mint must allow all union officials to "use a reasonable amount of official time"; the Mint must allow its five local union presidents to "use up to 80 hours of official time per pay period"; and the Mint must allow the national union president "80 hours of official time per pay period." This use of official time leads to loss of employee work in their positions of record and detracts from the Mint's mission.

c)    The CBA requires that "Local management will provide office space, office equipment (e.g., copy machine, fax.machine, PC), supplies and telephones for each Local Union office." This requirement causes the Mint to incur costs.

d)    The CBA requires the Mint to provide a longer performance-improvement period than is necessary of "at least 90 calendar days."  This delays the Mint's ability to remove poorly

1   performing employees.

2       e)    The CBA requires that Mint management pay more than fifty percent of

3   arbitration costs: "Management will pay the costs of one arbitration at each facility, per calendar

4   year, and two arbitrations for the Mint Council per calendar year to use as it chooses.

5   Management will pay 60% and the Union will pay 40% of the cost of all other arbitrations

6   during that calendar year." This will result in unnecessary expense in future arbitrations.

7       f)    The CBA requires that "For national negotiations, the Agency will grant official

8   time, travel and per diem for the Union participants agreed to in Rule 2, but only if they are

9   Agency employees." This results in unnecessary expense.

10

11  I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30,

12  2025.

13

14  _/s/_____
    John Brown

15

16

17  John B.    Digitally signed
             by John B.
18  Brown III  Brown III
             Date: 2025.06.30
19           18:51:28 -04'00'

20

21

22

23

24

25

26

27

28

Brown Decl. ISO Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>       Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       Defendants. | Case No. 3:25-cv-03070-JD<br><br>**Declaration of Mark Engelbaum in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal**<br><br>Judge: Hon. James Donato |

Pursuant to 28 U.S.C. § 1746, I, Mark Engelbaum, declare as follows:

1.     I am the Assistant Secretary for Human Resources and Administration/Operations, Security, and Preparedness in the Department of Veterans Affairs ("VA"), and I have served in this role since February 13, 2025. In my current role, I lead the development and oversight of human capital strategies, policies and practices as well as managing the Department's preparedness, law enforcement, and security capabilities across the nation. This portfolio includes Administration, Human Capital, Labor-Management Relations, Personnel Security and Suitability, Senior Executive Management, Employee Development, Manpower Management, Emergency Management Response and Recovery, and Security and Law Enforcement Policy.

2.     I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration in support of Defendants' emergency motion for stay of the preliminary injunction pending appeal. I make the following statements based upon my personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.     Section 2 of the Executive Order excludes the VA from coverage under Chapter 71 of Title 5, United States Code. Exec. Order No. 14,251 § 2, 90 Fed. Reg. 14,553, 14,553 (Apr. 3, 2025).

4.     The following information regarding the VA is correct and accurately reflects actions the

VA took to implement Executive Order 14251 prior to the June 24, 2025, issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No, except one agreement terminated not pursuant to the EO | Yes | No | No, but is requesting matters be held in abeyance | No, but is requesting matters be held in abeyance | No |

5.      The VA will suffer the following harms if forced to continue to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025, issuance of the Executive Order:

a)      The preliminary injunction prevents the VA from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b)      The preliminary injunction requires the VA to direct the payroll service providers to restart collecting union dues for AFGE, NAGE, NFFE, NNOC/NNU and SEIU.  The VA is not able to restart dues automatically for all former union members because most unions have been promoting the use of an internal dues collection system called e-Dues.  The VA does not have information on which employees are now paying their membership dues directly to the union. As a result, restarting automatic payroll deductions for all impacted employees could harm those employees by having double payment of dues.

c)    Changes in conditions of employment impacting bargaining unit employees must be negotiated before implementation, per the CBAs.  This requirement causes delays in implementation of all initiatives impacting services to Veterans.  Example of initiatives delayed because of protracted negotiations include: the use of body worn cameras by VA police officers; implementation of the Promise to Address Comprehensive Toxics (PACT) Act of 2022, Pub. L. No. 117-168, 36 Stat. 1759, section 603; implementation of VA Notice 24-03, Prohibited Procedures in the Department of Veterans Affairs Security and Law Enforcement; VHA Directive 1167, Mental Health Environment of Care Checklist; and the use of Telesitters Technology in VHA facilities.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30, 2025.

*Mark R. Engelbaum*

MARK ENGELBAUM

_____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | Case No. 3:25-cv-03070-JD |
| Plaintiffs, | **Declaration of Matthew E. Hirt in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Judge: Hon. James Donato |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Matthew E. Hirt declare as follows:

1.      I am a Senior Attorney for Labor and Employment Law Office, Justice Management Division, Human Resources Staff, at the United States Department of Justice ("DOJ"), and I have served in this role since 2001.  In my current role I am responsible for assisting with department-wide oversight of DOJ's labor and employment law Program, representing the Justice Management Division, and providing advice and guidance to all DOJ components on these matters.

2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.      I am familiar with Executive Order 14,251, Exclusions from Federal Labor-Management Relations Programs (the "Executive Order").  Section 2 of the Executive Order excludes DOJ, except for particular offices of the United States Marshals Service ("USMS"), from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.      The following information regarding DOJ is correct and accurately reflects actions DOJ took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re:

Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes | Not eliminated in full, but has denied official time | No, requested abeyance | No | No, although, the national counsel representing the Bureau of Prison bargaining unit is no longer allowed space in the DC office |

5.    Plaintiff unions represent employees in the Bureau of Prisons (BOP), Office of Justice Programs (OJP), Executive Office for Immigration Review (EOIR), Justice Management Divisions (JMD), Office on Violence Against Women (OVW), Tax Division (Tax), Antitrust Division (ATR), Civil Division (CIV), Civil Rights Division (CRT), Environment and Natural Resources Division (ENRD) United States Parole Commission (USPC), Community Oriented Policing Services (COPS), and Office of the Solicitor General (OSG).

6.    DOJ will suffer the following harms if forced to continue to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)    The preliminary injunction prevents DOJ from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b)    Requiring compliance with the preliminary injunction will cause irreparable harm to DOJ because of planned reorganizations within the litigating divisions, as well as the immediate need to move employees and work from one division to another in order to support the overall national security mission of the DOJ, which would require time-consuming

1    bargaining before these priorities could be implemented.  These harms existed before Executive

2    Order 14,251, and they routinely affected national security then as well because DOJ could not

3    act as effectively and efficiently as possible when trying to achieve its department-wide national

4    security goals.

5

6    I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30,

7    2025.

8

9                                                  _____

10                                                  Matthew E. Hirt

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hirt Decl. ISO Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                          3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,

        Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

        Defendants.

Case No. 3:25-cv-03070-JD

**Declaration of Christina V. Ballance in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, Christina V. Ballance, declare as follows:

1. I am the Executive Director of the National Labor and Employee Relations Office within the U.S. Department of Health and Human Services ("HHS"). I have held this position since August 2022. In my current role, I oversee the program and team responsible for oversight of HHS-wide labor and employee relations programs, including employee misconduct, strategic planning, and negotiations. Specifically, I negotiated bilateral collective bargaining agreements with the National Treasury Employee Union ("NTEU") and assess the overall labor-management relationship and identify training needs to reduce litigation and improve overall labor relations.

