**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5157**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

NATIONAL TREASURY EMPLOYEES UNION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Defendants-appellants are Donald J. Trump, Charles Ezell, Pamela J. Bondi, Robert F. Kennedy, Jr., Lee M. Zeldin, Christopher A. Wright, Brendan T. Carr, Scott Bessent, Melanie Krause, Margie Rollinson, Timothy E. Gribben, Mary G. Ryan, Rodney E. Hood, and John Raby. Plaintiff-appellee is National Treasury Employees Union. No other parties, intervenors, or amici curiae appeared before the district court or have entered appearances in this Court.

### B.    Rulings Under Review

Defendants seek review of the April 25, 2025, order and the April 28, 2025, opinion of the district court (Friedman, J.) granting plaintiff a preliminary injunction. *See* JA217-218; JA219-264. The district court's opinion is reported at 780 F. Supp. 3d 237.

## C.    Related Cases

This case has not previously been before the Court.  The following cases involve an overlapping set of defendants and raise similar issues to this case:

- *American Foreign Service Ass'n v. Trump*, No. 25-5184 (D.C. Cir.)

- *American Foreign Service Ass'n v. Trump*, No. 1:25-cv-01030 (D.D.C.)

- *Federal Education Ass'n v. Trump*, No. 25-5303 (D.C. Cir.)

- *Federal Education Ass'n v. Trump*, No. 25-cv-01362 (D.D.C.).

- *American Federation of Government Employees v. Trump*, No. 25-4014 (9th Cir.)

- *American Federation of Government Employees v. Trump*, No. 25-cv-03070 (N.D. Cal.)

- *U.S. Department of Treasury v. National Treasury Employees Union Chapter 73*, No. 25-5656 (6th Cir.)


*/s/ Joshua M. Koppel*
Joshua M. Koppel

ii

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................v

GLOSSARY ................................................................................ xiii

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION .................................................. 3

STATEMENT OF THE ISSUES .................................................... 4

PERTINENT STATUTES ............................................................ 4

STATEMENT OF THE CASE ...................................................... 4

    A.    Statutory And Regulatory Background ................................ 4

    B.    Factual Background ...................................................... 7

    C.    Prior Proceedings ...................................................... 10

SUMMARY OF ARGUMENT .................................................... 16

STANDARD OF REVIEW .......................................................... 19

ARGUMENT .......................................................................... 19

I.    THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS ............ 19

    A.    The FSLMRS Precludes District-Court Jurisdiction Over Plaintiff's Claims ........................................ 19

    B.    Plaintiff Cannot Assert An *Ultra Vires* Claim To Challenge The President's Exercise Of Discretion Granted By Statute .................................................. 31

iii

C.    Plaintiff Is Not Likely To Succeed On The Merits Of Its *Ultra Vires* Claim ................................................................ 34

    1.    The executive order is facially consistent with statute ............................................................................ 35

    2.    Plaintiff failed to rebut the presumption of regularity .................................................................... 37

    3.    The President's determinations reasonably apply the criteria of § 7103(b)(1) ........................................... 46

II.    PLAINTIFF DID NOT ESTABLISH THAT IT WOULD LIKELY SUFFER IRREPARABLE HARM ............................................. 54

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR ....................................................... 59

CONCLUSION ........................................................ 61

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*AFGE v. Loy*,
  367 F.3d 932 (D.C. Cir. 2004) ........................................................ 24-25

*AFGE v. Reagan*,
  870 F.2d 723 (D.C. Cir. 1989) .............................. 35, 36, 37, 40, 44, 50

*AFGE v. Secretary of the Air Force*,
  716 F.3d 633 (D.C. Cir. 2013) ........................................................ 20, 21

*AFGE v. Trump,* No. 25-cv-03070
  2025 WL 1755442 (N.D. Cal. June 24, 2025) ..................................... 15

*AFGE v. Trump,* No. 25-4014,
  2025 WL 2180674 (9th Cir. Aug. 1, 2025) ............ 15, 16, 42, 55, 58, 60

*AFGE v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ................... 21, 22, 24, 25, 26, 27, 30, 57

*AFGE Local 446 v. Nicholson*,
  475 F.3d 341 (D.C. Cir. 2007) ........................................................ 30, 31

*AFSA v. Trump*, No. 25-1030,
  2025 WL 1387331 (D.D.C. May 14, 2025) ........................................... 13

*AFSA v. Trump,* No. 25-5184,
  2025 WL 1742853 (D.C. Cir. June 20, 2025).... 13, 14, 31, 33, 37, 60, 61

*Axon Enter., Inc. v. Federal Trade Comm'n*,
  598 U.S. 175 (2023) ............................................................................ 21

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ............................................................................ 28

*BP P.L.C. v. Mayor & City Council of Baltimore*,
  593 U.S. 230 (2021) ............................................................................ 38

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ............................................................................ 32

*Clevinger v. Advocacy Holdings, Inc.*,
    134 F.4th 1230 (D.C. Cir. 2025) ................................................. 19, 58

*Cole v. Young*,
    351 U.S. 536 (1956) ........................................................... 51, 52, 53

*Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*,
    250 U.S. 163 (1919) ................................................................... 32

*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................... 31, 33

*Department of the Navy Naval Aviation Depot Naval
    Air Station Alameda & Int'l Ass'n of Machinists &
    Aerospace Workers Lodge 739*,
    36 F.L.R.A. 509 (1990) ............................................................. 57

*Department of the Navy, Naval Telecomms. Ctr. &
    Navtelcom Unit Loc. No. 1*,
    6 F.L.R.A. 498, 500 (1981) ....................................................... 29

*East St. Louis Laborers' Loc. 100 v. Bellon Wrecking &
    Salvage Co.*,
    414 F.3d 700 (7th Cir. 2005) ..................................................... 56

*Elgin v. Department of the Treasury*,
    567 U.S. 1 (2012) ................................................................. 25, 27

*Federal Educ. Ass'n v. Trump*, No. 25-1362,
    2025 WL 2355747 (D.D.C. Aug. 14, 2025) ...................................... 14

*Federal Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ................................................... 35

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ............................................................... 20

*Gilligan v. Morgan*,
    413 U.S. 1 (1973) ................................................................. 51

*Haig v. Agee*,
    453 U.S. 280 (1981) ............................................................... 34

vi

*Henderson ex rel. NLRB v. Bluefield Hosp. Co.*,
902 F.3d 432 (4th Cir. 2018) ............................................................ 56

*Hercules Inc. v. EPA*,
598 F.2d 91 (D.C. Cir. 1978) ............................................................ 38

*Holder v. Humanitarian L. Project*
561 U.S. 1 (2010) ............................................................................. 40

*Independent Union of Pension Emps. for Democracy & Just.*
*& Pension Benefit Guar. Corp.*,
68 F.L.R.A. 999 (2015) .................................................................... 26

*Nken v. Holder*,
556 U.S. 418 (2009) ......................................................................... 59

*North Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) .................................................. 34, 46

*NTEU v. Trump*, No. 25-5157,
2025 WL 1441563 (D.C. Cir. May 16, 2025) ........ 12, 13, 54, 55, 58, 60

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ......................................................................... 35

*Owlfeather-Gorbey v. Avery*,
119 F.4th 78 (D.C. Cir. 2024) .......................................................... 38

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ................................................................... 21, 27

*Trump v. Hawaii*,
585 U.S. 667 (2018) ................................................................... 40, 46

*Trump v. International Refugee Assistance Project*,
582 U.S. 571 (2017) ......................................................................... 59

*U.S. Army Corps of Eng'rs Memphis Dist. & National*
*Fed'n of Fed. Emps. Loc. 259*,
53 F.L.R.A. 79 (1997) ...................................................................... 51

vii

*U.S. Att'y's Off. S. Dist. of Tex. & AFGE Loc. 3966,*
  57 F.L.R.A. 750 (2002) ............................................................... 23, 28

*U.S. Dep't of Def. v. American Fed'n of Gov't Emps. Dist. 10,*
  No. 6:25-cv-00119, 2025 WL 2058374 (W.D. Tex. July 23, 2025) ..... 10

*U.S. Dep't of Def. Ohio Nat'l Guard & AFGE Loc. 3970,*
  71 F.L.R.A. 829 (2020) ....................................................................... 58

*U.S. Dep't of Homeland Sec. U.S. Immigration &*
*Customs Enf't & AFGE Nat'l Immigration & Customs*
*Enf't Council 118,*
  67 F.L.R.A. 501 (2014) ....................................................................... 43

*U.S. Dep't of the Air Force Davis-Monthan Air Force Base*
*& AFGE Loc. 2924,*
  62 F.L.R.A. 332 (2008) ....................................................................... 26

*U.S. Dep't of the Air Force Air Force Materiel Command*
*Warner Robins Air Logistics Ctr. Robins Air Force*
*Base & AFGE Local 987,*
  66 F.L.R.A. 589 (2012) ....................................................................... 29

*U.S. Dep't of the Treasury U.S. Mint & AFGE Mint*
*Council, C-157,*
  35 F.L.R.A. 1095 (1990) ..................................................................... 58

*U.S. Dep't of Treasury v. NTEU, Chapter 73,*
  No. 2: 25-049, 2025 WL 1446376 (E.D. Ky. May 20, 2025) ............... 10

*U.S. Dep't of the Treas., IRS & NTEU,*
  62 F.L.R.A. 298 (2007) ....................................................................... 49

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) ............................................................................ 37

*United States v. Ruiz,*
  536 U.S. 622 (2002) ............................................................................ 27

*Webster v. Doe,*
  486 U.S. 592 (1988) .............................................................. 33, 37, 41

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .......................................................... 19, 59

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017) ........................................................ 34

