## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL TREASURY EMPLOYEES UNION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

## JOINT APPENDIX

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*

  *Counsel for Defendants-Appellants*

# INDEX

| Description | Dkt. No. | Page |
|---|---|---|
| District Court Docket Sheet | | JA1 |
| Complaint | 1 | JA12 |
| Exhibits to Plaintiff's Motion for Preliminary Injunction | | |
|    Declaration of Daniel Kaspar | 9-2 | JA45 |
|    Declaration of Mark L. Gray | 9-3 | JA61 |
| Exhibits to Defendants' Opposition to Motion for Preliminary Injunction | | |
|    Declaration of Allen R. Brooks | 26-1 | JA65 |
|    Declaration of Erica Balkum | 26-2 | JA81 |
| Exhibits to Reply in Support of Motion for Preliminary Injunction | | |
|    Supplemental Declaration of Daniel Kaspar | 29-1 | JA89 |
| Transcript of April 23, 2025 Hearing on Motion for Preliminary Injunction | | JA161 |
| Order Granting Preliminary Injunction | 32 | JA217 |
| Opinion on Preliminary Injunction | 34 | JA219 |
| Notice of Appeal | 35 | JA265 |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00935-PLF

NATIONAL TREASURY EMPLOYEES UNION v. DONALD J. TRUMP et al

Assigned to: Judge Paul L. Friedman

Related Cases: 1:25-cv-02445-PLF
1:25-cv-01030-PLF
1:25-cv-00935-PLF
1:25-cv-02657-PLF
1:25-cv-01362-PLF

Case in other court:  USCA, 25-05157

Cause: 28:2201 Declaratory Judgment

Date Filed: 03/31/2025

Jury Demand: None

Nature of Suit: 360 P.I.: Other

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**NATIONAL TREASURY EMPLOYEES UNION**

represented by **Paras N. Shah**
NATIONAL TREASURY EMPLOYEES UNION
800 K Street, NW
Ste 1000
Washington, DC 20001
202-572-5500
Fax: 202-572-5645
Email: paras.shah@nteu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Horne**
NATIONAL TREASURY EMPLOYEES UNION
800 K Street, NW
Ste 1000
Washington, DC 20001
202-572-5500
Fax: 202-572-5645
Email: jessica.horne@nteu.org
*ATTORNEY TO BE NOTICED*

**Julie M. Wilson**
NATIONAL TREASURY EMPLOYEES UNION
800 K Street, NW
Ste 1000
Washington, DC 20001
202-572-5500
Email: julie.wilson@nteu.org
*ATTORNEY TO BE NOTICED*

**Kathryn W. Bailey**
NTEU
800 K St NW
Suite 1000
Washington, DC 20001
202-572-5500
Email: kathryn.bailey@nteu.org
*ATTORNEY TO BE NOTICED*

**Lindsay Dunn**
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, NW
Ste 1000
Washington, DC 20001
212-572-5500
Email: lindsay.dunn@nteu.org
*ATTORNEY TO BE NOTICED*

**Allison Conrey Giles**
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, NW
Ste 1000
Washington, DC 20001
202-572-5500
Fax: 202-572-5645
Email: allie.giles@nteu.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**
*President of the United States*

represented by **Emily Margaret Hall**
DOJ-Civ
Civil Division, Office of the Assistant
Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530
202-307-6482
Email: emily.hall@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
DOJ-Civ
1100 L St., NW
Washington, DC 20005
202-305-7590
Email: lydia.jines@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**

U.S. DEPARTMENT OF JUSTICE
Office of the Assistant Attorney General,
Civil Division
950 Pennsylvania Ave NW
Rm. 3632
Washington, DC 20530
202-514-4052
Email: tyler.becker@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHARLES EZELL**                  represented by   **Emily Margaret Hall**
*Acting Director*                                   (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Lydia Jane Jines**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Tyler J. Becker**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA J. BONDI**                represented by   **Emily Margaret Hall**
*U.S. Attorney General*                             (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Lydia Jane Jines**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Tyler J. Becker**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT F. KENNEDY, JR.**         represented by   **Emily Margaret Hall**
*Secretary*                                         (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Lydia Jane Jines**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Tyler J. Becker**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**LEE M. ZELDIN**
*Administrator*

represented by **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHRISTOPHER A WRIGHT**
*Secretary*

represented by **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BRENDAN T CARR**
*Chairman*

represented by **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT BESSENT**
*Secretary*

represented by **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MELANIE KRAUSE**
*Acting Commissioner*

represented by **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARGIE ROLLINSON**
*Chief Counsel*

represented by **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TIMOTHY E GRIBBEN**
*Commissioner*

represented by **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARY G. RYAN**
*Administrator*

represented by **Emily Margaret Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**RODNEY E HOOD**                    represented by **Emily Margaret Hall**
*Acting Comptroller of the Currency*                (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Lydia Jane Jines**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Tyler J. Becker**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN RABY**                        represented by **Emily Margaret Hall**
*Acting Director*                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Lydia Jane Jines**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Tyler J. Becker**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/31/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC-11577943) filed by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons)(Giles, Allison) (Entered: 03/31/2025) |
| 03/31/2025 | | Case Assigned to Judge Paul L. Friedman. (zmtm) (Entered: 03/31/2025) |
| 03/31/2025 | 2 | SUMMONS (15) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 03/31/2025) |
| 03/31/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL TREASURY EMPLOYEES UNION (Giles, Allison) (Entered: 03/31/2025) |
| 03/31/2025 | 4 | NOTICE of Appearance by Julie M. Wilson on behalf of All Plaintiffs (Wilson, Julie) (Main Document 4 replaced on 4/2/2025) (zjm). (Entered: 03/31/2025) |

| 03/31/2025 | 5 | NOTICE of Appearance by Paras N. Shah on behalf of All Plaintiffs (Shah, Paras) (Main Document 5 replaced on 4/2/2025) (zjm). (Entered: 03/31/2025) |
|---|---|---|
| 04/01/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lindsay Dunn, Filing fee $ 100, receipt number ADCDC-11581656. Fee Status: Fee Paid. by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Declaration PHV Declaration, # 2 Exhibit PHV Certificate of Good Standing, # 3 Text of Proposed Order PHV Proposed Order)(Shah, Paras) (Entered: 04/01/2025) |
| 04/01/2025 | 7 | ORDER granting 6 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on April 1, 2025. (lcjd) (Entered: 04/01/2025) |
| 04/02/2025 | 8 | NOTICE of Appearance by Lindsay Dunn on behalf of All Plaintiffs (Dunn, Lindsay) (Main Document 8 replaced on 4/2/2025) (zjm). (Entered: 04/02/2025) |
| 04/04/2025 | 9 | MOTION for Preliminary Injunction by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Text of Proposed Order)(Giles, Allison) (Entered: 04/04/2025) |
| 04/04/2025 | 10 | NOTICE *of Rule 65.1 certification* by NATIONAL TREASURY EMPLOYEES UNION (Giles, Allison) (Entered: 04/04/2025) |
| 04/04/2025 | 11 | ORDER scheduling oral argument on 9 Plaintiff's Motion for a Preliminary Injunction for April 23, 2025 at 10:00 a.m. and directing parties to meet and confer and file a joint status report. See Order for details. Signed by Judge Paul L. Friedman on April 4, 2025. (lcjd) (Entered: 04/04/2025) |
| 04/04/2025 | | Set/Reset Hearings: Motion Hearing set for 4/23/2025 at 10:00 AM in Courtroom 29A-In Person before Judge Paul L. Friedman. (tj) (Entered: 04/04/2025) |
| 04/04/2025 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/31/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/30/2025. (See Docket Entry 10 to view document) (zjm) (Entered: 04/08/2025) |
| 04/07/2025 | 12 | Joint STATUS REPORT by NATIONAL TREASURY EMPLOYEES UNION. (Shah, Paras) (Entered: 04/07/2025) |
| 04/07/2025 | 13 | NOTICE of Appearance by Lydia Jane Jines on behalf of All Defendants (Jines, Lydia) (Entered: 04/07/2025) |
| 04/07/2025 | | MINUTE ORDER: Upon consideration of the parties' 12 Joint Status Report, the government shall file its opposition to plaintiffs 9 motion for a preliminary injunction on or before April 11, 2025. The plaintiff shall file its reply on or before April 16, 2025. Signed by Judge Paul L. Friedman on April 7, 2025. (lcjd) (Entered: 04/07/2025) |
| 04/08/2025 | | Set/Reset Deadlines: Responses due by 4/11/2025; Replies due by 4/16/2025. (tj) (Entered: 04/08/2025) |
| 04/09/2025 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CHARLES EZELL served on 4/7/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/09/2025 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JOHN RABY served on 4/7/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/09/2025 | 17 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SCOTT BESSENT served on 4/7/2025 (Giles, Allison) (Entered: 04/09/2025) |

| 04/09/2025 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/7/2025. (Giles, Allison) (Entered: 04/09/2025) |
|---|---|---|
| 04/09/2025 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ROBERT F. KENNEDY, JR served on 4/7/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/09/2025 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. LEE M. ZELDIN served on 4/7/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/09/2025 | 21 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. BRENDAN T CARR served on 4/7/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/09/2025 | 22 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARGIE ROLLINSON served on 4/7/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/09/2025 | 23 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TIMOTHY E GRIBBEN served on 4/3/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/09/2025 | 24 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARY G. RYAN served on 4/3/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/09/2025 | 25 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CHRISTOPHER A WRIGHT served on 4/7/2025 (Giles, Allison) (Entered: 04/09/2025) |
| 04/11/2025 | 26 | RESPONSE re 9 MOTION for Preliminary Injunction *Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction* filed by SCOTT BESSENT, PAMELA J. BONDI, BRENDAN T CARR, DONALD J. TRUMP, CHARLES EZELL, TIMOTHY E GRIBBEN, RODNEY E HOOD, ROBERT F. KENNEDY, JR, MELANIE KRAUSE, JOHN RABY, MARGIE ROLLINSON, MARY G. RYAN, CHRISTOPHER A WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Exhibits 1, 1-A, 1-B, # 2 Exhibits 2, 2-A)(Jines, Lydia) (Entered: 04/11/2025) |
| 04/12/2025 | 27 | NOTICE of Proposed Order by SCOTT BESSENT, PAMELA J. BONDI, BRENDAN T CARR, DONALD J. TRUMP, CHARLES EZELL, TIMOTHY E GRIBBEN, RODNEY E HOOD, ROBERT F. KENNEDY, JR, MELANIE KRAUSE, JOHN RABY, MARGIE ROLLINSON, MARY G. RYAN, CHRISTOPHER A WRIGHT, LEE M. ZELDIN re 26 Response to motion, (Jines, Lydia) (Entered: 04/12/2025) |
| 04/14/2025 | 28 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD J. TRUMP served on 4/10/2025 (Giles, Allison) (Entered: 04/14/2025) |
| 04/16/2025 | 29 | REPLY to opposition to motion re 9 Motion for Preliminary Injunction filed by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Declaration) (Giles, Allison) (Entered: 04/16/2025) |
| 04/21/2025 | 30 | Joint STATUS REPORT by NATIONAL TREASURY EMPLOYEES UNION. (Giles, Allison) (Entered: 04/21/2025) |

| 04/21/2025 | | Minute Order: The Court will connect the public-access telephone line for the motion hearing now scheduled for April 23, 2025 at 10:00am. Any member of the public or media may access the public-access line by dialing (833) 990-9400, and using meeting ID 492497252. As a reminder, any use of the public-access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on April 21, 2025. (lcjd) (Entered: 04/21/2025) |
|---|---|---|
| 04/22/2025 | 31 | NOTICE of Appearance by Emily Margaret Hall on behalf of All Defendants (Hall, Emily) (Entered: 04/22/2025) |
| 04/23/2025 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Motion Hearing held on 4/23/2025 re 9 MOTION for Preliminary Injunction filed by NATIONAL TREASURY EMPLOYEES UNION. Oral argument heard, and the court takes the motion under advisement. (Court Reporter: Sonja Reeves) (ztj) (Entered: 04/23/2025) |
| 04/25/2025 | 32 | ORDER granting Plaintiff's 9 Motion for a Preliminary Injunction. See Order for details. Signed by Judge Paul L. Friedman on April 25, 2025. (lcjd) (Main Document 32 replaced on 4/25/2025) (rj). Modified on 4/25/2025 to correct pdf (rj). (Entered: 04/25/2025) |
| 04/28/2025 | 33 | TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION HEARING before Judge Paul L. Friedman held on April 23, 2025; Page Numbers: 1-68. Date of Issuance: April 28, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/19/2025. Redacted Transcript Deadline set for 5/29/2025. Release of Transcript Restriction set for 7/27/2025.(Reeves, Sonja) (Entered: 04/28/2025) |
| 04/28/2025 | 34 | OPINION explaining the Court's reasoning for its 32 April 25, 2025 Order. See Opinion for details. Signed by Judge Paul L. Friedman on April 28, 2025. (lcjd) (Entered: 04/28/2025) |
| 04/29/2025 | 35 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 32 Order on Motion for Preliminary Injunction, 34 Memorandum & Opinion by LEE M. ZELDIN, MARGIE ROLLINSON, CHARLES EZELL, CHRISTOPHER A WRIGHT, SCOTT BESSENT, DONALD J. TRUMP, TIMOTHY E GRIBBEN, JOHN RABY, RODNEY E HOOD, BRENDAN T CARR, PAMELA J. BONDI, MELANIE KRAUSE, MARY G. RYAN, |

| | | |
|---|---|---|
| | | ROBERT F. KENNEDY, JR. Fee Status: No Fee Paid. Parties have been notified. (Jines, Lydia) Modified on 4/30/2025 to add docket link (zjm). (Entered: 04/29/2025) |
| 04/30/2025 | 36 | Transmission of the Notice of Appeal, Order Appealed ( Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 35 Notice of Appeal to DC Circuit Court,. (zjm) (Entered: 04/30/2025) |
| 04/30/2025 | 37 | MOTION to Stay *Defendants' Motion to Stay Pending Appeal* by SCOTT BESSENT, PAMELA J. BONDI, BRENDAN T CARR, DONALD J. TRUMP, CHARLES EZELL, TIMOTHY E GRIBBEN, RODNEY E HOOD, ROBERT F. KENNEDY, JR, MELANIE KRAUSE, JOHN RABY, MARGIE ROLLINSON, MARY G. RYAN, CHRISTOPHER A WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Text of Proposed Order Proposed Order)(Jines, Lydia) (Entered: 04/30/2025) |
| 04/30/2025 | | USCA Case Number 25-5157 for 35 Notice of Appeal to DC Circuit Court, filed by LEE M. ZELDIN, MARY G. RYAN, MARGIE ROLLINSON, MELANIE KRAUSE, CHARLES EZELL, DONALD J. TRUMP, ROBERT F. KENNEDY, JR., RODNEY E HOOD, JOHN RABY, TIMOTHY E GRIBBEN, PAMELA J. BONDI, CHRISTOPHER A WRIGHT, BRENDAN T CARR, SCOTT BESSENT. (zjm) (Entered: 04/30/2025) |
| 05/01/2025 | | MINUTE ORDER: Upon consideration of the government's 37 Motion to Stay Pending Appeal, the motion is DENIED. Each of the government's arguments were addressed in this Court's Opinion of April 28, 2025, granting plaintiff's motion for a preliminary injunction. See Opinion [Dkt. No. 34]. Furthermore, as the Court explained in its Opinion, plaintiff has satisfied each of the preliminary injunction factors. This conclusion warrants preserving the status quo where plaintiff and federal employees subject to the Executive Order maintain the collective bargaining rights prescribed by Congress. Signed by Judge Paul L. Friedman on May 1, 2025. (lcjd) (Entered: 05/01/2025) |
| 05/02/2025 | 38 | Joint STATUS REPORT by NATIONAL TREASURY EMPLOYEES UNION. (Giles, Allison) (Entered: 05/02/2025) |
| 05/20/2025 | 39 | MEMORANDUM OPINION AND ORDER directing parties to meet and confer and submit a joint status report on or before 12:00 p.m. on May 22, 2025. See Memorandum Opinion and Order for details. Signed by Judge Paul L. Friedman on May 20, 2025. (lcjd) (Entered: 05/20/2025) |
| 05/22/2025 | 40 | Joint STATUS REPORT by NATIONAL TREASURY EMPLOYEES UNION. (Giles, Allison) (Entered: 05/22/2025) |
| 05/22/2025 | | MINUTE ORDER: In light of the parties' 40 Joint Status Report, the parties' briefing on their cross-motions for summary judgment shall proceed as follows: plaintiff shall file its motion for summary judgment on or before June 9, 2025; defendants shall file their opposition to plaintiff's motion and cross-motion for summary judgment on or before June 23, 2025; plaintiff shall file its opposition to defendants' cross-motion for summary judgment and reply in support of its motion on or before July 7, 2025; and defendants shall file their reply on or before July 17, 2025. Signed by Judge Paul L. Friedman on May 22, 2025. (lcjd) (Entered: 05/22/2025) |
| 06/03/2025 | 41 | NOTICE of Appearance by Jessica Horne on behalf of All Plaintiffs (Horne, Jessica) (Entered: 06/03/2025) |
| 06/03/2025 | 42 | NOTICE of Appearance by Kathryn W. Bailey on behalf of All Plaintiffs (Bailey, Kathryn) (Entered: 06/03/2025) |

| | | |
|---|---|---|
| 06/09/2025 | 43 | MOTION for Summary Judgment by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Declaration, # 4 Text of Proposed Order)(Bailey, Kathryn) (Entered: 06/09/2025) |
| 06/23/2025 | 44 | MOTION for Summary Judgment *Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment* by SCOTT BESSENT, PAMELA J. BONDI, BRENDAN T CARR, DONALD J. TRUMP, CHARLES EZELL, TIMOTHY E GRIBBEN, RODNEY E HOOD, ROBERT F. KENNEDY, JR, MELANIE KRAUSE, JOHN RABY, MARGIE ROLLINSON, MARY G. RYAN, CHRISTOPHER A WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Memorandum of Points and Authorities in Support of Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Proposed Order)(Jines, Lydia) (Entered: 06/23/2025) |
| 06/23/2025 | 45 | Memorandum in opposition to re 43 MOTION for Summary Judgment *Memorandum of Points and Authorities in Support of Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment* filed by SCOTT BESSENT, PAMELA J. BONDI, BRENDAN T CARR, DONALD J. TRUMP, CHARLES EZELL, TIMOTHY E GRIBBEN, RODNEY E HOOD, ROBERT F. KENNEDY, JR, MELANIE KRAUSE, JOHN RABY, MARGIE ROLLINSON, MARY G. RYAN, CHRISTOPHER A WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Defendants' Responses to Plaintiff's Statement of Material Facts Not in Dispute, # 11 Proposed Order)(Jines, Lydia) (Entered: 06/23/2025) |
| 06/24/2025 | 46 | NOTICE of Appearance by Tyler J. Becker on behalf of All Defendants (Becker, Tyler) (Entered: 06/24/2025) |
| 07/07/2025 | 47 | Memorandum in opposition to re 44 MOTION for Summary Judgment *Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment* filed by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Statement of Facts Plaintiff's Response to Defendants' Statement of Material Facts Not in Dispute and Plaintiff's Supplemental Statement of Facts Not in Dispute, # 2 Declaration Supplemental Declaration of Daniel Kaspar, # 3 Text of Proposed Order Revised Proposed Order)(Horne, Jessica) (Entered: 07/07/2025) |
| 07/07/2025 | 48 | REPLY to opposition to motion re 43 Motion for Summary Judgment filed by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Statement of Facts Plaintiff's Response to Defendants' Statement of Material Facts Not in Dispute and Plaintiff's Supplemental Statement of Facts Not in Dispute, # 2 Declaration Supplemental Declaration of Daniel Kaspar, # 3 Text of Proposed Order Revised Proposed Order)(Horne, Jessica) (Entered: 07/07/2025) |
| 07/17/2025 | 49 | REPLY to opposition to motion re 44 Motion for Summary Judgment,,, *Defendants' Reply in Support of Defendants' Cross-Motion for Summary Judgment* filed by SCOTT BESSENT, PAMELA J. BONDI, BRENDAN T CARR, DONALD J. TRUMP, CHARLES EZELL, TIMOTHY E GRIBBEN, RODNEY E HOOD, ROBERT F. KENNEDY, JR, MELANIE KRAUSE, JOHN RABY, MARGIE ROLLINSON, MARY G. RYAN, CHRISTOPHER A WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Exhibit 10, # 2 Defendants' Response to Plaintiff's Supplemental Statement of Material Facts Not in Dispute)(Jines, Lydia) (Entered: 07/17/2025) |
| 09/02/2025 | 50 | NOTICE by NATIONAL TREASURY EMPLOYEES UNION re 43 Motion for Summary Judgment (Giles, Allison) (Entered: 09/02/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001,

                Plaintiff,

        v.

DONALD J. TRUMP,
President of the United States
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500,

CHARLES EZELL,
Acting Director
Office of Personnel Management
1900 E Street N.W.
Washington, D.C. 20415,

PAMELA J. BONDI,
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530,

ROBERT F. KENNEDY, JR.,
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue S.W.
Washington, D.C. 20201,

LEE M. ZELDIN,
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue N.W.
Washington, D.C. 20460,

Case No. 1:25cv935

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

1

JA12

CHRISTOPHER A. WRIGHT,
Secretary
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington, D.C. 20585,

BRENDAN T. CARR,
Chairman
Federal Communications Commission
45 L Street N.E.
Washington, D.C. 20554,

SCOTT BESSENT,
Secretary
U.S. Department of Treasury
1500 Pennsylvania Avenue N.W.
Washington, D.C. 20220,

MELANIE KRAUSE,
Acting Commissioner
Internal Revenue Service
U.S. Department of Treasury
1111 Constitution Avenue N.W.
Washington, D.C. 20224,

MARGIE ROLLINSON,
Chief Counsel
Office of Chief Counsel
Internal Revenue Service
U.S. Department of Treasury
1111 Constitution Avenue N.W.
Washington, D.C. 20224,

TIMOTHY E. GRIBBEN,
Commissioner
Bureau of the Fiscal Service
U.S. Department of Treasury
3201 Pennsy Drive, Building E
Landover, MD 20785,

JA13

MARY G. RYAN,
Administrator
Alcohol and Tobacco Tax and Trade Bureau
U.S. Department of Treasury
1310 G Street N.W., Box 12
Washington, D.C. 20005,

RODNEY E. HOOD,
Acting Comptroller of the Currency
Office of the Comptroller of the Currency
U.S. Department of Treasury
400 7th Street S.W.
Washington, D.C. 20219, and

JOHN RABY,
Acting Director
Bureau of Land Management
1849 C Street N.W.
Washington, D.C. 20240,

            Defendants.

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents federal government employees in thirty-seven agencies and departments. NTEU negotiates collective bargaining agreements with agency employers, pushes for legislation that improves federal employees' working lives, and litigates disputes involving federal employees' rights.

On March 27, 2025, Defendant Donald J. Trump issued an executive order that guts Congress's federal sector collective bargaining regime. The Executive Order strips the collective bargaining rights of hundreds of thousands of federal

employees across a number of agencies. That includes nearly a dozen agencies or departments for which NTEU represents bargaining unit employees.

The heads of those agencies, who are defendants in this action along with the President and Acting Director of the Office of Personnel Management (OPM), must comply with the Executive Order. They will refuse to recognize NTEU as the duly elected exclusive representative of their bargaining unit employees. They will also cease the payroll deductions that their employees have requested for their dues payments, cutting off more than half of NTEU's revenue stream.

Congress granted federal employees collective bargaining rights. Congress gave the President narrow authority to exclude some agencies from the collective bargaining statute. But the President may use that authority only if the agency primarily does intelligence, counterintelligence, investigative, or national security work, *and* only if the statute cannot be applied "in a manner consistent with national security requirements and considerations."

The President's sweeping Executive Order is inconsistent with this narrow authority. The Administration's own issuances show that the President's exclusions are not based on national security concerns, but instead a policy objective of making federal employees easier to fire and political animus against federal sector unions. The Executive Order is therefore unlawful and must be enjoined.

## JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

2.      Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e). NTEU is located in Washington, D.C. The Defendants also reside here, and a substantial part of the events or omissions giving rise to the claim occurred in Washington, D.C. because the Executive Order was issued here.

## PARTIES

3.      Plaintiff NTEU is an unincorporated association with its principal place of business at 800 K Street N.W., Suite 1000, Washington, D.C. 20001. NTEU is, pursuant to Title VII of the Civil Service Reform Act, Public Law No. 95-454, 92 Stat. 1111, the exclusive bargaining representative of nearly 160,000 federal employees in thirty-seven departments and agencies. NTEU represents the interests of these employees by enforcing employees' collective and individual rights through grievances and federal court litigation; negotiating collective bargaining agreements; filing unfair labor practice charges; and advocating in Congress for favorable working conditions, pay, and benefits. NTEU brings this action on behalf of itself because the Executive Order will harm it directly.

4.      Defendant Donald J. Trump is the President of the United States of America. On March 27, 2025, he issued an executive order terminating federal employees' collective bargaining rights in numerous offices, departments, and agencies, including the termination of, as relevant here, twelve existing collective bargaining agreements that NTEU has negotiated. Executive Order, *Exclusions*

*from Federal Labor-Management Relations Programs* (Mar. 27, 2025) (the Executive Order).

5.  Defendant Charles Ezell, in his official capacity as the Acting Director of OPM, will implement and guide federal agencies' compliance and implementation of the Executive Order, including the termination of collective bargaining agreements of employees represented by NTEU.

6.  Defendant Pamela J. Bondi, in her official capacity as the Attorney General of the United States Department of Justice (DOJ), will comply with the Executive Order and will take steps to implement it as described in this complaint by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of DOJ employees in two of the agency's divisions: the Environment and Natural Resources Division and the Civil Rights Division.

7.  Defendant Robert F. Kennedy, Jr., in his official capacity as the Secretary of the United States Department of Health and Human Services (HHS), will comply with the Executive Order and will take steps to implement it as described in this complaint by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of HHS employees in five of the agency's subdivisions: the Office of the Secretary, the Food and Drug Administration, the Administration for Strategic Preparedness and Response, the

Centers for Disease Control and Prevention, and the Office of Refugee Resettlement in the Administration for Children and Families.

8. Defendant Lee M. Zeldin, in his official capacity as the Administrator of the Environmental Protection Agency (EPA), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of EPA employees.

9. Defendant Christopher A. Wright, in his official capacity as the Secretary of the United States Department of Energy (DOE), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of DOE employees.

10. Defendant Brendan T. Carr, in his official capacity as the Chairman of the Federal Communications Commission (FCC), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of FCC employees.

11. Defendant Scott Bessent, in his official capacity as the Secretary of the United States Department of Treasury (Treasury), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of Treasury employees within the Internal Revenue

Service (IRS), the IRS Office of Chief Counsel (IRS-OCC), the Bureau of Fiscal

Service (BFS), the Alcohol and Tobacco Tax and Trade Bureau (TTB), the Office of

the Comptroller of the Currency (OCC), and Treasury Departmental Offices (TDO).

12.    Defendant Melanie Krause, in her official capacity as the Acting

Commissioner of the IRS, will comply with the Executive Order and will take steps

to implement it as described in this complaint, including by, for example, refusing to

recognize and interact with NTEU as the duly authorized representative of IRS

employees.

13.    Defendant Margie Rollinson, in her official capacity as the Chief

Counsel of the IRS-OCC, will comply with the Executive Order and will take steps

to implement it as described in this complaint, including by, for example, refusing to

recognize and interact with NTEU as the duly authorized representative of IRS-

OCC employees.

14.    Defendant Timothy E. Gribben, in his official capacity as the

Commissioner of the BFS, will comply with the Executive Order and will take steps

to implement it as described in this complaint, including by, for example, refusing to

recognize and interact with NTEU as the duly authorized representative of BFS

employees.

15.     Defendant Mary G. Ryan, in her official capacity as the Administrator

of the TTB, will comply with the Executive Order and will take steps to implement

it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of TTB employees.

16.     Defendant Rodney E. Hood, in his official capacity as the Acting Comptroller of the OCC, will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of OCC employees.

17.     Defendant John Raby, in his official capacity as the Acting Director of the Bureau of Land Management (BLM), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of BLM employees.

<u>**STATEMENT OF CLAIMS**</u>

**I.    Congress Broadly Granted Collective Bargaining Rights to Federal Employees.**

18.     Prior to 1978, an "outdated patchwork of statutes and rules built up over almost a century" governed federal employment. *United States v. Fausto*, 484 U.S. 439, 444 (1988). Congress reacted to this state of disarray through its enactment of the Civil Service Reform Act of 1978 (the Act), which "overhauled the civil service system." *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 773 (1985).

19.     "In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had

9

been under the [prior] regime." *Bureau of Alcohol, Tobacco, & Firearms v. Fed. Labor Rel. Auth.*, 464 U.S. 89, 107 (1983). Thus, as a central piece of its federal civil service reform and as Title VII of the Act, Congress enacted the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 *et seq.* (the Statute).

20.    The Statute rests on Congress's explicit finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest." 5 U.S.C. § 7101(a)(1).

21.    Through the Statute, Congress assigned federal sector labor organizations the job of "act[ing] for" and "negotiat[ing] collective bargaining agreements covering" not only their members, but all employees in the bargaining units that they were elected to represent. 5 U.S.C. § 7114(a).

22.    Congress gave federal sector labor unions this responsibility based upon its conclusion that the work of labor organizations "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1).

23.    The Statute generally requires bargaining over matters affecting conditions of employment. *See* 5 U.S.C. § 7103(a)(14).

24.    Congress specifically excluded some agencies or offices within agencies from the Statute, such as the Federal Bureau of Investigation. 5 U.S.C. § 7103(a)(3).

25.    The Statute gives the President narrow grounds to exclude additional agencies if he determines that an agency or subdivision has a "primary function of intelligence, counterintelligence, investigative, or national security work," *and* the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added).

26.    The Statute requires agencies to honor dues allotment forms signed by employees who wish to voluntarily join a federal sector union and to have dues deducted from their paychecks. 5 U.S.C. § 7115.

27.    Under the Statute, NTEU must represent the interests of all employees in its bargaining units, not just the employees who choose to pay dues and become members. 5 U.S.C. § 7114(a)(1).

## II.    Presidents Have Used Their Authority Narrowly to Exclude Certain Security and Intelligence Agencies from the Statute.

28.    Presidents have issued orders exempting certain offices from the Statute, but no President has ever exempted an entire Cabinet-level agency–let alone multiple Cabinet-level agencies.

29.    Presidents have previously exempted discrete offices within agencies that clearly perform primarily security or intelligence work. In 1979, for example, President Carter exempted the Office of Intelligence Support from the Department of Treasury. Exec. Order No. 12171, 44 Fed. Reg. 66565 (Nov. 19, 1979). In 1986, President Reagan exempted the Office of Intelligence within the Drug Enforcement Administration of DOJ. Exec. Order No. 12559, 51 Fed. Reg. 18761 (May 20, 1986).

11

### III.    The President's Order Excluding Hundreds of Thousands of Federal Employees from the Statute is Baseless and Unlawful.

30.    President Trump's Executive Order strips collecting bargaining rights from three-quarters of the federal employees who are currently represented by federal sector unions. *See* Hassan Ali Kanu, Trump Moves to Strip Unionization Rights from Most Federal Workers, Politico.com (Mar. 28, 2025), www.politico.com/news/ 2025/03/28/union-rights-federal-workers-donald-trump-00257010. The Executive Order singly eliminates collective bargaining for some two-thirds of the federal workforce. *Id.*

31.    The Executive Order states that the President has determined that each of the agencies or agency components listed in the Order has "as a primary function intelligence, counterintelligence, investigative, or national security work." It further states "that chapter 71 of title 5, United States Code, cannot be applied to those agencies or agency components in a manner consistent with national security requirements and considerations."

32.    According to OPM, the agencies excluded from the Statute through the Executive Order "are no longer subject to the collective bargaining requirements of chapter 71," and the unions representing bargaining unit employees at those agencies have "los[t] their status" as the exclusive representatives for those employees. *See* OPM, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* (Mar. 27, 2025) at 3, www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf (OPM Guidance). Thus, the OPM Guidance discusses

the "terminat[ion] of [] CBAs" at these agencies in the context of ending participation in negotiated grievance procedures and ending compliance with negotiated reduction-in-force articles. *Id.* at 5.

33.    NTEU represents nearly a dozen federal departments or agencies that the Executive Order excludes from the Statute's coverage. The Executive Order and OPM Guidance will lead to the termination of, as relevant here, twelve collective bargaining agreements that NTEU bargained with those departments and agencies.

a.    The Executive Order and OPM Guidance direct the IRS to disregard its current collective bargaining agreement with NTEU. The IRS and NTEU agreed that the agreement would last until September 2027.

b.    The Executive Order and OPM Guidance direct the IRS Office of Chief Counsel to disregard its current collective bargaining agreement with NTEU. The IRS Chief Counsel and NTEU agreed that the agreement would last until January 2029.

c.    The Executive Order and OPM Guidance direct HHS to disregard its current collective bargaining agreement with NTEU as to the HHS components that the Executive Order excludes from the Statute. HHS and NTEU agreed that the agreement would last until July 2028 and then further extended its duration to July 2029.

d.    The Executive Order and OPM Guidance direct DOE to disregard its current collective bargaining agreement with NTEU. DOE and NTEU agreed that the agreement would last until January 2026.

13

JA24

e.      The Executive Order and OPM Guidance direct EPA to disregard its current collective bargaining agreement with NTEU. EPA and NTEU agreed that the agreement would last until December 2028.

f.      The Executive Order and OPM Guidance direct FCC to disregard its current collective bargaining agreement with NTEU. FCC and NTEU agreed that the agreement would last until March 2030.

g.      The Executive Order and OPM Guidance direct OCC to disregard its current collective bargaining agreement with NTEU. OCC and NTEU agreed that the agreement would last until February 2028.

h.      The Executive Order and OPM Guidance direct Treasury to disregard its current collective bargaining agreement covering its departmental offices with NTEU. Treasury and NTEU agreed that the agreement would last until June 2025.

i.      The Executive Order and OPM Guidance direct TTB to disregard its current collective bargaining agreement with NTEU. TTB and NTEU agreed that the agreement would last until January 2027.

j.      The Executive Order and OPM Guidance direct BLM to disregard its current collective bargaining agreements with NTEU. That direction eliminates three collective bargaining agreements. For one part of BLM, NTEU and BLM agreed that an interim collective bargaining agreement would last until a comprehensive collective bargaining agreement became effective. For a second part of BLM, the parties agreed that the collective bargaining agreement would last

14

until January 2028. For a third part of BLM, the parties agreed that the collective

bargaining agreement would last until February 2030.

        k.      The Executive Order and OPM Guidance direct BFS to

disregard its current collective bargaining agreement with NTEU. BFS and NTEU

agreed that the agreement would last until August 2025.

### A. None of the NTEU-Represented Agencies Excluded from the Statute Has a Primary Function of Intelligence, Counterintelligence, Investigative, or National Security Work.

      34.     The IRS does not primarily perform security, investigative, or

intelligence work. The IRS is the revenue service for the federal government,

responsible for collecting federal taxes and administering the Internal Revenue

Code. NTEU-represented employees at IRS do not primarily perform security,

investigative, or intelligence work. They provide tax assistance to taxpayers,

conduct taxpayer audits, and collect overdue tax revenue.

      35.     The IRS Office of Chief Counsel does not primarily perform security,

investigative, or intelligence work. NTEU-represented employees at the Office of

Chief Counsel do not primarily perform security, investigative, or intelligence work.

They provide legal guidance and interpretive advice to the IRS, to Treasury, and to

taxpayers; and coordinate the IRS's position in litigation.

      36.     The HHS components that the Executive Order excludes from the

Statute and that NTEU represents—the Office of the Secretary, the Food and Drug

Administration, the Administration for Strategic Preparedness and Response, the

Centers for Disease Control and Prevention, and the Office of Refugee Resettlement

in the Administration for Children and Families—do not primarily perform security, investigative, or intelligence work. Those components administer social service programs, civil rights and healthcare programs, and programs that assure food and drug safety and efficacy. NTEU-represented employees at those components of HHS do not primarily perform security, investigative, or intelligence work. They provide guidance and assistance on HHS's priorities; oversee state administration of HHS's programs; and inspect food and drugs.

