No. 25-5157

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATIONAL TREASURY EMPLOYEES UNION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

---

On appeal from the United States District Court
for the District of Columbia

---

## APPELLEE'S BRIEF

---

JULIE M. WILSON
General Counsel

PARAS N. SHAH
Deputy General Counsel

ALLISON C. GILES
Assistant Counsel

JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W.,
Suite 1000
Washington, D.C.  20001
(202) 572-5500

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D. C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

(A)     Parties and Amici

Plaintiff-Appellee is National Treasury Employees Union. Defendants-Appellants are Donald J. Trump; Charles Ezell; Pamela J. Bondi; Robert F. Kennedy, Jr.; Lee M. Zeldin; Christopher A. Wright; Brendan T. Carr; Scott Bessent; Melanie Krause; Margie Rollinson; Timothy E. Gribben; Mary G. Ryan; Rodney E. Hood; and John Raby (all in their official capacities). There are no other parties, intervenors, or amici.

(B)     Rulings Under Review

On April 25, 2025, the Honorable Paul F. Friedman issued an order granting plaintiff a preliminary injunction, with an accompanying opinion issued on April 28, 2025, in No. 25-935, Dkt. Nos. 32 and 34. *See* JA217-264. The district court's opinion is reported at *NTEU v. Trump*, 780 F. Supp. 3d 237 (D.D.C. 2025). Defendants-Appellants seek review of that order and opinion.

(C)     <u>Related Cases</u>

This case was not previously before this Court or any other court.

The following cases involve an overlapping set of defendants and raise

similar issues to this case:

*       *American Foreign Service Ass'n v. Trump*, No. 25-5184
(D.C. Cir.)

*       *American Foreign Service Ass'n v. Trump*, No. 1:25-cv-01030
(D.D.C.)

*       *Federal Education Ass'n v. Trump*, No. 25-5303 (D.C. Cir.)

*       *Federal Education Ass'n v. Trump*, No. 25-cv-01362 (D.D.C.)

*       *American Federation of Government Employees v. Trump*,
No. 25-4014 (9th Cir.)

*       *American Federation of Government Employees v. Trump*,
No. 25-cv-03070 (N.D. Cal.)

*       *U.S. Dep't of Treas. v. NTEU Ch. 73,* No. 25-5656 (6th Cir.)

*       *U.S. Dep't of Def. v. AFGE*, No. 25-50784 (5th Cir.)

Respectfully submitted,

<u>/s/ Allison C. Giles</u>
ALLISON C. GILES
Counsel for Plaintiff-Appellee
National Treasury Employees
October 9, 2025         Union

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, the undersigned counsel hereby certifies as follows:

1.     The National Treasury Employees Union (NTEU) is an unincorporated, non-profit professional organization that represents approximately 160,000 employees of the federal government and, after Executive Order 14,251, serves as the exclusive bargaining representative of about one-third of those employees pursuant to 5 U.S.C. §§ 7101-7135.

2.     NTEU has no parent companies.

3.     No publicly held company has an ownership interest in NTEU.

Respectfully submitted,

/s/ Allison C. Giles
ALLISON C. GILES
Counsel for Plaintiff-Appellee
National Treasury Employees
October 9, 2025              Union

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................. i

CORPORATE DISCLOSURE STATEMENT ......................................... iii

TABLE OF CONTENTS .......................................................... iv

TABLE OF AUTHORITIES .................................................... vii

GLOSSARY .................................................................. xvi

INTRODUCTION .............................................................. 1

STATEMENT OF ISSUES ....................................................... 4

PERTINENT STATUTES AND REGULATIONS .................................. 5

STATEMENT OF THE CASE .................................................... 5

I.  Congress's Broad Grant of Collective-Bargaining Rights to Federal Workers .......................................................... 5

II.  The President's Sweeping Executive Order Cancelling Statutory Collective-Bargaining Rights ....................................... 7

III.  The Administration's Admitted Motivations Behind the Executive Order ................................................... 8

IV.  Procedural History ................................................ 9

V.  Related Proceedings ............................................... 11

SUMMARY OF ARGUMENT .................................................... 13

ARGUMENT .................................................................. 17

I.  NTEU Is Likely to Succeed on the Merits. .......................... 17

A.    The District Court Had Jurisdiction Because the Executive Order Excludes the Defendant Agencies from the Statute's Administrative Review Scheme. ........................................... 17

B.    The President's Exclusions Are Reviewable as Ultra Vires Under the Clear and Specific Standards of Section 7103(b)(1) ................................................................. 25

    1.    Presidential Orders Are Reviewable When, As Here, Discernible Statutory Limits Cabin His Discretion. ... 26

    2.    The Clear and Mandatory Standards in Section 7103(b)(1) Form the Basis of a Viable Ultra Vires Claim ................................................................. 28

    3.    Precedent Requires Review Under the Rebuttable Presumption of Regularity ........................................... 29

    4.    National-Security Concerns Do Not Foreclose Review. ....................................................................... 30

C.    Clear Evidence Shows that the Executive Order Is Unworthy of the Presumption of Regularity. ....................... 33

    1.    The Unnuanced Breadth of the Executive Order Clashes with the Limiting Language in Section 7103(b)(1) ........................................................ 34

    2.    The Executive Order's Carveouts and the Fact Sheet's Outright Statements Show a Retaliatory Motive. ...... 37

    3.    The OPM Guidance Shows that the Executive Order Was Motivated by Policy Goals Unrelated to National Security. ................................................................... 40

D.    The Executive Order Is Ultra Vires. ...................................... 44

II.    The District Court's Finding of Irreparable Harm Has Ample Record Support and Is Consistent with Precedent. ...................... 54

A.    NTEU's Inability to Perform Its Statutory Mission Is Irreparably Harming Its Influence with Its Members and Leading to Membership Losses. ...........................................55

    1.    NTEU Is Losing Opportunities to Fight for Its Members, Which Is Irreparably Diminishing Its Influence and Reputation. ...........................................55

    2.    OPM's Litigation-Driven Frequently Asked Questions Document Is Irrelevant and Misleading. ...................61

B.    The Executive Order Threatens NTEU's Very Existence by Cutting Off Over Half of Its Revenue, Which Constitutes Irreparable Harm. ...............................................................65

III.    The Balance of Equities and the Public Interest Favor NTEU ....68

CONCLUSION .........................................................................70

# TABLE OF AUTHORITIES

**Cases**

*AFGE Local 987*,
  66 F.L.R.A. 589 (2012) ........................................................ 21

*AFGE v. Loy*,
  367 F.3d 932 (D.C. Cir. 2004) .............................................. 18

*\*AFGE v. Reagan*,
  870 F.2d 723 (D.C. Cir. 1989) ..................... 14, 28, 29, 30, 32, 33, 37, 44

*AFGE v. Sec'y of Air Force*,
  716 F.3d 633 (D.C. Cir. 2013) .............................................. 18

*AFGE v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) .............................................. 18

*AFGE v. Trump*, No. 25-1780 (N.D. Cal.) .............................. 39

*AFGE v. Trump*, No. 25-cv-03070,
  2025 U.S. Dist. LEXIS 120042 (N.D. Cal. June 24, 2025) ................. 21

*AFGE v. Trump*, No. 25-4014 (9th Cir. Aug. 25, 2025) ................. 13

*AFGE, AFL-CIO v. Trump*,
  782 F. Supp. 3d 793 (N.D. Cal. 2025) ................................... 12

*AFGE, AFL-CIO, Local 446 v. Nicholson*,
  475 F.3d 341 (D.C. Cir. 2007) ..................................... 22, 23, 24

*AFGE, Local 3966*,
  57 F.L.R.A. 750 (2002) ...................................................... 21

*AFL-CIO v. Trump*, No. 25-cv-2445, Order (D.D.C. Oct. 1, 2025) ......... 12

*AFSA v. Trump*,
  783 F. Supp. 3d 248 (D.D.C. 2025) ...................................... 12

*AFSA v. Trump*, No. 25-5184,
  2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025) .................... 12

*Am. Forest Res. Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023) ............................................................. 26

*Asseo v. Centro Medico Del Turabo, Inc.*,
  900 F.2d 445 (1st Cir. 1990) .............................................................. 61

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023) ...................................................................... 24, 25

*Bureau of Alcohol, Tobacco & Firearms v. FLRA*,
  464 U.S. 89 (1983) ............................................................................ 2, 5

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ........................................................... 26

*City of Ketchikan v. Cape Fox Corp.*,
  85 F.3d 1381 (9th Cir. 1996) ............................................................. 37

*Cole v. Young*,
  351 U.S. 536 (1956) ........................................... 34, 35, 36, 37, 47, 48

*Conley v. United States*,
  5 F.4th 781, 791 (7th Cir. 2021) ........................................................ 30

*Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*,
  250 U.S. 163 (1919) ........................................................................... 31

*Dalton v. Specter*,
  511 U.S. 462 (1994) ............................................................... 27, 28, 31

*Dep't of Comm. v. New York*,
  588 U.S. 752 (2019) ..................................................................... 33, 39

*Dep't of Treas. v. NTEU Ch. 73*,
  783 F. Supp. 3d 991 (E.D. Ky. 2025) ........................................... 19, 20

*DHS, ICE*, 70 F.L.R.A. 628 (2018) ....................................................... 70

*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*,
   414 F.3d 700 (7th Cir. 2005) ............................................................ 61

*EPA v. Calumet Shreveport Ref., LLC*,
   145 S. Ct. 1735 (2025) ..................................................................... 35

*FEA v. Trump*, No. 25-5303,
   2025 U.S. App. LEXIS 25013 (D.C. Cir. Sept. 25, 2025) ......... 12, 45, 48

*FEA v. Trump*, No. 25-cv-1362 (PLF),
   2025 U.S. Dist. LEXIS 157767 (D.D.C. Aug. 14, 2025) ...................... 12

*Franks Bros. Co. v. NLRB*,
   321 U.S. 702 (1944) ......................................................................... 57

*Garcia v. Sacramento Coca-Cola Bottling Co.*,
   733 F. Supp. 2d 1201 (E.D. Cal. 2010) ............................................... 58

*Global Health Council v. Trump*, No. 25-5097,
   2025 U.S. App. LEXIS 20495 (D.C. Cir. Aug. 13, 2025) ............... 28, 68

*Hartman v. Moore*,
   547 U.S. 250 (2006) ......................................................................... 40

*Henderson ex rel. NLRB v. Bluefeld Hosp. Co.*,
   902 F.3d 432 (4th Cir. 2018) ............................................................ 61

*Hernandez v. Mesa*,
   589 U.S. 93 (2020) ........................................................................... 38

*In re Navy Chaplaincy*,
   697 F.3d 1171 (D.C. Cir. 2012) ......................................................... 64

*Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*,
   426 F.2d 1243 (D.C. Cir. 1970) ......................................................... 59

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .............................................................. 56

*Local Union No. 5741, United Mine Workers v. NLRB*, 865 F.2d 733
    (6th Cir. 1989) ............................................................... 65, 67

*Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002)
    ................................................................................ 14, 26, 27

*N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020) ............ 44

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
    26 F.4th 960 (D.C. Cir. 2022) ....................................... 28, 29

*NLRB v. Electro-Voice, Inc.*,
    83 F.3d 1559 (7th Cir. 1996) .............................................. 57

*NTEU v. Chertoff*,
    452 F.3d 839 (D.C. Cir. 2006)............................................. 69

