**[ORAL ARGUMENT SCHEDULED FOR DECEMBER 15, 2025]**

**No. 25-5157**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL TREASURY EMPLOYEES UNION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

## REPLY BRIEF FOR APPELLANTS
———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
WEILI J. SHAW
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

GLOSSARY ......................................................................................... vi

INTRODUCTION AND SUMMARY ........................................................ 1

ARGUMENT ......................................................................................... 3

I.   THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS .............. 3

   A.   Plaintiff Identifies No Basis For District-Court
        Jurisdiction.............................................................................. 3

   B.   The FSLMRS Allows The President To Exercise
        Discretion, Which Cannot Be Challenged Through A
        Non-Statutory Cause Of Action............................................. 10

   C.   Plaintiff Failed To Establish A Likelihood Of Success
        On The Merits Of Its *Ultra Vires* Claim .............................. 17

        1.   Plaintiff failed to rebut the presumption of
             regularity...................................................................... 18

        2.   Plaintiff failed to demonstrate that the President
             exceeded his discretion under § 7103(b)(1).................. 26

II.  PLAINTIFF DID NOT ESTABLISH THAT IT WOULD LIKELY
     SUFFER IRREPARABLE HARM................................................... 31

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN
     DEFENDANTS' FAVOR .............................................................. 33

CONCLUSION ................................................................................... 36

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                    <u>**Page(s)**</u>

*AFGE v. Reagan,*
    870 F.2d 723 (D.C. Cir. 1989) ....................................... 15, 28

*AFGE v. Trump,*
    929 F.3d 748 (D.C. Cir. 2019) ...................................... 3, 5, 6

*AFGE Local 446 v. Nicholson,*
    475 F.3d 341 (D.C. Cir. 2007) ............................................ 8

*AFSA v. Trump*, No. 25-5184,
    2025 WL 1742853 (D.C. Cir. June 20, 2025) .............. 11, 17, 26-27, 34

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n,*
    110 F.4th 242 (D.C. Cir. 2024) ......................................... 16

*American Forest Res. Council v. United States,*
    77 F.4th 787 (D.C. Cir. 2023) ...................................... 14, 15

*Center for Nat'l Sec. Studies v. U.S. Dep't of Justice,*
    331 F.3d 918 (D.C. Cir. 2003) ....................................... 25-26

*Chamber of Com. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ......................................... 14

*Changji Esquel Textile Co. v. Raimondo,*
    40 F.4th 716 (D.C. Cir. 2022) ......................................... 17

*Cole v. Young*:
    226 F.2d 337 (D.C. Cir. 1955) .................................... 20, 21
    351 U.S. 536 (1956) ........................................... 19, 20, 21

*Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne,*
    250 U.S. 163 (1919) ................................................... 11

*Dalton v. Specter,*
    511 U.S. 462 (1994) ................................................... 10

*Duncan v. Walker,*
    533 U.S. 167 (2001) ................................................... 30

ii

*East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*,
414 F.3d 700 (7th Cir. 2005) ............................................................... 3

*Elgin v. Department of the Treasury*,
567 U.S. 1 (2012) .................................................................................. 7

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010) ......................................................... 25

*Federal Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .......................................................... 29

*Franks Bros. Co. v. NLRB*,
321 U.S. 702 (1944) .............................................................................. 3

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ............................................................. 17

*Gonzalez v. Thaler*,
565 U.S. 134 (2012) .......................................................................... 10

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) ........................................................... 6

*Haig v. Agee*,
453 U.S. 280 (1981) .......................................................................... 17

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........................................................ 31, 32

*Lee v. Garland*,
120 F.4th 880 (D.C. Cir. 2024) ......................................................... 17

*Mountain States Legal Found. v. Bush*,
306 F.3d 1132 (D.C. Cir. 2002) ....................................................... 15

*National Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022) .......................................................... 30

*North Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ....................................................... 26

*NTEU v. Trump*, No. 25-5157,
    2025 WL 1441563 (D.C. Cir. May 16, 2025) ..................... 31, 33, 33-34

*Owlfeather-Gorbey v. Avery*,
    119 F.4th 78 (D.C. Cir. 2024) ............................................. 18

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ............................................................ 7

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ............................................. 13, 18, 19

*Webster v. Doe*,
    486 U.S. 592 (1988) .......................................................... 29

## Statutes:

5 U.S.C. § 7103(a)(3) .......................................................... 20

5 U.S.C. § 7103(b)(1) ............................................... 1, 6, 13

5 U.S.C. § 7103(b)(1)(A) .......................................... 12, 22, 30

5 U.S.C. § 7103(b)(1)(B) .......................................... 12, 23, 24

5 U.S.C. § 7106(a)(2)(D) ..................................................... 34

5 U.S.C. § 7116(a) ............................................................... 4

5 U.S.C. § 7118(a) ............................................................... 4

5 U.S.C. § 7118(a)(7) .......................................................... 32

5 U.S.C. § 7121(a) ............................................................... 4

5 U.S.C. § 7122(a) ............................................................... 4

5 U.S.C. § 7123(a) ............................................................... 4

47 U.S.C. § 151 .................................................................. 21

**Regulatory Material:**

Exec. Order No. 14,251,
90 Fed. Reg. 14,553 (Apr. 3, 2025) ................................................. 1, 27

