USCA Case #25-5157    Document #2170063    Filed: 04/23/2026    Page 1 of 43



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

February 24, 2026

**MEMORADUM FOR:  ERIKA D. KING, PRESIDENT CHAPTER 297,
NATIONAL TREASURY EMPLOYEES UNION**

**FROM:**              MICHAEL J. WENZLER
Associate Chief Human Capital Officer

**SUBJECT:**  NOTICE OF TERMINATION OF COLLECTIVE BARGAINING AGREEMENT

This Memorandum provides official notice to Chapter 297 of the National Treasury Employees Union (NTEU) that the Departmental Offices (DO) of the Department of the Treasury (Treasury) terminates the Collective Bargaining Agreement (CBA) dated June 19, 2009, between the two parties for those employees impacted by Executive Order (E.O.) 14251 effective the date of this Memorandum.

## I.    Background.

On March 27, 2025, President Trump signed E.O. 14251, "Exclusions from Labor-Management Relations Programs."  On August 28, 2025, the President signed E.O. 14343, "Further Exclusions from the Federal Labor-Management Relations Program."  Both E.O. 14251 and 14343 amended Executive Order 12171, "Exclusions from the Federal Labor-Management Relations Program," November 19, 1979, which set forth those agencies and subdivisions thereof excluded from collective bargaining under the Federal Service Labor-Management Relations Statute (FSLMRS).[1]

In issuing E.O. 14251, President Trump determined under 5 U.S.C. § 7103(b)(1) that (1) Treasury, except the Bureau of Engraving and Printing (BEP), has a primary function of intelligence, counterintelligence, investigative, or national security work; and (2) the provisions of the FSLMRS cannot be applied to Treasury, except BEP, in a manner consistent with national security requirements and considerations.

The Certification of Representative issued by the Federal Labor Relations Authority identifies NTEU Chapter 297 as the exclusive representative for all nonprofessional employees of DO in the Washington, DC metropolitan area, excluding all professional employees, wage grade employees, employees employed by the Office of General Counsel Legal Division, employees excluded by E.O. 12171, management officials, supervisors, and employees described in 5 U.S.C. § 7112(b)(2), (3), (4), (6) and (7).  Because NTEU Chapter 297 represents employees of the Department of the Treasury identified in E.O. 14251 (and now E.O. 12171), the provisions of the FSLMRS no longer apply to these employees.

## II.   Agency Determination to Terminate the Parties' CBA.

After the President issued E.O. 14251 and E.O. 14343, Treasury considered whether to terminate any CBA, in whole or part, as it pertains to those bargaining unit employees who fall within the scope of either E.O.  As the headquarters of the Department, DO's mission is to protect and promote a strong U.S. economy by enabling economic growth and stability at home

A1

Subj:  Notice of CBA Termination
Page 2

and abroad, combating threats to the integrity of the financial system, and managing the U.S. Government's finances and resources effectively.  As a result, the overwhelming majority of the DO workforce is engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security and therefore excluded from bargaining unit coverage under 5 USC § 7112(b)(6).  Prior to E.O., this required DO to be vigilant and expend resources making and defending these determinations on a position-by-position basis and designating the small number of positions whose duties enable the performance of the national security mission as included in the bargaining unit.  The practical result is contrary to management's interest in unifying its workforce.  For example, when exercising rights-based changes, the statutory and contractual requirement to complete bargaining prior to implementation required management to choose between delaying implementation for the entire workforce based on the need to negotiate with the representative of approximately 10% of its workforce or causing workforce inequities and inefficiencies by operating two policies while negotiations are being completed.

Treasury also considered the interests of bargaining unit employees and NTEU Chapter 297 in continuing to adhere to the parties' CBA.  Treasury understands that bargaining unit employees and NTEU Chapter 297 structured certain expectations surrounding the existence of the parties' CBA, including work schedules, leave procedures, performance management, and other conditions of employment.  In evaluating the effect of terminating the CBA, the agency reviewed whether current law, rules, regulations, and agency policies provide meaningful safeguards and procedures.

Following termination of the CBA, former bargaining unit employees will remain fully covered by, among other authorities, applicable provisions of title 5, United States Code, and regulations issued by the U.S. Office of Personnel Management; merit system principles and prohibited personnel practice protections; equal employment opportunity and anti-discrimination laws; workplace safety requirements; and Treasury internal policies and directives (other than those required by or found in its CBA).  Where there are any gaps in policies, DO will take steps to address these, as appropriate, consistent with its mission.  These authorities provide fair and enforceable standards governing pay, leave, hours of work, performance management, discipline, adverse actions, workplace safety, and employee protections that (unlike CBA requirements) may be applied consistent with national security considerations.

After considering these provisions, Treasury has determined that continued adherence to the parties' CBA is detrimental to the agency's national security mission and can no longer be followed, consistent with the President's determination under E.O. 14251.  Continuing to adhere to these provisions will place the agency's ability to prevent or respond to national security threats in an untenable position.  Treasury also determined that existing legal and policy frameworks provide a sufficient backstop to ensure continuity of employee protections, mitigate potential disruption, and support effective and lawful personnel management.

## III. Agency Termination Notice.

Effective the date of this Memorandum, the parties' June 19, 2009, Collective Bargaining Agreement is terminated and no longer in effect except for those employees.  Any requests for further information concerning this termination notice may be directed to my attention.

MEMORANDUM FOR  Rani Ralston, NTEU Deputy Director of Negotiations

Date: February 25, 2026

FROM:  Amanda Kupfner, Chief Administrative Officer

SUBJECT: Notice of Termination of Collective Bargaining Agreement

This Memorandum provides official notice to Rani Ralston that the Bureau of the Fiscal Service (BFS) terminates the August 1, 2019 Master Labor Agreement between the parties for those employees impacted by Executive Orders 14251 effective the date of this Memorandum.

**Background**

On March 27, 2025, President Trump signed Executive Order (E.O.) 14251, "Exclusions From Labor-Management Relations Programs." On August 28, 2025, the President signed E.O. 14343, "Further Exclusions from the Federal Labor-Management Relations Program." Both E.O. 14251 and 14343 amended Executive Order 12171, "Exclusions from the Federal Labor- Management Relations Program," November 19, 1979, which set forth those agencies and subdivisions thereof excluded from collective bargaining under the Federal Service Labor Management Relations Statute (FSLMRS). With one exception, every President has exercised authority to exclude agencies or subdivisions from coverage under the FSLMRS.

In issuing E.O. 14251, President Trump determined under 5 U.S.C. 7103(b)(1) that (1) the U.S. Department of Treasury, Bureau of the Fiscal Service has a primary function of intelligence, counterintelligence, investigative, or national security work; and (2) the provisions of the FSLMRS cannot be applied to U.S. Department of Treasury, Bureau of the Fiscal Service, in a manner consistent with national security requirements and considerations. Because the NTEU represents employees of the U.S. Department of Treasury, Bureau of the Fiscal Service, identified in Executive Order 14251, the provisions of the FSLMRS no longer apply to these employees.

On February 12, 2026, the Office of Personnel Management instructed agencies subject to Executive Order 14251 to terminate applicable collective bargaining agreements.

**II. Determination to Cancel the Parties' Collective Bargaining Agreement (CBA)**

The Bureau of the Fiscal Service reviewed the parties' CBA to determine whether continuing to adhere to its provisions would be consistent with the President's national security determination.

In reviewing the parties' CBA, BFS has determined that there are several provisions that bear significant impact on the Bureau's national security mission, including but not limited to:

- Article 9, "Union Rights and Representation", of the parties MLA requires BFS to expend limited financial resources to provide paid, nonduty time to union representatives that would otherwise be devoted to the national security mission

A3

of the agency. For FY 24, taxpayer-funded union time (TFUT) of approximately 7,152 hours (including 2 full-time union officials), $29,113 in paid travel for NTEU, and $77,146 in office space cost. For FY25, TFUT of approximately 6,199 hours (including 2 full-time union officials) and approximately $77,146 in office space cost.

- Article 5, "Labor Management Negotiating Procedures", of the parties' MLA delays the Bureau of the Fiscal Service's ability to quickly adapt and respond to threats to its national security mission by requiring it to bargain over changes to conditions of employment not covered by the CBA. This has led to, for example, the parties spending 18 months engaging in term negotiations without reaching agreement.

- Article 26, "Space Moves", and a supplemental Memorandum of Understanding provide that NTEU will have pre-decisional input in space moves and commits BFS to establishing both a Bureau-wide workgroup and a local workgroup for each move. The local space workgroup is required to be established at least ninety (90) days prior to any anticipated space changes/relocations involving fifteen (15) or more employees. Once convened, the workgroups meet on a bi-weekly basis, until the space move has been completed. This process is burdensome to FS as it delays space moves to allow for the required pre-decisional input of the union and workgroups in advance of official negotiations of the space move.