2. I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal. I make the following statements based upon my personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3. I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Section 2 of the Executive Order excludes the following agencies or subdivisions of HHS from coverage under Chapter 71 of Title 5, United States Code: Office of the Secretary, Food and Drug Administration, Centers for Disease Control and Prevention,

1  Administration for Strategic Preparedness and Response, Office of the General Counsel, Office of

2  Refugee Resettlement Administration for Children and Families, National Institute of Allergy and

3  Infectious Diseases, and the Office of the Chief Information Officer.  Exec. Order 14,251 § 2, 90 Fed.

4  Reg. 14553, 14553 (Apr. 3, 2025).

5        4.    The plaintiff unions do not have Collective Bargaining Agreements with every HHS

6  subdivision enumerated in Section 2 of the Executive Order.  For instance, the American Federation of

7  Government Employees, AFL-CIO ("AFGE") has a CBA with the Food and Drug Administration

8  ("FDA") and several local CBAs with the Centers for Disease Control and Prevention ("CDC").  While

9  AFGE does have a CBA with some components of the National Institutes of Health, no CBA with

10  AFGE is in place with respect to the National Institute of Allergy and Infectious Diseases ("NIAID").

11  Similarly, while the National Association of Government Employees, Inc. ("NAGE") has a CBA with

12  the National Institutes of Health, no CBA with NAGE is in place with respect to the National Institute of

13  Allergy and Infectious Diseases.  Based on information available to me, the following plaintiff unions

14  do not have CBAs with HHS subdivisions identified in Section 2 of the Executive Order: American

15  Federation of State, County & Municipal Employees, AFL-CIO; National Nurses Organizing

16  Committee/National Nurses United; Service Employee International Union, AFL-CIO.

17        5.    The following chart reflects actions HHS took to implement Executive Order 14,251

18  prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| Yes | No | Yes | Eliminated approved official time but made no reassignments. | N/A – no current proceedings | Yes | No |

26        6.    HHS will suffer the following harms if forced to continue to comply with the preliminary

27  injunction and return its labor management operations to the status quo that existed prior to the March

28

27, 2025 issuance of the Executive Order:

       a)     The preliminary injunction prevents HHS from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

       b)     The operational and strategic capacities of the relevant HHS agencies will be seriously impacted if the preliminary injunction is not stayed. Although all effected components will be harmed, the CDC will be acutely harmed. The CDC's contributions to national security, including its efforts in bioterrorism preparedness, pandemic response, and infectious disease surveillance are indispensable. The CDC's national security programs often operate under strict timelines to mitigate risks and respond to emerging threats. As a frontline agency in the defense against public health threats, the CDC must be empowered to rapidly adjust its policies and operations in response to evolving intelligence and threat landscapes. The roadblocks created by this injunction may delay program execution, compromising the agency's ability to safeguard public health and national security.

       c)     Similarly, the injunction could harm the FDA's rapid response capabilities, which would have severe repercussions on public health, national economic stability, and security. The agency's swift evaluation and approval of vaccines and treatments during emergencies, like the COVID-19 pandemic, are crucial for quickly restoring and sustaining national productivity. Additionally, the FDA plays a critical role ensuring the safety of the food supply and developing countermeasures against chemical, biological, radiological, and nuclear threats. Any delay in the FDA's ability to adapt review processes and initiate emergency actions could undermine its effectiveness in safeguarding public health and national security, potentially leading to prolonged economic disruptions and increased vulnerability to threats

       d)     To effectuate the preliminary injunction, HHS has had to direct the re-establishment of dues deductions from the subset of employees affected by the preliminary injunction.

       e)     HHS has had to reinstate official time for employees affected by the preliminary

1    injunction. Reinstating official time for union members creates operational delays.  Critical work

2    in public health agencies such as the CDC could be delayed while employees are engaged in

3    union activities instead of mission-driven responsibilities.

4         f)     HHS has over 100 pending bargaining unit grievances.  The preliminary

5    injunction changed the current policy, which was to not participate in grievance or arbitration

6    proceedings, and could result in significant operational disruptions, creating duplicative work for

7    HHS, its subcomponents, and other parties involved in the process.  This could drain managerial

8    and legal resources and obstruct the HHS divisions' and subdivisions' ability to focus on their

9    core mission – responding to public health challenges.  Flipping the switch on grievances mid-

10   process creates confusion and dramatically increases costs associated with managing and

11   handling grievances.

12        g)     The preliminary injunction also requires HHS management and management of

13   subdivisions excluded from the Executive Order to reimplement processes and adjust to repeated

14   changes in management direction.  This is likely to create upheaval and conflict in the workplace

15   as management and employees try to keep up with constantly shifting goalposts.

16

17   I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30,

18   2025.



    /s/                             
                CHRISTINA V. BALLANCE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | Case No. 3:25-cv-03070-JD |
| Plaintiffs, | **Declaration of Kika Scott in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Judge: Hon. James Donato |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Kika Scott**,** declare as follows:

1.    I am the Acting Deputy Director at the U.S. Citizenship and Immigration Service ("USCIS"), a component of the United States Department of Homeland Security ("DHS"), and I have served in this role since May 25, 2025.  From on or about February 9, 2025 through May 24, 2025, I served as the acting USCIS Director.  In my current role I lead USCIS in the development, coordination, and implementation of immigration policies and resources.

2.    I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.    I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Section 2 of the Executive Order excludes the following agencies or subdivisions of DHS from coverage under Chapter 71 of Title 5, United States Code: Office of the Secretary, Office of the General Counsel, Office of Strategy, Policy, and Plans, Management

1  Directorate, Science and Technology Directorate, Office of Health Security, Office of Homeland Security

2  Situational Awareness, U.S. Citizenship and Immigration Services, United States Immigration and

3  Customs Enforcement, United States Coast Guard, Cybersecurity and Infrastructure Management Agency,

4  and Federal Emergency Management Agency.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553-54

5  (Apr. 3, 2025).

6  

7  4.  The following information regarding USCIS is correct and accurately reflects actions

8  USCIS took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re:

9  Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes[1] | No | No | Held in abeyance[2] | Yes |

5.  USCIS will suffer the following harms if forced to continue to comply with the preliminary

injunction and return its labor management operations to the status quo that existed prior to the March 27,

2025, issuance of the Executive Order:

a.  Since the issuance of Executive Order 14,251, the Agency has undertaken several

significant initiatives to comply with the Executive Order.  For example, (1) personnel

policies such as alternative work schedules (AWS) were cancelled and all employees

have returned to in-person work five (5) days per week; (2) agency enabled dues

withholding had been cancelled by the National Finance Center; (3) all grievances had

---

[1] On or about May 7, 2025, USCIS received notice that NFC would be reinstituting dues deduction. USCIS is awaiting confirmation that this action has been implemented.

[2] USCIS has participated in a single arbitration that was pending prior to the issuance of EO 14251.

Scott Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                    2

been held in abeyance; and (4) union office space was reclaimed for mission related work.  The preliminary injunction requires USCIS to reinstitute such changes and will potentially cause severe disruption to the overall management of USCIS and confusion to the workforce.

b.  In addition, while many initiatives, actions, and grievances have been held in abeyance pending the outcome of litigation, certain actions that directly affect national security were planned to continue.  Specifically, DHS has planned organizational changes that will significantly enhance USCIS's ability to identify and efficiently investigate and respond to fraud and national security or public safety concerns.  The changes will increase flexibility within adjudications, ensure functional alignment, and improve government efficiencies across the agency.  This will enable USCIS to address critical issues more effectively and streamline operations, ultimately strengthening our overall mission and service delivery.

c.  USCIS administers the nation's lawful immigration system by screening and vetting all immigration benefit requests while protecting Americans and securing our homeland. To achieve this goal, USCIS is undertaking one of the largest reorganizations in its history.  Over the last few months, USCIS has been working diligently towards rightsizing and aligning the workforce to meet the priorities of the Administration. Halting these efforts now because of the preliminary injunction will irreparably harm and negatively impact the mission and the integrity of our national immigration system. USCIS has invested considerable staff time and administrative resources on planning, communication, and coordination of workforce restructuring, which was a necessary first step of our reorganization efforts.  USCIS has lost over 10% of the workforce as a result of the workforce reshaping efforts, which in turn heightens the need for

streamlined and timely reorganization.  Delaying or reversing course at this stage, due

to bargaining obligations imposed by the preliminary injunction, wastes those efforts

and expenditures and will require duplicative efforts to restart later.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1,

2025.

KIKA M SCOTT    Digitally signed by KIKA M SCOTT
Date: 2025.07.01 14:10:05 -04'00'

**Kika Scott**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-03070-JD <br><br> **Declaration of Kathryn Jones in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal** <br><br> Judge: Hon. James Donato |

Pursuant to 28 U.S.C. § 1746, I, Kathryn Jones declare as follows:

1.      I am currently the Director of Civilian Personnel at the U.S. Coast Guard, a component of the United States Department of Homeland Security ("DHS"). I have served in this role since July 1, 2025. Prior to that, I served as the Office Chief, Office of Civilian Workforce Relations from January 2023 to June 30, 2025. In that role I managed a staff of 23 professional Human Resources professionals, including the Labor Relations Division and Labor Relations staff. I am the subject matter expert on all labor relations matters and served as Chief Negotiator for the most recent collective bargaining agreement with AFGE.