## Statutes:

5 U.S.C. §§ 7101-7135 ....................................................... 4

5 U.S.C. § 7101(a) ........................................................... 38

5 U.S.C. § 7102(2) ........................................................... 4

5 U.S.C. § 7103(a)(3) ........................................................ 1

5 U.S.C. § 7103(b)(1) ................................................... 1, 6, 10

5 U.S.C. § 7103(b)(1)(A) .................................................... 47

5 U.S.C. § 7103(b)(1)(B) ............................................. 38, 45, 50

5 U.S.C. § 7104(f)(2) ........................................................ 5

5 U.S.C. § 7105(a) ...................................................... 10, 25

5 U.S.C. § 7105(a)(2) ....................................................... 20

5 U.S.C. § 7106 .............................................................. 4

5 U.S.C. § 7112(b)(6) ....................................................... 26

5 U.S.C. § 7114 .............................................................. 4

5 U.S.C. § 7116 .............................................................. 5

5 U.S.C. § 7116(a) .......................................................... 22

5 U.S.C. § 7116(a)(8) ....................................................... 25

5 U.S.C. § 7118(a) .......................................................... 22

ix

5 U.S.C. § 7118(a)(1) ................................................................. 5

5 U.S.C. § 7118(a)(1)-(2) ........................................................... 5

5 U.S.C. § 7118(a)(7) ............................................................... 57

5 U.S.C. §§ 7121-7122 ............................................................... 5

5 U.S.C. § 7121(a) ................................................................... 22

5 U.S.C. § 7122(a) ................................................................... 22

5 U.S.C. § 7123(a) ...................................................... 5, 20, 22, 23

15 U.S.C. § 634b .................................................................... 47

22 U.S.C. § 4103 .................................................................... 33

28 U.S.C. § 1292(a)(1) ............................................................... 3

28 U.S.C. § 1331 ................................................................. 3, 20

31 U.S.C. § 321(a)(7) ............................................................... 49

38 U.S.C. § 7422(b) ................................................................. 30

38 U.S.C. § 7422(d) ................................................................. 30

50 U.S.C. § 3021(c) ................................................................. 49

42 U.S.C. § 247d-4(a)(1) ............................................................ 48

42 U.S.C. § 300hh-10(b) ............................................................. 49

42 U.S.C. § 7111(2) ................................................................. 48

47 U.S.C. § 151 ..................................................................... 49

**Regulatory Materials:**

5 C.F.R. §§ 2423.3-2423.6 ........................................................... 5

Exec. Order No. 12,171,
    44 Fed. Reg. 66,565 (Nov. 20, 1979) ...................................................... 6

Exec. Order No. 12,666,
    54 Fed. Reg. 1,921 (Jan. 17, 1989) ........................................................ 7

Exec. Order No. 13,039,
    62 Fed. Reg. 12,529 (Mar. 14, 1997) .................................................. 6-7

Exec. Order No. 13,252,
    67 Fed. Reg. 1,601 (Jan. 11, 2002) ........................................................ 6

Exec. Order No. 13,480,
    73 Fed. Reg. 73,991 (Dec. 4, 2008) ....................................................... 6

Exec. Order No. 14,251,
    90 Fed. Reg. 14,553 (Apr. 3, 2025) ......................................... 7, 45, 53

## Other Authorities:

Letter, *AFGE v. Trump*, No. 25-4014
    (9th Cir. Aug. 14, 2025), Dkt. 34.1 ....................................................... 9

Memorandum from Charles Ezell, Acting Dir., OPM,
    to Heads and Acting Heads of Departments and
    Agencies (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F .......... 7, 8, 45

Order, *AFSA v. Trump*, No. 25-5184 (D.C. Cir. July 30, 2025) ............. 14

The White House, *Fact Sheet: President Donald J.*
    *Trump Exempts Agencies with National Security*
    *Missions from Federal Collective Bargaining*
    *Requirements* (Mar. 27, 2025),
    https://perma.cc/Y7HR-4W3H ................................................. 42, 43, 44

U.S. Dep't of Energy, *Energy Security*,
    https://perma.cc/2YCS-EUBP ............................................................. 48

U.S. Dep't of State, *About the U.S. Department of State*,
    https://perma.cc/8GPX-63RG ............................................................. 47

U.S. Dep't of the Treasury, *Role of the Treasury*,
https://perma.cc/24Z9-QXE8 ................................................................ 49

# GLOSSARY

| | |
|---|---|
| AFGE | American Federation of Government Employees |
| AFSA | American Foreign Service Association |
| CSRA | Civil Service Reform Act |
| FLRA | Federal Labor Relations Authority |
| FSLMRS | Federal Service Labor–Management Relations Statute |
| NTEU | National Treasury Employees Union |
| OPM | Office of Personnel Management |

# INTRODUCTION

When Congress enacted the Federal Service Labor–Management Relations Statute (FSLMRS) and granted members of the civil service the right to unionize and bargain collectively, it recognized that those activities could, in certain circumstances, be inconsistent with the needs of national security. Accordingly, Congress vested the President with discretion to exclude certain agencies and agency subdivisions from FSLMRS coverage "if the President determines" that national security so requires. 5 U.S.C. § 7103(b)(1). Like his predecessors, President Trump exercised that authority by issuing an executive order determining that certain agencies and subdivisions should be excluded from the scope of the FSLMRS.

Plaintiff National Treasury Employees Union (NTEU), which represents employees in some of the excluded agencies, filed suit claiming that the executive order is inconsistent with the terms of the FSLMRS and violates the First Amendment. In this case, as in two others currently pending before this Court and a fourth pending before the Court of Appeals for the Ninth Circuit, the district court preliminarily enjoined the government from enforcing the executive

order.  In three of these cases, the court of appeals has stayed the

preliminary injunction, finding, for at least three different reasons, that

the government is likely to prevail on the merits.[1]

This Court should, consistent with the reasoning of those stay

decisions, reverse the district court and vacate the preliminary

injunction.  First, the district court was wrong to exercise jurisdiction

over NTEU's claims, which should have been brought before the

Federal Labor Relations Authority (FLRA), with judicial review

available directly in a court of appeals.  Second, the district court's

merits analysis is wrong several times over.  As a preliminary matter,

NTEU cannot bring a non-statutory *ultra vires* claim to challenge the

President's exercise of discretion conferred by statute.  Furthermore,

the district court failed to afford the considerable deference owed to the

President in making a national-security determination under the

FSLMRS.  Instead, the district court improperly drew negative

inferences at every turn, holding that NTEU had rebutted the

presumption of regularity that this Court has recognized attaches to a

President's exclusion order, based on a non-existent conflict with the

---

[1] The government's stay motion in the fourth case is pending.

2

statute.  And the district court then proceeded to second-guess the President's national-security determination, improperly replacing the President's judgment with the court's own.  Finally, the district court incorrectly weighed the equitable factors, ignoring that NTEU's injuries are both speculative and reparable and discounting the national-security interests that Congress left to the President to safeguard and that the executive order addresses.

In light of the district court's unwarranted usurpation of a national-security prerogative statutorily entrusted to the President, this Court should vacate the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiff invoked the jurisdiction of the district court under 28 U.S.C. § 1331.  JA15.  The district court granted plaintiff's motion for a preliminary injunction on April 25, 2025.  JA217-218.  Defendants filed a timely notice of appeal on April 29, 2025.  JA265.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

3

## STATEMENT OF THE ISSUES

1.  Whether the district court lacked Article III jurisdiction because plaintiff's claim must be channeled to the FLRA, with judicial review directly in a court of appeals, in accordance with the FSLMRS.

2.  Whether the district court erred in finding that plaintiff is likely to succeed on its claim that the executive order is *ultra vires*.

3.  Whether the district court erred in finding that equitable factors support a preliminary injunction.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background

Congress enacted the Federal Service Labor–Management Relations Statute as part of the Civil Service Reform Act of 1978 (CSRA) to govern labor relations between the Executive Branch and its employees.  *See* 5 U.S.C. §§ 7101-7135.  The FSLMRS grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters.  *Id.* §§ 7102(2), 7106, 7114.

The FSLMRS also establishes a dedicated mechanism for resolving labor disputes.  An employee or union may file a charge with the Federal Labor Relations Authority alleging that an agency has engaged in an unfair labor practice, which can include, *inter alia*, a failure to negotiate in good faith or comply with any FSLMRS provision.  *See* 5 U.S.C. §§ 7116, 7118(a)(1); 5 C.F.R. §§ 2423.3-2423.6.  The FLRA's General Counsel "shall investigate" any such charge and may file a complaint against the agency before the FLRA.  5 U.S.C. § 7118(a)(1)-(2); *see also id.* § 7104(f)(2).  Under the statutory scheme, an employee or union may also file a grievance through procedures that all collective-bargaining agreements must include, culminating in an arbitration that can be appealed to the FLRA.  *See id.* §§ 7121-7122.  With certain exceptions, an FLRA final order is subject to judicial review in a court of appeals.  *Id.* § 7123(a).

The FSLMRS exempts several federal agencies from coverage, including the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the Tennessee Valley Authority.  5 U.S.C. § 7103(a)(3).  Additionally, it provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—
>
> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

*Id.* § 7103(b)(1).

Shortly after the FSLMRS's enactment, President Carter issued an executive order excluding more than 45 agencies or subdivisions from coverage, precluding their employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Those agencies included, *inter alia*, subdivisions of the Library of Congress, Department of the Treasury and Internal Revenue Service, Department of Defense, Department of Energy, and Agency for International Development. *Id.* § 1-2, 44 Fed. Reg. at 66,565-66,566. Every President since, except President Biden, has issued similar executive orders expanding that list in response to changing circumstances and the evolving investigative and national-security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 11, 2002); Exec.

6

Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 12,666, 54 Fed. Reg. 1,921 (Jan. 17, 1989).

### B.    Factual Background

In March 2025, President Trump issued another such executive order, determining that certain agencies and subdivisions have "as a primary function intelligence, counterintelligence, investigative, or national security work" and that the FSLMRS "cannot be applied to th[o]se agencies and agency subdivisions in a manner consistent with national security requirements and considerations."  Exec. Order No. 14,251, §§ 1-2, 90 Fed. Reg. 14,553, 14,553-14,555 (Apr. 3, 2025).  The designated agencies include, *inter alia*, the Department of State, Department of Defense, Federal Communications Commission, and Environmental Protection Agency, along with subdivisions of the Departments of the Treasury, Energy, Justice, and Health and Human Services.  *Id.*

The same day, the Office of Personnel Management (OPM) issued guidance to federal agencies.  Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and Acting Heads of Departments and Agencies (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F (OPM Guidance).  OPM

explained that "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the FSLMRS.  OPM Guidance 3.  OPM advised agencies to "consult with their General Counsels as to how to implement" the executive order.  *Id.*

The OPM guidance also identified several ways in which exclusion from the FSLMRS could improve agency functions.  OPM explained that collective-bargaining agreements "often create procedural impediments to separating poor performers beyond those required by statute or regulation," and that covered agencies and subdivisions would now have a freer hand to "separate employees for unacceptable performance in appropriate cases."  OPM Guidance 3-4.  The guidance also emphasized that covered agencies would be able to "eliminate waste, bloat, and insularity" by conducting reductions in force where appropriate, ordering employees to return to in-person work, and ensuring that agency resources are used for agency, rather than union, business.  OPM Guidance 5-6.