37.    BFS does not primarily perform security, investigative, or intelligence work. BFS functions primarily to manage the government's accounting and federal centralized payment systems, and to reduce public debt. NTEU-represented employees at BFS do not primarily perform security, investigative, or intelligence work. They ensure that Americans receive their federal government payments on time.

38.    BLM does not primarily perform security, investigative, or intelligence work. BLM's primary function is to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations. NTEU-represented employees at BLM do not primarily perform security, investigative, or intelligence work. They manage public lands for various purposes, including energy development, livestock grazing, recreation, and resource conservation; and maintain natural, cultural, and historic resources.

39.    EPA does not primarily perform security, investigative, or intelligence work. EPA ensures compliance with and the fair administration of environmental

16

laws; conserving national resources; and repairing and reversing harmful environmental trends, where possible. NTEU-represented employees at EPA conduct studies and research on environmental issues; develop and enforce environmental regulations; and provide technical assistance.

40.    FCC does not primarily perform security, investigative, or intelligence work. FCC regulates interstate and international communications by radio, television, wire, satellite, and cable across the nation. NTEU-represented employees at FCC do not primarily perform security, investigative, or intelligence work. They review and act on license applications for radio, enforce FCC rules regarding construction and operation of communications systems, and respond to consumer inquiries.

41.    Treasury's departmental offices do not primarily perform security, investigative, or intelligence work. These offices guide Treasury's policies. NTEU-represented employees at Treasury's departmental offices do not primarily perform security, investigative, or intelligence work. They are non-professional employees who provide logistical and mission support, such as assuring adequate supplies, equipment, and mail services; distributing mail; and performing building repairs.

42.    OCC does not primarily perform security, investigative, or intelligence work. OCC ensures that national banks and federal savings associations operate in a safe and sound manner and provide fair access to financial services. NTEU-represented employees at OCC do not primarily perform security, investigative, or

intelligence work. They examine banks to ensure they are complying with banking rules and regulations that protect consumers.

43.    TTB does not primarily perform security, investigative, or intelligence work. TTB collects taxes on alcohol, tobacco, firearms, and ammunition; ensures the integrity of alcohol products; ensures that only qualified businesses enter the alcohol and tobacco industries; and prevents unfair and unlawful market activity for alcohol and tobacco products. NTEU-represented employees at TTB do not primarily perform security, investigative, or intelligence work. They are responsible for reviewing applications for permits for beer, wine, and spirits producers and manufacturers; and investigating those entities for product integrity, tax collection, and compliance.

44.    DOE does not primarily perform security, investigative, or intelligence work. DOE is responsible for ensuring that the United States has access to reliable, affordable, and cleaner sources of energy. Its work includes advancing energy technologies, managing the nation's energy resources, and addressing environmental impacts from past energy-related activities. NTEU-represented employees at DOE do not primarily perform security, investigative, or intelligence work. They evaluate the effectiveness and efficiency of DOE programs and provide information and advice to DOE management on the agency's programs and operations.

45.    The DOJ components that the Executive Order excludes from the Statute and that NTEU represents—the Environment and Natural Resources

Division and the Civil Rights Division—do not primarily perform security, investigative, or intelligence work. The Environment and Natural Resources Division is responsible for bringing cases against those who violate the nation's environmental laws as well as defending the federal government in litigation arising under a broad range of environmental statutes. Those in the Civil Rights Division work to uphold the civil and constitutional rights of all persons in the United States and enforce federal statutes prohibiting discrimination. NTEU-represented employees in these two DOJ divisions do not primarily perform security, investigative, or intelligence work. They are attorneys who enforce the laws that their division is charged with upholding.

    **B.**    **The Statute Can Be—and Has Been—Applied to the Excluded Agencies that NTEU Represents in a Manner Consistent with National Security Requirements and Considerations.**

    46.    NTEU has represented bargaining unit workers at the IRS since before the Statute was enacted. The IRS has approximately 76,892 bargaining unit employees who NTEU represents. It is NTEU's largest bargaining unit and has more dues-paying members than any other NTEU-represented agency or department. For the nearly half-century that the Statute has been in place, the IRS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

    47.    NTEU has represented bargaining unit workers at the IRS Office of Chief Counsel since March 1987. During that period, the IRS Office of Chief

Counsel has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

48.    NTEU has represented bargaining unit workers at HHS since November 1978. During that period, HHS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

49.    NTEU has represented bargaining unit workers at the FCC since July 1978. During that period, the FCC has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

50.    NTEU has represented bargaining unit workers at DOE since January 1979. During that period, DOE has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

51.    NTEU has represented bargaining unit workers at BFS since April 1985. During that period, BFS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

52.    NTEU has represented bargaining unit workers at the EPA since April 1998. During that period, the EPA has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

JA31

53.     NTEU has represented bargaining unit workers at Treasury's departmental offices since May 2002. During that period, Treasury's departmental offices have fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

54.     NTEU has represented bargaining unit workers at OCC since November 2002. During that period, OCC has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

55.     NTEU has represented bargaining unit workers at TTB since October 2003. During that period, TTB has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

56.     NTEU has represented bargaining unit workers at BLM since February 2021. During that period, BLM has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests. BLM has three different collective bargaining agreements with NTEU, each covering a different portion of the agency.

57.     NTEU has represented bargaining unit workers at DOJ since January 2025. During that period, DOJ has fallen within the Statute's coverage without any adverse effect on national security interests.

21

C.    **The Actual Motivations for the President's Mass Exclusion of Agencies from the Statute Have Nothing to do with National Security.**

58.    The OPM Guidance on the Executive Order shows that the President's primary motivation for the mass exclusion of agencies from the Statute's coverage is to make their employees easier to fire.

59.    The first section of the OPM Guidance falls under the heading "Performance Accountability," which is aimed at "facilitat[ing] the separation of underperforming employees." OPM Guidance at 3. That section states, "[a]gency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation." *Id.* OPM thus presents the reason for the President's mass exclusion of agencies from the Statute's coverage: nullifying those agencies' collective bargaining agreements (CBAs), so that they will no longer impede firing employees.

60.    Indeed, the OPM Guidance on the Executive Order references the larger context:  the President's direction to agencies "to prepare large-scale reductions in force (RIFs)." OPM Guidance at 5. Now, with the Executive Order's issuance, OPM advises that agencies can "conduct RIFs . . . without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.*

61.    The White House's Fact Sheet on the Executive Order further demonstrates that the objective of the Executive Order is to facilitate the firing of federal employees. The Fact Sheet indicates that the Civil Service Reform Act, of

22

which the Statute is one part, "enables hostile Federal unions to obstruct agency management," citing, among other examples, union litigation leading to the reinstatement of employees who had been fired. *See* Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.

62.     The same White House Fact Sheet reveals the secondary motivation for the Executive Order: political retribution. In justifying the Executive Order, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." It continues, "[t]he largest Federal union describes itself as 'fighting back' against Trump. It is widely filing grievances to block Trump policies." It then adds that this union has "filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day."

63.     NTEU is one of the federal unions that has fought back against President's Trump's agenda. It has filed lawsuits in federal district court against Executive Order No. 14171, Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce (Jan. 20, 2025) (*NTEU v. Trump*, No. 25-cv-170 (D.D.C.)); the Administration's attempt to dismantle the Consumer Financial Protection Bureau (CFPB) (*NTEU v. Vought*, No. 25-cv-381 (D.D.C.)); the Department of Government Efficiency's access of Privacy Act-protected

information at the CFPB (*NTEU v. Vought*, No. 25-cv-380 (D.D.C.)); and the Administration's attempt to hobble the federal civil workforce overall through mass firings of probationary employees, reductions-in-force, and a pressure campaign to get federal workers to resign their positions (*NTEU v. Trump*, 25-cv-420 (D.D.C.)). NTEU has also filed dozens of grievances in response to the Trump Administration's actions against federal workers.

64.    The Executive Order targets about a dozen different collective bargaining relationships that NTEU has with federal agencies and departments.

65.    Indeed, the morning after the Executive Order issued, the Administration sued an NTEU chapter in a federal district court seeking a judgment that the Department of Treasury may rely on the Executive Order to terminate the IRS's collective bargaining agreement with NTEU. This preemptive lawsuit filed in the U.S. District Court for the Eastern District of Kentucky shows the aggressiveness with which the Executive Branch is targeting NTEU. *See Dep't of Treasury v. NTEU Chapter 73*, No. 25-cv-49 (E.D. Ky.).

66.    Neither facilitating employee firings nor political retribution is an appropriate basis for invoking Section 7103(b)(1)'s national security exemption. These are nonetheless the President's declared bases for excluding about two-thirds of the federal workforce from the Statute through this narrow exemption.

67.    Underscoring the Executive Order's improper application of Section 7103(b)(1)'s national security exemption is the Executive Branch's inconsistency on whether the NTEU-represented employees excluded from the Statute through the

Executive Order do national security work. In January 2025, NTEU-represented employees in each of the agencies or agency components at issue here received an offer to participate in this Administration's "deferred resignation program." And NTEU-represented employees in each of the agencies or agency components at issue here accepted that offer and had their applications processed. But the Administration's deferred resignation program was not available to employees in "positions related to . . . national security." *See* OPM, *Guidance Regarding Deferred Resignation Program* (Jan. 28, 2025) at 3, www.opm.gov/media/3oaf3vs0/opm-guidance-memo-re-deferred-resignation-program-01-28-25-final.pdf. Thus, the Administration's view is that these NTEU-represented employees do not have a nexus to national security for purposes of the deferred resignation program—but must nonetheless be excluded from the Statute through Section 7103(b)(1)'s national security exemption.

## IV.    The Executive Order Will Cause NTEU Severe and Immediate Harm.

68.    The Executive Order will immediately and drastically reduce the number of employees that NTEU represents and prevent NTEU from collecting dues from those members via payroll deduction. This will threaten NTEU's very existence and will severely diminish NTEU's influence at the bargaining table.

### A.    <u>Financial Harm</u>

69.    In fiscal year 2024, member dues accounted for approximately 84.5% of NTEU's total revenue. NTEU gets 94% of its dues revenue through its members'

payroll deductions. Member dues paid through payroll deductions thus amount to 79.9% of NTEU's total annual revenue.

70.    The Executive Order will exclude about 60,000 dues-paying members from the Statute's coverage. Those members' dues payments reflect approximately 60% of NTEU's total dues revenue.

71.    The OPM Guidance directs agencies that are excluded from the Statute through the Executive Order to stop using payroll deductions for dues payments to unions. This will stop the flow of nearly all (approximately 94%) of the dues revenue from roughly 60,000 NTEU members. NTEU will also lose the interest it would otherwise earn on that revenue in its accounts. The Department of Interior, which encompasses BLM, has notified NTEU that it will stop processing dues deductions via payroll effective immediately.

72.    Even if collective bargaining rights were restored to employees at a later point, there is no mechanism under which NTEU can require employees whose automatic dues withholding stopped to pay back dues for a period in which those employees lacked collective bargaining rights.

73.    The loss of these dues will adversely affect NTEU's ability to carry out its mission. Even for NTEU-represented agencies that remain within the Statute's coverage, NTEU will have less money available for staff to assist employees with grievances; to file litigation on employees' behalf; to advocate for employees on Capitol Hill; and to negotiate collective bargaining agreements.

**B.** **Loss of Bargaining Power**

74.    At the end of December 2024, NTEU represented about 158,000 employees in bargaining units across thirty-seven federal agencies and departments.

75.    The Executive Order will reduce the number of employees in NTEU's bargaining units represented by over 100,000 employees. The Executive Order thus decreases the number of employees who NTEU represents by roughly two-thirds.

76.    The strength and influence of any union correlate directly with the size of its membership. NTEU, for example, is the nation's largest independent federal sector union and the second largest federal sector union overall. NTEU regularly tells its employees, agencies, Congress, courts, and the public that it represents over 150,000 employees in thirty-seven agencies across the government.

77.    Because the Executive Order will substantially reduce the number of employees that NTEU represents, the union's influence in negotiating agreements with other agencies or lobbying Congress for benefits that help federal employees will be diminished.

## CAUSES OF ACTION

**Count 1:   The President's Executive Order, Section 2 is unlawful and *ultra vires* because it conflicts with 5 U.S.C. § 7103(b)(1).**

78.    NTEU reasserts the allegations contained in paragraphs 1 through 77 of this complaint as though contained herein.

79.     Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

80.     A President can exclude an agency from the Statute *only* if the agency has "as a primary function intelligence, counterintelligence, investigative, or national security work" *and* if the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

81.     None of the federal agencies or agency components described above meet the requirements of 5 U.S.C. § 7103(b)(1). They therefore cannot be excluded from the Statute using this narrow exception.

82.     The President's own Fact Sheet regarding his Executive Order underscores that the Order's exclusions from the Statute were not based on Section 7103(b)(1)'s criteria. They were instead based on a policy goal of making federal employees easier to fire and political animus against federal sector unions who have opposed the Trump Administration's initiatives. These considerations are an improper basis for exclusions under Section 7103(b)(1).

<u>**Count 2**</u>:   **The President's Executive Order, Section 2 is unlawful and *ultra vires* because it conflicts with 5 U.S.C. Chapter 71.**

83.     NTEU reasserts the allegations contained in paragraphs 1 through 82 of this complaint as though contained herein.

84.     Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

85.     Before the Executive Order at issue here, no President had ever used the Statute's narrow national security exemption in Section 7103(b)(1) to exempt an entire Cabinet-level agency from the Statute. But this Executive Order exempts *six*, nearly one-half of all Cabinet-level agencies. It excludes some two-thirds of the federal workforce and three-fourths of workers who are currently represented by unions from the Statute.

86.     The Executive Order's attempt to largely nullify the Statute through the Statute's national security exemption conflicts with Congress's intent in enacting the Statute: to facilitate and strengthen collective bargaining—and to do so statutorily to guard against a President altering it materially.

87.     Congress enacted the Statute to facilitate and to strengthen collective bargaining in the federal sector (*Bureau of Alcohol, Tobacco, & Firearms*, 464 U.S. at 107), codifying its finding that collective bargaining is in the public interest in the Statute's initial section (5 U.S.C. § 7101(a)).

88.     Congress's explicit aim with the Statute was to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).

JA40

89.     The President cannot use the Statute's narrow national security exemption to undo the bulk of the Statute's coverage. His sweeping Executive Order thus conflicts with the Statute itself.

**Count 3:   The President's Executive Order, Section 2 is unlawful because it reflects retaliation in violation of NTEU's First Amendment rights.**

90.     Plaintiff reasserts the allegations contained in paragraphs 1 through 89 of this complaint as though contained herein.

91.     "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).

92.     NTEU's litigation against the Trump Administration's actions is protected speech and petitioning activity. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2000) ("advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (holding that "filing a complaint in court is a form of petitioning activity" that the First Amendment protects).

93.     The Executive Order retaliates against NTEU for that protected First Amendment activity. Indeed, the White House's Fact Sheet on the Executive Order proclaims the Order's retaliatory motive. To justify the Executive Order, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." Prior to this lawsuit, NTEU filed four other federal district court lawsuits challenging the Trump's Administration's execution of high priority policy objectives. That included legal challenges to the Trump Administration's attempts

to reduce the federal workforce through mass firings and resignations and to the Administration's attempt to dismantle the CFPB.

94.    The Executive Order plainly punishes NTEU for its legal challenges to this Administration's actions, cancelling, as relevant here, twelve of NTEU's collective bargaining relationships, including NTEU's largest and longest one at the IRS. The Order eliminates NTEU's ability to serve as the exclusive bargaining representative for more than half of its membership.

95.    The Executive Order thus "constitutes a sufficiently adverse action" against NTEU "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Order, in other words, "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff NTEU requests judgment against the defendants:

A.      Declaring that Section 2 of the Executive Order is unlawful as applied to the Defendants who are heads of NTEU-represented agencies.

B.      Declaring that the OPM Guidance on the Executive Order is unlawful as applied to the Defendants who are heads of NTEU-represented agencies.

C.      Enjoining all Defendants other than President Trump from implementing Section 2 of the Executive Order.

D.      Enjoining all Defendants other than President Trump from implementing the OPM Guidance on the Executive Order.

E.      Awarding Plaintiffs reasonable attorney fees and costs incurred.

F.      Ordering such further relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/  Julie M. Wilson*
JULIE M. WILSON
General Counsel
D.C. Bar 482946

*/s/  Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

*/s/  Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705

*/s/  Lindsay Dunn*
LINDSAY DUNN (pro hac vice application
forthcoming)
Assistant Counsel
N.Y. Bar 4574224

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
lindsay.dunn@nteu.org

March 31, 2025          Attorneys for Plaintiff NTEU

## DECLARATION OF DANIEL KASPAR

I, Daniel Kaspar, hereby declare as follows:

1.  I currently serve as Director of Field Operations at the National Treasury Employees Union (NTEU). I have worked for NTEU since 2011.

2.  As Director of Field Operations, I am responsible for overseeing NTEU's field offices across the nation. Representatives in each field office serve as chapters' and members' first line of contact with NTEU on a day-to-day basis. By virtue of my job duties, I am familiar with the agencies where NTEU-represented employees work as well as the duties those employees perform. I am also familiar with the collective bargaining agreements that we have negotiated with our agencies.

### The Executive Order and OPM Guidance

3.  I have reviewed President Trump's Executive Order entitled "Exclusions from Federal Labor Management Relations Programs" (March 27, 2025) (the Executive Order).

4.  I have also reviewed the guidance issued by the Office of Personnel Management (OPM) entitled "Guidance on Executive Order *Exclusions from Federal Labor Management Relations Programs*" (OPM Guidance) (March 27, 2025).

5.  The Executive Order, section 2, excludes multiple agencies from the 1978 Federal Service Labor-Management Relations Statute (the Statute).

1

6.    The Executive Order includes the following agencies where NTEU represents employees as the exclusive bargaining unit representative:

- Department of Treasury, Internal Revenue Service (IRS), IRS Office of Chief Counsel, Bureau of Fiscal Service (BFS), Departmental Offices, Alcohol and Tobacco Trade and Tax Bureau (TTB), Office of Comptroller of the Currency (OCC);

- Department of Energy (DOE);

- Department of Justice (DOJ), Civil Rights Division and Environment and Natural Resources Division;

- Environmental Protection Agency (EPA);

- Federal Communications Commission (FCC);

- Department of Health and Human Services (HHS), the Office of the Secretary, the Food and Drug Administration, the Administration for Strategic Preparedness and Response, the Centers for Disease Control and Prevention, and the Office of Refugee Resettlement within the Administration of Children and Families; and

- Department of the Interior, Bureau of Land Management (BLM).

### The Executive Order Will Reduce the Number of Employees Represented by NTEU

7.    The Executive Order immediately and adversely affects NTEU in multiple ways.

8.    The Executive Order substantially reduces the number of employees represented by NTEU.

2

9.     At the end of December 2024, NTEU represented 158,144 employees. Taken together, the number of employees who are represented by NTEU and who are in agencies covered by the Executive Order is 104,278. This means that the Executive Order will cut the number of NTEU-represented employees by 65.9%

10.    NTEU's clout and influence is related to the number of employees that it represents. For example, NTEU regularly tells arbitrators, courts, members of Congress, and the public that it represents more than 150,000 employees in 37 federal agencies and departments across the government.

11.    In my view, NTEU's clout and influence will be diminished if it represents substantially fewer employees at substantially fewer agencies.

12.    I anticipate that we will have less influence at the bargaining table with agencies not covered by the Executive Order because those agencies will be aware that NTEU represents many fewer employees than it did previously.

13.    I anticipate that it will be more difficult for NTEU to persuade employees to join NTEU and become dues-paying members because those employees will be aware that NTEU represents many fewer employees than it did previously.

14.    I anticipate that NTEU will have less influence in advocating employees' interest before Congress because NTEU will represent many fewer employees (and Congressional constituents) that it did previously.

<u>The Executive Order Will Substantially Reduce Dues Paid to NTEU</u>

15.     Of the more than 150,000 employees represented by NTEU, approximately 91,000 have voluntarily joined NTEU and pay dues. The vast majority of those—94%—have taken advantage of the option to have their employer agencies deduct dues from their paychecks automatically and remit the dues to NTEU.

16.     In the NTEU-represented agencies and agency components that the Executive Order excludes from the Statute, NTEU has approximately 58,692 dues-paying members.

17.     OPM Guidance states that such automatic dues withholding at the agencies covered by the Executive Order will stop. When that happens, NTEU's dues revenue will be reduced by about $25 million. This is more than half of NTEU's total revenue stream. The dues revenue that is cut off is forever lost. There is no mechanism for NTEU to recover lost dues revenue from former members for a period during which they had no union representation.

18.     This loss of dues from automatic withholding from such a large percentage of our membership threatens NTEU's very existence.

19.     Several NTEU-represented agencies have begun acting to stop dues withholding in response to the Executive Order, including NTEU's largest bargaining unit, the IRS.

20.     Some NTEU-represented agencies, including BLM and EPA, use the Interior Business Center (IBC) to process their payroll. NTEU learned that on

4

March 28, 2025, IBC, as a result of the Executive Order, "was directed to remove all union deductions from the Pay Period 25-07" which runs from March 23 to April 5, 2025.

21.    Other NTEU-represented agencies—IRS, BFS, FCC, OCC, TTB, and Treasury's departmental offices—use the United States Department of Agriculture National Finance Center (USDA NFC) to process their payroll. Yesterday, NTEU was scheduled to receive its dues payments for the NTEU members at those agencies for the last pay period. Those dues payments did not arrive. NTEU contacted USDA NFC, which cited the Executive Order as the reason those funds did not arrive.

<u>The Executive Order Will Diminish the Value of NTEU's Services</u>

22.    OPM has stated that in implementing the Executive Order, agencies should cease participating in grievance procedures and should cease collective bargaining with federal unions who represent employees at affected agencies. OPM Guidance at 3, 5.

23.    NTEU will be of less value to employees in the agencies covered by Executive Order if it can no longer participate in grievance procedures against those agencies.

24.    NTEU will be of less value to employees in the agencies covered by Executive Order if it can no longer participate in any collective bargaining that would benefit them.

25.     Separate from bargaining term agreements, NTEU staff frequently bargain with agencies over changes in employment conditions. To initiate bargaining over such changes, NTEU is required to notify the agency within a certain timeframe (often 30 days or less) after NTEU first receives notice of the change.

26.     If agencies covered by the Executive Order refuse to collectively bargain with NTEU, NTEU will lose that bargaining opportunity not just in the short term but forever.

27.     In one example of bargaining over changes in employment conditions, NTEU initiated bargaining promptly when the COVID-19 outbreak caused its first disruptions. If relevant agencies had simply refused to engage in bargaining, NTEU would have missed its chance to advocate for its members on issues like telework and the availability of personal protective equipment.

28.     NTEU-represented agencies that the Executive Order excludes from the Statute have begun to stop complying with existing collective bargaining agreements. The Bureau of Land Management, for example, has informed NTEU that it will be postponing scheduled collective bargaining agreement negotiations scheduled for April 2, 2025, because of the Executive Order.

29.     NTEU has also been informed that proceedings before the Federal Labor Relations Authority (for example in ongoing proceedings with BLM) are on hold because of the Executive Order.

30.    Similarly, the OCC has canceled a grievance meeting with NTEU based on the Executive Order.

### The Administration's Deferred Resignation Program

31.    On January 28, 2025, the Administration, via a "Fork in the Road" email, offered employees a "deferred resignation program." NTEU-represented employees in each of the agencies or agency components at issue received that offer, and some NTEU-represented employees in each of the agencies or agency components at issue here accepted that offer and had their applications processed.

32.    The administration's deferred resignation program was not available to employees in "positions related to . . . national security." *See* OPM, *Guidance Regarding Deferred Resignation Program* (Jan. 28, 2025) at 3, www.opm.gov/media/3oaf3vs0/opm-guidance-memo-re-deferred-resignation-program-01-28-25-final.pdf.

### Motivation for the Executive Order

33.    It is my belief, based on the language of the Executive Order, the OPM Guidance, and the White House's Fact Sheet on the Executive Order that the President's motivations for the mass exclusion of agencies from the Statute's coverage are animus against federal sector unions and a desire to make federal employees easier to fire.

34.    NTEU has actively opposed President's Trump's agenda which has targeted the federal workforce by filing multiple lawsuits and grievances against wrongful administration actions. NTEU will continue to take action if the Administration continues to act unlawfully to harm federal sector unions and the

employees they represent. I am fearful that additional NTEU action, whether in the courts or in other areas, will lead to further retribution against it, including having more of its agencies and agency components excluded from the Statute.

35.    My understanding based on the language of the Executive Order, news reports, information from other unions and NTEU's own data, is that the Executive Order will have the effect of excluding approximately two-thirds of the federal workforce overall, and three-quarters of those employees who have union representation.

### NTEU History

36.    NTEU has represented employees in federal agencies for many decades.

37.    NTEU was founded in 1938 to represent a group of Internal Revenue collectors.

38.    NTEU has represented additional employees at additional agencies over the intervening years, and its role expanded when collective bargaining was extended to the federal sector by Executive Order 10988 by President Kennedy in January 17, 1962, and by law when Congress enacted the Statute in 1978. *See* Pub.L. No. 95-454.

### Agency Missions and Duties of Employee

34.    The IRS does not primarily perform national security, investigative, or intelligence work. The IRS is the revenue service for the federal government, responsible for collecting federal taxes and administering the Internal Revenue

Code. NTEU-represented employees at IRS do not primarily perform security, investigative, or intelligence work. They provide tax assistance to taxpayers, conduct taxpayer audits, and collect overdue tax revenue.

35.    The IRS Office of Chief Counsel does not primarily perform national security, investigative, or intelligence work. NTEU-represented employees at the Office of Chief Counsel do not primarily perform security, investigative, or intelligence work. They provide legal guidance and interpretive advice to the IRS, to Treasury, and to taxpayers; and coordinate the IRS's position in litigation.

36.    The HHS components that the Executive Order excludes from the Statute and that NTEU represents— the Office of the Secretary, the Food and Drug Administration, the Administration for Strategic Preparedness and Response, the Centers for Disease Control and Prevention, and the Office of Refugee Resettlement, Administration for Children and Families—do not primarily perform national security, investigative, or intelligence work. Those components administer social service programs, civil rights and healthcare programs, and programs that assure food and drug safety and efficacy. NTEU-represented employees at those components of HHS do not primarily perform national security, investigative, or intelligence work. They provide guidance and assistance on HHS's priorities; oversee state administration of HHS's programs; and inspect food and drugs.

37.    BFS does not primarily perform national security, investigative, or intelligence work. BFS functions primarily to manage the government's accounting and federal centralized payment systems, and to reduce public debt. NTEU-

9

JA53

represented employees at BFS do not primarily perform national security, investigative, or intelligence work. They ensure that Americans receive their federal government payments on time.

38.    BLM does not primarily perform national security, investigative, or intelligence work. BLM's primary function is to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations. NTEU-represented employees at BLM do not primarily perform national security, investigative, or intelligence work. They manage public lands for various purposes, including energy development, livestock grazing, recreation, and resource conservation; and maintain natural, cultural, and historic resources.

39.    EPA does not primarily perform national security, investigative, or intelligence work. EPA ensures compliance with and the fair administration of environmental laws, and acts to conserve natural resources. NTEU-represented employees at EPA conduct studies and research on environmental issues; develop and enforce environmental regulations; and provide technical assistance.

40.    FCC does not primarily perform national security, investigative, or intelligence work. FCC regulates interstate and international communications by radio, television, wire, satellite, and cable across the nation. NTEU-represented employees at FCC do not primarily perform security, investigative, or intelligence work.

41.    Treasury's departmental offices do not primarily perform national security, investigative, or intelligence work. These offices guide Treasury's policies.

NTEU-represented employees at Treasury's departmental offices do not primarily perform security, investigative, or intelligence work. They are non-professional employees who provide logistical and mission support, such as assuring adequate supplies, equipment, and mail services; distributing mail; and performing building repairs.

42.    OCC does not primarily perform national security, investigative, or intelligence work. OCC ensures that national banks and federal savings associations operate in a safe and sound manner and provide fair access to financial services. NTEU-represented employees at OCC do not primarily perform national security, investigative, or intelligence work. They examine banks to ensure they are complying with banking rules and regulations that protect consumers.

43.    TTB does not primarily perform security, investigative, or intelligence work. TTB collects taxes on alcohol, tobacco, firearms, and ammunition; ensures the integrity of alcohol products; ensures that only qualified businesses enter the alcohol and tobacco industries; and prevents unfair and unlawful market activity for alcohol and tobacco products. NTEU-represented employees at TTB do not primarily perform security, investigative, or intelligence work. They are responsible for reviewing applications for permits for beer, wine, and spirits producers and manufacturers; and investigating those entities for product integrity, tax collection, and compliance.

44.    DOE does not primarily perform security, investigative, or intelligence work. DOE is responsible for ensuring that the United States has access to reliable,

affordable, and cleaner sources of energy. Its work includes advancing energy technologies, managing the nation's energy resources, and addressing environmental impacts from past energy-related activities. NTEU-represented employees at DOE do not primarily perform security, investigative, or intelligence work. They evaluate the effectiveness and efficiency of DOE programs and provide information and advice to DOE management on the agency's programs and operations.

45.    The DOJ components that the Executive Order excludes from the Statute and that NTEU represents—the Environmental and Natural Resources Division and the Civil Rights Division—do not primarily perform security, investigative, or intelligence work. The Environment and Natural Resources Division is responsible for bringing cases against those who violate the nation's environmental laws as well as defending the federal government in litigation arising under a broad range of environmental statutes. Those in the Civil Rights Division work to uphold the civil and constitutional rights of all persons in the United States and enforce federal statutes prohibiting discrimination. NTEU-represented employees in these two DOJ divisions do not primarily perform security, investigative, or intelligence work. They are attorneys who enforce the laws that their division is charged with upholding.

JA56

<u>NTEU's Collective Bargaining Has Not Adversely Affected National Security</u>

46.    For the nearly half-century that the Statute has been in place, the IRS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

47.    NTEU has represented bargaining unit workers at the IRS Office of Chief Counsel since March 1987. During that period, the IRS Office of Chief Counsel has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

48.    NTEU has represented bargaining unit workers at HHS since November 1978. During that period, HHS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

49.    NTEU has represented bargaining unit workers at the FCC since July 1978. During that period, the FCC has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

50.    NTEU has represented bargaining unit workers at DOE since January 1979. During that period, DOE has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

51.    NTEU has represented bargaining unit workers at BFS since April 1985. During that period, BFS has fallen within the Statute's coverage and had a

collective bargaining agreement with NTEU without any adverse effect on national security interests.

52.     NTEU has represented bargaining unit workers at the EPA since April 1998. During that period, the EPA has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

53.     NTEU has represented bargaining unit workers at Treasury's departmental offices since May 2002. During that period, Treasury's departmental offices have fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

54.     NTEU has represented bargaining unit workers at OCC since November 2002. During that period, OCC has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

55.     NTEU has represented bargaining unit workers at TTB since October 2003. During that period, TTB has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

56.     NTEU has represented bargaining unit workers at BLM since February 2021. During that period, BLM has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect

on national security interests. BLM has three different collective bargaining agreements with NTEU, each covering a different portion of the agency.

57.    NTEU has represented bargaining unit workers at DOJ since January 2025.  During that period, DOJ has fallen within the Statute's coverage without any adverse effect on national security interests.

<u>NTEU and Agency Collective Bargaining Agreements</u>

58.    NTEU has collective bargaining agreements with many of the agencies covered by the Executive Order.

    a.    The IRS and NTEU agreed that their agreement would last until September 2027.

    b.    IRS Office of Chief Counsel and NTEU agreed that the agreement would last until January 2029.

    c.    HHS and NTEU agreed that the agreement would last until July 2028 and then further extended its duration to July 2029.

    d.    DOE and NTEU agreed that the agreement would last until January 2026.

    e.    EPA and NTEU agreed that the agreement would last until December 2028.

    f.    FCC and NTEU agreed that the agreement would last until March 2030.

    g.    OCC and NTEU agreed that the agreement would last until February 2028.

h.    Treasury and NTEU agreed that the agreement would last until June 2025.

i.    TTB and NTEU agreed that the agreement would last until January 2027.

j.    For one part of BLM, NTEU and BLM agreed that an interim collective bargaining agreement would last until a comprehensive collective bargaining agreement became effective. For a second part of BLM, the parties agreed that the collective bargaining agreement would last until January 2028. For a third part of BLM, the parties agreed that the collective bargaining agreement would last until February 2030.

k.    BFS and NTEU agreed that the agreement would last until August 2025.

59.    The Executive Order will lead to the termination of twelve of these collective bargaining agreements (a small portion of HHS is not covered by the Executive Order and so a small portion of that agreement will still exist).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 2, 2025

Daniel Kaspar

# EXHIBIT 2

<u>DECLARATION OF MARK L. GRAY</u>

I, Mark L. Gray, hereby declare as follows:

1.     I currently serve as Director of Operations & Administration at the National Treasury Employees Union (NTEU). I have worked for NTEU from 1986 to 1996 and from 2013 through the present.

2.     As Director of Operations and Administration, I am responsible for overseeing the day-to-day internal functioning of NTEU. This includes accounting and financial operations, information technology, and other operational matters. The department that I oversee maintains data concerning the number of employees represented by NTEU, the number of employees who are dues-paying members, and details of incoming dues payments from across the Union.

3.     I have reviewed the Executive Order entitled "Exclusions from Federal Labor-Management Relations Programs" (March 27, 2025) ("The Executive Order"), including the list of agencies that the Order, section 2, excludes from the Federal Service Labor Management Relations statute.

4.     The Executive Order, section 2, applies to the following agencies where NTEU is the exclusive bargaining unit representative:

- Department of Treasury, Internal Revenue Service (IRS), IRS Chief Counsel, Bureau of Fiscal Service, Departmental Offices, Alcohol and Tobacco Trade and Tax Bureau, and Office of Comptroller of the Currency;
- Department of Energy

1

JA62

- Department of Justice, Civil Rights Division and Environment and Natural Resources Division

- Environmental Protection Agency

- Federal Communications Commission

- Department of Health and Human Services, Food and Drug Administration and several other operating divisions

- Department of the Interior, Bureau of Land Management

5.      At the end of December 2024, NTEU represented 158,144 employees in bargaining units through 37 agencies in the federal government.

6.      The number of employees who are represented by NTEU and who are covered by the Executive Order is approximately 104,278 which will therefore reduce by 65.9 % the total number of employees represented by NTEU.

7.      Of the employees in bargaining units represented by NTEU, employees can choose to become dues-paying members.

8.      NTEU has approximately 91,000 dues-paying members. Around 94% of those members take advantage of the option to have their employer agencies deduct dues from their paychecks automatically and remit the dues to NTEU.

9.      The IRS has the largest number of bargaining unit employees represented by NTEU (76,892) and the largest number of dues-paying members.

10.     In fiscal year 2024, NTEU took in approximately $39.5 million total in member dues, which represented about 84.5% of NTEU's total revenue for the year. In my experience, these figures are typical for at least the past ten years.

2

11.    In the agencies covered by the Executive Order, NTEU has approximately 58,692 dues-paying members. The Executive Order will therefore cut NTEU's dues-paying members by 64.5%.

12.    If agencies covered by the Executive Order refuse to honor voluntary employee requests to withhold dues from paychecks, NTEU will lose the dues that it receives by this method which will be over $25 million annually

13.    The immediate, drastic decrease in income from lost payroll deductions will jeopardize NTEU's very existence.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 2, 2025.