*NTEU v. Trump*, No. 25-5157, 2025 U.S. App. LEXIS 11952 (D.C. Cir.
    May 16, 2025) ................................... 7, 11, 61, 62, 63, 64, 67

*NTEU v. Trump*, No. 25-cv-935, 2025 U.S. Dist. LEXIS 96009 (D.D.C.
    May 20, 2025) ..................................................................... 65

*OPM v. FLRA*,
    864 F.2d 165 (D.C. Cir. 1988).............................................. 6

*Perkins Coie LLP v. U.S. Dep't of Justice*,
    783 F. Supp. 3d 105 (D.D.C. 2025)...................................... 67

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) ...................................... 57, 67

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ............................................................ 24

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ..................................................... 32, 33

*Turgeon v. FLRA*,
    677 F.2d 937 (D.C. Cir. 1982)............................................. 21

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
513 U.S. 18 (1994) ........................................................................ 4

*U.S. Dep't of Def. v. AFGE*, No. 6:25-CV-00119,
2025 U.S. Dist. LEXIS 142239 (W.D. Tex. July 23, 2025) ........... 12, 20

*U.S. Dep't of the Treas., IRS*, 62 F.L.R.A. 298 (2007) ........................... 48

*U.S. Dep't of Treas. v. NTEU, Chapter 73*,
783 F. Supp. 3d 991 (E.D. Ky. 2025) .................................................. 12

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977) ............................................................. 39

*Walker v. Bellnier*,
146 F.4th 228 (2d Cir. 2025) .............................................................. 30

*Wendt Corp. v. NLRB*,
26 F.4th 1002 (D.C. Cir. 2022) .......................................................... 40

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
774 F. Supp. 3d 86 (D.D.C. 2025) ...................................................... 66

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ............................................................ 66

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ..................................................................... 30, 31

**Statutes**

5 U.S.C. § 4302(c)(6) ........................................................................ 41

5 U.S.C. § 7101 ................................................................................ 41

5 U.S.C. § 7101(a) ........................................................... 2, 6, 17, 68

5 U.S.C. § 7103(a)(3) ......................................................................... 6

5 U.S.C. § 7103(b)(1) ..................................................... 7, 14, 23, 44, 45

5 U.S.C. § 7103(b)(1)(A)......................................................... 27, 34, 36, 47

5 U.S.C. § 7103(b)(1)(B)......................................................... 28, 34, 47, 49

5 U.S.C. § 7105(a)(2)...............................................................25

5 U.S.C. § 7106 ........................................................................70

5 U.S.C. § 7114(a) ......................................................................6

5 U.S.C. § 7115 ...................................................... 16, 41, 65, 66

5 U.S.C. § 7131 ......................................................................41

5 U.S.C. § 7513 ......................................................................41

31 U.S.C. § 321(a)(7) ............................................................47

38 U.S.C. § 7422(d)................................................................22

47 U.S.C. § 151 ......................................................................46

## Other Authorities

"Unfair Labor Practice Case Processing in the Absence of a General Counsel - Questions and Answers," FLRA.gov (Mar. 3, 2008) https://perma.cc/C5WA-MUUQ............................................23

124 Cong. Rec. 29,186 (daily ed. Sept. 13, 1978) (statement of Rep. Clay) ........................................................................................6

*About the Office of Energy Efficiency and Renewable Energy*, U.S. Dep't of Energy, https://perma.cc/W65V-N8DZ (last visited June 5, 2025) .51

*About TTB*, Alcohol & Tobacco Tax & Trade Bureau, https://perma.cc/2LXK-HSY8 (last updated Feb. 3, 2021) ..................53

*About Us*, afge.org/about-us/agencies/ .....................................39

*About Us*, Bureau of the Fiscal Serv., https://perma.cc/Z3KP-4DH4 (last modified Jan. 23, 2025) ........................................................52

*Environment and National Resources Division*, Env't & Natural Res. Div., U.S. Dep't of Justice, https://perma.cc/X9AW-UTXC (last visited June 5, 2025) ......................................................................54

Erich Wagner, *HHS the Latest to Cancel Union Contracts and Implement Trump's Order*, Government Executive (Aug. 25, 2025), www.govexec.com/workforce/2025/08/hhs-latest-cancel-union-contracts-and-implement-trumps-order/407673/ ...............................65

Executive Order No. 14,251, *Exclusions from Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14,553 (Mar. 27, 2025) .................................................................... 1, 10, 11, 37, 38

FLRA, Organizational Chart, FLRA.gov/about/organizational-chart (last visited Oct. 7, 2025) ....................................................21

*HHS Agencies & Offices*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/LU7H-ZW3G (last reviewed June 3, 2025)...............50

*Internal Revenue Manual* 1.1.6.1 (June 18, 2015), https://perma.cc/HE27-3BX9.................................................49

Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and Acting Heads of Departments and Agencies (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F .................................................. 8, 40, 41

*Mission*, U.S. Dep't of Energy, https://perma.cc/UF3R-Y42Q (last visited June 5, 2025) ....................................................51

Nick Miroff et al., *With Trump Backing, Border Patrol Contract Significantly Increases Union Staffing*, Washington Post (Dec. 10, 2019), https://www.washingtonpost.com/national/with-trump-backing-border-patrol-contract-significantly-increases-union-staffing/2019/12/10/77025414-16da-11ea-a659-7d69641c6ff7_story.html.....................................................38

*Office of Refugee Resettlement*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/SH7G-855M (last visited June 5 2025)....................50

OPM, Guidance Regarding Deferred Resignation Program (Jan. 28, 2025), https://perma.cc/ZZZ4-N2NZ ................................................... 43

*Organization and Functions*, U.S. Dep't of the Treasury, https://perma.cc/K6D5-4NVY (last visited June 5, 2025) .................. 52

*Our Mission and What We Do,* U.S. Env't Prot. Agency, https://perma.cc/4JCG-GL3E (last updated April 21, 2025) .............. 52

*Our Mission*, U.S. Dep't of the Interior, Bureau of Land Mgmt., https://perma.cc/QXY8-Z42H (last visited June 5, 2025) .................. 53

*Our Work*, C.R. Div., U.S. Dep't of Justice, https://perma.cc/94KK-HWQ4 (last updated Mar. 12, 2025) ................................................... 54

*Primary*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/primary ........................................................ 36

Rafael Bernal, *National Border Patrol Council Endorses Trump at Arizona Rally*, The Hill (Oct. 14, 2024 1:17PM), https://thehill.com/latino/4932425-trump-border-patrol-union-endorsement/ ....................................................................................... 38

Ryan J. Foley, Associated Press, *Largest Federal Employee Union, a Leading Trump Opponent, to Lay Off More Than Half of Staff* (updated April 24, 2025), https://apnews.com/article/afge-federal-union-trump-cuts-layoffs-downsizing-53c0a1491cc5af65278fbd16b8cfb6b5 ................................................... 68

*The Agency, Its Mission and Statutory Authority*, IRS, https://perma.cc/MYL8-LPMN (last updated May 29, 2025) .............. 49

The White House, Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H ........................................................................ 9, 15, 32, 38, 39

*What We Do*, Fed. Commc'ns Comm'n, https://perma.cc/XG8B-5M56 (last visited June 5, 2025) ........................................................... 46, 51

*What We Do*, Office of the Comptroller of the Currency, https://perma.cc/TNC5-TRJS (last visited June 5, 2025)....................52

William Wan & Hannah Natanson, *White House Officials Wanted To Put Federal Workers 'In Trauma.' It's Working.*, The Washington Post (May 20, 2025), www.washingtonpost.com/investigations/2025/05/20/federal-workers-trump-mental-health/.................................................60

# GLOSSARY

| | |
|---|---|
| AFGE | American Federation of Government Employees |
| AFL-CIO | American Federation of Labor and Congress of Industrial Organizations |
| AFSA | American Foreign Service Association |
| BFS | Bureau of the Fiscal Service |
| BLM | Bureau of Land Management |
| EPA | Environmental Protection Agency |
| FCC | Federal Communications Commission |
| FDA | Food and Drug Administration |
| FEA | Federal Education Association |
| FLRA | Federal Labor Relations Authority |
| HHS | Department of Health and Human Services |
| IRS | Internal Revenue Service |
| NTEU | National Treasury Employees Union |
| OPM | Office of Personnel Management |
| Statute | Federal Service Labor-Management Relations Statute |

## INTRODUCTION

President Trump has turned the government's machinery against his perceived enemies often over the last year. This case involves Executive Order No. 14,251, *Exclusions from Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14,553 (Mar. 27, 2025) (the Executive Order), through which the President targets federal-sector labor unions that have stood up against his policies.

The Executive Order strips collective-bargaining rights from federal workers in dozens of agencies or subdivisions. JA220. In all, it takes about two-thirds of federal workers outside the coverage of the Federal Service Labor-Management Relations Statute of 1978 (the Statute). *Id.* For NTEU, that means "65.9% of all NTEU-represented employees, or approximately 104,278 employees." JA252. The one dozen NTEU-represented agencies that the Executive Order exempts from the Statute are refusing to bargain with or to engage with NTEU—all while federal workers are under unprecedented attack and facing large-scale reductions-in-force. *See* JA223-24; JA254-55.

The district court correctly concluded that there is "clear evidence" that the Executive Order's sweeping use of a narrow national-security

exemption to undo the bulk of the Statute's coverage was driven by extra-statutory motivations unrelated to national security. JA236. Those motivations, the White House Fact Sheet on the Executive Order makes clear, included exacting political retribution against "hostile" federal-sector unions that have challenged the President's agenda and making federal workers easier to fire. JA238-42.

The President's sweeping use of the Statute's national-security exemption to strip the collective-bargaining rights of most of the federal employees who had them was not based on a national-security calculus. As the district court found, the White House Fact Sheet shows that the President's Executive Order targets "those that have sued him, those that have filed grievances, those that have complained against him." JA195 ("I mean, how else can you read what he's done?").

Congress passed the Statute to codify federal labor relations and to safeguard it from the whims of any President; to promote collective bargaining; and to strengthen federal-sector labor unions. *See* 5 U.S.C. § 7101(a); *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 107 (1983). It cannot follow that Congress also provided for unchecked

Executive discretion to dismantle that same statutory system, including as a way to punish union dissent.

The government portrays NTEU as seeking judicial review of legitimate and nuanced national-security exemptions that are just like the ones that Presidents since Jimmy Carter have made. But that is not remotely the case—and the Executive Order and accompanying White House Fact Sheet show it.

There is no limiting principle to the government's position in this case. In its view, the President could exempt *every* agency from the Statute using the national-security exemption. Those exemptions, the government believes, are unreviewable because it is within the President's discretion to render the Statute a nullity through one narrow exemption. It is irrelevant, according to the government, if the President uses that exemption explicitly to retaliate against perceived political enemies.

District court judges across the country have uniformly ruled against the government in litigation over the Executive Order. Those decisions came in cases that unions brought—which has led to five

preliminary injunctions to date, including four in this Circuit—and in cases that the government initiated in the Fifth and Sixth Circuits.

The union victories in emergency relief proceedings led to motions to stay preliminary injunctions against the Executive Order, including three in this Court. In the end, seven of this Court's judges split nearly evenly across those unpublished *per curiam* decisions, with three judges voting against stays of the preliminary injunction and four voting in favor. This mixed bag points in favor of this Court adopting the Supreme Court's "customary skepticism toward [its own] *per curiam* dispositions that lack the reasoned consideration of a full opinion." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994).