**Legislative Material:**

PN560-1, 119th Cong. (2025), https://www.congress.gov/
nomination/119th-congress/560/1 ............................................................ 6

**Other Authorities:**

Letter from U.S. Gov't Accountability Off. to
President Biden (Feb. 8, 2023),
https://perma.cc/9WW9-NPC7 .............................................................. 6

NTEU, *NTEU on the FY2026 Budget Request
for CBP* (June 13, 2025), https://perma.cc/4Z3Q-XBZB ...................... 22

The White House, *Fact Sheet: President Donald
J. Trump Exempts Agencies with National
Security Missions from Federal Collective
Bargaining Requirements* (Mar. 27, 2025),
https://perma.cc/Y7HR-4W3H ............................................................. 24

# GLOSSARY

| | |
|---|---|
| AFGE | American Federation of Government Employees |
| AFSA | American Foreign Service Association |
| FLRA | Federal Labor Relations Authority |
| FSLMRS | Federal Service Labor–Management Relations Statute |
| NTEU | National Treasury Employees Union |
| OPM | Office of Personnel Management |

# INTRODUCTION AND SUMMARY

Plaintiff National Treasury Employees Union (NTEU) challenges the President's exercise of discretionary authority vested in him by the Federal Service Labor–Management Relations Statute (FSLMRS). Acting in accordance with statute, the President issued Executive Order 14,251, excluding certain agencies and agency subdivisions from the FSLMRS's provisions after determining that they have "as a primary function intelligence, counterintelligence, investigative, or national security work" and that the provisions of the FSLMRS "cannot be applied to [those agencies or subdivisions] in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, § 1, 90 Fed. Reg. 14,553, 14,553 (Apr. 3, 2025); *see* 5 U.S.C. § 7103(b)(1).

Plaintiff fails to justify the district court's preliminary injunction of the executive order. First, the court erred by asserting jurisdiction over plaintiff's claim, which the FSLMRS requires plaintiff to raise first with the Federal Labor Relations Authority (FLRA) and then in a court of appeals on direct review of the FLRA decision. Plaintiff contends that it had no available route to bring its claims before the FLRA, but it

ignores the multiple channels for such review that the government identified in its opening brief.

Second, plaintiff cannot bring an *ultra vires* claim to challenge a presidential action where, as here, a statute commits the relevant decision to the President's discretion. Plaintiff identifies several cases in which this Court has reviewed *ultra vires* challenges to presidential action, but in each of those cases the plaintiff alleged that the President contravened a statutory requirement that did not vest discretion in the President. Such authorities fail to provide a basis for plaintiff's claim because the FSLMRS contains a clear grant of discretionary authority.

Third, even if plaintiff could assert a non-statutory claim that the executive order is *ultra vires*, that claim would fail on the merits because plaintiff has not identified any clear evidence to rebut the presumption of regularity. Plaintiff alleges that the President acted with improper motivations, but the evidence plaintiff relies upon supports the conclusion that the President acted pursuant to the statutory criteria—that is, he determined that the provisions of the FSLMRS cannot be applied to the identified agencies consistent with the requirements of national security. Furthermore, plaintiff's demand

that the government justify the President's exclusion decision is inconsistent with this Court's precedent that the President need not explain his decision.

Finally, the balance of equities weighs against a preliminary injunction because any harm plaintiff would suffer is reparable by an FLRA order if plaintiff ultimately prevails in this litigation. Furthermore, the district court's intrusion upon the President's exercise of national-security authority vested in him by Congress injures the Executive Branch and the public interest.

This Court should vacate the preliminary injunction.

## ARGUMENT

## I. THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

### A. Plaintiff Identifies No Basis For District-Court Jurisdiction

As the government explained (Br. 19-31), plaintiff's claims must be brought through the FSLMRS's review scheme, which is "exclusive with respect to claims within its scope." *American Fed'n of Gov't Emps. (AFGE) v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). Accordingly, the district court lacks jurisdiction over this suit.