- NTEU has argued that Article 36, "Telework Program", of the parties' MLA, prevents BFS from making Bureau-wide changes to telework frequency or the telework program. They interpreted the language to limit FS to only making changes on an individual employee basis. This created extensive delays in negotiating the Bureau's return to office posture for bargaining unit employees and created inconsistencies with application of policy between bargaining unit and non-bargaining unit employees throughout the process.

The Bureau of the Fiscal Service also considered the interests of bargaining unit employees and NTEU in continuing to adhere to the parties' CBA. BFS understands that bargaining unit employees and NTEU structured certain expectations surrounding the existence of the parties' CBA, including work schedules, leave procedures, performance management, and other conditions of employment. In evaluating the effect of terminating the CBA, the agency reviewed whether current law, rules, regulations, and agency policies provide meaningful safeguards and procedures.

Following termination of the CBA, bargaining unit employees will remain fully covered by, among other authorities, applicable provisions of title 5, United States Code, and regulations issued by the U.S. Office of Personnel Management; merit system principles and prohibited personnel practice protections; equal employment opportunity and anti-discrimination laws; workplace safety requirements; and the U.S. Department of Treasury's and the Bureau of the Fiscal Service's internal policies and directives (other than those required by or found in its

A4

CBA).  Where there are any gaps in policies, the agency will take steps to address these, as appropriate, consistent with its mission. These authorities provide fair and enforceable standards governing pay, leave, hours of work, performance management, discipline, adverse actions, workplace safety, and employee protections that (unlike CBA requirements) may be applied consistent with national security considerations.

After considering these provisions, BFS has determined that continued adherence to the parties' CBA is detrimental to the agency's national security mission and can no longer be followed consistent with the President's determination under Executive Order 14251. Continuing to adhere to these provisions will place the agency's ability to prevent or respond to national security threats in an untenable position. BFS also determined that existing legal and policy frameworks provide a sufficient backstop to ensure continuity of employee protections, mitigate potential disruption, and support effective and lawful personnel management.

## II.     Agency Termination Notice

Effective the date of this Memorandum, the parties' August 1, 2019 Master Labor Agreement is terminated and no longer in effect. For further information concerning this termination notice, please contact Amanda Kupfner (304-480-6571).

_____          _____

Amanda Kupfner                                    Date

A5



**FRANK J. BISIGNANO**
**CHIEF EXECUTIVE OFFICER**

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

MEMORANDUM FOR DOREEN P. GREENWALD, NATIONAL PRESIDENT, NATIONAL TREASURY EMPLOYEES UNION

FROM: FRANK J. BISIGNANO, CHIEF EXECUTIVE OFFICER OF INTERNAL REVENUE

SUBJECT: Notice of Termination of Collective Bargaining Agreement

This Memorandum provides official notice to the National Treasury Employees Union, that the Department of the Treasury, Internal Revenue Service IRS), terminates the 2022 National Agreement and the 2025 Addendum to the 2022 National Agreement between the two parties for those employees impacted by Executive Order 14251 effective the date of this Memorandum.

## I.      Background

On March 27, 2025, President Trump signed Executive Order (E.O.) 14251, "Exclusions From Labor-Management Relations Programs." E.O. 14251 amended Executive Order 12171, "Exclusions from the Federal Labor-Management Relations Program," November 19, 1979, which set forth those agencies and subdivisions thereof excluded from collective bargaining under the Federal Service Labor-Management Relations Statute (FSLMRS). With one exception, every President has exercised authority to exclude agencies or subdivisions from coverage under the FSLMRS.

In issuing E.O. 14251, President Trump determined under 5 U.S.C. 7103(b)(1) that (1) the Department of the Treasury and its subdivisions, including the Internal Revenue Service, have a primary function of intelligence, counterintelligence, investigative, or national security work; and (2) the provisions of the FSLMRS cannot be applied to the Department of Treasury, Internal Revenue Service in a manner consistent with national security requirements and considerations.

The Department of the Treasury, Internal Revenue Service recognized the National Treasury Employees Union as the exclusive representative for all professional and nonprofessional employees of the Internal Revenue Service, excluding all employees of the Chief Criminal Investigation; all employees of the Office of Chief Counsel; temporary employees with no reasonable expectancy of continued employment; management officials, supervisors, guards other than protective officers at the Enterprise Computing Center at Martinsburg, West Virginia; and employees described in 5 U.S.C § 7112 (b)(2), (3), (4), (6)

A6

and (7). Because the National Treasury Employees Union represents employees of the Department of the Treasury, Internal Revenue Service identified in E.O. 14521, the provisions of the FSLMRS no longer apply to these employees.

## II.    Agency Determination to Terminate the Parties' Collective Bargaining Agreement (CBA)

After the President issued E.O. 14251, the Department of the Treasury, Internal Revenue Service considered whether to terminate any CBA, in whole or part, as it pertains to those bargaining unit employees who fall within the scope of either E.O. The Department of the Treasury, Internal Revenue Service reviewed the parties' CBA to determine continuing to adhere to its provisions would be consistent with the President's national security determination.

The parties' CBA contains a number of provisions that bear significant impact on the Department of the Treasury, Internal Revenue Service's national security mission, such as:

- Article 40 creates a procedural impediment to quickly separating poor performers beyond those required by statute or regulation. Article 40 requires a Performance Improvement Period (PIP) of never less than 60 days, as opposed to the 30 calendar days required by the Office of Personnel Management.

- Article 43 establishes a grievance-arbitration process that prevents the IRS from quickly disciplining or removing employees for poor performance or misconduct detrimental to the national security mission of the Department of the Treasury, IRS and the efficiency of the service. In some circumstances, arbitrators have restored employees to their former positions despite evidence of their detrimental performance or conduct impacting  the Department of the Treasury, IRS's mission.

- Articles 8 and 9 require the Department of the Treasury, Internal Revenue Service, to expend limited financial resources to provide paid, nonduty time to union representatives that would otherwise be devoted to the national security mission of the agency. In FY2025, the Department of the Treasury, Internal Revenue Service allowed over 248,000 hours taxpayer-funded union time (TFUT), costing taxpayers more than $15,000,000. In addition, the Department of the Treasury, Internal Revenue Service provided more than $1,500,000 in government property usage and expended more than $25,000 agency expenses in connection with TFUT.

- Article 47 delays the Department of the Treasury, Internal Revenue Service's ability to quickly adapt and respond to threats to its national security mission by

2

A7

requiring it to bargain over changes to conditions of employment not covered by the CBA. This has led to, for example, the parties spending multiple days bargaining and litigating over the closure of the Fresno Submission Processing Center beginning in November 2019, including arbitration invoked concerning the number of offices occupied by National Treasury Employees Union Chapter 97, Fresno.

The Department of the Treasury, Internal Revenue Service also considered the interests of bargaining unit employees and the National Treasury Employees Union in continuing to adhere to the parties' CBA. The Department of the Treasury, Internal Revenue Service understands that bargaining unit employees and the National Treasury Employees Union structured certain expectations surrounding the existence of the parties' CBA, including work schedules, leave procedures, performance management, and other conditions of employment. In evaluating the effect of terminating the CBA, the Department of the Treasury, Internal Revenue Service reviewed whether current law, rules, regulations, and agency policies provide meaningful safeguards and procedures.

Following termination of the CBA, bargaining unit employees will remain fully covered by, among other authorities, applicable provisions of title 5, United States Code, and regulations issued by the U.S. Office of Personnel Management; merit system principles and prohibited personnel practice protections; equal employment opportunity and anti-discrimination laws; workplace safety requirements; and the Department of the Treasury, Internal Revenue Service's internal policies and directives (other than those required by or found in its CBA). Where there are any gaps in policies, the Department of the Treasury, Internal Revenue Service will take steps to address these, as appropriate, consistent with its mission. These authorities provide fair and enforceable standards governing pay, leave, hours of work, performance management, discipline, adverse actions, workplace safety, and employee protections that (unlike CBA requirements) may be applied consistent with national security considerations.

After considering these provisions, the Department of the Treasury, Internal Revenue Service has determined that continued adherence to the parties' CBA is detrimental to the agency's national security mission and can no longer be followed consistent with the President's determination under E.O. 12451. Continuing to adhere to these provisions will place the Department of the Treasury, Internal Revenue's ability to prevent or respond to national security threats in an untenable position. The Department of the Treasury, Internal Revenue also determined that existing legal and policy frameworks provide a sufficient backstop to ensure continuity of employee protections, mitigate potential disruption, and support effective and lawful personnel management.

3

**III.    Agency Termination Notice**

Effective the date of this Memorandum, the parties' 2022 National Agreement and the 2025 Addendum to the 2022 National Agreement are terminated and no longer in effect.

For further information concerning this termination notice, please contact LERN by email at hco.lern.director@irs.gov.