2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal. I make the following statements based upon my personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.      I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Section 2 of the Executive Order excludes the following agencies or subdivisions of DHS from coverage under Chapter 71 of Title 5, United States Code: Office of the Secretary, Office of the General Counsel, Office of Strategy, Policy, and Plans, Management

Directorate, Science and Technology Directorate, Office of Health Security, Office of Homeland

Security Situational Awareness, U.S. Citizenship and Immigration Services, United States Immigration

and Customs Enforcement, United States Coast Guard, Cybersecurity and Infrastructure Management

Agency, and Federal Emergency Management Agency.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553,

14553-54 (Apr. 3, 2025).

4.    The following information regarding USCG is correct and accurately reflects actions

USCG took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re:

Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes, but varies | Yes, Firefighters and AFGE Council leadership supporting eligible employees remain eligible to use official time | No | Held in abeyance. | No |

5.    USCG will suffer the following harms if forced to continue to comply with the

preliminary injunction and return its labor management operations to the status quo that existed prior to

the March 27, 2025 issuance of the Executive Order.

a)    The preliminary injunction prevents the Coast Guard from complying with the

President's directions in the Executive Order, in which the President made national-

security determinations entrusted to him by Congress.

b)    As part of DHS's Force Design 2028 project, and after nearly four months of preparation,

on July 1, 2025, the Coast Guard will dissolve the mission support overhead structure and

elevate both the Personnel Readiness and Materiel Readiness functions to separate

Deputy Commandants, rightsizing their span of control, and providing both talent

1     management and assets/systems the attention they require.

2     c) Halting this reorganization will have serious cost implications. From a financial

3     perspective, the Coast Guard has invested considerable staff time, contractor support, and

4     administrative resources in planning, communications, and coordination. Delaying or

5     reversing course at this late stage wastes that expenditure and will require duplicative

6     efforts to restart later.

7     6.     Beyond direct costs, the disruption also carries organizational costs that directly affect the

8 Coast Guard's strategic national security priorities the reorganization is intended to address.

9     a) Personnel policies such as alternative work schedules (AWS) were cancelled on April 28,

10     2025. All employees have returned to in-person work five (5) days per week. This

11     change was necessary to carry out the Coast Guard's national security mission during a

12     national emergency.

13     b) Dues withholding was cancelled, then briefly reinstated following the D.C. District

14     Court's Order enjoining Defendants in *NTEU v. Trump*, No. 25-930 (DDC Apr. 25,

15     2025), and then cancelled again once the D.C. Circuit Court stayed the District Court's

16     order pending appeal, *NTEU v. Trump*, No. 25-5157 (D.C. Cir. May 16, 2025). This

17     operational instability causes significant administrative burden and confusion to

18     employees and supervisors.

19     c) Grievances and arbitrations have been held in abeyance pending the outcome of

20     litigation. Employees have been offered administrative grievance procedures or other

21     appeal forums to address matters that are excluded by the administrative grievance

22     procedure. By requiring DHS to reengage on union grievances and arbitrations, it

23     complicates the alternative grievance procedures the agency had offered in their place.

24

25     I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1,

26 2025.

27

28

JONES.KATHRY    Digitally signed by
N.A.1472133094    JONES.KATHRYN.A.1472133094
                 Date: 2025.07.01 13:53:05 -04'00'

_____

Kathryn Jones

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-03070-JD<br><br>**Declaration of Meir Braunstein in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal**<br><br>Judge: Hon. James Donato |

Pursuant to 28 U.S.C. § 1746, I, Meir Braunstein, declare as follows:

1.     I am the Section Chief of Labor Relations at the U.S. Immigration and Customs Enforcement ("ICE"), a component of the United States Department of Homeland Security ("DHS"). My formal (temporary) assignment to this position began on June 29, 2025, although I was informally assigned to act in the capacity of Labor Relations Section Chief since approximately March 26, 2025. Prior thereto, I have been a Labor Relations Specialist (or Employee and Labor Relations Specialist) at ICE since February 1, 2009, to include prior periods acting as the Labor Relations Section Chief, both formally and informally. In my current role I am responsible for the day-to-day Labor Relations program at ICE, which includes (personally and through the ICE Labor Relations team) functions such as: maintaining regular communication with our Union; providing higher level management with assessments, options and recommendations regarding our obligations under our collective bargaining agreement(s) and the Federal Service Labor Management Relations Statute (among others); engaging in term and mid-term collective bargaining (to include assembling a bargaining team of operational managers, legal personnel, and Labor Relations staff); and engaging in Labor litigation and similar practices in front of the Federal Labor Relations Authority (FLRA) and via the negotiated grievance-arbitration process, working with operational managers to respond to claims and complaints, resolve

1   matters amicably where practicable and appropriate, and present ICE's positions and arguments to third

2   party adjudicators (e.g., arbitrators, administrative judges, the FLRA, and the Federal Service Impasses

3   Panel).

4        2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24,

5   2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency

6   Motion to Stay the Preliminary Injunction Pending Appeal.  I make the following statements based upon

7   my personal knowledge and information provided to me in my official capacity.  If called as a witness, I

8   could and would testify competently to the facts contained in this declaration.

9        3.      I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management*

10  *Relations Programs* (the "Executive Order").

11       4.      Section 2 of the Executive Order excludes the following agencies or subdivisions of DHS

12  from coverage under Chapter 71 of Title 5, United States Code: Office of the Secretary, Office of the

13  General Counsel, Office of Strategy, Policy, and Plans, Management Directorate, Science and

14  Technology Directorate, Office of Health Security, Office of Homeland Security Situational Awareness,

15  U.S. Citizenship and Immigration Services, United States Immigration and Customs Enforcement,

16  United States Coast Guard, Cybersecurity and Infrastructure Management Agency, and Federal

17  Emergency Management Agency.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14554 (Apr. 3, 2025).

18       5.      The following information regarding ICE is correct and accurately reflects actions ICE

19  took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re:

20  Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | No (however NFC paused them for 2 pay periods) | No | No | No* | No |

Braunstein Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                    2

1    With respect to grievance and arbitration proceedings, ICE continues to fully adjudicate, adjust and seek

2    compromise on grievances. However, the Agency is seeking to delay any potential arbitration until after

3    the litigation regarding the Executive Order is resolved. The Union has agreed to temporary delays while

4    other paths for resolution are explored; however, if those efforts fail and the injunction is not stayed, the

5    Agency will need to participate in arbitration proceedings over two active national level grievances,

6    encumbering significant amount of high-level management officials' time and creating significant

7    uncertainty regarding certain conditions of employment.

8          6.    ICE will suffer the following harms if forced to continue to comply with the preliminary

9    injunction and return its labor management operations to the status quo that existed prior to the March

10   27, 2025 issuance of the Executive Order:

11          a)    The preliminary injunction prevents DHS from complying with the President's

12    directions in the Executive Order, in which the President made national-security determinations

13    entrusted to him by Congress.