The Chief Human Capital Officers Council, an interagency forum led by the Director of OPM, also shared with the designated agencies a Frequently Asked Questions document regarding implementation of the

8

executive order.  The document advised agencies not to "terminate any [collective-bargaining agreements]" or file FLRA petitions to "decertify bargaining units" "until the conclusion of litigation."  JA77.[2]

Many designated agencies and subdivisions have collective-bargaining agreements with employee unions.  Several agencies filed suits requesting declaratory judgments that, under Executive Order 14,251, they can legally repudiate such agreements.  *See* Complaint, *U.S. Dep't of Def. v. American Fed'n of Gov't Emps. Dist. 10*, No. 6:25-cv-00119 (W.D. Tex. Mar. 27, 2025); Complaint, *U.S. Dep't of Treasury v. NTEU Chapter 73*, No. 2:25-cv-00049 (E.D. Ky. Mar. 28, 2025).  The district courts in those cases concluded that although the government made "compelling arguments that the Executive Order is a lawful exercise of the President's authority delegated to him by Congress under [the FSLMRS] and the President's inherent authority under Article II," the government lacks standing to seek a declaratory

_____

[2] The Council has more recently updated the Frequently Asked Questions document, advising agencies that they may terminate collective-bargaining agreements with unions other than NTEU.  The document continues to advise that "[d]ue to ongoing litigation, agencies should not terminate, abrogate, or repudiate any [collective-bargaining agreements] with the National Treasury Employees Union."  Letter, *AFGE v. Trump*, No. 25-4014 (9th Cir. Aug. 14, 2025), Dkt. 34.1.

judgment. *U.S. Dep't of Def. v. American Fed'n of Gov't Emps. Dist. 10*, No. 6:25-cv-00119, 2025 WL 2058374, at *1 (W.D. Tex. July 23, 2025); *see also U.S. Dep't of Treasury v. NTEU, Chapter 73*, No. 2:25-cv-00049, 2025 WL 1446376, at *1 (E.D. Ky. May 20, 2025) (noting that "Treasury makes a good argument on the merits" but "does not have standing to bring the action"), *appeal docketed*, No. 25-5656 (6th Cir.).

## C.    Prior Proceedings

**1.**  Plaintiff National Treasury Employees Union filed this action against the President, the acting director of OPM, and the heads of several agencies that were designated in Executive Order 14,251. NTEU alleged that the executive order is inconsistent with 5 U.S.C. § 7103(b)(1) and therefore *ultra vires*, and that the order was issued in retaliation for the union's exercise of its First Amendment rights. JA38-42.

Plaintiff moved for a preliminary injunction.  The district court granted an injunction on April 25 and issued an opinion on April 28. JA217-218; JA219-264.  Although the FSLMRS makes the FLRA "responsible for carrying out the purpose of" the statute and resolving disputes arising under the statute, 5 U.S.C. § 7105(a), the district court

10

determined that it has jurisdiction over NTEU's claims, JA226-231. The court reasoned that the statutory review scheme is not available here because the relevant agencies and subdivisions have been excluded from the FSLMRS's coverage by the executive order.  JA228.

On the merits, the court acknowledged that the executive order is entitled to a presumption of regularity, but it opined that NTEU had rebutted that presumption by identifying an ostensible conflict with the statute.  JA235-236.  In particular, the court thought that the President acted either with "indifferen[ce] to" or "deliberately in contravention" of the purposes of the FSLMRS by finding that union activity could be dangerous in agencies with national-security responsibilities, that an accompanying White House Fact Sheet reflected retaliatory motive toward certain unions, and that the order was motivated by policy goals unrelated to those reflected in FSLMRS.  JA236-242 (quotation marks omitted).  The court then held that the government had not shown that the designated agencies perform intelligence, investigative, or national-security work as a "primary" function, and declared that the President had applied an overly broad interpretation of "national security" when invoking § 7103(b)(1).  JA246-251.

11

The court also held that NTEU faced irreparable harm from loss of bargaining power and union dues.  JA252-258.  And it determined that an injunction would serve the public interest by preserving the status quo and furthering the purposes of the FSLMRS.  JA259-260.[3]

**2.**  The government appealed and moved for a stay of the injunction.  The Court granted that motion on May 16, 2025.  *NTEU v. Trump* (*NTEU* Stay Order), No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) (per curiam).  The Court reasoned that the government is likely to prevail on the merits of the appeal because NTEU "failed to establish irreparable harm."  *Id.* at *1-2.  The Court explained that the asserted harm to the union's bargaining power is speculative because it "would materialize only *after* an agency terminates a collective-bargaining agreement, and the Government directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes."  *Id.* at *1. Moreover, the Court found that the union's alleged financial injury is speculative because the union can collect dues directly from its

---

[3] The district court's decision did not address NTEU's First Amendment claim, and that claim is not at issue in this appeal.

members, and any loss that results from agencies declining to withhold dues from employees' paychecks can be remedied in a subsequent FLRA proceeding. *Id.* at *2. The Court also found that the preliminary injunction "inflicts irreparable harm on the President by impeding his national-security prerogatives, which were explicitly recognized by Congress" in the FSLMRS. *Id.*

NTEU moved for reconsideration en banc, which this Court denied on July 16, 2025.

**3.** District courts have preliminarily enjoined the executive order at issue here in three other cases, as well. In *American Foreign Service Ass'n* (*AFSA*) *v. Trump*, No. 25-1030, 2025 WL 1387331 (D.D.C. May 14, 2025), the same district judge who issued the injunction in this case enjoined the government from implementing a separate section of the executive order that excludes subdivisions of the Department of State and U.S. Agency for International Development from coverage of the Foreign Service Labor–Management Relations Statute. This Court stayed that injunction. *AFSA v. Trump* (*AFSA* Stay Order), No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) (per curiam). The Court explained that the AFSA faces a heavy burden in meeting the

13

standard for establishing an *ultra vires* claim and that it is unclear

whether *ultra vires* review is available against the President,

particularly when the statute in question commits the decision to the

discretion of the President. *Id.* at *2-3. And even if the case is

justiciable, the Court explained that its review of the executive order

"must be exceedingly deferential." *Id.* at *3. Under that deferential

review, the Court concluded "that the Executive Order likely

withstands the [union's] 'attacks on its sufficiency.'" *Id.* (alteration

omitted). The Court further concluded that the balance of equities

favors a stay because the national-security interests at stake outweigh

any non-monetary harm the union may suffer. *Id.* AFSA filed a motion

for reconsideration en banc, which this Court denied. Order, *AFSA v.*

*Trump*, No. 25-5184 (D.C. Cir. July 30, 2025) (en banc) (per curiam).

In *Federal Education Ass'n v. Trump*, No. 25-1362, 2025 WL

2355747 (D.D.C. Aug. 14, 2025), the same district court enjoined the

government from enforcing the executive order against unions

representing certain Department of Defense employees. The

government has appealed and moved for a stay. *See Federal Educ.*

*Ass'n v. Trump*, No. 25-5303 (D.C. Cir.).

14

Finally, in *American Federation of Government Employees* (*AFGE*) *v. Trump*, No. 25-cv-03070, 2025 WL 1755442 (N.D. Cal. June 24, 2025), another district court enjoined the executive order at issue at the behest of a separate group of union plaintiffs. This time, the district court did not reach the unions' *ultra vires* claims and instead held that the unions had raised a serious question whether the executive order is consistent with the First Amendment. *Id.* at *2. The Ninth Circuit granted a stay pending appeal. *AFGE v. Trump* (*AFGE* Stay Order), No. 25-4014, __ F.4th __, 2025 WL 2180674 (9th Cir. Aug. 1, 2025) (per curiam). The court explained that the government had shown that it is likely to succeed on the merits of the First Amendment retaliation claim because the executive order "[o]n its face … does not express any retaliatory animus" but instead "conveys the President's determination that the excluded agencies have primary functions implicating national security and cannot be subjected to the FSLMRS consistent with national security." *Id.* at *4. The court rejected the unions' reliance on a fact sheet issued by the White House, explaining that the fact sheet "conveys that [Executive Order] 14,251 advances national security by curtailing union activity that undermines the agile functioning of

15

government offices with national security-related missions." *Id.* The Ninth Circuit also found that the equitable factors favor the government because the preliminary injunction impedes the government's ability to protect national security and any temporary harm to the plaintiff unions could be addressed at the conclusion of litigation. *Id.* at *5.

## SUMMARY OF ARGUMENT

**I.** Plaintiff is unlikely to succeed on the merits of its suit. First, Congress withdrew district-court jurisdiction over claims like plaintiff's through the FSLMRS, which establishes a comprehensive scheme for reviewing and remedying allegations that federal agencies have violated the FSLMRS. Under the statute, plaintiff is required to submit its claims to the FLRA; only after receiving a final FLRA order may plaintiff seek judicial review, directly in the court of appeals.

Second, plaintiff's *ultra vires* claim fails at the outset because the Supreme Court has made clear that *ultra vires* review of presidential action is not available when the statute in question commits the action to the discretion of the President. The FSLMRS provides a grant of

16

broad, unreviewable discretion to the President and forecloses the application of any meaningful judicial standard of review.

Third, even if NTEU could assert an *ultra vires* claim, it cannot establish that the President acted contrary to the statute. The President properly invoked his authority to exclude agencies from the provisions of the FSLMRS, and this Court has held that such a decision is entitled to a presumption of regularity. The district court erred in holding that plaintiff had rebutted that presumption, and the evidence it cited only confirms that the executive order was issued after the President made the determination contemplated by statute. In any event, the President's exclusion determination cannot be found *ultra vires* because it is not obviously beyond the terms of the statute. The designated agencies and subdivisions perform intelligence, investigative, or national-security work as a primary function, and the President reasonably determined that applying the provisions of the FSLMRS to those agencies and subdivisions is inconsistent with national security.

**II.** Plaintiff has not established that it would likely incur irreparable harm absent a preliminary injunction. The district court

17

relied on two supposed harms, but neither supports the extraordinary
remedy of a preliminary injunction. First, NTEU's assertion that the
executive order will diminish the union's bargaining power is
speculative, at least before an agency terminates a collective-bargaining
agreement with the union. Furthermore, if NTEU ultimately prevails
in this litigation, the FLRA could impose a retroactive remedy to
address any interim changes to working conditions that agencies may
have made outside the bargaining process.

Second, NTEU's asserted monetary harm is not irreparable
because the FLRA can order agencies to reimburse NTEU if they are
found to have unlawfully failed to withhold dues from employees'
paychecks. And the claimed financial harm is speculative, in any event,
because NTEU can collect dues directly from its members.