Mark L. Gray

# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:25-cv-935-PLF |
| v. | ) ) | Judge Paul L. Friedman |
| DONALD J. TRUMP, *et al.,* | ) ) | |
| *Defendants.* | ) ) ) | |

## DECLARATION OF ALLEN R. BROOKS

Pursuant to 28 U.S.C. § 1746, I, Allen R. Brooks, declare as follows:

1.    I am the Acting Deputy Associate Director for Accountability and Workforce Relations at the Office of Personnel Management ("OPM"), and I have served in this role since March 2, 2025. In my current role, I am responsible for leading a team of career human resources specialists that develop governmentwide policy and guidance, draft regulations, and execute certain statutory functions in the areas of labor relations and employee accountability, consistent with direction from the Office of the Director of OPM. I recently joined the OPM on August 25, 2024, as Senior Human Capital Advisor for Labor Relations and Employee Accountability. I have served as a career federal employee since I started in the same office at the OPM in May 2010 before departing for another federal agency in December 2012.

2.    I am familiar with the claims in the above-captioned matter regarding a March 27, 2025 Executive Order issued by President Donald J. Trump, Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"). Based on personal knowledge and information provided to me in the course of my official duties, I provide

this declaration in support of the Defendants' Opposition to the Plaintiff's Motion for a Preliminary Injunction.

3.    My office is the point of entry for requests by federal agencies for guidance on further action pursuant to the Executive Order.

4.    I have reviewed the Executive Order and corresponding March 27, 2025 guidance issued to federal agencies by OPM entitled "Guidance on Executive Order *Exclusions from Federal Labor Management Relations Program*." A true and correct copy of that document is attached as Exhibit A to this declaration. I have also reviewed a Frequently Asked Questions ("FAQs") document that the Chief Human Capital Officers Council ("CHCOC") released to federal agency chief human capital officers (CHCOs) on April 8, 2025, which addresses federal agency questions concerning implementation of the Executive Order. The CHCOC is an interagency forum where CHCOs can provide and receive input and guidance on Federal HR policy. A true and correct copy of that FAQs document is attached as Exhibit B to this declaration.

5.    The CHCOC FAQs document was originally sent to federal agency Chief Human Capital Officers and Deputy Chief Human Capital Officers. On April 8, my office further distributed this document to senior labor and employee relations practitioners within federal agencies. Among the agency recipients of this document were officers or officials of each of the Defendant agencies in the above-caption matter, *i.e.*, the Department of Justice; the Department of the Treasury; the Department of Health and Human Services; the Department of the Interior; the Department of Energy; the Environmental Protection Agency; the Federal Communications Commission; and the Office of Personnel Management.

6.    Within the CHCOC FAQs document were the following key points of advice to

federal agencies:

    a.   Agencies should not terminate any collective bargaining agreements ("CBAs") until the conclusion of litigation or further guidance from OPM directing such termination.

    b.   Agencies should not file any decertification petitions until litigation regarding the Executive Order has been resolved.

    c.   Agencies should ask the Federal Labor Relations Authority to hold cases where an arbitrator ordered relief for a bargaining unit covered under the Executive Order in abeyance pending the outcome of litigation, where practicable.

    7.   Plaintiff National Treasury Employees Union ("NTEU") does not have a CBA with OPM nor does it represent any OPM bargaining unit employees.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 11, 2025.

ALLEN R. BROOKS

# Exhibit 1-A



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | March 27, 2025 |
| **RE**: | Guidance on Executive Order *Exclusions from Federal Labor-Management Programs* |

On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).[1] The President's Executive Order directs that the FSLMRS will no longer apply to the following agencies and agency subdivisions (collectively, the "covered agencies and subdivisions"):

- The Department of Defense;

- The Department of State;

- The Department of the Treasury, except the Bureau of Engraving and Printing;

- The Department of Veterans Affairs (VA);

- The Department of Justice, except certain components of the U.S. Marshals Service;

- Subdivisions of the Department of Homeland Security:
  - Departmental Headquarters components;
  - U.S. Citizenship and Immigration Services;
  - Immigration and Customs Enforcement;
  - U.S. Coast Guard;
  - The Cybersecurity and Infrastructure Security Agency; and
  - The Federal Emergency Management Agency;

---

[1] These provisions are codified in chapter 71 of title 5, United States Code, and subchapter X of chapter 52 of title 22, United States Code.

- Subdivisions of the Department of Health and Human Services:
  - Office of the Secretary;
  - Office of the General Counsel;
  - Food and Drug Administration;
  - Centers for Disease Control and Prevention;
  - The Administration for Strategic Preparedness and Response;
  - The National Institute for Allergy and Infectious Diseases, National Institutes of Health; and
  - Office of Refugee Resettlement, Administration for Children and Families.

- The Department of Energy, except the Federal Energy Regulatory Commission;

- Subdivisions of the Department of the Interior:
  - Office of the Secretary;
  - Bureau of Land Management;
  - Bureau of Safety and Environmental Enforcement;
  - Bureau of Ocean Energy Management;

- Subdivisions of the Department of Agriculture:
  - The Food Safety and Inspection Service;
  - The Animal and Plant Health Inspection Service;

- The International Trade Administration within the Department of Commerce;

- The Environmental Protection Agency;

- The U.S. Agency for International Development;

- The Nuclear Regulatory Commission;

- The National Science Foundation;

- The International Trade Commission;

- The Federal Communications Commission;

- The General Services Administration; and

- The Office of the Chief Information Officer (CIO) in each Executive department, as well as the CIO offices for the U.S. Office of Personnel Management (OPM) and the Social Security Administration, and any other agency or subdivision that has information

resources management duties as the agency or subdivision's primary duty.[2]

By operation of 5 U.S.C. § 7103(b) and *Exclusions*, covered agencies and subdivisions are no longer subject to the collective-bargaining requirements of chapter 71 of part III, subpart F of title 5 (5 U.S.C. §§ 7101-7135). Consequently, those agencies and subdivisions are no longer required to collectively bargain with Federal unions. Also, because the statutory authority underlying the original recognition of the relevant unions no longer applies, unions lose their status as the "exclusive[ly] recogni[zed]" labor organizations for employees of the agencies and agency subdivisions covered by *Exclusions*.[3]

Agencies should consult with their General Counsels as to how to implement the President's directive in *Exclusions*. Agencies should also begin to consider and implement the changes described below and any others that agencies deem necessary, consistent with the President's national security determination. OPM highlights some common provisions of agency CBAs that may be inconsistent with the President's policies and management priorities.

## I.      Performance Accountability

Merit system principles codified at 5 U.S.C. § 2301(6) direct agencies to separate employees who cannot or will not improve their performance to meet required standards. This often does not occur. When asked what happens to poor performers in their work unit, a plurality of Federal employees respond that they "remain in the work unit and continue to underperform."[4] Only a quarter of agency supervisors report that they are confident they could remove a seriously underperforming employee.[5]

Strengthening performance accountability in the Federal workforce is a high priority of President Trump and his Administration. The President believes that he must be able to effectively supervise Federal employees to take care that the law is faithfully executed and to protect America's national security. Shortly after taking office the President issued multiple directives to facilitate the separation of underperforming employees.[6]

Agency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation. Covered agencies and subdivisions should seek to bring

---

[2] The Executive Order excludes the immediate employing offices of police and firefighters. It also provides a process for the Secretaries of Defense and Veterans Affairs to retain collective bargaining in subdivisions of their agencies if they certify that doing so does not impair national security.

[3] *Cf.* 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . ."), *id.* § 7114(a)(1) (authorizing the exclusively recognized labor organization to "negotiate collective bargaining agreements covering[] all employees in the unit.")

[4] https://www.opm.gov/fevs/reports/opm-fevs-dashboard/.

[5] U.S. Merit Systems Protection Board, *Remedying Unacceptable Employee Performance in the Federal Civil Service* (June 18, 2019), at p. 15.

[6] *See* Executive Order 14171 of Jan. 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*); Memorandum of January 20, 2025 (*Restoring Accountability for Career Senior Executives*); Executive Order 4211 of Feb. 12, 2025 (*One Voice for America's Foreign Relations*).

their policies into alignment with the specific Administration priorities below.

### A. Limit PIPs to 30 Days.

The Civil Service Reform Act (CSRA) requires agencies to provide underperforming employees with an opportunity to demonstrate acceptable performance before dismissing them under chapter 43 of title 5, United States Code.[7] These opportunity periods are commonly known as Performance Improvement Periods (PIPs). Executive Order 13839 of May 25, 2018. (*Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles*) generally standardized PIPs at 30 days. Executive Order 14003 of January 22, 2021 (*Protecting the Federal Workforce*) rescinded Executive Order 13839 and directed agencies to reverse policies effectuated under it. Under this directive, agencies increased PIPs from 30 days to 60 to 120 days. However, Executive Order 14171 of January 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*) revoked Executive Order 14003 and directed agencies to reverse disciplinary and unacceptable-performance policies effectuated pursuant to it.

Prior OPM guidance has explained that Executive Order 14171 now requires agencies to return to the policies of Executive Order 13839.[8] Agencies are accordingly required to, consistent with applicable law, return PIPs to 30 days. Where a CBA requires PIPs of more than 30 days, agencies must generally wait until such CBAs expire or otherwise terminate before shortening PIPs.[9] After covered agencies and subdivisions terminate CBAs that require PIPs of more than 30 days, they should take prompt action to reduce PIPs for former bargaining unit employees to no more than 30 days.

### B. Use Chapters 43 and 75 for Performance-Based Removals.

Covered agencies and subdivisions are required to revert their discipline and unacceptable performance policies to those set in the first Trump Administration under Executive Order 13839. This includes the directive to use the procedures of chapter 75 of title 5, United States Code, in addition to chapter 43 (discussed above), to separate employees for unacceptable performance in appropriate cases.[10]

Chapter 75 actions do not require a PIP but bear a higher burden of proof than chapter 43 actions. Many agency CBAs functionally prohibit using chapter 75 procedures by requiring PIPs for all performance-based separations. Covered agencies and subdivisions that have terminated their CBAs should thereafter use chapter 75 procedures to separate underperforming employees without PIPs in appropriate cases. Agencies may continue to use chapter 43 procedures in appropriate cases.

### C. VA Should Resume Use of Section 714.

---

[7] 5 U.S.C. 4202(c)(6).
[8] OPM, *Guidance on Revocation of Executive Order 14003* (Feb. 7, 2025).
[9] 5 U.S.C. 7116(a)(7).
[10] See section 2(h) of Executive Order 13839.

In 38 U.S.C. § 714, Congress gave VA special authority to remove some employees for poor performance without a PIP and with a lower burden of proof than chapter 43 actions. The Biden Administration discontinued use of section 714 authority after an arbitrator held that VA could not renegotiate its CBA to eliminate contractual PIPs. VA should, upon termination of its CBA, consider whether to resume use of section 714 authority in appropriate cases. Where facts and circumstances warrant, VA should cease providing covered employees with PIPs before separating them for poor performance under section 714.

### D. Discontinue Grievance Participation.

In keeping with the provisions of the FSLMRS, CBAs provide for binding arbitration of union grievances, including disputes over whether personnel actions were justified.[11] To implement *Exclusions*, agencies should cease participating in grievance procedures after terminating their CBAs. To the extent that covered agencies and subdivisions are litigating grievances before an arbitrator when they terminate their CBAs, they should discontinue participation in such proceedings upon termination. Agencies can and should compensate arbitrators for work performed prior to the termination of the CBA, but not for any work performed thereafter. Agencies should not participate in further grievance arbitration proceedings following termination of their CBAs.

## II.    Effective and Efficient Government

It is the policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently. Covered agencies and subdivisions should therefore take the following actions after terminating their CBAs.

### A. Disregard Contractual RIF Articles.

The President has directed agencies to prepare large-scale reductions in force (RIFs).[12] OPM previously provided guidance about agency collective bargaining obligations when undertaking RIFs.[13] Covered agencies and subdivisions that terminate their CBAs are advised that this guidance will no longer apply. After terminating their CBAs, covered agencies and subdivisions should conduct RIFs consistent with applicable statutory and regulatory requirements, but without regard to provisions in terminated CBAs that go beyond those requirements.

### B. Return to In-Person Work.

The President considers returning agency employees to in-person work necessary for effective and efficient agency operations. The President issued a memorandum generally requiring

---

[11] 5 U.S.C. § 7121.
[12] OPM, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (February 26, 2025).
[13] OPM, *Guidance on Collective Bargaining in Connection with Reductions in Force* (March 12, 2025).

in-person work on the first day of his Administration.[14] OPM guidance has explained that substantive telework levels and the substantive determination of which positions are eligible for telework or remote work are non-negotiable management rights.[15] However, agency CBAs sometimes impose procedural restrictions on agency return to work policies that do not violate non-negotiable management rights. Upon termination of these CBAs, covered agencies and subdivisions should swiftly implement the President's directives in *Return to In-Person Work*.

### C.  Use Agency Resources for Agency Business.

The FSLMRS permits unions to negotiate to allow agency employees to perform union representational work instead of agency business during their official duty hours.[16] Contractual authorization for "taxpayer-funded union time" terminates when agency CBAs are terminated. Additionally, employees no longer have representational activities to conduct once their agency or subdivision has been excluded from the FSLMRS coverage. *Exclusions* requires agencies to promptly return such employees to performing solely agency business. Upon termination of any CBAs that require taxpayer-funded union time, agencies should reassign employees on union time to duties that solely include agency business.

Many agency CBAs similarly provide Federal unions with free use of agency resources (such as office space) or commit the agency to cover certain union expenses (such as the cost of travel and per diems). Following termination of CBAs that require such subsidies, covered agencies and subdivisions should promptly discontinue them and use agency resources only for agency business.

### D.  End Allotments Through Agency Payroll Systems.

The FSLMRS requires agencies to deduct union dues from employees' pay upon request.[17] Agency resources are expended to set up those payroll deductions and process payments, and many agency CBAs contractually commit agencies to making such allotments according to specified procedures. When a covered agency terminates its CBAs, those contractual commitments no longer apply, and the covered agency should terminate allotments except where required by statute. Agency employees may make other arrangements for dues payments if they wish to do so. However, agency resources ordinarily should not be expended to facilitate payment of union dues.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, Human Resources Directors, and Chiefs of Staff

---

[14] Memorandum of January 20, 2025 (*Return to In-Person Work*).
[15] OPM, *Guidance on Collective Bargaining Obligations in Connection with Return to In-Person Work* (February 3, 2025).
[16] 5 U.S.C. 7131(d), 22 U.S.C. 4118(d)(4).
[17] 5 U.S.C. 7115, 22 U.S.C. 4118(a).

# Exhibit 1-B

**Frequently Asked Questions**

**Executive Order 14251:**
**"Exclusions from Federal Labor-Management Relations Programs"**

**Q1:** What do agencies need to do to terminate applicable CBAs?

**A1:** Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination. Agencies should review relevant case law and consult with their General Counsels regarding next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA 2016).

**Q2:** Should agencies decertify bargaining units of covered agencies or subdivisions?

**A2:** Agencies should not file any decertification petitions until litigation regarding *Exclusions* has been resolved. **Only after the litigation is final and the Administration has assessed the implications of its outcome** should agencies consider filing Federal Labor Relations Authority (FLRA) petitions to clarify that bargaining units include only those positions not exempted from collective-bargaining requirements under *Exclusions*. Agencies should consult their General Counsels for updates on the litigation, and before taking steps to file a decertification petition in compliance with the *Exclusions* order.

**Q3:** Should agencies amend current filings with the FLRA for exceptions to arbitration awards where an arbitrator ordered relief for a bargaining unit covered under *Exclusions*?

**A3:** Agencies should ask the FLRA to hold these cases in abeyance pending the outcome of litigation, where practicable. In cases with pending deadlines for submissions, agencies should ask the FLRA to suspend or extend those deadlines until the conclusion of the litigation. If the FLRA does not suspend deadlines or hold cases in abeyance agencies should take the position that the union lacks standing as it is not recognized as a result of *Exclusions*.

**Q4:** In any ongoing proceedings in which an agency is asked to submit a statement of position regarding an unfair labor practice charge under investigation by the FLRA, should agencies submit a statement?

**A4:** Yes. However, agencies should raise to the appropriate FLRA regional office that the relevant agency or agency subdivision is no longer subject to provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) per the *Exclusions* order and, therefore, the union no longer has standing to file a charge or the FLRA to issue a complaint.

**Q5:** Should agencies and agency subdivisions covered by *Exclusions* continue to participate in the FLRA's Collaboration and Alternative Dispute Resolution Office (CADRO) with labor unions representing police officers, security guards, and firefighters? What about bargaining units comprised of other occupations?

**A5:** Agencies may continue collective bargaining activities, including dispute resolution efforts with CADRO and other third-party proceedings with unions representing police officers, security guards, and firefighters, provided that these unions continue to be recognized consistent with

*Exclusions*. However, for matters involving a dispute for any unit that represents positions now excluded under Executive Order 12171, as amended, agencies should continue those dispute resolution activities only if they are doing so independently of any requirements of a CBA and not relying on any provisions of Chapter 71 to compel their participation.

**Q6:** Should agencies change the bargaining unit status codes on employees' SF-50s?

**A6:** Not at this time. Agencies should wait until litigation is resolved before doing so.

**Q7:** What is meant by the term "subdivision?"

**A7:** The term "subdivision" refers to any organization, office, or component that is subordinate to an agency or department head, as well as any division within those organizations, offices, or components.

**Q8:** What is meant by Section 2 of Executive Order 14251 (*Exclusions*) where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"

**A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. Although this category will generally include purely the law enforcement officers in question, in some cases this may also include the administrative staff who support law enforcement operations.

**Q9**: What actions should agencies take regarding bargaining units that represent both (i) employees in positions *not* subject to exclusion (e.g., police officers, security guards, firefighters) and (ii) agency employees now *excluded* under the President's new directive?

**A9:** Agencies should preserve the rights of employees not excluded from collective bargaining including continuing to participate in third-party procedures (e.g., arbitrations) that are focused solely on conditions of employment, contractual and statutory obligations, or other matters limited to these employees. For employees no longer included in a bargaining unit, agencies should follow the direction provided in this guidance. If agencies need further guidance, please contact OPM at awr@opm.gov.

**Q10:** If an employee is no longer permitted to join or form a labor organization under the FSLMRS, can he or she strike against the Government while serving as a federal employee?

**A10:** Under 5 U.S.C. § 7311, employee strikes against the Government of the United States are prohibited for all Federal employees, irrespective of whether they are in a bargaining unit.

**Q11:** Can grievances initially filed under a negotiated grievance process (5 U.S.C. 7121) be transitioned to an administrative grievance process?

**A11:** Yes, provided the matter is not excluded by the agency's administrative grievance procedure and the grievant timely requests a transition to the administrative grievance procedure.

**Q12:** Are unions ineligible as employee representatives under the FSLMRS permitted to establish

consultative relationships with agencies pursuant to 5 C.F.R. Part 251?

**A12:** OPM's regulations "[provide] a framework for consulting and communicating with **non-labor organizations** representing Federal employees and with other organizations on matters related to agency operations and personnel management." A union is a "labor organization," as defined in 5 U.S.C. 7103(a)(4), and is therefore, not covered by 5 C.F.R. Part 251 whether they represent bargaining unit employees at an agency or not.

**Q13:** With announcement of the new Executive Order, *Exclusions*, are covered agencies still required to submit data to OPM regarding taxpayer-funded union time (TFUT), collective bargaining costs, and other labor relations data points?

**A13:** Yes. Please continue to collect and timely submit agency labor relations data as requested, even if the agency or subdivision therein is now exempted from the provisions of the FSLMRS.

**Q14:** What should we do with agreements that are pending Agency Head Review (AHR) and cover newly excluded agencies, subdivisions, or partial groups?

**A14:** Agencies should exercise their agency head authority under 5 U.S.C. § 7114(c) to disapprove any agreement currently undergoing review for units that are no longer recognized within a covered agency or subdivision. Agencies should cite to *Exclusions* or, if applicable, the presidential memorandum *Limiting Lame-Duck Collective Bargaining Agreements That Improperly Attempt to Constrain the New President*, as their basis for disapproval. For agreements that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct AHR as they normally would. Lastly, for agreements that include a mix of excluded and included units, agencies should continue AHR and include a note that the agreement only covers those not excluded by Executive Order 14251 and that the agreement has no applicability to other employees.

**Q15:** For agencies that are currently bargaining with unions, are there any concerns with solidifying and executing agreements such as tentative agreements or memoranda of understandings or agreements (MOUs or MOAs)?

**A15:** Agencies should suspend such negotiations until the conclusion of litigation.

**Q16:** In Section 2 of *Exclusions,* 1-419 states: "The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management: (a) Office of the Chief Information Officer (OCIO); (b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty." Does this apply to all OCIO offices within an agency not listed in *Exclusions*?

**A16:** This provision applies only to CIO offices in the Executive Departments (see 5 U.S.C. 101), OPM, and the Social Security Administration, as well as the subordinate agencies and offices under those Departments/agencies.

**Q17**: What does information resources management mean as used in Section 2 of *Exclusions*?

**A17**: The Paperwork Reduction Act defines "information resources management" at 44 U.S.C. § 3502(7), as "the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public."

# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) |
| *Plaintiff*; | ) ) |
| v. | ) ) |
| DONALD J. TRUMP, *et al.*, | ) ) |
| *Defendants*. | ) ) ) |

Case No. 1:25-cv-935-PLF

Judge Paul L. Friedman

### DECLARATION OF ERICA BALKUM

Pursuant to 28 U.S.C. § 1746, I, Erica Balkum, declare as follows:

1.      I am the Chief, Office of Case Intake and Publication ("CIP"), at the Federal Labor Relations Authority ("FLRA"). The FLRA is an administrative federal agency created by Title VII of the Civil Service Reform Act of 1978, also known as the Federal Service Labor-Management Relations Statute ("FSLMRS"), 5 U.S.C. §§ 7101–7135. The FLRA is organized into three statutory components: (1) the three-member Authority; (2) the Office of the General Counsel; and (3) the Federal Service Impasses Panel. As the Chief, pursuant to 5 U.S.C. § 7133, I oversee the office that publishes decisions and orders in proceedings before the three-member Authority. I have served in this capacity for two years.

2.      When a case is filed with the three-member Authority, and there is a question as to whether the Authority has jurisdiction, it is typical for the Authority to send the filing party an Order to Show Cause directing the party to show cause why the Authority should not dismiss the case. *See, e.g.*, *U.S. Atty's Off., S. Dist. of Tex. Houston, Tex.*, 57 FLRA 750 (2002).

JA82

3.      Exhibit A to this Declaration includes an example of an Order to Show Cause that I issued on behalf of the three-member Authority in light of *Exclusions from Federal Labor-Management Relations Programs ("Exclusions Executive Order")*, Exec. Order No. 14251 (Mar. 27, 2025), 90 Fed. Reg. 14553 (Apr. 3, 2025). All of the Orders the Authority issued in response to the *Exclusions Executive Order* contained the same operative language.

4.      Any person aggrieved by a final order of the three-member Authority may seek judicial review to extent allowed under 5 U.S.C. § 7123.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 11, 2025.

ERICA BALKUM

# Exhibit 2-A

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

—————

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**
**FEDERAL CORRECTIONAL INSTITUTION**
**WILLIAMSBURG, SOUTH CAROLINA**
**(Agency)**

**and**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES**
**COUNCIL OF PRISON LOCALS #33**
**LOCAL525**
**(Union)**

**0-AR-5995**

—————

**ORDER TO SHOW CAUSE**

**April 4, 2025**

—————

On March 27, 2025, President Donald J. Trump amended Executive Order 12,171 (1979), pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), to exclude certain agencies and agency subdivisions from the coverage of the Federal Service Labor-Management Relations Statute (the Statute).[1]  Accordingly, the Authority directs the Agency to show cause why the Authority should not dismiss this matter for lack of jurisdiction.[2]  As described further below, the Union may reply to the Agency's response to this order.

The Agency must file its response to this order with the Authority by **April 18, 2025**.  The Agency's response must also include a statement of service that complies with the Authority's Regulations showing that the Agency served its response on all counsel of record or other designated representatives.[3]

---

[1] Exclusions from Federal Labor-Management Relations Programs, Exec. Order No. 14251 (Mar. 27, 2025), 90 Fed. Reg. 14553 (Apr. 3, 2025).
[2] *See generally U.S. Att'y's Off., S. Dist. of Tex., Hous., Tex.*, 57 FLRA 750 (2002) (where President amended Executive Order 12,171 to exclude additional entity from Statute's coverage, Authority ordered affected parties to brief whether Authority lacked jurisdiction over their cases).
[3] 5 C.F.R. § 2429.27(a), (c).

The Agency should direct its response to Erica Balkum, Chief, Office of Case Intake and Publication, Federal Labor Relations Authority, 1400 K Street NW, Suite 300, Washington, D.C. 20424-0001. The proper methods for filing documents with the Authority are set forth at § 2429.24(e) of the Authority's Regulations.[4] As outlined in the Authority's Regulations, the Agency's response to the Authority must be filed by personal delivery, commercial delivery, first-class mail, or certified mail.[5]

The Agency's failure to comply with this order by **April 18, 2025**, may result in dismissal of the Agency's filing in this case.

If the Union chooses to file a reply to the Agency's response, then the reply must be filed with the Authority within *fourteen days* after service of the Agency's response. The Union's reply must also be filed in accordance with the Authority's Regulations, including the requirement to file a statement of service showing that the Union served its reply on all counsel of record or other designated representatives.[6]

Requests for extensions of time must be in writing and received by the Authority not later than five days before the established time limit for filing.[7] The request must state the position of the other party and must be served on the other party.[8]

Because the Authority's jurisdiction over this matter is in question, *the deadlines for any remaining filings in this case – except for responses or replies to this order – are temporarily suspended.* Except for responses or replies to this order, you are not required to submit any further filings in this case until the Authority notifies you otherwise.

Procedural questions regarding this case should be directed to the Office of Case Intake and Publication at (771) 444-5805.

For the Authority:

_Erica J. Balkum_
Erica Balkum, Chief
Office of Case Intake and Publication

---

[4] *Id.* § 2429.24(e).

[5] *Id.*; *see also id.* § 2429.24(a) ("To file documents by personal delivery, *you must schedule an appointment at least one business day in advance by calling* [(771) 444-5805]." (emphasis added)).

[6] *Id.* §§ 2429.24(e); 2429.27(a), (c).

[7] *Id.* § 2429.23(a).

[8] *Id.*

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

_____

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**
**FEDERAL CORRECTIONAL INSTITUTION**
**WILLIAMSBURG, SOUTH CAROLINA**
**(Agency)**

**and**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES**
**COUNCIL OF PRISON LOCALS #33**
**LOCAL 525**
**(Union)**

**0-AR-5995**

___

**STATEMENT OF SERVICE**

_____

    I hereby certify that copies of the Order of the Federal Labor Relations Authority in the subject proceeding have this day been served to the following:

<u>EMAIL</u>
Matthew E. Hirt
Senior Attorney
U.S. Department of Justice
Labor & Employment Law Office
145 N Street, NE, Suite 9W.300
Washington, DC  20530
█████████████████████

Jenniffer A. Hinton
Supervisory Labor Relations Specialist
U.S. Department of Justice
Federal Bureau of Prisons
346 Marine Forces Drive
Grand Prairie, TX 75051
████████████████

Larry Nelson
National Representative
Council of Prison Locals (CPL 33) Local 408
█████████████
Virgilina, VA 24598
cplnationalrep@gmail.com

Dated: _4-4-25_
WASHINGTON, D.C.

_____
Erica Balkum, Chief

2

<u>SUPPLEMENTAL DECLARATION OF DANIEL KASPAR</u>

I, Daniel Kaspar, hereby declare as follows:

     1.     As previously explained in my April 2, 2025 declaration, I am the Director of Field Operations for NTEU. In that capacity, I am familiar with the agencies where NTEU-represented employees work, as well as the duties those employees perform. I am also familiar with the collective bargaining agreements that we have negotiated with our agencies and whether agencies are complying with those agreements, as well as statutory collective bargaining obligations.

<u>Agencies' Failure to Honor Dues Withholding Requirements</u>

     2.     Federal law requires that "[i]f an agency has received from an employee in an appropriate unit a written assignment which authorizes the agency to deduct from the pay of the employee amounts for the payment of regular and periodic dues of the exclusive representative of the unit, the agency shall honor the assignment and make an appropriate allotment pursuant to the assignment." 5 U.S.C. § 7115(a).

     3.     In addition, every collective bargaining agreement that NTEU has with the agencies named as defendants in this action has a provision requiring the agencies to process payroll deductions for dues if the employee so requests.

     4.     Payroll for federal employees is processed by different agencies. Many are processed by the National Finance Center (NFC) within the U.S. Department of Agriculture. NTEU-represented agencies that use NFC include the Federal Communications Commission and the Department of Treasury (including the IRS,

IRS Office of Chief Counsel, Bureau of Fiscal Service, Office of the Comptroller of the Currency, Alcohol and Tobacco Tax and Trade Bureau (TTB), and Departmental Offices).

5.    Other agencies have payroll processed by the Interior Business Center (IBC) within the U.S. Department of Interior. NTEU-represented agencies that use IBC include the Bureau of Land Management (BLM) and the Environmental Protection Agency.

6.    Other agencies have payroll processed by the Defense Finance Accounting Service (DFAS) within the U.S. Department of Defense. NTEU-represented agencies that use DFAS include the Department of Energy and the Department of Health and Human Services.

7.    Payroll periods in the federal government are generally every two weeks, although they are numbered differently if employees are paid through different agencies. For example, the two-week pay period of March 9, 2025 through March 22, 2025 is pay period 5 for NFC paid employees, and is pay period 7 for IBC paid employees.

8.    Federal employees are typically paid on or around the second Thursday after the end of a pay period. For example, for the pay period running from March 9, 2025—March 22, 2025, employees would typically receive their pay (after any withholdings are taken out) on or about April 2 or 3, 2025. If the employee elected to have dues withheld and remitted to NTEU, NTEU would typically receive those dues on or about April 1, 2025.

2

9.    Agencies are stopping payroll deductions for dues payments from NTEU members to NTEU.

10.    For example, IBC stated in a March 28, 2025 email that "[a]s a result of Executive Order 'Exclusions from Federal Labor-Management Relations Programs' published March 27, 2025, the Interior Business Center (IBC) was directed to remove all union deductions from the Pay Period 25-07 calculate file." (Exhibit 1).

11.    Updating an earlier notice, NFC stated in an April 9, 2025 email that it was providing additional information "regarding halting union dues deductions" and was taking action "to ensure the termination of future union deductions[.]" (Exhibit 2).

12.    Consistent with these statements from payroll processing entities, some agencies have notified NTEU that they have stopped dues withholding. For example, TTB told NTEU on April 11, 2025 that "[p]ursuant to the executive order signed on March 27, 2025, *Exclusions from Federal Labor-Management Relations Programs*, the National Finance Center (NFC) will be halting union dues deductions for covered Treasury Bureaus . . . effective pay period 6 (March 23, 2025 through April 5, 2025) and beyond." (Exhibit 3).

13.    At the end of pay period March 9, 2025—March 22, 2025, NTEU lost more than a million dollars in dues that it otherwise would have received, if agencies had not halted automatic dues withholding.

3

14.    At the end of pay period March 23, 2025—April 6, 2025, NTEU again lost more than a million dollars in dues that it otherwise would have received, if agencies had not halted automatic dues withholding.

## Agencies' Failure to Honor Other Collective Bargaining Obligations

15.    In addition to agencies' refusal to comply with statutory and contractual dues withholding requirements, agencies are refusing to comply with other collective bargaining agreement provisions as well.

16.    For example, the IRS sent out a notice to employees on April 4, 2025, stating that "[t]he IRS has begun implementing a Reduction in Force (RIF) that will result in staffing cuts across multiple offices and job categories." (Exhibit 4). The IRS is beginning this process without following the RIF provisions in the IRS-NTEU collective bargaining agreement, such as required advance notice to NTEU's President.

17.    Indeed, IRS notices to employees affected by the RIF explicitly disavow any obligation to bargain or otherwise follow relevant collective bargaining agreement provisions. The notices state:

> Collective bargaining agreements required additional steps before proceeding with a RIF, including extended negotiation periods and waiting periods. However, President Trump signed an executive order entitled "Exclusions from Federal Labor-Management Relations Programs." Application of the national security exemption from collective-bargaining requirements under this executive order and resulting guidance from the Office of Personnel Management eliminates non-statutory delays in executing a RIF.

(Exhibit 5).

4

18.     Agencies are refusing to sit at the bargaining table with NTEU. For example, BLM stated in an April 2, 2025, email that "[d]ue to the issuance of Executive Order and OPM Guidance: Exclusions From Federal Labor-Management Relations Programs. . .[w]e will be postponing the CBA negotiations scheduled for April 3rd." (Exhibit 6). And on April 11, 2025, BLM told NTEU that it would be postponing a scheduled Labor Management Relations Committee meeting scheduled for April 14 because of the Executive Order. (Exhibit 7).

19.     BLM also stated in an April 8, 2025 email that it would not bargain with NTEU over the agency's offering of a deferred resignation program because "[c]onsistent with Executive Order 14251, 'Exclusions from Federal Labor-Management Relations Programs,' which was issued on March 27, 2025, the BLM is excluded from Chapter 71 of Title 5. . . ." (Exhibit 8).

20.     Agencies are refusing to participate in grievance proceedings. For example, an IRS representative told NTEU staff on April 2, 2025, in connection with a pending national grievance and unfair labor practice charge, that "[d]ue to the Executive Order on Thursday, we are currently in a holding pattern in terms of grievances." (Exhibit 9).

21.     TTB told NTEU on April 14 that as a result of the Executive Order, "TTB has suspended (until further notice) all proceedings under the CBA including but not limited to: grievances under the Negotiated Grievance Process (NGP), Partnership Council, midterm bargaining, and Requests for Information, etc." (Exhibit 10).

22.     On April 10, 2025, a representative from the IRS Office of Chief Counsel refused to move forward with arrangements for a long-scheduled arbitration because they were "awaiting further guidance on the Executive Order relating to the CBA." (Exhibit 11).

23.     Under law (5 U.S.C. § 7131(a)) and under all of NTEU's collective bargaining agreements, NTEU stewards are allowed to request "official time" to conduct representational duties during the workday. But BLM told NTEU on April 1, 2025, that it was disapproving use of "LRG and LRD" for certain dates. (Exhibit 12). These codes mean authorized official time.

24.     Management at the Food and Drug Administration (FDA) told NTEU on March 31, 2025 that "[u]ntil further notice, the FDA is ending labor relation meetings with the exclusive representatives of (NTEU/AFGE) in adherence to the above referenced presidential Executive Order." (Exhibit 13). And the FDA told NTEU April 8, 2025, that NTEU stewards would not be allowed to participate in formal meetings with employees, stating that "to comply with EO 14251, *Exclusions from Federal Labor-Management Relations Programs* . . . management participating in this meeting will not be engaging with NTEU. . . ." (Exhibit 14). On April 9, the FDA rescinded its previous approval of NTEU's presence at a meeting between management and an employee, again citing the Executive Order. (Exhibit 15).

25.     Arbitrators are beginning to stop action on lawfully filed grievances because of the Executive Order, which harms NTEU's ability to carry out its mission of fighting for employee and union rights through grievances. For example,

Arbitrator Stephen E. Alpern informed NTEU on April 3, 2025 that he was staying

further proceedings in a grievance about the validity of the BLM and NTEU

collective bargaining agreement because "the Agency raises the contention that

[pursuant to] an Executive Order 14251 (90 FR 14553, March 27, 2025), the

President excluded the Agency from the provisions of Chapter 7 of title 5, United

States Code." (Exhibit 16).

26.    The Executive Order is affecting how the Federal Labor Relations

Authority (FLRA) is handling labor relations matters. For example, NTEU has

multiple petitions pending before the FLRA regarding whether various contract

provisions are negotiable or not. For agencies covered by the Executive Order, the

FLRA has issued a series of show cause orders stating:

> On March 27, 2025, President Donald J. Trump amended Executive Order
> 12,171 (1979), pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), to
> exclude certain agencies and agency subdivisions from the coverage of the
> Federal Service Labor-Management Relations Statute (the Statute).
> Accordingly, the Authority directs the Union to show cause why the
> Authority should not dismiss this matter for lack of jurisdiction.

(Exhibit 17).