This Court should affirm the district court's conclusion that the Executive Order is likely unlawful, that it is causing NTEU irreparable harm by taking away two-thirds of its workers and half its revenue stream, and that the public interest favors preliminary relief.

## STATEMENT OF ISSUES

1.     Whether the district court erred in finding that NTEU is likely to succeed in proving that the Executive Order is ultra vires,

where it found clear evidence to overcome the presumption of regularity owed to the President.

2.      Whether the district court abused its discretion in finding that the equitable factors favor preliminary relief where NTEU cannot perform its statutory functions for two-thirds of its workers and is suffering financial harm that threatens its existence; and where interim relief preserves the status quo of collective bargaining with the agency defendants.

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes are contained in the Addendum to Appellants' Brief.

## STATEMENT OF THE CASE

### I.   Congress's Broad Grant of Collective-Bargaining Rights to Federal Workers

"In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the Executive Order regime." *Bureau of Alcohol, Tobacco & Firearms*, 464 U.S. at 107.

As Title VII of the Act, Congress enacted the Statute, 5 U.S.C.

§ 7101, *et seq*. Congress intended the Statute to replace the existing Executive Order regime governing collective bargaining with a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. 29,186 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).[1]

The Statute rests on Congress's finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest." 5 U.S.C. § 7101(a). The Statute assigns federal-sector unions the job of "act[ing] for" and "negotiat[ing] collective-bargaining agreements covering" all employees in the bargaining units that they are elected to represent. *Id.* § 7114(a).

Congress excluded some agencies from the Statute, such as the Federal Bureau of Investigation. *Id.* § 7103(a)(3). The Statute gives the President narrow grounds to exclude additional agencies if he determines that an agency or subdivision has a "primary function [of]

_____

[1] This Court has relied on statements from "major players in the legislation, such as Representative Clay." *OPM v. FLRA*, 864 F.2d 165, 169 (D.C. Cir. 1988).

6

intelligence, counterintelligence, investigative, or national security work," and the Statute cannot be applied "in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1).

## II. The President's Sweeping Executive Order Cancelling Statutory Collective-Bargaining Rights

Before the Executive Order, no President had used Section 7103(b)(1)'s narrow national-security exemption to exclude an entire Cabinet-level agency from the Statute—let alone multiple Cabinet-level agencies. *NTEU v. Trump*, No. 25-5157, 2025 U.S. App. LEXIS 11952, at *8 (D.C. Cir. May 16, 2025) (Childs, J., dissenting). This Executive Order strips collective-bargaining rights from about two-thirds of federal workers, including 65.9% of the workers that NTEU represents. JA252.

The Office of Personnel Management (OPM) issued guidance explaining that excluded agencies "are no longer subject to the collective-bargaining requirements of [chapter 71]" and that the unions representing bargaining-unit employees at those agencies have "los[t] their status" as the exclusive representative for those employees. JA225 (citing Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and Acting Heads of Departments and Agencies (Mar. 27, 2025),

https://perma.cc/QH4A-MQ9F (OPM Guidance)). NTEU represents
eleven federal agencies that the Executive Order excludes from the
Statute's coverage entirely and another agency that the Order excludes
in part. JA46. NTEU has represented several of the bargaining units
that the Executive Order excludes from the Statute's coverage for
decades and some since the Statute's inception in 1978. JA57-59.

## III. The Administration's Admitted Motivations Behind the Executive Order

The Administration issued a Fact Sheet and OPM Guidance on
the same night as the Executive Order. Each discussed the Executive
Order's impetus: facilitating mass firings of federal employees and
exacting political vengeance.

**A.** The OPM Guidance acknowledged the larger context, which
was the President's direction to agencies to start mass firings. *See* OPM
Guidance at 5. With the Executive Order's issuance, OPM advised
agencies to "[d]isregard [c]ontractual [reduction-in-force] [a]rticles" and
"prepare large-scale reductions in force" as the "President has directed."
*Id.* According to OPM, "[a]gency [collective-bargaining agreements]
often create procedural impediments" to removing underperforming
employees. *Id.* at 3.

**B.** The White House Fact Sheet revealed an additional motivation for the Executive Order: political retribution against "hostile Federal unions." The White House, Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H. The Fact Sheet stated that "[c]ertain Federal unions have declared war on President Trump's agenda." *Id.* NTEU is one of the "Federal unions" that has fought back against President Trump's agenda. NTEU has initiated litigation against several Administration initiatives that it believes are unlawful. JA51.

The Executive Order targets a dozen different collective-bargaining relationships that NTEU has with federal agencies and departments. JA59-60. That includes NTEU's largest bargaining unit: the IRS. JA63

## IV. Procedural History

On March 31, NTEU filed a lawsuit alleging that the Executive Order's exemptions of its bargaining units from the Statute, individually and collectively, were ultra vires because they exceeded the President's authority under the Statute; and that the exemptions

reflected First Amendment retaliation for NTEU's litigation against the Administration. JA226. NTEU then moved for a preliminary injunction against the Executive Order, Section 2, and OPM's implementing guidance. JA226.

In a decision issued on April 28, the district court held that the White House's own words and actions defeated the presumption of regularity and allowed for judicial review of NTEU's ultra vires claim. JA236. The court found "clear evidence" that the President's sweeping use of the national-security exemption was "retaliatory" and aimed to "punish unions for the 'war' they have 'declared [] on President Trump's agenda'"; served to facilitate "unrelated policy objectives" like "mak[ing] federal employees easier to fire"; and "b[ore] no relation to the [statutory] criteria" for the national-security exemption. JA239-41. The evidence likewise showed that the President's exemptions were based on a "disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a 'manner consistent with national security requirements and considerations.'" JA238.

The court concluded that NTEU would likely succeed in proving its ultra vires claim (JA236-51 (abstaining from evaluating First Amendment claim)); that it had shown irreparable harm given the damage to its bargaining power and the financial losses that threatened its very existence (JA251-58); and that the equities favored preliminary relief (JA259-60). The court thus preliminarily enjoined Section 2 of the Executive Order as it applies to eleven NTEU-represented agencies that the Order exempts from the Statute entirely and another NTEU-represented agency that the Order exempts in part. JA217-18.

On April 30, the government appealed that ruling. It then asked the D.C. Circuit for an immediate administrative stay of the ruling and a stay pending appeal. *See generally NTEU v. Trump*, 2025 U.S. App. LEXIS 11952. The D.C. Circuit did not grant an administrative stay, but on May 16 granted a stay pending appeal in a divided decision that was based solely on the equitable factors. *Id.*

## V.    Related Proceedings

District courts in every other proceeding concerning the legality of the Executive Order have uniformly ruled against the government.

In cases that unions have brought, the Executive Order has been preliminarily enjoined. S*ee AFL-CIO v. Trump*, No. 25-cv-2445, Order (D.D.C. Oct. 1, 2025); *FEA v. Trump*, No. 25-cv-1362 (PLF), 2025 U.S. Dist. LEXIS 157767 (D.D.C. Aug. 14, 2025); *AFSA v. Trump*, 783 F. Supp. 3d 248 (D.D.C. 2025); *AFGE, AFL-CIO v. Trump*, 782 F. Supp. 3d 793 (N.D. Cal. 2025).

In cases that the government brought seeking declaratory judgment that the Exclusions Order is lawful, district courts dismissed the actions for lack of standing. *See U.S. Dep't of Def. v. AFGE*, No. 6:25-CV-00119, 2025 U.S. Dist. LEXIS 142239 (W.D. Tex. July 23, 2025), *appeal docketed*, No. 25-50784 (5th Cir. Sept. 25, 2025); *U.S. Dep't of Treas. v. NTEU, Chapter 73*, 783 F. Supp. 3d 991 (E.D. Ky. 2025).

The government has appealed all but one of those decisions. Where the unions had won emergency relief, the government sought stays of those decisions. In this Court, the result was a mixed bag of decisions. *See FEA v. Trump*, No. 25-5303, 2025 U.S. App. LEXIS 25013 (D.C. Cir. Sept. 25, 2025) (denying stay); *AFSA v. Trump*, No. 25-5184, 2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025) (granting stay).

In the Ninth Circuit, a stay issued, but a judge has called for a vote on rehearing en banc. *AFGE v. Trump*, Order, No. 25-4014 (9th Cir. Aug. 25, 2025).

## **SUMMARY OF ARGUMENT**

The district court applied the proper legal standards in determining that NTEU's ultra vires claim would likely succeed. The extensive factual findings underlying that determination and the district court's analysis of the equitable factors are not clearly erroneous. If the abuse of discretion standard that governs this Court's review means anything, this preliminary injunction should survive.

**I.** The district court properly concluded that NTEU is likely to show that the President's evisceration of the collective-bargaining rights of three-quarters of the employees who had them exceeds the President's authority under the Statute.

**Channeling.** The government continues to press a channeling argument that has garnered no support among the ten appellate judges and two district court judges who have been presented with it. In the government's view, Congress intended for parties that the Statute no longer regulates to nonetheless be subject to the Statute's

administrative procedures. In other words, the government argues that Congress envisioned the President being able to exclude entities from the Statute's coverage while still requiring them to proceed through the Statute to raise legal claims. It is no wonder that no judge has been receptive to this argument.

**Reviewability.** As the government twice conceded to the district court, NTEU's ultra vires claim is reviewable under this Court's precedent. The text of the Statute's national-security exemption, 5 U.S.C. § 7103(b)(1), places discernible limits on the President's use of the exemption. This Court's decisions, including *AFGE v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989), and *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002), make clear that those limits allow for ultra vires review here.

**Ultra Vires.** The district court found clear evidence rebutting the presumption of regularity that attached to the President's use of the national security exemption, and then further concluded that the same evidence showed that NTEU would likely succeed on the merits. That evidence included the Executive Order's breadth, exempting two-thirds of the workforce from the Statute; the animus that abounds in the

accompanying Fact Sheet, which concedes (as the Order itself shows) that the President targeted certain "hostile Federal unions" and protected unions who support him; and the Administration's statements indicating that the exemptions served, in part, to make federal employees easier to fire. The district court's substantial factual findings are not clearly erroneous and firmly support its ultra vires ruling.

II.    The district court's conclusion that the Executive Order would irreparably harm NTEU was based on an extensive record and in line with court-of-appeals precedent.

*First*, the district court found that NTEU could not perform its statutory mission of acting as the exclusive bargaining representative for roughly two-thirds of the workers that it represents, at a time when workers were under unprecedented attacks and facing large-scale reductions-in-force. As the district court concluded, agencies were "disregarding provisions of the collective bargaining agreements," including those related to reductions-in-force, and would not engage with or bargain with NTEU. JA255. This neutering of NTEU was diminishing the union's influence among its affected workers and leading to membership loss. As several courts of appeals have held, that

type of waning influence among membership and the inability to collectively bargain on their behalf may be irreparable.

*Second*, the district court did not clearly err in concluding that the Executive Order cut off over half of NTEU's revenue and imperiled its existence. The agencies here have stopped adhering to their employees' requests to have dues deducted through their paychecks, as required by 5 U.S.C. § 7115, the free payroll dues-deduction system that Congress created for federal-sector labor unions and through which NTEU gets virtually all its dues revenue. This Court's precedent holds that such financial harm qualifies as irreparable injury.

While the government offers that NTEU could ask for dues payments another way, the government cannot contest that it has taken away both the apparatus through which NTEU gets nearly all its dues and the very reason that NTEU members pay dues in the first place: to support an organization statutorily authorized to bargain for their interests and with which their employers must engage. The district court correctly concluded that this financial harm served as additional irreparable injury.