**1.** Plaintiff contends (Br. 18) that it "has no administrative options" because the executive order "removed any union claims relating to the agencies at issue from the administrative scheme." But the government identified (Br. 22-23) numerous avenues for unions to challenge the executive order's validity before the FLRA and then on direct review in a court of appeals, and plaintiff fails to explain why those avenues are unavailable. Specifically, the government explained that plaintiff can file an unfair-labor-practice charge with the FLRA's General Counsel, *see* 5 U.S.C. §§ 7116(a), 7118(a), or raise such a claim through the grievance and arbitration procedures in the union's collective-bargaining agreements, *see id.* §§ 7121(a), 7122(a). In either event, plaintiff could then obtain judicial review of an adverse FLRA decision in the court of appeals. *See id.* § 7123(a). In addition, plaintiff could challenge the executive order in cases already pending before the FLRA by arguing that the FLRA continues to have jurisdiction over those cases because the executive order is invalid. Even if the FLRA disagrees with plaintiff and dismisses such a case for lack of jurisdiction, that dismissal order would generally be subject to judicial review. *See id.*

Plaintiff asserts (Br. 21) that the FLRA General Counsel "would refuse to issue" an unfair-labor-practice charge against an excluded agency. First, plaintiff's unsupported assumption on this score is insufficient to establish district-court jurisdiction. Second, even if plaintiff were correct, Congress chose to give the General Counsel unreviewable discretion to decide, after investigating a charge, whether to file an unfair-labor-practice complaint with the FLRA. That discretion is not particular to the facts presented here, and this Court has nonetheless held that the FSLMRS precludes district-court jurisdiction over claims that could be brought through the administrative process. *See AFGE*, 929 F.3d at 757, 761 (holding that the district court lacked jurisdiction to consider a challenge to executive orders that could be brought before the FLRA, including through an unfair-labor-practice proceeding). That Congress deliberately limited the administrative-review scheme by giving the FLRA's General Counsel discretion to decide whether to file a complaint does not give litigants the option to circumvent the administrative-review scheme altogether. After all, "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies thereunder,

that counsels judicial abstention." *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (quotation marks omitted).[1]

In any event, the government identified two avenues for administrative and judicial review that do not depend on the FLRA's General Counsel—namely, plaintiff could raise an unfair-labor-practice charge through grievance and arbitration procedures, which do not require any action by the General Counsel, or challenge the executive order's validity as a basis for opposing the dismissal of a pending FLRA proceeding. Of course, in the government's view, the FLRA lacks jurisdiction over any claims or grievances brought against excepted agencies because the executive order is a valid exercise of the President's discretion under 5 U.S.C. § 7103(b)(1). But the FLRA could

---

[1] There is no exception to the exclusive nature of the FSLMRS's review scheme during periods when there is no Senate-confirmed General Counsel. *Cf.* Answering Br. 23 n.7. Indeed, there was no such General Counsel when this Court issued the decision in *AFGE*, which identified unfair-labor-practice proceedings as a means to obtain administrative and judicial review. *See* 929 F.3d at 757; Letter from U.S. Gov't Accountability Off. to President Biden 2-3 (Feb. 8, 2023), https://perma.cc/9WW9-NPC7. In any event, the President nominated a General Counsel in September 2025. *See* PN560-1, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/560/1.

consider that issue if properly raised by parties, and a court of appeals could review the FLRA's decision on that issue on a subsequent appeal.

It is not relevant here that the FLRA may ultimately conclude that it lacks jurisdiction over any claims against the defendant agencies because the executive order is valid. Nor would it matter even if the FLRA thought it could not consider a challenge to the executive order. In *Elgin v. Department of the Treasury*, the Supreme Court held that the Civil Service Reform Act precludes district-court jurisdiction over constitutional challenges raised by former federal employees even if the Merit Systems Protection Board lacks jurisdiction to consider such challenges because they can be meaningfully addressed in the court of appeals. 567 U.S. 1, 16-17 (2012); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215-216 (1994) (holding that a statute precluded district-court review of statutory and constitutional claims even if the relevant administrative body lacked authority to address those challenges, because the court of appeals could address them). Here too, a court of appeals could consider the merits of a challenge to the executive order on appeal from an FLRA order dismissing a claim

brought against an excluded agency, even if the FLRA determined it could not consider the merits of such a challenge.

In any event, contrary to plaintiff's suggestion (Br. 21), the FLRA has never held that it lacks jurisdiction to consider the validity of a presidential exclusion order under § 7103(b)(1). As the government has already pointed out (Br. 28-29 & n.4), the FLRA cases on which the district court and plaintiff rely did not address this issue, because in those cases there was no dispute about the exclusion order's validity. If plaintiff asserts that the FLRA continues to have jurisdiction over cases against the defendant agencies because the executive order is invalid, the FLRA may consider that argument—thus confronting the merits of plaintiff's claim. Plaintiff has no response to these points. *See* Answering Br. 21.

As the government has already explained (Br. 30-31), plaintiff's reliance on *AFGE Local 446 v. Nicholson*, 475 F.3d 341 (D.C. Cir. 2007) is also misplaced. In *Nicholson*, a Veterans Affairs-specific statute expressly provided that the Secretary of Veterans Affairs' determination that a matter was not subject to collective bargaining could "not be reviewed by any other agency." *Id.* at 354 (quotation

marks omitted). Here, in contrast, no statute provides that the FLRA cannot consider a challenge to the President's exclusion order under § 7103(b)(1). Accordingly, the FLRA has jurisdiction to review such a challenge, just as it has authority to review other disputes arising under the FSLMRS.