02/27/2026

Frank J. Bisignano                                                                          Date
Chief Executive Officer of Internal Revenue

4

A9

**Office of Chief Office**
**Internal Revenue Service**
**Memorandum**

date: February 27, 2026

to: Doreen P. Greenwald, National President
National Treasury Employees Union

from: Kenneth J. Kies
Acting Chief Counsel for the Internal Revenue Service

subject: Notice of Termination of Collective Bargaining Agreement (CBA)

This Memorandum provides official notice to the National Treasury Employees Union that the Office of Chief Counsel of the Internal Revenue Service, Department of the Treasury (hereinafter the Office of Chief Counsel) terminates the 2025 Counsel-NTEU Agreement between the two parties for employees impacted by Executive Order 14251 effective the date of this Memorandum.

## I. Background

On March 27, 2025, President Trump signed Executive Order (E.O.) 14251, "Exclusions From Labor-Management Relations Programs." E.O. 14251 amended Executive Order 12171, "Exclusions from the Federal Labor-Management Relations Program," November 19, 1979, which set forth those agencies and subdivisions thereof excluded from collective bargaining under the Federal Service Labor Management Relations Statute (FSLMRS). With one exception, every President has exercised authority to exclude agencies or subdivisions from coverage under the FSLMRS.

In issuing E.O. 14251, President Trump determined under 5 U.S.C. 7103(b)(1) that (1) the Department of the Treasury and its subdivisions, which include the Office of Chief Counsel, have a primary function of intelligence, counterintelligence, investigative, or national security work; and (2) the provisions of the FSLMRS cannot be applied to the Department of the Treasury and its subdivisions in a manner consistent with national security requirements and considerations.

The Office of Chief Counsel recognized the National Treasury Employees Union (NTEU) as the exclusive representative for all professional and nonprofessional employees of the Office of Chief Counsel, excluding management officials, supervisors, and employees described in 5 U.S.C § 7112 (b)(2), (3), (4), (6) and (7). Because the NTEU represents employees of the

A10

Office of Chief Counsel identified in E.O. 14521, the provisions of the FSLMRS no longer apply to these employees.

## II. Agency Determination to Terminate the Parties' Collective Bargaining Agreement (CBA)

After the President issued E.O. 14251, the Office of Chief Counsel considered whether to terminate its CBA, in whole or part, as it pertains to those bargaining unit employees who fall within the scope of the E.O. The Office of Chief Counsel reviewed the parties' CBA to determine whether continuing to adhere to its provisions would be consistent with the President's national security determination.

The parties' CBA contains a number of provisions that bear significant impact on the Office of Chief Counsel's national security mission, such as:

- Article 30 (Unacceptable Performance) creates a procedural impediment, beyond those required by statute or regulation, to quickly separating poor performers. Under the collective bargaining agreement, before issuing a notice of proposed action based on unacceptable performance, employees must be placed on a performance improvement plan for at least 90 days to give them an opportunity to bring performance up to an acceptable level.

- Articles 33 (Employee Grievance Procedure), and 35 (Arbitration) establish a grievance-arbitration process that prevents the Office of Chief Counsel from quickly disciplining or removing employees for poor performance or misconduct detrimental to the national security mission of the agency and the efficiency of the service.

- Articles 37 (NTEU Rights), 39 (NTEU Representatives and Official Time), and 40 (NTEU Access to Official Facilities and Services) require the Office of Chief Counsel to expend its limited financial resources to provide paid, nonduty time to union representatives that would otherwise be devoted to the national security mission of the agency. NTEU stewards in the Office of Chief Counsel used approximately 3,361 hours of taxpayer-funded union time in FY 25. NTEU's use of agency office space, furniture, and equipment (e.g. computers, phones), and other resources for representational activities further diverts resources from the Office of Chief Counsel's mission.

- Article 45 (Mid-Term Bargaining) delays the Office of Chief Counsel's ability to quickly adapt and respond to threats to its national security mission by requiring it to bargain over changes to conditions of employment not covered by the CBA. This has led, for example, to 18 months of negotiations over the changes to performance critical elements

A11

and standards.

The Office of Chief Counsel also considered the interests of bargaining unit employees and the NTEU in continuing to adhere to the parties' CBA. The Office of Chief Counsel understands that bargaining unit employees and the NTEU structured certain expectations surrounding the existence of the parties' CBA, including work schedules, leave procedures, performance management, and other conditions of employment. In evaluating the effect of terminating the CBA, the Office of Chief Counsel reviewed whether current law, rules, regulations, and agency policies provide meaningful safeguards and procedures.

Following termination of the CBA, bargaining unit employees will remain fully covered by, among other authorities, applicable provisions of title 5, United States Code, and regulations issued by the U.S. Office of Personnel Management; merit system principles and prohibited personnel practice protections; equal employment opportunity and anti-discrimination laws; workplace safety requirements; and the Office of Chief Counsel's internal policies and directives. Where there are gaps in policies, the Office of Chief Counsel will take steps to address these, as appropriate, consistent with its mission. These authorities provide fair and enforceable standards governing pay, leave, hours of work, performance management, discipline, adverse actions, workplace safety, and employee protections that (unlike CBA requirements) may be applied consistent with national security considerations.

After considering these provisions, the Office of Chief Counsel has determined that continued adherence to the parties' CBA is detrimental to the agency's national security mission and can no longer be followed consistent with the President's determination under E.O. 12451. Continuing to adhere to these provisions will place the Office of Chief Counsel's ability to prevent or respond to national security threats in an untenable position. The Office of Chief Counsel also determined that existing legal and policy frameworks provide a sufficient backstop to ensure continuity of employee protections, mitigate potential disruption, and support effective and lawful personnel management.

## III.    Agency Termination Notice

Effective the date of this Memorandum, the parties' 2025 Counsel-NTEU Agreement is terminated and no longer in effect.

For further information concerning this termination notice, please contact Cesar Olmos, Director, Labor & Employee Relations, Cesar.Olmos@irscounsel.treas.gov.

A12

 **Office of the Comptroller of the Currency**

# MEMORANDUM

To: Doreen Greenwald, National President, National Treasury Employees Union

From: Jonathan V. Gould, Comptroller of the Currency

Date: March 3, 2026

Subject: Notice of Termination of Collective Bargaining Agreement

---

This Memorandum provides official notice to the National Treasury Employees Union ("NTEU" or the "Union") that, effective on the date of this Memorandum, the Office of the Comptroller of the Currency ("OCC" or "Agency") terminates the Collective Bargaining Agreement ("CBA") between the OCC and NTEU dated February 22, 2024.

## I.     Background

On March 27, 2025, President Trump signed Executive Order 14,251, "Exclusions From Labor-Management Relations Programs." On August 28, 2025, the President signed Executive Order 14,343, "Further Exclusions from the Federal Labor-Management Relations Program." Executive Orders 14,251 and 14,343 amended Executive Order 12,171, "Exclusions from the Federal Labor Management Relations Program," November 19, 1979, which set forth those agencies and subdivisions thereof excluded from collective bargaining under the Federal Service Labor Management Relations Statute ("Relations Statute"). With one exception, every President has exercised authority to exclude agencies or subdivisions from coverage under the Relations Statute. In issuing Executive Order 14,251, President Trump determined under 5 U.S.C. 7103(b)(1) that (1) the OCC has a primary function of intelligence, counterintelligence, investigative, or national security work; and (2) the provisions of the Relations Statute cannot be applied to the OCC in a manner consistent with national security requirements and considerations.

On November 22, 2002, the Federal Labor Relations Authority issued a Certification of Representative in case number WA-RP-02-0072, certifying NTEU as the exclusive representative for certain employees in the OCC—namely, all professional and nonprofessional employees at the OCC but excluding all management officials, supervisors, and employees described in 5 U.S.C. § 7112(b)(2), (3), (4), (6) and (7). Because NTEU represents employees of the OCC identified in Executive Order 14,251, the provisions of the Relations Statute no longer apply to these employees.

## II.     Agency Determination to Terminate the Parties' CBA

After the President issued Executive Order 14,251, the OCC complied with guidance from the U.S. Office of Personnel Management ("OPM") directing agencies not to terminate CBAs until

the conclusion of litigation or further guidance from OPM directing such termination. On February 12, 2026, the OCC received further guidance from OPM advising agencies to proceed to terminate their CBAs to fully comply with the Executive Order.

The parties' CBA contains several provisions that bear significant impact on the OCC's national security mission. The following examples are illustrative but not intended to be exhaustive:

- Article 31 creates a procedural impediment to quickly separating poor performers beyond those required by statute or regulation. Per Article 31, the OCC must provide a minimum of 60 days and as many as 120 days for a performance improvement period. Shorter improvement plans are not permitted for bargaining unit members. This restriction potentially impedes the agency's ability to address performance deficiencies promptly and efficiently if a shorter time would be reasonable to demonstrate performance. It conflicts with direction contained in Executive Order 14,171 and OPM guidance to return to the policies of the first Trump administration related to unacceptable performance.

- Articles 27 and 28 establish a grievance-arbitration process that prevents the agency from quickly disciplining or removing employees for poor performance or misconduct detrimental to the national security mission of the agency and the efficiency of the service. In some circumstances, arbitrators have restored employees to their former positions despite evidence of their detrimental performance or conduct impacting the agency's mission. For example, in January 2021, an arbitrator ordered the OCC to substitute a suspension for a removal despite the employee engaging in conduct unbecoming of an OCC employee and violation of OCC policy.