14          b)    At ICE there is a collective bargaining agreement (CBA) with the "professional

15    position" bargaining unit at ICE and their exclusive representative, the American Federation of

16    Government Employees (AFGE) through their bargaining agent, AFGE Local 511.  The CBA is

17    in effect via a May 2024 renewal through August 31, 2029 – "CBA 2019." CBA 2019 includes

18    provisions that are inconsistent with subsequently-issued government-wide rules and regulations

19    that cannot be modified to conform to any change in government-wide rule or regulation until

20    the agreement expires (and does not "renew" or "roll-over" either by agreement or its own

21    terms). For example, Article 24 of this CBA mandates that performance improvement plans run

22    at least 90 days in duration (prior to removals via Chapter 43). The CBA also contains provisions

23    that impose numerous, sometimes burdensome rules regarding temporary work assignments,

24    alternative work schedules, and more, which must be followed by the agency notwithstanding

25    any unanticipated needs that may run contrary to those provisions. For example, the enhanced

26    pace of operations in recent months has required the agency to evaluate ways to provide legal

27

28    Braunstein Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
      3:25-CV-03070-JD                   3

support to agents and officers in the field on a "24/7" basis, but the contract has provisions that set core hours and create other complications that significantly limit the way in which ICE can go about addressing this need. Further, both pending grievances/arbitrations contain arguments based on this principle, though ICE disputes applicability.

c)    For matters that are not "covered by" a contractual provision, an agency may generally only make a change on a subject within its discretion after engaging in mid-term bargaining resolved through agreement or impasse proceedings, a process that often takes in excess of 18 months in its entirety and can easily extend to three to four years if a Union opposes the underlying change and wishes to prolong bargaining. Agency records and information reflect that those obligations have caused ICE to suffer extended delays on policies, sometimes for periods of years, including but not limited to the implementation of body-worn cameras, expanded use of polygraph screening of employees, policy updates regarding body armor, firearms, detainee transfers, tactical teams, employee drug testing, and more. Other policies were subjected to extensive litigation over the timing, extent of, or obligation for negotiations, such as the termination of access to commercial webmail on ICE systems due to increased cyber-attacks, the implementation of a general on the job training policy, as well as minor changes to the form(s) (and associated form process) used by ICE officers – both matters which reached not only arbitration but subsequent litigation before the Federal Labor Relations Authority. Further, one of the pending grievances/arbitrations also contains an argument based on this principle.

d)    Labor negotiation and labor litigation also create an information and security risk. Under 5 USC § 7114, an Agency must provide a Union with information it requests for which it can articulate a "particularized need" for that information in relation to its labor activities. The dissemination of this information, which in the past has included things like building and office layouts, shift assignments and distributions, and the specifications of ICE equipment, is not subject to any protection, and Union employees and representatives do not have to be employees of ICE.

Braunstein Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                    4

e)    Collective bargaining and grievance litigation require significant agency resources. Negotiations and union grievance litigation require decision makers to spend many hours participating in, preparing for, or engaged in tasks related to these matters, such as bargaining sessions and arbitration testimony, which takes them away from managing the workforce and directing operations. Negotiations require multiple high-level operational managers to be present at sessions for dozens of hours, with a similar amount of time spent in between sessions. For example, Agency records and information show that the negotiations over a supplemental agreement to address conditions of employment for a new "professional unit" position in the ICE Health Service Corp required three to four high-level IHSC managers (and both Labor Relations and Legal support staff) to attend approximately 30 sessions over the course of nine months; mostly full-day. Combined with the work on bargaining that occurred outside of the scheduled bargaining sessions (i.e., to evaluate Union proposals, research matters, and prepare counter proposals and strategy), that amounted to approximately 45 work-days or more, reflecting over one-quarter of these managers' (including managing clinicians) work-time during that nine-month period.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1, 2025.

Digitally signed by Meir Braunstein
Date: 2025.07.01 14:01:25 -04'00'

_/s/_
Meir Braunstein

Braunstein Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                    5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | Case No. 3:25-cv-03070-JD |
| Plaintiffs, | **Declaration of Stephanie M. Holmes in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Judge: Hon. James Donato |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Stephanie M. Holmes, declare as follows:

1.     I am the Acting Chief Human Capital Officer for the Department of the Interior ("Department"), headquartered in Washington, D.C.  I have served in this role since February 24, 2025.

2.     I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.     I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").

4.     Section 2 of the Executive Order excludes the following subdivisions of DOI from coverage under Chapter 71 of Title 5, United States Code: Office of Secretary, Bureau of Land Management, Bureau of Safety and Environmental Enforcement, Bureau of Ocean Energy Management, and the Office of the Chief Information Officer.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

5.     The Department of the Interior protects and manages the Nation's natural resources and provides scientific and other information about those resources through multiple bureaus and offices.

6.     The Office of the Secretary includes the Immediate Office of the Secretary, certain secretarial officers, and designated staff immediately serving those officials and offices which serve department-wide functions or perform program functions directly on behalf of the Secretary, such as payroll operations for numerous other federal agencies and critical information management resource duties related to cybersecurity.

7.     Domestic energy production is a critical national security priority.  BLM oversees energy production on America's hundreds of millions of acres of public lands as one of its principal responsibilities.  BLM thus directly manages the Nation's economic and productive strength.  BLM's public lands management also plays a substantial role in funding the Federal Government's operations through mineral development, the Nation's second-largest revenue source after tax revenue.

8.     The United States has a core national security and economic interest in maintaining leadership in deep sea science and technology and seabed mineral resources.  The United States faces unprecedented economic and national security challenges in securing reliable supplies of critical minerals independent of foreign adversary control, and DOI subdivisions play an important role in resource management.  The Outer Continental Shelf (OCS) is a significant source of oil and gas for the Nation's energy supply.  BOEM manages thousands of active oil and gas leases on millions of OCS acres.  BSEE works to promote safety, protect the environment, and conserve resources offshore through vigorous regulatory oversight and enforcement.  For example, BSEE conducts thousands of inspections, mandating that each offshore energy operator establish and follow their Safety and Environmental Management System (SEMS), and BSEE carries out investigations when serious incidents occur.

9.     The Office of the Chief Information Officer, provides leadership to the Department of the Interior (DOI) and its bureaus in all areas of information management and technology.  To successfully serve the Department's multiple missions, the OCIO applies modern IT tools, approaches, systems, and products and is directly responsible for the cybersecurity of the Department's IT infrastructure.

10.    The following information regarding DOI is correct and accurately reflects actions the DOI took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes | No | DOI has not refused to participate in FLRA matters for the Plaintiff unions. FLRA has granted abeyances for matters impacted by the EO 14,251 | DOI has participated in the grievance process by denying grievances excluded under the EO and proceeded with grievances allowed under the EO. DOI has also received abeyances of arbitrations. | No |

11.     DOI will suffer the following harms if forced to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)     The preliminary injunction prevents DOI from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b)     A primary function of the Department of the Interior, specifically BLM, BOEM, and BSEE, is to protect the nation's natural energy and mineral resources from internal subversion and foreign aggression by helping the nation become more energy independent and ensuring safe energy production or mineral extraction and development in the face of external and internal threats.  To successfully perform this function, the Department, specifically BLM, BOEM, BSEE and the Office of the Secretary, must be able to react nimbly and quickly to adjust

conditions of employment to meet this goal.  BLM, BSEE, BOEM, and the Office of the

Secretary have CBAs with either AFGE or NFFE.  The FSLMRS requirements do not allow for

quick changes.  Instead, the cumbersome regulatory framework of the FSLMRS inhibits the

Department's ability to safely and effectively meet this primary function and to protect the

nation's security interests.

      c)    The CBAs include numerous terms that materially restrict the power of DOI and

the specified Bureaus/Offices to govern and set policies for its own workforce:

      i.)    Prior to making any changes to conditions of employment, the Agency is
required to provide advanced notice to the union (depending on the
agreement).  The union is then allowed to present proposals to the agency
prior to the parties bargaining over the impact and implementation of the
proposed change.  If the parties are unable to reach agreement, the parties
may seek the services of the Federal Mediation and Conciliation Services
("FMCS") and/or the Federal Service Impasse Panel ("FSIP").  Both the
FMCS and FSIP have experienced recent staffing changes which may lead
to additional delays.

      ii.)    The unions are allowed to file grievances and arbitrations on matters
specifically included in the CBAs and MOUs, such as employee discipline
or contract violations.  If the matter is not resolved satisfactorily, the
parties may elect FMCS services or file an exception of an arbitration
award with the FLRA.

      iii.)    While as a general matter all these examples were in existence prior to the
Executive Order 14,251, the expectation that the specified bureaus and
offices make changes quickly to adapt to a dynamic geopolitical global
environment that is having real-time impacts on the Nation's foreign
energy dependence is even more significant now.

      iv.)    As a general matter, the CBAs further interfere with DOI's ability to

1    execute and implement the President's initiatives related to national

2    security.  For example, DOI cannot implement government-wide rules and

3    regulations from the President that conflict with the CBAs (without

4    renegotiation and agreement with the unions), such as priorities to require

5    increased physical presence in the workplace, or initiatives to increase oil

6    and gas development on federal lands or increased coal production on

7    lands managed by BLM.  Similarly, to meet these initiatives DOI must

8    change the conditions of employment for some employees, for example by

9    increasing field activity in regulating oil and gas drilling on federal lands.