**III.** The balance of the equities and the public interest weigh in
defendants' favor. In the FSLMRS, Congress left it to the President to
determine when the government's national-security functions are
incompatible with the demands of collective bargaining. The district
court's preliminary injunction intrudes on the President's discharge of
his duties under that statute, subjecting the government to collective-

18

bargaining requirements that the President has concluded are inconsistent with various agencies' national-security functions.

## STANDARD OF REVIEW

The Court reviews the district court's weighing of the preliminary-injunction factors for an abuse of discretion, its factual findings for clear error, and its legal conclusions de novo. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233-1234 (D.C. Cir. 2025).

## ARGUMENT

To obtain a preliminary injunction, a movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these factors weighed against granting a preliminary injunction here.

## I. THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

### A. The FSLMRS Precludes District-Court Jurisdiction Over Plaintiff's Claims

**1.** Although Congress has generally granted district courts original jurisdiction over civil actions arising under the Constitution

19

and laws of the United States, 28 U.S.C. § 1331, Congress has at times withdrawn such jurisdiction by establishing an alternative statutory scheme for administrative and judicial review of a dispute. "[W]hen Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems," those procedures are generally intended "to be exclusive." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quotation marks omitted).

With the FSLMRS, as with the rest of the CSRA, "Congress passed an enormously complicated and subtle scheme to govern employee relations in the federal sector," along with dedicated mechanisms for resolving federal labor disputes. *AFGE v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (quotation marks omitted). In particular, the FSLMRS channels adjudication of such disputes to the FLRA, followed by direct review in the court of appeals. *See* 5 U.S.C. §§ 7105(a)(2), 7123(a). This Court has held that review scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims" and unions "cannot circumvent this

20

regime by instead bringing a suit in district court." *AFGE*, 716 F.3d at 637-638.

The district court thus lacks jurisdiction to review plaintiff's claims alleging that the government has acted contrary to the provisions of the FSLMRS, unless those claims are not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see AFGE v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("Congress intended the [FSLMRS] scheme to be exclusive with respect to claims within its scope."). In determining whether the claims presented here fit within the statutory review scheme, the Court must consider whether "a finding of preclusion could foreclose all meaningful judicial review," whether the claims are "wholly collateral" to the FSLMRS's review provisions, and whether the claims are "outside the [FLRA's] expertise." *Thunder Basin Coal Co.*, 510 U.S. at 212-213 (quotation marks omitted); *see also AFGE*, 929 F.3d at 755. "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme … reaches the claim in question." *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 186 (2023).

21

Each of the three *Thunder Basin* factors weighs in favor of finding plaintiff's claims precluded. First, requiring NTEU to proceed through the statutory review scheme would not foreclose all meaningful judicial review. Specifically, NTEU can litigate its claims through the statutory scheme by alleging that the defendant agencies have committed unfair labor practices by "refus[ing] to consult or negotiate in good faith with a labor organization as required by" the FSLMRS or "otherwise fail[ing] or refus[ing] to comply with any provision" of the statute, 5 U.S.C. § 7116(a). A union can file such a charge with the FLRA's General Counsel, *see id.* § 7118(a), or raise such a claim through the grievance and arbitration procedures that the FSLMRS requires be included in every collective-bargaining agreement, *id.* § 7121(a), and then appeal any adverse arbitrator's award to the FLRA, *id.* § 7122(a). In either event, the union can then obtain judicial review of an adverse FLRA decision regarding an alleged unfair labor practice in the court of appeals. *See id.* § 7123(a); *see also AFGE*, 929 F.3d at 757-758 (identifying ways a union could obtain judicial review of constitutional challenges to executive orders through the FSLMRS review scheme, including by filing unfair-labor-practice proceedings).

In addition, NTEU could challenge the executive order in cases already pending before the FLRA.  If an agency moves to dismiss such a case because the executive order excludes the agency from the provisions of the FSLMRS, or if the FLRA asks the parties to address its jurisdiction in light of the executive order, NTEU could raise its arguments that the FLRA continues to have jurisdiction over those pending cases because the executive order is invalid.  Indeed, as the district court noted, the FLRA has already requested that NTEU address whether the FLRA continues to have jurisdiction given the executive order.  *See* JA154-155; *see also U.S. Att'y's Off. S. Dist. of Tex. & AFGE Loc. 3966*, 57 F.L.R.A. 750, 750 (2002) (noting the FLRA "requested and received submissions from the parties as to why [the] cases should not be dismissed for lack of jurisdiction in light of the Executive Order" excluding U.S. Attorneys' Offices from coverage of the FSLMRS).  If the FLRA disagrees with NTEU and dismisses such a case, that dismissal order would generally be subject to judicial review.  *See* 5 U.S.C. § 7123(a).

Second, NTEU's claims are not wholly collateral to the FSLMRS's statutory review scheme.  On the contrary, the complaint squarely

23

raises a claim under the FSLMRS, alleging (among other things) that the executive order "conflicts with 5 U.S.C. § 7103(b)(1)" and "5 U.S.C. Chapter 71" (*i.e.*, the FSLMRS).  JA38-39.  The union's challenge in this case is thus "of the type" that this Court has explained "is regularly adjudicated through the FSLMRS's scheme: disputes over whether the Statute has been violated." *AFGE*, 929 F.3d at 760.  And the remedies that NTEU seeks include, *inter alia*, a declaration that the executive order is unlawful and an order prohibiting the defendant agencies from implementing it.  JA43.  That is precisely the type of relief that this Court has previously explained a union could obtain through the statutory scheme.  *See AFGE*, 929 F.3d at 760 ("[T]he unions ask the district court for the same relief that they could ultimately obtain through the statutory scheme, namely rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders during bargaining disputes.").

Indeed, in analogous contexts regarding orders excluding federal workers from the FSLMRS and collective bargaining, this Court has held that the FLRA has "exclusive authority to render judgment on the question" whether that exclusion was valid. *AFGE v. Loy*, 367 F.3d 932,

24

935-936 (D.C. Cir. 2004). NTEU's challenge is thus not wholly collateral to the statutory scheme. *See Elgin v. Department of the Treasury*, 567 U.S. 1, 22 (2012) (holding that a constitutional claim was not wholly collateral to the CSRA scheme because the plaintiffs challenged "precisely the type of personnel action regularly adjudicated by the [Merit Systems Protection Board] and the Federal Circuit within the CSRA scheme" and "request[ed] relief that the CSRA routinely affords").

Third, NTEU's claims are not beyond the expertise of the FLRA. Plaintiff's statutory challenges "lie at the core of the FLRA's 'specialized expertise in the field of federal labor relations.'" *AFGE*, 929 F.3d at 760. Their claims "require interpreting the FSLMRS—the very law that the FLRA is charged with administering and interpreting," *id.* at 760-761; *see* 5 U.S.C. § 7105(a), and Congress has directed the FLRA to adjudicate disputes over whether an agency has failed or refused to comply with the statute, *see* 5 U.S.C. § 7116(a)(8). *See Elgin*, 567 U.S. at 23 (ruling that a claim was not outside the Merit Systems Protection Board's expertise where the challenged statute was one that the Board "regularly construes"). The FLRA could also bring its expertise to bear

25

on factual issues that may be presented in this case; after all, it regularly resolves disputes over whether certain employees are "engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security," 5 U.S.C. § 7112(b)(6)—a standard with obvious overlap with the provision at issue in this case. *See, e.g.*, *U.S. Dep't of the Air Force Davis-Monthan Air Force Base & AFGE Loc. 2924*, 62 F.L.R.A. 332, 334-336 (2008) (considering whether employees were engaged in work that directly affects national security). The FLRA also adjudicates First Amendment-retaliation claims in the course of its ordinary work. *See Independent Union of Pension Emps. for Democracy & Just. & Pension Benefit Guar. Corp.*, 68 F.L.R.A. 999, 1014 (2015) (considering a claim that an agency had initiated arbitration in retaliation for a union's exercise of free-speech rights). The FLRA thus has expertise that goes to the core issues in this case.

Even if the FLRA declined to address all of NTEU's claims or lacked expertise on some issue raised by those claims, however, a court of appeals could consider the claims on appeal from the FLRA. *See AFGE*, 929 F.3d at 758. After all, "[i]t is not unusual for an appellate court reviewing the decision of an administrative agency to consider a

26

constitutional challenge to a federal statute that the agency concluded it lacked authority to decide." *Elgin*, 567 U.S. at 18 n.8; *see also AFGE*, 929 F.3d at 758 ("[I]t is of no dispositive significance whether the agency has the authority to rule on constitutional claims so long as the claims can eventually reach an Article III court fully competent to adjudicate them[.]" (quotation marks omitted)).  There is thus no reason why plaintiff's constitutional or statutory claims could not be "meaningfully addressed in the Court of Appeals." *Thunder Basin Coal Co.*, 510 U.S. at 215.

**2.**  The district court concluded that it had jurisdiction because Executive Order 14,251 exempts the agencies at issue from the FSLMRS, making FLRA review unavailable.  JA230.  But this circular logic assumes the validity of the very order that NTEU contends is invalid; if NTEU is correct on the merits of its claim, then the defendant agencies were not properly excluded and the FLRA has jurisdiction to resolve disputes between NTEU and those agencies.  Just as "a federal court always has jurisdiction to determine its own jurisdiction," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), including to consider the scope and validity of a jurisdiction-stripping provision, *see generally*

27

*Boumediene v. Bush*, 553 U.S. 723 (2008), the FLRA also has authority to consider whether the executive order was a valid exercise of the President's authority under § 7103(b)(1) to exclude agencies from coverage of the FSLMRS. Considering the scope of the FLRA's jurisdiction will of course give the FLRA an opportunity to decide the question at the heart of plaintiff's claims—whether the challenged executive order is lawful—and however the FLRA disposes of that question, the losing party may then obtain judicial review of that question in the court of appeals.