27.    The FLRA has also paused an unfair labor proceeding brought by

NTEU on behalf of BLM because of the Executive Order. (Exhibit 18).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2025

Daniel Kaspar

EXHIBIT 1

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Monday, March 31, 2025 10:00 AM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Peyton Diotalevi <peyton.diotalevi@nteu.org>; ██████████████████
**Subject:** Fw: URGENT: Union Deduction Impacts from a Recent Executive Order

████████

---

**From:** IBC User Group <IBC-User-Group@updates.ibc.doi.gov>
**Sent:** Friday, March 28, 2025 3:35 PM
**To:** Shea, Kathleen M <kshea@blm.gov>
**Subject:** URGENT: Union Deduction Impacts from a Recent Executive Order

# Interior Business Center

## MEMORANDUM

**DATE:** Friday, March 28, 2025

**TO:** All User Group Representatives

**FROM:** Keith O'Neill, Associate Director HRD

**SUBJECT:** URGENT: Union Deduction Impacts from a Recent Executive Order

### PLEASE SHARE THIS MESSAGE WITH YOUR APPROPRIATE AUDIENCES.

Valued Customers,

As a result of Executive Order "[Exclusions from Federal Labor-Management Relations Programs](#)" published March 27, 2025, the Interior Business Center (IBC) was directed to remove all union deductions from the Pay Period 25-07 calculate file.

**Who does this affect?**

This applies to employees only within Pay Processing Groups 1 and 4.

**What is the impact to employees?**

- Employees will see union deductions on their Leave and Earnings statement Pay Period 25-07.
- Employees will get dues amount returned in a future pay period.

**Does this require any agency action?**

At this time, no further actions are required.

**Union Reports - It is important to note:**

- The union reports will display deductions.
- However, it's crucial to understand that the corresponding funds have **not yet been deposited**.

For employee questions or concerns, please contact the Customer Support Center at CSC_IT_Services_Helpdesk@ios.doi.gov or 1-866-367-1272.

Regards,

Keith O'Neill
Associate Director
Human Resources Directorate
Interior Business Center
U.S. Department of the Interior
www.doi.gov/IBC

## Resources:

- IBC Customer Central

For User Group distribution list changes, email Lorraine Manzanares. All requests should come from a Primary Agency User Group Representative.

Stay Connected with the Interior Business Center



This email was sent by: U.S. Department of the Interior – Interior Business Center – 1849 C Street, NW - MS 1748 - Washington, DC - 20240



EXHIBIT 2

**From:** Langdon Ryan C <Ryan.C.Langdon@irs.gov>
**Sent:** Thursday, April 10, 2025 1:51 PM
**Subject:** FW: Update: Executive Order Stopping Union Dues Payroll Deductions

Hello,

We received your 1188 request, please refer to the below email and attached form.

Thanks,

## Ryan Langdon
**HUMAN RESOURCES ASSISTANT**
**IRS, Human Capital Office**
**HR Shared Services: Payroll Operations Center 1 Section 2**
**Human Resources Shared Services (HRSS)**
Phone: (267) 466-2536
Email  : Ryan.C.Langdon@IRS.Gov
TOD: 6:00 AM – 2:30 PM, M-F (EST)
Payroll Documents – Fax: (855) 207-0459



FYI

**From:** *HRSS NFChelpdesk
**Sent:** Thursday, April 10, 2025 7:15 AM
**Subject:** [EXT] Update: Executive Order Stopping Union Dues Payroll Deductions

Please review CAPPS notification below and share with your staff if applicable.

## National Finance Center
## CAPPS Notification

# Update: Executive Order Stopping Union Dues Payroll Deductions

April 9, 2025

Reference Number: NFC-1744117663

Dear Customer,

This is an update to the notice issued on April 4, 2025, titled "Follow-Up Executive Order Regarding Union Dues," to provide additional information regarding halting union dues deductions for specific Agencies and occupational series (0081, 0082, 0083, and 0085).

The National Finance Center (NFC) will take following actions in Pay Period (PP) 06 processing:

- Implement system changes in the Personnel Edit Subsystem Edit Messages (PINE) application to ensure the termination of future union deductions and elections within the designated Agencies and occupational series.
- Union deductions will be prevented for the affected employees using deactivation code "90" to stop deductions.
- Reimbursements for ineligible union deductions that occurred during PP05 will occur for affected employees. Employees will see this reimbursement in the remarks field on their Earnings and Leave Statement (E&L)

Attached in this notice, you will find a listing of the of the Department/Agencies affected by the Executive Order. In addition, your Client Management Representative will be providing a separate spreadsheet containing the impacted employees in the specified occupational series, Department/Agency.

**NOTE:** No action is required on the part of the Agency.

Authorized Agency representatives with questions concerning this notification should contact the NFC Contact Center at 1-855-632-4468 or submit a request in the ServiceNow Customer Service Portal using the following links:

JA102

- For Federated Users – https://nfcbsm.servicenowservices.com
- For Non-Federated Users
  - Customer Service Management Portal View (Designated CMB POC)
    https://nfcbsm.servicenowservices.com/csm
  - Current Service Portal View (all other users)
    https://nfcbsm.servicenowservices.com/sp_ess

Attachments:

Agency List - Cancelled Union Dues

- Agency List - Cancelled Union Dues.pdf

EXHIBIT 3

 **Outlook**

---

## Fw: Executive Order Stopping Union Dues Payroll Deductions

**From** Dan Kaspar <dan.kaspar@NTEU.ORG>

**Date** Mon 4/14/2025 2:38 PM

**To** Allie Giles <Allie.Giles@NTEU.ORG>

Get Outlook for iOS

---

**From:** William Igoe <william.igoe@NTEU.ORG>
**Sent:** Monday, April 14, 2025 2:36 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>
**Subject:** Executive Order Stopping Union Dues Payroll Deductions

---

**From:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Sent:** Friday, April 11, 2025 11:16 AM
**Cc:** All TTB SUPERVISORS <ALLTTBSUPERVISORS@ttb.gov>; Aderibigbe, Oyinlola <Oyinlola.Aderibigbe@ttb.gov>;
Martinez, Kameron T. <Kameron.Martinez@ttb.gov>; Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Subject:** Executive Order Stopping Union Dues Payroll Deductions

Good day,

**\*\*This message applies only to those TTB employees coded as bargaining unit.  Supervisors are copied for context.\*\***

Pursuant to the executive order signed on March 27, 2025, *Exclusions From Federal Labor-Management Relations Programs*, the National Finance Center (NFC) will be halting union dues deductions for covered Treasury Bureaus, to include TTB, as outlined in the executive order effective pay period 6 (March 23, 2025 through April 5, 2025) and beyond.  Any union dues elections that were being deducted from an employee's pay will automatically be cancelled by the National Finance Center.

Please direct any questions to your supervisor or HR Business Partner.

Regards,
Andrea Johnson
Human Resources Specialist
Alcohol and Tobacco Tax and Trade Bureau (TTB)
Office:  (202) 453-2166
https://www.ttb.gov/



This message was secured by **Zix**®.

# EXHIBIT 4

**From:** Doreen Greenwald <doreen.greenwald@NTEU.ORG>
**Sent:** Friday, April 4, 2025 4:17 PM
**To:** ███████████
**Subject:** FW: Reduction in Force (RIF) process is beginning

---

██

**From:** *IRS Human Capital Officer <irs.human.capital.officer@irs.gov>
**Sent:** Friday, April 4, 2025 4:01 PM
**To:** &&Employees All <employees.all@irs.gov>
**Subject:** Reduction in Force (RIF) process is beginning

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

The IRS has begun implementing a Reduction in Force (RIF) that will result in staffing cuts across multiple offices and job categories. This action is being taken to increase the efficiency and effectiveness of the IRS in accordance with agency priorities and the Workforce Optimization Initiative outlined in a recent Executive Order.

Today, the IRS initiated a RIF for the Office of Civil Rights and Compliance (formerly the Office of Equity, Diversity and Inclusion). This calendar year to date, approximately 5% of this office left through the Deferred Resignation Program and attrition. An additional 75% of the office will be reduced through a RIF. The remaining employees in the OCRC will move under the Office of Chief Counsel to continue to carry out its statutory responsibilities. None of the reductions were made today based on individual performance. The reductions were made in accordance with statute.

**What to expect**

- The RIF will be implemented in phases. **This message is only notification that the IRS has begun the RIF process and does not serve as your official notification.** Each office will receive direct communication when their phase begins.

- **Individual RIF notices** will be issued to impacted employees at least 30-60 days prior to the effective date of any personnel action, as required by the Office of Personnel Management (OPM) guidelines.
- **Personnel reassignments including relocations** will stop effective April 4, 2025. With limited exceptions, all actions with an effective date after April 4, 2025, will be canceled. If you are currently on a detail or temporary promotion, it will not be canceled. Detailed information on exceptions is included in the FAQs.
- We have received approval to offer **VERA (Voluntary Early Retirement Authority) and VSIP (Voluntary Separation Incentive Payment)**. More information, including the specific dates and FAQs, will be shared with you next week.

**Action you need to take:**

- **Upload a current resume to HRConnect by April 14, 2025** using these instructions (.docx). HCO will use your resume to determine qualifications during a RIF. If you choose not to upload a resume and are impacted by RIF, the Human Capital Office will use your current position description to determine qualifications. No resumes will be accepted outside of the HRConnect upload feature. If you cannot access HRConnect, you can work with your supervisor.
- **Training:** View the new Reduction in Force (RIF) Briefing - Understanding the Process, Your Rights, and Benefits Course 85139 in ITM.

**What resources are available:**

- Workforce Updates page, including RIF Q&A, with new information added as available.
- Employee Assistance Program (EAP), with confidential counseling and support services available.
- Resume resources:
  - USAJOBS Help Center - What should I include in my resume?
  - iManage - Resume Writing
- Additional guidance on the RIF process is available through OPM:
  - Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative (.pdf)
  - Workforce Reshaping Operations Handbook (.pdf)

We remain committed to sharing information as soon as it becomes available and ensuring all employees have access to resources and support.

Thank you for your continued professionalism and commitment to supporting our mission.

# EXHIBIT 5



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

April 4, 2025

MEMORANDUM FOR ████████████

FROM                    Melanie Krause    *Melanie Krause*
                        Acting Commissioner, Internal Revenue Service

Subject:                Reduction in Force Notice – Change to Lower Grade

This memorandum constitutes your official Reduction in Force (RIF) Change to Lower Grade (CLG) notice.

The Internal Revenue Service has determined it is necessary to abolish some positions in the Office of Civil Rights and Compliance, formerly known as the Office of Equity, Diversity, and Inclusion, to further workforce shaping efforts in accordance with the "Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative" guidance.  Collective bargaining agreements required additional steps before proceeding with a RIF, including extended negotiation periods and waiting periods.  However, President Trump signed an executive order entitled "Exclusions from Federal Labor-Management Relations Programs."  Application of the national security exemption from collective-bargaining requirements under this executive order and resulting guidance from the Office of Personnel Management eliminates non-statutory delays in executing a RIF.

To conduct the RIF, retention registers were prepared which list employees in retention standing order by civil service tenure group and subgroup, veterans' preference, performance ratings, and length of Federal service. The following information was used to determine your retention standing as of the RIF effective date: 6/3/2025.

Position of Record:  Management & Program Anal, GS-0343-13
Competitive Area:    Office of Civil Rights and Compliance, formerly known as the Office of
                     Equity, Diversity, and Inclusion
Competitive Level:   GS-0343-13-2480
Tenure Group:        1
Sub-Group:           AD
Type of Service:     COMPETITIVE
Service Computation Date (RIF):  8/13/2010
Performance Rating: RATING 1 DATE: 03/31/2023  |  RATING 1 SCORE: EXCEEDS FULLY SUCCESSFUL OR EXCEEDED
RATING 2 DATE: 02/28/2022  |  RATING 2 SCORE: EXCEEDS FULLY SUCCESSFUL OR EXCEEDED
RATING 3 DATE: 02/28/2021  |  RATING 3 SCORE: EXCEEDS FULLY SUCCESSFUL OR EXCEEDED
RATING 4 DATE: NO DATE  |  RATING 4 SCORE: NO RATING

Attachment

Adjusted Service Computation Date (RIF): 8/13/1994

In accordance with RIF procedures specified in Title 5, Code of Federal Regulations, Part 351, you were released from your competitive level but are being offered a CLG to the following position:

Position:        GS-0260-12
Position Description Number:  S927840027
Location:        OFC OF CIVIL RIGHTS AND COMPL
                 EQUAL EMPLOYMENT OPPORTUNITY
                 EEO - TERRITORY 2

This offer of continuing employment is the best offer available.

If you accept this offer:
- You must sign and email the attached Offer Reply Form to hco.ta.workforce.shaping@irs.gov within five (5) workdays of receipt of this notice.
- Your CLG will be effective the pay period immediately following the RIF effective date of: 6/3/2025.

If you decline or fail to respond to this offer within five (5) workdays, it will be considered a declination of the position offered to you in this notice. Consequently, you will be separated by RIF procedures on 6/3/2025.

If you are separated by the RIF because you declined a reasonable offer (defined as not more than two grade or pay levels below your current position), you will not be eligible for severance pay, or discontinued service retirement (even if you previously met the criteria for these entitlements).

- If you are RIF separated:
    - You will be eligible for the IRS Career Transition Assistance Plan (CTAP), registration on the Treasury Department's Reemployment Priority List (RPL), and special selection priority under the Interagency Career Transition Assistance Plan (ICTAP)
    - You may be eligible for benefits available to you under the Workforce Investment Act (WIA) of 1998

This RIF action does not reflect in any way upon your performance or conduct. The Internal Revenue Service sincerely appreciates the contributions you have made during your employment and regrets that you have been personally affected by this reduction in force.

**Appeal and Grievance Rights**

Merit Systems Protection Board
If you are separated by RIF procedures and you believe your rights have been violated, you may appeal the RIF action to the Merit Systems Protection Board,  MSPB's e-Appeal Online website. Your appeal must be submitted and must be filed any time during the 30-calendar day period beginning the day after the effective date of the RIF.  Your appeal must contain the

JA112

Attachment

information outlined in the attached extract of the MSPB regulations. You may access a complete copy of the MSPB regulations at www.mspb.gov. If you fail to file your appeal within the applicable time limit, the MSPB may dismiss it as untimely filed, unless you can show good cause for the delay. If you file your appeal untimely, the judge will provide you with an opportunity to show why your appeal should not be dismissed as untimely.

Equal Employment Opportunity Commission (EEOC)
If you seek to allege that this RIF action was taken against you based in whole or in part on discrimination because of race, color, religion, sex, age, national origin, or physical or mental disability, you may either (1) join your claim of discrimination with your appeal filed with the Merit Systems Protection Board; or (2) pursue an action under Part 1614 of the EEOC regulations. You may also access the U.S. Equal Employment Opportunity Commission (EEOC) website at www.eeoc.gov for additional and further detailed information on the Federal sector EEO process. You may also file with MSPB as noted above and raise discrimination as an affirmative defense. However, you may not proceed through both forums; you must elect one or the other. Whichever action is filed first will be considered an election to proceed in that forum. An election to proceed before the MSPB is determined as of the date the appeal is filled; and an election to proceed under Part 1614 is determined as of the date a complaint of discrimination is filed.

Office of Special Counsel
You may also seek corrective action before the U.S. Office of Special Counsel (OSC). Visit the OSC e-filing system web site at www.osc.gov, to access the online application. However, if you do so, you will be limited to whether the agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures. If you choose to file an action with OSC, you will be foregoing your right to otherwise challenge the basis for this personnel action.

If you have questions after reviewing this letter and the attached material, or you are considering resigning, please submit a ticket via IRworks or contact the Employee Resource Center (ERC) at 1-866-743-5748 or via the online chat box at https://connect.irs.gov/system/web/custom/vascripts/erc_launch_va.html, and tell them you received a RIF notice.

The following attachments can be found on https://www.irs.gov/newsroom/irs-employee-emergency-news
- RIF Notice Package - Quick Reference Guide
- RIF Information Sheet
- Benefits/Entitlements
- OPM RIF Regulations (5 CFR, Part 351)
- MSPB Abbreviated Regulations and Appeal Form

Attachment -Offer Reply Form

Attachment

## OFFER REPLY FORM

**PLEASE COMPLETE AND EMAIL THIS FORM WITHIN 5 WORKDAYS TO:**
hco.ta.workforce.shaping@irs.gov

**THIS FORM MUST BE RECEIVED NO LATER THAN CLOSE OF BUSINESS ON THE 5TH WORKDAY FROM THE DATE OF RECEIPT OF THE RIF NOTICE.  (The notice receipt date is not included in the 5 workdays.)**

**FAILURE TO RETURN THIS FORM WITHIN 5 WORKDAYS WILL BE CONSIDERED A DECLINATION.**
--------------------------------------------------------------------------------

Name: __███████████████

Present Organization and Post of Duty:

      Management & Program Anal, GS-0343-13
      INTERNAL REVENUE SERVICE OFC OF CIVIL RIGHTS AND COMPL DIVERSITY &
      INCLUSION DIVISION DIV,STRTGY&PROACT RES SVCS SEC

Position Offered in RIF Notice:

      GS-0260-12
      Position Description Number:  S927840027
      OFC OF CIVIL RIGHTS AND COMPL
      EQUAL EMPLOYMENT OPPORTUNITY
      EEO - TERRITORY 2

Please check one:

_____     I **ACCEPT** the position offered above.


_____     I **DECLINE** the position offered above.  I understand that, because of this declination, I will be separated from the Federal Service by RIF procedures on 6/3/2025, and that if this was a reasonable offer (defined as not more than two grade or pay levels below your current position), I will not be eligible for severance pay or discontinued service retirement (even if I previously met the criteria for these entitlements).

Employee Signature*: _████████████████_____ Date: _____
*Electronic or hand signatures are acceptable

JA114

EXHIBIT 6

Arathi Premkumar <arathi.premkumar@NTEU.ORG>
Wednesday, April 2, 2025 6:51 PM
Dan Kaspar <dan.kaspar@NTEU.ORG>
FW: CBA Negotiations: Postponement of April 3rd CBA Bargaining

---

Johnston, Lisa J <ljjohnston@blm.gov>
Wednesday, April 2, 2025 2:18 PM
Leib, Lauren A <lleib@blm.gov>; Ken Moffett <ken.moffett@NTEU.ORG>; Arathi Premkumar <arathi.premkumar@NTEU.ORG>
Hutcherson, Sheila K <shutcherson@blm.gov>; McNeer, Laura K <lmcneer@blm.gov>; Mishkin, Maximillian R <mmishkin@blm.gov>
CBA Negotiations: Postponement of April 3rd CBA Bargaining

This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Good afternoon all,

Due to the issuance of Executive Order and OPM Guidance: Exclusions From Federal Labor-Management Relations Programs:

https://www.whitehouse.gov/presidential-actions/2025/03/exclusions-from-federal-labor-management-relations-programs/

https://www.chcoc.gov/content/guidance-executive-order-exclusions-federal-labor-management-programs

We will be postponing the CBA negotiations scheduled for April 3rd

**Lisa J Johnston**

**ER/LR Specialist**
**New Mexico BLM**
**(505) 709-7888**

# EXHIBIT 7

**From:** Arathi Premkumar <arathi.premkumar@NTEU.ORG>
**Sent:** Friday, April 11, 2025 1:42 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Subject:** FW: April 14th LMRC meeting postponed

---

**From:** Johnston, Lisa J <ljjohnston@blm.gov>
**Sent:** Friday, April 11, 2025 9:32 AM
**To:** Arathi Premkumar <arathi.premkumar@NTEU.ORG>; Leib, Lauren A <lleib@blm.gov>
**Cc:** Hutcherson, Sheila K <shutcherson@blm.gov>; McNeer, Laura K <lmcneer@blm.gov>
**Subject:** April 14th LMRC meeting postponed

> **Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Good morning all,

Due to the issuance of Executive Order and OPM Guidance: Exclusions From Federal Labor-Management Relations Programs:

https://www.whitehouse.gov/presidential-actions/2025/03/exclusions-from-federal-labor-management-relations-programs/

https://www.chcoc.gov/content/guidance-executive-order-exclusions-federal-labor-management-programs

We will be postponing the April 14th LMRC meeting.

**Lisa J Johnston**

**ER/LR Specialist**
**New Mexico BLM**
**(505) 709-7888**

EXHIBIT 8

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Tuesday, April 8, 2025 10:44 AM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Cc:** Peyton Diotalevi <peyton.diotalevi@nteu.org>; Dan Kaspar <dan.kaspar@NTEU.ORG>
**Subject:** Fw: Department's Deferred Resignation/Retirement Program - Open Period April 4, 2025 - April 9, 2025

▓▓▓▓▓▓

**From:** McNeer, Laura K <lmcneer@blm.gov>
**Sent:** Tuesday, April 8, 2025 10:42 AM
**To:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Cc:** BLM_Labor_Relations_Support <BLM_Labor_Relations_Support@blm.gov>
**Subject:** RE: Department's Deferred Resignation/Retirement Program - Open Period April 4, 2025 - April 9, 2025

> **Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Good morning,

Consistent with Executive Order 14251, "Exclusions from Federal Labor-Management Relations Programs," which was issued on March 27, 2025, the BLM is excluded from Chapter 71 of Title 5 and will not bargain.

Thank You,



Laura McNeer
Lead Human Resources Specialist (Labor/Employee Relations)
Bureau of Land Management (Headquarters)
Cell: 385-315-6498
Email: lmcneer@blm.gov

# EXHIBIT 9

**From:** Ken Moffett <ken.moffett@NTEU.ORG>
**Sent:** Wednesday, April 2, 2025 11:15 AM
**To:** Doreen Greenwald <doreen.greenwald@NTEU.ORG>; Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Ken Moffett <ken.moffett@NTEU.ORG>
**Subject:** FW: [EXT] Re: National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)

███████████████████████████████████████████████

**From:** Jack Jarrett <jack.jarrett@NTEU.ORG>
**Sent:** Wednesday, April 2, 2025 11:08 AM
**To:** Ken Moffett <ken.moffett@NTEU.ORG>; Ryan Soon <ryan.soon@NTEU.ORG>; Rani Rolston <rani.rolston@NTEU.ORG>
**Subject:** Fw: [EXT] Re: National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)

███████████████████████████████████████████████

**From:** Johnson Heather L
**Sent:** Wednesday, April 2, 2025 11:04 AM
**To:** Jack Jarrett
**Cc:** Stratton Christopher R; McCrimmon Sharrean J
**Subject:** RE: [EXT] Re: National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Good Morning,

Due to the Executive Order on Thursday, we are currently in a holding pattern in terms of grievances. So, we cannot address the "Project A" grievance until we get direction from the Secretary.

However, for this particular matter, I did speak to the Business unit. Due to the upheaval that the service is currently facing, they have abandoned this initiative for now. I hope this gives you some clarity while we wait.


Thanks!


**From:** Jack Jarrett <jack.jarrett@NTEU.ORG>
**Sent:** Monday, March 31, 2025 8:26 AM
**To:** Johnson Heather L <Heather.L.Johnson2@irs.gov>
**Cc:** Stratton Christopher R <Christopher.R.Stratton@irs.gov>; McCrimmon Sharrean J <Sharrean.J.McCrimmon@irs.gov>
**Subject:** [EXT] Re: National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)


No problem.  Just let me know when works.


**From:** Johnson Heather L <Heather.L.Johnson2@irs.gov>
**Sent:** Monday, March 31, 2025 8:02 AM
**To:** Jack Jarrett <jack.jarrett@NTEU.ORG>
**Cc:** Stratton Christopher R <Christopher.R.Stratton@irs.gov>; McCrimmon Sharrean J <Sharrean.J.McCrimmon@irs.gov>
**Subject:** National Grievance and Unfair Labor Practice Charge — Unilateral Implementation of SB/SE Exam High-Income/High-Wealth Work Project in Violation of the 2022 National Agreement and 5 U.S.C. § 7116(a)(1), (5), and (8)


**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Hi Jack,

I'm not sure if you received acknowledgement from LRSN of receipt of the above referenced grievance. I will work on this and reach out to you regarding a grievance meeting.

I apologize for the delayed response.

Thanks!

Heather L. Johnson, M. Div. J.D.

Labor Relations Specialist

Labor Relations Strategy & Negotiations (LRSN)

Labor/Employee Relations & Negotiations (LERN)

1st Friday Short (8:00am   4:30pm); 2nd Friday off

2888 Woodcock Blvd.

Atlanta, Georgia 30341

(470) 719-6749

EXHIBIT 10

**Sent:** Monday, April 14, 2025 2:41 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Subject:** FW: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

---

**From:** Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Sent:** Monday, April 14, 2025 8:56 AM
**To:** William Igoe <william.igoe@NTEU.ORG>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>; Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Subject:** RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Will
TTB does not intend to respond to the grievance request and the information request in the foreseeable future.

As a result of EO 14251, TTB has suspended (until further notice) all proceedings under the CBA including but not limited to: grievances under the Negotiated Grievance Process (NGP), Partnership Council, midterm bargaining, and Requests for Information, etc.

Please note that employees may transition NGP grievances to TTB's Administrative Grievance Process.

R
Geoff


Geoffrey Trivers, DBA, SPHR, SHRM-SCP
Human Resources Officer
Alcohol and Tobacco Tax and Trade Bureau (TTB)
202 306-5971 (mobile)

---

**From:** William Igoe <william.igoe@NTEU.ORG>
**Sent:** Friday, April 11, 2025 3:48 PM
**To:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>; Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge,
Marlo A. <Marlo.Hodge@ttb.gov>
**Subject:** [EXTERNAL]RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB
elimination of telework and remote work options.

**CAUTION:** This email has originated from an external entity. **PLEASE CONSIDER THE SOURCE** before
responding, clicking on links, or opening attachments.

Goeffrey and Andrea,

Please let me know if you intend to respond to the grievance request and the information request.

Thank you,

Will Igoe

---

**From:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Sent:** Wednesday, March 19, 2025 11:10 AM
**To:** William Igoe <william.igoe@NTEU.ORG>; Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge,
Marlo A. <Marlo.Hodge@ttb.gov>
**Subject:** RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination
of telework and remote work options.

**Caution:** This message originated from outside of the organization. Do Not Click links or
Open attachments unless you recognize the sender and know the content is safe.

Thank you and no worries.

Regards,
Andrea Johnson
Human Resources Specialist
Alcohol and Tobacco Tax and Trade Bureau (TTB)
Office:  (202) 453 2166
https://www.ttb.gov/



**From:** William Igoe <william.igoe@NTEU.ORG>
**Sent:** Wednesday, March 19, 2025 12:05 PM
**To:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>; Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>
**Subject:** [EXTERNAL]RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**CAUTION:** This email has originated from an external entity. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

Attached is the grievance. I apologize for my mistake.

**From:** Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Sent:** Wednesday, March 19, 2025 10:44 AM
**To:** William Igoe <william.igoe@NTEU.ORG>; Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>
**Subject:** RE: Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Hi William:

You provided us with the same document in both attachments. Can you please send us the grievance?

Regards,
Andrea Johnson
Human Resources Specialist
Alcohol and Tobacco Tax and Trade Bureau (TTB)
Office: (202) 453-2166
https://www.ttb.gov/



**From:** William Igoe <william.igoe@NTEU.ORG>
**Sent:** Wednesday, March 19, 2025 11:11 AM
**To:** Trivers, Geoffrey A. <Geoffrey.Trivers@ttb.gov>; Johnson, Andrea M. <Andrea.Johnson@ttb.gov>
**Cc:** Michael McAuley <michael.mcauley@NTEU.ORG>; Mary R. Ryan <mary.ryan@fiscal.treasury.gov>; Hodge, Marlo A. <Marlo.Hodge@ttb.gov>

**Subject:** [EXTERNAL]Grievance filed on behalf of NTEU and all Bargaining Unit employees impacted by the TTB elimination of telework and remote work options.

**CAUTION:** This email has originated from an external entity. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

Ms. Johnson, and Mr. Trivers,

NTEU hereby formally submits the attached grievance(s) on behalf of all affected employees, and NTEU. If you are not the appropriate point of contact to address this matter, kindly forward the grievance to the designated TTB official and ensure a copy is cc'd to this email address.

Also, NTEU would like this filing to be processed as one grievance for efficiency. If you disagree, the filing can instead be treated as two separate grievances, with the ULP (Unfair Labor Practice) issues processed independently. Let me know if you agree.

Sincerely,

William Igoe
Assistant Counsel
National Treasury Employees Union
33 North LaSalle Street, Suite 1700
Chicago, IL 60602
(312) 451-1075 (Telephone)
(312) 977-0693 (Facsimile)
https://www.nteu.org/join





EXHIBIT 11

**From:** Gretchen Paulig <gretchen.paulig@NTEU.ORG>
**Sent:** Thursday, April 10, 2025 4:59 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>; Julie Lenggenhager <julie.lenggenhager@NTEU.ORG>
**Subject:** FW: [EXT] RE: Rescheduled Arbitration - V. Robinson

**From:** Elizabeth Reyes <elizabeth.reyes@NTEU.ORG>
**Sent:** Thursday, April 10, 2025 3:52 PM
**To:** Gretchen Paulig <gretchen.paulig@NTEU.ORG>
**Subject:** FW: [EXT] RE: Rescheduled Arbitration - V. Robinson

**From:** Bugaj Jennifer E <Jennifer.E.Bugaj@IRSCOUNSEL.TREAS.GOV>
**Sent:** Thursday, April 10, 2025 3:28 PM
**To:** Elizabeth Reyes <elizabeth.reyes@NTEU.ORG>
**Subject:** RE: [EXT] RE: Rescheduled Arbitration - V. Robinson

> **Caution:** This message originated from outside of the organization. Do Not Click links or
> Open attachments unless you recognize the sender and know the content is safe.

Hi Elizabeth,

We are currently awaiting further guidance on the Executive Order relating to the CBA. For this reason, I cannot make arrangements regarding this hearing at this time, nor commit to travel plans or location for this hearing until Department of the Treasury provides final guidance on the collective bargaining

agreement.  I will get back to you once there is an update on that; hopefully there will be a resolution soon.

Thank you,

**Jennifer E. Bugaj**
Senior Counsel (GLS)
Office of Chief Counsel (IRS) – Chicago
Ph: 312.292.2281

EXHIBIT 12

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Tuesday, April 1, 2025 7:12 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Peyton Diotalevi <peyton.diotalevi@nteu.org>
**Subject:** Re: Change in Decision: LRD and LRG not approved

████████████████████████████

LRT = Term Negotiations, including preparation
LRM = Mid-Term Negotiations, including preparation

LRG = General Labor-Management Relations (all contract, administration and representational activities except negotiations, grievances, appeals and complaints)
LRD = Dispute Resolution, Grievances, Appeals, and Complaints, including preparing and presenting

    b.  the requested date

    c.  the requested start time

    d.  the requested end date

    e.  the requested end time

    f.  the total number of official time hours requested

    g.  remarks, including a general description of the activity for which official time will be used.

Sent from my iPhone

On Apr 1, 2025, at 6:53 PM, Dan Kaspar <dan.kaspar@nteu.org> wrote:

███████████████████████████████████

Daniel J. Kaspar (he/him)
Director of Field Operations & Organizing
National Treasury Employees Union
800 K Street, NW - Suite 1000
Washington, D.C. 20001
(202) 572-5500, ext. 6346

---

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Tuesday, April 1, 2025 5:16 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>; Peyton Diotalevi <peyton.diotalevi@nteu.org>
**Subject:** Fwd: Change in Decision: LRD and LRG not approved

██

███████████████

Begin forwarded message:

> **From:** "Davidson, Zoe M" <zdavidson@blm.gov>
> **Date:** April 1, 2025 at 4:47:24 PM EDT
> **To:** Kate Sylvester <kate.sylvester@nteu.org>, "Paulete, Francisca (Panchita )" <fpaulete@blm.gov>
> **Subject: FW: Change in Decision: LRD and LRG not approved**
>
> **Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.
>
> FYI
>
> ---
>
> **From:** McIntosh, Stacie J <s05mcint@blm.gov>
> **Sent:** Tuesday, April 1, 2025 4:40 PM
> **To:** Davidson, Zoe M <zdavidson@blm.gov>
> **Subject:** Change in Decision: LRD and LRG not approved
>
> Hi Zoe,
>
> On March 27, 2025 EO "Exclusions from Federal Labor-Management Relations Program " was issued by President Trump . As a result of this order , I am unable to approve LRG (1598957) for March 27-31 and April 1-4, 2025 and LRD (1598960) for April 4, 2025, as requested. This email constitutes my change in decision to disapproved for the use of LRG and LRD on the dates indicated.
>
> Stacie

Deputy Assistant Director

Resources and Planning Directorate

Bureau of Land Management

(907) 378-3815 c

EXHIBIT 13

**From:** Doug Sanders <doug.sanders@NTEU.ORG>
**Sent:** Wednesday, April 9, 2025 1:30 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Kathryn Huth <kathryn.huth@NTEU.ORG>
**Subject:** FW: NTEU 254: Request for briefing on proposed offices moves for Article 6, Section 5(B) Notice at CDER-St. Louis (week of 3/31/2025)


**Douglas L. Sanders**
**Assistant Counsel and National Field Representative**
National Treasury Employees Union, Denver Field Office
1355 S. Colorado Blvd., Ste. C-210
Denver, CO 80222
303/295-6301 x6413


This email message and any attachments is intended only for the named recipient(s).  It may contain information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law and may not be forwarded, disclosed or otherwise utilized without the express permission of the sender.  If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, do not review the contents, please notify the sender and then delete the message.


**From:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 11:19 AM
**To:** Doug Sanders <doug.sanders@NTEU.ORG>

**Subject:** FW: NTEU 254: Request for briefing on proposed offices moves for Article 6, Section 5(B) Notice at CDER-St. Louis (week of 3/31/2025)

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**Stephanie Rogers**

*Chapter President NTEU 254*

**U.S. Food and Drug Administration**
T: 303-236-9638
Stephanie.Rogers@fda.hhs.gov



---

**From:** Cabrera, Naomi <Naomi.Cabrera@fda.hhs.gov>
**Sent:** Monday, March 31, 2025 9:34 AM
**To:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Cc:** Rodriguez, Jason <Jason.Rodriguez@fda.hhs.gov>; Rivas, Elaine M <Elaine.Rivas@fda.hhs.gov>; Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>; Stubbs, Latrecia <Latrecia.Stubbs@fda.hhs.gov>
**Subject:** RE: NTEU 254: Request for briefing on proposed offices moves for Article 6, Section 5(B) Notice at CDER-St. Louis (week of 3/31/2025)

Good morning,

Please see correction (highlighted) to the guidance below:
On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).
Until further notice, the FDA is postponing any scheduled labor relation meetings currently.

Very Respectfully,

**Naomi Cabrera,**
Labor Relations Specialist
Division of Employee and Labor Relations (DELR)
Office of Human Capital Management (OHCM)
Office of Operations (OO)
Office of the Commissioner (OC)
U.S. Food and Drug Administration (FDA)
email: naomi.cabrera@fda.hhs.gov

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed, and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this e-mail or the information herein by anyone other than the intended recipient is prohibited. If you have received this e-mail in error, please notify the sender by reply e-mail, phone, or fax, and destroy the original message and all copies.

**From:** Cabrera, Naomi
**Sent:** Monday, March 31, 2025 9:02 AM
**To:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Cc:** Rodriguez, Jason <Jason.Rodriguez@fda.hhs.gov>; Rivas, Elaine M <Elaine.Rivas@fda.hhs.gov>; Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>; Stubbs, Latrecia <Latrecia.Stubbs@fda.hhs.gov>
**Subject:** RE: NTEU 254: Request for briefing on proposed offices moves for Article 6, Section 5(B) Notice at CDER-St. Louis (week of 3/31/2025)

Good morning,

On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).

Until further notice, the FDA is ending labor relation meetings with the exclusive representatives of (NTEU/AFGE) in adherence to the above referenced presidential Executive Order.

Very Respectfully,

**Naomi Cabrera,**
Labor Relations Specialist
Division of Employee and Labor Relations (DELR)
Office of Human Capital Management (OHCM)
Office of Operations (OO)
Office of the Commissioner (OC)
U.S. Food and Drug Administration (FDA)
email: naomi.cabrera@fda.hhs.gov

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed, and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this e-mail or the information herein by anyone other than the intended recipient is prohibited. If you have received this e-mail in error, please notify the sender by reply e-mail, phone, or fax, and destroy the original message and all copies.