**III.** The district court properly concluded that the balance of equities and the public interest favored preliminary relief. Recognizing Congress's finding that "labor organizations and collective bargaining in the civil service are in the public interest," 5 U.S.C. § 7101(a), and wishing to maintain the nearly half-century status quo of federal-sector collective bargaining, the district court appropriately concluded that this factor weighted in NTEU's favor.

## ARGUMENT

**I. NTEU Is Likely to Succeed on the Merits.**

### A. The District Court Had Jurisdiction Because the Executive Order Excludes the Defendant Agencies from the Statute's Administrative Review Scheme.

The government argues that the district court lacked subject-matter jurisdiction over NTEU's claims because they must be brought through the Statute's administrative channels. That argument fails for several reasons. The most obvious is that the Executive Order has taken away the very administrative channels that the government argues must be used.

**1.** The district court correctly concluded that, consistent with this Court's precedent, NTEU's claims could not be channeled because the Executive Order blew up the channels. "The administrative review

scheme . . . is not available . . . for the simple reason that those agencies and subdivisions have been excluded from the [Statute's] coverage by the very Executive Order at issue here." JA228.

Because NTEU has no administrative options left as to the excluded agencies, the district court correctly concluded that this case is different from others where channeling has been mandated. In *AFGE v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019), for example, the unions had "several 'administrative options'" available to them for challenging the executive orders at issue. JA230 (quoting *AFGE v. Trump*). *See also AFGE v. Sec'y of Air Force*, 716 F.3d 633, 637 (D.C. Cir. 2013) (the Statute provides "multiple options" for plaintiff to challenge policies through administrative review).[2] Here, NTEU has no such options because the Executive Order categorically removed any union claims relating to the agencies at issue from the administrative scheme.

It is not just the district court that concluded that unions are excluded from the administrative channels—defendant OPM has

---

[2] For this reason, *AFGE v. Loy*, 367 F.3d 932 (D.C. Cir. 2004) is distinguishable (*see* Gov't Br. 24-25). There were clearly channels available to the union in that case, as evidenced by its filing a lawsuit in court nearly simultaneously with filing multiple petitions with the FLRA.

acknowledged the same. OPM has stated that a "union no longer has standing to file [an unfair labor practice] charge" against an excluded agency or subdivision because that agency or subdivision "is no longer subject to provisions of the [Statute]." JA77. Similarly, OPM has conceded that "unions lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by *Exclusions*." JA72.

The government itself has conceded, in other litigation, that the district courts have jurisdiction over claims involving excluded agencies. The government, on behalf of the Department of Treasury, sued NTEU in district court seeking a declaratory judgment that the Executive Order was lawful.[3] The government did not attempt any administrative route by, for example, going to the Federal Labor Relations Authority (FLRA or Authority) to raise an unfair labor practice (ULP) allegation against NTEU. The government told the court that the Department of Treasury "is not subject to Chapter 71 after the President's Executive

---

[3] Complaint, *Dep't of Treas. v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Mar. 28, 2025).

Order,"[4] and therefore had no channel through which to proceed. The government sued another federal-sector union in district court in Texas making the same argument.[5]

So, the government's positions are irreconcilable: It argues that federal district courts have jurisdiction to declare the Executive Order *lawful*, as it asked the district courts in Kentucky and Texas to do, but that a federal district court lacks jurisdiction to determine that the Executive Order is *unlawful*, as it argues to this Court. As one court observed, "[t]he question of the Court's jurisdiction is not answered by the plaintiffs' or defendants' beliefs about the merits of the case." *AFGE v. Trump*, No. 25-cv-03070, 2025 U.S. Dist. LEXIS 120042, at *31 (N.D.

---

[4] Motion for Summary Judgment at 20, *Dep't of Treas. v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Apr. 18, 2025).

[5] Complaint ¶ 12, *U.S. Dep't of Def. v. AFGE,* No. 6:25-CV-00119 (W.D. Tex. Mar. 27, 2025) (asserting the district court had jurisdiction), *dismissed for lack of standing*, Order (W.D. Tex. July 23, 2025); *see generally* Opposition to Motion to Dismiss at 20, *U.S. Dep't of Def. v. AFGE*, No. 6:25-CV-00119 (W.D. Tex. May 5, 2025) ("The FSLMRS and the CBAs do not provide an administrative process" for the government's claims about the legality of the Exclusion Executive Order.).

Cal. June 24, 2025), *stayed on other grounds*, 2025 U.S. App. LEXIS 19375 (9th Cir. Aug. 1, 2025).

The FLRA likewise has held that it lacks jurisdiction over disputes involving agencies excluded from the Statute. *See AFGE Local 987*, 66 F.L.R.A. 589, 598 (2012) (dismissing ULP claim against Air Force Office of Special Investigations for lack of jurisdiction because an Executive Order had exempted that Office from the Statute); *AFGE, Local 3966*, 57 F.L.R.A. 750 (2002) ("[S]ince [an] Executive Order exempts United States Attorneys' Offices from coverage of the Statute, the Authority lacks jurisdiction to decide the cases."). The FLRA General Counsel (if there were one)[6] would refuse to issue a ULP charge against an excluded agency for lack of jurisdiction—and that decision would not be subject to judicial review. *Turgeon v. FLRA*, 677 F.2d 937, 938–39 (D.C. Cir. 1982) (holding that FLRA General Counsel's decision not to issue a ULP charge is not appealable to a federal court of appeals).

---

[6] That position is vacant. FLRA, Organizational Chart, FLRA.gov/about/organizational-chart (last visited Oct. 7, 2025).

**2.**    Under this Circuit's precedent, federal district courts have jurisdiction for claims over which the Authority lacks jurisdiction. The D.C. Circuit considered an employee compensation dispute over Veterans Affairs (VA) nurses' pay in *AFGE, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341 (D.C. Cir. 2007). VA nurses generally have collective-bargaining rights under the Statute with some exceptions. *Id.* at 345. A union prevailed in a pay dispute before an arbitrator, and when the VA failed to comply, the union pursued a ULP charge before the FLRA. *Id.* A particular statute (38 U.S.C. § 7422(d)) placed certain VA decisions, such as ones involving compensation, outside the Statute's normal review process. *Id.* For that reason, the FLRA held that it lacked jurisdiction to decide the ULP matter. *Id.* at 346. The Court unanimously concluded that because the FLRA lacked jurisdiction over the dispute, the district court could hear it. *Id.* at 348.

The union was "presumptively entitled to judicial review of its claim" because the claim was "expressly outside the FLRA's purview." *Id. Nicholson* squarely applies here. Just as there was a statute in *Nicholson* that took some VA claims outside that statute's review

scheme, there is a statute here (5 U.S.C. § 7103(b)(1)) that takes claims involving some agencies outside the Statute's review scheme.

The government argues that if a union can find some way to bring a dispute to the FLRA (even though there is no General Counsel to issue ULP complaints),[7] and even though the FLRA will inevitably dismiss such matter for lack of jurisdiction, the union must still proceed down this fruitless path and then appeal that unfavorable jurisdictional ruling to an appellate court.

The government's argument is irreconcilable with *Nicholson*. The union there did try to get before the FLRA by filing a ULP charge against the VA. *Id.* at 345. The FLRA, predictably, concluded that it lacked jurisdiction. *Id.* at 346. The district court held that the union could have and should have appealed that dismissal to an appellate court, rather than filing a district court action—the same argument raised by the government here. *Id.* at 348. But the D.C. Circuit

---

[7] *See* "Unfair Labor Practice Case Processing in the Absence of a General Counsel - Questions and Answers," FLRA.gov (Mar. 3, 2008) https://perma.cc/C5WA-MUUQ. The FLRA has not had a Senate-confirmed General Counsel since 2017.

disagreed, concluding that the union was not required to appeal the FLRA's denial of jurisdiction to the D.C. Circuit. *Id.* at 349-50.

**3.** Here, the district court correctly found that the *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), factors do not require litigants to proceed through nonexistent administrative channels. JA226-28.

The first *Thunder Basin* factor focuses on the practical question of whether judicial review would "come too late to be meaningful." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023). In *Thunder Basin* itself, judicial review was not too late to be meaningful because the plaintiff was a mining company that all agreed could function while awaiting an agency adjudication. 510 U.S. at 216-18. In contrast here, the excluded agencies—at the President's direction—have deprived NTEU of its ability to function as employees' exclusive bargaining representative *at all*.

The second and third factors—whether the claim is "wholly collateral to [the] statute's review provisions" and "outside the agency's expertise"—"reflect in related ways the point of special review provisions," i.e., "to give the agency a heightened role in the matters it

*customarily handles*, and can apply *distinctive* knowledge to." *Axon*, 598 U.S. at 186 (emphases added). The FLRA cannot apply any distinctive knowledge to whether the President is acting ultra vires or in retaliation for a union exercising its constitutional rights.[8] *See Axon*, 598 U.S. at 194 (channeling not required, in part because administrative agency knew "nothing special" about the constitutional issue presented).[9] Indeed, the FLRA will apply no substantive expertise at all because it will, as explained above, decline to resolve any challenge to the Executive Order on threshold jurisdictional grounds.

### B. The President's Exclusions Are Reviewable as Ultra Vires Under the Clear and Specific Standards of Section 7103(b)(1).

Binding D.C. Circuit precedent contradicts the government's argument that NTEU fails to state a judicially reviewable ultra vires claim. Gov't Br. 31. This Court has held that presidential orders are reviewable according to discernible statutory limits; that such limits make a statute susceptible to ultra vires review; and that the

---

[8] *See* 5 U.S.C. § 7105(a)(2) (delineating the limited powers and duties of the FLRA).

[9] As noted above, when the Executive Order was issued, the government turned not to the FLRA for relief, but instead to federal district court.

President's determinations under Section 7103(b)(1) are reviewable under a rebuttable presumption of regularity. These holdings apply even when a President's order relates to national security.

### 1. Presidential Orders Are Reviewable When, As Here, Discernible Statutory Limits Cabin His Discretion.

*Chamber of Commerce v. Reich*, 74 F.3d 1322, 1325-32 (D.C. Cir. 1996), established that presidential orders are reviewable as ultra vires. This Court found it "untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President *claims* that he is acting pursuant to" statutory authority. *Id.* at 1332.

This Court reaffirmed the availability of ultra vires review of presidential actions in *Mountain States*, 306 F.3d at 1136, and again in *American Forest Resource Council v. United States*, 77 F.4th 787, 796-98 (D.C. Cir. 2023). Rejecting the same arguments of nonreviewability that the government raises here, the Court declared that "Congress can and often does cabin the discretion it grants the President, and it

remains the responsibility of the judiciary to ensure that the President acts within those limits." *Id.* at 797.

This precedent undercuts the government's reliance on *Dalton v. Specter*, 511 U.S. 462, 476 (1994). The government cites *Dalton* to argue that Section 7103(b)(1) commits exclusion decisions to the discretion of the President and that the President's exercise of such discretion "is not a matter for [courts'] review." Gov't Br. 31, 33 (citing *Dalton*, 511 U.S. at 474, 476). But in *Dalton*, the statute in question did "not at all limit the President's discretion." *Dalton*, 511 U.S. at 476. By contrast, as this Court explained in *Mountain States*, "[a] somewhat different case is presented . . . where the authorizing statute or another statute places discernible limits on the President's discretion." 306 F.3d at 1136.