**2.** Plaintiff's remaining arguments in favor of district-court jurisdiction also fail. Other than a conclusory assertion (Br. 24-25), plaintiff makes no argument that the matters raised in this suit are wholly collateral to the FSLMRS's review provisions or outside the FLRA's expertise. Instead, plaintiff just assumes that the FLRA will decline to resolve any challenge to the executive order—an assumption that, again, has neither a basis in precedent nor relevance to the jurisdictional analysis. And plaintiff fails to acknowledge that, as the government noted (Br. 23-26), plaintiff's claim raises an issue of statutory interpretation involving the very statute the FLRA is charged with administering, plaintiff seeks relief within the FLRA's power to issue, and the FLRA has expertise on the legal and factual issues this case may present.

Finally, plaintiff notes (Br. 19-20) that the government filed suits seeking declaratory judgments that excluded agencies could repudiate collective-bargaining agreements. Those declaratory-judgment suits differ from the present suit because the government did not allege that the executive order is invalid. But whether the government is correct about that theory is irrelevant because the district court here cannot assert jurisdiction on some theory of estoppel. *Cf. Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (explaining that a court must consider jurisdictional issues even if the parties "have disclaimed" them because "[s]ubject-matter jurisdiction can never be waived or forfeited"). Because the FSLMRS channels the present dispute to the FLRA, the district court lacks jurisdiction over this case.

## B. The FSLMRS Allows The President To Exercise Discretion, Which Cannot Be Challenged Through A Non-Statutory Cause Of Action

Even if the district court has jurisdiction, plaintiff cannot assert a non-statutory cause of action alleging "that the President has violated a statutory mandate" "when the statute in question commits the decision to the discretion of the President." *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *see* Opening Br. 31-34. As this Court has explained in the

analogous context of the Foreign Service Act, the FSLMRS "commits the relevant decision" under § 7103(b)(1) "to the President's discretion." *American Foreign Serv. Ass'n* (*AFSA*) *v. Trump* (*AFSA* Stay Order), No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025) (per curiam).

**1.** Plaintiff contends (Br. 26-27) that the judicial-review bar set out in *Dalton* is limited to situations where the statute provides no limits on the President's discretion, but that argument is refuted by *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163 (1919), which the Court cited in *Dalton*. In *Dakota Central*, the Court reviewed a claim that the President exceeded the scope of his authority under a statute permitting him to take control of the telegraphs "whenever he shall deem it necessary for the national security or defense." *Id.* at 181-182, 184. The statute thus limited the President's authority to situations where he had made the requisite national-security determination, yet the Supreme Court held that the plaintiffs could not challenge the President's national-security finding or argue that he exceeded his authority by making an improper determination.

Here, too, plaintiff cannot state a claim that the executive order exceeds the President's authority under the FSLMRS because the President allegedly erred in determining that the FSLMRS "cannot be applied" to the designated agencies and subdivisions "in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1)(B).  Indeed, that national-security determination— which plaintiff asserts (Br. 27) is one of two judicially enforceable limitations on the President's authority under § 7103(b)(1)—is virtually indistinguishable from the national-security determination at issue in *Dakota Central* that the Supreme Court held was unreviewable.

Nor does the first subparagraph of § 7103(b)(1) provide a basis for judicial review.  Congress permitted the President to exclude an agency or subdivision from coverage of the FSLMRS "if *the President* determines that," *inter alia*, "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work."  5 U.S.C. § 7103(b)(1)(A) (emphasis added).  The statute thus makes clear that both determinations necessary for the President to issue an exclusion order—the primary-function determination and

the national-security determination—are entrusted to the President's discretion.

Congress could have made the first of these prerequisites a judicially findable fact and only the second a presidential determination. For example, Congress could have provided:

> The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if ~~the President determines that~~ —
>
> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> (B) the President determines that the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

Such language might have permitted a court to review the President's assertion that an agency has as a primary function intelligence, counterintelligence, investigative, or national-security work. But by granting "the President" responsibility to "determine[]" whether both prerequisites for an exclusion order exist, the statute makes clear that both such determinations are entrusted solely to the President's discretion. 5 U.S.C. § 7103(b)(1); *see Trump v. Hawaii*, 585 U.S. 667, 683-684 (2018) (concluding that statutory language enabling the

President to "suspend the entry of all aliens or any class of aliens" whenever he "finds" that their entry "would be detrimental to the interests of the United States" "exude[d] deference to the President" (quotation marks omitted)).

**2.** The cases on which plaintiff relies (Br. 26-27) are inapposite because they involved allegations that the challenged presidential action violated a statute that delegated no discretion to the President. In *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), for example, the Court reviewed a claim that the President had acted unlawfully in issuing an executive order barring the federal government from contracting with employers who hired permanent replacements during a strike. Although the Court recognized the President's "broad discretion" under the Procurement Act, it held that it could review the plaintiffs' claim that the executive order "independently violate[d] the [National Labor Relations Act], a statute that delegates no authority to the President to interfere with an employer's right to hire permanent replacements during a lawful strike." *Id.* at 1330-1332.