- Article 6 requires the OCC to expend limited financial resources to provide paid, nonduty time to union representatives that would otherwise be devoted to the national security mission of the agency. It provides NTEU with a bank of hours for official time used in connection with representational activities, with the number of hours in the bank determined by multiplying the total number of bargaining unit employees NTEU represents as of October 1 of each year by 4.2 hours. Union representatives, including the four NTEU chapter presidents, are permitted to use official time for representational activities. NTEU may appoint such representatives at a ratio of no more than one representative for every thirty-five bargaining unit employees within each office. Article 37 grants NTEU access to the OCC's telephones, fax machines, photocopiers, email, and intra-agency mail system in connection with representational activities. It also provides NTEU with dedicated office space in multiple OCC offices, along with equipment such as tables, file cabinets, bookcases, chairs, a bulletin board, telephone, printer, scanner, and computer with full network and internet access.

- Article 7 delays the OCC's ability to quickly adapt and respond to threats to its national security mission by requiring it to bargain over changes to conditions of employment not covered by the CBA. This has led to, for example, the parties

2

A14

spending significant time bargaining over topics such as reopening OCC offices following the Covid-19 pandemic, office relocations, office closures, and organizational realignments.

- Article 8 interferes with the agency's process for providing feedback and the accurate rating of employee performance. It requires that any performance feedback provided to a rating official that will be considered when evaluating an employee's performance must be shared with the employee, normally within 15 workdays. Additionally, during interim reviews, managers are required to compare current performance to the prior year and notify employees if they have identified a change in performance that would result in a reduction in the employee's summary or element rating.

- Article 38 impedes the OCC's ability to promptly initiate a reduction in force because the OCC must provide NTEU with at least 90 days advance notice of a reduction in force, unless circumstances leave the OCC with "no choice" but to give less notice.

The OCC also considered the interests of bargaining unit employees and NTEU in continuing to adhere to the parties' CBA. The OCC understands that bargaining unit employees and NTEU structured certain expectations surrounding the existence of the parties' CBA, including work schedules, leave procedures, performance management, and other conditions of employment. In evaluating the effect of terminating the CBA, the agency reviewed whether current law, rules, regulations, and agency policies provide meaningful safeguards and procedures. Following termination of the CBA, employees formerly in the bargaining unit will remain fully covered by, among other authorities, applicable provisions of title 5 of the U.S. Code; OPM regulations; merit system principles and prohibited personnel practice protections; equal employment opportunity and anti-discrimination laws; workplace safety requirements; and the OCC's internal policies and directives (other than those required by or found in its CBA). Where there are any gaps in policies, the agency will take steps to address these, as appropriate, consistent with its mission. These authorities provide fair and enforceable standards governing pay, leave, hours of work, performance management, discipline, adverse actions, workplace safety, and employee protections that (unlike CBA requirements) may be applied consistent with national security considerations.

After considering these provisions, the OCC has determined that continued adherence to the parties' CBA is detrimental to the agency's national security mission and can no longer be followed consistent with the President's determination under Executive Order 14,251. Continuing to adhere to these provisions will place the agency's ability to prevent or respond to national security threats in an untenable position. The OCC has also determined that existing legal and policy frameworks provide a sufficient backstop to ensure continuity of employee protections, mitigate potential disruption, and support effective and lawful personnel management.

\*   \*   \*

3
A15

## III.   Agency Termination Notice

Effective on the date of this Memorandum, the parties' CBA is terminated and no longer in effect.

For further information concerning this termination notice, please contact Angela Jackson, Acting Director, Workforce Relations and Performance Management, who can be reached at Angela.Jackson@occ.treas.gov.

_____

Jonathan V. Gould
Comptroller of the Currency

March 3, 2026
_____

Dated

4
A16

**DEPARTMENT OF THE TREASURY**
ALCOHOL AND TOBACCO TAX AND TRADE BUREAU
WASHINGTON, D.C. 20005

**ADMINISTRATOR**

March 9, 2026

MEMORANDUM FOR DOREEN P. GREENWALD, NATIONAL TREASURY
EMPLOYEES UNION NATIONAL PRESIDENT

FROM: Mary G. Ryan, Administrator, Alcohol and Tobacco Tax and Trade Bureau

SUBJECT: NOTICE OF TERMINATION OF COLLECTIVE BARGAINING AGREEMENT

This Memorandum provides official notice to Doreen P. Greenwald, National President, National Treasury Employees Union (NTEU), that the Alcohol and Tobacco Tax and Trade Bureau (TTB), Department of the Treasury, terminates the December 2022 Negotiated Agreement between TTB and the NTEU, fully executed as of November 10, 2022 (the CBA).

## I.  Background

On March 27, 2025, President Trump signed Executive Order (E.O.) 14251, "Exclusions From Labor-Management Relations Programs." On August 28, 2025, the President signed E.O. 14343, "Further Exclusions from the Federal Labor-Management Relations Program." Both E.O. 14251 and 14343 amended Executive Order 12171, "Exclusions from the Federal Labor-Management Relations Program," November 19, 1979, which set forth those agencies and subdivisions thereof excluded from collective bargaining under the Federal Service Labor-Management Relations Statute (FSLMRS). With one exception, every President has exercised authority to exclude agencies or subdivisions from coverage under the FSLMRS.

In issuing E.O. 14251, President Trump determined under 5 U.S.C. 7103(b)(1) that (1) TTB has a primary function of intelligence, counterintelligence, investigative, or national security work; and (2) the provisions of the FSLMRS cannot be applied to TTB in a manner consistent with national security requirements and considerations.

The Certification[s] of Representative issued by the Federal Labor Relations Authority identifies NTEU Chapter 305 as the exclusive representative for all professional employees (those employees in occupations requiring positive education requirements) and nonprofessional employees of the Alcohol and Tobacco Tax and Trade Bureau, Department of the Treasury, including field employees and employees assigned to the Headquarters Office, excluding all professional employees who are management officials, supervisors, or employees described in 5 U.S.C. 7112(b)(2), (3), (4), (6), and (7).  Because NTEU Chapter 305 represents employees of

Doreen P. Greenwald, NTEU National President
Notice Of Termination of Collective Bargaining Agreement

the Department of the Treasury identified in E.O. 14251, the provisions of the FSLMRS no longer apply to these employees.

## II. Agency Determination to Terminate the Parties' Collective Bargaining Agreement (CBA)

After the President issued E.O. 14251, TTB considered whether to terminate the CBA, in whole or part, as it pertains to TTB's bargaining unit employees, all of whom fall within the scope of the E.O. TTB reviewed the CBA to determine whether continuing to adhere to its provisions would be consistent with the President's national security determination.

The CBA contains a number of provisions that bear significant impact on TTB's national security mission. These provisions include, but are not limited to, the following:

- Article 7, Evaluations of Performance, Section 3 creates a procedural impediment to the efficient establishment of and revisions to critical elements and performance standards, which are an essential component of management's exclusive right to assign work. The delays necessitated by this CBA provision harm TTB's ability to adjust performance standards as needed to fulfill its national security mission.

- Article 7, Section 5 creates a procedural impediment to the efficient separation of poor performers by imposing notice and guidance requirements whenever a supervisor notices a decrease in an employee's performance below the Fully Successful level. The notice and guidance must include identification of the performance standards that are not being achieved and also "training and/or developmental activities which would assist the employee in attaining a fully successful level of performance." The CBA requirement to provide this feedback often delays the implementation of a performance improvement plan (PIP) to correct Unacceptable performance if the employee and union argue that the employee did not receive timely notice of deficiencies before performance had fallen to the Unacceptable level. This impediment to the timely and efficient separation of poor performers impedes TTB's ability to fulfill its national security mission.

- Article 7, Section 6 creates a procedural impediment to the efficient separation of poor performers beyond those procedures required by statute or regulation as implemented by the administration. Per 5 CFR 432.104, when an employee's performance is determined to be unacceptable in one or more critical elements, the employee must be notified of the deficiencies, the standards that must be attained to demonstrate acceptable performance and provided a reasonable opportunity to demonstrate acceptable performance. This reasonable opportunity must be provided before an employee may be separated pursuant to an unacceptable performance action. Under current administration policy, the president has determined that the duration of this reasonable opportunity or PIP should be limited to

-2-

A18

30 business days. Under the CBA, the minimum duration of a PIP is 60 days. This period of time required to separate a poor performer prevents TTB from effectively fulfilling its national security mission.

- Articles 33, Unacceptable Performance Actions, and 35, Arbitration, establish a process that prevents TTB from quickly removing employees for poor performance, which is detrimental to TTB's national security mission. Just as provisions in Article 7 of the CBA impose procedural requirements that impede management's ability to efficiently address poor performance, making removals or demotions based on unacceptable performance subject to arbitration compounds the harm by allowing poor performers to contest a removal action based solely on alleged contractual process violations. Fear of reversal by an arbitrator creates powerful incentives for supervisors to extend PIP periods far beyond the contractual minimum of 60 days, spend inordinate amounts of time counseling employees on PIPs, and "pass" such employees as Minimally Satisfactory at the end of an extended PIP if there are concerns that an arbitrator might find that some direction provided to an employee was vague in any way. As a result, TTB can be blocked from timely and effectively addressing poor performance, which adversely affects TTB's ability to perform its national security mission.