10    However, as described above, DOI is required to provide advance notice

11    of the change and engage in impact and implementation bargaining.

12    Although the Executive Order removed these obstacles, the preliminary

13    injunction now restricts DOI from making these changes.

14        I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1,

15    2025.

16

17    STEPHANIE HOLMES  Digitally signed by STEPHANIE HOLMES
                          Date: 2025.07.01 11:22:57 -04'00'

18    STEPHANIE M. HOLMES

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,

        Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:25-cv-03070-JD

**Declaration of Reesha Trznadel in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, Reesha Trznadel, declare as follows:

1.     I have served in the Department of Energy ("DOE" or the "Department") for nineteen years in various positions. I am the Acting Chief Human Capital Officer, a position I have held since February 27, 2025. Previously I served as the Deputy General Counsel for Business Transactions. Before that I served as the Chief Counsel of the Department's Golden Field Office. The Office of the Chief Human Capital Officer ("OCHCO") is responsible for agency employment and staffing, compensation, benefits, executive resources, succession planning, labor and employee relations, workforce development, performance management, and other human capital functions. OCHCO also provides for the full range of human resource services to support Departmental Offices.

2.     I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal. I make the following statements based upon my personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.     I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Section 2 of the Executive Order excludes DOE, except the Federal Regulatory Commission, from coverage under Chapter 71 of Title 5, United States Code.

Trznadel Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD            1

Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4. The following information regarding DOE is correct and accurately reflects actions DOE took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No, but we have not been engaging with the unions | No | No, but we are not processing any new dues deduction enrollments | No | No pending matters | No, but has held them in abeyance while litigation is pending | No |

5. DOE has seven different collective bargaining agreements ("CBAs") with AFGE, each with its own requirements management has to comply with. AFGE represents DOE employees at the Western Area Power Administration, Bonneville Power Administration, Golden Field Office, National Energy Technology Laboratory (three separate bargaining units), and the Hanford Site Office. These organizational elements engage in a variety of missions in support of national security including providing critical sources of energy and grid stabilization and the management of nuclear waste.

6. DOE will suffer the following harms if forced to continue to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a) The preliminary injunction prevents DOE from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b) Due to the organizational structure of certain offices, such as Fossil Energy and Carbon Management or Energy Efficiency and Renewable Energy, management of one organization may have to comply with the requirements of multiple CBAs to implement a single change within an

1    organization.  Each Union may require notice, bargaining, or other time-consuming processes

2    prior to management being able to implement any changes.  In addition, the result of the

3    negotiations may impose conflicting requirements on management.  This impedes management's

4    ability to timely implement mission critical changes and efficiently manage its workforce.  In

5    general, the multiple CBAs result in similarly situated employees in the same office, and within

6    DOE as a whole, being treated differently by virtue of the CBA that governs their unit.

7    c)    Grievances: AFGE CBAs create a procedure under which Bargaining Unit Employees

8    may file grievances contesting certain management decisions.  If the matter is not resolved in the

9    grievance process, the Union may invoke arbitration on the matter.  This process can become

10    onerous to management, requiring time and resources to respond to grievances and participate in

11    arbitration rather than focusing on mission priorities.  Further, the grievance and arbitration

12    articles allow AFGE and third-party arbitrators to alter, constrain, and second-guess leadership

13    decisions about how to manage employees in the pursuit of the Agency's mission-related goals.

14    BPA-AFGE Sec. 13 and 14; Golden Field Office and AFGE Articles 25 and 26; NETL and

15    AFGE (Albany, Pittsburgh, and Morgantown) Article 33 and 35.

16    d)    Performance Management Program: Many provisions in AFGE CBAs make it more

17    difficult to remove employees who perform poorly.  For example, Bargaining Unit Employees

18    may receive more time to demonstrate performance than non-Bargaining Unit Employees, which

19    can result in inconsistent application of the requirements to ensure satisfactory performance.

20    Article 14 of the Golden Field Office and AFGE CBA states "If the employee continues to fail to

21    meet expectations with respect to a particular critical element(s), the Agency will issue a plan for

22    improving the employee's performance and be given a reasonable amount of time, no less than

23    forty-five (45) calendar days to demonstrate performance at an acceptable (ME) level."  The

24    CBA between Richland Operations Office (Hanford Site) and AFGE in Article 29.05 provides

25    that employees must be given ninety (90) days to demonstrate performance at an acceptable

26    level.  The Golden Field Office and AFGE CBA in Article 14 also requires that DOE provide

27    notice to the Union and bargain changes to its Performance Management Program, which

28

impairs management rights, limits the ability to make changes as needed to properly and timely manage DOE's workforce, is time consuming, and delays the implementation of DOE's priorities.

e)      Drug Testing: Some AFGE CBAs require that DOE give Bargaining Unit Employees additional rights and protections that are not available to non-Bargaining Unit Employees including the right to have an AFGE representative accompany him or her to the collection site and any meeting with security personnel or a management official regarding a non-negative test. Richland and AFGE Article 40.05. These requirements are overly burdensome and needlessly involve the Union in a process that is within the purview of a management right to properly manage its workforce and to enforce a safe and healthy work environment.

f)      Discipline: AFGE's CBAs with NETL require DOE to provide advance notice even for minor discipline, such as reprimands. This impedes DOE's ability to properly manage DOE's workforce and delays the ability to promptly correct employee misconduct. This also results in similarly situated employees being treated differently by virtue of the CBA that governs their unit. NETL and AFGE (Albany, Pittsburgh, and Morgantown) Article 19.

7.      As a general matter, CBAs interfere with DOE's ability to execute and implement the President's initiatives related to national security.  For example, DOE cannot implement government-wide rules and regulations from the President that conflict with the CBAs (without renegotiation and agreement with the unions). The Executive Order removed these obstacles, but the preliminary injunction re-imposed these restrictions.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30, 2025.

_____
REESHA TRZNADEL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:25-cv-03070-JD

**Declaration of Bryan Knowles in Support of
Defendants' Emergency Motion to Stay the
Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, Bryan Knowles, declare as follows:

1.     I am the Acting Deputy Director, Office of Human Resources Management within Departmental Administration at the U.S. Department of Agriculture ("USDA"). I have served in this role since April 27, 2025, and have previously served in various human resources and labor relations positions since joining USDA in 2011. In my current role, I provide oversight and leadership for the human capital functions and programs operating across the mission areas, agencies and staff offices that comprise USDA.

2.     I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal. I make the following statements based upon my personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.     I am familiar with Executive Order 14251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Section 2 of the Executive Order excludes the following agencies or subdivisions of USDA from coverage under Chapter 71 of Title 5, United States Code: Food Safety Inspection Service, Animal and Plant Health Inspection Service, and the Office of the Chief

1  Information Officer.  Exec. Order 14251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

2        4.      The following information regarding USDA is correct and accurately reflects actions

3  USDA took to implement Executive Order 14251 prior to the June 24, 2025 issuance of the "Order re:

4  Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No (except for a brief period) | No (except for a brief period) | Yes, except for a brief period | Eliminated official time but made no reassignments. | No, held in abeyance. | No, held in abeyance. | No. |

        a)      To clarify the response to the first two columns, on April 1, 2025, APHIS issued a

notice that it no longer recognized the National Federation of Federal Employees ("NFFE"),

Local 2021 as the exclusive representative, and that the Collective Bargaining Agreement

("CBA") between APHIS, Animal Care and NFFE, Local 2021 was no longer in effect.

However, on April 17, 2025, APHIS rescinded the notice.  Attachment 1.  With regard to the

third column, USDA suspended dues processing in pay periods (PP) 6 and 7 (i.e., March 23 to

April 5, 2025 and April 6 to 19, 2025, respectively), resumed dues processing for PP 8 (i.e.,

April 20 to May 3, 2025), and again suspended dues processing  in PP 9 (i.e., May 4 to 17,

2025).