The district court noted that the FLRA has disclaimed authority to hear claims brought in connection with agencies excluded from the FSLMRS, JA228-229, but that does not mean that the FLRA lacks authority to consider the *validity* of a presidential exclusion and thus whether the relevant agencies are in fact excluded from the scope of the statute. Indeed, in *U.S. Attorney's Office Southern District of Texas & AFGE Local 3966*, for example, the FLRA "requested and received submissions from the parties" as to whether it should dismiss a pending case in light of an exclusion order under § 7103(b)(1). 57 F.L.R.A. at 750. Although none of the parties in that case disputed the validity of

28

the executive order, if one of them had, the FLRA could have resolved

that dispute in order to resolve the question of its jurisdiction.  And in

*Department of the Navy, Naval Telecommunications Center &*

*Navtelcom Unit Local No. 1*, the FLRA had to (and agreed to) construe

the scope of an exclusion order in order to determine its jurisdiction.  6

F.L.R.A. 498, 500 (1981).  There is thus no reason to think that the

FLRA would refuse to consider the validity of an executive order where

doing so is necessary to determining its jurisdiction.[4]

In fact, the FLRA's order to show cause why a pending case

between NTEU and an excluded agency should not be dismissed for lack

of jurisdiction, *see supra* p. 23; JA154-155, demonstrates that the FLRA

may be willing to consider NTEU's contention that the executive order

is ineffective.  The show-cause order thus confirms the district court's

---

[4] The district court's reliance on the superseded administrative-law-judge decision in *U.S. Department of the Air Force Air Force Materiel Command Warner Robins Air Logistics Center Robins Air Force Base & AFGE Local 987*, 66 F.L.R.A. 589 (2012), provides no support for the court's conclusion.  The administrative law judge in that case correctly stated that "an exemption from [FSLMRS] coverage constitutes a jurisdictional bar to [the FLRA's] consideration" of cases raised under the statute, but he also recognized that the FLRA would have authority to determine "the effect" of an exclusion order.  *Id.* at 598.

lack of jurisdiction. *Contra* JA229-230. And in any event, even if the FLRA dismissed without opining on the validity of the challenged exclusion order, such an FLRA order would nonetheless trigger plaintiff's ability to seek judicial review of that preserved question in a court of appeals. *See AFGE*, 929 F.3d at 758-759 ("[W]e may review the unions' broad statutory and constitutional claims on appeal from an FLRA proceeding even if the FLRA cannot.").

Finally, the district court's reliance on *AFGE Local 446 v. Nicholson*, 475 F.3d 341, 348 (D.C. Cir. 2007), is misplaced, as that decision only underscores that NTEU's claims should have been brought before the FLRA. *See* JA231. In that case, the Secretary of Veterans Affairs' delegee had determined, pursuant to statutory authority, that a certain matter concerning employee compensation was not subject to collective bargaining. 475 F.3d at 346; *see* 38 U.S.C. § 7422(b), (d). This Court held that the FLRA did not have authority to review the Secretary's decision because the statute expressly provided that the decision "may not be reviewed by any other agency," which this Court interpreted to include the FLRA. *AFGE*, 475 F.3d at 347 (quoting 38 U.S.C. § 7422(d)). The authority providing for the President's

30

exclusion order at issue here, in contrast, does not "expressly" provide that such an order is "outside the FLRA's purview." *Id.* at 348. Accordingly, the FLRA has jurisdiction to review challenges to that executive order, just as it has authority to review other disputes arising under the FSLMRS and not expressly removed from the FLRA's jurisdiction.

### B.    Plaintiff Cannot Assert An *Ultra Vires* Claim To Challenge The President's Exercise Of Discretion Granted By Statute

Even if the district court has jurisdiction, NTEU is unlikely to succeed on the merits because it fails to state a claim upon which relief can be granted.  Plaintiff seeks non-statutory, or *ultra vires*, review of an order issued by the President.  The Supreme Court has assumed without deciding that some *ultra vires* claims that the President has violated a statutory mandate are judicially reviewable.  *Dalton v. Specter*, 511 U.S. 462, 474 (1994).  But "such review is not available when," as here, "the statute in question commits the decision to the discretion of the President." *Id.*; *see also AFSA* Stay Order, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam).

In *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, the Court considered a challenge to the President's exercise of statutorily conferred authority, for the duration of World War I, "to supervise or to take possession and assume control of any telegraph, telephone, … or radio system" "whenever he shall deem it necessary for the national security or defense."  250 U.S. 163, 181-182 (1919).  South Dakota claimed that the President exceeded his authority by taking control of the telegraph and telephone systems, contending that "there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority" and "assail[ing] the motives which it is asserted induced the exercise of the power."  *Id.* at 184.  The Court held that it lacked authority to consider such a claim because where a challenge to the President's action "concerns not a want of power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power."  *Id.*; *see also Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 114 (1948) (holding that certificates permitting foreign carriers to engage in overseas transportation

32

"embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate").

The FSLMRS provides a similar grant of broad, unreviewable discretion to the President to exercise certain powers when he has determined it is necessary for the national security to exclude certain agencies or subdivisions from coverage of the FSLMRS. *See AFSA* Stay Order, 2025 WL 1742853, at *3 (concluding that materially identical language in 22 U.S.C. § 4103 "delegates broad authority to the President to exclude parts of the Foreign Service from Subchapter X in the interest of national security" and "commits the relevant decision to the President's discretion"). The relevant provision "fairly exudes deference" to the President "and appears … to foreclose the application of any meaningful judicial standard of review." *Webster v. Doe*, 486 U.S. 592, 600 (1988). "How the President chooses to exercise the discretion Congress has granted him" in the FSLMRS is thus "not a matter for [a court's] review." *Dalton*, 511 U.S. at 476.

Judicial review of the President's discretionary determination in this area is particularly inappropriate because that determination—like the one at issue in *Dakota Central Telephone*—arises in the national-

33

security context. "National-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). Courts are therefore "'reluctant to intrude upon'" an exercise of that national-security authority "unless 'Congress specifically has provided otherwise,'" *Ziglar*, 582 U.S. at 143, and a non-statutory *ultra vires* claim like NTEU asserts here necessarily lacks congressional authorization. NTEU thus lacks a cause of action to challenge the President's exercise of discretion vested in him by the FSLMRS.

## C.  Plaintiff Is Not Likely To Succeed On The Merits Of Its *Ultra Vires* Claim

Even if NTEU could assert an *ultra vires* claim, it cannot establish that the President acted contrary to statute. NTEU faces a high bar to establish its right to relief. *Ultra vires* review "is intended to be of extremely limited scope." *North Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020) (quotation marks omitted). To prevail, NTEU would have to show that the President acted "'in excess of [his]

34

delegated powers and contrary to a *specific prohibition*' in a statute."
*Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). An *ultra vires* challenge "is essentially a Hail Mary pass," and "garden-variety errors of law or fact are not enough" to establish such a claim. *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764-765 (D.C. Cir. 2022) (alteration and quotation marks omitted). Rather, "*ultra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand." *Id.* at 765. NTEU is unable to meet this standard in light of the discretionary authority that the FSLMRS vests in the President.

### 1.    The executive order is facially consistent with statute

This Court has held that a President's exclusion order under § 7103(b)(1) need not be explained and is entitled to a presumption of regularity. *AFGE v. Reagan*, 870 F.2d 723, 727-728 (D.C. Cir. 1989). In *AFGE v. Reagan*, this Court considered a similar challenge to President Reagan's exercise of discretion to exclude certain subdivisions of the U.S. Marshals Service from the scope of the FSLMRS. *Id.* at 725. The union plaintiff in that case contended that federal marshals are not engaged in the protection of national security, and although the district

court rejected that argument, it held that the President did not lawfully

exercise his power because he did not include in the executive order his

determination of the conditions specified in the statute. *Id.* This Court

reversed, rejecting the argument that "courts are the instrumentalities

for ensuring that the [§ 7103(b)(1)] authority is properly exercised" and

upholding the validity of the executive order. *Id.* at 726-728. The Court

explained that "Section 7103(b)(1) makes clear that the President may

exclude an agency from the Act's coverage whenever he 'determines'

that the conditions statutorily specified exist," and this section "does not

expressly call upon the President to insert written findings into an

exempting order, or indeed to utilize any particular format for such an

order." *Id.* at 727. Rather, a bare determination by the President is

sufficient to invoke that authority. In light of the presumption of

regularity, the Court refused to entertain "an unwarranted assumption

that the President was indifferent to the purposes and requirements of

the Act, or acted deliberately in contravention of them." *Id.* at 728.

This Court in *AFGE* thus properly recognized the extent of the

discretion statutorily vested in the President and, correspondingly, the

limited role for judicial review. After all, "[s]hort of permitting cross-

examination of the [President] concerning his views of the Nation's security" and whether granting employees in the relevant agencies coverage under the provisions of the FSLMRS is "inimical to those interests"—a procedure that would plainly be improper—there is "no basis on which a reviewing court could properly assess" a President's exclusion decision.  *Webster*, 486 U.S. at 600.

The executive order under review here "cited accurately the statutory source of authority therefor, and purported to amend [President Carter's] earlier order that indubitably was a proper exercise of that authority."  *AFGE*, 870 F.2d at 728.  The President's determination thus "satisfies every requirement" of § 7103(b)(1), "and a finding which follows [the statute's] language, as this finding does, cannot well be challenged as insufficient."  *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 331 (1936); *see also AFSA* Stay Order, 2025 WL 1742853, at *3.

## 2.   Plaintiff failed to rebut the presumption of regularity

If any further role for judicial review remains, it must be limited to circumstances where a plaintiff can overcome the presumption of regularity by making a "strong showing of bad faith or improper

37

behavior." *Hercules Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978); *see also Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 86 (D.C. Cir. 2024) (a party seeking to rebut the presumption of regularity must present "clear evidence" that public officers have not "properly discharged their official duties" (quotation marks omitted)). No such showing was made here, and the district court mistakenly concluded that, for three reasons, NTEU had overcome the presumption of regularity.

**a.** First, the district court believed that the scope of the executive order is inconsistent with Congress's finding that "labor organizations and collective bargaining in the civil service are in the public interest." JA236-237 (quoting 5 U.S.C. § 7101(a)). But the FSLMRS's "[e]xceptions and exemptions are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 239 (2021). By permitting the President to exclude agencies from the FSLMRS's coverage where collective bargaining is inconsistent with "national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B), Congress recognized that this is an "area[] fraught with competing social demands where … trade-offs are required." *BP*, 593 U.S. at 239.

38

The district court erred in construing the executive order as a *violation* of the statute rather than as *respecting* the competing priorities that it balances.

Although Congress found that permitting collective bargaining in the civil service would generally be in the public interest, it also recognized that this would not always be the case, and it granted the President authority to exclude agencies and subdivisions from the scope of the FSLMRS in those circumstances. The executive order is entirely compatible with Congress's judgment that the President is best positioned to make determinations over time as to which agencies should be exempted from the FSLMRS based on national-security concerns.