EXHIBIT 14

**From:** Doug Sanders <doug.sanders@NTEU.ORG>
**Sent:** Thursday, April 10, 2025 4:45 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Kathryn Huth <kathryn.huth@NTEU.ORG>
**Subject:** FW: NTEU 254: BUE denied union representation during meeting with supervisor.

**Douglas L. Sanders**
**Assistant Counsel and National Field Representative**
National Treasury Employees Union, Denver Field Office
1355 S. Colorado Blvd., Ste. C-210
Denver, CO 80222
303/295-6301 x6413

This email message and any attachments is intended only for the named recipient(s). It may contain information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law and may not be forwarded, disclosed or otherwise utilized without the express permission of the sender. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, do not review the contents, please notify the sender and then delete the message.

**From:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>
**Sent:** Thursday, April 10, 2025 9:22 AM
**To:** Doug Sanders <doug.sanders@NTEU.ORG>
**Subject:** FW: NTEU 254: BUE denied union representation during meeting with supervisor.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.



**Stephanie Rogers**
*Chapter President NTEU 254*

**U.S. Food and Drug Administration**
T: 303-236-9638
Stephanie.Rogers@fda.hhs.gov



---

**From:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Sent:** Thursday, April 10, 2025 9:21 AM
**To:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>; Stubbs, Latrecia <Latrecia.Stubbs@fda.hhs.gov>
**Subject:** NTEU 254: BUE denied union representation during meeting with supervisor.

Good morning Stephanie and Latrecia,

The BUE requested Union representation during a 1 to 1 meeting with the supervisor, and the supervisor agreed. Later, the supervisor rescinded because of guidance on revocation of EO 14119 and *"cease the use of pre-decisional involvement of labor unions and employees in agency matters"*. Though CBA Article 5, section 4 retains the right of the supervisor to meet an employee without Union representation, I am concerned that this guidance may lead to the denial of union representation during Article 7 meetings.

Respectfully,
Anjanette Smith
NTEU Chapter 254 Representative
Food and Drug Administration
St. Louis, MO
Phone: 314-539-3858
Anjanette.Smith@fda.hhs.gov

---

**From:** ████████████████████@fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 4:01 PM
**To:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Subject:** FW: meetings and NTEU

Hi Anjanette,

███████████████████████████████████████

Thank you,



---

**From:** Hines, Michelle J <Michelle.Hines@fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 3:42 PM
**To:** ███████████████████████@fda.hhs.gov>
**Subject:** RE: meetings and NTEU

Good afternoon ████,

After further consideration, I am rescinding my approval of your request to have NTEU present during out meeting tomorrow and any future 1:1s/team meetings. It is not my current practice to have anyone from the union present during our 1:1s or my team meetings.

Thank you in advance,

Michelle J. Hines, Branch Chief
OBMI/DBMI3/BMIB3

EXHIBIT 15

**From:** Doug Sanders <doug.sanders@NTEU.ORG>
**Sent:** Thursday, April 10, 2025 4:45 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Kathryn Huth <kathryn.huth@NTEU.ORG>
**Subject:** FW: NTEU 254: BUE denied union representation during meeting with supervisor.

**Douglas L. Sanders**
**Assistant Counsel and National Field Representative**
National Treasury Employees Union, Denver Field Office
1355 S. Colorado Blvd., Ste. C-210
Denver, CO 80222
303/295-6301 x6413

This email message and any attachments is intended only for the named recipient(s). It may contain information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law and may not be forwarded, disclosed or otherwise utilized without the express permission of the sender. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, do not review the contents, please notify the sender and then delete the message.

**From:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>
**Sent:** Thursday, April 10, 2025 9:22 AM
**To:** Doug Sanders <doug.sanders@NTEU.ORG>
**Subject:** FW: NTEU 254: BUE denied union representation during meeting with supervisor.

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.



**Stephanie Rogers**
*Chapter President NTEU 254*

**U.S. Food and Drug Administration**
T: 303-236-9638
Stephanie.Rogers@fda.hhs.gov



---

**From:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Sent:** Thursday, April 10, 2025 9:21 AM
**To:** Rogers, Stephanie <Stephanie.Rogers@fda.hhs.gov>; Stubbs, Latrecia <Latrecia.Stubbs@fda.hhs.gov>
**Subject:** NTEU 254: BUE denied union representation during meeting with supervisor.

Good morning Stephanie and Latrecia,

The BUE requested Union representation during a 1 to 1 meeting with the supervisor, and the supervisor agreed. Later, the supervisor rescinded because of guidance on revocation of EO 14119 and *"cease the use of pre-decisional involvement of labor unions and employees in agency matters"*. Though CBA Article 5, section 4 retains the right of the supervisor to meet an employee without Union representation, I am concerned that this guidance may lead to the denial of union representation during Article 7 meetings.

Respectfully,
Anjanette Smith
NTEU Chapter 254 Representative
Food and Drug Administration
St. Louis, MO
Phone: 314-539-3858
Anjanette.Smith@fda.hhs.gov

---

**From:** ████████████████████@fda.hhs.gov>
**Sent:** Wednesday, April 9, 2025 4:01 PM
**To:** Smith, Anjanette P <Anjanette.Smith@fda.hhs.gov>
**Subject:** FW: meetings and NTEU

Hi Anjanette,

███████████████████████████████████████

Thank you,

█

---

**From:** Hines, Michelle J <<u>Michelle.Hines@fda.hhs.gov</u>>
**Sent:** Wednesday, April 9, 2025 3:42 PM
**To:** ████████████████████<u>@fda.hhs.gov</u>>
**Subject:** RE: meetings and NTEU

Good afternoon ██,

After further consideration, I am rescinding my approval of your request to have NTEU present during out meeting tomorrow and any future 1:1s/team meetings. It is not my current practice to have anyone from the union present during our 1:1s or my team meetings.

Thank you in advance,

**Michelle J. Hines, Branch Chief**
**OBMI/DBMI3/BMIB3**

EXHIBIT 16

**From:** Kate Sylvester <kate.sylvester@NTEU.ORG>
**Sent:** Thursday, April 3, 2025 5:05 PM
**To:** Dan Kaspar <dan.kaspar@NTEU.ORG>
**Cc:** Peyton Diotalevi <peyton.diotalevi@nteu.org>
**Subject:** Fw: [EXTERNAL] Re: BLM and NTEU: CBA Repudiation Grievance



**From:** hoya68@gmail.com <hoya68@gmail.com>
**Sent:** Thursday, April 3, 2025 3:20 PM
**To:** 'Nolet, Joshua M' <joshua.nolet@sol.doi.gov>; Kate Sylvester <kate.sylvester@NTEU.ORG>; arbitrator@alpern.us <arbitrator@alpern.us>
**Cc:** 'BLM_Labor_Relations_Support' <BLM_Labor_Relations_Support@blm.gov>
**Subject:** RE: [EXTERNAL] Re: BLM and NTEU: CBA Repudiation Grievance

**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.

Counsel:

I begin with the premise that I have some authority over this dispute. The authority derives from my appointment by the Federal Mediation and Conciliation ("FMCS").

Absent a withdrawal of that appointment by the FMCS, I am obligated to proceed. In the first instance, I must resolve whether I have jurisdiction over the dispute, recognizing that my determination is subject to review by the Federal Labor Relations Authority ("FLRA") and that its determination is not subject to judicial review unless this matter involves an unfair labor practice or if it involves a constitutional issue. See, *AFGE, HUD LOCALS COUNCIL 222, v. FLRA, et al.* (DC Cir No 22-5308 April 23, 2024).

Several issues are raised by the Agency challenging my jurisdiction. The Agency claims that the collective bargaining agreement was rejected by the designee of the Agency head with respect to several of its provisions. Presumably because of that rejection, the collective bargaining agreement never went into effect. In turn, the Union might argue that the rejection was of no effect because the agreement was previously reviewed and approved by the Acting Deputy Secretary of the Department of the Interior. These are issues which I have jurisdiction to resolve, as they are necessary to resolving whether the parties have a valid collective bargaining agreement.

However, the Agency raises the contention that an Executive Order 14251 (90 FR 14553, March 27, 2025), the President excluded the Agency from the provisions of Chapter 7 of title 5, United States Code. This exclusion would mean that the Agency has no authority to enter into a collective bargaining agreement. I would thus have no jurisdiction to resolve disputes between the parties. Whether the exclusion is constitutionally valid is beyond my competence and presumably the FLRA. Instead, this is a matter for resolution by the federal courts. I will stay further proceedings for sixty days. If the Union challenges the Executive Order insofar as it applies to the Agency, the stay shall remain in effect pending final judicial resolution. If the Union does not file a judicial action within that time frame, I will dismiss this action.

I request that the parties inform me of future developments.


Stephen E. Alpern
Arbitrator

www.alpern.us

EXHIBIT 17

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

_____

**NATIONAL TREASURY EMPLOYEES UNION**
**(Union)**

**and**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**WASHINGTON, D.C.**
**(Agency)**

**0-NG-3731**

_____

**ORDER TO SHOW CAUSE**

**April 4, 2025**

_____

On March 27, 2025, President Donald J. Trump amended Executive Order 12,171 (1979), pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), to exclude certain agencies and agency subdivisions from the coverage of the Federal Service Labor-Management Relations Statute (the Statute).[1]  Accordingly, the Authority directs the Union to show cause why the Authority should not dismiss this matter for lack of jurisdiction.[2]  As described further below, the Agency may reply to the Union's response to this order.

The Union must file its response to this order with the Authority by **April 18, 2025**.  The Union's response must also include a statement of service that complies with the Authority's Regulations showing that the Union served its response on all counsel of record or other designated representatives.[3]

The Union should direct its response to Erica Balkum, Chief, Office of Case Intake and Publication, Federal Labor Relations Authority, 1400 K Street NW, Suite 300, Washington, D.C. 20424-0001.  The proper methods for filing documents with the Authority are set forth at § 2429.24(e) of the Authority's Regulations.[4]  As outlined in the

---

[1] Exclusions from Federal Labor-Management Relations Programs, Exec. Order No. 14251 (Mar. 27, 2025), 90 Fed. Reg. 14553 (Apr. 3, 2025).
[2] _See generally U.S. Att'y's Off., S. Dist. of Tex., Hous., Tex._, 57 FLRA 750 (2002) (where President amended Executive Order 12,171 to exclude additional entity from Statute's coverage, Authority ordered affected parties to brief whether Authority lacked jurisdiction over their cases).
[3] 5 C.F.R. § 2429.27(a), (c).
[4] _Id._ § 2429.24(e).

Authority's Regulations, the Union's response to the Authority must be filed by personal delivery, commercial delivery, first-class mail, or certified mail.[5]

The Union's failure to comply with this order by **April 18, 2025**, may result in dismissal of the Union's filing in this case.

If the Agency chooses to file a reply to the Union's response, then the reply must be filed with the Authority within *fourteen days* after service of the Union's response. The Agency's reply must also be filed in accordance with the Authority's Regulations, including the requirement to file a statement of service showing that the Agency served its reply on all counsel of record or other designated representatives.[6]

Requests for extensions of time must be in writing and received by the Authority not later than five days before the established time limit for filing.[7]  The request must state the position of the other party and must be served on the other party.[8]

Because the Authority's jurisdiction over this matter is in question, ***the deadlines for any remaining filings in this case – except for responses or replies to this order – are temporarily suspended***.  Except for responses or replies to this order, you are not required to submit any further filings in this case until the Authority notifies you otherwise.

Procedural questions regarding this case should be directed to the Office of Case Intake and Publication at (771) 444-5805.

For the Authority:

Erica Balkum, Chief
Office of Case Intake and Publication

---

[5] *Id.*; *see also id.* § 2429.24(a) ("To file documents by personal delivery, *you must schedule an appointment at least one business day in advance* by calling [(771) 444-5805]." (emphasis added)).
[6] *Id.* §§ 2429.24(e); 2429.27(a), (c).
[7] *Id.* § 2429.23(a).
[8] *Id.*

2

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

_____

**NATIONAL TREASURY EMPLOYEES UNION**
**(Union)**

**and**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**WASHINGTON, D.C.**
**(Agency)**

**0-NG-3731**

_____

**STATEMENT OF SERVICE**

_____

I hereby certify that copies of the Order of the Federal Labor Relations Authority in the subject proceeding have this day been served by the following methods:

EMAIL

Allison Giles
Assistant Counsel
NTEU
800 K Street, N.W., Suite 1000
Washington, DC 20001
Allie.Giles@nteu.org

Christina Ballance
Agency Head Review Officer
Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201
Christina.Ballance@hhs.gov

Garrett Anderson
Attorney Advisor
1961 Stout St.
Denver, CO 80205
garrett.anderson@hhs.gov

Robert F. Kennedy, Jr.
Secretary, HHS
200 Independence Ave., SW
Washington, DC 20201
Christina.Ballance@hhs.gov

Dated:_____        _____ for
      WASHINGTON, D.C.        Belinda Stevenson
                                            Legal Assistant

2

JA157

EXHIBIT 18



UNITED STATES OF AMERICA
**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON REGIONAL OFFICE**
1400 K Street, NW, Third Floor
Washington, DC 20424-0001
(771) 444-5780   FAX: (202) 482-6724

April 3, 2025

**VIA EMAIL**

Kate Sylvester
Assistant Counsel
National Treasury Employees Union
800 K St NW, Suite 1000
Washington, DC 20001
Kate.sylvester@nteu.org

Joshua Nolet
Attorney-Advisor, Office of the Solicitor
United States Department of the Interior
1849 C Street, NW
Washington DC 2024
Joshua.Nolet@sol.doi.gov

Re:  Bureau of Land Management and
National Treasury Employees Union;
Case No: WA-CA-24-0563

Dear Parties:

This Office docketed the above-captioned unfair labor practice (ULP) charge on September 26, 2024. The Agent assigned to investigate this charge is Sarah Kurfis, who can be reached at 771-444-5787 or skurfis@flra.gov

On March 27, 2025, President Trump issued an Executive Order titled *Exclusions from Federal Labor-Management Relations Programs*, which amended Executive Order 12171, dated November 19, 1979 (as amended), and excluded a number of Federal agencies from collective bargaining pursuant to Section 7103(b)(1) of the Federal Service Labor-Management Relations Statute.

Because the Executive Order impacts the processing of this ULP charge, processing of this charge will be deferred so as to afford the Office of the General Counsel time to reevaluate the case in view of the Executive Order and in view of cases pending before the Authority.

Sincerely,

Jessica S. Bartlett
Regional Director

1          UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2

3  NATIONAL TREASURY EMPLOYEES   )
   UNION,                        )
4                                )
            Plaintiff,           )
5                                ) CASE NO. 1:25-cv-00935-PLF
       vs.                       )
6                                )
   DONALD J. TRUMP, et al.,      )
7                                )
            Defendants.          )
8  _____  )

9

      TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION HEARING
10     **BEFORE THE HONORABLE PAUL L. FRIEDMAN, DISTRICT JUDGE**
             Wednesday - April 23, 2025
11             10:03 a.m. - 11:35 a.m.
                  Washington, DC
12

13 **FOR THE PLAINTIFF:**
       National Treasury Employees Union
14     BY:  PARAS N. SHAH, LINDSAY DUNN and ALLISON GILES
       800 K Street, NW, Suite 1000
15     Washington, DC 20001
       (202) 572-5500
16

17 **FOR THE DEFENDANTS:**
       DOJ - Civil Division
18     BY:  EMILY MARGARET HALL and LYDIA JANE JINES
       950 Pennsylvania Avenue, NW
19     Washington, DC 20530
       (202) 307-6482
20

21

22 _____
                    **SONJA L. REEVES**
                 **Registered Diplomate Reporter**
23                **Certified Realtime Reporter**
                 **Federal Official Court Reporter**
24               333 Constitution Avenue, NW
                    Washington, DC 20001
25       Transcript Produced from the Stenographic Record

1    (Call to Order of the Court at 10:03 a.m.)

2    DEPUTY CLERK:  This is Civil Action 25-935, *National*

3  *Treasury Employees Union versus Donald J. Trump, et al.*

4    Counsel, please step to the podium and state your

5  appearances for the record.

6    MR. SHAH:  Good morning, Your Honor.  Paras Shah with

7  National Treasury Employees Union.

8    MS. JILES:  Allison Jiles for National Treasury

9  Employees Union.

10    MS. DUNN:  Lindsay Dunn for plaintiff.

11    MS. HALL:  Emily Hall, Department of Justice

12  representing all defendants.

13    THE COURT:  Good morning to all of you.  So we're here

14  on plaintiff's motion for preliminary injunction.  I have read

15  all of the papers pretty carefully.  I have also carefully read

16  the statute, executive order, the OPM guidance, the fact sheet,

17  and the cases that the parties have cited.  So I think I

18  understand what the case is all about.

19    This is a motion for preliminary injunction.  And so

20  plaintiff will go first.  And in response to my questions,

21  there is a joint status report.

22    Each side will have roughly 30 minutes, 10 minutes for

23  rebuttal.  I'm not going to hold you strictly to your times.  I

24  think those are good guidelines, but I'm going to have some

25  questions.  I want both sides to have a fair opportunity.  This

1   is not the Court of Appeals, it's not the Supreme Court.

2   Before your time clerking, but in the old days, in the Supreme

3   Court arguments, Chief Justice Rehnquist would cut you off

4   mid-sentence.  I think the current chief wishes he adopted that

5   policy from time to time, but that's not the way it goes, as

6   Ms. Hall knows.  Let's begin.

7           MR. SHAH:  Thank you, Your Honor, and may it please

8   the Court.  There are three areas I would like to cover today.

9   First, the urgent need for preliminary relief.  Second, the

10  ways in which the Executive Order contravenes the Federal

11  Sector Labor Statute.  And third, the First Amendment

12  retaliation that the Executive Order reflects.

13          First, the Executive Order targets federal sector

14  unions --

15          THE COURT:  Could you bring the microphone a little

16  closer to you?

17          MR. SHAH:  First, the Executive Order targets federal

18  sector unions, and it aims to kill them, and it will, absent

19  preliminary relief.

20          The Executive Order uses a narrow national security

21  exemption to exclude nearly a dozen agencies where NTEU

22  represents employees from the labor statute, agencies like the

23  IRS and the EPA.

24          The Executive Order has cut off over half our revenue

25  stream, threatening our very existence.  We have already lost

1   over $2 million to date because the agency defendants here have

2   stopped processing dues payment to NTEU through payroll

3   deductions, as our statute and our collective bargaining

4   agreements require.  The Executive Order drastically reduces

5   NTEU's bargaining power.  It removes two-thirds of the workers

6   that we represent from the statute's coverage.

7           As OPM's March 27th guidance directs, the nearly one

8   dozen agency defendants here have stopped honoring our

9   collective bargaining agreements.  They won't bargain with us.

10  They won't meet with us.  We're losing chances to advocate for

11  our workers at a time when they are under unprecedented attack,

12  including as agencies prepare for large scale reductions in

13  force.

14          Without preliminary relief, even if we prevail in the

15  end, we'll be wounded in a way from which we cannot recover.

16  And the final blow for NTEU might be just around the corner.

17  The Executive Order at section seven directs agency heads to

18  recommend additional national security exemptions from our

19  labor statute.  Those recommendations are due in three days.

20  If the government gets the unchecked executive power that it

21  asks this Court for, those additional exemptions are sure to

22  come.

23          THE COURT:  Let me take a look for a second so I'm

24  clear on what you're talking about, because I have been

25  focusing mostly on other sections of the Executive Order, but

1  section seven is -- additional review is what you're talking

2  about, and it says, "Within 30 days of the date of this offer,

3  the head of each agency with employees covered by Chapter 71 of

4  Title 5 United States Code shall submit a report to the

5  president that identifies additional subdivisions not covered

6  by Executive Order 12171 as amended, and it goes on.

7      And since the Executive Order was issued on March 27th

8  and today is April 23rd -- how many days in March?  So in any

9  event, you're saying three days from now this really may kick

10  in, will kick in, and affect other agencies and other employees

11  as well?

12      MR. SHAH:  That's correct, Your Honor.  This sweeping

13  Executive Order that we're talking about today may be just the

14  first step.

15      Second, Your Honor, turning to our statutory claims.

16  We have shown that the President's unprecedented use of the

17  national security exemption exceeds his authority under Section

18  7103(b)(1) of the statute.  That provision allows the President

19  to exclude an agency or agency component from the labor statute

20  if it has a primary function of intelligence,

21  counterintelligence, investigative, or national security work,

22  and if the statute cannot be applied to it in a manner

23  consistent with national security requirements and

24  considerations.

25      Before this Executive Order, no President had ever

     1    tried to use the national security exemption in such a sweeping

     2    way, nor had any presidential administration ever stated in

     3    writing that its national security exemptions were motivated --

     4              THE COURT:  Slow down.

     5              MR. SHAH:  -- were motivated by things that had

     6    nothing to do with national security.  The White House fact

     7    sheet and OPM guidance on the Executive Order showed that the

     8    exemptions at issue are not based on Congress's statutory

     9    criteria.

    10              Those documents made clear that the Executive Order's

    11    objectives are twofold:  First, to make federal employees

    12    easier to fire, and, second, to exact political retribution

    13    against unions that have stood up to the President's agenda.

    14              These improper motives inform the President's sweeping

    15    exemptions, which targeted the two largest federal sector

    16    unions, among others.

    17              THE COURT:  You say your client represents two-thirds

    18    of federal employees?

    19              MR. SHAH:  Your Honor, NTEU is the second largest

    20    federal sector union.  We represent approximately 160,000

    21    federal workers.  This Executive Order takes away over 100,000

    22    of those workers, roughly two-thirds.

    23              THE COURT:  The largest union is the VA union?

    24              MR. SHAH:  Correct.  The largest federal sector union

    25    is the American Federation of Government Employees, which

1  represents the VA, among others, yeah.

2       This Court shouldn't sanction national security

3  exemptions that are driven by improper considerations; nor

4  should this Court sanction national security exemptions where

5  the government has failed to argue that the statutory criteria

6  are met.

7       As we discussed in our reply, the government's brief

8  doesn't even attempt to apply the statutory criteria to five of

9  the Department of Treasury components at issue, those listed at

10 page 11 of our reply.  It mistakenly argues that the Executive

11 Order exempts all of the Department of Treasury and that,

12 therefore, an application of the statutory criteria should be

13 targeted to Treasury as a whole.

14      But the Executive Order exempts only components of

15 Treasury, not all of it.  The Bureau of Engraving and Printing

16 remains within the statute's coverage.  So for the five

17 Treasury components listed on page 11 of our reply, the

18 government has failed to offer any statutory defense at all.

19      THE COURT:  Let me see if I understand what you're

20 saying.  The Executive Order exempts certain components of

21 Treasury?

22      MR. SHAH:  That's correct, Your Honor.

23      THE COURT:  Are you saying that the fact sheet or the

24 OPM guidance or the government's brief is broader than the

25 Executive Order with respect to the Treasury Department?

1          MR. SHAH:  Looking at the Executive Order, what the

2     Executive Order says is the President exempts all of the

3     Department of Treasury, except for the Bureau of Engraving and

4     Printing.  In other words, it doesn't exclude the entirety of

5     the Department of Treasury, it's including parts of it.

6          And so our position is for each of the components of

7     Treasury that are exempted, whether it's the IRS, whether it's

8     the OCC, there are several, for each of those, this Court

9     should look to the primary function of each of those components

10    as opposed to the primary function of the department as a

11    whole.

12         And turning to that statutory criteria --

13         THE COURT:  Where is the -- is the term "primary

14    function" defined anywhere?

15         MR. SHAH:  Your Honor, it's not defined in the

16    statute.  So we have used, Your Honor, just the ordinary

17    dictionary definition of "primary."

18         And that's in contrast to the government, which in

19    applying the statutory criteria largely ignores the word

20    "primary" and argues that any work that any agency has ever

21    done that has a connection to, for example, our economy, is

22    national security work.

23         So if you look at the IRS, for example, the government

24    relies on the fact that it raised revenue for the Civil War to

25    justify the President's national security exemption of the

1  agency over 150 years later.

2      That elastic definition of national security work is

3  plainly at odds with the Supreme Court's decision in *Cole v.*

4  *Young*.  There, the Supreme Court limited the definition of

5  "national security" to activities directly concerning the

6  protection of the nation against internal subversion and

7  foreign aggression.

8      The Court chose to exclude activities that simply

9  strengthen the nation through their effect on the general

10  welfare.

11      THE COURT:  *Cole v. Young*, seems to me, is really a

12  centerpiece of the analysis, because in that case, the Court

13  seemed to draw a distinction, and did draw a distinction,

14  between activities that directly concern the protection of the

15  nation from internal subversion or foreign aggression, were the

16  words used in the opinion, as opposed to activities, which,

17  quote, "contribute to the strength of the nation only through

18  their impact on the general welfare."

19      And so I take it that what you're saying, I know what

20  you're saying is that so many of the agencies that are swept

21  into this Executive Order, as explained further by the OPM

22  guidance and fact sheet, fall into the second category under

23  *Cole* and not the first.

24      MR. SHAH:  That's absolutely correct, Your Honor.  And

25  what's important too from *Cole v. Young* is the reason the

 1   Supreme Court adopted the narrow definition that it did.  It

 2   was looking at -- it was in the context of worker protections.

 3   It was in the context of when you can suspend and remove

 4   employees.  And it didn't want a broad definition of national

 5   security to be used to swallow the entire purpose of that

 6   statutory construct.

 7          And that same rationale applies here.  If the

 8   government gets either the unreviewability that it wants or the

 9   expansive interpretation of national security work that it

10   wants, it will be used to destroy the entirety of the labor

11   statute.

12          THE COURT:  Is there anything from the Supreme Court

13   since *Cole versus Young* or any of the circuits that have

14   discussed *Cole versus Young* as relevant to what we're talking

15   about today?

16          MR. SHAH:  I don't believe so, Your Honor.  And

17   indeed, the case law, just as it relates to 7103(b)(1), it is

18   very limited.  And just because we are looking at such a

19   sweeping, unprecedented situation, those cases are largely

20   uninstructive and non-bind this Court in terms of any

21   definition of national security work.

22          Critically, showing a primary function of national

23   security work is just half the showing the government has to

24   make here.  It also has to show that the statute cannot be

25   applied to these agencies consistent with national security

1    considerations.

2          And the government has no real answer to the fact that

3    several of these agencies have been covered by the statute

4    since the statute was enacted in 1978.  That past treatment

5    under Supreme Court precedent should inform the Court's

6    statutory analysis.

7          The government hasn't pointed to any basis for

8    treating these agencies differently today, and their arguments

9    here are really just general policy arguments against the

10   existence of federal sector unions, policy views that the

11   government's brief admits are longstanding.

12         Those policy arguments have no relevancy here.

13   Instead, it's Congress's policy views that are codified in the

14   initial section of the statute that should guide the Court's

15   statutory interpretation.

16         Our second statutory claim challenges the Executive

17   Order's national security exemptions collectively as exceeding

18   the President's statutory authority.

19         Congress presumably understood when it passed the

20   statute that all federal agencies help strengthen the nation in

21   some way, but Congress still chose to codify collective

22   bargaining in the federal sector and to provide for only narrow

23   exemptions from the statutes's coverage, and it took this

24   approach for two basic reasons.

25         First, it wanted to promote collective bargaining in

the federal sector.  And second, it wanted to stabilize federal

sector labor relations, which had previously been governed by

Executive Order.

Congress wanted to create a system that couldn't be

altered in a material way by the President, but here, the

Executive Order exemptions collectively conflict with each of

those congressional objectives by undoing the bulk of the

statute's coverage.

Third, we have shown that the Executive Order

retaliates against NTEU for its legal challenges to the

President's initiatives.  The government mostly argues that

there isn't a causal connection between NTEU's protected

activity and the Executive Order, but the administration's own

words and actions show that causal connection.

Those words and actions include its fact sheet on the

Executive Order and its litigation against NTEU.  The White

House fact sheet provides direct evidence of retaliation

through its indication that the Executive Order is the result

of, quote, "certain federal unions declaring war on President

Trump's agenda."

NTEU has filed lawsuits challenging a number of this

administration's policy objectives, from its mass firings of

employees to its attempts to dismantle the CFPB, and

underscoring the connection between NTEU's speech and the

Executive Order is the government's unusual, preemptive lawsuit

against a local NTEU chapter in the Eastern District of
Kentucky.

THE COURT:  Is that in your brief or is that in the
record somewhere?

MR. SHAH:  It's in our brief, both our opening brief
and our reply.

The government's lawsuit against NTEU in Kentucky has
a single target.  It seeks to void NTEU's national collective
bargaining agreement with the IRS.  That's NTEU's largest group
of employees, its largest group of dues paying members.  In
other words, the administration picked the target that would
hurt NTEU the most.

There is other plausible explanation for the lawsuit's
scope.  It makes no mention at all of the other 11 NTEU
collective bargaining agreements that are affected by the
order.  And the complaint's language leaves no doubt that
political retribution is the driver.  It mimics the fact
sheet's language referring to NTEU as a, quote, "hostile
union," end quote, and alleges that NTEU plans to obstruct the
President's policy initiative of drastically reducing the
workforce.

That lawsuit is consistent with the fact sheet's
indication that hostile unions like NTEU will be hurt, while
unions that collaborate with the White House won't be.  And the
Executive Order backs up that statement with who it keeps

1     within the statute's coverage and who it excludes.  This Court

2     shouldn't sanction that type of unconstitutional executive

3     action.

4           THE COURT:  What's the status of the case in Kentucky?

5           MR. SHAH:  There is a hearing scheduled for Friday,

6     Your Honor.  Right after the government filed its complaint,

7     the judge there scheduled oral argument on the government's

8     request for a declaratory judgment.  The hearing was set before

9     we were served, before any piece of paper was filed in that

10    case.

11          THE COURT:  That sometimes happens, I guess.  So the

12    hearing is on a motion, the government motion for declaratory

13    judgment?

14          MR. SHAH:  There wasn't a motion per se, Your Honor.

15    The hearing was scheduled right after the complaint was filed

16    by the government.  And the order states that the judge will

17    hear oral argument on the government's request for declaratory

18    relief.

19          Since the scheduling of the order, I should add, Your

20    Honor, there have been different papers filed.  The government

21    filed a motion for summary judgment last Friday, and the NTEU

22    chapter filed a motion to dismiss the case earlier this week.

23          THE COURT:  All right.  We'll see what happens there.

24          Okay.  Thank you.  I'll hear from you in rebuttal too,

25    because I'm sure you will have some other things you want to

1  say.

2          MR. SHAH:  Thank you, Your Honor.

3          MS. HALL:  Good morning, Your Honor.

4          I would like to start just by addressing a few points

5  of clarification from plaintiff's presentation.  First, the

6  hearing on Friday in Kentucky is on the complaint, not

7  necessarily on the request for declaratory relief.  We're not

8  certain what the hearing will be about, but, in any event, it's

9  our position that separate litigation in Kentucky is irrelevant

10 to the request for a preliminary injunction today.

11         As to section seven of the Executive Order, which I

12 know Your Honor took a look at while plaintiff was presenting,

13 we have no idea at this point how agencies are going to respond

14 to section seven, so I think any injury that plaintiff is

15 asserting based on section seven and how that may be applied by

16 the agencies and then how the President may take the agency's

17 recommendations and put them into another EO or not is entirely

18 speculative and would be improper basis for Your Honor to find

19 irreparable harm here.

20         Plaintiff contends that we have no answer to the

21 executive branch's decision to have a longstanding inclusion of

22 the involved agencies in the provisions of the FSLMRS, but I

23 think that that underscores that Congress here enacted a

24 statute that vested the President with the authority to make

25 determinations based on changing national security requirements

1    and considerations.

2           That's the statutory language that Congress used to

3    confer authority on the President.  And the fact that

4    Presidents have exercised that type of authority differently

5    over time does not undermine the President's exercise of that

6    authority today.  The President may have latent authority for

7    decades and choose not to use it, but when it becomes

8    appropriate, the President can exercise that authority no less

9    than he could have 40 years prior.

10          I think that I'll now just kind of walk through the

11   preliminary injunction factors.  Plaintiffs have failed to meet

12   their burden to show that a preliminary injunction is warranted

13   here.

14          I would like to start with irreparable harm.  The

15   plaintiffs bring forth, I think, two primary theories of

16   irreparable harm here.  The first is the loss of union dues.

17          THE COURT:  First is what?

18          MS. HALL:  The loss of union dues.  Plaintiffs assert

19   they will lose union dues for about two-thirds of their

20   membership, but that fails to account for the fact that union

21   dues may be collected outside of the government payroll

22   processes.  The government payroll process is one way that the

23   union is permitted to collect union dues, but can also collect

24   union dues directly from the employees themselves.

25          And employees, before the exemption, were already

voluntary members of plaintiff's union.  Public sector

employees are not permitted to -- or may not be required to

join a union, so all of NTEU's members were voluntarily -- had

voluntarily joined NTEU.

So I think it's speculative for plaintiffs to assert

that at this point those voluntary members will choose not to

be members of NTEU or choose not to pay their dues at this

point.  And so any assertion that NTEU will cease to exist

because of a reduction in union dues is, again, speculative and

not sufficiently clear and certain and imminent to warrant a

finding of irreparable harm and justify preliminary relief

here.

Further, any monetary harm from the deprivation of

union dues would very likely be repairable through the FLRA

FSLMRS process if the unions are ultimately found to not be

properly excluded under the Executive Order, so if the

Executive Order is held to be unlawful, they will --

THE COURT:  Is it true that that administrative agency

has any authority or jurisdiction to do anything about that

problem down the road, assuming that it's not irreparable harm,

to lose the dues in the meantime?  Is that clear that they have

authority to do that?

MS. HALL:  Your Honor, it's my understanding that if

ultimately a court or the FLRA rules that the Executive Order

is unlawful and that instead these agencies should have been

included in the provisions of Chapter 71 all along, then the
FLRA has jurisdiction to enter broad remedies. And we cite to
*Ohio National Guard* in our brief, which is a case that held
that reimbursement for failure to withhold dues is a routine
authority and a routine remedy that's exercised by the FLRA.

The second, I think, category of harm that the
plaintiff asserts here is a loss of bargaining power. And NTEU
claims that it has more clout with the agencies with whom it
currently has active collective bargaining agreements because
it represents additional employees across the government.

I don't think that plaintiff has offered any
substantiation for its claim that agencies will treat it
differently or bargain with it less persuasively or find its
arguments to be less important at separate agencies with
separate bargaining units simply based on NTEU's national
profile representing employees in fewer unions.

In the Casper declaration, which was attached to
plaintiff's reply brief, there is no assertion based on
anything but his statements that clout matters or that there is
any indication that agencies will listen to NTEU any less at
the bargaining table in agencies that are left undisturbed by
the Executive Order.

Again, I think that the loss of bargaining power that
NTEU asserts is fundamentally speculative with respect to
agencies outside the scope of the Executive Order. And with

1  respect to agencies within the scope of the Executive Order,

2  the plaintiff will be able to resume bargaining and resume

3  negotiating --

4          THE COURT:  If they win in court.

5          MS. HALL:  -- if they win.

6          THE COURT:  In the meantime, is it really speculative

7  that they are going to lose lots of dues in the meantime and

8  lots of members in the meantime?

9          MS. HALL:  Your Honor, I think the loss of members in

10 the meantime is speculative because individual employees are

11 able to join a union regardless of whether that union is an

12 exclusive bargaining representative.

13         THE COURT:  What's their motivation?

14         MS. HALL:  Your Honor, I think unions provide

15 additional benefits to their members regardless of whether they

16 are an exclusive bargaining representative, and they also

17 engage in, I believe, some outside advocacy activity that the

18 members might want to associate themselves with.

19         Again, the membership is voluntary, so these

20 individuals were getting the benefits of the collective

21 bargaining whether they were members or not just by virtue of

22 their status as employees, so taking away the collective

23 bargaining power, I'm not sure that there is any evidence that

24 that would reduce the incentive to join the union, given that

25 those benefits were available whether an individual employee

1   was a member of that union or not.