Section 7103(b)(1) cabins the President's discretion to exclude an agency from collective bargaining with such "discernible limits." *Mountain States*, 306 F.3d at 1136. First, the agency must have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1)(A). Second, it must be impossible to apply the Statute to that agency "in a manner consistent with national security requirements and considerations." *Id.* §

7103(b)(1)(B). Because Section 7103(b)(1) authorizes the President to make exclusion determinations only under these "specified conditions," *AFGE v. Reagan*, 870 F.2d at 725, *Dalton*'s bar on judicial review does not apply.

> **2.** **The Clear and Mandatory Standards in Section 7103(b)(1) Form the Basis of a Viable Ultra Vires Claim.**

The "discernible standards" in Section 7103(b)(1) render it "susceptible to review for ultra vires acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022). Contrary to the government's argument, Gov't Br. 31, NTEU states a viable ultra vires cause of action.

A reviewable ultra vires claim must allege that "the challenged action is plainly in excess of [the executive's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Global Health Council v. Trump*, No. 25-5097, 2025 U.S. App. LEXIS 20495, at *33 (D.C. Cir. Aug. 13, 2025) (cleaned up). Though narrow, the "'clear and mandatory' standard subsumes review of claims" not just involving statutory *prohibitions*, but also "involving 'positive statutory commands.'" *Postal Supervisors*, 26 F.4th at 971

(citation omitted). It even encompasses certain "questions of statutory interpretation" when the challenged interpretation is "utterly unreasonable." *Id.* at 971, 975 (cleaned up).

NTEU's claim passes this test. NTEU contends that the Executive Order plainly exceeds the clear and mandatory limits on the President's authority in Section 7103(b)(1). The Executive Order retracts collective-bargaining rights from unprecedentedly broad swaths of the government with no plausible nexus to national security. This embodies an interpretation of Section 7103(b)(1) that is "utterly unreasonable." *Postal Supervisors*, 26 F.4th at 975.

### 3. Precedent Requires Review Under the Rebuttable Presumption of Regularity.

The clearest indicator that the President's exclusions under Section 7103(b)(1) are judicially reviewable is that this Court has reviewed them before. Just as the district court did with the Executive Order here (JA233-42), the Court in *AFGE v. Reagan* reviewed an executive order excluding certain subdivisions of the U.S. Marshals Service from the Statute under a "rebuttable presumption of regularity." 870 F.2d at 724. The union there failed to rebut the presumption because it did not even "suggest[] any actual irregularity

in the President's factfinding process or activity." *Id.* at 728. But the presumption can be rebutted with "clear evidence" that the official did not discharge his or her official duties properly. *Id.* (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). Though deferential, "the presumption of regularity is . . . not an excuse to rubberstamp any and all executive action as lawful." *Conley v. United States*, 5 F.4th 781, 791 (7th Cir. 2021); *see also Walker v. Bellnier*, 146 F.4th 228, 255 (2d Cir. 2025) (quoting *Conley*, 5 F.4th at 791).

The government conceded below that judicial review is available for determinations under Section 7103(b)(1) when a plaintiff alleges a "gross violation of the statute." Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 18 & n.7; *see also* JA187 (same). That is precisely what NTEU alleges here.

### 4. National-Security Concerns Do Not Foreclose Review.

The framework of *AFGE v. Reagan* controls, despite the government's reliance on various cases in the broad realm of national security that are otherwise inapposite. *See* Gov't Br. 32-34. For example, the "concerns" about "[j]udicial inquiry into the national-security realm" in *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017), do not

apply to NTEU's claim to enjoin the Executive Order. *See* Gov't Br. 34.

The Court in *Ziglar* held that, while suspected terrorists "may seek

injunctive relief" to challenge post-9/11 detention policies, they could

not bring an implied cause of action *for damages*. 582 U.S. at 144. That

is because separation-of-powers concerns were "more pronounced . . . in

the context of a claim seeking money damages rather than a claim

seeking injunctive or other equitable relief." *Id.* at 142.

Restricted to the damages context, *Ziglar* does not stand for

blanket non-reviewability of any matter touching national security. To

the contrary, the Court warned that "national security concerns must

not become a talisman used to ward off inconvenient claims." *Id.* at 143.

"There are limitations, of course, on the power of the Executive under

Article II of the Constitution and in the powers authorized by

congressional enactments, even with respect to matters of national

security." *Id.*

Nor does *Dakota Central Telephone Co. v. South Dakota ex rel.*

*Payne*, 250 U.S. 163, 181-82 (1919), set the framework for reviewing

NTEU's claim. *See* Gov't Br. 32-33. That case made the same point as

*Dalton* about the non-reviewability of uncabined presidential discretion.

*See Dalton*, 511 U.S. at 474 (quoting *Dakota Cent. Tel.*, 250 U.S. at 184). But as explained above, review of presidential actions that flout congressionally imposed limits on that discretion remains available. *See supra*. What's more, *Dakota Central Telephone* involved the President's conduct of World War I. *See Dakota Cent. Tel.*, 250 U.S. at 183. Those circumstances are much more "intimately related to foreign policy and national security" (*Haig v. Agee*, 453 U.S. 280, 292 (1981)) than the "war on President Trump's agenda" that "certain Federal unions" are perceived to have waged here. Fact Sheet.

Finally, *Trump v. Hawaii*, 585 U.S. 667 (2018), if anything, may counsel somewhat less deference to the President than *AFGE v. Reagan* does. Whereas the D.C. Circuit held that the President need not affirmatively explain his determinations under Section 7103(b)(1) (*AFGE v. Reagan*, 870 F.2d at 727), the Supreme Court found any such requirement under the Immigration and Nationality Act "questionable" but not conclusively foreclosed. *Hawaii*, 585 U.S. at 686. Then the Court proceeded to credit the thoroughness of the findings supporting the President's travel ban, spanning twelve pages and issued after consulting multiple Cabinet members and other officials. *Id.* And,

although the Act gave the President more discretion than Section

7103(b)(1)—the "sole prerequisite" for presidential action was to "find[]"

that entry "would be detrimental to the interests of the United States"

(*id.* at 685)—the Court still reviewed whether his action "comport[ed]

with . . . textual limits." *Id.* at 687.

## C. Clear Evidence Shows that the Executive Order Is Unworthy of the Presumption of Regularity.

As the district court concluded, NTEU has rebutted the

presumption of regularity by presenting clear evidence that "the

President was indifferent to the purposes and requirements of the

[Statute], or acted deliberately in contravention of them." *AFGE v.

Reagan*, 870 F.2d at 728. The sheer breadth of the agencies that the

Executive Order covers—compared to the agencies it does not—and the

Administration's own statements in the OPM Guidance and Fact Sheet

"reveal a significant mismatch between" the President's determinations

and the national-security "rationale he provided." *Dep't of Comm. v.

New York*, 588 U.S. 752, 783 (2019).

1. **The Unnuanced Breadth of the Executive Order Clashes with the Limiting Language in Section 7103(b)(1).**

The Executive Order excludes from the Statute two-thirds of the federal workforce and three-quarters of the workers who enjoyed union protections before the Order's issuance. JA52. It excludes six entire Cabinet-level agencies. That is unprecedented: No President had ever used Section 7103(b)(1) to exclude any single Cabinet-level agency—let alone six—until now. This sweeping and unnuanced use of Section 7103(b)(1) must give the Court pause before presuming that so many agencies have "as a primary function . . . national security work," § 7103(b)(1)(A), and that the Statute "cannot be applied" to all those agencies "in a manner consistent with national security requirements and considerations." § 7103(b)(1)(B).

a.  It is as "clear from the statute as a whole" here as it was in *Cole v. Young*, 351 U.S. 536, 544 (1956), that Congress intended the term "national security" to have a "narrow meaning." It encompasses only "those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign

aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare." *Id.*

In *Cole*, Congress listed select agencies to which certain procedural rights for terminated employees would not apply. Congress gave the President authority to add agencies to the list as he "deem[ed] necessary in the best interests of national security." *Id.* at 545. Given the specific, sensitive character of the agencies enumerated by Congress, the Court concluded that the President's authority similarly "require[d] a selective judgment" under a narrow, "less than all-inclusive" standard. *Id.* Otherwise, the Court reasoned, the exception would swallow the rule:

> [I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the "national security," the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws.

*Id. Accord EPA v. Calumet Shreveport Ref., LLC*, 145 S. Ct. 1735, 1751 (2025) ("Congress . . . is unlikely to intend for an exception to swallow the rule.").

The same analysis applies here. In Section 7103(a)(3), Congress specified select agencies, like the CIA and the National Security

35

Agency, to which collective-bargaining rights would not apply. As in *Cole*, the specific, sensitive character of those agencies calibrates the President's authority to exclude more agencies: It "reveals, without doubt, a purpose to single out those agencies which are directly concerned with the national defense and which have custody over information the compromise of which might endanger the country's security." *Id.* at 544. If construed more broadly, Section 7103(b)(1), though an exception to Congress's general policy that "labor organizations and collective bargaining in the civil service are in the public interest," could be used to supersede that policy. 5 U.S.C. § 7101.

**b.** The requirement in Section 7103(b)(1)(A) that "national security work" must constitute "a primary function" of the agency further narrows the scope of agencies eligible for exclusion. The dictionary definition of "primary"—"of first rank, importance, or value"—rules out the government's expansive interpretation. *Primary*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/primary; *contra* Gov't Br. 47. "Despite the use of 'a,' the word 'primary' connotes a single leading" function, or at least one of the few most important. *City of Ketchikan v. Cape Fox Corp.*, 85

F.3d 1381, 1383 (9th Cir. 1996). The government cannot "read[]
'primary' entirely out of the text" and simply point to "any function that
an agency at issue performs." JA247.

In sum, the clash between the Executive Order's immense breadth
and Section 7103(b)(1)'s limiting language shows that the President did
not apply a good-faith interpretation of the Statute. Especially given
Congress's overarching policy favoring collective bargaining in Section
7101, the assertion that two-thirds of the civil service perform national-
security work incompatible with collective bargaining smacks of
"indifferen[ce] to the purposes and requirements" of the Statute or
"deliberate[] contravention of them." *AFGE v. Reagan*, 870 F.2d at 728.

> **2. The Executive Order's Carveouts and the Fact
> Sheet's Outright Statements Show a Retaliatory
> Motive.**

**a.** Where the Executive Order is selective, it makes some
dubious distinctions. For example, the Executive Order covers the IRS,
which is part of the Treasury Department. Exec. Order § 2. The IRS
does not plausibly have a primary function that is "directly concerned
with the protection of the Nation from internal subversion or foreign
aggression." *Cole*, 351 U.S. at 544. It was, however, the largest

bargaining unit represented by NTEU, one of the so-called "hostile Federal unions" that has challenged President Trump's policies in court. Fact Sheet; JA63. By contrast, the Executive Order leaves the bargaining rights of Border Patrol agents intact. The conduct of Border Patrol agents "has a clear and strong connection to national security." *Hernandez v. Mesa*, 589 U.S. 93, 108 (2020). But the Border Patrol union has vocally supported President Trump's election campaigns and his policies.[10]

The Executive Order's treatment of "agency police officers, security guards, and firefighters" reflects similar discrimination. Exec. Order § 2. The Executive Order generally preserves the collective-bargaining rights of employees in those categories—that is, unless they work for the Bureau of Prisons. Employees there are represented by a

_____

[10] *See* Rafael Bernal, *National Border Patrol Council Endorses Trump at Arizona Rally*, The Hill (Oct. 14, 2024 1:17PM), https://thehill.com/latino/4932425-trump-border-patrol-union-endorsement/; Nick Miroff et al., *With Trump Backing, Border Patrol Contract Significantly Increases Union Staffing*, Washington Post (Dec. 10, 2019), https://www.washingtonpost.com/national/with-trump-backing-border-patrol-contract-significantly-increases-union-staffing/2019/12/10/77025414-16da-11ea-a659-7d69641c6ff7_story.html.

large federal-sector union that, like NTEU, has filed high-profile lawsuits against the President.[11]

In deciding whether to apply the presumption of regularity, courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Comm.*, 588 U.S. at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). The unmistakable driver of these distinctions is animus against organizations that oppose the President's agenda.