Likewise, in *American Forest Resource Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023), the Court held that it could review the

President's exercise of discretionary authority under the Antiquities Act for an alleged violation of an independent statute that imposed certain land-management requirements. *Id.* at 796-798. Thus, in *Chamber of Commerce* and *American Forest Resource Council*, it was critical that the plaintiffs claimed the President's exercise of discretionary authority under one statute violated a clear and non-discretionary requirement in another statute. Here, in contrast, plaintiff alleges only a violation of § 7103(b)(1), which grants broad discretion to the President.[2]

Plaintiff fares no better in arguing (Br. 29-30) that the executive order must be subject to judicial review because this Court performed an extremely deferential review of a similar order in *AFGE v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989). First, that case was decided before the Supreme Court reaffirmed in *Dalton* that the President's exercise of discretion granted to him by statute is not subject to review under a non-statutory cause of action. Second, the Court in *AFGE* simply

---

[2] Plaintiff's reliance on *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002), is also unavailing. There, the Court had "no occasion to decide the ultimate question of the availability or scope of review for exceeding statutory authority" because the plaintiff had failed to "allege facts to support the claim that the President acted beyond his authority under the Antiquities Act." *Id.* at 1137.

assumed that judicial review was available and addressed the proper deference to be given to the President's determination. The issue of reviewability *vel non* thus "received at best a 'drive-by' ruling … that did not amount to a precedential holding." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 110 F.4th 242, 254 (D.C. Cir. 2024). For the same reason, plaintiff errs in construing the government's reliance in the district court on the deferential standard of review applied in *AFGE v. Reagan* as a concession about the availability of judicial review.

**3.** As in *Dakota Central*, the fact that plaintiff asks the district court to review a national-security determination provides further reason for the Court to conclude that the executive order here is not subject to judicial review through an *ultra vires* action. But, as *Dalton* makes clear, the President's exercise of a broad grant of discretion is unreviewable even outside the national-security context.

In any event, plaintiff errs in suggesting (Br. 30-32) that the executive order here is not closely related to national security. Neither plaintiff nor the Court can properly second-guess the President's determination that this matter implicates national security—a determination made "consistent with the President's role as

commander-in-chief." *AFSA* Stay Order, 2025 WL 1742853, at *3. That national-security context confirms that courts would be ill-equipped to second-guess the President's determinations made under § 7103(b)(1). *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Lee v. Garland*, 120 F.4th 880, 891 (D.C. Cir. 2024) ("[F]ederal courts generally may not second-guess the political branches' discretionary judgments about matters of national security.").

### C. Plaintiff Failed To Establish A Likelihood Of Success On The Merits Of Its *Ultra Vires* Claim

Even if plaintiff could assert an *ultra vires* claim to challenge the President's exercise of discretion, it cannot meet the high bar to establish a right to relief on such a claim. *See, e.g.*, *Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (observing that such violations occur "only when the error is so extreme that one may view it as jurisdictional or nearly so" (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022))).

### 1. Plaintiff failed to rebut the presumption of regularity

Plaintiff contends (Br. 33) that the executive order's breadth, Office of Personnel Management (OPM) guidance, and a White House fact sheet rebut the presumption of regularity by demonstrating that the President was indifferent to the purposes and requirements of the FSLMRS. As the government has explained, however, each of these three circumstances is entirely consistent with a properly issued order excluding agencies from FSLMRS coverage. *Cf. Hawaii*, 585 U.S. at 705-706 (stating that a presidential policy would be upheld "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds"); *Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 86 (D.C. Cir. 2024) (a party seeking to rebut the presumption of regularity must present "clear evidence" that public officers have not "properly discharged their official duties" (quotation marks omitted)).

**a.** Plaintiff first contends (Br. 34) that the executive order's breadth should "give the Court pause." But the government has already explained (Br. 39-41) that the FSLMRS contains no limitation on the number of agencies that the President may exclude from its provisions. And it is entirely reasonable for a President to determine that in the

nearly half-century since the FSLMRS's enactment, national-security considerations and agencies' work have changed such that more of the federal workforce can, and should, be excluded from the statute's coverage. In any event, allegations that the President has established an "overbroad" policy that does not "serve national security interests" do not permit courts to "substitute [their] own assessment for the Executive's predictive judgments on such matters, all of which 'are delicate, complex, and involve large elements of prophecy.'" *Hawaii*, 585 U.S. at 707-708.