- Articles 34, Grievances, and 35, Arbitration, also have adverse effects on TTB's ability to fairly and accurately rate employee performance, which is vital to the effective execution of TTB's national security mission.  As noted above, Article 7, Section 5 imposes significant administrative burdens on supervisors in providing notice of declining performance to employees (even when such declines should be self-evident to a reasonable and conscientious employee).  Articles 34 and 35 give employees the tools and incentive to contest performance ratings simply on the allegation that the employee was not given sufficient notice of declining performance, without necessarily contesting the accuracy of a rating in any critical element. In addition, because annual performance awards are based on an employee's overall rating on the employee's annual performance appraisal, there can be Back Pay Act implications if an arbitrator determines that an employee's performance appraisal is an unjustified or unwarranted personnel action due to a supervisor's failure to provide sufficient notice of declining performance.

- Articles 4, Union Rights and Responsibilities, 6, Union Stewards, and 14, Facilities, require TTB to use limited financial resources to provide paid, nonduty time to union representatives that would otherwise be devoted to the national security mission of the agency.  In FY 24, TTB incurred $56,332 for taxpayer-funded union time (TFUT), $65,113 paid for management salaries responding to CBA issues, and provided $1,331 worth of office space to NTEU.   For a small bureau such as TTB, this diversion of resources away from core mission programs impacts the bureau's capacity to carry out its

-3-

national security mission.

- Article 39, Mid-Term Bargaining, delays TTB's ability to quickly adapt and respond to exigencies of its national security mission as they arise by requiring it to bargain over changes to conditions of employment for bargaining unit employees. The default notice period is twenty-one (21) calendar days, during which time the union may make substantive proposals in the case of subjects of permissive bargaining and proposals over the implementation of changes within the sphere of exclusive management rights. These bargaining requirements create unacceptable delays when the bargaining process works normally and litigation risks if exigent circumstances require the agency to implement changes before bargaining is concluded. These processes also divert management's focus from effective implementation and can water-down changes necessary to support TTB's national security mission.

- Article 22, Hours of Work, Section 3 generally provides that "All employees are eligible to work a flexible or compressed schedule . . .." and Section 4(G) provides for the use of "a flip of a coin" to resolve scheduling conflicts between employees of equal tenure. Section 7(E) requires bargaining as a condition precedent to terminate flexible and compressed work schedules, even if such work schedules are having an adverse impact on TTB's ability to provide service to the public and compromise TTB's national security mission.

TTB considered the interests of its bargaining unit employees and NTEU in continuing to adhere to the CBA. TTB understands that bargaining unit employees and the NTEU structured certain expectations surrounding the existence of the CBA, including work schedules, leave procedures, performance management, and other conditions of employment. In evaluating the effect of terminating the CBA, the agency reviewed whether current law, rules, regulations, and agency policies provide meaningful safeguards and procedures.

Following termination of the CBA, bargaining unit employees will remain fully covered by, among other authorities, applicable provisions of title 5, United States Code, and regulations issued by the U.S. Office of Personnel Management; merit system principles and prohibited personnel practice protections; equal employment opportunity and anti-discrimination laws; workplace safety requirements; and TTB's internal policies and directives (other than those required by or found in the CBA). Where there are any gaps in policies, the agency will take steps to address these, as appropriate, consistent with its mission. These authorities provide fair and enforceable standards governing pay, leave, hours of work, performance management, discipline, adverse actions, workplace safety, and employee protections that (unlike CBA requirements) may be applied consistently with national security considerations.

After considering these provisions, TTB has determined that continued adherence to the

Doreen P. Greenwald, NTEU National President
Notice Of Termination of Collective Bargaining Agreement

CBA is detrimental to the agency's national security mission and can no longer be followed in a manner consistent with the President's determination under E.O. 14251. Continuing to adhere to these provisions will place the agency's ability to prevent or respond to national security threats in an untenable position. TTB also determined that existing legal and policy frameworks provide a sufficient backstop to ensure continuity of employee protections, mitigate potential disruption, and support effective and lawful personnel management.

### III. Agency Termination Notice

Effective as of the date of this Memorandum, the CBA, including all agreements negotiated pursuant to Article 39 of the CBA and/or any similar provisions of the CBA or any previous collective bargaining agreements between the parties, is terminated and no longer in effect.

For further information concerning this termination notice, please contact Geoffrey Trivers, TTB Human Resources Officer at geoffrey.trivers@ttb.gov.

Attachment: 2022 TTB Agreement

A21



## OFFICE OF FINANCE AND ADMINISTRATION
### WASHINGTON, D.C. 20460

March 10, 2026

Doreen P. Greenwald
National President
National Treasury Employees Union
800 K Street NW, Suite 1000
Washington, DC 20001

Dear Ms. Greenwald:

This letter provides official notice to the National Treasury Employees Union (NTEU), the certified exclusive representative, that the U.S. Environmental Protection Agency (EPA) terminates the December 26, 2024 Collective Bargaining Agreement between the parties consistent with the President's national security determinations in Executive Orders 14251 and 14343, and the impact of the Collective Bargaining Agreement on EPA's national security requirements, effective the date of this notice.

## I. Background

EPA has a primary mission involving national security to prevent, limit, mitigate, or contain chemical, oil, radiological, biological and/or natural or man-made disasters and provide environmental monitoring, assessment, and reporting in support of overall domestic incident management under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* and the Clean Water Act, 33 U.S.C. § 1321. EPA functions as the Sector Risk Management Agency for the U.S. water and wastewater critical infrastructure sector and serves a primary national security function through its role in energy policy. The EPA also conducts investigative work, namely criminal and civil investigations into environmental violations, which directly impact the economy, society, and military of the United States (18 U.S.C. § 1956(e)).

On March 27, 2025, the President issued Executive Order 14251, "Exclusions From Labor-Management Relations Programs." On August 28, 2025, the President issued Executive Order 14343, "Further Exclusions from the Federal Labor-Management Relations Program."

These Executive Orders amended Executive Order 12171 and determined, pursuant to 5 U.S.C. 7103(b)(1), that certain agencies and subdivisions have a primary function of intelligence, counterintelligence, investigative, or national security work and that the provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) cannot be applied to those agencies and

A22

subdivisions in a manner consistent with national security requirements and considerations. The Federal Labor Relations Authority previously certified NTEU as the exclusive representative of certain bargaining unit employees at the U.S. Environmental Protection Agency (EPA). Because EPA employees and components identified in Executive Order 14251 fall within the scope of the President's determination under 5 U.S.C. 7103(b)(1), the provisions of the FSLMRS no longer apply to those employees.

## II. Agency Determination to Terminate the Collective Bargaining Agreement

After issuance of Executive Orders 14251 and 14343, EPA conducted a comprehensive review of the December 26, 2024, Collective Bargaining Agreement between EPA and NTEU to determine whether continued adherence to its provisions is consistent with the President's national security determination. EPA's review identified numerous provisions that materially impede both the Agency's ability to fulfill national security and internal security responsibilities and the efficiency of the service by materially restricting the power of EPA to govern and set policies for its own workforce.

A. Performance Management and Removal Procedures

Article 9 (Performance Appraisal and Recognition System), Article 10 (Actions Based on Unacceptable Performance), Article 47 (Adverse Actions), and Article 48 (Disciplinary Actions) impose procedural requirements beyond those mandated by statute and regulation.

These provisions include:

- Mandatory minimum performance periods before action
- Structured progress review requirements
- Restrictions on initiation of performance improvement periods
- Expanded documentation and narrative justification requirements
- Additional response and review layers

While such provisions were collectively bargained, their cumulative effect creates procedural barriers to timely removal or discipline of employees whose performance or conduct may adversely affect mission-critical or security-sensitive operations. EPA has determined that continued adherence to these procedural layers impedes the Agency's ability to act swiftly where necessary to protect national security requirements and the efficiency of the service by instituting barriers to holding employees accountable and removing poor performers.

B. Grievance and Arbitration Structure

Article 34 (Negotiated Grievance Procedure) and Article 35 (Arbitration) establish a multi-step grievance process culminating in binding arbitration.
This structure:

- Extends resolution timelines
- Permits third-party review of management determinations

2

A23

- May result in reinstatement or mitigation of disciplinary actions

While consistent with the FSLMRS framework, EPA has determined that maintaining mandatory grievance-arbitration review of personnel decisions involving security-sensitive employees is inconsistent with the President's determination that application of the FSLMRS cannot be reconciled with national security requirements and the efficiency of the service. These extended timelines and third-party reviews interfere with EPA's ability to execute and implement the President's initiatives by delaying workforce management decisions.