        5.      USDA will suffer the following harms if forced to continue to comply with the

preliminary injunction and return its labor management operations to the status quo that existed prior to

the March 27, 2025 issuance of the Executive Order:

        a)      The preliminary injunction prevents USDA from complying with the President's

directions in the Executive Order, in which the President made national-security determinations

entrusted to him by Congress.

Knowles Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                                        2

b)    Reallocating the Agency's limited resources to working through conflict with unions, will impede the agency's capacity for timely addressing conduct and performance issues, which could impact national security.

c)    Implementation of Executive Orders and changes to laws, rules or regulations will likely be delayed.

d)    Reinstating official time will harm USDA's ability to adequately staff the workforce to fulfill the mission critical work of, for example, the slaughter/processing establishments and the Food Safety Inspection Service, whose mission to protect the consuming public.  Given the current environment, the staffing of inspection personnel is at a critical level and allowing official time only exasperates the problem.

e)    Temporarily reengaging with bargaining units on a backlog of grievances, negotiations, and reinstating union dues withholding needlessly creates timely and costly burdens requiring the limited resources needed to promote the productivity of the U.S. economy and the safety of food production and processing.


I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1, 2025.

BRYAN
KNOWLES

Digitally signed by BRYAN
KNOWLES
Date: 2025.07.01 10:41:47
-04'00'

  /s/
BRYAN KNOWLES

**United States Department of Agriculture**

Marketing and
Regulatory
Programs (MRP)

**DATE:**      April 17, 2025

**TO:**        Amy Jirsa-Smith, President, Local 2021
              National Federation of Federal Employees (NFFE)

**FROM:**      Mike Watson, Administrator
              Animal and Plant Health Inspection Service

MICHAEL WATSON   Digitally signed by MICHAEL WATSON
                 Date: 2025.04.17 10:01:49 -04'

**SUBJECT:**   RESCISSION – Notice of Exclusion from the Federal Service Labor-
              Management Relations Statute (FSLMRS)

This is to inform you that my previous memo, Notice of Exclusion from the Federal Service Labor-Management Relations Statute (FSLMRS) and Accompanying Actions, signed March 31, 2025, is hereby rescinded. Accordingly, the Animal and Plant Health Inspection Service (APHIS) recognizes the National Federation of Federal Employees (NFFE), Local 2021, as the exclusive representative for employees referenced in the Federal Labor Relations Authority (FLRA) certification dated April 14, 2021, and the actions referenced in paragraphs A-C of the previous memo are not being taken. Of note, the collective bargaining agreement is not terminated.

Any questions or concerns regarding these actions should be directed to Jason Grams, Deputy Director, Employee Management Services Directorate, at Jason.c.grams@usda.gov

cc:    James Ivy, APHIS Chief Human Capital Officer
       Jason Grams, Deputy Director, Employee Management Services Directorate
       Chris Nelson, OHRM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-03070-JD<br><br>**Declaration of Michael Molina in Support of Defendants' Motion to Stay the Preliminary Injunction Pending Appeal**<br><br>Judge: Hon. James Donato |

Pursuant to 28 U.S.C. § 1746, I, Michael Molina, declare as follows:

1.     I am the Principal Deputy Assistant Administrator for Mission Support at the United States Environmental Protection Agency ("EPA" or "the Agency"), in the Office of Mission Support, and I have served in this role since February 24, 2025.  In my current role I oversee the organization responsible for the negotiation of all term union agreements at EPA.

2.     I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.     I am familiar with Executive Order 14,251, Exclusions from Federal Labor-Management Relations Programs (the "Executive Order").  Section 2 of the Executive Order excludes EPA from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.     The following information regarding EPA is correct and accurately reflects actions the Agency took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes | No | No | No | No |

5.    EPA will suffer the following harms if forced to continue to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)    The preliminary injunction prevents EPA from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress

b)    The AFGE collective bargaining agreement (CBA) includes numerous terms that materially restrict the power of EPA to govern and set policies for its own workforce that impact the national security mission of the agency.

i.    The AFGE CBA Article 17 generally requires performance improvement plans (PIPs) to last at least 90 days, and "[u]nder no circumstances" less than 60 days, before EPA can propose to remove an underperforming employee.  This is between double and triple the 30 days the President has determined is generally appropriate for these evaluations.

ii.    The AFGE CBA Article 21 is the "Discipline" article.  It requires supervisors to provide employees an extra-regulatory reply period before issuing letters of reprimand and requires employees to receive 30 calendar days before suspension for 14 days or less, which is 29 more days than required by regulation.

iii.    The AFGE CBA Article 25 requires individual supervisors to take

1    multiple administrative steps before accessing electronic monitoring data related to

2    employee entry and exit times at Agency facilities.  This limits EPA supervisors' ability

3    to efficiently and effectively manage the workforce.

4    c)    The AFGE CBA generally interferes with EPA's ability to execute and implement

5    the President's initiatives related to national security.  For example, EPA generally cannot

6    implement the President's government-wide rules and regulations that conflict with the AFGE

7    CBA (absent a compelling need or without renegotiation and agreement with AFGE). 5 U.S.C. §

8    7117. The implementation of the President's Memorandum directing remote employees back to

9    agency worksites was delayed by the CBA's requirement of multiple pay periods' notice before

10   terminating employees' telework and remote agreements.  The Executive Order removed these

11   obstacles.

12

13   I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1,

14   2025.

15

16   MICHAEL MOLINA    Digitally signed by MICHAEL MOLINA
     Date: 2025.07.01 12:06:55 -04'00'

17   _____
     MICHAEL D. MOLINA

18

19

20

21

22

23

24

25

26

27

28

Molina Decl. Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                    3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,

    Plaintiffs,

  v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:25-cv-03070-JD

**Declaration of Micah Cheatham in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, Micah Cheatham, declare as follows:

1. I am the Chief Management Officer in the National Science Foundation ("NSF"), and I have served in this role since July 14, 2024.  In my current role, I am responsible for advising the NSF Director and Deputy Director on agency operations and business activities, including the strategic management of human capital and labor-management relations.

2. I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3. I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").

4. Section 2 of the Executive Order excludes NSF from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

5. NSF's mission encompasses national security work to include safeguarding U.S. research security and investing in technologies that are essential tools for our collective national security.  NSF's ability to achieve its mission depends on swift implementation of agency priorities, at times working

1  closely with the Department of Defense and the intelligence communities.  AFGE Local 3403 is the

2  exclusive representative for the approximately 1,000 employees of the Bargaining Unit at NSF.

3      6.    The following information regarding NSF is correct and accurately reflects actions NSF

4  took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re:

5  Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes | Yes as to official time, no as to reassignments | No | Yes | Yes, reclaimed space |

7      7.    NSF will suffer the following harms if forced to continue to comply with the preliminary

12  injunction and return its labor management operations to the status quo that existed prior to the March

13  27, 2025 issuance of the Executive Order:

16      a)    The preliminary injunction prevents NSF from complying with the President's directions

16  in the Executive Order, in which the President made national-security determinations entrusted

17  to him by Congress.

19      b)    Should NSF continue to be required to participate in collective bargaining, grievance, and

19  arbitration procedures in effect prior to the Executive Order, the agency might have to engage in

20  sharing pre-decisional, sensitive, and deliberative information with the union that would hinder

21  or undermine future NSF operations and U.S. national security.  For example, restructuring

22  staffing models to align with agency priorities, including national security and research security,

23  might be disclosed during bargaining.  In another example, if NSF were required to discipline or

24  remove an employee for misconduct based on evidence gained from classified methods or

25  sources, it would be impossible to adhere to the representation requirements in the collective

26  bargaining agreement or the negotiated grievance procedure; NSF would not be able to discipline

28  an employee in this situation because NSF could not disclose evidence relied on for the action

1    and could not allow representation required by our Union contract.

2    c)    Should NSF continue to be required to comply with the injunction during the appeal

3    process, NSF will be required to undo certain actions taken to comply with the Executive Order,

4    and redo the actions should the Court of Appeals rule for the government, which will result in

5    less efficient and productive operations.  For example, NSF must inefficiently expend agency

6    resources to reinstate payroll deductions that were discontinued for union members, and reverse

7    the action should the Court of Appeals rule for the government.