The district court placed undue emphasis on the breadth of the executive order, disregarding the fact that the President could reasonably determine that in the nearly half-century since the FSLMRS was enacted, national-security considerations and the conduct of labor organizations have changed such that a larger share of the federal workforce can, and should, be excluded from the statute's coverage. Contrary to the district court's suggestion (JA237-238), Congress

39

nowhere stated that the President's determinations under § 7103(b)(1) can cover only a certain percentage of the federal workforce.  In any event, allegations that the President has established an "overbroad" policy that does not "serve national security interests" do not permit courts to "substitute [their] own assessment for the Executive's predictive judgments on such matters, all of which 'are delicate, complex, and involve large elements of prophecy.'"  *Trump v. Hawaii*, 585 U.S. 667, 707-708 (2018).  The district court's disagreement with the President's line-drawing and its assumption that the order's breadth indicated unlawful motives turned the presumption of regularity on its head and was "unwarranted."  *AFGE*, 870 F.2d at 728.

At any rate, it is not surprising that over time, in response to different national-security requirements and considerations, and applying different "informed judgment[s]," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010), different Presidents will make different determinations under § 7103(b)(1).  Some determinations may reflect a narrower view of agencies' national-security functions and the impact of the FSLMRS on prevailing national-security requirements and considerations.  Other determinations may reflect a different view and

assessment.  But Congress provided no standards by which to judge a President's invocation of § 7103(b)(1), leaving it to the President to make those determinations.  *See Webster*, 486 U.S. at 600.  The district court's suggestion that the President must have acted contrary to statute because he took a capacious view of national-security interests is entirely misplaced.

    **b.**  Second, the district court viewed statements in a White House fact sheet as indicating that the President had considered improper factors.  JA239.  But even if that fact sheet represented the motivations of the President in issuing the executive order, it does not reflect any motivations inconsistent with the statute.  Rather, the fact sheet merely explains how unions' activities have impaired the functioning of agencies in a manner that could undermine national security—a circumstance that is plainly relevant to the President's determination under § 7103(b)(1).  The fact sheet notes, for example, that the FSLMRS can "enable[] hostile Federal unions to obstruct agency management" by preventing agencies from removing employees for poor performance or misconduct and impede agencies from taking other operational measures including, for example, "modify[ing] cybersecurity policies."

The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H (*Fact Sheet*).  Such considerations are entirely in accord with an executive order issued to protect President Trump's "ability to manage agencies with vital national security missions" and "to ensure that agencies vital to national security can execute their missions without delay and protect the American people."  *Id.*; *see AFGE* Stay Order, No. 25-4014, __ F.4th __, 2025 WL 2180674, at *4 (9th Cir. Aug. 1, 2025) (per curiam) ("The Fact Sheet … conveys that [Executive Order] 14,251 advances national security by curtailing union activity that undermines the agile functioning of government offices with national security-related missions," and thus demonstrates "an overarching objective of protecting national security through its assessment that collective bargaining impedes the functioning of agencies with national security-related responsibilities.").

The district court drew a false distinction between whether "'the provisions' of the FSLMRS themselves" cannot be applied in a manner consistent with national security and whether "the unions' *use of* these

provisions" would be inconsistent with national security.  JA239.

Applying the provisions of the FSLMRS to certain agencies would be

inconsistent with national-security requirements precisely *because*

unions can use those provisions in a manner that "jeopardizes [the

President's] ability to manage agencies with vital national security

missions," which necessarily includes, *inter alia*, ensuring performance

accountability.  *Fact Sheet*.  Union activity that makes it difficult for

agencies engaged in national-security work to terminate poor

performers not only obstructs President Trump's "policy directives and

'agenda'" (which includes improving the functioning of these agencies),

JA239, but also impairs the agencies' ability to safeguard national

security, and it is thus a legitimate consideration under § 7103(b)(1).

As another example, the fact sheet describes how a union obtained an

FLRA decision holding that U.S. Immigration and Customs

Enforcement had to bargain before addressing cybersecurity threats by

blocking access to web-based email services on its network.  *See U.S.*

*Dep't of Homeland Sec. U.S. Immigration & Customs Enf't & AFGE*

*Nat'l Immigration & Customs Enf't Council 118*, 67 F.L.R.A. 501 (2014).

Rather than suggesting a "retaliatory motive," JA240, the fact sheet

43

reasonably describes how the FSLMRS has been used to undermine national-security requirements.

Instead of acknowledging the relevance of union activity to the § 7103(b)(1) determination and presuming that the fact sheet indicated legitimate considerations regarding past union practices, the district court drew the most negative possible inference and attributed unconstitutional motives to the President: The court suggested that the President issued the executive order to "punish" certain unions because of their opposition to his agenda. JA240. In doing so, the district court disregarded both the deference owed to the President's national-security assessments and its duty not to assume "that the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *AFGE*, 870 F.2d at 728.

Nor was the district court's conclusion supported by the fact that President Trump did not exclude agencies where unions have worked cooperatively with the government to improve agency functioning. *Contra* JA240. Where unions are engaged in such "constructive partnerships," *Fact Sheet*, the President was entitled to conclude that the provisions of the FSLMRS can be applied "in a manner consistent

44

with national security requirements and considerations," 5 U.S.C.
§ 7103(b)(1)(B), and exclusion is thus unwarranted.

    **c.** Third, the district court erred in declaring that the OPM
guidance demonstrates that the executive order was motivated by
unrelated policy goals. *See* JA241-242. The guidance notes the policy of
this Administration "to eliminate waste, bloat, and insularity" within
agencies, OPM Guidance 5, and as applied to agencies that have as a
primary function intelligence, investigative, or national-security work,
these policies are directly relevant to the policy goals of § 7103(b)(1).
Congress may have thought inefficiencies are tolerable in certain
circumstances as the price for allowing federal employees to organize,
but Congress made clear that labor interests cannot be allowed to
undermine national security. In agencies like the Department of
Defense, for example, *see* Exec. Order No. 14,251, § 2(b), 90 Fed. Reg. at
14,553, removing "procedural impediments to separating poor
performers" is a national-security imperative, OPM Guidance 3. So is
the ability to optimize the efficiency of an agency through restructuring,
even when that involves layoffs. *Contra* JA241.

The FSLMRS does not permit courts to second-guess the President's decisions about how agencies must be operated so that employees can best perform their national-security work.  Rather, the statute expressly leaves that judgment to the President.  Judicially second-guessing the President's national-security determinations would be "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere."  *Hawaii*, 585 U.S. at 686.  Furthermore, "'when it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'"  *Id.* at 704.  The district court erred in rejecting the presumption of regularity based on its disagreement with a determination that Congress appropriately left to the President.

### 3.    The President's determinations reasonably apply the criteria of § 7103(b)(1)

Even if the district court could properly look behind the President's determination, the government would still prevail because that determination is reasonable and not "'obviously beyond the terms of the statute,'" *North Am. Butterfly Ass'n*, 977 F.3d at 1263.

46

**a.**  The President reasonably determined that the covered agencies have intelligence, investigative, or national-security work as "a primary function," 5 U.S.C. § 7103(b)(1)(A).  An agency can have multiple primary functions, as Congress recognized through its use of the article "a."  And although Congress does not always enumerate an agency's primary functions, where it has, it frequently lists several.  *See, e.g.*, 15 U.S.C. § 634b (listing 12 "primary functions").  Thus, an agency would fit within the terms of § 7103(b)(1)(A) even if it does not only (or mostly) perform intelligence, investigative, or national-security work, so long as such work is "a" primary function of the agency.

It cannot be seriously disputed that the Department of Defense, for example, performs national-security work as a primary function.  Likewise, the Department of State's declared mission is "[t]o protect and promote U.S. *security*, prosperity, and democratic values and shape an international environment in which all Americans can thrive."  U.S. Dep't of State, *About the U.S. Department of State*, https://perma.cc/8GPX-63RG (emphasis added).  Yet the district court suggested that the President's exclusion of even these agencies was unlawful.

47

The President's determination as to the defendant agencies likewise contravenes no express statutory prohibition. To take a few examples, the Department of Energy performs several national-security functions, and Congress recognized as much when it created the agency. *See* 42 U.S.C. § 7111(2) (finding that an "energy shortage and … increasing dependence on foreign energy supplies present a serious threat to the national security of the United States"). The Department works to "increase nuclear nonproliferation and ensure the security of the U.S. nuclear weapons stockpile," "manages the Strategic Petroleum Reserve, invests in protection against cyber and physical attacks on U.S. energy infrastructure, … and provides training tools and procedures for emergency response and preparedness." U.S. Dep't of Energy, *Energy Security*, https://perma.cc/2YCS-EUBP.

The Centers for Disease Control and Prevention has "an essential role in defending against and combatting public health threats domestically and abroad," including "capabilities related to bioterrorism and other public health emergencies." 42 U.S.C. § 247d-4(a)(1). The Department of Health and Human Services' Administration for Strategic Preparedness and Response performs work in support of

48

"public health emergency preparedness and response, biodefense, [and] medical countermeasures." *Id.* § 300hh-10(b).  And the Federal Communications Commission was created to regulate communication "for the purpose of the national defense."  47 U.S.C. § 151.

The Department of the Treasury's mission likewise includes "strengthen[ing] national security by combating threats and protecting the integrity of the financial system."  U.S. Dep't of the Treasury, *Role of the Treasury*, https://perma.cc/24Z9-QXE8.  The enumerated duties of the Secretary of the Treasury include "tak[ing] steps to discover"—*i.e.*, investigating—fraud, 31 U.S.C. § 321(a)(7), and the IRS performs "investigative" work in the form of audits.  The FLRA has also previously found that the IRS performs national-security work.  *See, e.g., U.S. Dep't of the Treas., IRS & NTEU*, 62 F.L.R.A. 298, 304 (2007) ("[A]ny disruption to the [IRS]'s ability to collect taxes, which allows for the funding of governmental operations, would greatly impact the Nation's economic strength, and, thus, the national security.").  And Congress has provided for the Secretaries of Treasury and Energy to be part of the National Security Council.  50 U.S.C. § 3021(c).

In categorically enjoining the executive order, the district court
improperly usurped the President's discretion. And by putting the
burden on the government to "show[]" that the designated agencies
meet the criteria of § 7103(b)(1), JA263, the court turned the relevant
legal standard on its head. *See AFGE*, 870 F.2d at 727 (explaining that
§ 7103(b)(1) does not require "the President to insert written findings
into an exempting order").

**b.** The President also permissibly determined that the provisions
of the FSLMRS cannot be applied to the exempted agencies "consistent
with national security requirements and considerations." 5 U.S.C.
§ 7103(b)(1)(B). The dictates of national security may, at any time,
require changes in working conditions or employee status to be
accomplished without hesitation, prior notice, or an opportunity to
bargain. The collective-bargaining agreements negotiated under the
FSLMRS, in contrast, are by nature designed to reduce the control of
the agency over its personnel and operations.