2           As to this Court's jurisdiction on the channeling

3   argument that we make in our brief --

4           THE COURT:  Mr. Shah did not actually address that

5   just now, but that is an issue that you raise under the Supreme

6   Court's decision in *Thunder Basin*.

7           MS. HALL:  That's right, Your Honor, and particularly

8   also under the DC Circuit's decision in *American Federation of*

9   *Government Employee versus the Secretary of the Air Force*.

10          THE COURT:  Tell me which case.

11          MS. HALL:  I'm not certain whether we cited that in

12  our brief.

13          THE COURT:  American Federation of Government

14  Employees versus who?

15          MS. HALL:  Versus the Secretary of the Air Force.  I

16  can give you the citation for that, if it's helpful.  That's

17  716 F.3d 633.  And that's a decision by DC Circuit in 2013.

18          THE COURT:  716 --

19          MS. HALL:  F.3d 633.

20          THE COURT:  You're not sure whether that's in the

21  brief or not?

22          MS. HALL:  I'm not sure.

23          THE COURT:  We can find it though.

24          MS. HALL:  Your Honor, that case -- in that case an

25  opinion by Judge Henderson, the DC Circuit was unequivocal that

1    the FSLMRS provides the exclusive administrative procedures for

2    resolving disputes.

3              THE COURT:  What kind of disputes?

4              MS. HALL:  Disputes between unions and agencies

5    regarding unfair labor practices, as well as disputes between

6    unions and agencies regarding grievances.  And the definition

7    of grievance is broad.  We cite the full definition in a

8    footnote in our brief.

9              And the definition of unfair labor practice also

10   encompasses the alleged harms that plaintiff asserts here, such

11   as the failure to withhold union dues and the failure to

12   bargain with an exclusive representative recognized under the

13   statute.

14             So I think under plaintiff's theory, which is that the

15   Executive Order is invalid --

16             THE COURT:  Are employees or the union able to

17   challenge the Executive Order itself before the FSLMRS?

18             MS. HALL:  No, Your Honor.  So the unions have two

19   parts to this answer.  First is that, as I understand it, the

20   unions, not the employees, bring the claims in large part.  So

21   the employees themselves don't have the rights to challenge

22   violations of a CBA, except in quite different circumstances

23   regarding individual violations rather than the alleged

24   violations here.

25             Secondly, as to whether they can bring a sort of

facial challenge to the Executive Order, no.  But the validity

of the Executive Order I think would be inherently entwined

with the sorts of arguments that they are making here, which is

that the agencies are violating the FSLMRS statute by honoring

this Executive Order.

THE COURT:  Hypothetically, if the Executive Order is

clearly contrary to congressional findings and a congressional

statute, is there relief for the union or the employees or

anybody, anywhere, but in a federal court?

MS. HALL:  Your Honor, through the channeling process,

the plaintiff would get a ruling from a court of appeals after

exhausting the argument before the FLRA.

THE COURT:  So they go before the administrative

agency and they raise ultra vires arguments, they raise

presumption of regularity arguments, and the agency says we

don't have any authority to decide this, we just don't.

So then they go to the court of appeals and the court

of appeals says, "They're right, they don't have any

authority."

MS. HALL:  The court of appeals at that point -- the

basis for the FLRA's assertion in that instance, that it lacked

authority, would be based on the Executive Order.  And in the

court of appeals' review, the plaintiff, NTEU, could raise the

argument that that decision regarding the FLRA's jurisdiction

was incorrect because the Executive Order is invalid.  So the

1   court of appeals --

2        THE COURT:  That's kind of a derivative argument.  The

3   court of appeals might say the agency didn't have authority to

4   decide presumption of regularity, the ultra vires and all of

5   that stuff, and that's why they couldn't provide relief, and

6   they were right about that, but now that you're here in the

7   court of appeals, you can raise all of those arguments with us,

8   because we're the court of appeals.

9        MS. HALL:  Essentially, yes, Your Honor.  So the court

10  of appeals would be the proper forum to raise the types of

11  arguments that they are making here.  I think they would need

12  to probably preserve those arguments before the FLRA, but the

13  FLRA would likely not reach the merits of those arguments and

14  instead they would be reached by the court of appeals through

15  that channeling process.

16       But it would reach the court of appeals and a federal

17  court would be able to adjudicate those questions at that point

18  in the process.  And the Secretary of the Air Force case is

19  very clear that the FSLMRS provides the exclusive procedures

20  for claims between unions and agencies regarding these sorts of

21  issues.  So that case I think is very important to the Court's

22  determination on channeling and jurisdiction here.  It's at

23  pages 636 to 637, the most important discussion.

24       (Pause)

25       THE COURT:  It wasn't Judge Griffith, it was Judge

1    Henderson.

2              MS. HALL:  It was not.  Judge Henderson.

3              THE COURT:  I have got the opinion here.  I can look

4    at it.

5              MS. HALL:  As to reviewability of the President's

6    determinations under Section 7103(b), Section 7103 makes clear

7    that Congress made a choice to vest the President with

8    authority to make determinations, discretionary determinations

9    related to the nation's security.

10             And the President made those determinations in the

11   Executive Order, and, in our view, that is the end of the

12   inquiry.  The President here is acting with his maximum level

13   of authority under the Constitution, because the President is

14   acting at Congress's express authorization.

15             And that's what Justice Jackson's concurrence in

16   *Youngstown* makes clear, that the President's power is at its

17   maximum when he is acting consistent with and through

18   delegation of authority from Congress.  And that's exactly what

19   Congress did in Section 7103.

20             The language of that statute makes clear that the

21   President is vested with discretionary authority, particularly

22   -- I think that is particularly the case because this is a

23   determination that is inherently entwined with the President's

24   assessments of what is required to protect the nation's

25   security.

 1          That's an assessment that the Supreme Court has held

 2    repeatedly in cases like *Trump v. Hawaii*, *Webster v. Doe*,

 3    *Holder v. Humanitarian Law Project*, and *Department of the Navy*

 4    *versus Egan*, that the President's determinations as to the

 5    national security are really inappropriate for judicial

 6    second-guessing and judicial review, particularly when they

 7    involved assessments of what is an --

 8          THE COURT:  Slow down a little bit.

 9          MS. HALL:  I think that's particularly true in areas,

10    and this is according to the *Egan* case, where the courts are

11    asked to assess a determination of what constitutes an

12    acceptable margin of error in assessing the potential risk.

13          And here, the President is making again a

14    discretionary determination as to what is an appropriate level

15    of risk of the inconsistency of collective bargaining

16    agreements and the provisions of Chapter 71 with national

17    security requirements and considerations.

18          And so that's an inherently discretionary

19    determination.  It's one that is vested in the President.  And

20    for the reasons stated in our brief and that I have explained

21    here, for that reason, we think that the Court's review should

22    be limited to what the court identified in *American Federation*

23    *of Government Employees versus Reagan*, a DC Circuit case, which

24    said -- which reviewed the existence of the determinations.

25          So he looked at the order and said did the President

make the required determinations?  Yes, he did.  That's the

relevant inquiry for the Court.

THE COURT:  But in that case, a DC Circuit case, which

you just cited, which I have somewhere, *American Federation of*

*Government Employees versus Reagan*, 870 F.2d 723, the Court

also said -- and it's exactly on point because it's talking

about the statute, and they talk about the presumption of

regularity, which you talk about, and the government --

plaintiffs talk about.

But they also say, "Courts presume that Presidents

improperly exercised the discharge of their official duties in

the absence of clear evidence to the contrary."  So this is not

one of those cases where the President's discretion is wholly

unreviewable, but the burden is heavy to show clear evidence to

overcome the presumption of regularity.

I think the plaintiffs would agree with you that this

is the controlling standard.  Mr. Shah can correct me if I'm

wrong, but they think that they have shown clear evidence and

that therefore the presumption of regularity shouldn't apply,

and that that point -- and separately and/or relatedly what the

President did was ultra vires and disregarding what Congress

directed.

So I think that's their position, not that -- I don't

think you're -- what I'm trying to say is I don't think you're

disagreeing on the standard; I think you're disputing how to

1   apply it.

2          MS. HALL:  Okay.  On that point, Your Honor, I

3   think -- I can find the particular language, I think, but in

4   the *Reagan* case --

5          THE COURT:  The one I just was talking about?

6          MS. HALL:  Yes.

7          THE COURT:  There was several lawsuits against

8   President Reagan.

9          MS. HALL:  I will say one of the lawsuits that we cite

10  was originally a lawsuit against President Carter, got renamed.

11  But I believe the language --

12         THE COURT:  That was before your time, but it got very

13  complicated because President Reagan's treasury secretary was

14  named Donald Regan, and so when people were suing the treasury

15  department, it sometimes was confusing.

16         MS. HALL:  Good thing Secretary Bessent isn't named

17  Secretary Biden.

18         So under that *AFGE versus Reagan* case, I believe the

19  exception identified includes constitutional cases and gross

20  violations of the statute, is some of the language that that

21  case uses.

22         And I think we have a different view from plaintiff of

23  what would constitute a gross violation of the statute.  In our

24  view, I think a gross violation of the statute would be an

25  impropriety in the issuance of the order required by Section

1   7103, the sort of first language before the subdivisions one

2   and two.  And for example, the statute directs that the

3   President issue an order, so if, for example, the government

4   were here arguing that even though the President had not in

5   fact issued an order, it could still exercise this exemption,

6   for example, because an agency had determined -- if an agency

7   had determined simply based on its own assessment that the

8   provisions could not be applied consistent with national

9   security, then I think that would be a gross violation of the

10  statute.  Or if the President fails to issue an order and

11  instead orally directed some secretaries to stop collectively

12  bargaining because he had made a determination that was nowhere

13  recorded, I think that would again be a gross violation of the

14  statute.  So I think the scope of our disagreement may be about

15  what constitutes a violation of that type.

16        THE COURT:  Well, but when we get down to the

17  specifics, the gross violation, clear violation, clear

18  evidence, however you want to describe it, there are two terms

19  of art in the statute.  And I think everybody agrees the

20  President can make a determination without writing something or

21  issuing something or whatever, but if he makes a determination

22  that an agency or subdivision has as its, quote, "primary

23  function," intelligence, counterintelligence, investigative or,

24  quote, "national security work," and further that the

25  provisions cannot be applied to the agency or subdivision in a

1  manner consistent with, quote, "national security requirements

2  and consideration," then he may exempt agencies.

3       So what I think we come down to is, is there clear

4  evidence, a clear violation, in his finding that some of the

5  agencies or subdivisions have as their, quote, "primary

6  function" the national security or national security work, and

7  if there is some role for the Court to play under *American*

8  *Federation of Government Employees versus Reagan* in the DC

9  Circuit's precedent, don't I have to look at the determinations

10 about primary function and national security?

11      MS. HALL:  Well, Your Honor, for the reasons that I

12 just stated, I don't think so.  And I'll, if you don't mind,

13 direct your attention to the text of the statute.  I have

14 Section 7103(b) in front of me, and the statute is phrased in a

15 very particular way.

16      It says, "The President may issue an order excluding

17 any agency or subdivision thereof from coverage under this

18 chapter if the President determines that, A, the agency or

19 subdivision has as a primary function," and we have discussed

20 that, "and, B, the provisions of this chapter cannot be applied

21 to the agency or subdivision in a manner consistent with

22 national security requirements and considerations."

23      I think the key is that Congress decided to apply that

24 presidential determination language to both prongs of the

25 statute.  Congress could have elected to write a statute that

said, "The President can issue an order excluding any agency or subdivision thereof from coverage under this chapter if, A, the agency or subdivision has as a primary function intelligence, counterintelligence, investigative or national security work, and, B, the President determines that the provisions of the subchapter cannot be applied."

But that's not the statute that Congress wrote. Congress vested the President with authority to make determinations with respect to both prongs of that statute, and so I don't think that judicial review of the President's determination of whether the agency or subdivision has as a primary function those listed out functions would be appropriate given that statutory scheme.

It's particular language that's vesting the President with discretionary authority, rather than allowing that authority to be triggered by the existence of some objective view of whether an agency or subdivision has as a primary function --

THE COURT: Let's say the President said that every department and agency and subdivision of the entire federal government has as its primary function national security work and I conclude that the provisions of this chapter cannot be applied to any cabinet department, any independent agency, any agency or subdivision in a manner consistent with national security requirements and consideration. Is there any role for

1  a court to play?

2  　　　　　MS. HALL:  Your Honor, first, I don't think that's

3  this case, but even if that were an Executive Order that this

4  Court were tasked with reviewing, I think that the role of the

5  Court might be to determine whether if the President simply

6  listed the entire federal government without identifying

7  particular agencies, there is perhaps an argument to be made,

8  and it would depend on whether the plaintiff made it, that that

9  might not satisfy (b)(1)'s requirement that the order exclude

10  any agency or subdivision.  I'm not sure how that would come

11  out, but I think that could be potentially a part of the

12  review.

13  　　　　　THE COURT:  Well, let me ask you a more limited

14  example.  One of the agencies or departments that he lists is

15  the Department of Justice.

16  　　　　　MS. HALL:  That's right, Your Honor.

17  　　　　　THE COURT:  The Department of Justice has a national

18  security division.

19  　　　　　MS. HALL:  It does, Your Honor.

20  　　　　　THE COURT:  You're not in the national security

21  division?

22  　　　　　MS. HALL:  I am not.

23  　　　　　THE COURT:  What's your primary function?

24  　　　　　MS. HALL:  Your Honor, my primary function is

25  litigating on behalf of the United States government.

1          THE COURT:  So it's not national security?

2          MS. HALL:  Your Honor, I think the key to the question

3   under this statute is not what any particular employee's

4   function is; the key is the function of the agency or the

5   subdivision as a whole.

6          THE COURT:  So what's the function of the civil

7   division?

8          MS. HALL:  Your Honor, I think the civil division has

9   many primary functions, and one of them -- I mean, I, as part

10  of the requirements of my job, have a security clearance

11  because I may need to review sensitive national security

12  information in order to perform my job responsibilities, so I

13  think that as part of my responsibilities, or other

14  responsibilities of the civil division, there may be functions

15  related to national security.

16         And certainly the civil division engages in

17  affirmative litigation for violations of law, and I think that

18  involves investigative work, which is another trigger under the

19  statute.

20         THE COURT:  What about FEMA, does it have as its

21  primary function national security?

22         MS. HALL:  Your Honor, I'm not familiar with all of

23  the responsibilities of the Federal Emergency Management

24  Agency, but I would be very surprised if it doesn't engage in

25  anything related to national security or investigative work,

1  particularly as an important part of its role.  It is

2  responsible for responding to emergencies, and those

3  emergencies may include attacks on American soil.  And so I

4  think responding to a national security event very well could

5  and probably does count as national security work.

6          THE COURT:  What about National Institutes of Health?

7          MS. HALL:  The National Institutes of Health I think

8  are involved in pandemic preparedness and the country's ability

9  to respond to bioterrorism, and so that certainly could satisfy

10 the national security work category in subsection (a).

11          And as I understand it, the National Institutes for

12 Health also engage in substantial study, which is investigating

13 particular scientific questions that may have substantial

14 bearing on the national security.

15          THE COURT:  Okay.  Are you --

16          MS. HALL:  I think with that, Your Honor, I will --

17 unless you have further questions.

18          THE COURT:  Well, I do.

19          MS. HALL:  Okay.

20          THE COURT:  I accept the idea that when the President

21 issues an order and makes a determination that he doesn't have

22 to explain himself, but this President, as is his wont,

23 sometimes chooses to explain himself, and he did so in this

24 case.  And so part of the problem that I think you have, and I

25 would really like you to talk about for a minute, is that the

```
 1   Executive Order -- I'm sorry, the fact sheet --
 2           MS. HALL:  Yes, Your Honor.
 3           THE COURT:  -- that was issued from the White House,
 4   which is here somewhere.  I've got the OPM guidance.  I did
 5   have the fact sheet somewhere.
 6           The fact sheet -- although it's not numbered, the
 7   pages aren't numbered, on what is page 3, under a section
 8   called "Safeguarding American Interests" says, "President Trump
 9   is taking action to ensure that agencies vital to national
10   security can execute their missions without delay and protect
11   the American people.  The President needs a responsive and
12   accountable civil service to protect our national security."
13           And then it says the following:  "Certain federal
14   unions have declared war on President Trump's agenda."  Not on
15   the Constitution, not on the American people, not on the
16   government, but President Trump's agenda.
17           "The largest federal union describes itself as, quote,
18   fighting back against Trump.  It is widely filing grievances to
19   block Trump's policies.  For example, VA unions have filed 70
20   national and local grievances over President Trump's policy
21   since the inauguration and averaging once a day.
22           "Protecting American's national security is a core
23   constitutional duty, and President Trump refuses to let union
24   obstruction interfere with his efforts to protect Americans and
25   our national interest.
```

 1          "President Trump" -- and this is all a quote --

 2    "supports constructive partnerships with unions who work with

 3    him.  He will not tolerate mass obstruction that jeopardizes

 4    his ability to manage agencies with vital national security

 5    interests."

 6          So he's willing to be kind to those that work with

 7    him, but those that have sued him, those that have filed

 8    grievances, those that have complained against him, he's not

 9    going to bargain with, and so he's issued an Executive Order

10    which targets them.

11          I mean, how else can you read what he's done?

12          MS. HALL:  Your Honor, I think that that's -- there

13    are several reasons that I don't think that's exactly what this

14    Executive Order does.  The first is that, as to the last bullet

15    point, for example, "supports constructive partnerships with

16    unions who work with him," the President has not exempted every

17    NTEU -- every agency for which NTEU represents employees via

18    this Executive Order.  The same is true of the American

19    Federation of Government Employees, which is the union

20    described earlier in that paragraph.  Both of those unions

21    continue to represent federal employees throughout the federal

22    government.

23          THE COURT:  But under the OPM guidance, because of

24    that Executive Order, covered agencies and subdivisions, which

25    is almost everyone, are no longer subject to the collective

1   bargaining requirements of Chapter 71, and those agencies and

2   subdivisions are no longer required to collectively bargain

3   with federal unions.  And because the statutory authority

4   underlying the original recognition of the relevant unions no

5   longer applies, unions lose their status as they exclusively

6   recognize labor organizations for employees of the agency and

7   agency subdivisions covered by the exclusions.  Agency

8   collective bargaining agreements -- agencies should cease

9   participating in grievance procedures after terminating and

10  discontinue participation in arbitration of union grievances.

11       MS. HALL:  Your Honor, that's all true with respect to

12  agencies that are covered by this Executive Order, but there

13  are many agencies not covered by the Executive Order, at which

14  NTEU continues to represent employees.

15       I believe from its reply brief that that involves

16  about 70,000, or somewhere between 60,000 and 70,000 federal

17  employees who NTEU continues to represent regardless of this

18  Executive Order.

19       I think if there were a credible argument that this

20  Executive Order was meant to wipe out NTEU --

21       THE COURT:  It comes pretty close, doesn't it?  It

22  includes the Department of State, the Department of Defense,

23  the Department of Treasury, except for the Bureau of Engraving

24  and Printing, the Department of Justice, the Food and Drug

25  Administration, National Institutes of Health, Agencies or

 1  Subdivisions of the Department of Homeland Security, including

 2  FEMA, agencies in the Department of Interior, Bureau of Land

 3  Management, Environmental Protection Agency, Department of

 4  Agriculture, much of it, National Science Foundation, Federal

 5  Communications Commission, General Services Administration.

 6          MS. HALL:  That's certainly true, Your Honor, but the

 7  federal government is extremely large.  There are many, many

 8  agencies that are not covered.

 9          THE COURT:  It's getting smaller.

10          MS. HALL:  That appears to be true, but there are

11  many, many agencies that are not covered by this Executive

12  Order, including agencies whose employees NTEU represents.

13          Furthermore, the list of agencies that are covered by

14  this Executive Order is not -- does not exclusively represent

15  employees who are represented by NTEU or the American

16  Federation of Government Employees.  This is a broad exemption

17  agency by agency.  It's not done union by union.  It's not

18  targeting NTEU.

19          It's targeting specific agencies that meet the

20  statutory criteria in the President's determination, and so

21  that's the focus of the Executive Order.  It's not just going

22  after whatever agencies happen to be represented by NTEU or

23  other federal unions -- federal employee unions who are

24  described in the fact sheet.

25          Furthermore, I know you emphasized, and I understand

1    the emphasis of that federal unions have declared war on

2    President Trump's agenda.  I think that's actually part of the

3    President's reasoning under Section 2(b), I believe it is, if I

4    have the statute right, whether the provisions of Chapter 71

5    can be applied consistent with national security requirements

6    and considerations.

7         And part of that very discretionary determination

8    involves how agencies are able or unable, given the way that

9    collective bargaining operates, to go ahead and implement

10   changes that the President deems necessary for the national

11   security.  And that's what the President refers to in the

12   previous section, which is -- I think I may be looking at the

13   same printout as you.  It starts at the very bottom of page 2

14   titled "Ensuring that Agencies Operate Effectively."

15        THE COURT:  Yes.

16        MS. HALL:  So that discusses the way that unions at

17   times may obstruct agency management and prevent the President

18   from making changes that he deems necessary or that secretaries

19   or leaders of agencies deem necessary in order to promote the

20   national interest.  So I think in that sense, when the fact

21   sheet refers to President Trump's agenda there, President

22   Trump's agenda is safeguarding American national security.

23   That's what he's trying to do.

24        And all the steps he is taking are to effectuate what

25   he identifies in the immediately following paragraph, which is

1  protecting America's national security, protecting Americans
2  and our national interests.
3          THE COURT:  All right.
4          MS. HALL:  Your Honor, so for those reasons, I think
5  that plaintiff has failed to establish that the Executive Order
6  was enacted for retaliatory motive.  There is simply not
7  evidence to support that determination.
8          Although I recognize that the fact sheet refers to
9  unions' activities, within their collective bargaining
10 agreements and within their rights under the labor laws, that's
11 precisely the determination that the President is tasked with
12 making under the second subpart of that statute, which is
13 whether union activity or the provisions of the labor laws or
14 the provisions of CBAs render the participation of -- or the
15 engagement in collective bargaining to be incompatible with the
16 national security requirements and considerations.
17         Again, that's very broad and capacious language
18 indicating Congress's decision to grant the President
19 discretionary authority to make these determinations, to assess
20 the totality of the circumstances, to look forward
21 prospectively at what the country might need, and to ensure
22 that the country is able to respond quickly to changing
23 national security circumstances.  And that's exactly what this
24 fact sheet explains, that the CBAs and the union grievance
25 process precludes the agencies from doing.

1       In many of these circumstances, changes in policy are

2   subject to midterm bargaining requirements that can delay the

3   implementation of changes to agency policy, personnel policy,

4   moves across agencies, that sort of thing, for months, if not

5   years.  And President Trump is engaged in the national security

6   mission.  He is focused on making sure that the country is safe

7   from all kinds of threats, as this fact sheet also explains.

8       We have got cyber security, pandemic preparedness.  He

9   wants to ensure that all kinds of threats from countries all

10  over the globe, that this country is protected from those

11  threats.  And he wants to ensure that agencies can act quickly

12  to respond to potential threats in a way that sometimes, as

13  he's assessed is true here, collective bargaining agreements or

14  the provisions of labor laws can impede.

15      In sum, Your Honor, I think that there are several

16  reasons why plaintiffs have failed to meet their burden as to a

17  preliminary injunction here.

18      First is irreparable harm, as we discussed earlier in

19  the hearing.  But furthermore, just on the merits, this Court

20  should not exercise jurisdiction as to -- because of the

21  channeling requirement.  And even if this Court were to

22  exercise jurisdiction over this challenge, the President's

23  determinations should not be substantively reviewed.  There is

24  extreme deference owed to the Executive in determinations

25  related to national security, and those determinations are both

```
 1  sensible and should be respected here.  Thank you.

 2          THE COURT:  Mr. Shah?

 3          MR. SHAH:  Thank you, Your Honor.  Just a few points

 4  in response.  Starting with irreparable harm --

 5          THE COURT:  She said a lot of things, so feel free.

 6          MR. SHAH:  This idea that harm to NTEU currently is

 7  speculative, there is simply nothing there.  The idea that

 8  taking away the apparatus for dues payments, the payroll

 9  deductions, and taking away the very reason people pay dues to

10  us, which is because we can bargain for them collectively as

11  their exclusive representative, the idea they may still

12  nonetheless find a way to voluntarily pay dues to us and we

13  won't be harmed, that's not a credible argument.

14          We are losing $2 million a month, more than half our

15  revenue, because the apparatus is gone.  And again, we are now

16  for these excluded agencies outside of the statute's coverage.

17  We're not being recognized by agencies.  They won't meet with

18  us.  So saying that dues may still come to us for some reason

19  in some way, that argument should not prevail here.

20          In terms of the harm to our bargaining power, several

21  circuits have recognized that where you can't do your job,

22  where you're weakened in the way that we have been weakened

23  with two-thirds of our workers gone, now outside the statute's

24  coverage, that is irreparable harm.

25          In terms of the government's argument that we haven't
```

submitted any evidence to back up this theory of irreparable
harm, we have submitted data and declarations showing the ways
in which agencies are ignoring us.  They won't come to the
bargaining table.  They won't meet with us.  They are not
hearing our grievances.  We are powerless at these excluded
agencies right now.

And it's coming at a time where people are terrified.
Reductions in force are looming at many agencies.  At some,
including HHS, they have already begun.  They are looking to us
to help, and we are powerless.  That harm is irreparable.

In terms of the jurisdictional argument, the
channeling argument, several things there, Your Honor.  We
addressed this fully in our reply brief.  While the
governmentment wants you to side with them that the Kentucky
litigation is irrelevant here, it is not.  They have taken
inconsistent positions on jurisdiction in two different federal
district courts.

In Kentucky, they are asking the district court there
to declare that the Executive Order is lawful.  Here, in DC,
they are saying that you don't have the power to declare the
Executive Order unlawful.  Those positions can't be reconciled.

Here, the Chapter 71 procedures, the statute's
administrative procedures have been taken away from us.  We
can't go to the Federal Labor Relations Authority.  We can't
file grievances.  Arbitrators are not hearing grievances that

1 are filed at these excluded agencies.  The Federal Labor

2 Relations Authority, its precedent requires dismissal of cases

3 filed where agencies are excluded from the statute.

4 And moreover, the President's Executive Order from

5 earlier this year, which focuses on independent agencies, it

6 declares that no employee of the government, to include

7 formerly independent adjudicators, such as the members of FLRA,

8 they cannot disagree with any legal interpretation that's

9 advanced by the President or the attorney general.

10 So the Federal Labor Relations Authority here can't

11 disagree with the President and say, no, no, these agencies are

12 going to remain within the statute's coverage.  That's not an

13 option that's available to it under its own precedent or under

14 the Executive Order.

15 The last thing I will say on jurisdiction, unless the

16 Court has further questions, is, one of the cases we cite in

17 our brief is the DC Circuit's decision in *Jarkesy versus SEC*,

18 which makes clear that where a party would suffer irreparable

19 harm from the delays that come with going through the channel,

20 then district court jurisdiction is merited.  That would be the

21 situation here for the same reasons our irreparable harm theory

22 should succeed.

23 Moving to reviewability, the cases that the government

24 relies on for its reviewability arguments themselves show that

25 reviewability is available here for our claims, because we are

 1    arguing that the President has gone far beyond his statutory

 2    powers, and where there are gross violations of the statute or

 3    violations of a constitutional dimension, even these cases that

 4    the government relies on make clear that judicial review is

 5    available.

 6         THE COURT:  The case being *American Federation of*

 7    *Government Employees versus Reagan*?

 8         MR. SHAH:  That's correct, Your Honor.

 9         THE COURT:  As I said before, it seems to me that you

10    both agree that that's the relevant authority.  The

11    disagreement is whether under that case the presumption of

12    regularity applies or whether there is, in this case before me,

13    quote, "clear evidence to the contrary" so that the presumption

14    of regularity is overcome.

15         MR. SHAH:  That's absolutely correct, Your Honor.  We

16    believe the clear evidence exists here.  Number one, with the

17    clear evidence of the improper motivations underlying the

18    Executive Order and the White House's own contemporaneous

19    issuances.  And second, in the purported justifications for the

20    exclusions that are elsewhere in the White House fact sheet.

21         In the end, Congress knows how to prevent judicial

22    review.  It didn't do it here.  And here the statutory context

23    is critical.  The entire context of our statute is Congress

24    trying to wrestle away power from the President.

25         There was some discussion of primary function and a

textual argument by our friend on the other side that because

the statute includes the word "determines" ahead of "primary

function," that basically primary function means whatever the

President says it means.  That cannot be right.  That type of

interpretation would be used to defeat the entire purpose of

the labor statute.

    THE COURT:  Primary function has to have some meaning.

    MR. SHAH:  Yes.

    THE COURT:  It's not just the President says it's a

primary function.  I mean, I don't think you could say that.

Pick an example.  The primary function of the Food and Drug

Administration is to serve at a military base in -- pick a

country where a military base is -- that's not what they do;

the Army does that, the Air Force.

    The primary function of the Department of Agriculture

is not to present affidavits and declarations to the FISA

court.  That's the National Security Division of the Justice

Department.  So you can't say it if there is not some basis for

it.

    And you say we look at the dictionary definition, and,

you know, common sense definition, primary function has to mean

something.

    MR. SHAH:  Absolutely, Your Honor.  And our view is

that this Court determines what a primary function is, whereas

I believe our friends on the other side, their position is the

1  President determines what it is, but that is a statutory

2  interpretation for this Court to perform.

3        In the end, Your Honor, I believe on the crux of the

4  entire case, just a few minutes ago saying that the President

5  doesn't have to explain himself, but he did here.  And in the

6  end, this Court shouldn't ignore what's in black and white on

7  the fact sheet, one-third of which, one-third of those three

8  pages is simply taking aim at unions.  We are being targeted

9  here.

10        And finally, Your Honor, this didn't come up in the

11  government's initial presentation, but I want to make sure that

12  -- there shouldn't be any factual question here that agencies

13  are disregarding our CBAs.  In the government's brief it argued

14  that agencies are not terminating CBAs, and it offered an FAQ

15  document from the Office of Personnel Management advising

16  agencies that they, quote-unquote, "shouldn't terminate CBAs."

17        Your Honor read from the March 27th OPM guidance

18  that's still in force that says unequivocally, "Agencies and

19  agency components that have been excluded through this

20  Executive Order are no longer covered by Chapter 71," period.

21        That OPM guidance at pages 5 and 6, it details actions

22  that agencies should take after terminating their CBAs, and

23  that's the language it uses, "after terminating CBAs."  And

24  those actions include disregarding reduction in force articles

25  and CBAs.  We know, and it's established in the record, that's

1 already happening here with NTEU's agencies.

2   It also says, "After termination, stop processing dues

3 payment via payroll deduction."  We already know, and it's in

4 the record, that's already happening.  So if it happens to be

5 the case that some of the agency defendants here haven't used

6 the magic word "termination," those contracts have been

7 terminated and agencies are acting consistent with the

8 March 27th guidance and they are not honoring our CBAs.

9   Unless there are further questions --

10   THE COURT:  What did you say -- you said something

11 about something happens in three days.

12   MR. SHAH:  That's correct, Your Honor.  The Executive

13 Order at section seven requires agency heads to suggest

14 additional exemptions.

15   THE COURT:  And she responded we're not sure they are

16 going to do it, but your point is -- and that I shouldn't

17 consider it.  And it may be that I shouldn't consider it in

18 evaluating the preliminary injunction factors, but as a

19 practical matter, I already have in mind to try to decide this

20 as quickly as possible.

21   I take her point it's not -- it's speculative what

22 will happen.  That's not part of the irreparable harm argument,

23 but it's an argument for getting a quick decision.

24   MR. SHAH:  Exactly, Your Honor.  Our irreparable harm

25 arguments do not rely on that undisputable fact that those

1    recommendations are coming.

2            THE COURT:  The proposed order that you submitted at

3    Docket 9-4, if I were to grant your preliminary injunction,

4    that's still the order that you propose?

5            MR. SHAH:  It is, Your Honor.

6            THE COURT:  Okay.

7            MR. SHAH:  Thank you.

8            THE COURT:  Okay.  Ms. Hall, anything else you want to

9    say?

10           MS. HALL:  Just a few points, Your Honor.

11           THE COURT:  All right.

12           MS. HALL:  Thank you, Your Honor.

13           First, as to channeling, plaintiff's counsel suggests

14   that our position in the Kentucky litigation is inconsistent

15   and undermines our position here on channeling.  That's not

16   true.

17           As to our theory of the case in Kentucky, the

18   Executive Order is valid and the agencies at issue are not part

19   of -- are not subject to Chapter 71, which includes its

20   channeling procedures.  According to plaintiff's theory of the

21   case here and the premise of their complaint, the Executive

22   Order is invalid and the agencies therefore should have all of

23   the benefits of Chapter 71.

24           Part of Chapter 71 includes the channeling

25   requirement, so I think the argument here that they should be

     1    subject to the purported benefits of Chapter 71, but they

     2    should not have to go through the channeling requirements of

     3    Chapter 71 is inconsistent with their fundamental theory of

     4    this case.

     5         As to the *Jarkesy* case, I think that case is

     6    distinguishable because --

     7         THE COURT:  Which case?

     8         MS. HALL:  *Jarkesy v. SEC*, 2015.  The nature of the

     9    claim in that case was fundamentally different from the claim

    10    here, and that was a claim that the existence of the

    11    administrative procedure violated the separation of powers, and

    12    so the harm was having to go through the administrative

    13    adjudication.

    14         Here, the plaintiffs are not alleging that the harm is

    15    accruing by virtue of their having to go through the

    16    administrative procedure, because having to appear before the

    17    FLRA, for example, is independently causing them constitutional

    18    harm.  They simply are arguing that delays associated with

    19    channeling would harm them, but those are precisely the sorts

    20    of arguments that I think in the Air Force case, the DC Circuit

    21    said those are the exclusive procedures, you can't get around

    22    to those procedures, even if you are not going to be able to

    23    get exactly the relief that you want.

    24         On reviewability, plaintiff's counsel mentioned that

    25    Congress enacted the statute in order to take away power from

the President. That certainly is true. Congress was codifying

various particular rights as to the labor statute. But if

Congress was trying to take away the President's power, I think

Section 7103 was a strange way to do that as to the national

security determinations that are at issue there.

And I walked through earlier the textual reasons that

I think vests the President with authority, and that the

statute is quite clear that this is a responsibility of the

President. It's vesting authority in the President. It did

not vest these decisions in, for example, the agencies where

agency decision is subject to the type of review in the APA.

That's not the scheme that Congress designed.

Congress designed a scheme that vests authority in the

President, and those determinations made in those -- in this

Executive Order are entitled to significant deference.

I will rest, unless the Court has further questions.

THE COURT: Just this, because I always ask this

question. Have you looked at their proposed order?

MS. HALL: I did yesterday. Let me pull it up if you

don't mind.

THE COURT: I wanted to ask, assuming you lose and

they win, do you have any problems with the language of the

order?

While you're doing that, I'm going to take a minute

and talk to my clerk.

1          MS. HALL:  Thank you, Your Honor.

2      (Pause)

3          MS. HALL:  Good timing for me to resume, Your Honor.

4  Having reviewed the proposed order, I have a few objections, if

5  this Court were to rule against us.

6          One, just as a preliminary matter, if Your Honor were

7  to engage in this sort of review that plaintiffs identify with

8  respect to the particular agencies covered by the Executive

9  Order, we would certainly request review of each particular

10  agency, and if there are some agencies that the Court

11  determines were properly included in the President's

12  determination, those should be allowed to stand rather than

13  invalidating the entire Executive Order as applied to NTEU.

14          So if there are agencies for which the Court believes

15  that they do have as a primary function intelligence,

16  counterintelligence, investigative or national security work,

17  and that the determination in the second subsection is met,

18  those should not be included in a preliminary injunction.

19          Furthermore, as to the status report within 24 hours

20  of the issuance and then every two weeks for 12 weeks, Your

21  Honor, we do oppose that kind of compliance measure.  We don't

22  think there is any reason for the Court to impose such a

23  burdensome compliance requirement.

24          If plaintiff believes that agencies are not complying,

25  then it is our view that plaintiffs can proceed in the ordinary

 1    course and file a motion to enforce the injunction.