**b.** The Court need not infer that the Executive Order punishes unions that challenge the Administration's policies—the Fact Sheet says so outright. The most transparent example is its statement that President Trump "supports constructive partnerships with unions who work with him" but "will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." Fact Sheet. As the district court observed, "[s]uch clear evidence of retaliatory motive is 'of great significance in addressing the presumption' of regularity." JA240-41 (first citing *Hartman v. Moore*,

---

[11] *See About Us*, afge.org/about-us/agencies/ (listing agencies represented by AFGE); Complaint, *AFGE v. Trump*, No. 25-1780 (N.D. Cal. Feb. 19, 2025) (challenging Administration's mass firings).

547 U.S. 250, 263-64 (2006) (concluding that "prosecutor's disclosure of retaliatory thinking on his part" was significant in determining whether the presumption of regularity should be applied); then citing *Wendt Corp. v. NLRB*, 26 F.4th 1002, 1011 (D.C. Cir. 2022) ("A company's open hostility toward Union activity, including a manager's anti-union speech, is clearly sufficient to establish anti-union animus on the part of that company.") (cleaned up)).

### 3. The OPM Guidance Shows that the Executive Order Was Motivated by Policy Goals Unrelated to National Security.

**a.** Based on the OPM Guidance, the district court found that the President's "invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria." JA241. Indeed, "the OPM Guidance says little about national security." JA242. Instead, it discusses the President's policy objectives under two headings: "Performance Accountability" and "Effective and Efficient Government." OPM Guidance at 3, 5.

The Performance Accountability section claims that collective-bargaining agreements "create procedural impediments to separating poor performers beyond those required by statute or regulation." *Id.* at

3. For instance, although the law requires agencies to provide employees "an opportunity to demonstrate acceptable performance" before removing them, 5 U.S.C. § 4302(c)(6), the Administration takes issue with agencies' and unions' ability to set the length of those performance improvement periods through bargaining. OPM Guidance at 4. The Administration also takes issue with defending agencies' firing decisions in grievance-arbitration procedures, even though agencies would encounter similar "procedural impediments" defending those decisions at the Merit Systems Protection Board. *Id.* at 3, 5; *see also* 5 U.S.C. § 7513.

In the second section of the OPM Guidance, the Administration expresses disagreement with Congress's statements that union rights "contribute[] to the effective conduct of public business" and can be applied "in a manner consistent with the requirement of an effective and efficient government." 5 U.S.C. § 7101. For example, it suggests that official time for union representatives and payroll deductions for union dues waste agency resources, even though Congress approved such use of resources in Sections 7131 and 7115 of the Statute. OPM Guidance at 6. The OPM Guidance also highlights the President's goal

to reshape the federal workforce through "large-scale reductions in force (RIFs)." *Id.* at 5. With unions out of the way, the Guidance acknowledges, agencies can "[d]isregard [c]ontractual [RIF] [a]rticles" and proceed with firing employees en masse. *Id.*

**b.** The government argues that "as applied to agencies that have as a primary function intelligence, investigative, or national-security work," the policies discussed in the OPM Guidance "are directly relevant to the policy goals of § 7103(b)(1)." Gov't Br. 45. In agencies with national-security missions, the argument goes, "inefficiencies" can "undermine national security." *Id.* Thus, the government acknowledges that performance accountability and efficiency by themselves are not national-security requirements or considerations. Rather, the government's argument hinges on the premise that the excluded agencies primarily perform national-security work. As explained above, that premise is suspect.

When considering its implications, the government's argument falls apart. For example, it is utterly implausible that giving an IRS employee 60 days (versus 30 days), to demonstrate acceptable performance before removing the employee would jeopardize national

security. It is similarly implausible that giving official time to union representatives at the EPA or FDA would threaten national security more than giving official time to union representatives who would otherwise be working as police officers, firefighters, or Border Patrol agents.

As these illustrations show, the policy goals discussed in the OPM Guidance are far from "national-security imperative[s]." Gov't Br. 45. The district court did not err in concluding that the OPM Guidance constitutes "strong evidence that the President's invocation of Section 7103(b)(1) was" not to protect national security, but "to remove the barriers created by the [Statute] to his unrelated policy objectives." JA242.[12]

---

[12] This Administration's application of its "deferred resignation program" further shows that its conception of "national security" shapeshifts depending on unrelated policy objectives. The program was not available to employees in "positions related to . . . national security." OPM, Guidance Regarding Deferred Resignation Program (Jan. 28, 2025) at 3, https://perma.cc/ZZZ4-N2NZ. Nevertheless, NTEU-represented employees in each of the defendant agencies received and accepted resignation offers under the program. JA51.

**D. The Executive Order Is Ultra Vires.**

**1.** Just as the district court concluded, the same "evidence rebutting the presumption of regularity" provides "persuasive reasons to believe NTEU likely will be successful on the merits" of its ultra vires claim. JA243-44. Indeed, if "the President was indifferent to the purposes and requirements of the [Statute], or acted deliberately in contravention of them," *AFGE v. Reagan*, 870 F.2d at 728, he very likely acted "obviously beyond the terms of the statute." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (cleaned up). So, the extraordinary breadth of the President's exclusions, as well as the improper motives evident from the Executive Order's carveouts and the Administration's own statements, together rebut the presumption and demonstrate that the Order is ultra vires.

**2.** Despite the problems with the Executive Order as a whole, the government highlights some national-security-related functions of certain excluded agencies. *See* Gov't Br. 48-49. These agency-by-agency arguments fail for two reasons.

**a.** First, reviewing the order's exclusions on an agency-by-agency basis is not the right approach. Section 7103(b)(1) "provides that

'[t]he President may issue an *order* excluding any agency or subdivision thereof,' suggesting that the order itself is the proper unit of review." *FEA*, 2025 U.S. App. LEXIS 25013, at *28 n.17 (Pan, J., concurring). The Executive Order as a whole—with its overinclusive scope and improper motives—plainly exceeds the President's statutory authority.

    **b.**    Second, even if an agency-by-agency analysis were appropriate, the government's falls short. Tellingly, the government foregrounds the Departments of Defense and State—agencies that are not defendants but are more easily shoehorned into a national-security narrative. Gov't Br. 47. As for the agencies and subdivisions at issue, the government mentions only a handful. *See* Gov't Br. 48-49. It completely fails to defend the exclusions of the EPA; the FDA and the Office of Refugee Resettlement in the Department of Health and Human Services (HHS); the Bureau of Land Management (BLM) in the Department of the Interior; and the Civil Rights Division and the Environmental and Natural Resources Division of the Department of Justice (DOJ).

    Although the government mentions the IRS and the Department of Treasury, the plain text of Section 7103(b)(1) requires that the

statutory criteria be applied to each excluded "subdivision." *See* Emergency Mot. for Immediate Administrative Stay and Stay Pending Appeal at 5 (acknowledging that the Executive Order excluded "subdivisions of the Department[] of Treasury," not the Department as a whole"). The government says nothing about the subdivisions of the IRS Office of Chief Counsel, the Bureau of the Fiscal Service (BFS), the Departmental Offices, the Office of the Comptroller of the Currency, and the Alcohol and Tobacco Tax and Trade Bureau.

For the agencies that the government does mention, it cites evidence that they may perform some national-security-related work, but certainly not as a primary function. For example, the government notes that the FCC statute says it was "created to regulate communication 'for the purpose of the national defense.'" Gov't Br. 49 (citing 47 U.S.C. § 151). But the full statutory language and the FCC's website show that other functions—namely regulating interstate and foreign communication—predominate. *See* 47 U.S.C. § 151; *What We Do*, Fed. Commc'ns Comm'n, https://perma.cc/XG8B-5M56 (last visited June 5, 2025).

The government's arguments about the Department of Treasury and the IRS are especially weak. The government argues that they perform "investigative" work within the meaning of Section 7103(b)(1)(A): "The enumerated duties of the Secretary of the Treasury include 'tak[ing] steps to discover'—*i.e.*, investigating—fraud, 31 U.S.C. § 321(a)(7), and the IRS performs 'investigative' work in the form of audits." Gov't Br. 49.

Given the statutory context, however, "investigative" does not mean any form of investigation or merely "taking steps to discover" something. "Investigative" in Section 7103(b)(1)(A) is sandwiched between "intelligence, counterintelligence" and "national security"—all terms relating to "the protection of the Nation from internal subversion or foreign aggression." *Cole*, 351 U.S. at 544. Moreover, Section 7103(b)(1)(B) does not use the term "investigative"—it is limited to the compatibility of coverage under the Statute with "national security requirements or considerations." So, "'investigative' work likely should be interpreted as having a national security valence in light of Section 7103(b)(1) as a whole." JA245. Fraud investigations and tax audits lack that valence.

Finally, the government argues that "[t]he FLRA has also previously found that the IRS performs national-security work." Gov't Br. 49 (citing *U.S. Dep't of the Treas., IRS*, 62 F.L.R.A. 298, 304 (2007)). But in the case that the government cites, the FLRA used a definition of national security that was "indefinite," "virtually unlimited," and thus invalid. *Cole*, 351 U.S. at 547. The FLRA reasoned that "any disruption to the Agency's ability to collect taxes, which allows for the funding of governmental operations, would greatly impact the Nation's economic strength, and, thus, the national security." *U.S. Dep't of the Treas., IRS*, 62 F.L.R.A. at 304. In other words, the IRS "contribute[s] to the strength of the Nation only through [its] impact on the general welfare." *Cole*, 351 U.S. at 544.

**c.**    Below are more comprehensive summaries of the primary functions of the agencies and subdivisions at issue. The summaries are drawn from the agencies' websites, which Judge Pan recently cited in listing the EPA, the FCC, the DOJ's Civil Rights Division, and the Department of the Interior's BLM as examples of excluded agencies that do not appear to meet Section 7103(b)(1)'s criteria. *FEA*, 2025 U.S. App. LEXIS 25013, at *25 (Pan, J., concurring). The entries for each

agency and subdivision also note how long NTEU has represented employees there. These agencies' continuing coverage under the Statute—which in many cases goes back for decades—is consistent with "national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B).

**i.** ___*The IRS*___ is the revenue service for the federal government, responsible for collecting federal taxes and administering the Internal Revenue Code. *See The Agency, Its Mission and Statutory Authority*, IRS, https://perma.cc/MYL8-LPMN (last updated May 29, 2025). NTEU has represented bargaining-unit workers at the IRS since before Congress enacted the Statute. JA57.

**ii.** ___*The IRS Office of Chief Counsel*___ provides legal guidance and interpretive advice to the IRS, to Treasury, and to taxpayers; and coordinates the IRS's position in litigation. *See Internal Revenue Manual* 1.1.6.1 (June 18, 2015), https://perma.cc/HE27-3BX9. NTEU has represented bargaining-unit workers at the IRS Office of Chief Counsel since March 1987. JA57.