Plaintiff relies (Br. 34-35) on *Cole v. Young*, 351 U.S. 536 (1956), to argue that Congress must have intended the term "national security" in § 7103(b)(1) to have a narrow meaning. As an initial matter, *Cole* rested on the text and legislative history of the particular 1950 Act at issue there, *see* 351 U.S. at 543-551, and thus is of limited value in construing the FSLMRS. Plaintiff tries to draw a comparison based on just one part of the 1950 Act—its enumeration of particular agencies in which the government would have summary-termination powers when necessary to national security. The Supreme Court in *Cole* explained that "of the 11 named agencies" in the 1950 Act, "8 are concerned with

military operations or weapons development, and the other 3, with international relations, internal security, and the stock-piling of strategic materials." *Id.* at 544-545. The Court reasoned that the President's power to extend summary-termination powers must be limited to similar agencies. In drawing a comparison to the FSLMRS, however, plaintiff fails to note that Congress's express exclusions in that statute were not as limited as in the 1950 Act. Congress expressly excluded from the FSLMRS security services such as the Central Intelligence Agency and the National Security Agency, but it also excluded other agencies such as the Government Accountability Office and the Tennessee Valley Authority. 5 U.S.C. § 7103(a)(3). These exclusions—which Congress may or may not have provided for on national-security grounds—thus provide little support for plaintiff's assertion that the President's exclusion power under § 7103(b)(1) must be limited to agencies with roles similar to those of the CIA or National Security Agency.

Furthermore, this Court in *Cole v. Young*, 226 F.2d 337, 339-340 (D.C. Cir. 1955), rejected an argument that the President exceeded his powers under the 1950 Act by extending summary-termination powers

to the Department of Health, Education, and Welfare.  The Court

explained that "[t]he statute puts the selection of the agencies to be

affected in the hands of the President" and "says nothing about

sensitiveness or policy-making." *Id.* at 339.  The Supreme Court

declined to disturb that ruling, "assum[ing], for purposes of [the]

decision, that the Act ha[d] validly been extended to apply to the

Department of Health, Education, and Welfare." *Cole*, 351 U.S. at 542.

As the government explained (Br. 52-53), the Supreme Court reversed

this Court's decision on an independent ground.  Thus, *Cole* does not

support plaintiff's argument that the President's exclusion authority

under § 7103(b)(1) extends only to a narrow set of agencies.

Plaintiff also errs in contending (Br. 36) that the phrase "primary

function" in § 7103(b)(1) refers only to an agency's "'single leading'

function, or at least one of the few most important."  Contrary to

plaintiff's assertion, the government has not construed "primary

function" as "any function."  Rather, the government explained that

Congress has recognized that agencies can have several "primary

functions." *See* 15 U.S.C. § 634b (listing 12 "primary functions"); *cf.* 47

U.S.C. § 151 (identifying four "purpose[s]" for the creation of the

Federal Communications Commission).  That plaintiff may have identified a primary function unrelated to investigations, intelligence, or national-security work thus does not preclude a finding that an agency also performs investigations, intelligence, or national-security work as a primary function.

**b.**  Plaintiff next contends (Br. 37-39) that the executive order "discriminat[es]" against certain unions by excluding agencies with bargaining units represented by plaintiff and not excluding other agencies.  This is incorrect.  Plaintiff represents agency subcomponents eligible for, but not included in, the order.  For example, plaintiff represents approximately 30,000 employees in U.S. Customs and Border Protection.  *See* NTEU, *NTEU on the FY2026 Budget Request for CBP* (June 13, 2025), https://perma.cc/4Z3Q-XBZB.  There is no dispute that Customs and Border Protection has "as a primary function intelligence, counterintelligence, investigative, or national security work," 5 U.S.C. § 7103(b)(1)(A).  Nonetheless the order did not exclude that agency from collective bargaining.  Plaintiff's argument thus fails on its own terms.

Furthermore, the government explained (Br. 41-45) that the President may properly consider union activity and past union practices in determining whether the FSLMRS's provisions can be applied to an agency or subdivision "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). Plaintiff cannot rebut the presumption of regularity by relying on evidence that is at least as consistent with a permissible rationale as with an impermissible one.

Plaintiff fails to support its case by relying on a White House fact sheet. As an initial matter, the fact sheet does not necessarily reflect the President's thinking in issuing the executive order. Plaintiff has not produced any evidence, or even alleged, that the President reviewed the fact sheet before it was published. Without more, the fact sheet cannot be attributed to the President.

In any event, rather than demonstrating animus against plaintiff or other specific unions, the fact sheet suggests consideration of whether unions have engaged in "constructive partnerships" that promote an agency's national-security mission or engaged in "mass obstruction that jeopardizes" the agency's ability to fulfill that mission.

The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H. Such considerations clearly bear on the statutory criteria. *See* 5 U.S.C. § 7103(b)(1)(B). Plaintiff has no response to the government's argument on this point.

**c.** Plaintiff's reliance on the OPM guidance that followed the executive order fails for the same reason. First, the guidance does not purport to describe the President's motivations in issuing the executive order; rather, it addresses the consequences of that order and how agencies should implement it. *See* JA70-75. Second, the government explained (Br. 45) that the inefficiencies created by collective bargaining and addressed by the OPM guidance can have detrimental effects on national security as applied to agencies that have as a primary function intelligence, investigative, or national-security work.