C. Official Time and Resource Allocation

Article 6 (Union Representation and Official Time) requires EPA to provide substantial taxpayer-funded official time for representational activities, including:

- Multiple full-time union officials
- Partial-time Chapter Presidents
- 200-hour annual training banks per Chapter
- Official time for arbitration preparation
- Official time for third-party proceedings
- Official time for congressional contact


Article 7 (Use of Official Facilities) requires EPA to provide:

- Dedicated office space
- Government-furnished equipment
- Information technology resources
- Mail distribution access
- Bulletin boards and intranet support


EPA determined that the continued diversion of personnel time, funds, facilities, and IT resources to representational activities limits the Agency's operational flexibility and resource allocation in fulfilling national security-related requirements and the efficiency of the service.


D. Mid-Term Bargaining Requirements

Article 33 (Mid-Term Negotiations) and Article 28 (Labor Management Relations) require EPA to bargain over changes to personnel policies, practices, and working conditions. EPA determined that such bargaining obligations delay the Agency's ability to implement internal security measures, organizational realignments, and mission-driven operational adjustments necessary to fulfill the Agency's national security requirements.


E. Reduction in Force Requirements

Article 29 (Reduction in Force) imposes advance notice and briefing requirements beyond regulatory

3

A24

minimums. While transparency is important, EPA determined that continued adherence to collectively bargained RIF notice structures could constrain timely workforce restructuring necessary to address emergent national security considerations. Development of EPA's regulations and policies as well as enforcement operations require maximum flexibility in shaping the structure and workforce of the Agency.

### III. Employee Protections Following Termination

EPA carefully considered the impact of terminating the CBA on bargaining unit employees and NTEU.

Following termination of the CBA, employees will remain fully protected by:

- Title 5, United States Code
- Merit System Principles
- Prohibited Personnel Practice protections
- 5 CFR Parts 430, 432, 752, and 771
- Equal Employment Opportunity statutes
- Whistleblower protection laws
- Workplace safety requirements
- Applicable EPA internal policies

These statutory and regulatory safeguards provide enforceable standards governing performance management, discipline, adverse actions, leave, pay, and employee protections. EPA has determined that these authorities provide sufficient protections while enabling the Agency to operate consistent with national security requirements.

### IV. Termination Notice

Effective the date of this notice, the December 26, 2024, Collective Bargaining Agreement between EPA and NTEU is terminated and no longer in effect for employees covered by Executive Orders 14251 and 14343.

For further information regarding this notice, please contact: Phil Brown, Senior Labor and Employee Relations Specialist, (202) 564-2607, Brown.Phil@epa.gov

Sincerely,

*Kathryn Smith*

Katryn Smith
Director, Workforce Integrity Division
U.S. Environmental Protection Agency

4

A25



# United States Department of the Interior

## OFFICE OF THE SECRETARY
Washington, DC  20240

April 6, 2026

Memorandum

To:         Alexis Thomas, Assistant Counsel
            Panchita Paulete, President
            Zoe Davidson, Vice-President
            National Treasury Employees Union, Chapter 341

From:       Rachel M. Borra     *Rachel M. Borra*
            Deputy Assistant Secretary for Human Capital, Learning and Safety
            Chief Human Capital Officer

Subject:    Notice of Termination of Memorandum of Understanding

This memorandum provides official notice to the National Treasury Employees Union (NTEU), Chapter 341 that the U.S. Department of the Interior (DOI), Bureau of Land Management (BLM) terminates the Memorandums of Understanding (MOU) dated April 17, 2023 (Ground Rules), and September 28, 2023 (Remote Work), between the two parties for those employees impacted by Executive Order (EO) 14251 effective the date of this memorandum.

## I. Background

On March 27, 2025, President Trump signed EO 14251, "Exclusions From Labor-Management Relations Programs." On August 28, 2025, the President signed EO 14343, "Further Exclusions from the Federal Labor-Management Relations Program." Both EO 14251 and 14343 amended Executive Order 12171, "Exclusions from the Federal Labor-Management Relations Program," November 19, 1979, which set forth those agencies and subdivisions thereof excluded from collective bargaining under the Federal Service Labor-Management Relations Statute (FSLMRS). With one exception, every President has exercised authority to exclude agencies or subdivisions from coverage under the FSLMRS.

In issuing EO 14251, President Trump determined under 5 U.S.C. 7103(b)(1) that (1) the U.S. Department of the Interior (DOI), Bureau of Land Management (BLM) has a primary function of intelligence, counterintelligence, investigative, or national security work; and (2) the provisions of the FSLMRS cannot be applied to the U.S. Department of the Interior (DOI), Bureau of Land Management (BLM) in a manner consistent with national security requirements and considerations.

On June 3, 2022, the Federal Labor Relations Authority issued a Certification of Representative in case number DE-RP-22-0014, certifying the National Treasury Employees Union, Chapter 341 as the exclusive representative for all professional and nonprofessional employees assigned to the

A26

U.S. Department of the Interior (DOI), Bureau of Land Management (BLM) Headquarters, regardless of location. Because the National Treasury Employees Union, Chapter 341 represents employees of the U.S. Department of the Interior (DOI), Bureau of Land Management (BLM) identified in EO 14251, the provisions of the FSLMRS no longer apply to these employees.

## II. Agency Termination Notice

Effective the date of this Memorandum, the parties' April 17 and September 28, 2023 MOUs are terminated and no longer in effect due to EO 14251. To officially document this action, the Agency will be filing a petition with the FLRA.

Following this notice, former bargaining unit employees will remain fully covered by, among other authorities, applicable provisions of title 5, United States Code, and regulations issued by the U.S. Office of Personnel Management; merit system principles and prohibited personnel practice protections; equal employment opportunity and anti-discrimination laws; workplace safety requirements; and the U.S. Department of the Interior's internal policies and directives. Where there are any gaps in policies, the agency will take steps to address these, as appropriate, consistent with its mission. These authorities provide fair and enforceable standards governing pay, leave, hours of work, performance management, discipline, adverse actions, workplace safety, and employee protections that (unlike collective bargaining agreement requirements) may be applied consistent with national security considerations.

For further information concerning this termination notice, please contact Laura McNeer (Lead Human Resources Specialist, Labor/Employee Relations) at laura_mcneer@ios.doi.gov or (385) 315-6498.

2

A27



**From:** Labor Relations Operations Division <LROD@hq.doe.gov>

**Sent:** Friday, March 6, 2026 3:45 PM

**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Subject:** Notice of Termination of Collective Bargaining Agreement (DOE HQ and NTEU Chapters 213 and 228)

Good afternoon,

This is official notice to National Treasury Employees Union (NTEU), Chapters 213 and 228 that the U.S. Department of Energy (DOE or the Department) terminates the DOE Headquarters (DOE HQ) and NTEU Chapters 213 and 228, Collective Bargaining Agreement (CBA), dated January 12, 2022, Clarification of Unit Case No. WA-RP-24-0003, dated September 3, 2024, for all bargaining unit employees, effective the date of this message. DOE HQ will no longer recognize NTEU Chapters 213 and 228 as the exclusive representative for bargaining unit employees within this component.

On March 27, 2025, President Trump signed Executive Order (E.O.) 14251, *Exclusions From Labor-Management Relations Programs*. This E.O. amended E.O. 12171, *Exclusions from the Federal Labor-Management Relations Program*, dated November 19, 1979, which set forth those agencies and subdivisions excluded from collective bargaining under the Federal Service Labor-Management Relations Statute (FSLMRS).

In issuing E.O. 14251, President Trump determined under 5 U.S.C. 7103(b)(1) that (1) DOE has a primary function of intelligence, counterintelligence, investigative, or national security work; and (2) the provisions of the FSLMRS cannot be applied to DOE in a manner consistent with national security requirements and considerations. As a direct consequence of this exclusion from the provisions of 5 U.S.C. Chapter 71, the Agency is unable to recognize the union as the exclusive representative of employees within this component for collective bargaining purposes.

Former bargaining unit employees will remain fully covered by, among other authorities, applicable provisions of Title 5, United States Code, and regulations issued by the U.S.

Office of Personnel Management; merit system principles and prohibited personnel practice protections; equal employment opportunity and anti-discrimination laws; workplace safety requirements; and DOE's internal policies and directives (other than those required by or found in its CBA).

In accordance with this decision, the Department will terminate automatic dues deduction within the next two pay periods and additional necessary actions will be implemented.



**From:** *IRS Human Capital Officer <irs.human.capital.officer@irs.gov>
**Sent:** Friday, February 27, 2026 2:37 PM
**To:** &&Employees All <employees.all@irs.gov>
**Subject:** Moving forward together

<span style="color:red">**Caution:** This message originated from outside of the organization. Do Not Click links or Open attachments unless you recognize the sender and know the content is safe.</span>

On March 27, 2025, President Trump signed Executive Order 14251, Exclusions from Federal Labor-Management Relations Programs directing that the Federal Service Labor-Management Relations Statute will no longer apply to several federal government agencies and their subdivisions, including the Department of the Treasury. The IRS was one of the impacted subdivisions of the Department of the Treasury. As a result, we have notified the National Treasury Employees Union (NTEU) that we have terminated the 2022 National Agreement and the 2025 Addendum.