8    d)    Should NSF continue to be enjoined from implementing the Executive Order, NSF will

9    inefficiently expend agency resources to convert union space and equipment that was reclaimed

10    by the agency to the union, and later reverse the action should the Court of Appeals rule for the

11    government.

12    I declare under penalty of perjury that the foregoing is true and correct. Executed on this 1st day

13    of July, 2025.

14

15    

16    MICAH CHEATHAM

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                Defendants. | Case No. 3:25-cv-03070-JD<br><br>**Declaration of Katie A. Higginbothom in Support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal**<br><br>Judge: Hon. James Donato |

Pursuant to 28 U.S.C. § 1746, I, Katie A. Higginbothom, declare as follows:

1.      I am the Chief Administrative Officer at the United States International Trade Commission ("USITC"), and I have served in this role since September 10, 2023.  In my current role, I am designated as the USITC's Principal Management Official for Labor Relations.

2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal.  I make this declaration based upon my personal knowledge and information provided to me in the course of performing my official duties.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.      I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").  Section 2 of the Executive Order excludes USITC from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.      The following information regarding USITC is correct and accurately reflects actions USITC took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

Higginbothom Decl. ISO Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                                    1

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes | No | N/a—no cases pending before the FLRA | Yes | No |

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1, 2025.

KATIE HIGGINBOTHOM   Digitally signed by KATIE HIGGINBOTHOM Date: 2025.07.01 10:00:57 -04'00'

/s/
Katie A. Higginbothom

Docusign Envelope ID: C40CE72B-5S3C-4F12-9781-3C874D35D55B

Case 3:25-cv-03070-JD   Document 63-20   Filed 07/01/25   Page 1 of 3
USCA Case #25-5157   Document #2123529   Filed: 07/02/2025   Page 76 of 91

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-03070-JD <br><br> **Declaration of Arron Helm in Support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal** <br><br> Judge: Hon. James Donato |

Pursuant to 28 U.S.C. § 1746, I, Arron Helm, declare as follows:

1.    I am the Chief Human Capital Officer in the General Services Administration ("GSA"), and I have served in this role since July 2024.  In my current role, I am responsible for all human resources activities, including Labor Relations, at GSA.

2.    I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal.  I make this declaration based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.    I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").  Section 2 of the Executive Order excludes GSA from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.    The following information regarding GSA is correct and accurately reflects actions GSA took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

Docusign Envelope ID: C40CE72B-5S3C-4F12-9781-3C874D35D55B

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No, GSA previously terminated its CBA on April 1 but rescinded such termination on April 25 | Yes | Yes | No, they are held in abeyance | All pending national grievances held in abeyance; no arbitrations | Yes |

5.    GSA will suffer the following irreparable harms if forced to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)    The preliminary injunction prevents GSA from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b)    Compliance with the preliminary injunction would require GSA to revert to the labor-management framework that existed prior to the issuance of the Executive Order.  GSA has vacated or repurposed office space formerly dedicated to union activities as part of its ongoing real estate optimization initiative.  Reacquiring or reconstructing these facilities for the unions would require the expenditure of public funds and resources.

c)    GSA also suspended union-related operations such as dues withholding, granting and tracking official time, and grievance administration.  Reversing all the changes GSA has

Docusign Envelope ID: C40CE72B-5C3C-4F12-9781-3C874D35D55B

Case 3:25-cv-03070-JD    Document 63-20    Filed 07/01/25    Page 3 of 3
USCA Case #25-5157    Document #2123529    Filed: 07/02/2025    Page 78 of 91

1    implemented would impose significant and unrecoverable costs, expend significant

2    agency resources and time, and cause confusion for GSA employees.

3

4        I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 1,

5    2025.

6

7

8    Arron Helm

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | ) Case No. 3:25-cv-03070-JD ) ) **Declaration of Michael Russo in Support of** |
| Plaintiffs, | ) **Defendants' Emergency Motion to Stay** ) **Preliminary Injunction Pending Appeal** ) |
| v. | ) ) Judge: Hon. James Donato |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) ) |
| Defendants. | ) ) |

Pursuant to 28 U.S.C. § 1746, I, Michael Russo, declare as follows:

1.      I am the Chief Information Officer of the United States Social Security Administration ("SSA"), and I have served in this role since February 2025.

2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter. I provide this declaration in support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal. I make the following statements based upon my personal knowledge and information provided to me in my official capacity. If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.      I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Section 2 of the Executive Order excludes the following agencies or subdivisions of SSA from coverage under Chapter 71 of Title 5, United States Code: Office of the Chief Information Officer. Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.      The following information regarding SSA is correct and accurately reflects actions SSA took to implement Executive Order 14,251 prior to the June 24, 2025, issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes | Eliminated approved official time and made one reassignment. | No | No, held in abeyance. | No |

5.    SSA will suffer the following harms if forced to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)    The preliminary injunction prevents SSA from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b)    The preliminary injunction prevents SSA from making any changes to conditions of employment without offering AFGE the opportunity to bargain.

c)    The preliminary injunction prevents SSA from changing flexible work bands during the term of the agreement.

d)    The preliminary injunction requires SSA to revert to a 60-day Opportunity to Perform Successfully (OPS) period before removing poor performers, requiring SSA to keep poor performers in critical national security positions weeks longer than is necessary.

e)    The preliminary injunction requires SSA to follow progressive discipline in most circumstances and establish "just cause" when addressing conduct, impairing SSA's ability to remove.

f)    The preliminary injunction prevents SSA from changing pre-existing telework procedures.

g)    The preliminary injunction requires SSA to process requests from AFGE members to have their union dues, fees and assessments withheld through payroll deductions.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 1, 2025.

_____

MICHAEL RUSSO

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | Case No. 3:25-cv-03070-JD |
| Plaintiffs, | **Declaration of Kimberly Amaya in Support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal** |
| v. | Judge: Hon. James Donato |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Kimberly Amaya, declare as follows:

1.      I am the Labor Relations Section Chief in the Department of Labor ("DOL"), and I have served in this role since December 8, 2019.  In my current role, I am responsible for all aspects of Labor Relations, including providing advice and guidance regarding the disciplinary and performance-based actions, negotiation, and administration of collective bargaining agreements, including the interpretation and application of Departmental/union-negotiated agreements as they apply to grievances, arbitration, and unfair labor practice matters.

2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.      I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").  Section 2 of the Executive Order excludes the following subdivision of DOL from coverage under Chapter 71 of Title 5, United States Code: Office of Chief Information Officer.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.      The following information regarding DOL is correct and accurately reflects actions DOL

took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes, only for the excluded employees | No | No | No | No |

5.     DOL will suffer the following harms if forced to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)     The preliminary injunction prevents DOL from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b)     The preliminary injunction requires DOL to re-add approximately 320 former American Federal of Government Employee (AFGE) bargaining unit member employees of its Office of the Chief Information Officer (OCIO), within DOL's Office of Assistance Secretary for Administration and Management (OASAM), to their appropriate AFGE bargaining units, *i.e.*, either AFGE Local 12 for those OCIO employees located within the Washington D.C. metropolitan area, or AFGE National Council of Field Labor Locals (NCFLL) for those OCIO employees located outside the Washington D.C. metropolitan area.  No other DOL employees are affected by the preliminary injunction.

c)     This return to one of the two AFGE bargaining units for the approximately 320 OCIO affected employees will require about a month of significant, mostly administrative manpower effort across numerous divisions within DOL's Office of Human Resources (OHR) within DOL's Office of Assistance Secretary for Administration and Management (OASAM).

d)     Specifically, OASAM OHR's Division of Classification & Analysis (DCA) will

need to reclassify and update each employee's position description to capture the status of the position as within the relevant AFGE bargaining unit (some OCIO employees have the same position description).  During the earlier process to remove these OCIO employees from the AFGE bargaining units, DCA had approximately two (2) employees working on the effort.

e)    In addition, for each of the 320 OCIO employees, OASAM OHR's Division of Compensation and Processing (DCP) and the Division of Human Resources Information Systems (HRIS) will need to confirm and/or upload each employee's revised position description in the relevant HR system(s) and change each employee's bargaining unit code in the relevant HR system(s).  During the earlier process to remove these OCIO employees from the AFGE bargaining units, DCP had approximately 27 employees working on the effort.

f)    In addition, we will need to make changes to reinstate each employee's dues-paying status in the relevant HR and/or financial system(s) for the subset of the 320 OCIO employees who were dues-paying members for AFGE.

g)    Further, the preliminary injunction will significantly complicate OHR Labor Relations' compliance with contractually obligated notification, briefing, and engagement efforts with AFGE.  Specifically, OHR Labor Relations will have to ensure the OCIO employees get back to the AFGE bargaining units, ensure reinstatement of their dues payments, and analyze and process AFGE request(s) to get reimbursed for the dues payments missed during the time period when the previously dues-paying OCIO bargaining unit members were not paying dues.  During the earlier process to remove these OCIO employees from the AFGE bargaining units, OHR Labor Relations had approximately four (4) employees working on the effort.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 1, 2025.