For example, under the FSLMRS, agencies must postpone
operational changes that substantively affect working conditions until
they have offered the relevant union an opportunity to bargain. The

50

FLRA routinely pauses agency attempts to implement changes before this midterm bargaining process has concluded, a process that often imposes delays of months or years. *See, e.g., U.S. Army Corps of Eng'rs Memphis Dist. & National Fed'n of Fed. Emps. Loc. 259*, 53 F.L.R.A. 79, 86-87 (1997). Employee performance is also critical in agencies with important national-security roles. Yet many collective-bargaining agreements make it difficult to remove employees who perform poorly.

Providing for the national security involves "complex, subtle, and professional decisions as to the composition, training, equipping, and control" of the workforce performing investigations, intelligence, and national-security tasks. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). The President reasonably concluded that collective-bargaining agreements that impede or prevent agencies from separating underperforming employees, dictate the place or conditions of work, or impair the Executive Branch's ability to react to rapid developments with due haste are inconsistent with national-security considerations.

**c.** Relying on *Cole v. Young*, 351 U.S. 536 (1956), the district court opined that the term "national security" includes "only those activities … that are directly concerned with the protection of the Nation from

51

internal subversion or foreign aggression." JA250 (alteration in original) (quoting *Cole*, 351 U.S. at 544). But nothing in Executive Order 14,251 is inconsistent with that definition. The Defense Department's supervision of the military, the Energy Department's role in stockpiling petroleum and nuclear weapons and protecting energy infrastructure from domestic or foreign attacks, and the Centers for Disease Control and Prevention's bioterrorism-response capabilities—to name just a few—all fit within *Cole*'s definition of national-security functions. *Cf. Cole*, 351 U.S. at 544-545 (noting that agencies "directly concerned with the national defense" include those that "are concerned with military operations or weapons development, … international relations, internal security, and the stock-piling of strategic materials"). Indeed, in *Cole* itself the Supreme Court was willing to "assume" that the President had validly extended a statute permitting the summary dismissal of employees to the Department of Health, Education, and Welfare on the basis that doing so was in the best interests of national security. *Id.* at 542.

In any event, *Cole*'s holding is clearly inapplicable here. *Cole* held that an employee had been improperly subjected to summary-

52

termination procedures that the statute permitted only in circumstances where "necessary or advisable in the interest of the national security" because the agency had acted pursuant to an executive order that allowed the discharge of "any employee of doubtful loyalty, *irrespective* of the character of his job and its relationship to the 'national security.'" 351 U.S. at 541, 552-553, 556-557 (emphasis added). The Court found that the executive order in that case permitted summary termination in circumstances not authorized by statute because it allowed agencies to dispense with the national-security determination contemplated by statute. Here, however, the President expressly determined that, with regard to each of the agencies listed in the executive order, the provisions of the FSLMRS "cannot be applied … in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, § 1, 90 Fed. Reg. at 14,553. *Cole* provides no basis to second-guess that determination.

Accordingly, the district court's decision to second-guess the President's determination of whether the provisions of the FSLMRS can be applied to certain agencies consistent with the requirements of

53

national security was entirely improper.  Such an approach is inconsistent with the statute's grant of discretion to the President, the presumption of regularity recognized in *AFGE v. Reagan*, and the standard for establishing a right to relief on a non-statutory *ultra vires* claim.

## II.  PLAINTIFF DID NOT ESTABLISH THAT IT WOULD LIKELY SUFFER IRREPARABLE HARM

As this Court explained in granting a stay of the preliminary injunction, NTEU "failed to establish irreparable harm," which is by itself "a sufficient basis for vacating [the] preliminary injunction." *NTEU* Stay Order, No. 25-5157, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025) (per curiam).  The district court identified two supposed harms to NTEU, but neither supports the injunction.

**A.**  First, the district court thought that NTEU would lose bargaining power absent an injunction.  JA252-256.  But as the stay panel concluded, such harms are speculative, at least before an agency terminates a collective-bargaining agreement.  *NTEU* Stay Order, 2025 WL 1441563, at *1 (holding that the loss of bargaining power and reputational harm "are speculative because they would materialize only *after* an agency terminates a collective-bargaining agreement"); *see also*

54

*AFGE* Stay Order, 2025 WL 2180674, at *5 ("Whatever harm to collective bargaining rights that Plaintiffs will experience due to a stay is mitigated by the direction to agencies to refrain from terminating collective bargaining agreements until litigation has concluded.").  And the government "directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes."  *NTEU* Stay Order, 2025 WL 1441563, at *1; *see* JA77.[5]

Indeed, it is speculative to think that employees—whose membership is purely voluntary regardless of the executive order—will leave the union even before their bargaining unit has been decertified and while this litigation is ongoing, and just as speculative to think that the loss of some number of members would materially weaken NTEU's bargaining position.  Other courts have similarly held that a union's concern "that its members will lose confidence in the union" absent immediate relief "is too speculative to justify a preliminary injunction."

---

[5] Although the Chief Human Capital Officers Council has modified its advice to agencies with respect to other unions, it has continued to advise agencies not to terminate collective-bargaining agreements with NTEU.  *See supra* n.2.

55

*East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414
F.3d 700, 704 (7th Cir. 2005).  A union "is free to explain the difficulties
of litigation to its members if they ask why more is not being done
sooner," and "if some members' confidence is shaken, the chance that
vindication of the union at trial would not restore that confidence is too
speculative to justify a preliminary injunction." *Id.*; *see also, e.g.*,
*Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 440 (4th
Cir. 2018) (rejecting the "theory that interim relief is necessary to
prevent the Union from losing employee support").  If NTEU ultimately
prevails in this litigation and its status as an exclusive bargaining
representative is reaffirmed, NTEU has identified no reason that
employees who may have left the union would not rejoin.  NTEU thus
cannot demonstrate that any ostensible harm would be lasting or
irreparable.

Nor would plaintiff suffer irreparable harm from any agency's
refusal to negotiate over changes to employment conditions during the
pendency of litigation.  If NTEU prevails and the executive order is
invalidated, the FLRA could direct agencies not to implement the
executive order and impose a retroactive remedy—including with

56

regard to any reductions in force. *See* 5 U.S.C. § 7118(a)(7) (authorizing the FLRA to issue an order that gives a collective-bargaining agreement "retroactive effect" and to take "such other action as will carry out the purpose" of the Civil Service Reform Act); *Department of the Navy Naval Aviation Depot Naval Air Station Alameda & International Ass'n of Machinists & Aerospace Workers Lodge 739*, 36 F.L.R.A. 509, 511 (1990) ("Where an agency violates the [FSLMRS] by changing a negotiable condition of employment without fulfilling its obligation to bargain on that change, the Statute requires the imposition of a status quo ante remedy, in the absence of special circumstances."). NTEU's remedy for agency non-compliance with a collective-bargaining agreement is through the grievance procedures set out in the collective-bargaining agreements and the FLRA, not by seeking a preliminary injunction in district court. *See AFGE*, 929 F.3d at 757-758 (union had administrative options to challenge executive orders before the FLRA, and the FLRA could grant effective relief by directing agencies not to implement various provisions of executive orders).

**B.** The district court also erred in finding that plaintiff would suffer monetary harm absent an injunction because the defendant

agencies have stopped withholding union dues from employees'
paychecks.  Such "financial injuries are rarely irreparable because they
are presumptively remediable through monetary damages." *Clevinger
v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025).  And
as this Court explained in the stay order, NTEU "can seek to recover
missing dues in subsequent [FLRA] proceedings if the Union ultimately
prevails in this litigation." *NTEU* Stay Order, 2025 WL 1441563, at *2;
*see U.S. Dep't of Def. Ohio Nat'l Guard & AFGE Loc. 3970*, 71 F.L.R.A.
829, 830 (2020) (ordering reimbursement of dues that an agency
unlawfully failed to withhold); *U.S. Dep't of the Treasury U.S. Mint &
AFGE Mint Council, C-157*, 35 F.L.R.A. 1095, 1100-1102 (1990) (same).

In any event, it is speculative that NTEU will suffer significant
financial injury in the interim.  Although agencies are no longer
withholding dues from the paychecks of employees who are covered by
the executive order, NTEU can collect dues directly from such members.
*NTEU* Stay Order, 2025 WL 1441563, at *2.  "[T]hat is, after all, how
most other voluntary membership organizations collect dues." *Id.*; *see
also AFGE* Stay Order, 2025 WL 2180674, at *5 ("[P]aused
administration of dues collection can be addressed by voluntary dues

payment in the interim and by monetary damages at the end of
litigation[.]").

### III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR

Finally, the last two preliminary-injunction factors—which merge
because the government is the party opposing an injunction, *see Nken v.
Holder*, 556 U.S. 418, 435 (2009)—strongly favor defendants. The clear
congressional purpose of § 7103(b)(1) is to allow the President to
guarantee the effective operation of agencies relevant to national
security without the constraints of collective bargaining. "The interest
in preserving national security is an urgent objective of the highest
order." *Trump v. International Refugee Assistance Project*, 582 U.S.
571, 581 (2017) (per curiam) (quotation marks omitted). To interfere
with the President's assessment of the government's investigative,
intelligence, and national-security functions "would appreciably injure
[the Nation's] interests." *Id.* at 582; *see also Winter*, 555 U.S. at 31
(holding that it would be "cold comfort" to allow the Navy to request
relief from a preliminary injunction on an emergency basis if the
injunction "actually results in an inability to train and certify sufficient

naval forces to provide for the national defense" (alteration and quotation marks omitted)).

As this Court previously concluded, "[t]he district court's preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress." *AFSA* Stay Order, 2025 WL 1742853, at *3. The injunction "ties the government's hands" in determining whether and how to implement the executive order, and "[t]hat transfer of control, from the Executive to the Judiciary," is particularly "problematic … in the national security context, an area in which the President generally enjoys unique responsibility." *NTEU* Stay Order, 2025 WL 1441563, at *2 (quotation marks omitted). In contrast, "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest." *Id.* at *3; *see also* *AFGE* Stay Order, 2025 WL 2180674, at *5.