 2            As to a status report within 24 hours, I will tell

 3    Your Honor I think any status report filed within 24 hours is

 4    unlikely to have much useful information.  There are a lot of

 5    parties here, a lot of defendants, and collecting that

 6    information in that sort of period of time would be very

 7    difficult to give the Court anything that's useful.

 8            Finally, as to bond, the government does request bond

 9    here.  The government, if the implementation of this Executive

10    Order is enjoined, stands to suffer substantial monetary harms,

11    and that's because --

12            THE COURT:  Who stands to suffer monetary harms?

13            MS. HALL:  The government, Your Honor.

14            THE COURT:  How is that?

15            MS. HALL:  I can explain how.

16            THE COURT:  Because you've got to pay employees

17    instead of firing them?

18            MS. HALL:  No, Your Honor, that's not what I'm

19    identifying here.  Under the provisions of the FSLMRS and the

20    CBAs at issue, the government is required to pay their

21    employees to engage in union activities.  It's called taxpayer

22    funded union time.  And those employees are, if they are

23    subject to these CBAs, if this Executive Order is enjoined,

24    they will be engaging in non-agency work, non-mission-oriented

25    work, and there are reports from OPM that the total amount of

time and the total salary and benefits calculations associated

with taxpayer funded union time is in the millions for these

defendants alone, and so the government requests $5 million in

bond.

THE COURT:  That's not happening.  Okay.

MS. HALL:  Well, Your Honor, we would request whatever

bonds Your Honor would find appropriate.

THE COURT:  Zero.  Okay.  What else?

MS. HALL:  That's my final objection, Your Honor.

THE COURT:  Let me talk to Mr. Shah about some of your

other objections that I think are fair.  Bond we'll put aside.

MS. HALL:  Thank you, Your Honor.

THE COURT:  Mr. Shah, first of all, she suggests that

the order -- that there are at least certain agencies or

subagencies which clearly engage in national security and is

the order too broad by not excluding them, and that's point

one.

And point two is the status report.  Why am I to

assume, which I think is the implication of your last ordering

paragraph, that if -- I have two questions.

One, why am I to assume that the government won't

comply with a court order, and, two, and I have seen this in

lots of cases over the years, the Justice Department typically

has lots of clients, and in this case, there is the Acting

Director of OPM, the Attorney General of the United States, the

1  Secretary of HHS, the Administrator of EPA, the Secretary of

2  U.S. Department of Energy, Chairman of Federal Communications

3  Commission, Secretary of Department of Treasury, the Acting

4  Commissioner of the Internal Revenue Service, whoever it may be

5  this morning or this afternoon, it may change any moment, the

6  Office of Chief Counsel of the Internal Revenue Service, the

7  Commissioner of Bureau of Fiscal Services, the Administrator of

8  Alcohol and Tobacco Tax and Trade Bureau, the Acting

9  Comptroller of the Currency, and Acting Direct of Bureau of

10 Land Management.

11        I mean, there is a lot of coordination to do if I

12 issue an order.  So I think that -- I told her I'm not going to

13 impose a bond, but I am going to suggest to you that the last

14 ordering paragraph is just unrealistic.

15        And the other thing is what do we do about -- some of

16 your members presumably do work for legitimate -- for agencies

17 which even you concede do national security work.  So is there

18 a way to say -- to change the order or is there a reason not

19 to?

20        MR. SHAH:  Your Honor, at this point, we would not

21 change the order, apart from abandoning the joint status report

22 request.  That's fine with us.  But in terms of whether the

23 order is too broad, two of our claims, if Your Honor were to

24 agree with them, would defeat the national security exemptions

25 that we have challenged in our lawsuit across the board.

1        One of our statutory claims, one of our ultra vires

2   claims discusses the exemptions collectively as contravening

3   the statute by undoing most of it.  And second, our First

4   Amendment claim, our retaliation claim would likewise undo the

5   exemptions that we have challenged in this case.

6        So we don't think the proposed order should change,

7   and it may very well be the case that Your Honor doesn't have

8   to go agency by agency given those two claims.

9        Now, if those two claims are not accepted and this

10  Court does go agency by agency, we don't concede that any one

11  of them satisfies the national exemption criteria.  Whether it

12  is the *Cole v. Young* test that governs or even the authorities

13  test, which the government uses that talks about sensitive

14  activities directly related to military, economic and

15  productive strength, there are several agencies that don't need

16  even that standard, and we don't think any meet the *Cole v.*

17  *Young* standard.

18        THE COURT:  Okay.  All right.  Anybody else have

19  anything urgent that you want to say, other than the fact that

20  you want a decision quickly?

21        MR. SHAH:  No, Your Honor.

22        MS. HALL:  Nothing further, Your Honor.

23        THE COURT:  I want to say to both of you I really

24  appreciate the quality of the arguments this morning on both

25  sides, and it makes a difference.  We don't always get that

1  from both sides.  Sometimes we don't get it from either side,

2  but hopefully in most cases we do.  There is a reason that some

3  of us schedule oral arguments.  There are some cases you can

4  decide on the papers.  This is a really important case, and I,

5  therefore, really appreciate the work that both of you have

6  done both on your briefs, but also the professionalism that you

7  have shown and the way you presented your arguments.

8          So thank you both, and I will get you an opinion as

9  quickly as I possibly can.

10          Thank you.

11      (Proceedings concluded at 11:35 a.m.)

12

13                         CERTIFICATE

14      I, Sonja L. Reeves, Federal Official Court Reporter in and
    for the United States District Court of the District of
15  Columbia, do hereby certify that the foregoing transcript is a
    true and accurate transcript from the original stenographic
16  record in the above-entitled matter and that the transcript
    page format is in conformance with the regulations of the
17  Judicial Conference of the United States.

18      Dated this 24th day of April, 2025.

19

20                          /s/ Sonja L. Reeves
                         SONJA L. REEVES, RDR-CRR
21                       FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| )<br>)<br>NATIONAL TREASURY EMPLOYEES )<br>UNION, )<br> )<br> )<br>Plaintiff, )<br> )<br> )<br>v. )<br> )<br>DONALD J. TRUMP, et al., )<br> )<br>Defendants. )<br> ) | Civil Action No. 25-0935 (PLF) |

ORDER

Upon consideration of Plaintiff's Motion for a Preliminary Injunction [Dkt. No. 9], it is hereby

ORDERED that Plaintiff's Motion for a Preliminary Injunction [Dkt. No. 9] is GRANTED; it is

FURTHER ORDER that Section 2 of the Executive Order, Exclusions from Federal Labor-Management Relations Programs (Mar. 27, 2025), is unlawful as applied to the Defendants who are heads of agencies with employees represented by the Plaintiff; it is

FURTHER ORDER that the Office of Personnel Management's Guidance on Executive Order Exclusions from Federal Labor-Management Programs (Mar. 27, 2025) ("OPM Guidance"), on the Executive Order is unlawful as applied to the Defendants who are heads of agencies with employees represented by the Plaintiff; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing Section 2 of Executive Order; it is

JA217

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing the OPM Guidance; and it is

FURTHER ORDERED that the parties shall meet and confer and file a joint status report on or before May 2, 2025, proposing a schedule for how this case should proceed.

An opinion explaining the Court's reasoning will be issued within the next few days.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/25/25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

NATIONAL TREASURY EMPLOYEES
UNION,

          Plaintiff,

          v.

DONALD J. TRUMP et al.,

          Defendants.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 25-0935 (PLF)

## OPINION

In 1978, Congress passed the Federal Service Labor-Management Relations Statute. This landmark piece of legislation codified the rights of federal employees to collectively bargain and "participate through labor organizations of their own choosing in decisions which affect them." 5 U.S.C. § 7101(a)(1). In passing the statute, Congress spoke unequivocally: "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). Congress's determination that these rights should apply broadly – and that those rights "contribute[] to the effective conduct of public business," 5 U.S.C. § 7101(a)(1)(B) – was undisturbed for decades, governing the state of the federal workforce despite changes in the composition of Congress and presidential administrations.

This all changed on March 27, 2025. On that day, President Trump issued an Executive Order invoking 5 U.S.C. § 7103(b)(1), which permits the President to "issue an order excluding any agency or subdivision thereof from coverage" of the Federal Service Labor-Management Relations Statute if the President determines that "the agency or subdivision has as

a primary function intelligence, counterintelligence, investigative, or national security work," and that the statute's provisions "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." The effect of the Executive Order was substantial: it removed collective bargaining rights from approximately two-thirds of the federal workforce. In response to this sweeping Executive Order, the National Treasury Employees Union ("NTEU") filed the instant action challenging the Executive Order, arguing that the President exceeded his power when issuing the order.

NTEU filed a motion for a preliminary injunction on April 4, 2025. See Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 9]. The Court held oral argument on the motion on April 23, 2025. Upon careful consideration of the parties' written submissions, their oral arguments, and the relevant authorities, the Court granted NTEU's motion for a preliminary injunction. See Order of April 25, 2025 [Dkt. No. 32].[1]

## I.    BACKGROUND

### A.  Statutory Background

The Federal Service Labor-Management Relations Statute set forth in Title VII of the Civil Service Reform Act, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978) (codified at 5 U.S.C. §§ 7101-35) ("FSLMRS"), provides certain protections of the "right of employees to organize, bargain collectively, and participate through labor organizations of their

---

[1]    The papers reviewed by the Court in connection with this matter include: Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1]; Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 9]; Memorandum of Points and Authority in Support of Plaintiff NTEU's Motion for a Preliminary Injunction ("Pl.'s Mem.") [Dkt. No. 9-1]; Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Opp.") [Dkt. No. 26]; and Plaintiff NTEU's Reply in Support of its Motion for a Preliminary Injunction ("Pl.'s Reply) [Dkt. No. 29].

own choosing in decisions which affect them . . . ." 5 U.S.C. § 7101(a)(1).  In passing the

statute, Congress found that based on "experience in both private and public employment," the

protections were necessary to "safeguard[] the public interest," "contribute[] to the effective

conduct of public business," and "facilitate[] and encourage[] the amicable settlements of

disputes between employees and their employers involving conditions of employment."  Id.  In

sum, Congress found that "labor organizations and collective bargaining in the civil service are

in the public interest."  Id.

Among other things, the FSLMRS requires federal agencies to collectively

bargain "with respect to the conditions of employment affecting such employees."  5 U.S.C.

§ 7103(a)(12).  The statute provides a role for "labor organizations" in this collective bargaining

process, stating:

> A labor organization which has been accorded exclusive recognition
> is the exclusive representative of the employees in the unit it
> represents and is entitled to act for, and negotiate collective
> bargaining agreements covering, all employees in the unit.  An
> exclusive representative is responsible for representing the interests
> of all employees in the unit it represents without discrimination and
> without regard to labor organization membership.

5 U.S.C. § 7114(a)(1).

While Congress extended these protections to "many" federal employees, it did

not "include the entire federal workforce within this regime."  Am. Fed'n of Gov't Emps., AFL-

CIO v. Reagan, 870 F.2d 723, 724 (D.C. Cir. 1989).  "The Act itself exempted several federal

agencies from coverage," id., including the Federal Bureau of Investigation, the Central

Intelligence Agency, and the National Security Agency.  See 5 U.S.C. § 7103(a)(3).  In addition

to these explicit exclusions, "Congress also addressed the matter of national security" in

Section 7103(b).  Soc. Sec. Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps.

(Petitioner/Labor Org.), 59 F.L.R.A. 137, 143 (Sept. 12, 2003). Specifically, Congress granted

the President the authority to either exclude or suspend certain "agenc[ies] or subdivision[s]

thereof" from the statute's coverage. See 5 U.S.C. § 7103(b). Section 7103(b) provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –

>> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

>> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

> (2) The President may issue an order suspending any provision of this chapter with respect to any agency, installation, or activity located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security.

5 U.S.C. § 7103(b). The exclusion provided in Section 7103(b)(1) has been invoked numerous

times since the passage of the FSLMRS.[2] As NTEU points out, however, Section 7103(b)(1) has

never been invoked to exclude an entire cabinet-level department from the FSLMRS. See Pl.'s

Mem. at 4.

---

[2]     See Exec. Order No. 12171, 44 Fed. Reg. 66565 (1979); Exec. Order No. 12338, 47 Fed. Reg. 1369 (1982); Exec. Order No. 12410, 48 Fed. Reg. 13143 (1983); Exec. Order No. 12559, 51 Fed. Reg. 18761 (1986); Exec. Order No. 12632, 53 Fed. Reg. 9852 (1988); Exec. Order No. 12666, 54 Fed. Reg. 1921 (1989); Exec. Order No. 12671, 54 Fed. Reg. 11157 (1989); Exec. Order No. 12681, 54 Fed. Reg. 28997 (1989); Exec. Order No. 12693, 54 Fed. Reg. 40629 (1989); Exec. Order No. 13039, 62 Fed. Reg. 12529 (1997); Exec. Order No. 13252, 67 Fed. Reg. 1601 (2002); Exec. Order No. 13381, § 5(b), 70 Fed. Reg. 37955 (2005); Exec. Order No. 13467, § 3(d), 73 Fed. Reg. 38107 (2008); Exec. Order No. 13480, §§ 2-6, 73 Fed. Reg. 73991, 73992 (2008); Exec. Order No. 13741, § 3, 81 Fed. Reg. 68291 (2016); Exec. Order No. 13760, §2, 82 Fed. Reg. 5325 (2017); Exec. Order No. 13869, §3(b), 84 Fed. Reg. 18130 (2019); see also 5 U.S.C. § 7103, U.S. Government Publishing Office, available at https://www.govinfo.gov/content/pkg/USCODE-2019-title5/html/USCODE-2019-title5-partIII-subpartF-chap71-subchapI-sec7103.htm [https://perma.cc/4JFC-SQXY].

*B. Factual Background*

1. The Executive Order

On March 27, 2025, President Trump issued an executive order titled "Exclusions from Federal Labor-Management Relations Programs." Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order"). Section 2 of the Executive Order amends a previous executive order – Executive Order 12171 of November 19, 1979 – which had excluded various agencies and subdivisions from the FSLMRS pursuant to Section 7103(b). See Exec. Order No. 12171, 44 Fed. Reg. 66565, 66565 (Nov. 19, 1979). The March 27, 2025 Executive Order states that "[t]he agencies and agency subdivisions set forth in section 2 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work," and that it has been "determined that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." Executive Order § 1(a).

As is relevant to NTEU, the Executive Order excludes from the FSLMRS the following agencies and subdivisions "where NTEU represents employees as the exclusive bargaining unit representative":

> Department of Treasury, Internal Revenue Service, IRS Office of Chief Counsel, Bureau of Fiscal Service, Departmental Offices, Alcohol and Tobacco Trade and Tax Bureau, Office of Comptroller of the Currency;
>
> Department of Energy;
>
> Department of Justice, Civil Rights Division and Environment and Natural Resources Division;
>
> Environmental Protection Agency;
>
> Federal Communications Commission;

> Department of Health and Human Services, the Office of the
> Secretary, the Food and Drug Administration, the Administration
> for Strategic Preparedness and Response, the Centers for Disease
> Control and Prevention, and the Office of Refugee Resettlement
> within the Administration of Children and Families; and

> Department of the Interior, Bureau of Land Management.

Declaration of Daniel Kaspar ("Kaspar Decl.") [Dkt. No. 9-2] ¶ 6; see Executive Order § 2.

According to NTEU, the "Executive Order singly eliminates collective bargaining for some two-thirds of the federal workforce." Pl.'s Mem. at 5.

A "Fact Sheet" was issued by the White House the same day that the Executive Order was issued. See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ [https://perma.cc/Y7HR-4W3H] ("Fact Sheet"). The Fact Sheet is divided into three parts. First, it lists eight "national security missions" – "National Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Cybersecurity," "Economic Defense," and "Public Safety" – and provides descriptions of each of these missions. See Fact Sheet. Second, in a section titled "Ensuring that Agencies Operate Effectively," the Fact Sheet explains that the Civil Service Reform Act "enables hostile Federal unions to obstruct agency management," and that this "is dangerous in agencies with national security responsibilities." See id. Finally, in a section titled "Safeguarding American Interests," the Fact Sheet explains:

> President Trump is taking action to ensure that agencies vital to
> national security can execute their missions without delay and
> protect the American people. The President needs a responsive and
> accountable civil service to protect our national security.

- Certain Federal unions have declared war on President Trump's agenda.

  o The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.

  o For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration –an average of over one a day.

- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

Fact Sheet at 3.

On the same day, the Office of Personnel Management ("OPM") issued a memorandum titled "Guidance on Executive Order Exclusives from Federal Labor-Management Programs." See Charles Ezell, Guidance on Executive Order Exclusions from Federal Labor-Management Programs, OPM, Mar. 27, 2025, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf [https://perma.cc/QH4A-MQ9F] ("OPM Guidance"). The OPM Guidance states that pursuant to the Executive Order and Section 7103(b), "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the FSLMRS and "are no longer required to collectively bargain with federal unions." OPM Guidance at 3. The document also states that "Federal unions" "lose their status as the 'exclusively recognized' labor organizations for employees of the agencies and agency subdivisions covered by Exclusions" in the Executive

Order.  Id. (alterations omitted) (referencing 5 U.S.C. § 7111(a)); see 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . by a majority of the employees in an appropriate unit who cast valid ballots in the election.").

## 2.  The Instant Litigation

On March 31, 2025, NTEU filed this lawsuit.  See Compl.  NTEU brings three counts:  (1) Section 2 of the Executive Order "is unlawful and ultra vires because it conflicts with 5 U.S.C. § 7103(b)(1)"; (2) Section 2 of the Executive Order "is unlawful and ultra vires because it conflicts with 5 U.S.C. Chapter 71"; and (3) Section 2 of the Executive Order "is unlawful because it reflects retaliation in violation of NTEU's First Amendment rights."  See id. ¶¶ 78-95.  NTEU seeks, inter alia, an injunction enjoining all the defendants – excluding the President – from "implementing" Section 2 of the Executive Order and OPM Guidance related to the Executive Order.

## II.  JURISDICTION

The government's first argument is that that the Court lacks jurisdiction over this case.  See Opp. at 12-16.  In support, the government contends that Congress created a "special statutory review scheme" in the FSLMRS, and that such a scheme precludes this Court's review under Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994).

The Supreme Court has recognized that "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action."  Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023) (citing Thunder Basin Coal Co. v. Reich, 510 U.S. at 207).  While Congress may create such a "statutory review scheme"

explicitly, it may also do so implicitly by "specifying a different method to resolve claims about agency action," such as by providing for "review in a court of appeals following the agency's own review process." Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., Civil Action No. 24-3354 (RDM), 2025 WL 637416, at *4 (D.D.C. Feb. 27, 2025). To determine whether district court review is precluded, courts apply a two-step approach. At the first step, the court determines whether Congress has "preclude[d] district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019). Congress can be found to have done so "when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." Id. (citation and quotation marks omitted).

At the second step, courts consider whether the plaintiff's claim falls within this "alternative statutory scheme for administrative and judicial review." Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 754. To answer this question, courts consider three factors: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Thunder Basin Coal Co. v. Reich, 510 U.S. at 212-13); see Nat'l Ass'n for the Advancement of Colored People v. United States Postal Serv., 496 F. Supp. 3d 1, 14 (D.D.C. 2020) (subsequent history omitted). "When the answer to all three questions is yes, '[the Court] presume[s] that Congress does not intend to limit jurisdiction.'" Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 489 (2010)). In the event the factors "point in different

directions," "[t]he ultimate question is how best to understand what Congress has done – whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., 2025 WL 637416, at *5 ("[I]f the factors point in different directions . . . . courts must return to the lodestar of whether Congress intended the type of claim at issue to be swept into the statutory enforcement scheme.") (internal citation and quotation marks omitted).

The Court concludes that its jurisdiction is not precluded in this case. The government's argument is essentially that NTEU must pursue its claims using the administrative review scheme created by Congress in the FSLMRS – the Federal Labor Relations Authority ("FLRA") – rather than by bringing claims in a federal district court. See Opp. at 12-13. The administrative review scheme, however, is not available to challenge the Executive Order's exclusions of the agencies and subdivisions subject to the Executive Order for the simple reason that those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order at issue here. See Pl.'s Reply at 17 (arguing that the "Executive Order has taken away the administrative channels that Defendants argue must be used). The relevant precedents from the FLRA make this point clear. See United States Dep't of the Air Force Air Force Materiel Command Warner Robins Air Logistics Ctr. Robins Air Force Base, Georgia (Respondent) & Am. Fed'n of Gov't Emps. Loc. 987 (Charging Party/union), 66 F.L.R.A. 589, 598 (Apr. 20, 2012) ("[T]he Authority has determined that an exemption from coverage constitutes a jurisdictional bar to its consideration of unfair labor practice complaints raised under the Statute"); Department of the Navy, Naval Telecommunications Ctr., Ward Circle and NAVTELCOM Unit Local No. 1, American Federation of Government Employees, 6 F.L.R.A. 498, 500 (1981) ("Where the President has specifically excluded an agency from coverage under

the Statute by issuing an executive order, the Authority is clearly without jurisdiction to process a representation petition.").

Indeed, the exact case the government contends NTEU should bring to the FLRA was attempted in 2002 in the context of a different executive order invoking the Section 7103(b)(1) exclusion, and the FLRA dismissed the case for lack of jurisdiction. See United States Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party), 57 F.L.R.A. 750 (Apr. 25, 2002). In a brief opinion, the FLRA summarized the case and explained why it lacked jurisdiction, stating:

> In each of these cases, the Respondent is the United States Attorney's Office for the Southern District of Texas. On January 7, 2002, the President issued Executive Order 13252, "Exclusions From the Federal Labor-Management Program," exempting, as relevant here, United States Attorneys' Offices from coverage of the Federal Service Labor-Management Relations Statute (the Statute).

> Subsequently, the Authority requested and received submissions from the parties as to why these cases should not be dismissed for lack of jurisdiction in light of the Executive Order. In their submissions, the General Counsel and the Respondent agree that, since the Executive Order exempts United States Attorneys' Offices from coverage of the Statute, the Authority lacks jurisdiction to decide the cases and should dismiss the complaints.

> We agree that, in light of Executive Order 13252, the Authority lacks jurisdiction to decide these cases. Accordingly, we dismiss the complaints.

United States Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party), 57 F.L.R.A. at 750 (footnotes omitted).

In view of this precedent, the Court can think of no reason why the FLRA would decide to exercise jurisdiction over NTEU's case. In fact, NTEU has already brought a case before the FLRA, which has since "issued an order asking why NTEU's case before it . . . should not be dismissed for lack of jurisdiction," citing United States Att'ys Off. S. Dist. of Texas

Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps. Loc. 3966 (Charging Party), 57

F.L.R.A. at 750.  See Pl.'s Reply at 18; Exhibit 17 to Supplemental Declaration of Daniel Kaspar

("Kaspar Supp. Decl.") [Dkt. No. 29-1 at ECF 65-69] (FLRA's order to show cause "why the

[FLRA] should not dismiss [NTEU's case] for lack of jurisdiction").

     At oral argument, the government agreed that the FLRA likely would determine

that it lacks jurisdiction over NTEU's case challenging the Executive Order.  See Transcript

("Tr.") [Dkt. No. 33] at 21:16-22:5.  The government asserts, however, that this Court's

jurisdiction is nevertheless precluded because the "special administrative review scheme" can

still be followed.  See id. at 21:25-23:23.  Specifically, the government contends that NTEU

must bring its claim to the FLRA – which the FLRA will dismiss for lack of jurisdiction – and

then appeal the FLRA's dismissal to a United States court of appeals, where NTEU can raise its

arguments related to the validity of the Executive Order.  See id.; see also 5 U.S.C. § 7123(a)

(outlining appeal process to a United States court of appeals); Am. Fed'n of Gov't Emps. v.

Sec'y of Air Force, 716 F.3d 633, 636 (D.C. Cir. 2013); Am. Fed'n of Gov't Emps., AFL-CIO v.

Trump, 929 F.3d 748 (D.C. Cir. 2019).  The government's argument misses the point:  the

administrative process of the FSLMRS cannot and does not govern here because the Executive

Order at issue removed the agencies and subdivisions in question from coverage of the

FSLMRS.  In other words, this case is distinguishable from the cases relied on by the

government where the unions had "several administrative options for challenging the executive

orders . . . ."  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 757 (internal

quotation marks omitted); see also Am. Fed'n of Gov't Emps. v. Sec'y of Air Force, 716 F.3d

at 637 ("Because the FSLMRS's remedial regime is exclusive, providing [plaintiff] with multiple

options to challenge the [policy], [plaintiff] cannot circumvent this regime by instead bringing a

suit in district court.").  In the instant case, by virtue of the Executive Order, the claims – and

indeed NTEU itself – now are "expressly outside the FLRA's purview."  See Am. Fed'n of

Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson, 475 F.3d 341, 348 (D.C. Cir. 2007).  Because

there is no "special statutory review scheme" that is actually available to NTEU for reviewing its

claim, this Court is not deprived of jurisdiction.

## III. PRELIMINARY INJUNCTION

### A.  *Legal Standard*

A movant seeking preliminary injunctive relief must make a "clear showing that

four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm

in the absence of preliminary relief, a balance of the equities in its favor, and accord with the

public interest." Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d 314,

321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby, 838 F.3d 1, 6 (D.C.

Cir. 2016)); see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a

preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to

such relief" (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008))).  Of these,

the most important factor is whether a movant has established a likelihood of success on the

merits.  See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); Bailey v. Fed. Bureau of

Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024)

Before the Supreme Court's decision in Winter, courts in this Circuit weighed

these four factors on a "sliding scale," under which the movant need not "make as strong a

showing" on one factor if they "make[ ] an unusually strong showing" on another.  Davis v.

Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting Davenport v.

Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)); accord Damus v. Nielsen, 313 F.

Supp. 3d 317, 326 (D.D.C. 2018). This Circuit has suggested, however, that "a likelihood of success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction." Sherley v. Sebelius, 644 F.3d at 392-93 (quoting Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1296 (Kavanaugh, J., concurring)); see Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d at 334 (declining to resolve whether the "sliding scale" approach is still valid after Winter); Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025). Regardless, "a failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion." Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009)); see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 117-18 (D.D.C. 2018).

For each of its claims, NTEU bears the burden of persuasion. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). NTEU also "bears the burden of producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief." Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

### B. Likelihood of Success on the Merits

The core of the parties' dispute centers on whether the President exceeded the authority afforded to him in the FSLMRS when he excluded the agencies and subdivisions under Section 7103(b)(1). NTEU contends that the President's Executive Order was ultra vires, arguing that each of the agencies and subdivisions listed in the Executive Order – agencies which employ nearly two-thirds of the federal workforce, see Pl.'s Mem. at 24 – do not meet the criteria listed in Section 7103(b)(1). See id. at 10-24. The government makes two general arguments in

response. First, the government argues that the Court lacks the authority to review the President's "national security-related determinations under" Section 7103(b) or, at a minimum, that it owes significant deference to the President's conclusion that the particular agencies and subdivisions subject to the Executive Order are excludable from the FSLMRS. See Opp. at 17-20. Second, in the event the Court does review the President's determination, the government contends that the identified agencies and subdivisions meet the criteria listed in Section 7103(b)(1). See id. at 17-28.

The D.C. Circuit's decision in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan is instructive on how the Court must consider the legal issue before it. See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d 723 (D.C. Cir. 1989). In that case, unions representing federal employees challenged President Reagan's executive order excluding certain subdivisions of the United States Marshals Service from coverage under the FSLMRS pursuant to Section 7103(b). See id. at 725; see also Exec. Order No. 12559, 51 Fed. Reg. 18761 (1986).[3] The district court concluded that President Reagan's executive order was invalid because it failed to provide the basis by which the President determined that the criteria in Section 7103(b)(1) had been satisfied. See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 727-28. The district court had reasoned that the bases for the President's authority to issue the executive order must be provided in some way, and that "the absence of determinations or findings in the [executive order], the lack of any language incorporating and republishing prior findings and determinations, and the absence of a separate source of executive power sufficient to sustain the

---

[3]     More specifically, Executive Order 12559 excluded "The Office of Special Operations, the Threat Analysis Group, the Enforcement Operations Division, the Witness Security Division and the Court Security Division in the Office of the Director and the Enforcement Division in Offices of the United States Marshals in the United States Marshals Services."

action" meant the executive order was "not a valid exercise of power under § 7103(b)." Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 665 F. Supp. 31, 34 (D.D.C. 1987).

The D.C. Circuit disagreed and reversed the district court. See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728. The court of appeals began by noting that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist," and that the district court imposed an extra-statutory obligation of requiring "the President to insert written findings into an exempting order . . . ." Id. at 727. As to the argument that "courts are the instrumentalities for ensuring that the authority is properly exercised[] and that the courts must see some proof that these prerequisites were satisfied," the D.C. Circuit stated that the "presumption of regularity [was] decisive" on this issue, explaining:

> We deem the familiar presumption of regularity decisive here. It "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."
>
> [. . . .]
>
> Over the many years since Martin v. Mott[, 25 U.S. (12 Wheat.) 19, 6 L. Ed. 537 (1827)], the presumption of regularity has been applied in a variety of contexts, it is clearly applicable to the case at bar. The executive order under review cited accurately the statutory source of authority therefor, and purported to amend an earlier order that indubitably was a proper exercise of that authority. The Act does not itself require or even suggest that any finding be reproduced in the order. No more than the District Court have appellants suggested any actual irregularity in the President's factfinding process or activity. In these circumstances, we encounter no difficulty in presuming executive regularity. We cannot allow a breach of the presumption of regularity by an unwarranted assumption that the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them.

Id. at 727-28 (footnote omitted).  The court of appeals therefore concluded that "the presumption of regularity [was] pivotal" to the issue of whether the executive order was a valid exercise of authority.  Id. at 728.

In the instant case, as in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, the President has not provided the justification for excluding each of the agencies and subdivisions from the FSLMRS pursuant to Section 7103(b)(1) in the Executive Order itself.  In light of the D.C. Circuit's analysis in Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, the Court therefore must address the following issues:  (1) whether the "presumption of regularity" applies to the President's exercise of authority; and (2) whether the President's exercise of authority was ultra vires.  The Court addresses each issue separately.

1.  Presumption of Regularity

The "presumption of regularity has been recognized since the early days of the Republic," Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d 723, 727 (D.C. Cir. 1989), and has been applied in a variety of contexts where a governmental official's action has been challenged.  See Aram A. Gavoor & Steven A. Platt, In Search of the Presumption of Regularity, 74 FLA. L. REV. 729, 749 (2022) (outlining different categories of examples where the presumption of regularity has been applied).  The "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926); see Latif v. Obama, 677 F.3d 1175, 1178-181 (D.C. Cir. 2011) (same); Paracha v. Trump, Civil Action No. 04-2022 (PLF), 2019 WL 5296839, at *2 (D.D.C. Oct. 18, 2019).  The presumption of regularity, however, is just that, a presumption.  The presumption can be rebutted with "clear evidence" that the official did not discharge his or

her official duties properly, see Owlfeather-Gorbey v. Avery, 119 F.4th 78, 86 (D.C. Cir. 2024), a standard which is "higher than preponderance of the evidence but lower than beyond a reasonable doubt." Paracha v. Trump, 2019 WL 5296839, at *2 (citing Addington v. Texas, 441 U.S. 418, 423-35 (1979)).

The Court concludes that NTEU has rebutted the presumption of regularity by presenting clear evidence that "the President was indifferent to the purposes and requirements of the [FSLMRS], or acted deliberately in contravention of them." Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728. The Court reaches this conclusion for three reasons: (1) the Executive Order and the Administration's surrounding statements are at odds with Congress's findings in the FSLMRS; (2) the White House Fact Sheet reflects retaliatory motive; and (3) the Administration's guidance related to the Executive Order – specifically, the OPM Guidance – suggests that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria.

a.  The Executive Order is at Odds with the Statute's Purpose and Congress's Findings

The first reason that NTEU prevails in rebutting the presumption of regularity is because the scope of the Executive Order itself and the statements in the accompanying Fact Sheet demonstrate that the President was either "indifferent to" or "acted deliberately in contravention" of the purposes of the FSLMRS. See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728. As discussed above, see supra Section I.A, Congress made explicit findings when passing the FSLMRS that "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them" "safeguards the public interest," "contributes to the effective conduct of public business," and "facilitates and encourages the amicable settlements of disputes between

employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1). Congress concluded that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a).

The scope of the Executive Order – covering two-thirds of the federal workforce – and the Fact Sheet's characterization of unions and collective bargaining rights established by the Civil Service Reform Act as "dangerous" stand in stark contrast to these Congressional findings. See Fact Sheet. For example, the Fact Sheet acknowledges that normally "[a]gencies cannot modify policies in collective bargaining agreements until they expire" and that "[a]gencies cannot make most contractually permissible changes until after finishing 'midterm' union bargaining." Fact Sheet at 3. But it finds that the statute "enables hostile Federal unions to obstruct agency management," which is "dangerous in agencies with national security responsibilities." Id. at 2-3. Indeed, the OPM Guidance highlights several examples of the obstacles that collective bargaining agreements have presented to the Trump Administration in accomplishing its broader policies related to reforming the federal workforce. See, e.g., OPM Guidance at 5 (citing Guidance on Collective Bargaining in Connection with Reductions in Force, OPM (Mar. 12, 2025), available at https://www.opm.gov/policy-data-oversight/latest-and-other-highlighted-memos/guidance-on-collective-bargaining-in-connection-with-reductions-in-force.pdf [https://perma.cc/ENN2-37YQ])). The description of these obstacles resulting from collective bargaining as "dangerous," and the characterization of the Civil Service Reform Act as "enabl[ing] hostile Federal unions to obstruct agency management," Fact Sheet at 2-3, are directly contrary to Congress's conclusion that such labor policy and labor organizations are "in the public interest." 5 U.S.C. § 7101(a).

To be sure, as the Section 7103(b)(1) exclusion provision highlights, Congress anticipated that collective bargaining rights may not, in certain cases, be applied in a "a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). But the statements in the Fact Sheet must be considered in the context of the breadth of the Executive Order: the order strips collective bargaining rights from two-thirds of the federal workforce. See Pl.'s Mem. at 4. In other words, justifying the sweeping Executive Order by pointing to the "obstruct[ion] to agency management" caused by "hostile Federal unions" is better understood as a disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a "manner consistent with national security requirements and considerations." See 5 U.S.C. § 7103(b)(1)(B). Indeed, many of the cabinet-level departments that the President has excluded were not included by Congress in the list of agencies exempted from the FSLMRS's coverage. See 5 U.S.C. § 7103(a)(3) (excluding the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, the Federal Service Impasses Panel, and the United States Secret Service and the United States Secret Service Uniformed Division). In sum, there is clearly an inconsistency. Congress determined that collective bargaining rights for the majority of the federal workforce was "in the public interest," yet the Executive Order strips these rights from a majority of the federal workforce. This certainly provides evidence that the "President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them" in his invocation of the Section 7103(b) exclusion. Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.

b. <u>Contemporaneous Statements in the White House Fact Sheet Reflect Retaliatory Motive</u>

The second reason that NTEU prevails in rebutting the presumption of regularity by clear evidence is because the White House Fact Sheet reflects retaliatory motive towards certain unions. For example, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda," by, <u>inter alia</u>, filing grievances against President Trump and by stating that they would "'fight[] back' against Trump." Fact Sheet at 3. The Fact Sheet further states that the Civil Service Reform Act of 1978 – of which the FSLMRS is a part – "enables hostile Federal unions to obstruct agency management," and that the President "refuses to let union obstruction interfere with his efforts to protect Americans and our national interests." Fact Sheet at 3. These statements bear no relation to the criteria established by Congress in Section 7103(b)(1). Rather, the statements reflect President Trump's frustration with the unions' representational activity and exercise of their First Amendment rights – such as through "filing grievances to block Trump policies" – and the impact those activities have had on his policy directives and "agenda." <u>See</u> Fact Sheet at 3. Indeed, as NTEU points out, these statements in the Fact Sheet appear to be in direct response to the number of lawsuits and grievances NTEU has filed against the Trump Administration in the last several months. <u>See</u> Compl. ¶ 63.