**iii.** ___*Five HHS components*___ in which NTEU represents employees were excluded from the Statute. The Office of the Secretary

"administers and oversees the organization, its programs, and its activities." *HHS Agencies & Offices*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/LU7H-ZW3G (last reviewed June 3, 2025). The FDA "ensures that food is safe, pure, and wholesome; human and animal drugs, biological products, and medical devices are safe and effective; and electronic products that emit radiation are safe." *Id.* The Administration for Strategic Preparedness and Response "leads the nation's medical and public health preparedness for, response to, and recovery from disasters and public health emergencies." *Id.* The Centers for Disease Control and Prevention "protects the public health of the nation by providing leadership and direction in the prevention and control of diseases and other preventable conditions, and responding to public health emergencies." *Id.* The Office of Refugee Resettlement in the Administration of Children and Families "promote[s] the health, well-being, and stability of refugees, unaccompanied alien children, and other eligible individuals and families, through culturally responsive, trauma-informed, and strengths-based services." *Office of Refugee Resettlement*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/SH7G-855M (last visited June 5 2025). NTEU has

represented bargaining-unit workers at HHS since November 1978. JA57.

**iv. _The FCC_** regulates interstate and international communications by radio, television, wire, satellite, and cable across the nation. _See What We Do_, Fed. Commc'ns Comm'n. NTEU has represented bargaining-unit workers at the FCC since July 1978. JA57.

**v. _The Department of Energy_** is responsible for ensuring that the United States has access to reliable, affordable, and cleaner sources of energy. _About the Office of Energy Efficiency and Renewable Energy_, U.S. Dep't of Energy, https://perma.cc/W65V-N8DZ (last visited June 5, 2025). Its work includes advancing energy technologies, managing the nation's energy resources, and addressing environmental impacts from past energy-related activities. _Mission_, U.S. Dep't of Energy, https://perma.cc/UF3R-Y42Q (last visited June 5, 2025). NTEU has represented bargaining-unit workers at DOE since January 1979. JA57.

**vi. _BFS_** functions primarily to manage the government's accounting and centralized payment systems, and to reduce public debt. _See About Us_, Bureau of the Fiscal Serv., https://perma.cc/Z3KP-4DH4

(last modified Jan. 23, 2025). NTEU has represented bargaining-unit

workers at BFS since April 1985. JA57.

      **vii.** ***The EPA*** ensures compliance with and the fair

administration of environmental laws and acts to conserve natural

resources. *See Our Mission and What We Do,* U.S. Env't Prot. Agency,

https://perma.cc/4JCG-GL3E (last updated April 21, 2025). NTEU has

represented bargaining-unit workers at EPA since April 1998. JA58.

      **viii.** ***Treasury's Departmental Offices*** "are primarily

responsible for the formulation of policy and management of the

Department as a whole." *Organization and Functions*, U.S. Dep't of the

Treasury, https://perma.cc/K6D5-4NVY (last visited June 5, 2025).

JA28. NTEU has represented bargaining-unit workers at Treasury's

Departmental Offices since May 2002. JA58.

      **ix.** ***The Office of the Comptroller of the Currency (OCC)***

ensures that national banks and federal savings associations operate in

a safe and sound manner and provide fair access to financial services.

*What We Do*, Office of the Comptroller of the Currency,

https://perma.cc/TNC5-TRJS (last visited June 5, 2025). NTEU has

represented bargaining-unit workers at OCC since November 2002. JA58.

    **x.** ***The Alcohol and Tobacco Tax and Trade Bureau (TTB)*** collects taxes on alcohol, tobacco, firearms, and ammunition; ensures the integrity of alcohol products; ensures that only qualified businesses enter the alcohol and tobacco industries; and prevents unfair and unlawful market activity for alcohol and tobacco products. *About TTB,* Alcohol & Tobacco Tax & Trade Bureau, https://perma.cc/2LXK-HSY8 (last updated Feb. 3, 2021). NTEU has represented bargaining-unit workers at TTB since October 2003. JA58.

    **xii.** ***BLM*** sustains the health, diversity, and productivity of public lands for the use and enjoyment of the public. *Our Mission*, U.S. Dep't of the Interior, Bureau of Land Mgmt., https://perma.cc/QXY8-Z42H (last visited June 5, 2025). NTEU has represented bargaining-unit workers at BLM since February 2021. JA58.

    **xiii.** ***Two subdivisions of DOJ*** where NTEU represents employees were excluded from the Statute. The Environment and Natural Resources Division is responsible for bringing cases against those who violate the nation's environmental laws and defending the

federal government in litigation arising under a broad range of environmental statutes. *Environment and National Resources Division*, Env't & Natural Res. Div., U.S. Dep't of Justice, https://perma.cc/X9AW-UTXC (last visited June 5, 2025). Those in DOJ's Civil Rights Division work to uphold the civil and constitutional rights of all persons in the United States and enforce federal statutes prohibiting discrimination. *Our Work*, C.R. Div., U.S. Dep't of Justice, https://perma.cc/94KK-HWQ4 (last updated Mar. 12, 2025). NTEU has represented bargaining-unit workers at DOJ since January 2025. JA59.

## II. The District Court's Finding of Irreparable Harm Has Ample Record Support and Is Consistent with Precedent.

The district court was well within the limits of its discretion in concluding that the Executive Order would cause NTEU irreparable harm in two ways: that NTEU would not recover the lost influence among its membership if it cannot perform classic union functions for them; and that the dues revenue that the Executive Order cuts off threatens NTEU's existence. The government argues that no real harm results if NTEU cannot perform its statutory functions when it matters to its workers the most or if NTEU will go out of business. Those views are incompatible with precedent.

### A. NTEU's Inability to Perform Its Statutory Mission Is Irreparably Harming Its Influence with Its Members and Leading to Membership Losses.

The district court's conclusion that the Executive Order would irreparably harm NTEU's influence and standing among its workers was not speculative. The agencies here will not acknowledge NTEU or allow it to perform its statutory functions of bargaining for and representing its workers. NTEU is missing opportunities to fight for its workers that it will never get back. And its members are cancelling their membership as a result.

### 1. NTEU Is Losing Opportunities to Fight for Its Members, Which Is Irreparably Diminishing Its Influence and Reputation.

The Executive Order eliminates NTEU's status as the exclusive bargaining representative for about two-thirds of the workers that it represents, and it has led to agencies disregarding a dozen of its collective-bargaining agreements. *See* JA252; JA255. For the over 104,000 workers affected, NTEU cannot perform its statutory mission of bargaining on their behalf and protecting their rights through a grievance-arbitration process. The district court correctly concluded that NTEU's inability to perform its "primary mission" and the

resulting loss in influence among its workers is irreparable injury.

JA256 *(*quoting *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C.

Cir. 2016)).

      **a.**      The agencies here stopped recognizing NTEU altogether.

For example, they stopped bargaining with NTEU on changes to

conditions of employment—including the impending reductions-in-

force—and stopped participating in the grievance-arbitration process.

JA241 (citing OPM Guidance); JA253; JA257. As the IRS explained to

NTEU and to an arbitrator in an email illustrative of the state of

affairs:

> Our office has been instructed to refrain from participating in any activities related to collective bargaining, including having any substantive contact with the union. Substantive contact is basically anything more than notifying the union that we are not to have contact.[13]

FDA sent a similar notification to NTEU:

> FDA is not recognizing labor relations with (NTEU/AFGE) in adherence to the presidential Executive Order . . . FDA will cease to recognize all labor organizations and will not participate in any labor related activities . . .

*Id.* ¶ 153.

---

[13] NTEU Mot. for Sum. J., Stmt. of Material Facts Not in Dispute ¶ 138, No. 25-cv-935 (Dkt. 43-2) (D.D.C. June 9, 2025).

As the district court correctly found, courts have long recognized that "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *See* JA253 (quoting *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944)). When employers engage in such anti-union activity, that results in a serious, irreparable injury. The Seventh Circuit has held, for example, that there was irreparable injury warranting an injunction when an employer caused union activity to grind to a halt. *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996). The Court found that "[a]s time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases." *Id.*

Similarly, the Ninth Circuit held in *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191-92 (9th Cir. 2011), that an employer's refusal to engage in collective bargaining was irreparable injury. The Court found such harm for several reasons, including (1) without bargaining, employees are denied the opportunity to achieve the economic benefits that a collective-bargaining agreement can secure; (2) "unions provide a

range of non-economic benefits to employees that are not realized when an employer refuses to bargain with the union," such as ensuring greater job security and representation in grievances and arbitrations; and (3) "a delay in bargaining weakens support for the union" which cannot be remedied later. *Id.*

In an analogous vein, "courts have historically held that withdrawal of union recognition is often irreparable." *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d 1201, 1216-17 (E.D. Cal. 2010) (collecting cases and finding irreparable harm where "support for and confidence in the Union is waning because of [the employer's] continued refusal to recognize the Union").

Here, short of formal derecognition, the agencies simply ignored NTEU and its collective-bargaining agreements leading up to the district's court's preliminary injunction. JA253 (citing submitted evidence that agencies were refusing to honor multiple contractual obligations). It was therefore not speculative for the district court to conclude, based on the extensive record evidence, that NTEU's inability to perform its statutory function for its workers and the resulting diminishment in its influence qualified as irreparable injury.

**b.** The weakening of support for NTEU among its workers is not theoretical; the record shows that it is happening. NTEU members in the agencies at issue here have cancelled their membership explicitly because of the Executive Order. An NTEU member at HHS, for example, wrote the following when cancelling her membership: "President Trump demolished the union several weeks ago . . . Please see the attached form, SF-1188 to end my participation in NTEU." Appellee's Resp. to Appellant's Mot. for a Stay at A94, ECF No. 2114615.

This Court has long recognized the non-theoretical, commonsense reality that "[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining," making after-the-fact remedies insufficient. *See Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). That is especially so when a union cannot perform its function—here, its statutory function—at a time when its workers need it the most.

In the current climate, federal workers are looking to their unions for support which makes the Executive Order's neutralizing of NTEU

even more likely to have lasting harmful effects. *See* JA254 (finding that concerns over a decrease in union support "are heightened in the instant case"). Federal workers have been under unprecedented and incessant attack. As the Director of the Office of Management and Budget has explained:

> We want the bureaucrats to be traumatically affected. When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains. . . . We want to put them in trauma.

William Wan & Hannah Natanson, *White House Officials Wanted To Put Federal Workers 'In Trauma.' It's Working.*, The Washington Post (May 20, 2025), www.washingtonpost.com/investigations/2025/05/20/federal-workers-trump-mental-health/.

Particularly in this climate, when an agency ignores the reduction-in-force article in its collective-bargaining agreement with NTEU or refuses to progress a grievance alleging discrimination or harassment (*see* JA92-95: JA107-114; JA122-133), the affected workers (not to mention their fellow union members) will not look at NTEU in the same way again. They will question why they should belong to NTEU at all. And NTEU will be diminished in a way that cannot be undone.