Plaintiff identifies (Br. 42-43) two examples of collective-bargaining rights that it contends cannot plausibly implicate national security: giving Internal Revenue Service employees 60 days to demonstrate acceptable performance before they are subject to removal

and allowing union representatives at the Environmental Protection Agency and Food and Drug Administration to work on union business during official time. But § 7103(b)(1) does not require the President to make exclusions at such a granular level. Rather, the President must consider whether the provisions of the FSLMRS generally—not each particular provision of specific collective-bargaining agreements—can be applied to agencies or subdivisions consistent with the requirements of national security. In any event, in an era of limited budgets, it is critical that agencies performing national-security work are empowered to utilize their resources and human capital efficiently. It is not for plaintiff or a court to decide whether it would impact national security to require agencies to retain poor-performing employees on a long-term performance plan or to allow employees to spend their official-duty hours on work that does not support the core mission of the agency. Rather, Congress entrusted that judgment to the President. *Cf., e.g., El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) ("[C]ourts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security."); *Center for Nat'l Sec.*

*Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003) ("It is within the role of the executive to acquire and exercise the expertise of protecting national security.  It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.").

### 2. Plaintiff failed to demonstrate that the President exceeded his discretion under § 7103(b)(1)

**a.**  Even if plaintiff could rebut the presumption of regularity accorded to the executive order, it cannot demonstrate that the President acted "'obviously beyond the terms of the statute,'" *North Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020).  Plaintiff's arguments on this score largely duplicate the arguments it makes in attempting to rebut the presumption of regularity, *see* Answering Br. 44, and they fail for the same reasons.

Plaintiff contends (Br. 44) that the executive order must be viewed as a whole and that a court should not review the exclusions "on an agency-by-agency basis."  The government agrees: an agency-by-agency approach would engage the courts in a line-drawing exercise that Congress intended be undertaken only by the President.  *See AFSA*

Stay Order, 2025 WL 1742853, at *3 (explaining that a "'searching inquiry'" of the executive order "would be 'inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere'"). "The President's national-security findings are not agency actions subject to arbitrary-or-capricious review," and this Court should "decline to treat them as such." *Id.* Under the appropriate level of review, it suffices to conclude that the executive order on its face reflects that the President made the requisite determinations that the listed agencies and subdivisions "have as a primary function intelligence, counterintelligence, investigative, or national security work" and that the provisions of the FSLMRS "cannot be applied to th[o]se agencies and agency subdivisions in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, § 1, 90 Fed. Reg. at 14,553.

Despite initially arguing that the executive order must be viewed as a whole, plaintiff then reverses course and argues (Br. 45-54) that the executive order should be vacated even if it validly excludes some agencies from the FSLMRS because it also covers agencies that, in plaintiff's view, do not fit § 7103(b)(1)'s criteria. But a court is not

equipped or authorized to second-guess the President's determinations as to any particular agencies or subdivisions.

In *AFGE v. Reagan*, the plaintiffs had argued that "the courts are the instrumentalities for ensuring that the [§ 7103(b)(1)] authority is properly exercised" and that "the courts must see some proof that [the statutory] prerequisites were satisfied." 870 F.2d at 726. This Court rejected those arguments, explaining that "Section 7103(b)(1) makes clear that the President may exclude an agency from the [FSLMRS's] coverage whenever he 'determines' that the conditions statutorily specified exist," and the statute "does not expressly call upon the President to insert written findings into an exempting order, or indeed to utilize any particular format for such an order." *Id.* at 727. Rather, a bare determination by the President is sufficient to invoke that authority. Thus, the Court held that the district court had erred "by mandating a presidential demonstration of compliance with" § 7103(b)(1). *Id.*

Just as the President need not make written findings supporting the determinations stated in his exclusion order, neither may a court require the government to justify the President's determination in

subsequent litigation.  Indeed, there would be no way for a court to inquire into the President's determination other than to subject him to cross-examination or discovery—a process that would plainly be improper.  *See* Opening Br. 36-37; *Webster v. Doe*, 486 U.S. 592, 600 (1988).

In any event, plaintiff's claim would fail even if the executive order did include some agencies or subdivisions that might fall outside § 7103(b)(1)'s criteria because the order plainly addresses several agencies, such as the Departments of Defense and State, that are manifestly within the statute's scope.  As plaintiff concedes, the order should be considered as a whole, and to substantiate an *ultra vires* claim, any error would have to be so broad and plain that it undermines the basis for the entire order.  *See Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) ("[*U*]*ltra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand.").

**b.**  Although the Court need not reach the issue because there are no grounds to second-guess the President's determinations under § 7103(b)(1), plaintiff errs in contending (Br. 47) that the "investigative"

work referenced by statute should be narrowly read to relate only to national security. If Congress had intended to limit the President's exclusion authority to agencies that conduct national-security investigations, it would not have needed to include the word "investigative" at all; such agencies would have been covered by virtue of performing "national security work," 5 U.S.C. § 7103(b)(1)(A). Each term in the relevant list—"intelligence, counterintelligence, investigative, or national security work," *id.*—must be given independent meaning. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts should "give effect, if possible, to every clause and word of a statute" (quotation marks omitted)). Thus, by auditing taxpayers and investigating fraud, for example, the Internal Revenue Service clearly performs, as a primary function, investigative work within the meaning of the statute. Certainly this interpretation of statute is, at very least, not "utterly unreasonable," as plaintiff would need to demonstrate to substantiate an *ultra vires* claim. *National Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 975 (D.C. Cir. 2022) (quotation marks omitted).