This change deepens our commitment of operating as One IRS, a collaborative team focused on serving American taxpayers.

Our employees are the strength of our agency, and we will continue to treat everyone with dignity and respect, in alignment with civil service laws and regulations, merit system principles and equal employment opportunity protections. We will continue to foster a workplace grounded in respect, professionalism and service for America.

Thank you for your dedication and commitment to the IRS and for your service to America.

For more information, please review the FAQS below, which will also be available on the Federal Labor Management Relations IRS Source page.

Thank you,

Alex Kweskin
Chief Human Capital Officer

---

**Questions & Answers**

1. **Is the IRS terminating the 2022 National Agreement/2025 Addendum (NA)?**

   Yes.  The IRS terminated the 2022 National Agreement/2025 Addendum effective February 27, 2026.

2. **Is the IRS changing the bargaining unit status codes on employees' SF 50s?**

   Yes. HCO will work with Treasury to update the bargaining unit status codes in a systemic update. No actions by employees or managers are necessary. We will also be updating position descriptions and related documents.

3. **What should managers do if they receive a negotiated grievance from the Union for an individual or the Union?**

   If you receive a negotiated grievance from an employee or Union representative, send it immediately to Labor Employee Relations and Negotiations (LERN) through IRS Service Central.

   Follow these simple steps:

   1. Log in to IRS Service Central (IRWorks)
   2. Search for **Grievance**
   3. Select Negotiated Grievance
   4. Enter the name of the Grievant
   5. Enter the date the grievance was filed.
   6. Upload a copy of the grievance, click submit

A31

Once submitted, the grievance will be assigned to a Labor Relations Specialist (LRS) who will assist with processing the grievance. In consultation with the LRS, the manager should acknowledge receipt, inform the affected employee that the negotiated grievance is being closed due to *Exclusions*, and provide other avenues for the employee to seek relief. (See question 4.)

4. **Can grievances initially filed under the negotiated grievance process be transitioned to the Agency Grievance System (AGS)?**

Yes. Employees may request to transfer a grievance initially filed under a negotiated grievance procedure to the AGS, IRM 6.771.1 provided the matter is not excluded by the AGS and the grievant timely requests to transition to the AGS.

5. **Can an employee still have a representative?**

Yes. Because the CBA is terminated, employees no longer have Union representatives for those purposes. However, there are other forums in which employees can designate a representative, such as EEO cases, employee discipline, and the like. See some references below.

See:
- IRM 6.752.1, Addressing Employee Misconduct - Non-disciplinary, Disciplinary, and Adverse Actions
- IRM 6.752.2, Disciplinary Suspensions and Adverse Actions - Adverse Actions
- IRM 6.771.1, Agency Grievance System - Agency Grievance System (AGS)

6. **Should managers continue to allow Union representation in Weingarten meetings and formal discussions with employees excluded under *Exclusions*?**

No. Managers should not invite Union representatives to formal discussions or honor requests for Weingarten meeting (investigative interviews) representation.

NOTE: Investigative interviews concerning potential misconduct no longer require management to furnish Form 8111 or allow Union representation. As a reminder, if the interview concerns a potential crime, only TIGTA should perform interviews. If an employee invokes the Fifth Amendment (or "pleads the Fifth"), cease the interview immediately and contact the LERN Support Gate to speak to an HR

Specialist: 1-866-743-5748, Option 1, and Option 6.

7.  **If an employee is no longer permitted to join or form a labor organization under the FSLMRS, may he or she strike against the Government while serving as a federal employee?**

No. Under 5 U.S.C. § 7311, employee strikes against the government of the United States are prohibited for all federal employees, whether or not they are in a bargaining unit.

8.  **What should I do if contacted by the media?**

The Media Relations office is the sole point of contact for the IRS with the news media. Employees who are contacted by reporters or producers should remember that they're not permitted to speak to or communicate with members of the media on behalf of the IRS unless explicitly authorized to do so.

All media requests must be referred to the IRS Media Relations office by phone at 202-317-4000 or by email to *IRS Newsroom.

9.  **What if an arbitration is already scheduled pursuant to the terms of the National Agreement?**

IRS will cancel any arbitration hearings and pay arbitrators for work already performed. In accordance with *Exclusions*, the Union is no longer the exclusive representative and there is no jurisdiction before the arbitrator.

10. **What should business units do with matters currently in the negotiations process?**

The IRS has cancelled all negotiations and will implement any changes to conditions of employment without bargaining.  See Question 11 below.

A33

**11. How should managers handle an impending change in conditions of employment for employees?**

Managers should continue to consult with their Business Based Embedded Human Resource Liaisons (BBHRs) and LERN on all proposed changes to policies, processes, and procedures impacting employees. With BOD executive approval, managers can implement the change without negotiation If managers receive a demand to bargain by the union, they should forward it immediately to LERN.

**12. Should managers respond to Union requests for information under 5 U.S.C. 7114(b)(4)?**

No. Managers should notify LERN. Because IRS is excluded from the FSLMRS, the Union no longer has a right under Section 7114 to request information and all requests for information will be denied.

**13. What will happen with Union dues?**

To comply with *Exclusions*, Treasury and NFC do not facilitate the collection and payment of Union dues. Employees may contact the Union with any questions.

**14. How should managers handle union (official or bank) time provided to Union representatives?**

Employees who were previously authorized to use taxpayer-funded union time (official time) are no longer permitted use of such time and should only be conducting IRS-assigned work during their scheduled duty time. Supervisors should not approve any time and attendance records that include requests for, and use of, taxpayer-funded union time (official time).

**15. How will the IRS handle office space provided to Union representatives?**

FMSS and IT will develop plans to reclaim any space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by the Union for

A34

representational activities and repurpose those resources for IRS business only. The Union will generally be allowed 30 days to remove any items.

**16. Should the IRS participate in labor-management relations committees?**

No. On March 27, 2025, OPM issued guidance requiring agencies to abolish labor-management forums, committees, and councils at the agency-wide and organizational levels. Many of these forums were established under Executive Order 14119, which was rescinded by President Trump under Executive Order 14236 in March 2025.



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

HUMAN CAPITAL OFFICE

March 5, 2026

Control Number: HCO-06-0226-0003
Expiration Date: March 5, 2028
Affected IRM(s): See attached

MEMORANDUM FOR DISTRIBUTION

FROM:              Alex Kweskin  /s/ Alex Kweskin
                   Chief Human Capital Officer
                   Internal Revenue Service

SUBJECT:           Interim Guidance (IG) on IRM Language Related to Collective
                   Bargaining Agreements

This memorandum issues guidance on Internal Revenue Manuals (IRM) containing references to the former bargaining unit; collective bargaining agreements (CBA), such as the rescinded National Agreement; and the National Treasury Employees Union. Until the IRM chapters listed below are formally updated to eliminate such language, the IRM provisions will be understood to apply to all employees, and the IRM provisions will govern should they conflict with any provisions in a CBA. Please ensure this information is distributed to all affected employees within your organization.

**Purpose:** This memorandum implements Executive Order (EO) 14251, Exclusions from Federal Labor-Management Relations Program and EO 14343, Further Exclusions from the Federal Labor-Management Relations Program, in accordance with Office of Personnel Management (OPM) direction dated February 12, 2026. This guidance remains in effect until permanent revisions are incorporated into the affected IRMs.

**Sources of Authority:**

1. Executive Order 14251, Exclusions from Federal Labor-Management Relations Program

2. Executive Order 14343, Further Exclusions from the Federal Labor-Management Relations Program

3. OPM Memorandum, "Implementation of Executive Orders 14251 and 14343," dated February 12, 2026, revised February 17, 2026

**Effect on Other Documents:** This guidance will be incorporated into affected IRM chapters listed below not more than two years from the date of this memorandum.

2

**Effective Date:** This policy is effective immediately upon issuance.

**Contact:** Questions concerning IRM language related to CBAs should be directed to Luana Smith, Director, Policy Office, or LaTonya Malloy, acting Associate Director, Staffing and Compensation, Policy Office.