KIMBERLY AMAYA  Digitally signed by KIMBERLY AMAYA Date: 2025.07.01 08:35:22 -04'00'

_____

KIMBERLY AMAYA

1
2
3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

4
5
6
7
8
9
10

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | Case No. 3:25-cv-03070-JD |
| Plaintiffs, | **Declaration of Lori A. Michalski in Support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Judge: Hon. James Donato |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to 28 U.S.C. § 1746, I, Lori A. Michalski, declare as follows:

1.      I am the Chief Human Capital Officer at the United States Department of Housing and Urban Development ("HUD"), and I have served in this role since February 2021.  In my current role, I am responsible for providing oversight and management of all human capital functions for the Department.

2.      I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' Emergency Motion to Stay Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.      I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").  Section 2 of the Executive Order excludes the following agencies or subdivisions of HUD from coverage under Chapter 71 of Title 5, United States Code: Office of Chief information Officer.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.      HUD's Office of the Chief Information Officer's (OCIO) primary function in cybersecurity directly impacts national security.  Hostile nation states like China, Iran, and North Korea constantly attempt to penetrate agency computer systems, posing significant threats.  OCIO implements

Michalski Decl. ISO Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                          1

cybersecurity frameworks under the Federal Information Security Modernization Act of 2014, protecting agency systems from cyber threats such as state-sponsored attacks or ransomware. OCIO also manages systems for storing sensitive data and personally identifying information. If accessed by foreign governments or terrorist organizations, this data could pose substantial risks to national security. Specifically, the OCIO for HUD oversees HUD's information security program, ensuring the security of networks, public and financial data, devices, systems, and personnel.

5.    The following information regarding HUD is correct and accurately reflects actions HUD took to implement Executive Order 14,251 prior to the June 24, 2025, issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | Yes, for OCIO employee only | No | No | No | No |

6.    HUD will suffer the following harms if forced to comply with the preliminary injunction and return its labor management operations to the status quo that existed prior to the March 27, 2025 issuance of the Executive Order:

a)    The preliminary injunction prevents HUD from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

b)    Given the sensitive and high-stakes nature of OCIO's work, labor management programs could introduce additional layers of bureaucracy and potential delays. For example, when OCIO has to respond to cybersecurity events, OCIO staff often must work quickly to resolve the issues. Some of these events require working longer hours or over the weekend. HUD's collective bargaining obligations require our Agency to inform the union of the need to work extra hours in advance. Excluding OCIO from these programs ensures it can maintain the

1    agility and focus necessary to protect national security.

2          c)    The preliminary injunction restricts HUDs ability to manage its workforce.  For

3    example, Article 49 of the HUD-AFGE CBA requires HUD to notify the Union of any changes

4    to personnel policies, practices, and general conditions of employment, which could include

5    assignment of work or making an organizational change, and, if requested by the Union, to

6    negotiate the impact and implementation of the proposed changes.  If the negotiations reach an

7    impasse, HUD cannot implement any changes until a final agreement is reached, or the Federal

8    Services Impasses Panel issues a decision.  The Executive Order would remove these obstacles.

9

10    I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30,

11    2025.

12    LORI
       MICHALSKI
       Digitally signed by: LORI MICHALSKI
       DN: CN = LORI MICHALSKI C = US O
       = U.S. Government OU = Department
       of Housing and Urban Development
       Date: 2025.06.30 19:49:57 -04'00'

13    _____

14    LORI A. MICHALSKI

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michalski Decl. ISO Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal
3:25-CV-03070-JD                                3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,

          Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

          Defendants.

Case No. 3:25-cv-03070-JD

**Declaration of DeShawn Shepard in Support of
Defendants' Emergency Motion to Stay the
Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, DeShawn Shepard, declare as follows:

1.     I am the Deputy Director of the Departmental Office of Human Resources Management in the Department of Transportation ("DOT"), and I have served in this role since May 22, 2022.  In my current role, I am responsible for establishing strategic policies and programs for human resources functions such as staffing, recruitment, workforce and succession planning, employee and labor relations for the Office of the Secretary and the Operating Administrations, excluding the Federal Aviation Administration and the Office of the Inspector General.

2.     I provide this declaration in support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.     I am familiar with Executive Order 14251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").  Section 2 of the Executive Order excludes the following agencies or subdivisions of DOT from coverage under Chapter 71 of Title 5, United States Code: the Office of the Chief Information Officer, and any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty.  Exec. Order 14251 § 2, 90

Fed. Reg. 14553, 14553 (Apr. 3, 2025).

4.      Section 5 of the Executive Order delegates to the Secretary of Transportation the authority to exclude any subdivision of DOT from coverage under Chapter 71 of Title 5, United States Code.  Exec. Order 14251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).  The Secretary has not exercised this authority.

5.      The following information regarding the DOT is correct and accurately reflects actions DOT took to implement Executive Order 14251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No[1] | No | Yes | No | No | No | No |

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 1, 2025.

Digitally signed by DESHAWN MONIQUE SHEPARD
Date: 2025.07.01 10:29:40 -04'00'

DeShawn Shepard

---

[1] On Monday March 31, 2025, the Office of the Secretary of Transportation ("OST") provided a preliminary notice to AFGE, that it would no longer recognize the Union as the exclusive representative for its OCIO employees and that the CBA provision that identifies the OCIO as part of the bargaining unit was void.  However, no further action has been taken to remove OST OCIO employees from the bargaining unit, and no employee's bargaining unit status was changed in the system.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
*et al.*,

              Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:25-cv-03070-JD

**Declaration of Jacqueline Clay in Support of Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal**

Judge: Hon. James Donato

Pursuant to 28 U.S.C. § 1746, I, Jacqueline Clay, declare as follows:

1.    I am the Chief Human Capital Officer in the Department of Education ("ED"), and I have served in this role since June 19, 2022.  In my current role, I am responsible for overseeing federal labor management relations.

2.    I have reviewed the "Order re: Preliminary Injunction" entered by this Court on June 24, 2025, in the above captioned matter.  I provide this declaration in support of Defendants' motion for stay of the preliminary injunction pending appeal.  I make the following statements based upon my personal knowledge and information provided to me in my official capacity.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

3.    I am familiar with Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order").  Section 2 of the Executive Order excludes the following subdivision of ED from coverage under Chapter 71 of Title 5, United States Code: Office of Chief Information Officer.  Exec. Order 14,251 § 2, 90 Fed. Reg. 14553, 14554 (Apr. 3, 2025).

4.    The following information regarding ED is correct and accurately reflects actions ED took to implement Executive Order 14,251 prior to the June 24, 2025 issuance of the "Order re: Preliminary Injunction":

| Has refused to recognize unions as exclusive reps? | Has terminated CBAs? | Has suspended dues processing? | Has eliminated official time and reassigned employees who used it? | Has refused participation at FLRA? | Has terminated or refused to participate in grievance or arbitration proceedings? | Has reclaimed agency space or equipment used by the unions? |
|---|---|---|---|---|---|---|
| No | No | No | No | No | No | No |

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 1, 2025.

JACQUELINE CLAY
Digitally signed by JACQUELINE CLAY
Date: 2025.07.01 09:35:46 -04'00'

Jacqueline Clay