Congress already weighed the competing interests—union representation versus national security—when it passed the FSLMRS. *See AFSA* Stay Order, 2025 WL 1742853, at *3. To the extent NTEU

will suffer any irreparable harm directly traceable to the executive order, the balance of equities favors the government.  *See id.*

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON

 */s/ Joshua M. Koppel*
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*
  *joshua.m.koppel@usdoj.gov*

September 2025

61

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,338 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joshua M. Koppel*
Joshua M. Koppel

**ADDENDUM**

## TABLE OF CONTENTS

5 U.S.C. § 7103 ................................................................................... A1

5 U.S.C. § 7105 ................................................................................... A2

5 U.S.C. § 7116 ................................................................................... A4

5 U.S.C. § 7118 ................................................................................... A5

5 U.S.C. § 7121 ................................................................................... A8

5 U.S.C. § 7122 ................................................................................. A10

5 U.S.C. § 7123 ................................................................................. A11

**5 U.S.C. § 7103**

**§ 7103. Definitions; application**

(a) For the purpose of this chapter--

* * *

(3) "agency" means an Executive agency (including a nonappropriated fund instrumentality described in section 2105(c) of this title and the Veterans' Canteen Service, Department of Veterans Affairs), the Library of Congress, the Government Publishing Office, and the Smithsonian Institution but does not include--

(A) the Government Accountability Office;

(B) the Federal Bureau of Investigation;

(C) the Central Intelligence Agency;

(D) the National Security Agency;

(E) the Tennessee Valley Authority;

(F) the Federal Labor Relations Authority;

(G) the Federal Service Impasses Panel; or

(H) the United States Secret Service and the United States Secret Service Uniformed Division.

* * *

(b) (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that--

(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

* * *

A1

**5 U.S.C. § 7105**

## § 7105. Powers and duties of the Authority

(a) (1) The Authority shall provide leadership in establishing policies and guidance relating to matters under this chapter, and, except as otherwise provided, shall be responsible for carrying out the purpose of this chapter.

(2) The Authority shall, to the extent provided in this chapter and in accordance with regulations prescribed by the Authority--

(A) determine the appropriateness of units for labor organization representation under section 7112 of this title;

(B) supervise or conduct elections to determine whether a labor organization has been selected as an exclusive representative by a majority of the employees in an appropriate unit and otherwise administer the provisions of section 7111 of this title relating to the according of exclusive recognition to labor organizations;

(C) prescribe criteria and resolve issues relating to the granting of national consultation rights under section 7113 of this title;

(D) prescribe criteria and resolve issues relating to determining compelling need for agency rules or regulations under section 7117(b) of this title;

(E) resolves issues relating to the duty to bargain in good faith under section 7117(c) of this title;

(F) prescribe criteria relating to the granting of consultation rights with respect to conditions of employment under section 7117(d) of this title;

(G) conduct hearings and resolve complaints of unfair labor practices under section 7118 of this title;

(H) resolve exceptions to arbitrator's awards under section 7122 of this title; and

(I) take such other actions as are necessary and appropriate to effectively administer the provisions of this chapter.

* * *

A2

(g) In order to carry out its functions under this chapter, the Authority may--

(1) hold hearings;

(2) administer oaths, take the testimony or deposition of any person under oath, and issue subpenas as provided in section 7132 of this title; and

(3) may require an agency or a labor organization to cease and desist from violations of this chapter and require it to take any remedial action it considers appropriate to carry out the policies of this chapter.

* * *

**5 U.S.C. § 7116**

**§ 7116. Unfair labor practices**

(a) For the purpose of this chapter, it shall be an unfair labor practice for an agency--

   (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

   (2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment;

   (3) to sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to other labor organizations having equivalent status;

   (4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter;

   (5) to refuse to consult or negotiate in good faith with a labor organization as required by this chapter;

   (6) to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter;

   (7) to enforce any rule or regulation (other than a rule or regulation implementing section 2302 of this title) which is in conflict with any applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed; or

   (8) to otherwise fail or refuse to comply with any provision of this chapter.

* * *

A4

**5 U.S.C. § 7118**

**§ 7118. Prevention of unfair labor practices**

(a) (1) If any agency or labor organization is charged by any person with having engaged in or engaging in an unfair labor practice, the General Counsel shall investigate the charge and may issue and cause to be served upon the agency or labor organization a complaint. In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint.

(2) Any complaint under paragraph (1) of this subsection shall contain a notice--

(A) of the charge;

(B) that a hearing will be held before the Authority (or any member thereof or before an individual employed by the authority and designated for such purpose); and

(C) of the time and place fixed for the hearing.

(3) The labor organization or agency involved shall have the right to file an answer to the original and any amended complaint and to appear in person or otherwise and give testimony at the time and place fixed in the complaint for the hearing.

(4) (A) Except as provided in subparagraph (B) of this paragraph, no complaint shall be issued based on any alleged unfair labor practice which occurred more than 6 months before the filing of the charge with the Authority.

* * *

(5) The General Counsel may prescribe regulations providing for informal methods by which the alleged unfair labor practice may be resolved prior to the issuance of a complaint.

(6) The Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) shall conduct a hearing on the complaint not earlier than 5 days after the date on which the complaint is served. In the discretion of the

A5

individual or individuals conducting the hearing, any person involved may be allowed to intervene in the hearing and to present testimony. Any such hearing shall, to the extent practicable, be conducted in accordance with the provisions of subchapter II of chapter 5 of this title, except that the parties shall not be bound by rules of evidence, whether statutory, common law, or adopted by a court. A transcript shall be kept of the hearing. After such a hearing the Authority, in its discretion, may upon notice receive further evidence or hear argument.

(7) If the Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) determines after any hearing on a complaint under paragraph (5) of this subsection that the preponderance of the evidence received demonstrates that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, then the individual or individuals conducting the hearing shall state in writing their findings of fact and shall issue and cause to be served on the agency or labor organization an order--

(A) to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;

(B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect;

(C) requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; or

(D) including any combination of the actions described in subparagraphs (A) through (C) of this paragraph or such other action as will carry out the purpose of this chapter.

If any such order requires reinstatement of an employee with backpay, backpay may be required of the agency (as provided in section 5596 of this title) or of the labor organization, as the case may be, which is found to have engaged in the unfair labor practice involved.

(8) If the individual or individuals conducting the hearing determine that the preponderance of the evidence received fails to demonstrate that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, the individual or

individuals shall state in writing their findings of fact and shall issue an order dismissing the complaint.

(b) In connection with any matter before the Authority in any proceeding under this section, the Authority may request, in accordance with the provisions of section 7105(i) of this title, from the Director of the Office of Personnel Management an advisory opinion concerning the proper interpretation of rules, regulations, or other policy directives issued by the Office of Personnel Management.

**5 U.S.C. § 7121**

**§ 7121. Grievance procedures**

(a) (1) Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d), (e), and (g) of this section, the procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage.

* * *

(b) (1) Any negotiated grievance procedure referred to in subsection (a) of this section shall--

    (A) be fair and simple,

    (B) provide for expeditious processing, and

    (C) include procedures that--

        (i) assure an exclusive representative the right, in its own behalf or on behalf of any employee in the unit represented by the exclusive representative, to present and process grievances;

        (ii) assure such an employee the right to present a grievance on the employee's own behalf, and assure the exclusive representative the right to be present during the grievance proceeding; and

        (iii) provide that any grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration which may be invoked by either the exclusive representative or the agency.

    (2) (A) The provisions of a negotiated grievance procedure providing for binding arbitration in accordance with paragraph (1)(C)(iii) shall, if or to the extent that an alleged prohibited personnel practice is involved, allow the arbitrator to order--

        (i) a stay of any personnel action in a manner similar to the manner described in section 1221(c) with respect to the Merit Systems Protection Board; and

A8

(ii) the taking, by an agency, of any disciplinary action identified under section 1215(a)(3) that is otherwise within the authority of such agency to take.

(B) Any employee who is the subject of any disciplinary action ordered under subparagraph (A)(ii) may appeal such action to the same extent and in the same manner as if the agency had taken the disciplinary action absent arbitration.

\* \* \*

**5 U.S.C. § 7122**

## § 7122. Exceptions to arbitral awards

(a) Either party to arbitration under this chapter may file with the Authority an exception to any arbitrator's award pursuant to the arbitration (other than an award relating to a matter described in section 7121(f) of this title). If upon review the Authority finds that the award is deficient--

(1) because it is contrary to any law, rule, or regulation; or

(2) on other grounds similar to those applied by Federal courts in private sector labor-management relations;

the Authority may take such action and make such recommendations concerning the award as it considers necessary, consistent with applicable laws, rules, or regulations.

(b) If no exception to an arbitrator's award is filed under subsection (a) of this section during the 30-day period beginning on the date the award is served on the party, the award shall be final and binding. An agency shall take the actions required by an arbitrator's final award. The award may include the payment of backpay (as provided in section 5596 of this title).

A10

**5 U.S.C. § 7123**

**§ 7123. Judicial review; enforcement**

(a) Any person aggrieved by any final order of the Authority other than an order under--

(1) section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118 of this title, or

(2) section 7112 of this title (involving an appropriate unit determination),

may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of the Authority's order in the United States court of appeals in the circuit in which the person resides or transacts business or in the United States Court of Appeals for the District of Columbia.

(b) The Authority may petition any appropriate United States court of appeals for the enforcement of any order of the Authority and for appropriate temporary relief or restraining order.

(c) Upon the filing of a petition under subsection (a) of this section for judicial review or under subsection (b) of this section for enforcement, the Authority shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of the petition, the court shall cause notice thereof to be served to the parties involved, and thereupon shall have jurisdiction of the proceeding and of the question determined therein and may grant any temporary relief (including a temporary restraining order) it considers just and proper, and may make and enter a decree affirming and enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Authority. The filing of a petition under subsection (a) or (b) of this section shall not operate as a stay of the Authority's order unless the court specifically orders the stay. Review of the Authority's order shall be on the record in accordance with section 706 of this title. No objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances. The findings of the Authority with respect to questions of fact, if supported

A11

by substantial evidence on the record considered as a whole, shall be conclusive. If any person applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there were reasonable grounds for the failure to adduce the evidence in the hearing before the Authority, or its designee, the court may order the additional evidence to be taken before the Authority, or its designee, and to be made a part of the record. The Authority may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed. The Authority shall file its modified or new findings, which, with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. The Authority shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with the court, the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the judgment and decree shall be subject to review by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

(d) The Authority may, upon issuance of a complaint as provided in section 7118 of this title charging that any person has engaged in or is engaging in an unfair labor practice, petition any United States district court within any district in which the unfair labor practice in question is alleged to have occurred or in which such person resides or transacts business for appropriate temporary relief (including a restraining order). Upon the filing of the petition, the court shall cause notice thereof to be served upon the person, and thereupon shall have jurisdiction to grant any temporary relief (including a temporary restraining order) it considers just and proper. A court shall not grant any temporary relief under this section if it would interfere with the ability of the agency to carry out its essential functions or if the Authority fails to establish probable cause that an unfair labor practice is being committed.