Other statements in the Fact Sheet reflect that this frustration with the unions' "war" on President Trump may have been a significant factor in his issuing the Executive Order. For example, the Fact Sheet suggests that it is not "the provisions" of the FSLMRS themselves that "cannot be applied . . . in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B), but rather the unions' <u>use of</u> these provisions, which President Trump views as "mass obstruction that jeopardizes his ability to manage agencies with

vital national security missions." Fact Sheet at 3. Indeed, the Fact Sheet's statement that President Trump "supports constructive partnerships with unions who work with him" but "will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions" comes very close to conceding this point. See id. Furthermore, as NTEU argues, certain inclusions and exclusions from the Executive Order reflect a preference for unions that have a "constructive relationship" with the President. For example, the President's decision to allow "police officers, security guards, [and] firefighters" to retain collective bargaining rights, but to remove such rights from employees of the Federal Bureau of Prisons – whose employees are represented by a union that has been critical of the President and his Administration – suggests that the President's relationship with particular unions was a factor in determining which agencies and subdivisions were included in the Executive Order. Pl.'s Reply at 7; see Executive Order § 2(b).

The language used in the Fact Sheet coupled with the focus on "constructive partnership[s]" as opposed to "mass obstruction" undercuts the presumption that the President considered and abided by the statutory language in Section 7103(b)(1). See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728. Furthermore, it suggests a retaliatory motive to punish unions for the "war" they have "declared [ ] on President Trump's agenda." Fact Sheet at 3. Such clear evidence of retaliatory motive is "of great significance in addressing the presumption" of regularity. See Hartman v. Moore, 547 U.S. 250, 263-64 (2006) (concluding that "prosecutor's disclosure of retaliatory thinking on his part" was significant in determining whether the presumption of regularity should be applied); see also Wendt Corp. v. NLRB, 26 F.4th 1002, 1011 (D.C. Cir. 2022) ("A company's open hostility toward Union activity,

including a manager's anti-union speech, is clearly sufficient to establish anti-union animus on the part of that company.") (cleaned up).

    c.  <u>Evidence Reflects that the Executive Order was Motivated by Unrelated Policy Goals</u>

        The final reason that NTEU prevails in rebutting the presumption of regularity is because substantial evidence in the record reflects that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria. <u>See</u> Pl.'s Reply at 4-6 (arguing that the Executive Order was motivated by "a desire to make federal employees easier to fire"). The OPM Guidance strongly supports this point, couching the Executive Order in the broader "policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently." OPM Guidance at 5. The OPM Guidance goes on to outline the Administration's many policies and directives related to the federal workforce writ large. For example, the OPM Guidance notes that the "President issued multiple directives to facilitate the separation of underperforming employees," but that "Agency [collective bargaining agreements] often create procedural impediments" to removing these employees. <u>Id</u>. at 3. The OPM Guidance directs the agencies and subdivisions covered by the Executive Order to "seek to bring their policies into alignment with the specific Administration priorities," including limiting performance improvement periods and discontinuing grievance participation. <u>See id</u>. at 3-4. In a section entitled "Effective and Efficient Government," the OPM Guidance explains that "after terminating [the agencies'] [collective bargaining agreements]" pursuant to the Executive Order, agencies can proceed to "[d]isregard contractual [reduction-in-force] articles" and "prepare large-scale reductions in force" as the "President has directed." <u>Id</u>. at 5 (capitalization omitted).

In sum, the OPM Guidance says little about national security, notwithstanding the national security valence of Section 7103(b)(1).  On examination, the OPM Guidance and the Executive Order appear to be more about accomplishing the Administration's goal of substantially changing the nature of the federal workforce.  The OPM Guidance lists numerous examples of earlier policy directives by the President and OPM, identifies the difficulties collective bargaining agreements posed to accomplishing those directives, and states that those obstacles are now gone as a result of the Executive Order.  The framing of the Executive Order in this way is evidence that the President was at best "indifferent to the purposes and requirements of the" FSLMRS.  Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.  Indeed, it is strong evidence that the President's invocation of Section 7103(b)(1) was to remove the barriers created by the FSLMRS to his unrelated policy objectives.  See In re Aiken Cnty., 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections.").

*     *     *

For the reasons discussed above, the Court concludes that NTEU has successfully rebutted the presumption of regularity.  The Court therefore need not presume that the President has "properly discharged [his] official duties" in the absence of justification for the Executive Order.  See United States v. Chemical Foundation, Inc., 272 U.S. at 14-15.

2.   The President's Executive Order is Ultra Vires

Having determined that the presumption of regularity does not apply, the issue now becomes whether NTEU likely will be successful in showing that the Executive Order was ultra vires.

"The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself[,]'" or from a combination of the two. Medellin v. Texas, 552 U.S. 491, 523 (2008) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952)). While a party has different bases by which to challenge Presidential actions that may exceed the scope of the President's power, one such claim is that the President's action was ultra vires. See Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority.") (quoting Dart v. United States, 848 F.2d 217, 224 (D.C. Cir. 1988)). An ultra vires claim is a "non-statutory form of review [that] derives from courts' equitable authority to 'reestablish the limits on' executive authority '[w]hen an executive acts ultra vires.'" Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab., Civil Action No. 25-339 (JDB), 2025 WL 1129227, at *22 (D.D.C. Apr. 16, 2025) (quoting Dart v. United States, 848 F.2d at 224); see Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015) (Scalia, J.) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."). This claim, however, "is a doctrine of last resort, 'intended to be of extremely limited scope.'" Schroer v. Billington, 525 F. Supp. 2d 58, 65 (D.D.C. 2007) (quoting Griffith v. Fed. Labor Relations Auth., 842 F.2d 487, 493 (D.C. Cir. 1988)).

In the instant case, the evidence rebutting the presumption of regularity is a significant reason to believe NTEU will prevail on its claim. The scope of the Executive Order when compared with the intent of Congress in passing the FSLMRS, coupled with the surrounding statements in the Fact Sheet and OPM Guidance – which strongly suggest that

President Trump's invocation of Section 7103(b)(1) was mere pretext for retaliation and for accomplishing unrelated policy objectives – are persuasive reasons to believe NTEU likely will be successful on the merits of its claim.

Ultimately, the success of NTEU's claim hinges on whether the agencies and subdivisions subject to the Executive Order meet the statutory criteria set forth in the FSLMRS. See Opp. at 20. The government provides a meager defense explaining how the agencies and subdivisions covered by the Executive Order – which include approximately two-thirds of the federal workforce, see Kaspar Decl. ¶ 35 – meet the Section 7103(b)(1) criteria. The government's defense consists primarily of statements about the general role of the agencies and subdivisions, and then listing several examples of offices within the agencies and subdivisions that may perform work related to national security. Given the breadth of the Executive Order, however, this approach is wholly inadequate to assess whether each of the agencies and subdivisions actually falls within the statutory national security exception.

To remind, Section 7103(b) provides that:

The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –

> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1).  The government's interpretation of Section 7103(b)(1) hinges on whether each agency and subdivision cited has a "primary function" of "national security work."[4]

With regard to Section 7103(b)(1)(A), the government asserts that "[t]he statute's first three categories of primary functions" – that is, "intelligence, counterintelligence, [and] investigative" work – "require no further explanation."  Opp. at 20.  As for the term "national security work," the government argues that it "has long and consistently been interpreted in the federal labor relations context to refer to work 'directly related to protection and preservation of the military, economic, and productive strength of the United States.'"  Id. (quoting Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 F.L.R.A. 644, 655-56 (1980)).

As for Section 7103(b)(1)(B), the government essentially argues that any agency or subdivision that "has a significant, critical national security mission" necessarily will satisfy the criteria in Section 7103(b)(1)(B).  Opp. at 26.  The government contends that because it has shown that "each Defendant agency or subdivision has a significant, critical national security mission," Section 7103(b)(1)(B) is satisfied.  Id.

---

[4] The government suggests at several points in its opposition that a few of the agencies and subdivisions satisfy the Section 7103(b)(1) criteria by nature of performing "intelligence, counterintelligence, [or] investigative" work.  See, e.g., Opp. at 23 (arguing Food and Drug Administration has an "investigative function"); id. at 24 (arguing that the Department of Justice "performs investigative, intelligence, and national security work").  The terms "intelligence, counterintelligence, [and] investigative" work likely should be interpreted as having a national security valence in light of Section 7103(b)(1) as a whole.  See Soc. Sec. Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps. (Petitioner1labor Org.), 59 F.L.R.A. at 143 ("Congress also addressed the matter of national security in § 7103(b) of the Statute.").  This issue, however, need not be addressed here because the government undoubtably relies on "each Defendant agenc[ies'] or subdivision[s'] . . . significant, critical national security mission" in arguing that the Section 7103(b)(1)(2) criteria has been satisfied.  See Opp. at 26; see also id. at 2 ("[T]he Court lacks authority to review the President's national security determination, as Congress expressly recognized").  The government's success therefore depends on the validity of its interpretation of work implicating "national security."

27

The President's determination appears to apply an overly broad interpretation of both the term "primary function" and the term "national security work." The Court therefore concludes that NTEU is likely to succeed on its claim.

### a. "Primary Function"

While the government never explicitly states how it interprets "primary function," its arguments related to each of the agencies and subdivisions reflect either an overly broad interpretation of the term or a disregard of the term entirely. The government's arguments related to each of the agencies and subdivisions illustrate this point by either pointing to generalized mission statements of the agencies referencing national security, or by pointing to individual functions that segments of the agencies or subdivisions perform that have a national security valence, and then concluding that the entire agencies' or subdivisions' "primary function" is national security.

For example, the government argues that the Department of the Treasury is primarily engaged in "national security work" because it "exists to promote economic and productive strength of the United States – a core national security mission." Opp. at 20. As to the Internal Revenue Service within the Department of the Treasury, the government argues that it primarily performs "national security work" because it "collect[s] almost all Federal revenues," of which "America's military, economic, and productive capacity directly depend . . . ." Opp. at 21. In terms of the Department of Energy ("DOE"), the government argues that the department's "primary role is setting national energy policy, with obvious national security objectives and implications." Id. The government points to certain examples of this, such as the DOE's role in the "security of the U.S. nuclear weapons stockpile" and in the creation of "affordable and reliable domestic supply of energy," which "'is a fundamental

requirement for the national and economic security of any nation.'" Id. (quoting Exec. Order No. 14156, 90 Fed. Reg. 8,433 (Jan. 20, 2025)).[5] With respect to the Food and Drug Administration, the government maintains that it ensures "a secure food supply," which is "critical to national security." Id. at 23. As for the Bureau of Land Management, the government argues that its "overseeing of energy production" on public land and its "funding [of] the Federal Government's operations through mineral development" makes it critical to national security. Id. at 22.

NTEU responds that these examples demonstrate that the government "reads 'primary' entirely out of the text, as they reference any function that an agency at issue performs . . . ." Pl.'s Reply at 10-11. The Court agrees. The government's approach is essentially pointing to a specific function that a particular agency or subdivision performs, and then arguing that the instance of "national security work" means the entire agency's or its subdivision's "primary function" is "national security work." But even if an agency performs some work that implicates national security, that does not mean that the entire agency has "a primary function" of "national security work." 5 U.S.C. § 7103(b)(1)(A). In sum, because the government's arguments make clear that the President applied an overly broad interpretation of the term "primary function" or wrote the term out of the statute entirely, the Court concludes that NTEU likely will succeed on its claim.

---

[5] The government notes that the DOE was created by the "same Congress that enacted the FSLMRS," failing to explain why that Congress did not include the DOE in its list of agencies excluded from the protections in the FSLMRS. See 5 U.S.C. § 7103(a)(3).

b. "National Security" and "National Security Work"

The government's interpretation of "national security" and "national security work" is also overly broad. See 5 U.S.C. § 7103(b)(1)(A)-(B). The government interprets "national security work" as work "directly related to protection and preservation of the military, economic, and productive strength of the United States." See Opp. at 20 (citation omitted). As illustrated above, the government contends that this definition encompasses everything from the collection of taxes to the management of the United States's food supply and distribution.

The government's single citation for its expansive interpretation of "national security work" is to the FLRA's decision in Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 F.L.R.A. 644, 655-56 (1980). See Opp. at 20. But that case is significantly less supportive of the government's position than it may think. Indeed, in that case, the FLRA cautioned against applying an overly broad interpretation of "national security," stating in relevant part:

> A complex legal framework surrounds 'national security' in the context of Government employment. See, e.g., 5 U.S.C. § 7532; Executive Order 10450; FPM Chapter 732-3, subchapter 1. Exclusion from an appropriate unit deprives employees of the opportunity under the Statute to determine whether or not they wish to be represented by a labor organization and of the opportunity to engage in collective bargaining with respect to conditions of employment through labor organizations. Labor organizations and collective bargaining in the civil service have been determined by the Congress to be 'in the public interest.' 5 U.S.C. § 7101(a). Therefore, the term 'national security' must be interpreted to include only those sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the United States, including the security of the Government in domestic and foreign affairs, against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense. See Cole v. Young, 76 S. Ct. 861, 351 U.S. 536 (1956); FPM Chapter 732-3, subchapter 1, paragraph 1.1; 32 C.F.R. § 156.5.

<u>Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181</u>, 4

F.L.R.A. at 655-56.  The FLRA's reasoning in the <u>Oak Ridge</u> case makes clear that the Supreme

Court's decision in <u>Cole v. Young</u>, 351 U.S. 536 (1956), provided guidance on the interpretation

of "national security" in Section 7103(b)(1).  On this point, NTEU agrees, arguing that <u>Cole v.</u>

<u>Young</u>'s definition of "national security" "should govern here."  Pl.'s Reply at 9.

   In <u>Cole v. Young</u>, the Supreme Court addressed "the meaning of the term

'national security' as used in" a statute enacted in 1950, which gave "the heads of certain

departments and agencies of the Government summary suspension and unreviewable dismissal

powers over their civilian employees, when deemed necessary 'in the interest of the national

security of the United States.'"  <u>See</u> <u>Cole v. Young</u>, 351 U.S. at 538.  The Supreme Court

concluded that while the term "national security" was not defined in the law, it was "clear from

the statute as a whole that that term was intended to comprehend only those activities of the

Government that are directly concerned with the protection of the Nation from internal

subversion or foreign aggression, and not those which contribute to the strength of the Nation

only through their impact on the general welfare."  <u>Id</u>. at 544.  The Supreme Court found that the

law reflected "Congress' concern for the procedural rights of employees and its desire to limit

the unreviewable dismissal power to the minimum scope necessary to the purpose of protecting

activities affected with the 'national security.'"  <u>Id</u>. at 547.  This intent "hardly seem[ed]

consistent" with the "indefinite and virtually unlimited meaning" of "national security" asserted

by the government.  <u>Id</u>.  The government's interpretation had to be rejected.  After all, the

Supreme Court reasoned, the statute's requirement that the President determine that an

"employee's misconduct would affect the 'national security'" would not be necessary "if

'national security' were used in the Act in a sense so broad as to be involved in all activities of

the Government, for then the relationship to the 'national security' would follow from the very fact of employment." Id. at 542-43. The Court concluded with a cautionary statement about the ability for national security determinations to supersede law:

> [I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws. For why could it not be said that national security in that sense requires not merely loyal and trustworthy employees but also those that are industrious and efficient? The relationship of the job to the national security being the same, its demonstrated inadequate performance because of inefficiency or incompetence would seem to present a surer threat to national security, in the sense of the general welfare, than a mere doubt as to the employee's loyalty.

Cole v. Young, 351 U.S. at 547-48.

Appling the reasoning of Cole v. Young to this case, this Court must conclude that the President's interpretation of "national security" exceeds the scope of the meaning intended by Congress. In passing the FSLMRS, Congress clearly expressed a desire to extend collective bargaining rights broadly because it determined that those rights were "in the public interest." 5 U.S.C. § 7101(a) ("[L]abor organizations and collective bargaining in the civil service are in the public interest"). Congress provided a narrow exception that allowed the President to exclude agencies and subdivisions from these protections if the provisions of the law "cannot be applied . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7101(b)(1)(B). And as in Cole v. Young, it is "clear from the statute" that the term "national security" "comprehend[s] only those activities . . . that are directly concerned with the protection of the Nation from internal subversion or foreign aggression . . . ." Cole v. Young, 351 U.S. at 544. But President Trump instead has applied a startlingly broad application of "national security," which – directly contrary to the Supreme

Court's definition in <u>Cole v. Young</u> – encompasses "those activities of Government . . . which contribute to the strength of the Nation only through their impact on the general welfare." <u>Cole v. Young</u>, 351 U.S. at 544. This interpretation of "national security" therefore is inconsistent with the statute and "risks allowing the exception to swallow the rule, thereby undermining the purpose of the statute itself." <u>Nat'l Fed'n of Fed. Emps. v. McDonald</u>, 128 F. Supp. 3d 159, 172 (D.D.C. 2015). "[I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the [FSLMRS], though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." <u>Cole v. Young</u>, 351 U.S. at 548.

In sum, NTEU is likely to prevail in showing that the President has applied an overly broad interpretation of "national security" when invoking Section 7103(b)(1), thereby making the President's Executive Order <u>ultra</u> <u>vires</u>.

*     *     *

In light of its analysis above, the Court concludes that NTEU is likely to succeed on its claim that the Executive Order is <u>ultra</u> <u>vires</u>. This conclusion is reached in light of the evidence rebutting the "presumption of regularity" and the interpretation of Section 7103(b)(1).[6]

### C.  Irreparable Harm

The next factor to consider is whether NTEU will suffer irreparable injury without the requested preliminary injunction. <u>See</u> <u>Archdiocese of Washington v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d at 321. The D.C. Circuit "has set a high standard for irreparable injury."

---

[6]     Because the Court concludes that NTEU is likely to succeed on its <u>ultra</u> <u>vires</u> claims, <u>see</u> Compl. ¶¶ 78-89 (Counts One and Two), the Court does not reach the issue of whether NTEU has satisfied the requirements for a preliminary injunction on its First Amendment retaliation claim.

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). "Not only must the injury 'be both certain and great,' and 'actual and not theoretical,' but 'the injury must be beyond remediation.'" Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com., 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297). Importantly, "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of establishing] irreparable harm." League of Women Voters v. Newby, 838 F.3d at 9.

NTEU advances two primary bases by which it argues it will face irreparable harm absent a preliminary injunction. First, it argues that the Executive Order significantly reduces its bargaining power by "cut[ting] the number of NTEU-represented employees by over 65%." Pl.'s Mem. 32; see Declaration of Mark L. Gray ("Gray Decl.") [Dkt. No. 9-3] ¶ 6; Kaspar Decl. ¶ 9. Second, it argues that it faces "severe financial harm" caused by the loss of dues revenue. See Pl.'s Mem. at 30-32. More specifically, NTEU states that it will lose approximately $25 million in dues revenue over the course of the next year, or approximately half of its annual revenue. See id. at 31; Kaspar Decl. ¶ 17; Gray Decl. ¶ 12.

The Court concludes that each of the injuries are sufficient to show that NTEU will face irreparable harm absent a preliminary injunction.

### 1. Loss of Bargaining Power

NTEU contends that its loss of bargaining power is both significant and irreparable. See Pl.'s Mem. at 32-33. According to NTEU, the Executive Order covers 65.9% of all NTEU-represented employees, or approximately 104,278 employees. Kaspar Decl. ¶ 9. NTEU argues that it will become "a less effective, less influential organization in ways that cannot be undone" as a result of the Executive Order, Pl.'s Mem. at 33, which removes both

agencies' obligation to collectively bargain and NTEU's status as the exclusive bargaining representative of the agencies' employees.  See OPM Guidance at 3.  More specifically, NTEU asserts that as a result of this reduction in representation, it will be less effective at (1) advocating for employees at agencies not covered by the Executive Order; (2) persuading employees to join the union; and (3) advocating for employees' interests before Congress.  See Kaspar Decl. ¶¶ 11-14.  NTEU argues that these injuries have already begun to occur.  See Pl.'s Reply at 20-23.  For example, NTEU states that certain agencies have already failed to honor provisions of the respective collective bargaining agreements by failing to withhold dues payment from employees' paychecks, Kaspar Supp. Decl. ¶¶ 12-14, "disavow[ing] any obligation to bargain," id. ¶¶ 17-18, and beginning to implement reductions in force.  See id. ¶ 16.

      Courts have long recognized that "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions."  Franks Bros. Co. v. NLRB, 321 U.S. 702, 704 (1944).  "The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable."  N.L.R.B. v. Electro-Voice, Inc., 83 F.3d 1559, 1573 (7th Cir. 1996).  Furthermore, "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished."  Id.; see Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.").  Therefore, any relief a court may provide "must come quickly."  In re Am. Fed'n of Gov't Emps., AFL-CIO, 790 F.2d 116, 117-18 (D.C. Cir. 1986) (citation and quotation marks omitted).

These concerns are heightened in the instant case given the Trump Administration's directive "to prepare large-scale reductions in force."  OPM Guidance at 5.  Should NTEU not obtain a preliminary injunction, there is a substantial possibility that only a small fraction of its once large union would remain upon prevailing in this litigation.  And, as NTEU argues, see Kaspar Decl. ¶¶ 11-14, the loss of representation and status as an exclusively recognized labor organization creates "obstacles [that] make it more difficult for the [plaintiff] to accomplish [its] primary mission."  See League of Women Voters v. Newby, 838 F.3d at 9.  This in itself constitutes irreparable harm.  See id.; Garcia v. Sacramento Coca-Cola Bottling Co., 733 F. Supp. 2d 1201, 1216 (E.D. Cal. 2010) ("[C]ourts have historically held that withdrawal of union recognition is often irreparable.") (collecting cases); Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, Civil Action No. 25-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025).

The government's arguments to the contrary are unavailing.  First, the government argues that NTEU's concern over losing bargaining power and members is "speculative" because "no defendant agency has yet taken action to terminate a [collective bargaining agreement] or to remove individuals covered by Executive Order 14,251 from bargaining units."  Opp. at 10.  In support, the government points to an April 8, 2025 memorandum from the Chief Human Capital Officers Council that states that "[a]gencies should not terminate any collective bargaining agreements . . . until the conclusion of litigation or further guidance from OPM directing such termination."  Opp. at 6.

The guidance in the memorandum can provide little solace to plaintiff, and no real support for the government's argument that NTEU's injury is "speculative."  The April 8 memorandum itself indicates that collective bargaining agreements may be terminated based on

"guidance from OPM directing such termination." See Opp. at 6 (quoting Declaration of Allen R. Brooks [Dkt. No. 26-1] ¶ 6). And OPM has already made clear that agencies and subdivisions "are no longer subject to the collective-bargaining requirements" of the FSLMRS. OPM Guidance at 3 (emphasis added). In other words, notwithstanding the lack of the formal cancellation of the collective bargaining agreements, the agencies and subdivisions have been instructed that the protections in the FSLMRS are no longer operative. Moreover, NTEU has stated that agencies and subdivisions have already begun disregarding provisions of the collective bargaining agreements in line with the OPM Guidance. See Kaspar Supp. Decl. ¶¶ 12-25. The government's argument that NTEU's injury is "speculative" therefore must be rejected for the simple reason that it has already begun to materialize. See Pl.'s Reply at 21 (stating that "[b]efore and after" the April 8 memorandum, "agencies have refused to meet with NTEU, to bargain with NTEU, or to honor contractual obligations . . . .").[7]

Second, the government argues that there is "no reason why losing current NTEU members while this litigation is pending could not be remedied by a favorable judicial ruling in this case restoring its scope of representation." Opp. at 10-11. This argument fails for two reasons. First, the argument ignores the injuries that NTEU will suffer in the interim given that "[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining." Int'l Union of Elec., Radio & Machine Workers, AFL-CIO v. NLRB, 426 F.2d at 1249. Put differently, the period of time when union representation is suspended will have lasting and irreparable effects on employees' interest and

---

[7] The government also asserts that "[e]ven if agencies did remove NTEU members from bargaining units, those employees could remain members of NTEU . . . ." Opp. at 10. This argument is left unexplained, and it does not address the fact that NTEU would be significantly obstructed in representing its members if the agencies terminate their collective bargaining agreements and refuse to bargain with their employees.

participation in the union. Second, the President's directive "to prepare large-scale reductions in force" outlined in the OPM Guidance – which the IRS has already appeared to begin to follow through on, see Kaspar Supp. Decl. ¶ 16 – creates the serious concern that NTEU's bargaining power garnered through the size of its membership base will either be forever diminished or will take a great deal of time to restore. See N.L.R.B. v. Electro-Voice, Inc., 83 F.3d at 1573 ("As time passes, the benefits of unionization are lost and the spark to organize is extinguished.").

In light of the injuries to NTEU's bargaining power that are likely to occur – and indeed have already begun to occur – and the "obstacles" that the loss of bargaining power creates for it to "accomplish [its] primary mission" of representing its members, the Court concludes that NTEU will face irreparable harm absent a preliminary injunction. See League of Women Voters v. Newby, 838 F.3d at 9; see Garcia v. Sacramento Coca-Cola Bottling Co., 733 F. Supp. 2d at 1216 ("[C]ourts have historically held that withdrawal of union recognition is often irreparable.") (collecting cases).

## 2. Union Dues

"While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the'" movant's operations. Climate United Fund v. Citibank, N.A., Civil Action No. 25-0698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)). NTEU's declarations clearly reflect that the financial harm from the loss of dues revenue "threatens NTEU's very existence." Kaspar Decl. ¶ 18; see Gray Decl. ¶ 13 ("The immediate, drastic decrease in income from lost payroll deductions will jeopardize NTEU's very existence."). NTEU's Director of Field Operations, Daniel Kaspar, asserts that absent preliminary relief, NTEU will lose approximately $25 million

dollars in revenue over the next year, which is "more than half of NTEU's total revenue stream." Kaspar Decl. ¶ 17; see Gray Decl. ¶ 12. He further states that this injury is imminent, as certain agencies subject to the Executive Order have already begun to stop automatic deductions from union members' paychecks. Kaspar Decl. ¶¶ 20-21. Indeed, as of the filing of its reply memorandum on April 16, 2025, NTEU has already lost $2 million in dues revenue. Kaspar Supp. Decl. ¶¶ 13-14.

   The government does not meaningfully dispute that the severity of the financial loss threatens the very existence of NTEU's operations, though it briefly mentions the general rule that "economic loss does not, in and of itself, constitute irreparable harm." Opp. at 9 (quoting Nat'l Min. Ass'n v. Jackson, 768 F. Supp. 2d 34, 50 (D.D.C. 2011). Instead, the government first argues that the financial injury is speculative because "[u]nion members remain free to pay their dues directly to the union" notwithstanding an agency's decision to discontinue automatic deductions from the members' paychecks. Opp. at 9. This argument is brief and unexplained. As NTEU correctly notes, it has already started losing significant dues revenue, and the Executive Order takes "away the basic reason that NTEU members pay dues: to support their exclusive bargaining representative . . . ." Pl.'s Reply at 21; see Kaspar Decl. ¶¶ 22-24 (stating that "NTEU will be of less value to employees . . . if it can no longer participate in" any grievance procedure or collective bargaining). Moreover, as NTEU points out, it is not clear how NTEU would collect dues since some of the defendants have "taken away the very apparatus" created by Congress for collecting the dues payments. Pl.'s Reply at 21; see 5 U.S.C. § 7115.

   The government next argues that NTEU can recover the lost dues revenue at a later date through the FSLMRS's administrative review procedures, since the FLRA "routinely

orders agencies to reinstate the dues allotments of individuals in the unit whose allotments were unlawfully terminated . . . ." Opp. at 10. This argument is unpersuasive for at least two reasons. First, while NTEU may be able to recover dues that it has immediately lost as a result of the Executive Order, this cannot account for the reduction in dues moving forward. Such a reduction inevitably will result from a decrease in membership, either as a product of the agencies following through on the President's directive to implement reductions in force, or through "discourage[ment]" in union membership that results from "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives . . . ." Franks Bros. Co. v. NLRB, 321 U.S. at 704. Second, even if some dues are eventually recovered later, the government ignores the fact that the significant loss NTEU will suffer over the next year – approximately half of its revenue – "will jeopardize NTEU's very existence." Gray Decl. ¶ 13. In the meantime, the loss of revenue creates a serious obstacle for NTEU to "accomplish [its] primary mission" of representing its members. League of Women Voters v. Newby, 838 F.3d at 9; see Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President, Civil Action No. 25-0917 (RJL), 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) ("While economic loss does not always warrant a TRO, this is not a typical situation because plaintiff faces more than economic harm – it faces crippling losses and its very survival is at stake.").

*      *      *

In sum, NTEU's loss of bargaining power and the significant financial harm to the union that is both ongoing and can be expected to continue represent irreparable harm warranting preliminary relief.

*D.  Equities and Public Interest*

The remaining preliminary injunction factors – the balance of the equities and assessment of the public interest – weigh in NTEU's favor.  These factors "merge when, as here, the Government is the opposing party.'"  Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).

NTEU makes two arguments that a preliminary injunction is in the public interest.  First, NTEU argues that a preliminary injunction will maintain the status quo that has existed for decades, in which a large portion of the federal workforce possessed collective bargaining rights.  See Pl.'s Mem. at 35.  Second, NTEU asserts that a preliminary injunction is in the public interest because "[t]he public has an interest in ensuring that the laws enacted by their representatives are not imperiled by executive fiat."  Pl.'s Reply at 23 (citation omitted).

The Court agrees with both propositions.  Congress unequivocally identified collective bargaining rights and federal unions as being "in the public interest."  See 5 U.S.C. § 7101(a).  Pursuant to this finding, Congress determined that large portions of the federal workforce should have the right to collectively bargain and be represented by federal unions.  This was the state of the federal workforce for decades.  The Executive Order dramatically changes this, excluding two-thirds of the federal workforce from the FSLMRS.  The scope of the Executive Order, contemporaneous evidence surrounding the Executive Order, and the government's defense of the Executive Order in this case raise serious concerns about whether the President has exceeded his power.  See Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[E]nforcement of an unconstitutional law is always contrary to the public interest"); TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) ("[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'")

(quoting R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); see also League of

Women Voters v. Newby, 838 F.3d at 12 (holding that while "[t]here is generally no public

interest in the perpetuation of unlawful agency action," "there is a substantial public interest 'in

having governmental agencies abide by the federal laws that govern their existence and

operation'") (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)); Grace v.

Whitaker, Civil Action No. 18-1853 (EGS), 2019 WL 329572, at *5 (D.D.C. Jan. 25, 2019)

("[T]here is a public interest . . . in ensuring that statutes enacted by their representatives are not

imperiled by executive fiat.") (citation omitted) (cleaned up).

       The government's argument that the public interest will be harmed if the Court

issues a preliminary injunction is unavailing.  The thrust of the government's argument is that it

is in the public interest to ensure that the President can effectively operate "agencies relevant to

national security without the constraints of collective bargaining," and that a preliminary

injunction would "displace and frustrate the President's decision about how to best address

issues of national security."  Opp. at 34.  These arguments, however, presuppose that the

President's decisions are in fact "national security" determinations, rather than a recasting of

decisions related to "the general welfare" as "national security" determinations.  See Cole v.

Young, 351 U.S. at 544.  For the reasons discussed at length above, the President's assertion of

"national security" interests is overly broad in this case.

       The Court therefore concludes that the balance of the equities and assessment of

the public interest weigh in favor of granting a preliminary injunction.  Indeed, each of the

preliminary injunction factors weighs in favor of granting NTEU's motion.

## IV. SECURITY AND SCOPE OF PRELIMINARY INJUNCTION

The final two matters the Court must address were raised for the first time by the government at oral argument. First, the government requests that the Court impose a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. See Tr. at 52:8-11. Second, the government argues that in the event that the Court grants NTEU's motion, it should exempt agencies or subdivisions from the preliminary injunction order that meet the criteria in Section 7103(b)(1). See id. at 51:6-13.

Turning first to the request for a bond, the Federal Rules of Civil Procedure provide that the Court may grant a motion for a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). Nevertheless, "[c]ourts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." Simms v. District of Columbia, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (citation omitted) (second alteration in original) (quoting DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999)); see Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *13 n.5 (D.D.C. June 28, 2024). "A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, Civil Action No. 25-0239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (quoting Nat. Res. Def. Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases)).

At oral argument, the government requested that NTEU be required to post a bond because the government will suffer financial harm from a preliminary injunction as a result of

needing to pay certain expenses for employees to engage in union activity. See Tr. at 52:18-53:4. The court exercises its discretion to decline this request. See Aviel v. Gor, Civil Action No. 25-0778 (LLA), 2025 WL 1009035, at *12 (D.D.C. Apr. 4, 2025). As the Court's analysis of this motion illustrates, NTEU has made a substantial showing that the Executive Order is of unprecedented scope, deprives federal employees and the federal unions of rights that Congress found to be in the public interest, and poses an existential risk to NTEU. Requiring the posting of a bond would conflict with both the Court's findings that each of the preliminary injunction factors weigh heavily in NTEU's favor and the principles of the right to seek judicial review of unlawful government action. See Aviel v. Gor, 2025 WL 1009035, at *12 n.7 ("Setting a bond would conflict with every holding in this opinion and contravene the interests of justice."); see also League of United Latin Am. Citizens v. Exec. Off. of the President, Civil Action No. 25-0946 (CKK), 2025 WL 1187730, at *62 (D.D.C. Apr. 24, 2025) (collecting recent cases denying government's request to "post any bond as a condition of obtaining an injunction against agencies or officers of the federal government").

Turning next to the scope of the preliminary injunction, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017). In the instant case, the government's request that the Court exempt from its preliminary injunction agencies and subdivisions that meet the requirements of Section 7103(b)(1) must be rejected. NTEU has challenged Section 2 of the Executive Order in its entirety and the government has defended the Executive Order in its entirety. The Court has concluded that the preliminary injunction factors all weigh heavily in favor of granting preliminary relief. Specifically, the Court has found that NTEU is likely to succeed in showing

that the President applied an overly broad interpretation of "national security," seemingly disregarded the statutory term "primary function," and – as the evidence rebutting the presumption of regularity suggests – "was indifferent to the purposes and requirements of the [FSLMRS], or acted deliberately in contravention of them."  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 728.  These conclusions all speak to the fact that Section 2 of the Executive Order is entirely ultra vires.  Furthermore, those conclusions, coupled with a preliminary injunction's purpose of "preserv[ing] the status quo while the district court assesses the merits of a case," Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381 (ABJ), 2025 WL 1144646, at *4 (D.D.C. Apr. 18, 2025), warrant enjoining Section 2 of the Executive Order in its entirety.

Moreover, the government's arguments do not warrant specific agency or subdivision exemptions in the preliminary injunction order.  The government has not shown that any particular agency or subdivision meets the Section 7103(b)(1) criteria.  The meager seven pages explaining how two-thirds of the federal workforce meets the Section 7103(b)(1) criteria, coupled with the limited factual record now before the Court, does not afford the Court the opportunity to determine the exemptions at this time.  The government has not provided sufficient argument or factual support warranting specific exemptions from the preliminary injunction order.

### V. CONCLUSION

For the foregoing reasons, NTEU's Motion for a Preliminary Injunction [Dkt. No. 9] is hereby GRANTED.

An Order consistent with this Opinion was issued on April 25, 2025. <u>See</u> Order of April 25, 2025 [Dkt. No. 32].

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/28/25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) | |
| *Plaintiff*; | ) ) | Case No. 1:25-cv-935-PLF |
| v. | ) ) | Judge Paul L. Friedman |
| DONALD J. TRUMP, *et al.*, | ) ) | |
| *Defendants*. | ) ) ) | |

## DEFENDANTS' NOTICE OF APPEAL OF PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's April 25, 2025 Order (ECF No. 32) and April 28, 2025 Memorandum Opinion (ECF No. 34) granting Plaintiff's motion for a preliminary injunction.

Dated: April 29, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
EMILY M. HALL
SARAH E. WELCH
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
Civil Division, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

_/s/ Lydia J. Jines_
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
Trial Attorneys
LISA ZEIDNER MARCUS
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St., NW, Twelfth Floor
Washington, DC 20530
Tel: (202) 353-5652
Fax: (202) 616-8470
Email: Lydia.Jines@usdoj.gov

*Counsel for Defendants*

2