The district court had an ample record basis to conclude that "injuries to NTEU's bargaining power . . . are likely to occur – and indeed have already begun to occur" and that such injuries would be irreparable absent injunctive relief. JA256. Without such relief, there is a "very real danger" that NTEU's membership will continue to "erode" and that any final remedy "would be ineffective." *See Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990).[14]

### 2. OPM's Litigation-Driven Frequently Asked Questions Document Is Irrelevant and Misleading.

A divided motions panel stayed the district court's preliminary injunction. *NTEU v. Trump*, 2025 U.S. App. LEXIS 11952. The linchpin of the majority's analysis was its mistaken view that federal agencies were not implementing the Executive Order at issue when the district court enjoined its implementation. *See id.* at *3 (stating that "the

---

[14] The cases that the government cites are starkly different. *See* Gov't Br. 56. Whether a preliminary injunction is warranted by the layoff of a single worker in violation of a CBA (*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 702 (7th Cir. 2005)) or bad-faith surface bargaining (*Henderson ex rel. NLRB v. Bluefeld Hosp. Co.*, 902 F.3d 432, 435-36 (4th Cir. 2018)) sheds little light on the harms resulting from the complete (and indefinite) elimination of labor rights for entire bargaining units of employees.

Government directed agencies to *refrain* from terminating collective-bargaining agreements . . . until after the litigation concludes"), *id.* at *3 n.3 ("To be clear, if a specific agency or subagency deviates from that self-imposed rule, individual units may seek injunctive relief appropriately tailored to any nonspeculative, irreparable harm."), *id.* at *4 (relying on "the Government's self-imposed restrictions"). That led the majority to stay the district court's emergency relief based strictly on an equities analysis. *Id.* at 2 n.1. The majority's analysis was based on a factual misunderstanding that the government continues to promote. Govt' Br. 54-55.

The majority's erroneous belief was based on a Frequently Asked Questions document that OPM issued on April 8—after NTEU filed suit and moved for preliminary relief—which contains the following suggestion: that "'[a]gencies should not terminate any CBAs . . . until the conclusion of litigation or further guidance from OPM directing such termination.'" JA77; *see NTEU v. Trump*, 2025 U.S. App. LEXIS 11952 at * 2.

Based on the mistaken premise that agencies complied with OPM's suggestion, the majority concluded that neither NTEU nor

anyone else was harmed from a stay of the preliminary injunction. *NTEU v. Trump*, 2025 U.S. App. LEXIS 11952 at **2-7. Indeed, in the majority's view, the preliminary injunction was not needed at all, given agencies' alleged compliance with their collective-bargaining agreements. *Id.* at **2-3. Thus, the majority concluded, the government will likely prevail on appeal. *Id.* at *7.

The majority's foundational understanding of the state of affairs before the preliminary injunction issued was incorrect. The district court found that the record showed that "certain agencies have already failed to honor provisions of the respective collective bargaining agreements by failing to withhold dues payment from employees' paychecks, 'disavow[ing] any obligation to bargain,' and beginning to implement reductions in force." JA253 (internal citations omitted).

That led the district court to reasonably conclude:

> In other words, notwithstanding the lack of the formal cancellation of the collective bargaining agreements, the agencies and subdivisions have been instructed that the protections in the [Statute] are no longer operative . . . [and] have already begun disregarding provisions of the collective bargaining agreements in line with the OPM Guidance.

JA 255. That factual finding must be accepted unless clearly erroneous. *In re Navy Chaplaincy*, 697 F.3d 1171, 1180 (D.C. Cir. 2012). And, here, that finding is undisputed.

The majority nonetheless accepted the government's conclusory argument based on OPM's April 8 issuance. *NTEU v. Trump*, 2025 U.S. App. LEXIS 11952 at *3 (citing Exhibit 1-B to Government's Preliminary Injunction Brief). And the majority completely ignored the district court's findings to the contrary and the supporting evidence that NTEU provided to the panel. *See id*. That error renders its analysis plainly wrong.[15]

Indeed, after the divided panel decision issued, the district court issued an opinion restating the wealth of evidence showing that NTEU's collective-bargaining agreements were a dead letter to the agency

---

[15] In another case involving the same Executive Order, the government took a contrary position, stating that many of the agency defendants here (*e.g.*, the Departments of Treasury, HHS, and Justice) *are* implementing the Executive Order. *See* Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal at 5-6, *AFGE v. Trump*, No. 25-cv-03070 (N.D. Cal. July 1, 2025). Indeed, the government argued that these agencies would be injured if they had to unwind their extensive compliance efforts and provided supporting declarations from each agency defendant. *Id.* at 6.

defendants here. *NTEU v. Trump*, No. 25-cv-935, 2025 U.S. Dist. LEXIS 96009, at *4-11 (D.D.C. May 20, 2025). That opinion quoted record evidence concerning refusals to process dues payments, refusals to bargain, refusals to follow reduction-in-force articles in contracts, and refusals to participate in the grievance-arbitration process. *Id.*[16]

## B. The Executive Order Threatens NTEU's Very Existence by Cutting Off Over Half of Its Revenue, Which Constitutes Irreparable Harm.

"[D]ues payments of union members are the economic lifeblood of a labor organization. . . ." *Local Union No. 5741, United Mine Workers v. NLRB*, 865 F.2d 733, 738 (6th Cir. 1989) (cleaned up). NTEU lost over $2 million before the district court's preliminary injunction because the agency defendants stopped processing dues payments to NTEU through payroll deductions, as 5 U.S.C. § 7115 and their collective-bargaining

---

[16] During the pendency of this appeal, Defendant HHS terminated NTEU's collective-bargaining agreement, notwithstanding OPM's updated Frequently Asked Questions document, which states that "agencies should not terminate, abrogate, or repudiate, any [collective-bargaining agreements] with the National Treasury Employees Union" (Govt. Br. 9, n.2). *See* Erich Wagner, *HHS the Latest to Cancel Union Contracts and Implement Trump's Order*, Government Executive (Aug. 25, 2025), www.govexec.com/workforce/2025/08/hhs-latest-cancel-union-contracts-and-implement-trumps-order/407673/.

agreements require. JA256-57. The absence of emergency relief will cause NTEU to lose over half of its annual revenue. *See* JA252.

The district court found based on the evidence submitted that financial losses of this magnitude threaten "NTEU's very existence" (JA256) and thus constitute irreparable harm. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 89 (D.D.C. 2025) (finding irreparable harm where an Executive Order threatened almost one-third of the plaintiff's revenue, which would be a "devastating blow to plaintiff—threatening plaintiff's very existence").

The government suggests that NTEU can make up for dues that are lost through agencies stopping payroll deductions by asking members to make voluntary contributions. Gov't Br. 58. But the Executive Order takes away the apparatus that Congress created in 5 U.S.C. § 7115 (JA257) and on which NTEU relies for virtually all its dues payments. JA48; JA63. And the Executive Order, the district court correctly concluded, takes away "the basic reason that NTEU members pay dues" at all: to support their exclusive representative, which is statutorily entitled to collectively bargain on their behalf and with

which their employers are statutorily required to engage. JA257; *cf.* *Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105, 133 n.20 (D.D.C. 2025) (noting that executive order took away the reason clients hired firm: i.e., it "hamper[ed] the effectiveness of [firm's] representation of clients").

The Administration cannot eliminate NTEU's ability to perform its statutory mission and then suggest that NTEU should still be able to collect dues from the members whom it is unable to effectively serve. The government has struck at the heart of the very reason that employees join a union. *See Small*, 661 F.3d at 1193 ("Whether or not the employer bargains with a union chosen by his employees is normally decisive of its ability to secure and retain members.").

\* \* \*

It is telling, ultimately, that the government promptly cut off the "economic lifeblood" (*Local Union No. 5741*, 865 F.2d at 738) of "hostile Federal unions" (JA34; JA224) like NTEU instead of adhering to the "self-imposed" restraints that it misleadingly proclaims. *NTEU v. Trump*, 2025 U.S. App. LEXIS 11952 at \*3 n.3. The President wants to

kill these unions or to forever weaken them.[17] That is the objective of the Executive Order—not national security. And the President will succeed absent this Court's intervention.

## III. The Balance of Equities and the Public Interest Favor NTEU

A. Congress's words should settle this aspect of the analysis: It codified its finding that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). If Congress's words have meaning, nullifying the collective-bargaining rights of over one hundred thousand NTEU-represented workers spread across a dozen federal agencies is not in the public interest.

At worst, this prong of the analysis is a draw. While Congress's codified finding on the public interest should govern, it is arguably "not clear how to balance a public interest asserted on behalf of the Congress against the public interest asserted by the Executive." *Global Health*

---

[17] *See* Ryan J. Foley, Associated Press, *Largest Federal Employee Union, a Leading Trump Opponent, to Lay Off More Than Half of Staff* (updated April 24, 2025), https://apnews.com/article/afge-federal-union-trump-cuts-layoffs-downsizing-53c0a1491cc5af65278fbd16b8cfb6b5 (stating that the largest federal-sector union has announced it is laying off over half its staff nationwide because of the effect of this Administration's actions on its finances).

*Council*, 2025 U.S. App. LEXIS 20495, *36 (citations omitted). In such a circumstance, "this factor does not . . . favor" the government, as it contends. *See id.*

B.     The district court's order requires only that the agency defendants honor the collective-bargaining agreements that they negotiated (JA217-18) and that Defendant OPM has, according to the government, instructed them not to terminate. Gov't Br. 9.

The government does not explain, with any degree of concreteness, why maintaining collective bargaining at the affected agencies impairs national-security interests. That omission is particularly glaring given its representation to this Court three months ago "that agencies have generally continued to comply with [NTEU's collective-bargaining] agreement[s]." *See* Gov't Resp. to Appellees' Rule 28(j) letter, No. 25-5157 (D.C. Cir. July 8, 2025). If that is its view, notwithstanding the district court's findings and record evidence to the contrary, the district court's relief "generally" represents a continuation of the status quo.

The statutory construct casts further doubt on the government's purported harm. This Court has underscored that "the scope of bargaining under [the Statute] is extraordinarily narrow." *NTEU v.*

*Chertoff*, 452 F.3d 839, 860 (D.C. Cir. 2006). "[T]he restricted scope of bargaining under [the Statute] gives federal agencies great 'flexibility' in collective bargaining." *Id.* at 861. And the Statute grants agencies wide latitude to act promptly in exigent situations and often allows bargaining to occur after an agency implements a change to working conditions.[18]

Thus, there is no credible argument that being subject to the Statute impairs supervision of (or the performance of) an employee's duties. These employees, moreover, who work in agencies like the IRS, the EPA, and HHS are manifestly not performing national-security work, even under the most charitable view for the government.

## CONCLUSION

Because it was not an abuse of discretion for the district court to conclude that the Executive Order issued for nakedly retaliatory reasons; that it will lead to the demise of NTEU; and that the public

---

[18] *See* 5 U.S.C. § 7106 (granting agencies the right "to take whatever actions may be necessary to carry out the agency mission during emergencies"); *DHS, ICE*, 70 F.L.R.A. 628, 630 (2018) (agency may bargain after implementing changes to condition of employment if made pursuant to a law or government-wide regulation).

interest favors emergency relief, this Court should affirm the district

court's preliminary injunction.

Respectfully submitted,

*/s/ Julie M. Wilson*
JULIE M. WILSON
General Counsel

*/s/ Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel

*/s/ Allison C. Giles*
ALLISON C. GILES
Assistant Counsel

*/s/ Jessica Horne*
JESSICA HORNE
Assistant Counsel

NATIONAL TREASURY
EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org

October 9, 2025                Counsel for Appellee NTEU

## CERTIFICATE OF COMPLIANCE

I hereby certify this response complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 12,883 words, excluding those words that Federal Rule of Appellate Procedure 32(f) exempts.

*/s/ Jessica Horne*
JESSICA HORNE
Assistant Counsel