## II. PLAINTIFF DID NOT ESTABLISH THAT IT WOULD LIKELY SUFFER IRREPARABLE HARM

This Court correctly determined, in the course of staying the preliminary injunction, that plaintiff's asserted non-monetary harms are speculative "because they would materialize only *after* an agency terminates a collective-bargaining agreement," and the government has directed agencies to refrain from terminating collective-bargaining agreements with plaintiff until the conclusion of litigation. *NTEU v. Trump* (*NTEU* Stay Order), No. 25-5157, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025) (per curiam). Plaintiff has not shown that it will suffer irreparable harm in the absence of a preliminary injunction.

Quoting *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016), plaintiff contends (Br. 55-56) that it cannot currently perform its mission of bargaining on behalf of its members, and that this inability to perform its "primary mission" is irreparable injury. But *League of Women Voters* held simply that a plaintiff's inability to accomplish its primary mission—in that case, registering voters—is an injury, not that it is necessarily irreparable. 838 F.3d at 9. The Court found the injury irreparable there because after the registration deadlines for the then-upcoming election "there can be no do over and

no redress." *Id.* (quotation marks omitted).  Here, in contrast, any injury that plaintiff might incur from an inability to negotiate on behalf of its members is reparable.  As the government has explained (Br. 56-57), if plaintiff ultimately prevails in this case, the FLRA can undo any harm to plaintiff by directing agencies not to implement the executive order and imposing a retroactive remedy.  *See* 5 U.S.C. § 7118(a)(7).

Plaintiff's reliance (Br. 57) on *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944), is unavailing for the same reason.  The government does not dispute that an employer's refusal to bargain collectively with a union can discourage membership in the union, *see id.*, but there is no reason to think that such an injury cannot be remedied if plaintiff ultimately prevails on the merits.  As the Seventh Circuit has held, a union's concern "that its members will lose confidence in the union" absent immediate relief "is too speculative to justify a preliminary injunction." *East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005).  It is speculative to think that members will lose faith in plaintiff or that such faith would not be restored if plaintiff ultimately prevails in this litigation and its status as an exclusive bargaining representative is reaffirmed.

The motions panel also correctly concluded that plaintiff will not be irreparably harmed by agencies halting their collection of dues on plaintiff's behalf. *See NTEU* Stay Order, 2025 WL 1441563, at *2. As the government explained (Br. 58-59), plaintiff remains free to collect dues directly from its members. Although plaintiff characterizes (Br. 66) that possibility as asking for "voluntary contributions," it fails to note that a federal employee's membership in a union and payment of dues is always voluntary, even when an agency is collecting the dues on a union's behalf.

Moreover, any interim injury that plaintiff may incur can be fully remedied by the FLRA, which can order an agency to reimburse a union for any dues that the agency unlawfully failed to withhold. *See* Opening Br. 58 (citing cases). And plaintiff made no showing beyond its unsupported assertion that any temporary reduction in revenue threatens plaintiff's very existence.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR

Finally, this Court correctly concluded that any injury to plaintiff is outweighed by the injury a preliminary injunction imposes on the government and the public interest. *NTEU* Stay Order, 2025 WL

1441563, at *2-3.  Notwithstanding the policy judgments that may underlie other portions of the FSLMRS, § 7103(b)(1) reflects a clear congressional intent to permit the President to guarantee the effective operation of agencies as necessary to national security, without the constraints of collective bargaining.

As this Court previously concluded, "[t]he district court's preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress." *AFSA* Stay Order, 2025 WL 1742853, at *3.  The injunction "ties the government's hands" in determining whether and how to implement the executive order, and "[t]hat transfer of control, from the Executive to the Judiciary," is particularly "problematic … in the national security context, an area in which the President generally enjoys unique responsibility." *NTEU* Stay Order, 2025 WL 1441563, at *2 (quotation marks omitted).

The harm the injunction imposes on the government and the public interest is hardly mitigated by the statutory provisions permitting the government to act outside the restrictions of collective-bargaining agreements in "emergencies," 5 U.S.C. § 7106(a)(2)(D).  The

existence of § 7103(b)(1) reflects Congress' determination that the government cannot wait until a precipitating event to protect the national security.  Nor need the government identify a particular national-security threat to demonstrate the public interest in avoiding a constraint on the President's powers in this context.  It is because such threats are often uncertain or unpredictable that the President must be granted wide latitude in exercising control over agencies whose work impacts national security.

## CONCLUSION

The district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MELISSA N. PATTERSON
WEILI J. SHAW

*/s/ Joshua M. Koppel*
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4820*
*joshua.m.koppel@usdoj.gov*

October 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,498 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joshua M. Koppel*
Joshua M. Koppel