**Attachment:** Impacted IRMs

**Distribution:**
Commissioner of Internal Revenue
Chief Executive Officer of Internal Revenue
Chief of Staff
Chief Counsel
Chief, Independent Office of Appeals
National Taxpayer Advocate
Chief, Taxpayer Services
Taxpayer Experience Office
Chief, Communications and Liaison
Chief Tax Compliance Officer
Enterprise Case Management Office
Large Business and International
Office of Professional Responsibility
Return Preparer Office
Small Business/Self-Employed
Tax Exempt and Government Entities
Whistleblower Office
Chief, Criminal Investigation
Chief Financial Officer
Chief Facilities Management and Security Services
Chief Privacy Officer
Chief Procurement Officer
Chief, Data and Analytics
Chief Risk and Control Officer
Chief Information Officer
Chief of Internal Consulting

cc: IG Coordinator for Office of Servicewide Policy, Directives and Electronic Research

A37

Attachment

Interim Guidance: HCO-06-0226-0003

The following IRMs are affected by this IG.

| IMD Number | IMD Title |
|---|---|
| IRM 1.1.4 | Organizational Planning |
| IRM 1.4.1 | Managements Roles and Responsibilities |
| IRM 10.23.1 | National Security Positions and Access to Classified Information |
| IRM 10.23.2 | Contractor Investigations |
| IRM 10.23.3 | Personnel Security Operations |
| IRM 25.29.1 | Standard Tax Compliance Checks for Suitability and Monitoring |
| IRM 6.10.1 | IRS Personnel Staffing Accountability |
| IRM 6.213.1 | Employment in the Excepted Service |
| IRM 6.250.1 | Policies, Requirements, Responsibilities, and Strategies |
| IRM 6.250.2 | Internal Revenue Service Enterprise Workforce Planning |
| IRM 6.250.3 | Delegated Examining Authority |
| IRM 6.300.1 | Employment (General) |
| IRM 6.304.1 | Expert and Consultant Appointments |
| IRM 6.307.1 | Veteran Employment Program and Restoration to Duty |
| IRM 6.308.1 | Student Volunteer Service |
| IRM 6.315.1 | Career and Career-Conditional Employment. |
| IRM 6.315.2 | Probationary Period for Career and Career-Conditional Employment |
| IRM 6.316.1 | Temporary and Term Appointments |
| IRM 6.330.1 | Recruitment, Selection, and Placement |

| IRM 6.332.1 | Workforce Recruitment Strategies |
|---|---|
| IRM 6.332.2 | New Hire Eligibility and Pre-Employment Review |
| IRM 6.334.1 | Temporary Assignments under the Intergovernmental Personnel Act (IPA) |
| IRM 6.335.1 | IRS Merit Promotion Plan and Internal Placement |
| IRM 6.335.2 | Training and Development Programs under the Merit Promotion Plan |
| IRM 6.337.1 | Alternative Rating and Selection |
| IRM 6.338.1 | Qualification Requirements |
| IRM 6.339.1 | Medical Qualification Determination Requirements |
| IRM 6.340.1 | Other than Full-Time Career Employment (Part-time, Seasonal, and Intermittent) |
| IRM 6.350.1 | Use of Non-Reduction in Force (RIF) Job Abolishment Procedures |
| IRM 6.362.1 | External Pathways Program |
| IRM 6.410.1 | Learning and Education Policy |
| IRM 6.410.10 | Event Planning and Approval |
| IRM 6.410.8 | Learning Management System Standards |
| IRM 6.410.9 | Training Evaluation Policy |
| IRM 6.430.1 | Performance Management Requirements |
| IRM 6.430.2 | Performance Management Program for Evaluating Bargaining Unit and Non-Bargaining Unit Employees Assigned to Critical Job Elements (CJEs) |
| IRM 6.430.3 | Performance Management Program for Evaluating Managers, Management Officials, and Confidential Management and Program Analysts |
| IRM 6.430.4 | Performance and Reduction in Force |
| IRM 6.430.5 | Performance Appraisals for Temporary Assignments |
| IRM 6.432.1 | Addressing Poor Performance |

| IRM 6.451.1 | Awards |
|---|---|
| IRM 6.511.1 | Position Management and Classification Policy and Operational Guidance |
| IRM 6.530.1 | Aggregate Limitations on Pay and Special Rate Schedules |
| IRM 6.531.1 | Pay Under the General Schedule and IRS Payband System |
| IRM 6.536.1 | IRS Grade/Band and Pay Retention |
| IRM 6.537.1 | Student Loan Repayment Program (SLRP) |
| IRM 6.550.1 | Pay Administration – General |
| IRM 6.550.2 | Premium Pay Under Title 5 and the Fair Labor Standards Act (FLSA) and Compensatory Time Off for Travel |
| IRM 6.550.3 | Severance Pay |
| IRM 6.553.1 | Reemployed Annuitants (REA) with a Salary Offset Waiver |
| IRM 6.575.1 | IRS Recruitment, Relocation, Retention, and Extended Assignment Incentives |
| IRM 6.576.1 | Use of Direct Buyouts (VSIP) and Job Swaps |
| IRM 6.610.1 | IRS Hours of Duty |
| IRM 6.630.1 | IRS Absence and Leave |
| IRM 6.630.2 | Absence and Leave for Military-Related Reasons |
| IRM 6.630.4 | Administrative Leave and Weather and Safety Leave |
| IRM 6.630.5 | Leave and Flexibilities for Birth, Adoption, Foster Care, Child Bereavement and/or Additional Flexibilities |
| IRM 6.630.6 | Conduct-Related Leave |
| IRM 6.711.1 | Labor Relations Authorities |
| IRM 6.711.2 | Processing Information Requests |
| IRM 6.731.1 | Suitability Determinations for Employment |

4

Attachment

| IRM 6.735.1 | Ethics Program Requirements |
|---|---|
| IRM 6.735.2 | IRS Outside Employment |
| IRM 6.752.1 | Addressing Employee Misconduct, Non-disciplinary, Disciplinary, and Adverse Actions. |
| IRM 6.771.1 | Processing Agency Grievances |
| IRM 6.792.1 | Child Care Subsidy Program |
| IRM 6.800.1 | Workers' Compensation Program |
| IRM 6.800.2 | IRS Telework Program |
| IRM 6.800.3 | Employee Assistance Program and Work-Life Referral Services, Drug Free Workplace Program, and Domestic Violence |
| IRM 6.800.4 | Lactation Program |
| IRM 6.800.6 | Phased Retirement |
| IRM 6.959.1 | IRS Payband System |

**From:** Fugh, Justina <Fugh.Justina@epa.gov>
**Sent:** Wednesday, April 8, 2026 4:16 PM
**To:** ███████████████████████████████
**Cc:** █████████████████████████████████████
████████████████████████████████
**Subject:** I don't see why you need to seek approval for this (but I'll still give you advice!)

Hi,

I don't understand why you anticipate needing to seek prior approval for you to be a fact witness in your personal capacity.  You already note that you understand you will have to take annual leave to participate and to prepare in advance if necessary.  Nevertheless, I'll be happy to provide you with general ethics advice.

Even in your personal capacity, be careful about appearing to represent the union. As a federal employee, you remain bound by the representational conflict of interest statute, 18 U.S.C. § 205, that prevents you from serving as representative, agent, or attorney for anyone else back to a federal department, agency or court in connection with any matter in which the United States is a party or has a direct and substantial interest, even if that service is uncompensated.

Please note that the exception at 18 U.S.C. § 205(d)(1)(A) does not apply to all types of activity.  You are precluded from representing back to the United States with respect to:  (a) any claim against the federal government itself, (b) any judicial or administrative proceeding involving the union itself, or (c) any agreement or request for the disbursement of federal funds to the union.  *See* 18 U.S.C. § 205(d)(2).  In addition, EPA Ethics notes that Executive Order 14251 (03/27/2025) invoked Section 7103(b)(1) of the Federal Service Labor-Management Relations (FSLMR) statute, 5 U.S.C. Chapter 71, to exclude the EPA specifically from coverage.  Consequently, EPA Ethics simply cannot determine that the representational conflict of interest exemptions at 18 U.S.C. § 205(i)(1) (for the FSLMR) or 18 U.S.C. § 205(i)(5) (for labor-management relations between an agency and a labor organization) would still apply to all types of activity related to the former EPA unions that you may wish to pursue in outside activity.  EPA Ethics continues to advise caution on this point.

Remember too that you ought not use your EPA title, authority, or resources in furtherance of the outside activity.  If you mention your EPA position at all, then include at least two other significant biographical details about yourself besides your EPA affiliation and make clear that you are participating in your personal

A42

capacity.  Avoid divulging any information that EPA deems *non-public,* which means information that you gained by reason of your EPA employment and that you know or reasonably should know has not been made available to the general public. It includes information that you know or reasonably should know: (1) is routinely exempt from disclosure under 5 U.S.C. § 552 or otherwise protected from disclosure by statute, Executive order, or regulation; (2) is designated as confidential by an agency; or (3) has not actually been disseminated to the general public and is not authorized to be made available to the public on request.

With kind regards,
Justina

Justina Fugh / Director, Ethics Office / U.S. Environmental Protection Agency / Mail Code 2311A / 1200 Pennsylvania Avenue, NW / Washington, DC  20460 / (202) 564-1786

**From:** ███████████████████████
**Sent:** Wednesday, April 8, 2026 3:08 PM
**To:** Fugh, Justina <Fugh.Justina@epa.gov>
**Cc:** ███████████████████████
███████████████

**Subject:** Ethics form for Union-related outside activities

Hi Justina:

Attached is my ethics form for consideration of a union-related outside activity on 4/23. Please let me now the status once reviewed and thank you!

